```
                                    Volume 3

                                Pages 398 - 582

                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

CONTOUR IP HOLDING, LLC,        )
                                )
            Plaintiff,          )    CONSOLIDATED CASES
                                )    NO. 3:17-CV-04738 WHO
   VS.                          )    NO. 3:21-CV-02143 WHO
                                )
GOPRO, INC.,                    )
                                )
            Defendant.          )
_____ )


                            San Francisco, California
                            Wednesday, October 1, 2025

                TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiff:
                        SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
                        845 Texas Avenue, 25th Floor
                        Houston, Texas 77002
                BY:     JOHN R. KEVILLE, ATTORNEY AT LAW
                        MICHELLE C. REPLOGLE, ATTORNEY AT LAW
                        SUNNY AKARAPU, ATTORNEY AT LAW
                        MICHAEL C. KRILL, ATTORNEY AT LAW

For Defendant:
                        ALSTON & BIRD LLP
                        One Atlantic Center
                        1201 West Peachtree Street
                        Atlanta, Georgia  30309
                BY:     JOHN D. HAYNES, ATTORNEY AT LAW
                        SLOANE S. KYRAZIS, ATTORNEY AT LAW

            (APPEARANCES CONTINUED ON FOLLOWING PAGE)

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter
```

1    **APPEARANCES**:   (CONTINUED)

2    For Defendant:

3                                   ALSTON & BIRD LLP
                                    55 Second Street, Suite 2100
                                    San Francisco, California 94105
4                        BY:   **MICHELLE A. CLARK, ATTORNEY AT LAW**
                                    **PHILIP C. DUCKER, ATTORNEY AT LAW**
5

6                                   ALSTON & BIRD LLP
                                    2828 North Harwood Street, Suite 1800
7                                   Dallas, Texas  75201
                         BY:   **ELLIOTT C. RICHES, ATTORNEY AT LAW**
8
                                    ALSTON & BIRD LLP
9                                   Vantage South End
                                    1120 South Tryon Street, Suite 300
10                                  Charlotte, North Carolina 28203
                         BY:   **KARLEE N. WROBLEWSKI, ATTORNEY AT LAW**
11

12   **Also Present:**

13                                  Robert Mooney, Contour Corporate Rep
                                    Pablo Lema, GoPro Corporate Rep
                                    Tyler Gee, Deputy General Counsel, GoPro
14                                  Jesse Taylor, Trial Technician
                                    Allen Eaton, Trial Technician
15                                  Luke Arndt, Trial Technician
                                    Sarah Moyer, Trial Technician
16

17

18

19

20

21

22

23

24

25

```
1                              I N D E X

2

3    Wednesday, October 1, 2025 - Volume 3

4
```

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **MANDER, RICHARD IAN (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 417 | 3 |
| Cross-Examination resumed by Mr. Haynes | 417 | 3 |
| Redirect Examination by Ms. Replogle | 437 | 3 |
| | | |
| **HU, PH.D., JING** | | |
| (SWORN) | 439 | 3 |
| Direct Examination by Mr. Krill | 440 | 3 |
| Cross-Examination by Mr. Haynes | 513 | 3 |
| Redirect Examination by Mr. Krill | 544 | 3 |
| | | |
| **WOODMAN, NICHOLAS D.** | | |
| (SWORN) | 549 | 3 |
| Direct Examination by Mr. Keville | 550 | 3 |

```
15
16                          E X H I B I T S
```

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| PDX-2 | | 404 | 3 |
| PDX-3 | | 404 | 3 |
| 55 | | 459 | 3 |
| 56 | | 459 | 3 |
| 57 | | 459 | 3 |
| 69 | | 459 | 3 |
| 71 | | 459 | 3 |
| 74 | | 459 | 3 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 87 | | 459 | 3 |
| 100 | | 504 | 3 |
| 120 | | 459 | 3 |
| 148 | | 459 | 3 |
| 149 | | 459 | 3 |
| 152 | | 459 | 3 |
| 155 | | 451 | 3 |
| 156 | | 459 | 3 |
| 158 | | 459 | 3 |
| 159 | | 459 | 3 |
| 160 | | 459 | 3 |
| 259 | | 558 | 3 |
| 263 | | 560 | 3 |
| 702 | | 512 | 3 |
| 813 | | 459 | 3 |
| 814 | | 464 | 3 |
| 815 | | 459 | 3 |
| 816 | | 459 | 3 |
| 817 | | 459 | 3 |
| 818 | | 459 | 3 |
| 1210 | | 464 | 3 |
| 1211 | | 464 | 3 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1212 | | 464 | 3 |
| 1213 | | 464 | 3 |
| 1214 | | 464 | 3 |
| 1215 | | 464 | 3 |
| 1229 | | 468 | 3 |
| 1231 | | 493 | 3 |
| 1259 | | 483 | 3 |
| 1291 | | 466 | 3 |
| 1292 | 403 | | 3 |
| 1293 | | 498 | 3 |
| 2351 | | 567 | 3 |
| 2833 | | 555 | 3 |
| 3431 | | 572 | 3 |
| 4481 | | 475 | 3 |

| | |
|---|---|
| 1 | <u>**Wednesday - October 1, 2025**</u>                                    <u>**7:59 a.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | **---o0o---** |
| 4 | (Proceedings were heard out of the presence of the jury.) |
| 5 | **THE COURT:**  So do you have -- I have a couple of |
| 6 | issues for you, but do you have any issues for me? |
| 7 | **MS. REPLOGLE:**  Yes, Your Honor, just a few. |
| 8 | **THE COURT:**  Please come to the mic. |
| 9 | **MS. REPLOGLE:**  First of all, just some housekeeping |
| 10 | items. |
| 11 | Your Honor, yesterday during the examination of |
| 12 | Mr. Mander, wanted this -- I proposed a demonstrative, and you |
| 13 | wanted to mark it as a trial exhibit.  So we were going to do |
| 14 | that on the record.  We can do it now or later.  But Trial |
| 15 | Exhibit 1292 for the ContourGPS. |
| 16 | **THE COURT:**  Okay.  Good.  That's marked. |
| 17 | (Trial Exhibit 1292 marked for identification.) |
| 18 | **THE COURT:**  And so my idea -- this is one of the |
| 19 | things I wanted to talk about as well. |
| 20 | **MS. REPLOGLE:**  Yes. |
| 21 | **THE COURT:**  So my thought was that because they have |
| 22 | looked at it and it's been used, that they might as well have |
| 23 | it, and we ought to have it as part of the record.  But I did |
| 24 | not give GoPro much opportunity to object or anything else. |
| 25 | So I'm curious as to whether you had any thoughts one way |

1    or another, Mr. Haynes.

2         **MR. HAYNES:**  Your Honor, we have no objection to that.

3    We will introduce a GoPro camera as well, and we would just ask

4    that it be treated the same.

5         **THE COURT:**  Fabulous.  Okay.

6         **MS. REPLOGLE:**  Okay.  And then as well, we had a

7    couple of demonstratives that have been presented so far.  The

8    first one was the Contour 4K camera that James Harrison had up

9    on the stand, if you recall.

10        So we have, you know, some labels that we were just going

11   to go ahead and label that particular demonstrative exhibit on

12   the table, as well as the two drawings from Mr. Mander, to

13   label it -- we have it as PDX-2 and -3 for both pages as record

14   identifiers.  It's not going to go back.  It's not an exhibit.

15        **THE COURT:**  Mr. Haynes, what's your perspective?

16        **MR. HAYNES:**  No objection to labeling, Your Honor.  My

17   suggestion would be that we take a picture that both sides

18   agree with the label on it so that we don't have to travel a

19   bunch of paper along with the record.

20        **THE COURT:**  That's fine.  So, and without objection,

21   I'll admit those.

22        (Trial Exhibits PDX-2 and PDX-3 received in evidence.)

23        **MS. REPLOGLE:**  Okay.  And then the second issue we

24   have is, we will be playing the deposition testimony of the

25   other co-founder Jason Green, and there are just a couple of

1  issues that we wanted to bring up to the Judge today.  I have

2  copies of the designations if you'd like to see them.

3            **THE COURT:**  Okay.

4                 (Document handed up to the Court.)

5            **MS. REPLOGLE:**  All right.  And so just for some

6  context here, the one in particular that we're going to be

7  arguing about is at page 20, line 11.  It was on the second --

8  if you flip the page.

9            **THE COURT:**  So is it in the smaller group or the

10  larger group?  Okay.  I've got it.  20:11.

11            **MS. REPLOGLE:**  That's correct.

12            **THE COURT:**  Do you remember when Contour shut down?

13            **MS. REPLOGLE:**  Yes, that's correct.

14     So page 20, lines 11 and 12, and then it jumps to --

15  because it's the same issue.  So if we could just -- I think

16  it'd be more efficient to talk about it together.  It picks

17  back up at page 23, line 15.

18            **THE COURT:**  Okay.

19            **MS. REPLOGLE:**  And then goes to the following page at

20  31, line 24.

21     So all of that in orange is GoPro's counter-designations.

22  You know, in accordance with the Court's preference to have a

23  witness only be prepared -- only be presented once --

24            **THE COURT:**  Yeah.

25            **MS. REPLOGLE:**  -- this is from their affirmatives, and

1    it's not a proper counter, but it is from their affirmatives,

2    so we don't have an issue with that.

3        But what is being designated here is the issue that

4    Contour went into receivership in 2013.  At this point, the

5    jury has heard that fact more than once, and so it's cumulative

6    at this point.  It also doesn't go to a core issue in this

7    case.  It's not related to infringement or validity.  And at

8    this point, when it's cumulative, it's just not an efficient

9    use of the time.

10        But more pressing and more concerning is his lack of

11    personal knowledge.  So especially, if you look at page 23,

12    lines 19 in his answer, when he's answering a question of

13    GoPro's attorney, he says [as read]:

14            "My only caveat was that I wasn't on the board."

15        He continues and he says [as read]:

16            "I wasn't in the room."

17        And he continues and says [as read]:

18            "So my -- I would say my understanding is a bit

19            secondhand.  I learned some things after the fact.

20            But I want to clarify that I'm by -- I have by no

21            means perfect understanding of the process."

22        And then he continues to repeat what he had heard from

23    someone else as to, you know, what had happened with respect to

24    the reasons that they went into receivership.

25        So at this point, you have the facts that they're trying

1    to bring on in is something that has already been heard by the

2    jury.

3              THE COURT:  Okay.  So you don't have to re-summarize.

4         So are you objecting to 23:19 through 24:10?

5              MS. REPLOGLE:  23:19...

6         Yes.  Our objection is for the entirety of 20:11 -- this

7    issue.  20:11, it goes to 20:12, and then it jumps to 23 --

8              THE COURT:  Yeah, okay.

9              MS. REPLOGLE:  It's all the same issue.

10             THE COURT:  Let me hear from GoPro.

11             MR. RICHES:  Good morning, Your Honor.  Elliott Riches

12   on behalf of GoPro.

13        Your Honor, I'll address first the issue Ms. Replogle

14   raised at the end regarding personal knowledge.

15        Your Honor, it's actually in the question itself.

16   Mr. Green was a corporate designee, a 30(b)(6) witness on

17   behalf of Contour.  The question was asked on behalf of Contour

18   what was his understanding.  A 30(b)(6) witness, as Your Honor

19   well knows, is allowed to testify to information he gained from

20   others, and that's corporate testimony.

21        As to the issue of relevance and cumulativeness, it's

22   relevant for multiple issues, the first of which --

23             THE COURT:  You don't need to tell me about that.

24             MS. REPLOGLE:  On the corporate testimony point, I

25   would just request that you point to which topic that that was

1   responsive to for this particular issue on the receivership

2   point.

3          THE COURT:  You know, I think if you can't be specific

4   about that, I'm going to allow this testimony.  In addition to

5   being a 30(b)(6) witness, he's a co-founder.  He's going to

6   have information.  I think -- and to the extent that this is

7   repetitive, it's their time.  So I'm not worried about that.

8          MS. REPLOGLE:  Okay.  Okay.

9      And just one last issue I have.  Sorry.

10     All right.  So in the -- oh, excuse me.

11     I'm sorry, Elliott.  I think you had a couple of issues.

12  Apologize.

13         MR. RICHES:  Your Honor, we do have one with this.

14  This is one of Contour's counter-counter-designations, at

15  page 31, line 25, through page 32, line 13.

16         THE COURT:  Okay.

17         MR. RICHES:  So, Your Honor, our objection to this

18  testimony is a couple issues.

19     The first is that Mr. Green here is providing legal

20  testimony as to whether a patent can be infringed prior to its

21  issuance.  As a matter of law, the answer to that question is

22  no, a patent cannot be infringed prior to issuance.  There's

23  Supreme Court case law back to 1850 and earlier that a patent

24  only provides protection to an inventor once it's issued.

25         And as Your Honor well knows, no fact witness should be

1    instructing the jury on the law.  I think playing this portion

2    would confuse the jury as to an issue that's really not even in

3    dispute in this case, whether there's no claim to pre-issuance

4    damages under any basis.  So I think this is confusing.  It's

5    improper opinion on what the law is.  And Mr. Green clearly has

6    no legal knowledge that he can provide to the jury.

7            THE COURT:  Was it Mr. Pak who asked this question?

8        Yes.

9            MR. RICHES:  I believe so, Your Honor.

10           THE COURT:  I'm overruling that objection.

11           MS. REPLOGLE:  Then, Elliott, for the next counter,

12   we're going to withdraw that particular counter-counter.  We're

13   just going to take it out.

14           MR. RICHES:  Which one is that?

15           MS. REPLOGLE:  34.  So 34:1 --

16           MR. RICHES:  Through 15?

17           MS. REPLOGLE:  -- all the way to --

18                   (Simultaneous cross-talk.)

19     (Official reporter requests clarification for the record.)

20           MS. REPLOGLE:  34:1 to 34:15, we're going to cut that

21   out for our counter-counter.

22           MR. RICHES:  Then, obviously, we'll withdraw our

23   objection if it's not going to be played anyway.

24           THE COURT:  Okay.

25           MS. REPLOGLE:  All right.  So last issue is, the

1  parties, as Your Honor knows, we filed a joint pretrial

2  conference statement, you know, before this case was tried.

3      And in paragraph 35 of that pretrial statement, the

4  parties had agreed that for each examination, whether on direct

5  examination, cross-examination, or with an adverse witness, the

6  party examining the witness will provide a binder of all

7  exhibits to be used with the witness to the witness, the Court,

8  and the other party.

9      Yesterday, after the conclusion of trial, I emailed the

10  other side because they had not presented binders of their

11  cross exhibits for either Mr. Harrison, our first witness, or

12  Mr. Mander.  At 3:46 I emailed them, let them know paragraph 35

13  required this, and informed them that they hadn't provided them

14  that day.  And so we were just going to propose that we just

15  maintain that status quo then going forward, that we would not

16  be providing or exchanging exhibits as well.

17      At 5 o'clock or so, they emailed back and they said,

18  "While we had prepared cross binders for today's witness, we

19  inadvertently did not hand them out prior to examination."  And

20  they said that they would be providing them today.

21      I'd just note they didn't provide them last night.  I

22  didn't get copies or even, you know, which exhibits they

23  planned to use in that binder.  It's unfortunate.

24      So, I mean, I'm just kind of looking for what we do going

25  forward, you know, and what the best course is here.

1          **MR. HAYNES:**  Your Honor, I'll take responsibility for

2    that.  We did have the binders in the court.  I believe -- and

3    I haven't double-, triple-checked this, but I believe that I

4    only introduced one exhibit that they didn't cover, and I think

5    it was actually in their binder originally.  So I don't believe

6    it was a situation where we introduced a whole bunch of

7    exhibits that we did not give them a binder to look at as we

8    were examining them.

9          **THE COURT:**  So I don't care what time people talk to

10   each other.  I don't -- these are your agreements.  They're not

11   my agreements.  And if you can't figure out how you work

12   together, which seems to be part and parcel of this case, you

13   just -- you're acting in a way that is below the character that

14   I expect.

15         So figure it out.  If you don't want to abide by your

16   agreements, don't abide by them.  They're not mine.

17         But if you want to live up to your obligations that you

18   make to somebody else, then do it right.

19         **MR. HAYNES:**  I understand, Your Honor.

20         **THE COURT:**  So figure it out.  Why don't you decide in

21   the next -- once I do the thing that I'm interested in, why

22   don't you decide how you want to proceed with this case in a

23   way that comports with the highest levels of practice, which is

24   what I expect.

25         **MR. HAYNES:**  Thank you, Your Honor.

1          **MS. REPLOGLE:**  Yes, Your Honor.

2          **THE COURT:**  Were there other issues?

3          **MR. KRILL:**  Housekeeping issue, Your Honor, that's no

4    objection to, so just to raise it with the Court.

5          Michael Krill on behalf of Contour.

6          Our expert, Dr. Jing Hu, is going to be called today.

7    She's going to do a live demonstration of a GoPro camera.

8    We're okay marking that into evidence, as Your Honor raised

9    earlier.

10         The accused functionality is live preview while recording,

11   and so we were hoping that she could demonstrate that

12   functionality while recording as long as we delete all the

13   files afterwards.  And I've asked her to focus the camera on

14   me, not the jury.  And I was -- wanted to raise it with

15   Your Honor to see if that would be okay.

16         **THE COURT:**  Just to show as a demonstrative?

17         **MR. KRILL:**  Yes.

18         **THE COURT:**  Mr. Haynes?

19         **MR. HAYNES:**  I think it's okay as long as she's doing

20   what she has described in her report already as a

21   demonstrative.  I think she has some pictures.  If that's what

22   she's going to illustrate, that process, I don't have an

23   objection.  If it's something different from that, then I would

24   want to see what she's going to do before she does it.

25         **THE COURT:**  Sure.

1    And that reminds me, just in general, the one place where

2    time can get wasted is on objections of beyond the scope.  So I

3    really hope that your -- that you know exactly where in the

4    report you're presenting evidence so that you can tell me

5    quickly, because otherwise -- and the time will be assessed

6    against one of you.  So...

7        **MR. KRILL:**  Yes, Your Honor.  And the last thing, just

8    to make the Court aware --

9        **THE COURT:**  So respond to Mr. Haynes' --

10       **MR. KRILL:**  Yes, it's in her report.  Yes, there's

11   screenshots of the testing in her report all the way, and it's

12   just a live demonstration of those screenshots.

13       **THE COURT:**  Okay.

14       **MR. HAYNES:**  No objection to that --

15       **MR. KRILL:**  Happy to provide that.

16       **MR. HAYNES:**  -- based on that representation.

17     But if you want to show me before we get there, that would

18   make it easier.

19       **MR. KRILL:**  Last thing.  There are two documents

20   discussed in Ms. Hu -- or Dr. Hu's testimony that are

21   confidential to GoPro, and I was going to ask that it not be

22   published -- at GoPro's request, not be published to the

23   gallery when it comes up.  Just wanted to --

24       **THE COURT:**  So when those documents come up, you want

25   them to come up for the jury and not to be displayed to the

**PROCEEDINGS**

 1  public?

 2          **MR. KRILL:**  That's GoPro's want, Your Honor.

 3          **MR. HAYNES:**  Yes, Your Honor.  It's a screenshot of

 4  sort of the -- all the components of the interior of the image

 5  processing chain.  It's actually part GoPro -- actually,

 6  I think this one is all GoPro confidential information.

 7      So we would ask that -- we're fine with the testimony

 8  about it, but we don't want somebody in the back taking notes

 9  on all the details.

10          **THE COURTROOM DEPUTY:**  The system isn't set up that

11  way.  Basically, the system is automatically going to send,

12  when it goes to the jury, to the two large monitors.  But if

13  you want to have people stationed at those monitors to turn

14  them off and back on, that's probably the best way to make that

15  work.

16          **MR. HAYNES:**  Okay.  We can do that, Your Honor.

17          **MR. KRILL:**  Yes.

18          **THE COURT:**  Okay.

19          **MR. KRILL:**  Yes, we can do that.

20          **MR. RICHES:**  And then, Your Honor, we have -- sorry.

21      Elliott Riches on behalf of GoPro again.

22      We have one more issue.  This relates to some slides for

23  Dr. Hu's testimony.  I have a copy, if I could pass that up.

24      And, Your Honor, this relates to an issue that -- last

25  week counsel for Contour IP Holding narrowed their allegations

1    of infringement so that each product is only accused of a

2    single functionality, either live preview or live streaming.

3         Our problem with this slide, as Your Honor can see, is

4    there are products where "Yes" is listed both for live preview

5    and for live streaming.  Given that Contour is no longer making

6    the allegation that they infringe for two functionalities, we

7    think this is confusing to the jury under 403 and they're going

8    to be confused to what is or isn't at issue for these products

9    where they've already narrowed to one functionality.

10        **MR. KRILL:**  Your Honor, if you flip to the next slide,

11   it clearly grays out "Yes" for all the other non-accused

12   functionalities in the live preview groups.  It's just to make

13   the point that they support the functionality, but we are not

14   accusing those because they're only accused of live preview.

15        We feel it would be misleading to not address the fact

16   that those cameras are cable of both.  And Dr. Hu will explain

17   clearly that our infringement allegations are limited -- for

18   live streaming, are limited to these three highlighted cameras.

19        **THE COURT:**  Okay.  I'm going to allow it.

20        **MR. KRILL:**  Thank you, Your Honor.

21        **MR. RICHES:**  Thank you, Your Honor.

22        **THE COURT:**  All right.  Those are the rest of your

23   issues.

24        The one more of mine, I appreciated getting the

25   information from the -- that was produced in violation of my

1    order with respect to the use of questionnaires.  It is exactly

2    the issue -- the material that I'm -- that I created the order

3    for.  So I don't know what I'm going to do about it.

4        My assumption is that GoPro's counsel didn't give the jury

5    consultant any direction with respect to -- you don't need to

6    respond.  I'm going to tell you what my assumption is, and if

7    my assumption is wrong, we'll deal with it by declaration and

8    otherwise once this case is done.

9        But my assumption is that the jury consultant just hired

10   the PI without providing any information about what the Court's

11   orders are.  I think that does fall on the law firm and not

12   GoPro and not the jury consultant.  I may be wrong about that.

13   And I don't want to make the problem that I'm concerned about

14   worse for individuals, and I do want to make clear to the world

15   why I think this is a bad thing.  And I haven't figured out the

16   way that would be effective to do that, and I won't for a

17   while.

18       And I will give -- if there are things that the firm wants

19   to explain to me in an under-seal submission for me to think

20   about, as long as it's provided -- a copy is provided to

21   plaintiff, that's fine.

22       So I will be back when the jury is here.

23                   (Recess taken at 8:19 a.m.)

24                 (Proceedings resumed at 8:31 a.m.)

25       (Proceedings were heard out of the presence of the jury.)

MANDER - CROSS / HAYNES

1          THE COURT:  Are we ready to proceed?

2          MR. KEVILLE:  We are.

3          THE COURT:  Okay.  Let's get the jury.

4      (Proceedings were heard in the presence of the jury.)

5          THE COURT:  Please be seated, everybody.

6      Good morning, ladies and gentlemen.  Thank you very much

7  for being prompt.  We are in the middle of the

8  cross-examination, I believe, of Mr. Mander.

9      So, Mr. Haynes, please proceed.

10                  **RICHARD IAN MANDER**,

11  called as a witness for the Plaintiff, having been previously

12  duly sworn, testified further as follows:

13              **CROSS-EXAMINATION   (RESUMED)**

14  BY MR. HAYNES:

15  **Q.**   Good morning, Mr. Mander.

16  **A.**   Good morning.

17  **Q.**   Yesterday we were talking about your work related to the

18  ContourGPS product.  Do you remember that generally?

19  **A.**   Yes.

20  **Q.**   And that ContourGPS product used an Ambarella A5 chip; is

21  that right?

22  **A.**   Yes.

23  **Q.**   And the A5 chip provides the hardware needed to take data

24  from a sensor or audio source or other input, and it uses that

25  to create imagery, still pictures, audio, and video; correct?

 1  **A.**    That's some of what it does, yes.

 2  **Q.**    And that A5 chip from Ambarella, that comes with an SDK

 3  that lets you build -- and also information about how to power

 4  the chip and use all the connections on the chip so that you

 5  can build a hybrid-type camera; right?

 6  **A.**    Yes.

 7  **Q.**    And I think you already testified, but the Contour A5 --

 8  sorry -- the Ambarella A5 chip, Contour did not invent any of

 9  the image processing techniques used in that chip; right?

10  **A.**    That's not quite correct.  It's part of the -- we create a

11  camera and we build it.  One of the major building blocks is

12  the A5 system on chip, but there are other components and

13  methods that we apply to make it our camera.

14  **Q.**    Sure.  Let me make sure my question was clear.  Contour

15  did not contribute any of the ideas to how that A5 chip itself

16  does image processing; right?

17  **A.**    Well, the A5 chip provide- -- it has silicon in it which

18  provides, at its core, a DSP, and there's an SDK that we use,

19  but we add our own code.  We do -- we certainly do some image

20  processing in our own code on their platform.

21  **Q.**    Mr. Mander, you were deposed on January 31st, 2020; is

22  that right?

23  **A.**    Yes.

24         **MR. HAYNES:**  Could we show the witness page 104,

25  lines 14 to 16, of Mr. Mander's deposition.  Just to the

 1   witness.

 2   **BY MR. HAYNES:**

 3   **Q.**   Mr. Mander, did Contour contribute any of the image

 4   processing to the A5 chip?

 5   **A.**   No, not to the chip itself.

 6          **MR. HAYNES:**  Let's bring up Trial Exhibit 10.

 7   **BY MR. HAYNES:**

 8   **Q.**   You recall discussing Trial Exhibit 10 yesterday,

 9   Mr. Mander?

10   **A.**   Yes.

11   **Q.**   And yesterday we discussed this email exchange between you

12   and Jason Huang of Ambarella.  Do you recall that?

13   **A.**   Yes.

14   **Q.**   And you indicated that Ambarella, at the time of this

15   email in April of 2010, at least had a road map for

16   implementing a Linux driver to facilitate sending a

17   low-resolution video stream from the Ambarella chip to an

18   external device?

19   **A.**   They did have -- they talked about that in their future

20   road map, yes.

21   **Q.**   Okay.  Let's turn to the next page of this document.  This

22   is an email from you to Mr. Huang on April 6, 2010.  Do you see

23   that?

24   **A.**   Yes.

25          **MR. HAYNES:**  Okay.  If we could, let's highlight --

1  BY MR. HAYNES:

2  Q.   Well, what you're asking or telling Mr. Huang is that

3  there are a few open items for which you need to make a final

4  decision on.  Is that fair?

5  A.   Yes.

6         MR. HAYNES:  Okay.  Let's look at Number 4 here.  If

7  we could highlight that.

8  BY MR. HAYNES:

9  Q.   Now, in Number 4, one of the items you need to make a

10  decision on was the potential for capturing still images at

11  some intervals while HD video is being recorded; correct?

12  A.   Sorry.  I'm not sure what the question is.

13  Q.   So one of the items for which you were trying to make a

14  decision and talking to Mr. Huang about was the potential for

15  capturing still images at some intervals while HD video is

16  being recorded; correct?

17  A.   That's correct.

18  Q.   And that feature was a feature of the A5 that was being

19  offered by Contour's competitor GoPro at the time; right?

20  A.   To be accurate, I don't think at the time -- I'm not sure

21  if at the time GoPro already had an A5-powered -- a camera

22  built on the A5.

23       What I'm referencing here is that it is a feature of what

24  is called a hybrid camera.  So Ambarella makes the system on

25  chips that help you build a hybrid camera.  And one of the

1    things that makes it a hybrid camera is the fact that you can

2    be -- interesting, while you're recording video.  So you're

3    capturing video, and you can -- amazingly, at the same time,

4    you can tell the camera to also take a full frame picture, like

5    capture one picture of the best it possibly can.  And that's a

6    core feature of a hybrid camera.

7         And although we had built several cameras to date at that

8    time using the Ambarella processes like the A2, older ones, we

9    hadn't actually done -- we hadn't decided to implement --

10   actually make that a part of our camera.

11        But I'm referencing here that it is a feature of the A5.

12   And when I say "offered by our competitor GoPro," I'm not

13   meaning that I know what GoPro's going to do with the A5

14   because I don't.  I'm saying it's a feature -- taking a

15   still -- you know, a hybrid method is a feature of one of our

16   competitors, and we might consider doing it in this camera we

17   do.

18        Does that help?  I'm trying to be clear.

19   **Q.**   Mr. Mander, my question is a little simpler.

20   **A.**   Yeah.

21   **Q.**   You're talking about a feature in GoPro's cameras that you

22   were aware of that you wanted to make a decision of whether you

23   were going to put that same feature in your camera; right?

24   **A.**   Well, I want to be clear -- careful here.  I want to be

25   clear that I had no knowledge of what features GoPro would be

1    putting in the camera they were going to build based on the A5,

2    and I did not want to know anything about those features.

3        So when I reference -- I'll keep it short.  When I

4    reference "is offered by our competitor GoPro" -- it's in the

5    same sentence, so I want to be clear about this.  In my mind,

6    I'm not referencing that GoPro is going to use that in their --

7    in a new camera they're building.  I'm really referencing it's

8    a feature they've had on other cameras.

9    Q.   Right.  So you were aware that GoPro had that feature in

10   other cameras by April of 2010; right?

11   A.   I think so, yes.

12   Q.   And you were generally aware of the features that GoPro

13   was offering in its cameras at that time; right?

14   A.   Generally.  I didn't pay a lot of attention to the details

15   of it.

16   Q.   Well, you were competing head-to-head with GoPro; right?

17   A.   We considered them a competitor.

18   Q.   Right.  And as a competitor, good business, you wanted to

19   be aware of the features that GoPro was offering because you're

20   competing head-to-head with them in the marketplace; right?

21   A.   I have a slightly different way I operate.  I -- I -- and

22   this is -- I want to have a general sense of who our

23   competitors are, but I do not spend a lot of time getting into

24   the details of it.  I compete by innovating and by focusing my

25   team on our ideas.

1          So, yes, I'm generally aware of what GoPro was doing, what

2     their cameras were; but I spent -- I didn't spend a lot of time

3     on the details of that.

4     **Q.**   Okay.  Well, at least on the detail of this particular

5     feature, you knew that they had that feature in their products,

6     and you were trying to see whether Ambarella could put it in

7     your products; right?

8     **A.**   No.  I'm just -- I'm saying we need a final decision,

9     meaning we haven't decided yet whether we're going to do that.

10    It's actually a very minor feature.  It's very trivial to

11    implement.  And "We need a final decision" just means we're

12    going to tell them whether we're going to do it or not.

13    **Q.**   Okay.  Let's --

14    **A.**   It's a standard part of the SDK.

15    **Q.**   Sorry.  I didn't mean to speak over you.

16         Okay.  Let's move to another document.

17              **MR. HAYNES:**  Can we bring up TX-2188.

18    **BY MR. HAYNES:**

19    **Q.**   This is another document that we discussed yesterday, an

20    email from you -- or, sorry -- from you to Ben Bodley.  Do you

21    recall talking about this document yesterday?

22    **A.**   Yes.

23    **Q.**   And the subject of this email is "Ways around Bluetooth

24    issue"; correct?

25    **A.**   I see that.

1  Q.   And I want to focus down on the final paragraph here at

2  the very bottom.

3       MR. HAYNES:   If you could highlight the paragraph

4  beginning "One thing."

5  BY MR. HAYNES:

6  Q.   There it states that [as read]:

7            "One thing that has made me think of this is

8       that in our design, we only have BT . . . ."

9       That's Bluetooth; right?

10  A.   Yes.

11  Q.   [As read]:

12            ". . . we only have Bluetooth output of the

13       video to the iPhone until we start recording

14       video."

15       Did I read that -- is that what you said there?

16  A.   Yes.

17  Q.   And then it continues [as read]:

18            "Once the video recording starts, we shut off

19       the second stream to the iPhone and instead record

20       it as the lower resolution video."

21       Do you see that?

22  A.   Yes.

23  Q.   So at this point in time --

24       MR. HAYNES:   And if we could scroll down a little bit.

25  Sorry.  Scroll up a little bit.

MANDER - CROSS / HAYNES

1  **BY MR. HAYNES:**

2  **Q.**   At this point in time, in March 24th of 2010, your

3  Bluetooth solution only provided a live preview stream until

4  you started recording; correct?

5  **A.**   That's correct.

6  **Q.**   And once you started recording, your Bluetooth stream that

7  was the preview stream shut off; right?

8  **A.**   The stream to the camera was shut off, but the stream is

9  still there.  I mean, it's -- we're choosing what to do with

10  it.  We're not sending it to the camera anymore -- sorry -- to

11  the phone anymore.  It's being recorded to the SD card.

12  **Q.**   Right.  So when the user hits "record," when they're

13  looking at their preview on the phone, once they hit "record,"

14  that preview video stops on the phone; right?

15  **A.**   At that time, that's how we did it, yeah.

16  **Q.**   Okay.  All right.  I'm going to switch topics on you

17  again.

18      There was some discussion yesterday about your proprietary

19  software in -- that you developed for the ContourGPS.  Do you

20  remember that generally?

21  **A.**   Yes.

22  **Q.**   And the proprietary software that you were talking about

23  was a proprietary protocol to communicate over a Bluetooth

24  wireless protocol module; right?

25  **A.**   It was really a protocol to communicate over radio

1    wireless, and we were using it with Bluetooth.

2    **Q.**   Okay.  And Contour had written proprietary source code to

3    run a mobile app and connect to the Bluetooth module inside

4    your camera; right?

5    **A.**   Yes.

6    **Q.**   And that proprietary source code that you wrote was being

7    able to communicate over the Bluetooth protocol; right?

8    **A.**   Yes.  It was used to communicate -- it was to communicate

9    over a low bandwidth.

10   **Q.**   Okay.  Now, there was some discussion yesterday that you

11   were concerned that other companies might somehow get access to

12   your proprietary source code.  Do you remember that?

13   **A.**   Yes.

14   **Q.**   Now, you were not suggesting that GoPro ever had access to

15   your proprietary Bluetooth source code, were you?

16   **A.**   I would hope not, but I don't know for sure.

17   **Q.**   Well, in fact --

18   **A.**   What's your question?

19   **Q.**   -- you knew that GoPro was using WiFi as its protocol;

20   right?

21   **A.**   I didn't know that.

22   **Q.**   Okay.  Well, let me ask you to assume that GoPro was using

23   WiFi for its protocol.  Your Bluetooth protocol, they couldn't

24   have plugged that in and used it; right?

25   **A.**   So just to be clear, I didn't know anything about what

MANDER - CROSS / HAYNES

1    GoPro was doing with the A5 processor, and I wouldn't want to

2    know.  And I know that sometime later, they actually --

3    you know, they announced and launched a WiFi back for their

4    camera.  But at that -- that was a surprise to me when it came

5    out.  I had no awareness of them developing that.

6        And given that the A5 SDK had no support for WiFi, I had

7    no reason to believe that Con- -- that GoPro was developing

8    something for WiFi.

9    **Q.**  Okay.

10   **A.**  It's sort of interesting, because that would be a kind of

11   silly approach really.  But, yeah.

12   **Q.**  Now, you said that Bluetooth source code that you

13   developed was proprietary, secret to Contour; right?

14   **A.**  Yes.

15   **Q.**  So you certainly didn't disclose in your patent that

16   proprietary software or source code so that the world could use

17   it to implement your invention; right?

18   **A.**  That's not correct.  We -- we mentioned some techniques in

19   our patent --

20   **Q.**  Well, you certainly --

21   **A.**  -- that apply to how we packaged files, et cetera, to go

22   over the radio.

23   **Q.**  Well, you certainly didn't disclose to the world the

24   source code and the protocols that you considered to be

25   proprietary; right?

1   **A.**   Correct, yeah.  They're proprietary.

2   **Q.**   All right.  Let's look at the patent.

3         **MR. HAYNES:**  If we can bring up JX-1.

4   **BY MR. HAYNES:**

5   **Q.**   Do you recognize this as one of the patents on which

6   you're a named inventor?

7   **A.**   Yes.

8   **Q.**   This is the '954 patent?

9   **A.**   Correct.

10  **Q.**   All right.  If we could, let's go to the back and look at

11  the claim of that patent, Claim 11.

12        Do you have an understanding this is one of the claims

13  that have been asserted against GoPro in this case?

14  **A.**   I think so, yes.  I'm aware what Claim 11 is.

15  **Q.**   Now, looking at this claim, there's nothing in this claim

16  that says anything about Bluetooth specifically as the wireless

17  protocol; right?

18  **A.**   That's correct.

19  **Q.**   There's nothing in this claim that says anything about the

20  portable device having to be an iPhone or an iPod Touch;

21  right?

22  **A.**   Let me take a look at it.

23        (Witness examines document.)  We talk about the -- you

24  mentioned the iPod Touch -- right? -- meaning the -- in the

25  claim, we reference that in a more broad way.  We talk about --

1   there's a lot of sort of technical high-level language here.

2       Here we go.  So we say -- so the -- what is the iPod

3   Touch or iPhone is referred to as a personal portable

4   computing device executing an application.  That's line 65.

5   **Q.**   Right.  But that's any portable device.  It's not limited

6   to an iPhone or an iPhone Touch; right?  You don't mention

7   those; right?

8   **A.**   Correct, because we could -- we also made it work on an

9   Android device.  We could have made it work on a -- by radio to

10  a laptop, to a dedicated thing.  So it's a more -- when it's

11  a -- that's how we reference it.  iPod and iTouch, that's a

12  specific product from Apple.

13  **Q.**   Right.  Okay.  So let me shift gears one more time, talk

14  more about the ContourGPS.

15      When you launched the ContourGPS, the preview that you

16  were sending was JPEG; right?

17  **A.**   No.  It was Motion JPEG.

18  **Q.**   Motion JPEG.  Okay.  And what Motion JPEG is, is that you

19  send a series of JPEG images; and then when the portable device

20  receives them, it displays them in sequence as video; right?

21  **A.**   Motion JPEG is a video format.

22  **Q.**   And I think you testified yesterday that you were able to

23  send five to seven frames per second of Motion JPEG images;

24  right?

25  **A.**   To be correct, exact, in the first -- there's different

 1    times in the project.

 2         In the first instantiation, the first what we called Orca

 3    prototype, we were sending images.  Later -- I'm not sure at

 4    that point whether they were Motion JPEG or not.  They may have

 5    just been JPEGs because we were looking at the worst possible

 6    case because, you know, if we can send separate images on a

 7    prototype, once it turns into -- once we do it later as, say,

 8    Motion JPEG, it will be faster.

 9         So my point is, yes.  But to answer your question, I think

10    we were able to send at five to seven frames a second in that

11    very early version.

12    **Q.**  Okay.  In that early version where you may have been

13    sending JPEG images and playing them in sequence, you still

14    considered that to be video; right?

15    **A.**  Yes.

16         **MR. HAYNES:**  If we could bring up DDX-8.

17    **BY MR. HAYNES:**

18    **Q.**  Now, this is a slide that was presented during opening

19    statements by Contour's counsel.  And I understand you weren't

20    here from that -- or for that, but let me ask you just a

21    general question.

22         Do you believe that what's shown in this demonstrative

23    accurately reflects the key portions of your invention?

24    **A.**  Let me look at it.

25         (Witness examines document.)  Yes, that's a high-level

1    view of part of how it worked.

2    Q.    Okay.  Now, I just want to go through this and see if we

3    can identify what was new versus not new.  Okay?

4    A.    Okay.

5    Q.    All right.  So start at the high level.  The idea of

6    having a digital camera, just that general idea, that was not

7    something that Contour invented; right?  Digital cameras were

8    out there?

9    A.    Correct.  We invented a particular kind of digital camera.

10   Q.    Sure.  And also point-of-view digital cameras, there were

11   other point-of-view digital cameras before you came up with

12   your invention; right?

13   A.    There were.

14   Q.    And on the left here, we see --

15   A.    More correctly -- let me correct myself.  I think we were

16   the first company to -- before my time, I think we were the

17   first company to produce an integrated point-of-view camera

18   which was known as the VholdR.  So we did, in some level,

19   invent that.

20   Q.    Right.  But that's not -- that was done before you claim

21   to have invented what we're talking about in this case?

22   A.    Yes.

23   Q.    Okay.  And, again, focusing on the patents that are

24   asserted here, the idea of having a lens in a point-of-view

25   camera, that was already known too; right?

**MANDER - CROSS / HAYNES**

1    **A.**    Yes.

2    **Q.**    Okay.  I'll put an X on the things that were already

3    known.  All right?

4          Okay.  So put an X on the lens.

5          Let's go to the image sensor.  A point-of-view digital

6    camera that had an image sensor, that was not new at the time

7    of your invention of the patents in this case; right?

8    **A.**    Correct.

9    **Q.**    Same with a wireless device.  Wireless protocol devices

10   were known prior to your invention in this case; right?

11   **A.**    Not necessarily in point-of-view cameras of this consumer

12   quality.

13   **Q.**    Well, you bought a commercially available Bluetooth chip

14   for use in your product; right?

15   **A.**    True.

16   **Q.**    Okay.  So wireless protocol Bluetooth devices were

17   commercially available.  You didn't invent that; right?

18   **A.**    Right.  But they weren't in point-of-view cameras.

19   **Q.**    I understand that.  I'm just asking about the device

20   itself.

21   **A.**    Which device?

22   **Q.**    The wireless Bluetooth protocol device.

23   **A.**    No, no.  Okay.  So just to be clear, you're using a

24   particular term not quite accurately.  But the wireless --

25          Could you read back what he said?  There was something

1    about the wireless protocol device, please.

2        (Record read as follows:

3        **"QUESTION:** I understand that. I'm just asking about the

4        device itself.

5        **"ANSWER:** Which device?

6        **"QUESTION:** The wireless Bluetooth protocol device.")

7            **THE WITNESS:** Thank you.

8        So you're saying wireless Bluetooth protocol device.

9    I think you're referencing there something that is in our

10   patent which is -- and I'd have to look at it to get my words

11   right; but part of our patent is a piece of our platform, which

12   was the Bluetooth -- a radio that sends -- can communicate with

13   a mobile device by -- over the -- wirelessly, right, through

14   radio, and software and other aspects that we put together to

15   be a -- what I call a building block or a module in our

16   platform, in our camera platform, that allowed the creation and

17   sending of a video stream to a mobile device.

18       And that -- that is, I think, what -- is that what you're

19   referring to?

20   **BY MR. HAYNES:**

21   **Q.**  My question was actually a lot more simple.

22   **A.**  Okay.

23   **Q.**  The Bluetooth chip that you put in your camera you bought

24   commercially off the market. It was already out there; right?

25   **A.**  Yes. We bought it on a module.

1   Q.   Right.  Okay.  So let's cross out image sensor.  Well,

2   take the X away on that one.  We haven't talked about that yet.

3       Now, you also did not invent a camera that had the ability

4   to transmit video wirelessly -- well, let me rephrase that.

5       Before your invention, there were cameras out there that

6   could transmit video wirelessly from the camera to a remote

7   device; right?

8   A.   There were some cameras that could do that.  I'm not sure

9   that they were fully integrated, and they weren't point-of-view

10  cameras.

11  Q.   So that concept of wirelessly transmitting video from a

12  camera to a portable device, that was known before your

13  patent -- right? -- the concept?

14  A.   I would say the concept of sending wireless video --

15  sorry -- sending video wirelessly was known.

16  Q.   Okay.  So at least the concept of sending wireless video

17  was known.  So let's put an X on that piece.

18      And then let's go ahead and X out the wireless device as

19  well, the chip itself.

20      Now, what about a storage device?  That storage device

21  that you had there, commercial -- you're talking about a memory

22  device, like an SD card; right?

23  A.   Yes.

24  Q.   And SD cards were well-known prior to your invention;

25  right?

**MANDER - CROSS / HAYNES**

1    **A.**    Yes.

2    **Q.**    Okay.  Let's cross out the storage device.

3         Now, that brings us to the camera processor.  The camera

4    processor that you used to implement your invention was the A5

5    from Ambarella; right?

6    **A.**    That was part of it, yes.

7    **Q.**    And that chip was also publicly available and on the

8    market prior to your invention; right?

9    **A.**    No.

10   **Q.**    It's your testimony that the A5 was not publicly available

11   prior to your invention date in December of 2009?

12   **A.**    Correct.  It wasn't publicly available.

13   **Q.**    Okay.  But you at least agree with me that Ambarella

14   invented that chip; right?  You didn't?

15   **A.**    Yes, that's correct.

16   **Q.**    Okay.  And that Ambarella chip is what provides the

17   ability to output a higher-quality video stream and a

18   lower-quality video stream; right?

19   **A.**    Yes.  That's a feature of the system on chip.

20   **Q.**    Okay.  So let's put the Ambarella components in there.

21        And on the video streams as well.

22        Okay.  Now, I understand -- well, let me just ask you one

23   final question.  With respect to all of the components that

24   I've labeled here -- I've labeled them accurately; right?

25   **A.**    I didn't catch the last part.

**MANDER - CROSS / HAYNES**

1   **Q.**   With respect to each of components that I've labeled

2   here --

3   **A.**   Yes.

4   **Q.**   -- those components were known before your invention;

5   right?

6   **A.**   To be accurate, I think you're talking about these in a

7   very simplistic hardware fashion.  These are very high-level

8   building blocks that we're talking about here.  And there

9   are -- the Ambarella system on chip is a -- there's -- it

10  doesn't work without software.  And when we build a camera,

11  what's not shown in this picture is that we add value to it.

12      So some of the things that -- at the top here, it says

13  "Contour's Invention."  Some of the things that are in the --

14  you know, in the invention that make the magic happen are

15  things we added that is software and intellectual property

16  knowledge that we -- that we put into -- that sits on and runs

17  on the Ambarella processor -- right? -- on the ARM processor

18  that's inside there, even down at lower levels in the software.

19      And that's -- that's part of this.  So it's -- yeah, I

20  just want to make that clear.

21  **Q.**   Okay.  So, in your opinion --

22  **A.**   So let me -- one more point to wrap that up.

23          **THE COURT:**  Mr. Mander --

24          **THE WITNESS:**  Okay.

25          **THE COURT:**  -- your counsel may ask questions.

MANDER - REDIRECT / REPLOGLE

1          THE WITNESS:  Okay.

2          THE COURT:  So go ahead, Mr. Haynes.

3   BY MR. HAYNES:

4   Q.   Just one final question.  In your opinion, the idea and

5   the important part of your invention was the software that put

6   all these components together.  Is that generally fair?

7   A.   It's part of it.  The software and hardware.

8          MR. HAYNES:  Okay.  I have no further questions.

9    I pass the witness, Your Honor.

10         THE COURT:  All right.  Thank you.

11   Any redirect?

12         MS. REPLOGLE:  Briefly.

13   And I would ask, could you put up the slide with the red

14   Xs that you just had on.

15                  <u>REDIRECT EXAMINATION</u>

16   BY MS. REPLOGLE:

17   Q.   Mr. Mander, counsel was just referring to this particular

18   slide a few moments ago.

19   Let me ask you this:  Could anyone just buy these various

20   component parts and put it together in a camera?  Could anyone

21   just do that?

22   A.   No.

23   Q.   Why not?

24   A.   There's an enormous amount of knowledge in what it takes

25   to assemble all the pieces that create a camera, and there's

1   also other, like, software that has to be developed to build

2   the features that you want to have in your camera.

3   **Q.**   And had anyone, at the time that you came up with this

4   idea, had put even all of these different component parts or

5   thought to put all these component parts together, to your

6   knowledge?

7           **MR. HAYNES:**  Objection, Your Honor.  The witness

8   testified yesterday that he did not know what GoPro was doing.

9           **THE COURT:**  Fair enough, but -- so, sustained on that

10  basis.

11          **MS. REPLOGLE:**  Sure.

12          **THE COURT:**  You can rephrase if you'd like.

13  **BY MS. REPLOGLE:**

14  **Q.**   You mentioned -- you mentioned just a second ago about the

15  difference between software and hardware and the hardware

16  component parts.  Do you recall that?

17      Do you recall that?

18  **A.**   Yes.

19  **Q.**   Okay.  All right.  Prior to your idea of putting in --

20  adding a Bluetooth module or a WiFi module into a camera in

21  order to stream wirelessly, had anyone come up with that idea

22  before, to your knowledge?  To your knowledge.

23          **MR. HAYNES:**  Objection.

24          **THE COURT:**  So you can answer that question.  Go

25  ahead.

1          **THE WITNESS:**  Not to my knowledge.

2          **MS. REPLOGLE:**  No further questions.

3          **THE WITNESS:**  No.

4          **THE COURT:**  All right.  Thank you.

5      Mr. Mander, you're excused.

6          **THE WITNESS:**  Oh, thank you.

7          **THE COURT:**  Thank you for your testimony.

8                    (Witness excused.)

9          **MR. KRILL:**  Your Honor, for our next witness, we call

10     Dr. Jing Hu.

11                    (Witness steps forward to be sworn.)

12                    **JING HU, PH.D.**,

13     called as a witness for the Plaintiff, having been duly sworn,

14     testified as follows:

15          **THE WITNESS:**  Yes, I do.

16          **THE COURTROOM DEPUTY:**  Be seated, please.  And if

17     you'd begin, please, by stating your full name and spelling it

18     for the court reporter.

19          **THE WITNESS:**  My full name is Jing Hu.  First name is

20     spelled as J-i-n-g, and last name is H-u.

21          **MR. KRILL:**  Your Honor, may I hand up exhibits and

22     demonstratives --

23          **THE COURT:**  Sure.

24          **MR. KRILL:**  -- to the Court and also to the witness?

25          **THE COURT:**  Yes.

1    **MR. KRILL:**  And, Your Honor, may I hand up

2    demonstratives that the witness --

3           **THE COURT:**  Sure.

4                    **DIRECT EXAMINATION**

5    **BY MR. KRILL:**

6    **Q.**   Good morning, Dr. Hu.

7    **A.**   Good morning.

8    **Q.**   Can you please introduce yourself to the jury.

9    **A.**   Of course.

10          Hello.  My name is Jing Hu.  I grew up in China and moved

11   to the United States when I was 21 years old to pursue my

12   graduate studies.

13          And after getting my master's degree from Rice University

14   in Houston, Texas, I moved to California and got my Ph.D. from

15   UC Santa Barbara in 2007.  And both of my advanced degrees are

16   in the field of electrical and computer engineering.

17          I have lived in Santa Barbara for the past, well, 22

18   years, and I'm married and have two kids.

19   **Q.**   And after your getting your Ph.D., what did you do?

20   **A.**   After graduating with a Ph.D., I worked at the company

21   Cisco Systems between the years of 2007 and 2013.

22   **Q.**   What did you do for Cisco Systems?

23   **A.**   At Cisco, I had two main roles.  One was that I was a

24   company-wide video expert, and the other role was that I was a

25   software engineer, which means that I was lucky enough to

1   develop and test actual Cisco products.

2   **Q.**   What Cisco products or what types of products were you

3   involved in testing?  How was your work used?

4   **A.**   Because of these two roles that I had at Cisco, I worked

5   on a large variety of Cisco products, such as videoconferencing

6   systems that run inside Cisco's routers.

7        And I also worked on those Cisco desktop phones with a

8   video panel on top of it.  At one point, it feels like

9   everybody had one in their office.

10       And I also worked on Cisco's TelePresence systems as well

11  as some compact, portable video camera prototypes.

12  **Q.**   So you had experience with portable video cameras before

13  your work on this case?

14  **A.**   Yes.

15  **Q.**   Now, after Cisco, what did you do next?

16  **A.**   Since Cisco, for the past 12 years, I have been working as

17  an independent engineering consultant; and I started my own

18  company, Shoreline Technology Consulting, along the way.

19  **Q.**   And what do you do at Shoreline?

20  **A.**   I generally advise and work in, for example, patent

21  litigation, patent portfolio evaluation, and general products

22  analysis.  I also advise companies on, for example, industry

23  trends and forecasting.

24  **Q.**   Have you testified at any jury trials before?

25  **A.**   Yes, I have.

1  **Q.**  How many?

2  **A.**  Just once before this.

3  **Q.**  So this is your second?

4  **A.**  Yes.

5  **Q.**  Have you published any papers?

6  **A.**  Yes, I have published many papers in the field of

7  electrical and computer engineering.  And I'm also an inventor

8  of four issued United States patents.

9  **Q.**  Are any of your patents or publications relevant to the

10  subject matter of this case?

11  **A.**  Yes.

12       Oh, yeah.  So on this slide, I have listed some of my

13  patents and publications that are directly related to, for

14  example, video generation, video transmission over WiFi, and

15  also the video quality as perceived by us, human beings.  And

16  those are some of the key technological areas that are at issue

17  in this case.

18  **Q.**  Can you explain what some of those terms mean?  Like

19  I think you said video coding or transmission.  What all does

20  that mean?

21  **A.**  Of course.

22       So we hear video generation a lot in this case.  So it's

23  very -- it's a simple idea.

24       It's about how the light, propagated through camera lens

25  and captured by image sensors, is then converted to digital

1   numbers that machines and computers and smartphones can

2   understand.  That's video generation.

3       Video transmission is then to take that generated video

4   and transmit it over, say, a wireless local area network.

5   That's what WLAN means here.  Another name for that that we're

6   more familiar with is WiFi.

7       And then quality, if I may add, is just kind of how we see

8   the video at the end.  And it's us human beings who are the

9   ultimate judge of how good a quality is, not the

10  number differences.

11  **Q.**  About how many years of experience do you have in this

12  field?

13  **A.**  Over 20 years at this -- at this point.

14      **MR. KRILL:**  Your Honor, we tender Dr. Hu as an expert

15  in this case.

16      **MR. HAYNES:**  No objection, Your Honor.

17      **THE COURT:**  All right.  You may proceed.

18  **BY MR. KRILL:**

19  **Q.**  Were you retained by Contour as an expert in this case?

20  **A.**  Yes, I was.

21  **Q.**  What were you retained as an expert to do at a high level?

22  **A.**  At a very high level, I was asked to evaluate whether

23  Contour's patents are infringed by GoPro's cameras.  I was

24  asked to evaluate whether GoPro had acceptable non-infringing

25  alternatives.  And I was also asked to evaluate whether

1    Contour's patents are valid.

2        And the first two topics here are what I'm going to focus

3    today, and I believe next week I have the pleasure -- I will

4    have the pleasure to come back and talk more about the third

5    topic on the slide.

6    **Q.**    Now, ultimately, did you render any opinions as to whether

7    Contour's patents were infringed by GoPro's cameras?

8    **A.**    Yes.  I concluded that all Contour's cameras infringe the

9    two patents asserted in this case.

10   **Q.**    And what information did you consider in rendering your

11   opinions?

12   **A.**    I reviewed a lot of information in this case.  On the

13   infringement side, I have, for example, reviewed documents,

14   including GoPro's own internal documentation that amounts to

15   over 10,000 pages.  I have reviewed the source code that runs

16   inside all 27 accused camera models that comes up to about

17   200,000 lines of code.  I have tested the accused products

18   myself, and I also have reviewed deposition testimony of GoPro

19   witnesses.

20   **Q.**    Dr. Hu, have you been in attendance through this entire

21   trial?

22   **A.**    I'm sorry?

23   **Q.**    Have you been in it attendance throughout this entire

24   trial?

25   **A.**    Yes.  For the past -- I have been engaged, I believe, for

1   the past six years.

2   **Q.**   And you were here while Dr. Mander testified; correct?

3   **A.**   Oh, I see.  Yes, I was.

4   **Q.**   And so you mentioned source code, and it came up with

5   Dr. Mander.  Can you just explain what source code is and if

6   it's confidential, in general?

7   **A.**   Yes.  It's generally -- when you say, jeez, what do you

8   programmers do all day or what do software engineers do all

9   day, among the understanding, analysis, eventually how they put

10  the implementation in paper is to write these what I think

11  Dr. Mander referred to as text documents.  So they have

12  parameter names, function names, and numbers.  They could look

13  absurd to people who don't work with them, but to me, sometimes

14  it's like reading a story, on the best days.

15      So, basically, those are then compiled into zeros and ones

16  that the computers can understand.

17  **Q.**   Are we going to look at any source code today?

18  **A.**   I don't believe so.

19  **Q.**   Did you prepare any simplified diagrams to assist the jury

20  in understanding how the process involved in this case works?

21  **A.**   Yes.  I have abstracted the actual implementation that I

22  have seen inside these cameras in, hopefully, diagrams and

23  animations that everybody can understand.

24  **Q.**   Now, before we talk about your opinions in this case, can

25  you please give the jury a brief overview of the timeline of

1  the invention that we heard from Dr. Mander?

2  **A.**   Of course.

3       As we all heard from Dr. Mander, both yesterday and this

4  morning briefly, the inventor at Contour invented -- conceived

5  the idea of the claimed invention in December 2009.

6       They then filed the original application that later became

7  these two patents in September 2010.

8       They -- shortly after that, they released two -- actually,

9  three Contour cameras listed here:  GPS, which is the camera

10  I believe you all looked at yesterday, as well as Contour+ and

11  Contour+2.

12  **Q.**   Now, can you please walk us through what this slide here

13  is showing?

14  **A.**   Of course.

15       This slide is what I have put together to explain how the

16  source code and the hardware work inside these cameras based on

17  my analysis.

18       For example, the image signal that propagates through the

19  lens is first captured by image sensors.  These are just

20  devices that sit right behind the lens that capture the light

21  signal analog and turn them into numbers for further

22  processing.

23       These signals are then processed by the camera processor

24  to generate video streams.  And prior to the user pressing the

25  record button, the lower-quality video stream is generated and

1  wirelessly transmitted, as indicated in the green arrows, to a

2  personal commuting -- personal portable computing device such

3  as our smartphones.

4  **Q.**   What happens next?

5  **A.**   And then after the user presses the recording button, two

6  streams will be generated in parallel.

7       And prior to that also, the live preview feature allows

8  the camera settings, such as resolution, lighting, color, and

9  audio, to be changed remotely on the mobile device.

10 **Q.**   Now, have you inspected the Contour cameras?  I think you

11 mentioned some earlier.

12 **A.**   Yes.  I inspected -- I tested four Contour cameras.  Three

13 of them were listed in the timeline slide, and one of them that

14 you looked at yesterday.  And I also tested a 4 -- Contour

15 camera called Contour 4K.  All the testing I did, I did also

16 with Contour's mobile apps, and there are two of them.

17 **Q.**   Is this demonstrative consistent with how the

18 Contour cameras worked when you tested them?

19 **A.**   Yes, it is.

20 **Q.**   And when you hit the record button on the Contour cameras,

21 did the video streams stay on?

22 **A.**   Yes, it did.

23 **Q.**   So a few minutes ago, you discussed your work as a video

24 quality expert.  In the context of this demonstrative, can you

25 explain how your work as a video quality expert is relevant to

1  this case?

2  **A.**   Of course.

3     We talked about video generation.  That's essentially the

4  entirety of this diagram.

5     And then the wireless transmission over WiFi part -- oh,

6  that works -- that generally refers to this connection here.

7     And also, what is not depicted here is that all of the

8  videos are being viewed by us, human beings.

9  **Q.**   We heard earlier this morning about some terms,

10 Motion JPEG and JPEG, during Dr. Mander's testimony.  Are you

11 familiar with those terms?

12 **A.**   Very much so.

13 **Q.**   Can you explain what those terms mean and if they're

14 similar or different?

15 **A.**   Of course.

16    So there is a big distinction between JPEG and

17 Motion JPEG, although one just has one more letter than the

18 other.

19    So JPEG will be how the still images are recorded,

20 encoded, and stored on our devices.  So when you send a

21 sequence of JPEG images from, say, for example, the camera to

22 the phone, these are a sequence of still images and they're not

23 video.

24    If you say I put a video receiver on the phone and trying

25 to receive that sequence of JPEG images, the video receiver

**HU - DIRECT / KRILL**

1   will be like:  I don't recognize it.  What is this data?  It's

2   not among the video codecs that have been standardized and all

3   devices are equipped to receive and decode and then display.

4        On the other hand, Motion JPEG is a video codec that does

5   build on the JPEGs, some basic building blocks in JPEGs.  But

6   it adds a layer of encoding on top of these images and make it

7   a video.

8        So now, when the video receiver in our phone, it receive

9   an MPEG video as either in a file or in data packets, it'll be

10  like:  Oh, I know this.  This is Motion JPEG video.  And it's

11  able to decode and then display that video.

12       So even though those two codecs only have one letter in

13  difference, they are very different.  And I'm sure the

14  researchers and engineers who invented Motion JPEG will be very

15  upset if you're saying, "Oh, that's just JPEG," with nothing

16  else.

17  **Q.**   Let's turn to your infringement opinions in this case.

18       **MR. KRILL:**  Do you know how to clear the screen up

19  there from the green?

20  **BY MR. KRILL:**

21  **Q.**   What is this slide here showing?

22  **A.**   This is a HERO6 Black camera.

23  **Q.**   Did you bring one of those here with you today?

24  **A.**   Yes, I did.  Just making sure I'm getting the right

25  camera.

1    This is the HERO6 Black camera.  Right now it's inside

2  this frame with some mounting components.

3  **Q.**  And did you inspect this camera prior to today?

4  **A.**  Yes, I did.

5  **Q.**  Now, what is this slide here showing?

6  **A.**  On this slide, I will show you some screenshots that I

7  took when I tested the HERO6 Black camera with GoPro's mobile

8  app on my iPhone.

9  **Q.**  So this would be the user experience as you're using the

10  camera through the phone?

11  **A.**  Yes.

12  **Q.**  Now, can you walk us through this slide?

13  **A.**  Of course.

14    The first screenshot here shows me live previewing the

15  scene before I pressed the recording button.

16  **Q.**  And before you pressed the recording button, what can you

17  do?

18  **A.**  Then I can click the settings button and change many

19  different camera settings from my phone, such as resolution,

20  lighting, color, and some audio settings.

21  **Q.**  And then what happens next?

22  **A.**  After that, I could press the record button and continue

23  previewing the scene on my iPhone while the scene is being

24  recorded.

25  **Q.**  Have you seen any GoPro promotional videos discussing this

 1  functionality that you've been describing here today?

 2  **A.**   Yes, I have.

 3  **Q.**   In your binder, there's a document TX-155, trial exhibit,

 4  that I believe is the cover sheet for that video.  And if you

 5  could let me know if you recognize that cover sheet that was

 6  produced.

 7  **A.**   Sorry.  Could you repeat the number?

 8  **Q.**   155.

 9  **A.**   Yes, I do.

10      **MR. KRILL:**  Your Honor, we move to admit Trial

11  Exhibit 155.

12      **MR. HAYNES:**  No objection, Your Honor.

13      **THE COURT:**  It's admitted.

14      (Trial Exhibit 155 received in evidence.)

15  **BY MR. KRILL:**

16  **Q.**   Let's go ahead and take a look at that video.

17          (Video was played but not reported.)

18  **BY MR. KRILL:**

19  **Q.**   How does GoPro's description of its products in that video

20  compare to your analysis?

21  **A.**   It's fully consistent with my analysis and my own testing.

22  **Q.**   Now, did you also analyze how the GoPro cameras work

23  internally to provide this functionality that was described in

24  the video?

25  **A.**   Yes, I did.

1  **Q.**   And can you please walk us through this slide here.

2  **A.**   Yes.  At a high level, just like how it's taught in the

3  invention of the two asserted patents, the light propagated

4  through the lens is first captured by the image sensor that

5  sits right behind the lens.  It's further processed by the

6  camera processor to generate video streams.

7       Prior to the recording button being pressed, the

8  lower-quality green stream is generated and wirelessly

9  transmitted to a user's smartphone.  And after -- at that time,

10  the user can change different lighting settings, including

11  resolution, lighting, color, and audio.

12       And after the user presses the recording button, two video

13  streams are generated.  The lower-quality green stream

14  continues to be wirelessly transmitted to the smartphone, and

15  the higher-quality orange stream is generated and further

16  stored in the storage device on the camera.

17  **Q.**   Going forward today, how should we refer to this

18  functionality that you described with the low-quality stream

19  being sent to the phone and a high-quality stream being saved?

20  **A.**   We'll refer to them as live preview while recording

21  feature.

22  **Q.**   And when we talk about live preview while recording, what

23  exactly is being recorded?

24  **A.**   From the user's experience, the recording here talks

25  about, for example, the user pressing the recording button and

 1  the higher-quality orange stream being stored in the storage

 2  device.  But behind the scene, both the orange higher-quality

 3  stream and the lower-quality green stream are generated and

 4  recorded in data buffers.

 5  **Q.**   And is this demonstrative that you just walked through, is

 6  that an accurate representation of how you found the

 7  HERO6 Black to operate?

 8  **A.**   Yes.

 9  **Q.**   Are there any benefits to having a camera with this live

10  preview while recording functionality?

11  **A.**   Yes.  Just like how GoPro explained in its own YouTube

12  video that we just saw, seeing what the camera see -- is seeing

13  allows the user to frame the perfect shot, to change the camera

14  settings or simply adjust the placement or angle of the camera.

15  **Q.**   Is it also possible to play back the recording?

16  **A.**   Yes.  When the video is stored in the storage device, the

17  user clearly can play back those videos as well.

18  **Q.**   Now, what is this slide here showing?

19  **A.**   This slide lists all 27 GoPro accused cameras that we're

20  going to look at in detail today.

21  **Q.**   Are all 27 cameras listed here on the screen?

22  **A.**   They're all represented here, but I have grouped some

23  similar models.  For example, the HERO3 models, the third group

24  from the top, includes HERO3 Black, Silver, and White.  So I

25  have grouped them together to make the table slightly shorter

1   than how it would have been.

2   **Q.**   And you reviewed each of those 27 camera models?

3   **A.**   Yes, I did.

4   **Q.**   Now, have there been any findings as to whether Claim 11

5   of the '954 patent has been met, the elements of Claim 11 of

6   the '954 patent has been met by the products listed here?

7   **A.**   Yes.  We all heard from the Judge yesterday morning that

8   all elements of Claim 11 have been met by all 20 camera models

9   that have a gavel next to them.

10   **Q.**   How should we refer to this group of 20 camera models that

11   are listed here that have already been found to meet the

12   elements of Claim 11?

13   **A.**   We refer to them as Live Preview Group 1 cameras, and

14   sometimes I'll just say Group 1 cameras.  They refer to these

15   20 cameras.

16   **Q.**   And I think you mentioned there are 20 cameras in that

17   group; is that right?

18   **A.**   Yes.

19   **Q.**   How many additional cameras are there still at issue

20   listed below that?

21   **A.**   There's seven remaining cameras outside of those

22   20 camera, Group 1.

23   **Q.**   And one last question on the Group 1 cameras.  We were

24   looking at the HERO6 Black earlier.  How does the HERO6 Black

25   compare to these other Group 1 cameras, at least related to the

1    live preview while recording functionality?

2    **A.**    I have found that the HERO6 Black camera to be

3    representative of all the 20 cameras in Group 1.

4    **Q.**    Are there any other claims being asserted in this case

5    against the Live Preview Group 1 cameras?

6    **A.**    Yes.  And they include Claim 12 of the '954 patent and

7    Claim 6 of the '694 patent.

8    **Q.**    How does Claim 12 relate to Claim 11?

9    **A.**    Claim 12 is what's called a dependent claim and it depends

10   on Claim 11.

11   **Q.**    And what does that mean?

12   **A.**    That just means that in order to show that Claim 12 is

13   infringed by a camera, all elements of Claim 11 have to be met

14   or included in that camera, and the additional requirement in

15   Claim 12 needs to be met or included in that same camera.

16       So when I say an element is met by a camera or an element

17   is met -- is included in a camera, it's the same way as I say

18   this element is infringed by that camera.

19   **Q.**    What is this slide here showing?

20   **A.**    This slide shows all elements of 11 -- of Claim 11 of the

21   '954 patent.  And we're focusing on the 20 cameras in Group 1

22   right now.  And I just -- I mentioned with the last slide that

23   all elements shown here have been found by the Court to be

24   included in all 20 Group 1 cameras.

25   **Q.**    Okay.  Let's move on to Claim 12.  What does Claim 12

1   require in addition to Claim 11?

2   **A.**   The additional requirement that Claim 12 has is that these

3   two streams generated to have either different resolutions or

4   different frame rates.  And I found that because all 20 cameras

5   in Group 1 have at least different resolutions, so they all

6   infringe Claim 12 of the '954 patent.

7   **Q.**   And how were you able to make this finding about the

8   different resolutions and different frame rates?

9   **A.**   I reviewed the source code, relevant documentation as

10  well.  I also relied on my own testing of these cameras.

11  **Q.**   Okay.  So let's move on to Claim 6.  Does Claim 6 depend

12  on any claims, like Claim 11 we just looked at?

13  **A.**   Yes.  Claim 6, as you can see here, is also a dependent

14  claim.  It depends on Claim 3 of the same patent.  Again, it

15  just means that we have to show that all elements of Claim 3

16  are met by a camera and the additional requirement of Claim 6

17  is also met by the same camera.

18  **Q.**   Okay.  So let's go ahead and look at Claim 3 first.

19      Before we do that, what is this slide here showing?  I

20  know there's a lot of words on the screen, so can you just walk

21  us through this real quick?

22  **A.**   Of course.

23      On this slide, I'm showing all elements of Claim 11 on the

24  left and all elements of Claim 3 on this side.  The good news

25  is that there are a lot of similarities between these two

HU - DIRECT / KRILL

1  groups.  Some elements are either identical, near identical, or

2  are very similar.  So we're going to look at those first with

3  regard to the 20 cameras in Group 1.

4  **Q.**  Okay.  And I think I got ahead of you, but could you

5  please just walk us through the slide.

6  **A.**  Of course.

7  So, for example, the preamble, the lens, the image sensor,

8  and first requirement of camera processor elements, so those

9  are preamble Elements A, B, D, and E of Claim 11 are near

10  identical or word-for-word the same as the Preamble Elements B,

11  C, and D in Claim 3.

12  And I think the next set we have are the wireless

13  connection protocol device elements that will be Element C in

14  Claim 11 and Element E in Claim 3.  And they are very similar

15  as well except -- if we could go back just a little bit.

16  **MR. KRILL:**  Allen, can you go -- oh, got it.  Wrong

17  button.

18  **THE WITNESS:**  No worries.  I wish we could go that

19  fast too.

20  So we go back to these two elements about wireless

21  connection protocol device.  And what I just wanted to point

22  out, that they're similar, but Claim 11 for this element has an

23  additional real-time requirement than that Element E in

24  Claim 3.

25  And then the next set are the generate elements and calls

1    the wireless connection protocol device to send the first image

2    data stream elements.  So that will be Elements F and G in

3    Claim 11 and Elements H and I in Claim 3.

4         And these two elements are very similar to each other as

5    well, except they just refer to these two video streams by

6    different names, and that difference doesn't affect

7    infringement.

8         The next set of elements relate to control signals, and

9    they include Elements H, I, J in Claim 11 and Elements K and L

10   in Element 3 -- in Claim 3.  And there are some subtle

11   differences.  For example, Claim 3 has additional requirement

12   based at least in part on input received from a user of the

13   personal portable computing device prior to a recording of the

14   scene.  And those are all met by Group 1 cameras.

15   **BY MR. KRILL:**

16   **Q.**   So what is your opinion with regard to whether the

17   Live Preview Group 1 cameras include the elements of Claim 3

18   with a check on the right side of the screen?

19   **A.**   My opinion is that for the same or very similar reasons,

20   that those claims corresponding to these -- those elements in

21   Claim 11 are met by all 20 Live Preview Group 1 cameras.

22        These corresponding elements in Claim 3 are also met by

23   the same cameras in Group 1.

24   **Q.**   Now, before walking through the remaining elements of

25   Claim 3 of the '694 patent, have you reviewed the product

**HU - DIRECT / KRILL**

1  manuals for each of the Group 1 cameras?

2  **A.**    Yes, I have.

3  **Q.**    And remind us again, how many cameras are in the Group 1

4  set?

5  **A.**    There are 20 of them.

6  **Q.**    So there are how many product manuals?

7  **A.**    20.

8  **Q.**    So I'm going to ask you just to flip through briefly a few

9  of those and see if you have a -- have reviewed those and admit

10  them into evidence.  And that would be -- I'll wait for you --

11  Trial Exhibit 55, 56, 57, 69, 71, 74, 87, 120, 148, 149, 152,

12  156, 158, 159, 160, and then 813 -- 813, 815, 816, 817, and

13  818.

14      Are those the product manuals you reviewed for the Group 1

15  cameras?

16  **A.**    Yes, they are.

17        **MR. KRILL:**  Your Honor, we would move to admit those

18  into evidence?

19        **THE COURT:**  Any objection?

20        **MR. HAYNES:**  No objection, Your Honor.

21        **THE COURT:**  All right.  They're all admitted.

22      (Trial Exhibits 55, 56, 57, 69, 71, 74, 87, 120, 148, 149,

23  152, 156, 158, 159, 160, 813, 815, 816, 817, and 818 received

24  in evidence.)

25  \\\

1    BY MR. KRILL:

2    **Q.**   Now, are these all 20 of the manuals you reviewed for the

3    Group 1 cameras?

4    **A.**   Yes, they are.

5    **Q.**   Now, looking at this slide here, did you find that the

6    remaining elements of Claim 3 of the '694 patent were met by

7    the Live Preview Group 1 cameras?

8    **A.**   Yes.  And just to reorient ourselves, starting on this

9    slide, we're looking at a few elements in Claim 3 that are not

10   in Claim 11.  So we have to look at those claims as well.  In

11   the first set of -- those elements as well.

12        And the first set of such elements include Elements A, F,

13   and G in Claim 3, and they all relate one way or the other to

14   the mount and mounting interface.

15   **Q.**   And can you walk us through these elements?

16   **A.**   Of course.

17        Using HERO6 Black as an example, as I explained earlier,

18   the camera is inside this frame.  Let me take this apart.

19        So this frame with this bit at the bottom, just like how

20   HERO6 Black's manual explains, that satisfies the mounting

21   interface coupled to the video camera for mounting the video

22   camera to a user of the video camera, Element F.

23        And this bit at the bottom, if I can put this back in,

24   this constitute as the required camera mount.

25        And then additionally, I can mount that, for example, to

1   my helmet or a chestee, a strap that I can put here, and so on.

2       And this allows the user of the camera to further do some

3   manual adjustment of the video camera.  So this satisfies the

4   Element G.

5       And all together, they make the camera hands-free,

6   compact, and portable.  So that satisfies Element A in Claim 3.

7   **Q.**   So what is your opinion as to whether Elements A, F, and G

8   are satisfied?

9   **A.**   They are all met by all 20 cameras in Live Preview

10  Group 1.

11  **Q.**   And the HERO6 Black you showed just now with the product

12  manual on the screen, did the other 19 product manuals for the

13  Group 1 cameras describe similar mounting-related components?

14  **A.**   Yes, they all do.

15  **Q.**   And it's your opinion that those other 19 cameras meet

16  these elements for the same reasons?

17  **A.**   Yes.

18  **Q.**   Now, what's the next element shown here on the screen?

19  **A.**   The next element that's also new in Claim 3 compared to

20  Claim 11 is Element J, and that requires the first video image

21  content, which is the lower-quality green stream, to comprise a

22  preview image of the scene, which it does.  And this preview

23  image allows the user of the camera to manually adjust an angle

24  of the video camera.

25      And, for example, HERO6 Black, you can do here very easily

1    to adjust the angle.

2    **Q.**    So what did you find for Element J, if it was met?

3    **A.**    I found that Element J in Claim 3 is met by all 20 cameras

4    in Group 1.

5    **Q.**    How about Element M, about recording the second stream?

6    **A.**    The last element in Claim 3 requires the record command to

7    cause the second video image content that is the higher-quality

8    orange stream to be stored in a storage device at the video

9    camera.  And I have found that element is met by all 20 Group 1

10   cameras as well.

11   **Q.**    Is your opinion supported by any GoPro material?

12   **A.**    Yes.  I believe that the YouTube video that we looked at a

13   few minutes ago also touch on some of the specific elements

14   that we are talking about here as well.

15           **MR. KRILL:**  Let's watch a 10-second clip of that.

16           (Video was played but not reported.)

17   **BY MR. KRILL:**

18   **Q.**    And so how does that support your opinion?

19   **A.**    It's fully consistent with my analysis.  And this camera

20   shown right here, that's another one of the 20 cameras in

21   Group 1.  It's a HERO Session camera.  And I believe at the

22   beginning of the clip it mentions viewfinder.  That's just

23   another name for live preview feature.  So you can use your

24   mobile device to live preview the scene or use that as a

25   viewfinder of your camera.  So those are two terms that refer

1    to the same feature.

2    **Q.**    So before moving to Claim 6, what is your opinion as to

3    whether all elements of Claim 3 are met?

4    **A.**    My opinion is that all elements of Claim 3 are met by all

5    20 cameras in Group 1.

6    **Q.**    Now, let's look at Claim 6.  What does Claim 6 require?

7    **A.**    Claim 6 requires additionally that the light -- the

8    control signals to comprise the lighting settings.

9    **Q.**    And what did you find for Claim 6?

10    **A.**    Based on my analysis of the source code, the relevant

11    documentation, and my own testing, I have found that 18 cameras

12    in Group 1 include at least one type of lighting settings.  So

13    those 18 cameras also infringe Claim 6.

14        But there are two cameras in Group 1, HERO7 Silver and

15    HERO7 White, they don't support any lighting settings.  So

16    those two cameras, they infringe Claim -- Claims 11, 12 of the

17    '954 patent, but those two cameras don't infringe Claim 6 of

18    the '694 patent.

19        But all 20 cameras in Group 1 infringe the two claims of

20    the '954 patent, and 18 cameras in Group 1 infringe Claim 6 of

21    the '694 patent.

22    **Q.**    And how are you able to tell -- the control settings, the

23    lighting settings, how could you tell that the cameras could

24    adjust those?

25    **A.**    Basically, I used the word "behind the scene" a lot in the

1   source code, so how the cameras are implemented.  I look at the

2   source code that set up these configurations.

3        Then I go to my own testing to see, can I change those

4   settings on my mobile phone?  And I look for relevant

5   documentation.  I say:  Oh, these settings can be changed on

6   this -- in this cameras.  So I look at a body of evidence like

7   that.

8   **Q.**  So those are the 20 cameras in the Live Preview Group 1.

9        So let's move on to the other cameras that are at issue.

10  What is this slide showing?

11  **A.**  This slide shows and highlights the remaining seven camera

12  models that we also need to look at today.

13  **Q.**  Now, before discussing these, did you review the product

14  manuals for these seven accused products?

15  **A.**  Yes, I did.

16  **Q.**  Can you flip in your binder and just really quick look at

17  Exhibit 814 first, then 1210, 1211, 1212, 1213, 1214, and 1215.

18  Are those the product manuals that you reviewed and relied on?

19  **A.**  Yes, they are.

20       **MR. KRILL:**  Your Honor, we move to admit those

21  exhibits into evidence.

22       **MR. HAYNES:**  No objection.

23       **THE COURT:**  All right.  They're all admitted.

24       (Trial Exhibits 814, 1210, 1211, 1212, 1213, 1214, and

25  1215 received in evidence.)

1  BY MR. KRILL:

2  Q.    And are these the seven product manuals that you reviewed

3  for these cameras?

4  A.    Yes, they are.

5  Q.    Do all of the remaining cameras at issue function exactly

6  the same way?

7  A.    No.  There are a lot of similarities among these seven

8  cameras, but there are some differences as well.

9  Q.    So what are those similarities?  I'm sorry.  What are

10  those differences that you had mentioned?

11  A.    We're going to look at both sides, either ways.

12      So if we focus on the differences first, we can see here

13  that in terms of the live preview while recording feature, not

14  all of the seven remaining camera models support that feature.

15  Q.    And which camera models of the remaining seven support

16  that feature and which do not?

17  A.    Starting with the HERO9 Black and HERO10 Black, and those

18  two cameras are not configured to support this feature at all.

19      And then when we go to the HERO11 models, there are two

20  models in that group, HERO11 Black and HERO11 Black Mini.  And

21  those two cameras, when they first were released to the

22  customers, they also didn't support that feature.  But the

23  feature was added back later on with a software update.

24  Q.    Did you review the HERO11 camera models?

25  A.    Yes, I did.

HU - DIRECT / KRILL

```
 1   Q.   Can you turn in your binder to Trial Exhibit 1291.

 2        Is that a photograph of the HERO11 Black that you

 3   reviewed?

 4   A.   Yes, it is.

 5             MR. KRILL:  Your Honor, we would move to admit Trial

 6   Exhibit 1291.

 7             MR. HAYNES:  No objection, Your Honor.

 8             THE COURT:  It's admitted.

 9        (Trial Exhibit 1291 received in evidence.)

10   BY MR. KRILL:

11   Q.   Is this the picture that you were just looking at that you

12   took?

13   A.   Yes.  This is a picture of HERO11 Black that I took when I

14   first took it out of its box.

15   Q.   And what does the camera say on the back?

16   A.   It says that -- that's a sticker at the back of the camera

17   that says [as read]:

18             "Your camera must be updated before you can use

19        it."

20   Q.   And did you, in fact, have to update it before you used

21   it?

22   A.   Yes, which means that when I started the camera, I was

23   required to load the new software for that camera and install

24   that on that camera.

25   Q.   And after you installed that software, did you test the
```

HU - DIRECT / KRILL

1   camera?

2   **A.**   Yes, I did.

3   **Q.**   And what did you observe?

4   **A.**   The live preview while recording feature worked.

5   **Q.**   Now, were you able to tell when the live preview while

6   recording features were added back to those HERO11 models?

7   **A.**   Yes.

8   **Q.**   And what were those dates?

9   **A.**   The dates that the -- firmware is just another name for

10  software in the camera.  So the firmware/software update was

11  released for these two models on March 14th, 2024, and May 9th,

12  2024, respectively.

13  **Q.**   And how did you figure out those dates?

14  **A.**   Through my independent research, as well as reviewing

15  GoPro's documentation.

16  **Q.**   So how about the HERO11, 12, 13, and 4K models?  Did you

17  review any documents also showing that those have the live

18  preview while recording feature?

19  **A.**   Yeah.  They always have the feature configured.

20  **Q.**   Can you turn in your binder to Trial Exhibit 1229.  Is

21  1229 a document you reviewed in forming your opinions?

22  **A.**   Yes.

23       **MR. KRILL:**  Your Honor, we move to admit 1229 into

24  evidence?

25       **MR. HAYNES:**  No objection, Your Honor.

1              **THE COURT:**  It's admitted.

2         (Trial Exhibit 1229 received in evidence.)

3    **BY MR. KRILL:**

4    **Q.**    What does Trial Exhibit 1229 say?

5    **A.**    This is a recent web page from GoPro's website, gopro.com,

6    that explains that, at the very bottom of the slide, that

7    HERO12 Black and newer cameras support live preview while

8    recording feature.

9    **Q.**    Now, right down there at the bottom where you just read,

10   it refers to pairing the camera and Quik via WiFi to use the

11   live preview while recording feature.

12        What is that referring to?

13   **A.**    So here, if you have not used GoPro app before, Quik is

14   just the current name for the GoPro mobile app.  And here, it

15   means that the camera and the phone that runs the GoPro mobile

16   app must be paired via WiFi.  And this pairing will be a direct

17   pairing.  So it's not going out to your home WiFi or WiFi at

18   Starbucks, for example.  It's a direct WiFi connection between

19   the camera and the phone.

20   **Q.**    So going forward today, how should we refer to these live

21   preview cameras that you just discussed?

22   **A.**    So you can see that the bottom four model lines all

23   support live preview while recording feature, but -- so I'll

24   refer to most of them as Live Preview Group 2 cameras.

25        I singled out HERO 4K from that group because -- just

1   because it uses a camera processor from a different

2   manufacturer than the cameras in Group 2.

3   Q.   So looking at this chart, the first 20 models listed here

4   supported live preview while recording.  The next three did

5   not.  Then GoPro added it back in the HERO11 models and then

6   released three more models that did support the feature; is

7   that correct?

8   A.   That's correct.

9   Q.   Now, we've been discussing live preview while recording.

10   Are the HERO9 Black, 10 Black, and 11 models accused of

11   infringing in this case?

12   A.   Yes, they are.

13   Q.   And what feature is that that they're accused of?

14   A.   It's a very similar feature called live streaming while

15   recording that are supported by these cameras that also

16   infringe the two patents asserted in this case.

17   Q.   So for purposes of today, which cameras are we going to be

18   focused on for live streaming?

19   A.   I'm including those four camera models:  HERO9 Black,

20   10 Black, and the two HERO11 models in the live streaming

21   group.

22   Q.   Why aren't you including the other cameras that we looked

23   at that also support live streaming?

24   A.   Yeah.  Those cameras with a grayed-out "Yes" in their row

25   under "Live Streaming," these ones, because they already

1  infringe the asserted patents with the live preview while

2  recording feature, I'm excluding them from the live streaming

3  group.

4  **Q.**   So going -- sorry.  So going forward today, the

5  HERO9 Black, the HERO10 Black, and the pre-updated HERO11

6  models, how are we going to refer to those?

7  **A.**   I will refer to them as live streaming cameras.

8  **Q.**   And that's just limited to those three -- or four camera

9  models right there; correct?

10  **A.**   That's correct.

11  **Q.**   For purposes of live streaming, how do these four camera

12  models represented by this list compare?

13  **A.**   They're very similar, for the feature of live streaming

14  while recording, with each other.

15  **Q.**   Now, looking at all the remaining seven cameras at issue,

16  you mentioned that there were some similarities between them.

17      Did you prepare any demonstratives to show those

18  similarities?

19  **A.**   Yes, I did.  And this slide shows a HERO12 Black camera.

20      And can I show the -- and I have a sample of HERO12 Black

21  camera here.

22  **Q.**   Now, can you walk the jury through this demonstrative

23  showing the similarities between the remaining seven cameras.

24  **A.**   Of course.

25      A few minutes ago, I explained that with the seven

 1    remaining cameras, there are some differences among them, but

 2    there are a lot of similarities within those seven cameras.

 3    And this slide highlights those similarities.

 4         And they include that the light propagated through the

 5    lens being captured by image sensor and is further used to --

 6    by the camera processor to generate video streams.  And prior

 7    to the user presses the record button for live preview while

 8    recording or start live streaming for live streaming while

 9    recording feature, it's the same.  The lower-quality green

10    video stream is generated and transmitted to the mobile device

11    which allows the user to change those camera settings from the

12    mobile device.

13         And that process, at a high level, is the same among the

14    seven remaining cameras.  And also, they're the same compared

15    to those 20 cameras in Group 1 that we already looked at.

16    Q.   Now, focusing on those similarities at that level of

17    detail, what is this claim or what is this slide here showing?

18    A.   This slide, we bring back these two long claims, Claim 11

19    of the '954 patent and Claim 3 of the '694 patent side by side,

20    and address some of the common elements first, but this time

21    with regard to the seven remaining camera models.

22    Q.   And which --

23              THE COURT:  Maybe this is a good time to take our

24    morning break.

25              MR. KRILL:  Sure.

```
 1              THE COURT:  So, ladies and gentlemen, we'll break for
 2   15 minutes.  And please remember the admonitions.
 3        (Proceedings were heard out of the presence of the jury.)
 4              THE COURT:  We'll be back at 10:15.
 5                   (Recess taken at 10:01 a.m.)
 6                  (Proceedings resumed at 10:16 a.m.)
 7        (Proceedings were heard out of the presence of the jury.)
 8              THE COURT:  Are you ready to go?
 9              MR. KRILL:  Yes, Your Honor.
10        (Proceedings were heard in the presence of the jury.)
11              THE COURT:  All right.  Please be seated.
12        You may proceed.
13   BY MR. KRILL:
14   Q.   Hi, Dr. Hu.
15   A.   Hello.
16   Q.   I believe where we left off, we were going to walk through
17   the similarities between the remaining products at issue in
18   view of the claims, starting with the preamble.
19        So, first, can you explain your opinion as to whether
20   the -- all seven remaining products include the preamble of
21   both Claims 11 and 3?
22   A.   Of course.
23        My opinion is that all remaining seven camera models
24   include the two preambles in these two claims.  They're all
25   portable point-of-view video cameras.
```

1  **Q.**   Did you rely on any documents showing that?

2  **A.**   Yes.  For example, I relied on GoPro's own user manuals

3  for these cameras.

4  **Q.**   And which user manual is shown here?

5  **A.**   This one is HERO12 Black in particular.

6  **Q.**   And what is this manual describing?

7  **A.**   A snippet from this manual that I'm showing here

8  essentially -- is essentially showing GoPro's own words that

9  HERO12 Black camera is a POV camera and how some of the aspect

10  ratios, such as the 8:7 -- that's a width by height ratio -- is

11  especially good for taking POV video footages.

12  **Q.**   Was that 8:7 aspect ratio present in the Group 1 products

13  that we looked at?

14  **A.**   No.  This is an additional feature of the remaining

15  cameras.

16  **Q.**   So that's a new feature that was added?

17  **A.**   Yes.

18  **Q.**   And can you just explain again, what does this manual have

19  to say about that new feature that was added?

20  **A.**   It just says that it's especially good for POV cameras.

21  **Q.**   How about the HERO 4K manual?  What does that have to say?

22  **A.**   This snippet from HERO 4K manual again shows GoPro's own

23  words that how this particular camera model takes, I quote,

24  unforgettable point-of-view footage.  So it's a POV camera as

25  well.

1  **Q.**   And are all remaining accused products POV cameras?

2  **A.**   Yes, they all are.

3  **Q.**   What is this slide showing here?

4  **A.**   Then the next set of elements recite camera lens, image

5  sensor, and a requirement of the camera processor.  These set

6  of elements, Elements A, B, D, and E in Claim 11, are identical

7  to those in Elements B, C, and D in Claim 3, and they are all

8  met by the remaining seven camera models.

9  **Q.**   What about Element C of Claim 11 and Element E of Claim 3

10  reciting a wireless connection protocol device?

11  **A.**   As we talked before with regard to the first group,

12  Group 1, 20 cameras, these two wireless connection protocol

13  device elements are also similar between the two claims; but

14  Claim 11 has an additional real-time requirement.  And these

15  two elements are met by the seven remaining camera models as

16  well.

17  **Q.**   What wireless connection protocol device is used in the

18  remaining seven cameras?

19  **A.**   In the representative HERO12 Black camera, which is this

20  one here, as well as four other camera models, 9 Black,

21  11 Black, and 11 Black and Mini, it's a wireless chip made by a

22  company called Qualcomm, and the model number is QCA9377.  That

23  is the wireless chip in those cameras acting as the wireless

24  connection protocol device.

25  **Q.**   And the HERO13 Black and HERO 4K have a different one, it

1   looks like.

2   **A.**   Yes.  They have a slightly different, but functionally the

3   same, wireless chip made by a different company called

4   Broadcom.  And here I listed their model numbers as BCM4381,

5   BCM43456.

6   **Q.**   Did you review any documentation related to the QCA9377

7   protocol device?

8   **A.**   Yes, I did.

9   **Q.**   Could you turn in your binder, please, to Trial

10  Exhibit 4481.  It might be at the very beginning, if I may

11  suggest.

12      Is this Trial Exhibit 4481 a document that you reviewed in

13  forming your opinions?

14  **A.**   Yes, it is.

15      **MR. KRILL:**  Your Honor, we move to admit Trial

16  Exhibit 4481 into evidence.

17      **MR. HAYNES:**  No objection.

18      **THE COURT:**  It's admitted.

19      (Trial Exhibit 4481 received in evidence.)

20  **BY MR. KRILL:**

21  **Q.**   Now, what is 4481 showing?

22  **A.**   4481 is a publicly available design document of this

23  QCA9377 chip.  It looks slightly bigger on the screen than --

24  it's about a square inch in size.

25      So this is a wireless connection protocol device that

1    supports both WiFi and Bluetooth.

2    **Q.**    Now, I want to go back to the prior slide.  How does that

3    QCA9377 device and the remaining accused seven cameras compare

4    to the wireless connection protocol device used in the -- some

5    of the Group 1 cameras?

6    **A.**    In fact, it's the same chip and configured the same in

7    some of the Group 1, though, among those 20 cameras that

8    the Court has already found to include the wireless connection

9    protocol device element in Claim 11.

10   **Q.**    Now, going back to this QCA9377 device, how are wireless

11   transmissions sent from the device?

12   **A.**    It's over WiFi.

13   **Q.**    How are wireless transmissions received by the device?

14   **A.**    For the control signals, they're received by the device

15   through Bluetooth; and in some scenarios it could also receive

16   by WiFi.  But it doesn't matter because the claim requires a

17   wireless connection protocol device.  It doesn't say it has to

18   be WiFi or it has to be Bluetooth.  It doesn't say it has to be

19   the same protocol or it has to be different protocols.  Just

20   that it is a wireless connection protocol device that can

21   transmit video wirelessly and receive control signals

22   wirelessly as well.

23   **Q.**    So does that support your infringement opinion?

24   **A.**    Yeah.

25   **Q.**    Were you in the -- were you present in the courtroom for

1  opening statements on Monday?

2  **A.**   Yes, I was.

3       **MR. KRILL:**   Allen, can you bring up DDX-1.24?

4  **Q.**   Are these the same two -- well, let me back up.

5       Do you recall this slide being shown in opening arguments?

6  **A.**   Yeah, I recall this was a slide from GoPro's opening

7  statement.

8  **Q.**   And are these the same two wireless connection protocol

9  device limitations that we're discussing right now?

10  **A.**   Yes.   And I like their highlighting as well.   That's

11  exactly what I was explaining to you, what these two elements

12  require.

13       **MR. KRILL:**   Could you go to 25, the next slide?

14  **Q.**   Do you recall this slide being shown during opening

15  arguments?

16  **A.**   Yes, I do.

17  **Q.**   And do you see how it's titled GoPro's Separate Protocol

18  Devices?

19  **A.**   I see that.

20  **Q.**   What device is shown here in this block diagram?

21  **A.**   It's the same QCA9377, this one square inch wireless chip

22  made by Qualcomm that's shown in this diagram.   So, basically,

23  if I may, this is a very high-level diagram of all the

24  components and functionality inside that one square inch chip.

25  **Q.**   And so are there separate wireless protocol devices and

1  separate Bluetooth protocol devices or is this one protocol

2  device?

3  **A.**    It's just one device.  So I would, if I can --

4       So it's just one wireless connection protocol device,

5  QCA9377.

6  **Q.**    And I see that the WiLAN -- WLAN boxes are boxed in red

7  and the Bluetooth, BT boxes, are boxed in yellow.  Are those

8  the only components of this QCA9377 device related to WiFi or

9  Bluetooth?

10  **A.**    No.  I -- somehow GoPro is trying to say within this -- at

11  least from my understanding of what they said at the opening,

12  that somehow within this chip, you can carve it into two parts,

13  one is WiFi and one is Bluetooth.  And that's just not the

14  case.

15       For example, GoPro used these red and yellow frames to

16  indicate wireless LAN and Bluetooth respectively, but you can

17  see that even the diagram itself here also mention WiFi and

18  Bluetooth.  And WiFi is just another name for wireless LAN or

19  WLAN.

20       And what's more than that, all of the remaining components

21  are related to WiFi and Bluetooth as well.  For example, the

22  2.4 gigahertz band is a shared frequency band used by both WiFi

23  and Bluetooth.

24       And here, these 802.11A/B/G and N and AC, I think we use

25  that in our everyday life.  Like you buy a wireless router,

1    what it supports.  So that part is related to WiFi as well.  Or

2    wireless LAN.

3        And all of the remaining elements -- the CPU runs the

4    software and all the remaining components, they are related to

5    WiFi and Bluetooth as well.

6        So this QCA9377 is a single wireless connection protocol

7    device that supports both WiFi and Bluetooth in an intertwined

8    way.  You cannot just break them into two parts, as shown by

9    the same block diagram that GoPro has relied upon in their

10   opening statement.

11           MR. KRILL:  Allen, can we go back to the presentation.

12   BY MR. KRILL:

13   Q.   Okay.  Let's look at the next set of elements, which I

14   think you might have referred to as the control signal elements

15   earlier.  Can you walk us through these.

16   A.   Of course.

17        So these elements, H, I, J of Claim 11 and K and L in

18   Claim 3, are all related to control signals.  And I want to

19   point out some of the details here about what those control

20   signals require.

21        So it requires one from each of the two groups.  The first

22   group includes a resolution setting, and the second group

23   includes an audio setting.

24   Q.   And what did you find with respect to whether the

25   remaining seven accused camera models included these control

1    signal limitations?

2    **A.**    Based on my review of the source code, my own testing, and

3    relevant documentation, I have found that all of these elements

4    are all included in the seven remaining camera models.

5        For example, here is a table that I have put together,

6    based on my analysis, exactly what settings and what type of

7    lighting settings, what type of color settings and audio

8    settings, and so on, are supported in each of the seven

9    remaining camera models.

10       As you can see, at a minimum, they all support at least a

11   resolution setting from the first group required by the claim

12   and at least the audio settings required in the second group in

13   the claim language.

14       So all seven remaining cameras include, and hence

15   infringe, all of the control signals related elements in these

16   two patents.

17   **Q.**    Now, finally, looking at Claim 3 on the right, what did

18   you find for these other elements, A, F, and G in Claim 3?

19   **A.**    These three elements relate to mounting and mounting

20   interface, and I believe that I have here a few models from

21   these remaining seven models.

22       So here is HERO12 Black, also includes the mounting

23   interface.  That would be this bit here.  It doesn't have the

24   frame compared to HERO6, but it has this bit here.  Okay.  I'll

25   just take it apart quickly so that it's obvious.

1    So it has this bit here that constitute as -- if I can

2    pull it out.  Okay.  Yeah.

3    **Q.**    It's a little tricky.

4    **A.**    So this will be the mounting interface.  And, similarly,

5    this is the mount, and I can put this back together and mount

6    to my helmet, for example.  And that's the same for

7    HERO10 Black, and I have HERO 4K on the selfie stick.

8    **Q.**    So what is your opinion as to whether the remaining seven

9    camera models include these elements?

10   **A.**    My opinion is that the remaining seven camera models all

11   include these elements.

12   **Q.**    And do the product manuals support that opinion?

13   **A.**    Yes, they all do.

14   **Q.**    So going forward today, for the remaining seven camera

15   models, what limitations are we focused on?

16   **A.**    Now we're going to zoom in to these elements highlighted

17   in yellow in Claim 11 and Claim 3, and then we're going to look

18   at their respective dependent claims, Claim 12 and Claim 6.

19   **Q.**    So let's start with the Live Preview Group 2 Cameras that

20   we were looking at, starting with Claim 11.  What camera is

21   shown here on the slide?

22   **A.**    This, again, is the HERO12 Black camera.

23   **Q.**    And, again, how does the HERO12 Black compare to the other

24   Group 2 cameras?

25   **A.**    I have found that to be representative for the cameras in

HU - DIRECT / KRILL

1    Group 2.

2        And to refresh our memories, Group 2 includes HERO12

3    Black, HERO11 Black and Mini after the software update in 2024,

4    as well as the HERO13 Black camera.  So four cameras in

5    Group 2.  And I have found the 12 Black to be representative.

6    **Q.**   What did you find for Elements F and G here, highlighted?

7    **A.**   I have found that these two elements both are requirements

8    for the camera processor.  One is to generate two video

9    streams, and the second is to cause the wireless connection

10   protocol device to send the first stream and -- directly to the

11   personal portable computing device for display on the display

12   of the personal portable computing device.  These are all met

13   by Live Preview Group 2 Cameras.

14   **Q.**   Now, does the term "generate," was that defined in any

15   particular way?

16   **A.**   Yes.  The Court has construed the generate term in

17   Element F to mean record in parallel.

18   **Q.**   For the Group 2 cameras, are the streams recorded in

19   parallel as required by the Court's construction?

20   **A.**   Yes, they all are.

21   **Q.**   What did you review in forming your opinions?

22   **A.**   Again, I reviewed different types of evidence.  One of

23   them is GoPro's own documentation explaining how the camera

24   processors function for these cameras.

25   **Q.**   And before we get to that documentation, you said the

1    source code.  How did the source code -- without talking about

2    specifics, how did the source code support your opinion?

3    **A.**    The source code is essentially the recipe inside these

4    cameras.  And the engineers wrote them, say you do this first

5    to call this function, run this command, and that's that.  And

6    that's compiled into binary instructions that the cameras can

7    understand.

8    **Q.**    Now, if you could turn in your binder to Trial

9    Exhibit 1259.

10   **A.**    Yes.

11   **Q.**    Did you review Trial Exhibit 1259 in forming your

12   opinions?

13   **A.**    Yes, I did.

14          **MR. KRILL:**  Your Honor, we move to admit Exhibit 1259.

15          **MR. HAYNES:**  No objection.

16          **THE COURT:**  It's admitted.

17      (Trial Exhibit 1259 received in evidence.)

18   **BY MR. KRILL:**

19   **Q.**    Okay.  What is this Exhibit 1259 cover page showing here?

20   **A.**    This is one of GoPro's own design documentation describing

21   how the camera processor in Live Preview Group 2 Cameras

22   function to support various use cases.

23   **Q.**    You said "use case."  What is a use case?

24   **A.**    It's just a scenario that you can use your camera for.

25   For example, live preview while recording is a use case, and

1  live streaming while recording is another use case.

2  **Q.**   What does this slide here show?

3  **A.**   This slide is a high-level block diagram from GoPro's own

4  design documentation, explains how the camera works inside

5  those -- how the processor works inside those cameras.

6  **Q.**   There's a lot going on here.  Did you prepare any

7  simplified demonstratives to assist the jury in explaining how

8  you formed your opinion based on this document?

9  **A.**   Yes, I did.

10  **Q.**   Let's walk through those.

11      Dr. Hu, could you walk us through this demonstrative here?

12  **A.**   Of course.

13      So the light propagated through the camera lens is

14  captured by the image sensor and further used by the camera

15  processor to generate video streams.  And after the user

16  presses the recording button, two video streams are generated.

17  The lower-quality green stream is recorded and further

18  wirelessly transmitted to the mobile device, and the

19  higher-quality orange stream is recorded and further stored in

20  the storage device.

21  **Q.**   Now, is the image processing represented by the yellow

22  arrows, is there any delay associated with that?

23  **A.**   Yes.  In fact, there are two delays put in the design by

24  GoPro.  In the lower-quality green path, there is a

25  1/60th second of delay.  That's natural because you have to

1  take one frame -- in this particular example, the video is

2  taken at 60 frames per second.  So this 1/60th-second delay is

3  very natural.  You have to take a frame that comes in from the

4  image sensor at 60 frames per second.  Then you need time to

5  process that frame and then sends it along.  So that is a very

6  common delay.  But 1/60th of a delay is not perceivable by us

7  as humans.

8      But in the upper paths, the orange higher-quality video

9  stream, there is up to one-second delay.  And the purpose of

10  that delay is that it helps the image stabilization.  So we

11  know that action cameras are often used when the users are

12  skiing, mountain biking, and so on, so they're often a lot of

13  motion in the video.  So this one is put in here by design to

14  help eliminate some of those shakes.

15  **Q.**  So does that one-second delay mean that the streams are

16  not generated in parallel from the same image data?

17  **A.**  It doesn't affect that because generate, which the Court

18  has construed as record in parallel, doesn't require record at

19  the exact same time.

20      So we can see that these two streams are generated along

21  one another, so they are in parallel, and the different delay

22  numbers in their paths don't matter.

23  **Q.**  So to provide some context, what would be the opposite of

24  generating two streams in parallel?

25  **A.**  The polar opposite, obviously, is to generate in serial or

1  to generate in sequence.  And what will show up here is that if

2  we change how the accused GoPro camera work and instead of

3  generating these two streams in parallel, and somehow we take

4  the output of the orange stream and use that to generate the

5  green stream, that would be an example of generating in serial.

6  And that is opposite to GoPro's actual implementation, which,

7  as you can see here, is generating in parallel.

8  **Q.**   Now, how about the requirement that generate means record

9  two streams?  Are the two streams recorded?

10 **A.**   Yes.  They're both recorded in the data buffers.  For the

11 higher-quality video stream is recorded in the 80 megabits per

12 second data buffer and then is further stored in the storage

13 device, and the lower-quality video stream is recorded in the

14 4 megabits per second data buffer and then it's further

15 transmitted out over WiFi.

16 **Q.**   Does Claim 11 require storing the low-quality green stream

17 here in a memory card or a file storage device?

18 **A.**   Claim 11 doesn't have that requirement.

19 **Q.**   Are there other claims in the '954 patent that require the

20 first green stream that we were looking at to be stored in the

21 storage device?

22 **A.**   Yes.  Another claim, that's Claim 13 of '954 patent, that

23 does have that requirement.  But that claim, Claim 13, is not

24 asserted against the GoPro cameras at this trial, so we don't

25 need to consider this additional requirement about the

1  permanent storage of the video streams in SD card.

2      Claim 11 just requires both streams to be recorded in

3  parallel.

4  **Q.**  So looking back at this diagram, is the green stream saved

5  in a file storage device like an SD card?

6  **A.**  Generally, it's not.

7      And there is another stream, the gray stream shown here,

8  that is stored in the SD card as well.  It's also of lower

9  quality than the orange stream, but it's the additional feature

10  that GoPro has.  The claim just requires two streams, orange

11  and green; and whether or not GoPro also implements other

12  features, additional features, that doesn't affect

13  infringement.

14  **Q.**  So how does this gray stream and what you're describing

15  here compare to the Group 1 cameras that we looked at earlier?

16  **A.**  That's another difference between the 20 cameras in

17  Group 1 and some of the cameras in Group 2, is that in the

18  20 cameras of -- in Group 1, the gray stream and the green

19  stream are one stream.  So the lower-quality video stream in

20  the 20 cameras is recorded, wirelessly transmitted, and stored

21  in the SD card in the camera.  But because Claim 11 doesn't

22  require any storage in the SD card, so that difference doesn't

23  affect infringement.

24  **Q.**  So to be clear, how does this gray LRV stream shown here

25  affect your opinions for Claims 11 and 12?

1    **A.**    It doesn't affect my infringement opinion.

2    **Q.**    Okay.  Let's go back to the other elements.

3        What does real time mean in the context of these claims?

4    **A.**    The Court has construed real time to mean without

5    perceived delay.

6    **Q.**    And what did you find for Element B?

7    **A.**    I have found that Element B, the real-time requirement is

8    what the image sensor produces and sends to the camera

9    processor.  That's where I have marked in this diagram.

10    **Q.**    How about for Element C?  What did you find here?

11    **A.**    Now, the real-time requirement in Element C is about the

12    wireless connection protocol device, the QCA9377 that we looked

13    at earlier, how that transmits video to the mobile device.

14        So that's why I marked the real-time requirement of

15    Element C next to the WiFi symbol on that path.

16    **Q.**    We talked about delay -- delays earlier.  Where do those

17    delays occur in the context of this diagram?

18    **A.**    That's right.  That's why details matter.  And if we put

19    the delays that we talked about, one-second delay in the orange

20    path and 1/60th delay in -- 1/60th of a second delay in the

21    green path, we can see that that one-second delay in the orange

22    path is not relevant to where real time is required by

23    Claim 11.

24        Claim 11 requires real time to be in the second yellow

25    arrow and along the paths of the green arrows.  So that

**HU - DIRECT / KRILL**

1    one-second delay only means, in this scenario, that the

2    high-quality video stream will take up to a second delay when

3    they are stored in the storage device on the SD card.

4         But we all know that in normal use cases, we'll take that

5    SD card out of the camera later on to then download to our

6    laptop and so on.  So that delay doesn't matter.  And also, it

7    doesn't matter to the infringement of Claim 11.

8         Now, let's look at the 1/60th of a second delay.  So it is

9    in the path that is addressed by the real-time requirement of

10   Element C, but because it's so short, that we cannot perceive

11   it as human beings.  And, frankly, all camera systems have this

12   either 1/30th frame of a second delay, 1/60th second delay.

13   Just means that frame needs some time to be processed.

14        So that doesn't affect the infringement for the Group 2

15   cameras as well.

16   **Q.**   You said that you had tested these cameras as well.  Did

17   you perceive any delay when you were testing them?

18   **A.**   No.  I tested all cameras in Group -- a sample of all

19   cameras in each -- in Group 2, and I didn't perceive any delay.

20   **Q.**   Now, what was your ultimate conclusion regarding

21   Element C, a wireless connection protocol device?

22   **A.**   I concluded that Element C in Claim 11 is infringed by all

23   cameras in Group 2.

24   **Q.**   So let's go ahead and move on to Claim 11.  I'm sorry.

25   Claim 12.  What did you find for Claim 12?

1   **A.**   I found that Claim 12 requires, additionally, the two

2   streams to be configured with different resolutions or

3   different frame rates.  And based on my analysis of the source

4   code documentation and my own testing, all cameras in Group 2

5   support both different resolutions and different frame rates,

6   so they all infringe Claim 12.

7   **Q.**   There's a lot going on on the right side of the screen on

8   that table.  How were you able to discern that information?

9   **A.**   Here, in these two tables, I listed at least one example

10   of how different resolutions and different frame rates or

11   different resolutions, same frame rate are supported in each of

12   the four camera models in Group 2.

13   **Q.**   So what was your ultimate opinion for Claim 12?

14   **A.**   My opinion is that Claim 12 is supported, which means it's

15   met, included, and infringed by all cameras in Group 2.

16   **Q.**   Now, let's move on to Claim 6 of the '694 patent, starting

17   with Claim 3.  We've seen this slide a few times.  Can you

18   explain what you're trying to show here?

19   **A.**   Yes.  I'm showing here that these claims -- these

20   elements, C, F, and G, the wireless connection protocol device

21   element generate and transmission of the first image data

22   stream element; and the corresponding Elements E, H, and I are

23   similar between Claim 11 and Claim 3.

24        So for the same reasons or similar reasons that I just

25   explained with regard to Live Preview Group 2, these elements

1    in Claim 3 are infringed by cameras in Group 2 as well.

2    **Q.**   So let's talk about the last two elements that are

3    different.  What did you find for Element J regarding the

4    preview image and Element M regarding recording command?

5    **A.**   They're both met by all cameras in Group 2.  All cameras

6    in Group 2 include a first video image content that is a

7    lower-quality green stream.  It is a preview image of the scene

8    and allows the user to manually adjust an angle of the video

9    camera.

10       And all cameras in Group 2 allows a record command to

11   call -- cause the second video image content that is a

12   higher-quality video stream to be stored in the storage device

13   at the video camera.

14       And what I want to point out here also is that Claim 3

15   requires the orange stream to be stored in the storage device.

16   That's an additional requirement compared to Claim 11.  But

17   Claim 3 still doesn't require the lower-quality green stream to

18   be stored in the storage device, just that it's recorded and

19   wirelessly transmitted.

20   **Q.**   And so what is your ultimate opinion as to whether the

21   Live Preview Group 2 cameras include all elements of Claim 3?

22   **A.**   I concluded that all cameras in Group 2 infringe all

23   elements of Claim 3.

24   **Q.**   Let's look at Claim 6.  What did you find for Claim 6?

25   **A.**   I found that because Claim 6 requires, additionally, the

1    control signals to comprise the lighting settings, and based on

2    my review of the source code and documentation and my own

3    testing, all camera models in Group 2 support at least two

4    types of lighting settings, and they all infringe Claim 6.

5  **Q.**    So that's Live Preview Group 2.

6        Moving along to the --

7  **A.**    Yes.

8  **Q.**    -- HERO 4K.

9        Can you remind the jury why we're discussing the HERO 4K

10    separately?

11  **A.**    Of course.

12        We'll go back to that big table listing all 27 camera

13    models, and HERO 4K is at the very bottom.  So it's a new

14    camera, and it also supports live preview while recording

15    feature, but it uses a processor from a different manufacturer,

16    actually the Ambarella company that we've heard a lot so far in

17    this case.  So that camera processor -- the implementation is

18    slightly different from the other Group 2 camera processors.

19    So that's why I want to just talk about them separately.

20  **Q.**    Did you review any documents describing that Ambarella

21    processor used with the HERO 4K?

22  **A.**    Yes, I did.

23  **Q.**    Can you turn in your binder to Trial Exhibit 1231.

24  **A.**    Yes.

25  **Q.**    Is this a document you reviewed and relied on?

1    **A.**    Yes.

2         **MR. KRILL:**  Your Honor, we move to admit Trial

3    Exhibit 1231.

4         **THE COURT:**  Any objection?

5         **MR. HAYNES:**  No objection.

6         **THE COURT:**  It's admitted.

7         (Trial Exhibit 1231 received in evidence.)

8    **BY MR. KRILL:**

9    **Q.**    Okay.  What does Trial Exhibit 1231, this Ambarella

10   document, have to say about the processor?

11   **A.**    First of all, this processor -- the particular model is

12   H22.  So this is a much later version of the A5 or A5s that

13   we've heard about a lot in this -- in this case, so far.

14        And this particular camera processor from Ambarella, in

15   Ambarella's own words in their document, says that it can

16   provide simultaneous second stream.  It provides dual encode

17   for on-the-fly mobile resolution streaming.

18   **Q.**    What else does this document have to say?

19   **A.**    It further says it provides simultaneous streams and also,

20   in their own words [as read]:

21        "H22 delivers up to 4K video recording at

22        60 frames per second or equivalent performance" -- so

23        that is the orange higher-quality stream in our

24        diagram -- "while streaming a second, live,

25        mobile-resolution video over a WiFi network for

1          preview or sharing."

2          So that refers to the green lower-quality stream in our

3     diagram.  So this is -- these words shown on the screen are

4     from Ambarella's own documentation.

5     **Q.**   Now, did you review any other evidence in forming your

6     opinions as to whether the HERO 4K generates two streams in

7     parallel?

8     **A.**   Yes.  I reviewed source code of HERO 4K.  That's the

9     software portion that runs on the Ambarella processor inside

10    HERO 4K.

11    **Q.**   And so what was your conclusion as to whether the HERO 4K

12    generates two streams in parallel?

13    **A.**   My review of the source code supports my opinion.  The

14    source code is very clear at -- the camera software sets up

15    multiple streams, and there is a single function call that

16    starts encoding of those streams.

17         And we can see from Ambarella's own document those are

18    dual encoding, simultaneous streams, and so on.

19    **Q.**   So are Elements F and G, shown here, met by the HERO 4K?

20    **A.**   Yes.  My conclusion is that they are supported, which

21    means they are infringed by HERO 4K.

22    **Q.**   Let's move on to Element C.  What did you find regarding

23    Element C, a wireless connection protocol device?

24    **A.**   I found that Element C is also infringed by HERO 4K.

25    **Q.**   What does the HERO 4K product manual have to say about

1    wireless connectivity?

2    **A.**    To remind ourselves, HERO 4K uses a wireless connection

3    protocol device, the wireless chip made by a company called

4    Broadcom.  It's very similar to QCA9377 used in HERO12 Black.

5        And here, GoPro's own user manual explains how HERO 4K

6    supports both WiFi -- I believe this document talks about how

7    the WiFi can be supported and can be supported on both the

8    5 gigahertz WiFi band and the 2.4 gigahertz WiFi band.

9    **Q.**    Now, let's look at the real-time requirements and the

10    claim limitations of Claim 11.  Does HERO 4K include an image

11    sensor configured to produce real-time video image data?

12    **A.**    Yes, it does.

13    **Q.**    Is the wireless connection protocol device configured to

14    send real-time image content?

15    **A.**    Yes.

16    **Q.**    What evidence supports that opinion?

17    **A.**    For example, I tested the HERO 4K using live preview while

18    recording feature myself, and I didn't perceive any delay.

19    **Q.**    Did anything in the source code support your opinion?

20    **A.**    Yes.  The source code supports my opinion that there's no

21    delay added in the signal processing path and the video

22    generation path.

23    **Q.**    Now, do you recall earlier we looked at some documents for

24    the Live Preview Group 2 Cameras that refer to a 1/60th-second

25    delay?

1  **A.**   Yes.

2  **Q.**   Did you have similar documentation like that for the

3  HERO 4K showing the specific processing delay?

4  **A.**   I did not.

5  **Q.**   Why didn't you have that document?

6  **A.**   I believe that GoPro and Ambarella didn't produce such

7  document in this case.

8  **Q.**   So how were you able to tell that the HERO 4K produces

9  real-time content?  Was that based on your product testing and

10  source code review that you said earlier?

11 **A.**   Yes.

12 **Q.**   And what did your testing show?

13 **A.**   My testing of the live preview while recording feature

14 showed that I perceived no delay when I watched the live

15 preview video on the device, which means that there's no delay

16 in this path that covers both Elements B and C of Claim 11 that

17 have the real-time requirements.

18 **Q.**   Did you bring a HERO 4K camera here today to demonstrate

19 for the jury?

20 **A.**   Yes, I did.

21      **MR. KRILL:**  Your Honor, may the witness step down and

22 demonstrate?

23      **THE COURT:**  Sure.

24          (Witness steps down from the stand.)

25      **THE WITNESS:**  I'm turning on HERO 4K, but I should be

 1  careful where it's pointing at.

 2          **THE COURT:**  Yes.

 3          **THE WITNESS:**  Okay.  Here it found HERO 4K camera, and

 4  there is a button here that says "Enable Preview."  That will

 5  be enabling live preview prior to recording.

 6      And here a notification says [as read]:

 7          "GoPro Quik," which is the GoPro mobile app,

 8      "wants to join WiFi network GoPro HERO."

 9      That is the WiFi network that's direct between these two.

10  So it's not using the WiFi network in the Court or anything.

11      Okay.  So then I click "Join."  This is setting up the

12  live preview and, in particular, the direct wireless WiFi

13  connection between the two devices.

14      I'll point it at -- you need to point that at yourself.

15  Oh, I see.

16  **BY MR. KRILL:**

17  **Q.**  You can show on that.

18  **A.**  Okay.  Okay.  So this is prior to recording.

19      Now let me press the recording button.

20      So we can see part of Mike.  You can see for yourself, and

21  which is consistent with all my testing of HERO 4K camera, that

22  there is no delay in the live previewed video while recording.

23          **MR. KRILL:**  Your Honor, may we pass it to the jury to

24  examine?

25          **THE COURT:**  Sure.

HU - DIRECT / KRILL

1    **MR. KRILL:**  Would you like us to turn the recording

2    feature off or --

3        **THE COURT:**  I think that would be a good idea.

4                        (Laughter.)

5                   (Camera shown to jury.)

6                  (Witness resumes the stand.)

7        **MR. KRILL:**  Your Honor, we would move to admit the

8    HERO 4K as an Exhibit 1293.

9        **THE COURT:**  All right.  It's admitted.

10       (Trial Exhibit 1293 received in evidence.)

11   **BY MR. KRILL:**

12   **Q.**   Okay.  So what is your opinion as to whether the HERO 4K

13   camera meets the elements of Claim 11 of the '954 patent?

14   **A.**   My opinion is that HERO 4K meets all elements of Claim 11,

15   which just means that HERO 4K infringes Claim 11.

16   **Q.**   Now, let's move on to Slide -- or to Claim 12.  Excuse me.

17       What did you find for Claim 12?

18   **A.**   I found that since Claim 12 requires additionally that the

19   two streams to support either different resolutions or

20   different frame rates, and HERO 4K does support different

21   resolutions but the same frame rate.  But because it's an "or"

22   requirement in Claim 12, HERO 4K also infringes Claim 12.

23   **Q.**   Did you also look at Claim 6 for the HERO 4K?

24   **A.**   Yes, I did.

25   **Q.**   And what did you find for Claim 6?

1    **A.**    I found that because Claim 6 requires specifically that

2    the control signals to comprise the lighting setting, but HERO

3    4K doesn't support any lighting settings.  So HERO 4K only

4    infringes Claim 11, 12 of the '954 patent, but not Claim 6 of

5    the '694 patent.

6    **Q.**    Last group of products, the live streaming products.

7         Did you test these live streaming cameras?

8    **A.**    Yes, I did.  And, in particular, I tested the live

9    streaming while recording feature using my mobile device as a

10   hot spot.  So that's very similar to what I just did with

11   testing HERO 4K with an iPad.  The hot spot is a WiFi

12   hot spot.  So I connected the live streaming cameras to my

13   phone directly for live streaming while recording feature.  I

14   didn't connect to home WiFi or any other public WiFis.

15   **Q.**    Now, what is this slide here showing?

16   **A.**    The slide is showing that GoPro's -- one of GoPro's

17   instructions to use hot spot for live streaming and to make

18   sure your signal is strong.

19   **Q.**    What happens next?

20   **A.**    Next screenshot shows optional platforms that the user can

21   choose to host their live streaming.  And if gopro.com is

22   choosed, the next screen shows how the app allows the user to

23   save a copy.  That is the orange-colored higher-quality video

24   stream in the diagram.

25   **Q.**    What happens next?

1  **A.**    Next the app also allows a user to configure the

2  resolution of the stream being live streamed.  So that is the

3  green stream lower quality in the diagram.

4  **Q.**    What happens next?

5  **A.**    After that, the user can click "Set Up Live Streaming" --

6  "Live Stream" button; and at that time, the video is live

7  streamed to the audience, who also have been provided the link

8  to the live streaming.

9  **Q.**    And what is the blue button shown here in the middle?

10  **A.**    You can see that right in the middle of the middle

11  screenshot, there is a button called "View Your Stream."  That

12  is GoPro's instruction that if the user chooses, the user can

13  view the same live streamed video stream, the green stream, on

14  the same device.  And that's what I did, as shown in the last

15  screenshot on the slide.

16  **Q.**    Did you analyze how the GoPro cameras worked to provide

17  this live streaming functionality internally?

18  **A.**    Yes, I did.

19  **Q.**    And did you prepare a demonstrative to help explain that

20  today?

21  **A.**    Yes, I did.

22  **Q.**    Now, this demonstrative is starting, I believe, where we

23  left off earlier with the common features; is that right?

24  **A.**    Yes.

25  **Q.**    And so what happens when you press the "Start Live Stream"

1  button?

2  **A.**   So when I press the "Start Live Streaming" button, two

3  streams, one higher quality than the other, are generated in

4  parallel.   The difference between live streaming and live

5  preview is that, yes, in live streaming, the lower-quality

6  video is transmitted directly from the camera to the phone

7  through the hot spot, that the phone acts as a hot spot for the

8  camera.

9      But then the video goes up to -- through cell towers to a

10  server in the cloud, goes out to the Internet, and comes back

11  to the user's phone.   And that's when the user can view the

12  lower-quality green stream.

13  **Q.**   Are there any benefits to having a camera with this live

14  streaming functionality?

15  **A.**   Yes.   And it's pretty straightforward.   In addition to all

16  the benefits that live preview while recording provides, such

17  as you can frame your shot, you can change the settings or just

18  adjust the placement or angle of the camera, live streaming

19  also allows other people you give permission to to also view

20  the same -- to also view the lower-quality video stream in

21  addition to user themselves.

22  **Q.**   Now, let's go ahead and get into the claims.   What claims

23  are we going to be discussing for live streaming?

24  **A.**   We are only going to discuss Claim 6 of the '694 patent,

25  but we'll look at Claim 3 first because Claim 6 depends on

1  Claim 3.

2  **Q.**    Why aren't we discussing the '954 claims?

3  **A.**    Just to streamline my testimony in the trial.

4  **Q.**    Okay.  Now, let's look at Claim 3 shown here.  What did

5  you find regarding the Element H, the generate element and

6  Element M, the record command element?

7  **A.**    I have concluded that these two elements are met, hence

8  infringed, by live streaming cameras.

9  **Q.**    Do the live streaming products record two streams in

10  parallel as required by -- as defined by the Court?

11  **A.**    Yes.

12  **Q.**    What evidence did you rely on in forming that opinion?

13  **A.**    I relied on different types of evidence, source code, my

14  testing, as well as, for example, GoPro's own design spec.

15  **Q.**    And is that the same design spec at Trial Exhibit 1259

16  that we looked at earlier today?

17  **A.**    Yes.

18  **Q.**    Now, with reference to this slide, can you please walk the

19  jury through how the live streaming camera shown here records

20  two streams in parallel?

21  **A.**    Of course.

22      The light propagated through lens is captured by image

23  sensor and generated -- and further used by the camera

24  processor to generate the two streams, orange higher quality

25  and green lower quality.

**HU - DIRECT / KRILL**

1     And the lower-quality green stream is sent directly to the

2   user's mobile device, and that process matches up to GoPro's

3   own design document as shown here.

4   **Q.**   Why is there an X at the bottom of this screen there?

5   **A.**   I don't know if you noticed, in one of the screenshots of

6   my live streaming testing of this group of cameras, there is a

7   little notification saying:  Live preview is not available

8   during live streaming.  I might be paraphrasing it.

9     But that refers to this stream that -- that's at the

10  bottom of this one, that it have a cross.  So that stream is

11  not generated when the cameras perform live streaming while

12  recording functionality because the green stream here, this one

13  is lower quality and it is recorded in parallel to the

14  higher-quality orange stream, and that's the stream that is

15  live preview -- live streamed.

16  **Q.**   Is there any delay associated with the live streaming

17  process?

18  **A.**   Yes.  There is that one-second delay, similar to the live

19  preview while recording feature.  And as I explained, it's by

20  design so that the image can be stabilized.

21  **Q.**   Does that one-second delay mean that the streams are not

22  generated in parallel?

23  **A.**   No.  Again, record in parallel doesn't mean that it needs

24  to record at the same time.  Plus, for live streaming while

25  recording feature, both of the orange stream and the green

 1   stream have that up to one-second delay in their paths.

 2   **Q.**   Now, I see that this is -- at the top, you noted this is

 3   for the HERO10 and 11.  Did you review a similar document for

 4   the HERO9 camera?

 5   **A.**   Yes, I did.

 6   **Q.**   Can you turn in your binder to Trial Exhibit 100.

 7   **A.**   Yes.

 8        **MR. KRILL:**  Your Honor, I move to admit Trial

 9   Exhibit 100 into evidence.

10        **MR. HAYNES:**  No objection, Your Honor.

11        **THE COURT:**  Admitted.

12   (Trial Exhibit 100 received in evidence.)

13   **BY MR. KRILL:**

14   **Q.**   So this is Trial Exhibit 100 that you reviewed?

15   **A.**   Yes.

16   **Q.**   And what is this document, just briefly?

17   **A.**   This says Socionext here is another chip company that, as

18   I understand, makes the GoPro 1 camera processor used in the

19   HERO9 camera with GoPro.

20   **Q.**   Now, another semi-confusing diagram.  Can you -- did you

21   prepare any demonstratives to assist the jury in explaining how

22   this shows parallel generation?

23   **A.**   Yes, I did.

24   **Q.**   Can you explain that?

25   **A.**   Of course.

1            So here, very similar to the other diagrams that we have

2       seen, there is a common path between the two streams generated,

3       and then the higher-quality orange stream is generated in

4       parallel to the lower-quality green stream.  And they're both

5       recorded, and the higher-quality orange stream is stored in the

6       SD device on the camera, and the lower-quality green stream is

7       live streamed.

8       Q.   Is this similar to any other cameras that have been

9       already found to include the element of generating two streams

10      in parallel?

11      A.   Yes.  This is using the same camera processor and performs

12      the same function as HERO6 Black camera and HERO8 Black camera.

13      Those are the two cameras among the 20 cameras in Group 1 that

14      have been found by the Court to include the generate element.

15      Q.   Almost done.  Now, let's go back to Element E, the

16      wireless connection protocol device, and Element C, the image

17      sensor to produce real-time video image data.  What did you

18      find for those elements?

19      A.   I found that these elements are met by live streaming

20      cameras.

21      Q.   Did you find that the wireless connection protocol device

22      was configured to send video image content?

23      A.   Yes.  And this is -- all cameras in the live streaming

24      group use the same QCA9377 wireless chip as used by

25      HERO12 Black and some of the cameras in Group 1.

1  **Q.**   Now, does that one-second delay you mentioned earlier,

2  does that affect your opinions for this claim?

3  **A.**   It does not.

4  **Q.**   What's different about Element E in Claim 3 as compared to

5  Element -- the wireless connection protocol device in Element C

6  of Claim 11 that we looked at earlier?

7  **A.**   A big difference is that now there is only one real-time

8  requirement in Claim 3, unlike in Claim 11 there are two

9  real-time requirements.  So in Claim 3, the only real-time

10  requirement occurs in Element C with regard to this path

11  between the image sensor and the camera processor.

12      And there's no longer a real-time requirement here in

13  Claim 3, just that this video image content is sent directly

14  from the camera to the mobile device.  And when we use the live

15  streaming feature with the mobile device as a hot spot, this

16  directly requirement is met.  But there's no real-time

17  requirement here.  So whether or not the one-second delay is

18  perceivable here by the user is irrelevant to the infringement

19  of Claim 3.

20  **Q.**   And when you were testing -- did you test the live

21  streaming functionality?

22  **A.**   Yes.  So the screenshots that I showed earlier are from

23  one of my testing of the live streaming functionality.

24  **Q.**   And just to be clear, did you perceive delay when you were

25  testing the live streaming?

1    **A.**    I didn't.

2    **Q.**    Now, let's move on to the last element, or one of the last

3    elements, I.  What did you find about whether the wireless

4    connection protocol device was configured to send the first

5    video image content directly to the personal portable computing

6    device for display?

7    **A.**    I have found that Element I is also infringed by the live

8    streaming cameras.

9              **MR. KRILL:**  Allen, can you bring up DDX-1.26.

10   **BY MR. KRILL:**

11   **Q.**    Do you recall this slide being showed in opening?

12   **A.**    Yes, I do.

13   **Q.**    Does this slide accurately reflect your opinions?

14   **A.**    It does not.  This is a slide from GoPro's opening, and

15   I'll explain what I agree with what's shown on this slide and

16   what I don't.

17        So this connection is using the phone as the WiFi hot spot

18   for the camera.  So the green stream is transmitted directly

19   from the camera to the user's mobile device.

20        And because the mobile device is acting as a hot spot,

21   it's connected to the cell tower, a 5G, 4G and so on, for the

22   cell phone.

23        And it can use different Web services, presumably.  So

24   it's okay that we show here that it goes to Amazon's Web

25   services.  So that part, I agree with what's shown here on this

1    slide.

2        Okay.  So this part, it does happen more or less in the

3    way that it's shown here if you share the link for live

4    streaming with your audience.  So these are other people -- I'm

5    trying to spell "audience."

6        Okay.  So this part is what your audience see.  So that is

7    irrelevant to -- that doesn't affect infringement of the claims

8    because nobody has said the claims requires how your audience

9    sees the video.

10       But what's missing, and what's important here, is that

11   there is this path.

12       Okay.  Sorry.  Can we cancel all of that?

13       Okay.  So, again, this is for audience.  And there is this

14   path coming back through the cell tower and back to the phone.

15       And this screen shows -- showing here on the phone is the

16   same screen shown in my screenshot from my testing, and that's

17   the "See Your" -- "View Your Stream" button there.

18       So this is the stream that the user themself sees in the

19   live streaming while recording feature.

20           **MR. KRILL:**  Can we go back to the presentation.

21   **BY MR. KRILL:**

22   **Q.**   So does the fact that the stream goes to the phone, then

23   to the cloud and cell servers, then back to the phone affect

24   your opinion?

25   **A.**   No.  That does not affect infringement.

1  **Q.**   Did we look at -- do you recall looking at these

2  screenshots a few minutes ago?

3  **A.**   Yes.

4  **Q.**   What is boxed in the red on the left side of the screen?

5  **A.**   It says [as read]:

6         "Use your phone to check your stream or pocket

7     it to stay in the moment."

8  **Q.**   Does that support your opinion?

9  **A.**   It does.  It does show that the second stream, the

10  lower-quality green stream, is for display on the user's

11  device.  It can also be for display for the user's audience.

12  But also, the viewer's stream button in the middle screen shot,

13  those all show that the lower-quality green stream is for

14  display on the user's device.

15  **Q.**   Finally, Element J, the preview stream, what did you find

16  here?

17  **A.**   I found that it's met by all live streaming cameras.  They

18  all include the first video image content, which is the green

19  lower-quality stream, which is a preview image of the scene and

20  allows the user to manually adjust an angle of the video

21  camera.

22  **Q.**   So what is your opinion as to whether the live streaming

23  cameras include all elements of Claim 3?

24  **A.**   My opinion is that all live streaming cameras include all

25  elements of Claim 3.

1  Q.  Finally, Claim 6, what did you find here?

2  A.  Again, Claim 6 requires additionally that the control

3  signals to comprise the lighting setting.  And based on my

4  analysis of the source code, documentation and my own testing,

5  I found that all cameras in live streaming group support at

6  least two types of lighting settings, and they all infringe

7  Claim 6.

8  Q.  So are these your opinions here regarding the groups of

9  products that we've been discussing today?

10 A.  Yes.

11 Q.  Now, you were here for opening; correct?

12 A.  Yes.

13 Q.  Do you remember this large, confusing, busy slide that was

14 shown during opening?

15 A.  It looks very clear to me, but I can see how that can be

16 confusing to others.

17 Q.  Now, just by group numbers, can you briefly summarize your

18 findings on infringement?

19 A.  Of course.

20     So 20 cameras in Group 1, and the Court has found that all

21 20 cameras include all elements of Claim 11.

22     And I have concluded that those 20 cameras also infringe

23 Claim 12, and 18 of those 20 cameras, all but HERO7 White and

24 Silver, also infringe Claim 6 of the '694 patent.

25     And then there are seven other accused cameras among the

1  bottom three groups.  The live streaming cameras practicing the

2  live streaming while recording feature, and they all infringe

3  Claim 6 of the '694 patent.

4       And the Live Preview Group 2 Cameras infringe all three

5  claims.  And the HERO 4K Camera infringes Claim 11 and Claim 12

6  of the '954 patent.

7  **Q.**   Thank you, Doctor.  Just a couple more topics.

8       Did you also -- we talked about earlier that you evaluated

9  and tested the Contour cameras; correct?

10 **A.**   That's correct.

11 **Q.**   Did you make any findings as to whether the

12 Contour cameras practice the asserted claims that we've been

13 discussing today?

14 **A.**   I found that all four cameras practice all three asserted

15 claims in this case.

16 **Q.**   Now, have you reviewed any licenses related to Contour's

17 patents?

18 **A.**   Yes, I have.

19 **Q.**   Can you turn in your trial exhibit binder to Trial

20 Exhibit 702.

21 **A.**   Yes.

22 **Q.**   Is this the document you reviewed?

23 **A.**   Yes.

24         **MR. KRILL:**  Your Honor, move to admit Trial

25 Exhibit 702.

1          **MR. HAYNES:**  No objection.

2          **THE COURT:**  It's admitted.

3          (Trial Exhibit 702 received in evidence.)

4     BY MR. KRILL:

5     **Q.**   We'll hear more about this later, but what does the

6     Element license pertain to -- what does the Element license

7     pertain to at a high level?

8     **A.**   It's a license agreement between Contour and a company

9     called Element.

10    **Q.**   What subject matter is being licensed in this agreement?

11    **A.**   Within this license agreement, there is an Exhibit A that

12    lists two patents as relevant; and those two patents are the

13    exact two patents, '954 patent and '694 patent asserted in this

14    case.

15    **Q.**   Did you render any opinions as to whether the Element

16    license involves comparable technology to the technology at

17    issue in this case?

18    **A.**   Yes, I did, and I concluded that they are technologically

19    comparable.

20    **Q.**   Last topic of non-infringing alternatives.  You were here

21    in opening, I believe, and I think you saw something similar to

22    this.  Have you evaluated any non-infringing alternatives that

23    have been alleged by GoPro in this case?

24    **A.**   Yes, I have.

25    **Q.**   Are those non-infringing alternatives listed here on the

1  screen as Numbers 1 through 9?

2  **A.**  Yes, they are.

3  **Q.**  And has GoPro switched to any of these non-infringing

4  alternatives?

5  **A.**  No, they have not.

6  **Q.**  In your opinion, are any of these non-infringing

7  alternatives acceptable?

8  **A.**  My opinion is that none of them is acceptable.

9         **MR. KRILL:**  Thank you, Dr. Hu.

10        **THE WITNESS:**  Thank you.

11        **MR. KRILL:**  Pass the witness.

12        **THE COURT:**  All right.

13     Mr. Haynes**?**

14        **MR. HAYNES:**  Your Honor, may I approach the witness?

15        **THE COURT:**  You may.

16     Go ahead.

17        **MR. HAYNES:**  May I proceed?

18                    <u>**CROSS-EXAMINATION**</u>

19  BY MR. HAYNES:

20  **Q.**  Good morning.  I think we're still morning.

21     Good morning, Dr. Hu.

22  **A.**  Good morning.

23  **Q.**  Now, you understand that one of the things that the jury

24  is going to be asked to do is identify what was new about this

25  invention; fair?

HU - CROSS / HAYNES

1   **A.**   Yes.

2   **Q.**   And you would agree with me that, in your view, one of the

3   key inventions of the patents-in-suit, both patents-in-suit,

4   includes generating two streams of different qualities in

5   parallel, communicating wirelessly the lower-quality video

6   stream to a personal portable computing device for live preview

7   and playback and other similar features; correct?

8   **A.**   Yes.

9   **Q.**   And you would agree that the claims as a whole are

10  directed towards this notion of dual streaming where you are

11  creating a high-resolution video and streaming a low-resolution

12  video; right?

13  **A.**   As part of the invention, yes.

14  **Q.**   Now, just to be clear, you've looked at the claims, and

15  you just walked through those claims.  There's nothing in the

16  language of the claims that is directed towards specific

17  software; correct?

18  **A.**   I think that's fair.  It doesn't say the word "software."

19  **Q.**   Okay.  What the claim is reciting is hardware components

20  that are configured to perform the concepts we talked about,

21  the live streaming -- or, sorry -- the creating two streams,

22  one high resolution, one low resolution, and wirelessly

23  transmitting the low resolution; fair?

24  **A.**   That's not correct.

25  **Q.**   Well, you would agree with me that that is -- one of the

1   requirements of the claims is that they have a high-resolution

2   stream and a low-resolution stream that are recorded in

3   parallel.  You agree with that; right?

4   **A.**   That's correct.

5   **Q.**   And the low-resolution stream is what gets transmitted

6   wirelessly; right?

7   **A.**   I agree with that.

8   **Q.**   So you would agree with me that in your infringement

9   allegations in this case, you are only accusing GoPro's

10  products based on your view that those products either have a

11  live preview while recording or a live stream while recording;

12  correct?

13  **A.**   That's correct.

14        **MR. HAYNES:**  Can we bring up DDX-9.1.

15  **BY MR. HAYNES:**

16  **Q.**   This is one of the slides you testified to, Dr. Hu?

17  **A.**   Yes, I believe so.

18  **Q.**   Okay.  And you identified a conception date here of

19  December 2009 for when you believe Contour possessed all of the

20  ideas that are recited in the claims of the asserted patents --

21  of the asserted claims of the asserted patents; correct?

22  **A.**   Sorry.  Could you repeat your question?

23  **Q.**   Let me try it again.

24        You agree that your opinion is that by December of 2009,

25  Contour had conceived of all of the ideas that are required by

1   the asserted claims of the two patents here; correct?

2   **A.**   That is correct.

3   **Q.**   And just looking at your timeline, from the time they

4   conceived of those ideas to the time that they released those

5   ideas in the ContourGPS was about a year later?

6   **A.**   Yeah, that's right.

7   **Q.**   Okay.  And from the time you think of something to the

8   time you actually build it, a year is actually pretty fast;

9   right?

10   **A.**   In this context, I agree.

11   **Q.**   Yeah.  I mean, in consumer electronics, you're aware that

12   once you come up with an idea, sometimes it takes some time to

13   put the parts together and launch a commercial product; right?

14   **A.**   Generally, I would agree that's true.

15         **MR. HAYNES:**   Okay.  Let's pull up TX-006.

16   **BY MR. HAYNES:**

17   **Q.**   Now, you were here when Mr. Mander testified; correct?

18   **A.**   Yes, when Dr. Mander testified.

19   **Q.**   I'm sorry.  Dr. Mander.  You were here when he testified.

20   And you recall he testified about this document in connection

21   with when he came up with certain ideas.  Do you recall that?

22   **A.**   I believe so.

23         **MR. HAYNES:**   If we can go to page 2 of the document.

24   **BY MR. HAYNES:**

25   **Q.**   You see at the top, you recall Dr. Mander referenced

**HU - CROSS / HAYNES**

1    [as read]:

2            "Dual-encode (Capture main video and secondary

3        video file.)"

4        Do you recall him testifying about that?

5    **A.**    Yes.

6    **Q.**    Now, my question for you is:  Do you believe that that

7    reference to "Dual-encode (Capture main video and secondary

8    video file)" shows that Dr. Mander, at that time, was in

9    possession of the idea of generating two streams in parallel?

10    **A.**    It's part of the evidence that -- as to the conclusion

11    that Dr. Mander and the inventors at Contour had this specific

12    idea of dual encoding at the time of the invention.

13    **Q.**    My question was a little more specific.

14        Do you believe that that statement shows that Dr. Mander

15    was in possession of the idea of recording two streams in

16    parallel, one high resolution, one low resolution?

17    **A.**    This line -- these words alone, I don't see higher and

18    lower quality, just main video and secondary video file.  It

19    supports everything else that I have seen, including

20    Dr. Mander's own testimony that the inventors had the idea.

21    But from these words alone, I don't think the higher quality

22    and lower quality, these two quality -- that the different

23    qualities are reflected literally in these words.

24    **Q.**    Okay.  What about the notion of recording in parallel

25    these dual streams?  Does the notion that it is dual stream

1    support or show, in your opinion, that Dr. Mander had conceived

2    of recording two streams in parallel?

3    **A.**    Within the body of evidence that I have seen, this

4    sentence does indicate that Dr. Mander and the inventors at

5    Contour had the idea.

6    **Q.**    Okay.  Let's go down a little further in the document.

7        Do you see here where it talks about "Remote for

8    configuring camera"?  And it says [as read]:

9            "(Formats, video settings, GPS settings,

10        et cetera.)"

11   **A.**    Yes, I do see that.

12   **Q.**    Okay.  Do you believe that this description, that there is

13   a -- they want to have a remote for configuring the camera

14   settings is sufficient to show that they had the idea that is

15   recited in the claims with respect to the configuration of the

16   camera settings?

17   **A.**    This is part of the evidence that I relied on -- relied

18   upon to come to the conclusion.  This is not the sole sentence

19   that I have seen about this particular topic in this case.

20   **Q.**    Okay.  Let me ask you this question just generally.  When

21   you talk about camera settings, you're not going to suggest to

22   the jury that a particular camera setting is something that

23   Contour invented; right?

24   **A.**    That's correct.

25   **Q.**    And when you talk about controlling camera settings, what

1  you're talking about is you want the remote to control whatever

2  the settings the camera allowed you to control; fair?

3  **A.**    Sorry.  Can you repeat your question?

4  **Q.**    When you see references to "We want to be able to control

5  the camera settings from a remote device," that's suggesting to

6  you that you want to be able to control the settings that the

7  camera allows you to change; right?

8  **A.**    Yes.

9  **Q.**    Now, go down one more at the very bottom of this paragraph

10  where it says [as read]:

11             "Wireless:  Bluetooth or WiFi."

12  Do you see that?

13  **A.**    Yes, I see that.

14  **Q.**    Do you believe that the reference to "Wireless:  Bluetooth

15  or WiFi" shows that Dr. Mander was in possession of the idea of

16  having a wireless protocol device or wireless connection

17  protocol device that could both transmit video and receive

18  control signals?

19  **A.**    That's part of the evidence.

20  **Q.**    Okay.  Let's stay on that topic of the wireless connection

21  protocol device.

22          **MR. HAYNES:**  If we could just bring up JX-1, which is

23  the '954 patent.  Okay.  I'm going to go to Claim 11.

24  **BY MR. HAYNES:**

25  **Q.**    You're obviously very familiar with Claim 11 at this

1   point; right, Dr. Hu?

2   **A.**   Yes.

3   **Q.**   Okay.  Now, I think you actually put up the slide that I

4   used in opening of the claim language where it talks about the

5   wireless connection protocol device.

6        And you agree with me that the wireless connection

7   protocol device must both send video and receive control

8   signals; right?

9   **A.**   Wirelessly, yes.

10  **Q.**   Wirelessly.  Now, you would agree with me that one example

11  of a wireless connectivity protocol device is a WiFi

12  transceiver?

13  **A.**   I don't agree with that exactly.

14  **Q.**   Okay.  Would you agree with me that one example of a

15  Bluetooth protocol -- sorry -- another example of a wireless

16  connection protocol device is a Bluetooth transceiver?

17  **A.**   I don't agree with that either for the inaccuracy on the

18  technical level.

19  **Q.**   Okay.  Let's look at Dr. Hu's March 31st, 2025, report at

20  paragraph 183.  Do you see here, Dr. Hu, where it says [as

21  read]:

22           "Like the Contour I and Contour II products,

23       each of the accused products includes a wireless

24       connection protocol device such as a WiFi and/or

25       Bluetooth transceiver."

1        Those are your words; correct, Dr. Hu?

2   **A.**   Yes.  And -- yes.

3   **Q.**   Thank you.  Thank you, Dr. Hu.

4        Let me just ask you a yes-or-no question.  And if you

5   can't answer "yes" or "no," you can say, "I don't know."

6        Sitting here today, is it your opinion that WiFi is an

7   example of a wireless communication protocol?

8   **A.**   Yes.

9           **MR. HAYNES:**  Can we play Dr. Hu's June 26, '25 -- 2025

10  deposition, beginning at page 137, line 25, through 139,

11  line 16.  And we've eliminated the lawyers talking as part of

12  this clip.

13          (Video was played but not reported.)

14  **BY MR. HAYNES:**

15  **Q.**   That was your testimony in June; correct, Dr. Hu?

16  **A.**   Yes, it was.

17          **THE COURT:**  If you're going to move on, we'll take a

18  break if --

19          **MR. HAYNES:**  This would be a great time, Your Honor.

20          **THE COURT:**  -- this is a good time.

21      Okay.  Ladies and gentlemen, we'll take a 15-minute break

22  and come back just a little past noon.

23      (Proceedings were heard out of the presence of the jury.)

24          **THE COURT:**  All right.  We'll be in recess.

25               (Recess taken at 11:46 a.m.)

 1                  (Proceedings resumed at 12:04 p.m.)

 2            (Proceedings were heard in the presence of the jury.)

 3                  **THE COURT:**  All right.  Please be seated, everybody.

 4       Mr. Haynes, go ahead.

 5                  **MR. HAYNES:**  May I proceed, Your Honor?

 6  **BY MR. HAYNES:**

 7  **Q.**   Before we broke, Dr. Hu, we were talking about the

 8  wireless connection protocol device limitation.  You remember

 9  that?

10  **A.**   Yes, I do.

11  **Q.**   Okay.  And it's your contention that the GoPro products

12  from the HERO9 going forward, 10, 11, 12, that all of those

13  products satisfy the requirement that there be a wireless

14  connection protocol device that both transmits video and

15  receives control signals; is that correct?

16  **A.**   That's correct.

17  **Q.**   But you know, don't you, that in the accused products,

18  starting with the HERO9, when you are sending video wirelessly,

19  that is being sent over the WiFi protocol; correct?

20  **A.**   That's correct.

21  **Q.**   And when you are -- from the HERO9 going forward, when you

22  are receiving control commands, that is being received over the

23  Bluetooth protocol; correct?

24  **A.**   That's correct.

25  **Q.**   Okay.  And -- all right.

1    I'm going to switch gears on you a little bit and talk

2    about the generate limitations.  Okay?

3        **MR. HAYNES:**  If we could pull up your Slide 52,

4    I believe.  And I think we've relabeled it DDX-9.2.

5        Sorry.  Let us get the screens in the back turned off

6    first.  They've got it.

7    **BY MR. HAYNES:**

8    **Q.**   Now, this was your slide.  And at the bottom there, we see

9    the Court's construction of record in -- of the generate terms.

10   You see that?

11   **A.**   Yes, I do.

12   **Q.**   Okay.  And you agree that in order to satisfy both of the

13   asserted claims, the accused products must record in parallel

14   from the video image data a first image data stream and a

15   second image data stream wherein the second image data stream

16   is higher quality than the first image data stream; correct?

17   **A.**   That is correct.

18   **Q.**   Okay.  Let's go to the use case document that you

19   discussed, the CPK use cases.  And you recall I asked you about

20   that document in your deposition?

21   **A.**   Yes.

22   **Q.**   Do you remember we took out a pen and we put some labels

23   in that document?

24   **A.**   Yes.

25       **MR. HAYNES:**  If we could bring up DD3.  There we go.

1  BY MR. HAYNES:

2  Q.   You recall -- is this the document that we labeled in your

3  deposition, Dr. Hu?

4  A.   I think so.

5  Q.   Okay.  And this is a page out of the CPK use cases

6  document that you testified about previously.  It's the same

7  diagram that you testified about; right?

8  A.   I recall that at the time of the deposition, we also used

9  a different page to do some markings.  So I don't recall if

10 this is -- and it's pretty blurred.  So I don't know if this is

11 the exact page I cited in my direct testimony or a different

12 page from the same document that we used for marking.

13 Q.   Okay.  Well, you're familiar with the streams that you're

14 accusing of infringement here; right?

15 A.   Yes.

16 Q.   Okay.  So -- and you recall that in your deposition, I

17 took out a pen and had you label the streams that you were

18 accusing of infringement.  Do you recall that?

19 A.   Yes.

20 Q.   Okay.  Now, I want to focus down on the phone preview

21 stream where there's an A.  Do you see that?

22 A.   Yes, I see that.

23 Q.   And where you -- where we put that A, you said that's the

24 first image data stream that you're accusing of infringement in

25 the claims; right?

1    **A.**   Can you repeat your question?

2    **Q.**   Where we put that A in this figure above the phone

3    preview, that is what you identified as being the first image

4    data stream required by the claims; correct?

5    **A.**   Yes.

6    **Q.**   Okay.  And that -- what you identified there is after the

7    orange box that's to the left of it; right?

8    **A.**   Yes.

9    **Q.**   Okay.  And from at least the point where it comes out of

10    that orange box until it's sent out over the Internet, there's

11    no saving of that stream at all; correct?

12    **A.**   It's -- it can be saved in data buffers along the way, but

13    it's not shown on this diagram.  It's just one arrow for phone

14    preview here.

15    **Q.**   Let me just be clear.  You're not pointing to any buffers

16    to the right of that orange box in your infringement

17    allegations; correct?

18    **A.**   Did you say right after?

19    **Q.**   Yes, after that orange box.

20    **A.**   That's correct.

21    **Q.**   That's correct.  Okay.  So something else happens out

22    there.  You're not saying that is what infringes; correct?

23    **A.**   For the generate term, that's correct.

24    **Q.**   Okay.  Now, you would agree with me that when we talk

25    about this notion of a video stream, that is a sequence of

1  video frames that are being transmitted one after another;

2  right?

3  **A.**   That's right.

4  **Q.**   Okay.  So if I just have one frame, that's not a stream;

5  right?

6  **A.**   Generally speaking, that's true.

7  **Q.**   And in your direct testimony -- it's harder to see here,

8  but in your direct testimony, that orange box there, that's

9  something called a DDR buffer in your opinion; is that right?

10 **A.**   That's correct.

11 **Q.**   Okay.  And it's your opinion that it's in that DDR buffer,

12 the orange box, where the image stream is being recorded.  Is

13 that fair?

14 **A.**   The video stream is recorded.

15 **Q.**   Okay.  But you don't know, do you, whether or not more

16 than one frame of the video is ever stored in that orange box;

17 correct?

18 **A.**   That's incorrect.

19       **MR. HAYNES:**  Can we play Dr. Hu's June 26, 2025,

20 deposition at page 49:17 through page 50, line 11.

21            (Video was played but not reported.)

22       **MR. KRILL:**  Your Honor, this is improper impeachment.

23 The question is much different than the question that was just

24 asked.  The question in the deposition says:  Is there more or

25 less?

1          **THE COURT:**  I now need to see this before I rule on

2     your objection.  So I'd like to see the rest of the video,

3     please.

4          **MR. KRILL:**  Yes, Your Honor.

5               (Video was played but not reported.)

6          **MR. KRILL:**  Your Honor, in my objection, the question

7     asked was whether -- we don't know whether more than one frame

8     is ever stored in the orange box.  The question at the

9     deposition was [as read]:

10              "For phone preview and the DDR buffer labeled

11          4 megabits per second, are there more or less frames

12          stored there than in the 80 megabits per second

13          buffer for the record stream?"

14         He's asking her to compare the two different buffers, not

15     how many frames are stored in the one buffer.

16         **THE COURT:**  Yeah, I'm going to sustain that objection.

17 **BY MR. HAYNES:**

18 **Q.**   Dr. Hu, in your direct testimony today, you didn't provide

19    any testimony regarding precisely how many frames of the video

20    can be stored in that 4 megabits per second buffer; correct?

21 **A.**   That's correct.

22 **Q.**   Okay.  And you agree with me, in order to meet the claims,

23    I need to store at least two video frames in that buffer or

24    else I'm not storing a stream; fair?

25 **A.**   That's not fair.

1  Q.    You would agree that in order to satisfy the Court's

2  construction of the generate terms, some storage of the first

3  and second image data streams must occur?

4  A.    That's correct.

5  Q.    Okay.  And a stream is more than one frame; correct?

6  A.    That's correct.

7  Q.    Okay.  Okay.  If we could go to your Slide -- it's

8  DDX-9.4, I think.  It was your Slide 17.

9       Do you recall giving some testimony about this document?

10  A.    This slide, yes.

11  Q.    This slide, yes.

12       Now, you agree that the claims -- Claim 11, at least,

13  requires that you produce real-time video image data of the

14  scene; right?

15  A.    That's correct.

16  Q.    And I think you testified to this.  The Court has

17  construed the term "real-time" to mean without user perceptible

18  delay -- sorry -- without perceived delay.

19  A.    That's correct.

20  Q.    Okay.  And the claims also require that from that

21  real-time video image data, you generate a first image data

22  stream and a second image data stream; correct?

23  A.    That's correct.

24  Q.    Okay.  And we looked at before, those two streams need to

25  be recorded in parallel; right?

1   **A.**    That's correct.

2   **Q.**    All right.  Let's go to your Slide 57, which is DDX-9.5.

3         Do you recall testifying about this slide?

4   **A.**    Yes.

5   **Q.**    Okay.  Now, in this slide, it's your opinion that for that

6   phone preview stream at the bottom there, there's a 1/60th of a

7   second delay; correct?

8   **A.**    That's correct.

9   **Q.**    And it's your opinion that that 1/60th of a second is not

10  going to be perceived by a user; is that right?

11  **A.**    That's correct.

12  **Q.**    Okay.  When we go up and we look at that top stream and we

13  talk about one-second delay, you would agree with me that a

14  one-second delay is perceptible by a user; correct?

15  **A.**    It depends on the context and use case.

16  **Q.**    You can't tell me whether or not if I capture an image at

17  .0 and I wait one second later, you can't tell me whether

18  that's perceivable or not?

19  **A.**    It depends, for example, if the user is looking at both

20  video streams side by side.  For example, the camera facing

21  there and the user is looking at the phone here, sometimes the

22  user is not able to -- it's not comparing these exact two video

23  streams side by side.  And sometimes that one-second delay is

24  perceivable and sometime it's not.

25  **Q.**    Okay.  So if I got your testimony right, as long as I'm

1  looking somewhere else, I might perceive the delay that's going

2  on over here?

3  **A.**    That's an incorrect characterization of what I just said.

4  **Q.**    But let me just ask the question.  I don't want to

5  characterize your testimony.

6       Is your testimony that the delay is not going to be

7  perceived because when you're capturing the image, you may be

8  staring here, and you have to turn your head, and it may take

9  you a second so you may not notice that there's a delay?

10  **A.**    No, that's not what I said or meant.

11       It's not about how quickly you can turn your head but,

12  rather, you're skiing down the slope or you're trying to

13  capture something and then you look at your phone.  It's not

14  like you are being a video-quality expert in a darkroom trying

15  to look at, compare two video streams side by side.  And that

16  is one of the scenarios where up to one-second delay might not

17  be perceivable to the user.

18       And in other scenarios, for example, FaceTiming, there's a

19  lot of out of sync between voice and video.  And in those

20  situations, up to one-second delay is very perceivable.

21  **Q.**    Thank you for that explanation.

22       All right.  Let's look at the patent again.  Go back to

23  Claim 11 of JTX-1.  Now, again, I'm still focused on the claim

24  language that's talking about the real-time image content.

25  Okay?

**HU - CROSS / HAYNES**

1  **A.**   Okay.

2  **Q.**   And the claim further requires generating from that

3  real-time image data that's collected at the sensor that first

4  image data stream; correct?

5  **A.**   Yes.

6  **Q.**   And that's true of the second stream as well.  That second

7  stream has to be recorded from that real-time image data also;

8  correct?

9  **A.**   That's correct.

10 **Q.**   Okay.  And so let me just talk to you about this notion of

11 real-time image data.

12       There's data and then there's real-time image data.  Do

13 you see a distinction between those two things?

14 **A.**   Yes, of course.

15 **Q.**   Okay.  And the distinction is that data doesn't have to be

16 real time.  You don't have to be acting on it in real time.  Is

17 that fair?

18 **A.**   That's correct.

19 **Q.**   Real-time image data, however, means that you are acting

20 on data that's real time; right?

21 **A.**   I disagree with that within the context of the claims and

22 the Court's construction.

23 **Q.**   Okay.  Fair enough.

24       Let's go back to your slide that had -- I think it was 3,

25 yeah, that has the labels on it again.

1          Now, and, again, we talked about this at your deposition.

2     You see there's the green boxes on the left and there's a

3     circle around them?

4     **A.**   I can't read the exact text of those green boxes, but I

5     can see there is a collection of green boxes there.

6     **Q.**   Okay.  You know what's in those green boxes, though;

7     right, Dr. Hu?  I can get you a better picture but --

8     **A.**   Yes, please do.

9              **MR. HAYNES:**  Okay.  Can we bring up her slide from...

10    **BY MR. HAYNES:**

11    **Q.**   Well, I'll tell you what.  You know that there is a

12    one-second delay in the box that's labeled "Delayed

13    Processing"; right?

14    **A.**   Yes.

15    **Q.**   Okay.  And that one-second delay is because you're

16    actually collecting a number of image frames in buffers because

17    you need to collect multiple frames in order to do some of the

18    smoothing techniques that you talked about; right?

19    **A.**   That's correct.

20    **Q.**   Okay.  And those smoothing techniques, the way they work

21    is, you can't act on just a frame of data.  In order to smooth

22    it out, you have to look at both the data that's coming in, but

23    you've also got to look at data in the past and sometimes data

24    in the future.  That's how it works; right?

25    **A.**   You don't have to do that, but that's how GoPro has

1    implemented the specific feature.

2    **Q.**    Okay.  So in order to do that, what you have to do is take

3    that data that comes in and collect it in a buffer and make it

4    sit there in that buffer; right?

5    **A.**    Yes.

6    **Q.**    Okay.  And it sits there for a second.  That's what causes

7    that second delay; correct?

8    **A.**    Yes.

9    **Q.**    And it's your testimony that even though that data is

10   sitting there for a full second, that's still real-time data,

11   in your view.  Is that fair?

12   **A.**    Yes.

13   **Q.**    Okay.  Now, we also talked about another theory of yours

14   on infringement that has to do with live streaming, when you're

15   passing the live stream through the hot spot of the phone;

16   correct?

17   **A.**    That's correct.

18   **Q.**    And I'm correct that you are only accusing that live

19   streaming via hot spot when you are doing the live streaming

20   while recording.  Is that fair?

21   **A.**    That's correct.

22   **Q.**    Okay.  All right.  If we could go to DDX-9.6.

23        This is your slide where you talked about that live

24   streaming via a hot spot scenario; correct?

25   **A.**    That's correct.

1  **Q.**   Okay.  And what you're showing here is the green stream,

2  that's the lower-resolution stream that is output from the

3  camera, and it's going to the hot spot of the phone; right?

4  **A.**   That's correct.

5  **Q.**   Okay.  And when the phone is acting as a hot spot, that

6  data that goes in, the phone can't open it and look at it at

7  that point, can it?

8  **A.**   As it implemented in GoPro app, it cannot.

9  **Q.**   Cannot.  So that data, when it goes into that phone, you

10  can't display it at that point; right?

11  **A.**   That's correct.

12  **Q.**   Okay.  Instead, the data has to go out into the Internet

13  up to the cloud.  It has to go into some sort of server from

14  Facebook or Amazon or GoPro; right?  That has to happen?

15  **A.**   That's correct.

16  **Q.**   And you know, don't you, that when it goes out there to

17  the cloud, it is getting transcoded, that stream is getting

18  transcoded by those different service providers into whatever

19  format they want to stream; right?

20  **A.**   That's incorrect.

21  **Q.**   You don't think there's transcoding that's going on in the

22  cloud?

23  **A.**   Not necessarily.

24  **Q.**   So you're saying it happens sometimes but maybe not all

25  the time?

**HU - CROSS / HAYNES**

1    **A.**    That's correct.

2    **Q.**    Okay.  But you agree with me if there is transcoding going

3    on, if I'm changing that stream from the resolution that went

4    out and I'm changing it to a different resolution, I'm not

5    talking about the same stream anymore; right?

6    **A.**    That's correct.

7    **Q.**    Okay.  So is it your opinion that there is only

8    infringement in the scenarios where I have to send the video

9    stream through a hot spot up to the cloud and it has to be a

10    scenario where the wherever I've sent it up in the cloud

11    decides not to change it.  That's the only scenario that would

12    infringe in your view; right?

13    **A.**    That's incorrect.

14    **Q.**    So if the cloud changes the stream and creates another one

15    and sends back a different stream, is it your opinion that

16    infringes?

17    **A.**    Yes.

18    **Q.**    Okay.  So you think that the stream that's coming back

19    here, this guy, you think that that stream does not have to be

20    in the same format as the stream that was sent to the phone in

21    the first place?  Is that your testimony?

22    **A.**    Yes, within the context of what is required by the claims

23    of the patents.

24    **Q.**    Okay.  Now, we looked at the claims --

25            **MR. HAYNES:**  Actually, can we go back to Claim 11.

1   BY MR. HAYNES:

2   **Q.**   Now, when we're talking about this forward display

3   limitation -- sorry -- this preview limitation and sending it

4   directly to the phone, you agree with me that that has to be

5   sending it to the phone for display?  That's a limitation of

6   the claims; right?

7   **A.**   That is correct.

8   **Q.**   Okay.  And you agree with me that -- we just talked about

9   it -- when the phone is doing live streaming, when that stream

10  goes to the hot spot, the phone cannot display it at that

11  point; correct?

12  **A.**   In the accused products, that's correct.

13  **Q.**   Okay.  We're only talking about the accused products here

14  today, though; right?  Okay.

15       All right.  Let's go back to -- actually, let's go back to

16  your slide, which is DDX-9.5.  I think this was your Slide 57.

17       Okay.  Now, I think you testified -- well, maybe that's

18  not a good one because I can't see.

19            **MR. HAYNES:**   Can you go back to DDX-9.3.

20  BY MR. HAYNES:

21  **Q.**   Okay.  Now, what you testified to on direct that you said

22  was the video stream that is being used in this live streaming

23  scenario, I think you pointed to this FB streaming stream; is

24  that right?

25  **A.**   Yes.

1  **Q.**   Okay.  And that FB streaming stream is also part of this

2  delayed processing box; right?

3  **A.**   The what processing box?

4  **Q.**   The delayed processing box.

5  **A.**   That's correct.

6  **Q.**   And so what's happening in that delayed processing box,

7  that's referring to the video streams that have to go into that

8  one-second delayed buffer; right?

9  **A.**   That's correct.

10  **Q.**   Okay.  So when we talked about how you are generating that

11  stream with respect to the live preview -- or, sorry -- the

12  higher-resolution stream, which you labeled B, the same is true

13  for that FB streaming stream.  It's going to sit in that buffer

14  for a second; right?

15  **A.**   That's correct.

16  **Q.**   Okay.  And then in the FB streaming thing, we have a

17  one-second delay; and then I send it from the camera, through

18  the phone, up to the cloud.  The cloud does whatever it wants.

19  And then it has to come back.

20  **A.**   That is correct.

21  **Q.**   Okay.  You would agree with me that at that point, I'm no

22  longer looking at a live preview; right?

23  **A.**   In my testing, because I'm not comparing the two videos

24  side by side, I didn't perceive any delay myself; but it's

25  possible that one -- that one-second delay could be

1   perceivable.  For example, when the cell phone signal is

2   terrible, it takes a long time to watch a video on your phone

3   anyways.  So when that video stream comes back, there

4   definitely could be delay perceivable to humans in those

5   scenarios.  But those don't affect the infringement of Claim 3.

6   **Q.**   Okay.  Let's see if we can break that up a little bit.

7   There's a delay that happens actually inside the camera that's

8   at least one second because of the data sitting inside that

9   buffer; right?

10  **A.**   Yes.

11  **Q.**   Okay.  And then when it leaves the phone and you're

12  streaming it, there also could be additional delays as a result

13  of having to send it through a hot spot up to the cloud and

14  have it come back; fair?

15  **A.**   That's correct.

16       **MR. HAYNES:**   Okay.  Now let's go to DDX-9.7.  I just

17  want to make sure we all agree on something.

18  **BY MR. HAYNES:**

19  **Q.**   What I've drawn here is I've modified your slide.  This is

20  not your slide.  What I'm trying to show here is there's

21  another live-streaming scenario where I don't use the phone as

22  a hot spot.

23  **A.**   Okay.

24  **Q.**   Okay?  And in that scenario, you just connect to any other

25  WiFi device, somebody else's phone, a WiFi network, anything

1    with WiFi, and you can also send it up to the cloud.  And then

2    the user can go to a site on the cloud and watch that video;

3    right?

4    **A.**    Yes.

5    **Q.**    Okay.  And just to be clear, you are not accusing that

6    scenario of infringement; correct?

7    **A.**    That's correct.

8    **Q.**    Okay.  And so you would agree with me that one option to

9    avoid any allegation that there's infringement by live

10   streaming would be all the other use cases where you're not

11   using the phone as a hot spot; right?

12   **A.**    Sorry.  I missed the first part of your question.

13   **Q.**    You would agree with me that one way to avoid infringement

14   of these claims entirely in the live-streaming scenario would

15   be to do live streaming using any other WiFi device apart from

16   the user's phone that's going to be looking at the live stream?

17   **A.**    I agree with that.

18   **Q.**    All right.  We talked in the very beginning about the

19   notion that when we are evaluating the value of a patent, we

20   have to look at what the patent added to the prior art.  Is

21   that fair?

22   **A.**    Yeah, that's fair.

23   **Q.**    Okay.  And you had some discussions with Contour's damages

24   expert where you tried to explain to him what was added to the

25   art.  Is that fair?

1    A.    That's fair.

2    Q.    All right.  Now, you would agree with me that the only way

3    that you infringe these claims is if every single limitation of

4    those claims is satisfied; right?

5    A.    That is correct.

6    Q.    Okay.  And we looked at -- in your direct, there were two

7    sets of image settings, and you needed to have at least one

8    setting from each of those groups of three.  Do you recall

9    that?  We can go back.

10          MR. HAYNES:  Can we bring up Claim 11.

11    BY MR. HAYNES:

12    Q.    You see down at the bottom, there's the two groups of

13    settings here?  Do you recall testifying about those?

14    A.    If you're talking about the group that includes lighting,

15    color, and audio settings, yes, I see that.

16    Q.    And there's actually two groups where you need to have at

17    least one setting from each group to infringe these claims;

18    right?

19    A.    That's correct.

20    Q.    Okay.  You agree with me if I just don't allow the user

21    to -- make the camera so that they can't change three of those

22    settings, so that there's no way to select one of the three

23    options in that group, no infringement; right?

24    A.    We're talking about the second group again?

25    Q.    Either one of the groups.  So one you said was lighting

1  setting, color setting, or an audio setting.  If I make it so

2  the camera cannot receive changes to those settings, no

3  infringement; right?

4  **A.**   That's correct.  Just the first group has four items, so I

5  just want to be accurate.

6  **Q.**   That's fair.

7     And in that scenario, if I change the camera so I can't

8  change any one of those three settings in that second group, I

9  can do live preview while recording -- right? -- without

10  infringing?

11  **A.**   Are you talking about making changes in the camera itself

12  or in the GoPro's mobile app?

13  **Q.**   Thank you for that distinction.

14     I'm talking about changes in the camera to the firmware so

15  that the camera cannot receive a signal from somewhere else

16  that changes one of the three signals:  lighting setting,

17  color setting, or audio setting.

18  **A.**   I would agree that will avoid infringement.

19  **Q.**   Okay.  So as long as I'm not doing that, I can do live

20  preview while recording; right?

21  **A.**   I want to be accurate.  It's not like the user is not

22  changing the setting; that the camera is modified to remove

23  those functionalities so nobody can make any changes using

24  whatever app, then I agree with that.

25  **Q.**   Okay.  And in that scenario, if the camera disables those

**HU - CROSS / HAYNES**

1  settings, I can do live preview while recording without

2  infringing; right?

3  **A.**  Generally, that is true.

4  **Q.**  And I can do any kind of live streaming that I want

5  without infringing; right?

6  **A.**  That is true as well.

7  **Q.**  Okay.  And I can record a high-resolution stream and a

8  low-resolution stream in parallel and transmit the

9  lower-resolution stream for a wireless preview on a device.  As

10  long as I don't have one of those three camera settings, still

11  no infringement; right?

12  **A.**  As long as you don't have any of those three camera

13  settings, that's correct.

14  **Q.**  Any one of the three?

15  **A.**  Yes.

16  **Q.**  All right.  Now, let's talk about what was already in the

17  art, which is what we should be valuing the invention against.

18  Okay?

19  **A.**  Okay.

20  **Q.**  All right.  So you agree portable point-of-view cameras,

21  those were out there just in the general concept.  That was a

22  known type of device in the art; right?

23  **A.**  That is correct.

24  **Q.**  And cameras that had a lens and an image sensor, again,

25  known in the art; right?

1   **A.**   That is correct.

2   **Q.**   Cameras that had an image sensor, a lens, and an image

3   processor, also known in the art; right?

4   **A.**   That is correct.

5   **Q.**   And cameras that had a lens, an image sensor, and a camera

6   processor that could record two streams parallel, also known in

7   the art; right?

8   **A.**   I don't recall if there were -- did you say in parallel?

9   **Q.**   Yeah, record in parallel.

10   **A.**   I don't know if -- I don't recall if there was an actual

11   camera that had all of those features at the time of the

12   invention.

13   **Q.**   Okay.  But you have -- you're aware that and you testified

14   that about the ContourGPS; right?

15   **A.**   Yes.

16   **Q.**   Okay.  And you know that ContourGPS had an A5 chip from

17   Ambarella in it; right?

18   **A.**   Yes.  But ContourGPS was after the conception of the

19   invention.

20   **Q.**   I understand that.

21   **A.**   Okay.

22   **Q.**   I'm getting there.  Give me just one second.

23        All right.  And that ContourGPS, you heard testimony --

24   or, sorry.  The Ambarella A5 chip that was in the ContourGPS,

25   that's not something that Contour invented; right?

1    **A.**   That capability in hardware was what the Ambarella chip

2    provided.

3    **Q.**   Okay.  And you know, because you've looked at it, that the

4    Ambarella A5 chip was launched in January of 2009; correct?

5    **A.**   I don't remember the exact date right now, but it's around

6    that time frame.

7    **Q.**   Okay.  And that's certainly well before December 2009

8    where you say that Contour conceived of their invention; right?

9    **A.**   The piece of hardware was released before Contour's

10   invention.

11          **MR. HAYNES:**  No further questions, Your Honor.

12      I pass the witness.

13          **THE COURT:**  All right.

14      Mr. Krill?

15          **MR. KRILL:**  Just a few questions in redirect,

16   Your Honor.

17          **THE COURT:**  Okay.

18                    <u>**REDIRECT EXAMINATION**</u>

19   BY MR. KRILL:

20   **Q.**   Dr. Hu, when you were talking about conception date in

21   your direct testimony, were you referring to your opinions

22   based on all the evidence you reviewed, or were you summarizing

23   Dr. Mander's testimony?

24   **A.**   I relied upon all the evidence that I have reviewed that

25   included Dr. Mander's testimony.

1   **Q.**   And were you shown all that evidence today during your

2   cross-examination?

3   **A.**   No, I wasn't.

4   **Q.**   Did you consider additional evidence on top of

5   Dr. Mander's testimony today and even in his deposition that

6   supports your opinion on conception date?

7   **A.**   Yes, I did.

8   **Q.**   Now, will you be back to testify regarding -- about that,

9   if necessary, later in this trial?

10  **A.**   I hope so, next week.

11  **Q.**   You were asked a question about a WiFi transceiver and a

12  Bluetooth transceiver, and I think you were asked if that's a

13  protocol device.  Do you recall that?

14  **A.**   Yes, I did.

15  **Q.**   I believe you wanted to explain further and you didn't get

16  the chance to, so would you like to explain further?

17  **A.**   Of course.

18       Can we bring back the diagram that GoPro used in their

19  opening statement as well as in my direct testimony?

20            **MR. HAYNES:**  Your Honor, that's outside the scope of

21  my cross.  I did not ask her about that document at all.

22            **THE COURT:**  I think this is responsive to what she was

23  going to say when you were asking the questions.  So,

24  overruled.

25            **THE WITNESS:**  I can explain without as well.  I just

1    thought it will be much clearer.

2        It will be the next slide.

3    **BY MR. KRILL:**

4    **Q.**    Okay.  This slide?

5    **A.**    Yes.

6    **Q.**    Please feel free to explain.

7    **A.**    Okay.  So, again, this is QCA9377.  So that is the

8    wireless connection protocol device.  And WiFi, technically, as

9    well as Bluetooth, are each collection of protocols.  So they

10   have multiple layers of the connection.  And researchers and

11   companies have agreed upon different protocols within each

12   layer so that the two devices that are made by different

13   companies can talk wirelessly, either through WiFi or

14   Bluetooth, to each other.

15       So when I explained that I couldn't say "yes" or "no" to

16   whether WiFi or Bluetooth themselves were protocol, singular,

17   during my deposition that the video clip was shown, the counsel

18   and I had back-and-forth questions and answers about are they

19   protocols, focusing on whether they're singular protocol.

20       So they are each collections of protocols.  But when you

21   kind of zoom out, at a very high level we say, when you compare

22   each other, is WiFi a protocol?  Yes, it's a collection of

23   protocols.  But if you group it together, it is a protocol.  Is

24   Bluetooth a protocol?  Same.

25       But does it matter to the infringement of the wireless

1   connect- -- wireless protocol connection device?  It doesn't

2   matter.  The claim language only requires the device to be able

3   to transmit videos and receive control signals wirelessly.  It

4   doesn't say it has to be WiFi, it has to be Bluetooth, has to

5   be a single protocol, or has to be two protocols.  So the

6   different -- that distinction doesn't really matter, and the

7   distinction makes sense on the technical level.

8           **MR. KRILL:**  Allen, could you go back one slide.

9   **BY MR. KRILL:**

10  **Q.**   Do the claims say a wireless connection protocol or a

11  wireless connection protocol device?

12  **A.**   It says a wireless connection protocol device.

13  **Q.**   Can a wireless connection protocol device carry out one or

14  more wireless protocols?

15  **A.**   Yes, it can.

16  **Q.**   And did you explain that at your deposition in clips that

17  were not played?

18  **A.**   Yes.

19          **MR. KRILL:**  Allen, could you pull up Slide 57 from our

20  presentation today.

21  **BY MR. KRILL:**

22  **Q.**   I believe earlier you were shown an exhibit from your

23  deposition where you drew an A on phone preview.

24  **A.**   Yes.

25  **Q.**   Is it your opinion that the phone preview stream -- well,

1  let me ask you this:  What is your opinion about the phone

2  preview stream?  Does it exist before or after the buffer

3  that's shown there in orange?

4  **A.**  It's before.  You can see that it comes here before the

5  one-second delay that is by design to perform image

6  stabilization feature in the GoPro cameras, this group of GoPro

7  cameras.

8  **Q.**  Were you asked some questions about live streaming and the

9  use case where the live streaming -- or where the phone -- or

10  the stream is sent to the cloud instead of directly to the

11  phone?  Do you remember that?

12  **A.**  Yes.

13  **Q.**  And you don't contend that when the stream goes to the

14  cloud instead of directly to the phone, that that infringes;

15  right?

16  **A.**  If it doesn't go through the user's phone, it does not

17  infringe.

18  **Q.**  And are GoPro's cameras action cameras?

19  **A.**  Yes, they are.

20  **Q.**  When you're using an action camera -- well, let me ask

21  you.  Where do you use action cameras?

22  **A.**  Usually, outdoors.  It can be used in your home, but more

23  often than not, you're on the ski slope, you're doing something

24  cool, mountain biking, hiking, and there is no other WiFi

25  connections, WiFi networks, your home WiFi or Starbucks, or so

```
 1   on, around.

 2   Q.   You were also asked several questions about settings and

 3   if GoPro removed certain settings, whether or not that would

 4   avoid infringement.  Do you remember that?

 5   A.   I remember that.

 6   Q.   Has GoPro ever done that?

 7   A.   No.

 8           MR. KRILL:  No further questions.

 9           THE COURT:  All right.

10   Dr. Hu, thank you.

11           THE WITNESS:  Thank you very much, Your Honor.

12           THE COURT:  You're excused for now.

13   Mr. Keville?

14           MR. KEVILLE:  Your Honor, our next witness, we call

15   Nick Woodman, GoPro's CEO.

16           MR. HAYNES:  We may need a minute to go get him.

17           THE COURT:  Well, let's go find him.

18    (Witness enters the courtroom and steps forward to be sworn.)

19           THE COURT:  Mr. Woodman, come on up.

20           THE COURTROOM DEPUTY:  If you'll stand for me and

21   raise your right hand.

22                     NICHOLAS D. WOODMAN,

23   called as a witness for the Plaintiff, having been duly sworn,

24   testified as follows:

25           THE WITNESS:  I do.
```

WOODMAN - DIRECT / KEVILLE

1          **THE COURTROOM DEPUTY:**  Be seated.

2      And if you would please begin by stating your full name

3   and spelling it for the court reporter.

4          **THE WITNESS:**  Nicholas Dudley Woodman,

5   N-i-c-h-o-l-a-s, D-u-d-l-e-y, W-o-o-d-m-a-n.

6                    <u>**DIRECT EXAMINATION**</u>

7   BY MR. KEVILLE:

8   **Q.**   Almost afternoon.  How are you, Mr. Woodman?

9   **A.**   Good.  Thank you.  How are you?

10  **Q.**   Good.  Thanks.

11      You are the CEO of GoPro; correct?

12  **A.**   I am.

13  **Q.**   And you founded the company; correct?

14  **A.**   I did.

15  **Q.**   In this trial here in October 2025, GoPro is saying

16  Contour's patents are obvious and invalid; correct?

17  **A.**   I don't know exactly what we're saying in this courtroom.

18  I haven't been here.

19  **Q.**   Okay.  You've been in this litigation for a long time;

20  correct?

21  **A.**   I have been.

22  **Q.**   You understand GoPro's contentions; correct?

23  **A.**   I do.

24  **Q.**   You understand GoPro is contending the patents are not --

25  are not valid; correct?

WOODMAN - DIRECT / KEVILLE

1   **A.**   My understanding is we're being accused of copying, and I

2   don't believe that we did.

3          **MR. KEVILLE:**  Your Honor, move to strike as

4   nonresponsive.

5          **THE COURT:**  No.  Overruled.

6   **BY MR. KEVILLE:**

7   **Q.**   You under-

8          **THE COURT:**  Keep going.

9          **MR. KEVILLE:**  Sorry, Your Honor.

10  **BY MR. KEVILLE:**

11  **Q.**   Is it your defense in this case that the patents claim

12  something that is not new?

13  **A.**   I'm sorry.  Could you repeat the question?

14  **Q.**   Is it your defense in this case that the Contour patents

15  claim something that is not new?

16  **A.**   I believe I'm here to talk about the fact that we're being

17  accused of copying, and I don't believe that we are -- or that

18  we did.

19  **Q.**   Are you not contending that you are the first inventor of

20  what is claimed in these patents?

21  **A.**   No, I am not the inventor.

22  **Q.**   Okay.  And you didn't invent the subject matter that is

23  claimed in these patents?

24  **A.**   What patents are you referring to?

25  **Q.**   The two Contour patents that are at issue in this case.

**WOODMAN - DIRECT / KEVILLE**

1    **A.**    And the question again, please?

2    **Q.**    You are not claiming that you invented first what is

3    claimed in the patents in this case?

4    **A.**    I believe I had a concept for what is claimed in the

5    patents, but, no, I am not claiming to be the inventor of those

6    concepts.

7    **Q.**    Okay.  Do you believe what is claimed in the Contour

8    patents was an improvement to point-of-view cameras?

9    **A.**    No.

10   **Q.**    Okay.  You're not claiming in this case -- it's your

11   defense in this case that what Contour did did not improve

12   point-of-view cameras?

13   **A.**    I'm sorry.  Could you ask the question again?

14   **Q.**    Are you contending in this case that what Contour claimed

15   and invented in the two patents was not an improvement to

16   point-of-view cameras?

17   **A.**    I think that the concepts that are in Contour's patent are

18   interesting features in a camera but...

19   **Q.**    What is claimed in the patents at issue that are asserted

20   against you, were those improvements to point-of-view cameras?

21   **A.**    If what you're saying:  Are the ability to live preview a

22   camera an improvement in a point-of-view camera over what was

23   before?  That was an interesting feature.

24   **Q.**    Okay.

25   **A.**    I think that's what you're asking me.

1   **Q.**   So Contour did improve point-of-view cameras by claiming

2   the invention that they've claimed in this case?

3   **A.**   I don't know that I would say that's true, that by

4   claiming something in a patent, they improved point-of-view

5   cameras.  I don't think that's accurate.

6           **MR. KEVILLE:**  Can you put up Claim 11 of the patent,

7   Allen.

8   **BY MR. KEVILLE:**

9   **Q.**   You've seen this claim.  We've talked about it, and it's

10  been asserted against you for a long time; correct?

11  **A.**   Yes.

12  **Q.**   Do you agree that this claim represented an improvement to

13  point-of-view cameras?

14  **A.**   No, I don't think so.  At least I wouldn't say it like

15  that.

16  **Q.**   Okay.  Have you said -- has GoPro said the opposite

17  outside of this Court?

18  **A.**   I'm sorry.  I don't really understand the question, how a

19  claim in a patent could improve a point-of-view camera.  A

20  reduction to practice and introducing certain features into the

21  market would improve a camera or the industry.

22  **Q.**   Do you believe this claim recites an improved

23  point-of-view camera relative to what came before it?

24  **A.**   I couldn't say.  This is a legal document, and I'm not a

25  lawyer.

1   **Q.**   Okay.  Has GoPro represented publicly that this claim

2   represented an improved point-of-view camera?

3   **A.**   I don't know.

4        **MR. KEVILLE:**  Allen, could you put up GoPro's

5   statement from December 2024.

6   **BY MR. KEVILLE:**

7   **Q.**   This is a statement GoPro made in a public filing *In the*

8   *Matter of Certain Cameras* in the International Trade Commission

9   in December 2024.

10       GoPro said, similar to its Claim 1, which recites a

11  processor specifically configured by instruction stored in a

12  storage medium to select subframes, and it goes on, and then it

13  compares to the representative Claim 11 in Contour recites an

14  improved POV camera with a processor being configured to record

15  low- and high-quality data streams in parallel, followed by the

16  low-quality data stream's wireless transfer to a remote device.

17       This is GoPro's statement.  Do you stand by it?

18  **A.**   If that's what we said.

19  **Q.**   So GoPro agrees today in this Court with what it said in

20  this case, that the representative Claim 11 in Contour's patent

21  recites an improved point-of-view camera with a processor being

22  configured to record low- and high-quality data streams in

23  parallel, followed by the low-quality data stream's wireless

24  transfer to a remote device?  Yes, you stand by that?

25  **A.**   Yes.  Whether that's novel or not, I don't know; but, yes,

 1   that's what this says.

 2         **MR. KEVILLE:**  Okay.  Can you show the witness

 3   Exhibit 253.  No, that's not the right one.

 4      No, that's not the right one.  2833.  Sorry, Michelle.

 5      2833?  No, this isn't the right one.  Hold on.

 6         **MR. HAYNES:**  Can we take it down?  I'm not sure this

 7   is in evidence.

 8         **THE COURT:**  Yes.

 9         **MR. KEVILLE:**  That's fair.

10      Scroll down now so I can see it.

11      Okay.  I got it.

12   **BY MR. KEVILLE:**

13   **Q.**   Mr. Woodman, do you recognize this as a series of emails

14   that includes you?

15   **A.**   I do.

16         **MR. KEVILLE:**  Your Honor, I move to admit

17   Exhibit 2833.

18         **MR. HAYNES:**  No objection.

19         **THE COURT:**  All right.  It's admitted.

20      (Trial Exhibit 2833 received in evidence.)

21   **BY MR. KEVILLE:**

22   **Q.**   Okay.  If we look at the earliest part of this on page 3,

23   do you see --

24         **MR. KEVILLE:**  Down at the bottom, Allen, please.

25   **Q.**   -- there's an email on January 5th, 2011, from Rudy

1    Samuels to -- well, it's to you and others.  We'll see from

2    above.

3        And he says -- and he attaches an article and says [as

4    read]:

5            "Contour adds Live Viewfinder to its ContourGPS

6        helmet cam, real-time streaming to smart phones."

7        Do you see that?

8    A.    I do.

9    Q.    And do you remember receiving that email from Mr. Samuels?

10   A.    I do.

11   Q.    Okay.  And you remember that Contour was the first one to

12   come out with a live viewfinder that you could use on your

13   phone streaming from an action camera?

14   A.    Commercialized, yes, publicly released.

15   Q.    Okay.  Now, let's go up and see what you responded.

16       When you read that Contour had released the ContourGPS

17   with its wireless preview and control in January 2011, your

18   response then was not, "Hey, we did it first"; correct?

19   A.    No.

20   Q.    No.  Your response in 2011 was "we should have been

21   smarter"; correct?

22   A.    Yes, in context of --

23   Q.    Is that your answer?

24   A.    -- knowing that they would have been able to do that with

25   the A5 chip, yes.

1    Q.    Okay.  You didn't say, "Hey, we've already had this
2    invention," did you?  I don't see that anywhere here.
3    A.    I'm referring to we should have known they would enable
4    this feature with the A5 chip, because it was capable of doing
5    that.
6    Q.    Nowhere in here did you say, "We already knew how to do
7    this," did you?
8    A.    No, because it was well-understood amongst my team that we
9    were already working on a WiFi-based solution to do something
10   similar.
11          THE COURT:  So if you could just respond to the
12   question that you're being asked, that would be great.
13          THE WITNESS:  Okay.
14   BY MR. KEVILLE:
15   Q.    Your response was [as read]:
16          "Do we have any of these units we can take
17      apart?  We should get Zahid and Ben each a unit to
18      disassemble and review."
19      Correct?
20   A.    Correct.
21   Q.    And then you instructed your people, Rudy and Steve, to
22   covertly get us a couple of ContourGPS units; correct?
23   A.    That's correct.
24   Q.    And then later, Rudy Samuels did covertly get the Contour
25   cameras with the wireless preview and remote control; correct?

1  A.   That's correct.

2          MR. KEVILLE:  Okay.  Allen, can you show the witness

3  Exhibit 259, I believe.

4  BY MR. KEVILLE:

5  Q.   This is Mr. Samuels' expense report from GoPro's records;

6  correct?

7  A.   Correct.

8          MR. KEVILLE:  Your Honor, I move to admit Exhibit 259.

9          MR. HAYNES:  No objection.

10          THE COURT:  It's admitted.

11      (Trial Exhibit 259 received in evidence.)

12  BY MR. KEVILLE:

13  Q.   All right.  So Mr. Samuels, in this expense report, down

14  at the bottom on May 16th, it has [as read]:

15          "Secret shopper competitive product:  1

16      ContourGPS."

17      Do you see that?

18  A.   Yes.

19  Q.   And then on May 21st, a little less than a week later [as

20  read]:

21          "Secret shopper competitive product:  2 Contour+

22      cameras."

23      Do you see that?

24  A.   I do.

25  Q.   And the purpose of this was secret shopper competitive

1    product; correct?

2    **A.**    Correct.

3    **Q.**    That's what it says on top.

4         And then he charged it to "Product Development"; correct?

5    **A.**    Correct.

6    **Q.**    So Mr. Samuels is buying Contour's cameras to use for

7    GoPro's product development; correct?

8    **A.**    He's in the Product Development Department, so that's how

9    that's accounted for.

10    **Q.**    Okay.  So Mr. Samuels, in the Product Development Group,

11    is the guy you told to go out and covertly get some

12    Contour cameras to tear them apart?

13    **A.**    That's correct.

14    **Q.**    And then Mr. Samuels, who was in the Product Development

15    Department, did so; correct?

16    **A.**    That's correct.

17    **Q.**    Okay.  And he told you --

18             **MR. KEVILLE:**  If we look at -- Allen, can you put up

19    263 for the witness.

20    **BY MR. KEVILLE:**

21    **Q.**    He let you know that he ordered one ContourGPS to test

22    Bluetooth streaming to iPhone and two Contour+ for testing

23    and teardown; correct?

24    **A.**    Correct.

25    **Q.**    That's what your product development guy told you in

1    May 2011; correct?

2    **A.**   Correct.

3    **Q.**   And the first thing you responded was "Good"; correct?

4    **A.**   Yes.

5    **Q.**   The first thing you say.

6         You didn't say, "Hey, we don't need to test" --

7              (Co-counsel confer off the record.)

8         **MR. KEVILLE:**  Your Honor, I move to admit Exhibit 263.

9         **MR. HAYNES:**  No objection.

10        **THE COURT:**  It's admitted.

11        (Trial Exhibit 263 received in evidence.)

12   **BY MR. KEVILLE:**

13   **Q.**   All right.  Let's look at your response again.  You didn't

14   say in this 2011 email, "Hey, we don't need to test and tear

15   down Contour's cameras because we already know how to do this,"

16   did you?  I don't see it.

17   **A.**   I'm sorry.  The question again?

18   **Q.**   Sure.  You didn't say in this email, when he went out and

19   covertly got the cameras, "We don't need to test and tear down

20   Contour's cameras.  We already did this"?

21   **A.**   Can I read the email?

22   **Q.**   Sure.

23   **A.**   Thank you.

24        (Witness examines document.)  Okay.  Sorry.  The question

25   one more time?

**WOODMAN - DIRECT / KEVILLE**

1  **Q.**   Sure.  When you got the email from Rudy Samuels, the

2  product development guy, that he got the Contour cameras to

3  test and tear down, you didn't write book and say, "Hey, we

4  don't need to do that.  We did this first"?

5  **A.**   No, I clearly didn't write that.

6  **Q.**   And you didn't tell Mr. Samuels, "Hey, what Contour did

7  was obvious.  We don't need their cameras"?

8  **A.**   No, I didn't write that.

9  **Q.**   And you didn't say, "Hey, Mr. Samuels, this is all just

10  Ambarella chip stuff.  We don't need to see what's in Contour's

11  cameras"?  You didn't say that either, did you?

12  **A.**   No.

13  **Q.**   Okay.  And, by the way, this is May 2011.  That's two

14  years after you said you wanted to squash VholdR; correct?

15  **A.**   Oh.  Yeah, we were a small company of 12 -- 12 people

16  then, so our ability to squash anybody is questionable.  But

17  this is May 2011, yes.

18  **Q.**   You weren't 12 people in May 2011, were you?

19  **A.**   No, not in May 2011.

20  **Q.**   Okay.  And by the time -- you agree that Contour and

21  VholdR, the company, was a competitor to GoPro?

22  **A.**   Yes.

23  **Q.**   Okay.  And by the time that you put out the competitive

24  product, the HERO3 or the HERO2 with the WiFi BacPac, you were

25  a big company; correct?

1   **A.**   I wouldn't say we were a big company, but we were a leader

2   in our industry.

3   **Q.**   Okay.  And ultimately, you did squash VholdR Contour;

4   correct?

5   **A.**   No.  I think that Contour went out of business due to some

6   mismanagement of the business and I believe we had a better

7   product.  But, no, we didn't squash them.

8   **Q.**   You agree one way to squash a competitor is to take their

9   technology and not pay for doing so; correct?

10  **A.**   I wouldn't know.  I've never done that.

11  **Q.**   Well, you do agree, the first time you had a camera with

12  real-time video streaming to smartphones and wireless control

13  through smartphones, that was when GoPro introduced the GoPro

14  app in October 2012; correct?

15  **A.**   I'm sorry.  Could you ask the question again?

16  **Q.**   Sure.  It wasn't until October 2012 when GoPro first had a

17  product out there for sale with real-time video preview and

18  remote control of settings?

19  **A.**   The first time that we sold a product that could do all

20  that was with the introduction of the WiFi BacPac in June of

21  2012.  When you combine that with HD HERO2, that was the first

22  time we commercially sold a product that could do that.

23  **Q.**   In June of 2012, you sold the WiFi with BacPac, but you

24  didn't have the app that allowed you to live stream and preview

25  on your phone; correct?

1    **A.**    The app came out, I think, three months after the WiFi

2    BacPac, that's correct.

3    **Q.**    That's what I asked.

4    **A.**    Okay.

5    **Q.**    So it wasn't until October 2012 that you had the live

6    preview and the remote control from your phone?

7    **A.**    Commercially available, that entire product suite would

8    have been available October, I believe, of 2012, yes.  That's

9    not the first time that we got that to work, though.

10    **Q.**    I asked you when did you have it out there.

11    Now, Contour, we saw -- you saw that they had it out in

12    January of 2011; correct?

13    **A.**    I believe so, yes.

14    **Q.**    Okay.  All right.  And October 2012, that's almost

15    18 months after you tell your guys to covertly get the cameras

16    for teardown and testing; correct?

17    **A.**    If that's the timeline, then, yes.

18    **Q.**    Do you agree that being able to use your smart device to

19    remotely turn on and control your GoPro, see what your camera

20    sees, that opens up all sorts of interesting new use cases?

21    **A.**    Sure.

22    **Q.**    Okay.  You agree that a smartphone makes for an incredible

23    video remote control for a GoPro.  And in 2013, you said that

24    happened, now users are able to preview and control a GoPro

25    with a smartphone?

1    A.    Yes.

2    Q.    Okay.  You've stated, GoPro has, that mobile devices such

3    as phones are good complements for GoPro's products; correct?

4    A.    Absolutely.

5    Q.    Okay.  You would agree that the ability to have the GoPro

6    app on your phone and have live preview and being able to

7    remotely control your GoPro, that's been a very important

8    feature for GoPro?

9    A.    I think in the past, we thought it was very important; and

10   then we've learned over time that it's not as important as we

11   thought it was.

12   Q.    And yet you've never taken it off of the phones; correct?

13   You still have that feature on the phones that are coming out

14   today?

15   A.    The cameras that are coming out today?

16   Q.    Yes.

17   A.    We --

18   Q.    Do you --

19   A.    Do you want to reask the question?

20   Q.    Sure.  You still have that feature that you can live

21   preview and remote control even on cameras that are coming out

22   today?

23   A.    We do.

24   Q.    I want to be clear on something.  Let's put up Claim 11

25   again.  This is the claim that GoPro said is an improved

1    point-of-view camera.

2         Are you claiming in this trial that you, Nick Woodman,

3    conceived of this invention first, before Contour?

4    **A.**   I don't -- I don't know that I -- what I conceived of was

5    an invention.  I had concepts related to enabling wireless

6    preview while recording, and I may have been amongst the first

7    people to have that idea, but I don't think I invented that

8    concept.

9    **Q.**   Okay.  You -- the ideas that you say you conceived of,

10   you've said and you testified that those are in a patent that

11   you filed; correct?

12   **A.**   Yes.

13   **Q.**   Okay.  And that's where we would see what ideas or

14   concepts you had -- correct? -- before Contour?

15   **A.**   The genesis of them, yes.

16   **Q.**   Okay.  Who is Paul "Nipper" Donovan?

17   **A.**   Paul is a contract engineer that we used to work with in

18   the early days of GoPro before we had an internal engineering

19   team.

20   **Q.**   Okay.  And was he the person you claim made the prototypes

21   that you say proved out what your concepts were?

22   **A.**   Yes.

23   **Q.**   And what was Rudy Samuel's involvement in that?

24   **A.**   Rudy was another contract engineer, and he was more

25   focused on product design and mechanical engineering.

1    **Q.**   Okay.  But he was involved in these early concepts that

2    you're talking about; correct?

3    **A.**   Yes.  He was involved in helping us develop the module

4    expansion BacPac system that's described in my patent.

5    **Q.**   Okay.  And in that time when you were working on this

6    modular BacPac expansion system that's described in your

7    patent, you were working with Ambarella on -- Ambarella on a

8    chip; correct?  You were using one of their chips?

9    **A.**   Yes.

10   **Q.**   Okay.  And that was the A2 chip; correct?

11   **A.**   Yes.

12   **Q.**   Okay.  And was that the chip that was in the prototypes

13   that we've talked about?

14   **A.**   Yes.

15         **MR. KEVILLE:**  Can we look at -- Allen, can you show

16   the witness Defendant -- Exhibit 2351.

17   **BY MR. KEVILLE:**

18   **Q.**   This is the patent that you're talking about, the '251

19   patent where you're listed as the inventor; correct?

20   **A.**   Yes.

21   **Q.**   Okay.  And you listed only yourself as an inventor on this

22   patent; correct?

23   **A.**   It looks that way, yes.

24   **Q.**   You didn't name Rudy Samuels; correct?

25   **A.**   No.

1   **Q.**   You didn't name Paul "Nipper" Donovan; correct?

2   **A.**   No.

3   **Q.**   You didn't name Ambarella as a company?

4   **A.**   No.

5   **Q.**   You didn't name any employees of Ambarella; correct?

6   **A.**   No.

7   **Q.**   Even though they provided the processor for what you're

8   claiming here -- correct? -- in this patent?

9   **A.**   No.  This patent has nothing to do with a processor that

10   we would use in the theoretical camera that I'm describing here

11   that would work with the expansion modules.

12        **MR. KEVILLE:**  And, Your Honor, I may have forgot.  I

13   move Exhibit 2351 into evidence.

14        **THE COURT:**  Any objection?

15        **MR. HAYNES:**  No objection.

16        **THE COURT:**  Okay.  It's admitted.

17   (Trial Exhibit 2351 received in evidence.)

18   **BY MR. KEVILLE:**

19   **Q.**   Okay.  So this patent has nothing to do with the ideas of

20   generating two streams in parallel and having a high-resolution

21   stream get saved and a low-resolution stream go to a phone or a

22   mobile device?

23   **A.**   No.  It absolutely does in concept, but how you would do

24   that is not covered in the patent.

25   **Q.**   Okay.  See this patent doesn't tell you how you do what's

1    in Claim 11 of Contour's patent or the other claims?

2    **A.**    This patent describes a camera that can both record to the

3    camera and send a live preview to another device.  I couldn't

4    say exactly how that translates to Contour's patent from a

5    legal perspective.

6    **Q.**    Okay.  But to the extent this has the concept of wireless,

7    you didn't come up with that concept; correct?

8    **A.**    Obviously not.

9    **Q.**    And that's done by the camera processor; correct?

10    **A.**    No.

11    **Q.**    Okay.  So the camera processor, the Ambarella, doesn't

12    have the wireless capability?

13    **A.**    No.  You'd use a separate wireless protocol device to

14    enable a camera or an expansion module to have wireless

15    capabilities, not the camera's processor itself.

16    **Q.**    And at this time, in 2008 when you first filed this, there

17    were no camera processors by Ambarella or anybody else that had

18    wireless capability; correct?

19    **A.**    I don't know.

20    **Q.**    Okay.  And at 2009, when you filed the non-provisional of

21    this, there were no camera processors by Ambarella or anybody

22    else that had wireless capability; correct?

23    **A.**    I can't say.  I do know that the A5 processor from

24    Ambarella was capable of dual stream video which would enable a

25    high- and low-quality video encoding for live preview and

1   saving to an SD card, but I couldn't say from a technical

2   perspective what the wireless capabilities were or weren't of

3   the A5 processor.

4   **Q.**   Okay.  You certainly never had seen, before 2010, a camera

5   processor by Ambarella or anybody else that had the ability to

6   wirelessly transmit a stream; correct?

7   **A.**   I don't know.  I don't know.

8          **MR. KEVILLE:**  All right.  Now, let's put up -- Allen,

9   can you put up Claim 9.

10       Let's start at Claim 1, if you don't mind.

11          **THE WITNESS:**  Sorry.  Whose patent is this?

12   **BY MR. KEVILLE:**

13   **Q.**   This is yours, Mr. Woodman.

14   **A.**   Okay.

15   **Q.**   All right.  What you filed for -- and we'll get into it a

16   little more.  But what you filed for in 2008 and ultimately got

17   a patent on, you claimed a camera system comprising a camera,

18   then a removable display screen detachably coupled to the

19   camera, and then a first portion of a camera housing, a second

20   portion of a camera housing, an inner hinge, an outer hinge, a

21   first fastening structure, a second fastening structure.

22       So a lot about the body of the camera; correct?

23   **A.**   That's correct.

24   **Q.**   And that's because this patent was really directed to your

25   idea of where you'd have a GoPro that you could attach an

1    expansion module to it; correct?

2    **A.**    That's correct.

3    **Q.**    Okay.  And then let's look at Claim 9, which depends from

4    Claim 1.  It says [as read]:

5            "The system of Claim 1, wherein the removable

6        display screen comprises a wireless module,

7        configured to allow a user of the system" -- "of the

8        camera system to wirelessly control operation with a

9        remote controller."

10    Do you see that?

11    **A.**    I do.

12    **Q.**    Okay.  Did Ambarella have anything, when you filed this

13    patent, that allowed you to do that?

14    **A.**    I don't know.

15    **Q.**    Okay.  Well, if you're the inventor, who invented the idea

16    of having this wireless module?

17    **A.**    The wireless module that could attach to the back of the

18    camera to expand its capabilities?

19    **Q.**    Yeah.

20    **A.**    The concept for that, I invented.

21    **Q.**    Okay.  You didn't name in this patent any manufacturer of

22    a wireless module, did you?

23            **MR. KEVILLE:**  Go back to the cover, Allen.

24            **THE WITNESS:**  No, I didn't, because I'm not specifying

25    a particular wireless protocol here.  I'm talking about it at a

1  higher level, where wireless could mean any number of different

2  wireless protocols.

3  **BY MR. KEVILLE:**

4  **Q.**   Okay.  You didn't talk about configuring the processor in

5  order to have generating dual streams, did you?

6  **A.**   No.  This patent is more about the -- the wireless --

7  sorry -- the expansion BacPacs being able to attach to the back

8  of the camera for a variety of different new features.  But how

9  those features themselves actually worked, it's not what this

10  patent is about.

11  **Q.**   Okay.  And, by the way, you didn't list any prior art --

12  you understand where it lists prior art, patent documents, and

13  other publications?

14  **A.**   Mm-hmm.

15  **Q.**   Okay.  And you guys, GoPro and yourself, you didn't submit

16  anything from the camera processor at all when you submitted

17  this to the Patent Office; correct?

18  **A.**   That's correct, because the patent has nothing to do with

19  that.

20  **Q.**   So this patent, the '251, has nothing to do with what the

21  camera processor does or how it's configured.  Is that fair?

22  **A.**   From a technical perspective, no.  It covers the concept

23  of various things, including being able to wirelessly transmit

24  a live preview to another device from the camera using a

25  wireless protocol, but how it specifically does that is not

1  covered in the patent.

2          **MR. KEVILLE:**  All right.  I'd like to look at the file

3  history of this patent, and that's Defendant's Exhibit 3431.

4  I'd offer that into evidence, Your Honor.

5          **THE COURT:**  Any objection?

6          **MR. HAYNES:**  No objection.

7          **THE COURT:**  All right.  It's admitted.

8      (Trial Exhibit 3431 received in evidence.)

9  **BY MR. KEVILLE:**

10 **Q.**  All right.  You have a few patents yourself, Mr. Woodman;

11 correct?

12 **A.**  Over a hundred, yes.

13 **Q.**  Okay.  So you understand what we're looking at here is the

14 file of the patent in the proceedings in the Patent Office;

15 correct?

16 **A.**  This is -- I'm sorry.  This is what?

17 **Q.**  This whole document contains the back-and-forth with the

18 Patent Office.

19 **A.**  Okay.

20 **Q.**  It's all those pages.  And you understand there's

21 back-and-forth with the Patent Office?

22 **A.**  I do.

23 **Q.**  Okay.  Let's look at --

24          **MR. KEVILLE:**  Allen, if you would go to page 181.

25 \\\

1    BY MR. KEVILLE:

2    **Q.**   This is what you first claimed when you filed this patent.

3    And your first claim was to "A camera system, comprising";

4    correct?

5    **A.**   Yes.

6    **Q.**   And it goes on to talk about the housing and the expansion

7    module; correct?

8    **A.**   Yes.

9    **Q.**   Okay.  And then if we go to Claim 10, it's [as read]:

10        "The system of claim 1, wherein the integrated

11        expansion module comprises a wireless module to

12        wirelessly communicate image information captured by

13        the camera to a remote wireless receiver."

14        Correct?

15   **A.**   I see that.

16   **Q.**   Okay.  And so it's talking about transmitting image

17   information; correct?

18   **A.**   Yes.

19   **Q.**   And this is a camera.  It takes photos; right?

20   **A.**   And video, yes.

21   **Q.**   It can take video.

22        And all you said here was "image information."  You didn't

23   specify video; correct?

24   **A.**   That's correct.

25   **Q.**   Okay.  Now let's look at how you described that in the

 1   specification you filed.

 2           MR. KEVILLE:  Can you turn to page 171.

 3       Can you find "the wireless interface transmits," Allen.

 4   There we go.

 5   BY MR. KEVILLE:

 6   Q.   [As read]:

 7           "The wireless interface transmits the image

 8       currently in view of the camera lens to the remote

 9       preview screen 604 for display."

10       Do you see that?

11   A.   I do.

12   Q.   Okay.  So here, you're talking about "the image"; right?

13   "The image currently in view of the camera lens," not "the

14   video"?

15   A.   That's correct.

16   Q.   Okay.  And you disclosed that the remote preview screen

17   could have control buttons on it; correct?

18   A.   Correct.

19   Q.   Okay.  And that's shown in --

20           MR. KEVILLE:  Page 152, Allen, if you would.

21   BY MR. KEVILLE:

22   Q.   So your idea, back in this time, was you would have this

23   wrist-mounted remote device; correct?

24   A.   That's one example shown here, yes.

25   Q.   Yeah.  That's the example you're talking about, what we

1  just saw; correct?

2  **A.**    Okay.

3  **Q.**    Okay.  And you would have this preview screen that would

4  have the image; correct?

5  **A.**    Yes.  "The image" meaning what the camera was seeing.

6  That could either be photo or video.

7  **Q.**    No, no.  You said "the image"; correct?  Not -- you didn't

8  say "the video"; you said "the image"?

9  **A.**    Yes.

10  **Q.**    Okay.  And then we have two buttons 606 on the side;

11  right?

12  **A.**    Yes.

13  **Q.**    And those were meant to be able to, like, start, stop, and

14  do the things that would do if you press the button on the

15  GoPro; correct?

16  **A.**    Amongst other things, yes.

17  **Q.**    Okay.  Now, looking back.

18       **MR. KEVILLE:**  Let's go back to the specification at

19  171 and find "alternatively."

20  **BY MR. KEVILLE:**

21  **Q.**    [As read]:

22       "Alternatively, the communication interface may

23       be a one-way communication such that the remote

24       preview screen 604 only receives and displays image

25       information from the camera but does not send any

1          information or controls to the camera."

2          Do you see that?

3     A.   I do.

4     Q.   Okay.  So that's the other embodiment you had, is you

5     would send image information -- right? -- and then not get any

6     controls back; correct?

7     A.   Yes.  It describes that that's one of the ways that that

8     remote interface could work.

9     Q.   Sure.  And that's the way you described it here; right?

10    A.   Yes.

11    Q.   Okay.  No mention here of two streams, one of high

12    quality, one of low quality; correct?

13    A.   Not here, no.

14    Q.   Okay.  Have you read the Contour patent application that's

15    at issue in this case?

16    A.   The claims, yes.  The whole patent, no.

17    Q.   Okay.  So you don't even know that Contour had paragraphs

18    in the specification describing specific ways of how you could

19    create low- and high-quality video screens and transmit those?

20    You never even read that?

21    A.   No.

22    Q.   Okay.  All right.  Now, let's go back to this and go to

23    page 91.

24         We looked at Claim 10, and here we can see the

25    Patent Office rejected your Claim 10.  Do you see that?

**WOODMAN - DIRECT / KEVILLE**

1   **A.**   I do.

2   **Q.**   Okay.  Patent Office said it was rejected under

3   35 U.S.C. 103(a).  That means it's obvious; correct?

4   **A.**   I don't know why they rejected it.

5   **Q.**   But they did say it's rejected and unpatentable; correct?

6   **A.**   That looks like what it says.

7   **Q.**   Okay.  Now, let's go to what you responded.

8        **MR. KEVILLE:**  Allen, that's at page 60.

9   BY MR. KEVILLE:

10  **Q.**   See what you did, you said Claim 7 to 18 canceled.  Do you

11  see that?

12  **A.**   I do.

13  **Q.**   You didn't go back and say, "Hey, hold on, Examiner.

14  You're wrong.  We were going to send image information, or one

15  image from the camera to a remote wireless receiver and that's

16  new"; right?  Instead, you just canceled the claims?

17  **A.**   I actually didn't manage the back-and-forth with the

18  Patent Office.

19  **Q.**   Sure, but it's your patent.

20  **A.**   Our attorneys do that.  That's true.

21  **Q.**   Well, I don't have your attorneys here to ask, and it's

22  your patent so I'm going to ask you; okay?

23  **A.**   Okay.

24  **Q.**   Let's see what happens -- still here in this same

25  document, page --

1          **MR. KEVILLE:** Let's go to 63.  And Claims 25 and 26,

2    could you highlight those.

3          25 and 26.  Just the two on the left, Allen, 25 and 26.

4          There we go.

5    **BY MR. KEVILLE:**

6    **Q.**   Okay.  So now you put in new claims.  And those claim

7    [as read]:

8               ". . . the detachable camera expansion module

9          comprising a wireless module, wherein the user

10         interface comprises a communication interface

11         configured to allow the user of the camera system to

12         wirelessly control operation of the camera system

13         with a remote controller."

14         And then the next claim depends on that and says

15   [as read]:

16              ". . . wherein the remote controller comprises a

17         preview screen and control buttons."

18         Correct?

19   **A.**   Correct.

20   **Q.**   So now you've dropped even the transmit image information;

21   right?  After the examiner rejected it, you took that out and

22   you said, "All right.  We're not even going to claim we had

23   transmit image information."  You just claimed a detachable

24   controller and a remote controller with a preview screen and

25   control buttons; correct?

WOODMAN - DIRECT / KEVILLE

1   **A.**   In this particular claim, yes.

2   **Q.**   Okay.

3   **A.**   I'm not sure if other claims seek to claim something else.

4   **Q.**   All right.  And then let's go to page 52.  The next thing

5   that happens is in February 2012, your attorneys had an

6   interview with the examiner; correct?

7   **A.**   Okay.

8   **Q.**   And you said you have a lot of patents.  That's not

9   uncommon to have interviews with patent examiners, the

10  attorneys and/or the inventors; correct?

11  **A.**   I don't know.  I never actually have.

12  **Q.**   You understand your attorneys have done that?

13  **A.**   I do now.

14  **Q.**   Okay.  All right.  And the examiner requested that

15  Claims 25 --

16        **MR. HAYNES:**  I was just going to object, Your Honor.

17  He's just reading the file history to this witness.  The

18  witness has said he's not familiar with this back-and-forth by

19  the attorneys.

20        **THE COURT:**  So I don't know where this is going.  So

21  I'm going to allow it for the time being.

22  **BY MR. KEVILLE:**

23  **Q.**   Okay.  The examiner requested that Claims 25 and 26 be

24  withdrawn; correct?  No?  It's not --

25  **A.**   I don't know.

1   Q.   Okay.  Well, let's move on and go to Claim --

2           MR. KEVILLE:  Go to page 51, Allen.  And -- there we

3   go, the "Disposition of Claims."

4   BY MR. KEVILLE:

5   Q.   It says [as read]:

6           "Claims 1 through 6 and 19 through 32 are

7       pending.  Of the above claims, 19 to 32 are withdrawn

8       from consideration."

9       Okay.  So the ones we looked at, 25 and 26, were then

10  withdrawn; correct?

11  A.   I honestly don't understand.

12      Yes, if they're in the 19 to 32 range, then yes.

13  Q.   Okay.  Let's do this.  In the end, do you know what your

14  '251 patent claims?

15  A.   Is that the patent that we've been reviewing?  Yes, in

16  general, I understand the claims.

17  Q.   And in general, what that claims is a detachable expansion

18  module; correct?

19  A.   Yes.

20  Q.   And one embodiment was having a removable display screen

21  and a wireless module; correct?

22  A.   Yes.

23          MR. KEVILLE:  Okay.  Your Honor, do we want to break

24  here?

25          THE COURT:  Yes.  I think this is as good a time as

 1    any.

 2         Ladies and gentlemen, we're done for today.  So, again,

 3    we've got plenty more.  We have more from Mr. Woodman.  We have

 4    more from other witnesses.  Keep an open mind, don't do any

 5    research, don't talk with anybody about things.  Come as

 6    promptly as you did this morning, and this case will move right

 7    along.

 8         Let me give you some good news, which is that despite the

 9    shutdown of the Government, which is not good news, the

10    Administrative Office of the Courts has indicated that we will

11    have funding for a little bit longer, certainly through this

12    trial.  So there shouldn't be any impact on you.  That doesn't

13    mean that there won't be.  I can't make any promises, but

14    I think we're going to be in pretty good shape as things go

15    along.

16         And if that's not true, Ms. Davis is the person to let

17    know, and then we'll deal with it.

18         All right.  Have a good afternoon.  See you tomorrow

19    morning.

20         (Proceedings were heard out of the presence of the jury.)

21              THE COURT:  Now you can go, Mr. Woodman.

22              THE WITNESS:  Sorry.

23              THE COURT:  Sit down for just a sec, everybody.

24         So I do believe that what I just told the jury is correct

25    with respect to the funding matters that we had talked about

**PROCEEDINGS**

1  earlier.  We'll see how this develops because you never know.

2       And other than that, I will see you tomorrow at 8:00.

3           **MR. KEVILLE:**  Thank you, Your Honor.

4           (Proceedings adjourned at 1:30 p.m.)

5                    ---o0o---

6

7           <u>**CERTIFICATE OF REPORTER**</u>

8       I certify that the foregoing is a correct transcript

9  from the record of proceedings in the above-entitled matter.

10

11  DATE:  Thursday, October 2, 2025

12

13

14

15                 _Ana Dub_

16       _____

17           Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

18       CSR No. 7445, Official United States Reporter

19

20

21

22

23

24

25