```
                              Volume 4

                          Pages 583 - 767
```

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

```
CONTOUR IP HOLDING, LLC,        )
                                )
            Plaintiff,          )  CONSOLIDATED CASES
                                )  NO. 3:17-CV-04738 WHO
   VS.                          )  NO. 3:21-CV-02143 WHO
                                )
GOPRO, INC.,                    )
                                )
            Defendant.          )
_____)
```

```
                           San Francisco, California
                           Thursday, October 2, 2025
```

### TRANSCRIPT OF JURY TRIAL PROCEEDINGS

**APPEARANCES**:

For Plaintiff:

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
845 Texas Avenue, 25th Floor
Houston, Texas 77002
BY:  **JOHN R. KEVILLE, ATTORNEY AT LAW**
**MICHELLE C. REPLOGLE, ATTORNEY AT LAW**
**SUNNY AKARAPU, ATTORNEY AT LAW**
**MICHAEL C. KRILL, ATTORNEY AT LAW**

For Defendant:

ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia  30309
BY:  **JOHN D. HAYNES, ATTORNEY AT LAW**
**SLOANE S. KYRAZIS, ATTORNEY AT LAW**

### (APPEARANCES CONTINUED ON FOLLOWING PAGE)

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant:

> ALSTON & BIRD LLP
> 55 Second Street, Suite 2100
> San Francisco, California 94105
> BY:  **MICHELLE A. CLARK, ATTORNEY AT LAW**
> **PHILIP C. DUCKER, ATTORNEY AT LAW**


> ALSTON & BIRD LLP
> 2828 North Harwood Street, Suite 1800
> Dallas, Texas  75201
> BY:  **ELLIOTT C. RICHES, ATTORNEY AT LAW**

> ALSTON & BIRD LLP
> Vantage South End
> 1120 South Tryon Street, Suite 300
> Charlotte, North Carolina 28203
> BY:  **KARLEE N. WROBLEWSKI, ATTORNEY AT LAW**


**Also Present:**

> Robert Mooney, Contour Corporate Rep
> Pablo Lema, GoPro Corporate Rep
> Tyler Gee, Deputy General Counsel, GoPro
> Jesse Taylor, Trial Technician
> Allen Eaton, Trial Technician
> Luke Arndt, Trial Technician
> Sarah Moyer, Trial Technician

<pre>
 1                          I N D E X

 2

 3      Thursday, October 2, 2025 - Volume 4

 4

 5      PLAINTIFF'S WITNESSES                        PAGE   VOL.

 6      WOODMAN, NICHOLAS D. (RECALLED)
        (PREVIOUSLY SWORN)                           592     4
 7      Direct Examination resumed by Mr. Keville    592     4
        Cross-Examination by Mr. Woodman             640     4
 8      Redirect Examination by Mr. Keville          702     4
        Recross-Examination by Mr. Haynes            709     4
 9

10      GREEN, JASON
        By Video Deposition (not reported)           715     4
11

12      MOONEY, ROBERT PAUL KALMAR
        (SWORN)                                      716     4
13      Direct Examination by Ms. Replogle           716     4
        Cross-Examination by Mr. Ducker              747     4
14

15                        E X H I B I T S

16      TRIAL EXHIBITS                        IDEN  EVID   VOL.

17       3                                          719     4

18       4                                          728     4

19       303                                        695     4

20       304                                        598     4

21       363                                        596     4

22       367                                        595     4

23       405                                        622     4

24       412                                        620     4

25       426                                        597     4
</pre>

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1000 | | 662 | 4 |
| 1294 | | 714 | 4 |
| 1295 | | 714 | 4 |
| 2136 | | 760 | 4 |
| 2309 | | 763 | 4 |
| 2378 | | 689 | 4 |
| 2381 | | 607 | 4 |
| 2383 | | 606 | 4 |
| 2384 | | 682 | 4 |
| 2387 | | 611 | 4 |
| 2387 | | 685 | 4 |
| 2411 | | 600 | 4 |
| 3116 | | 618 | 4 |
| 3127 | | 678 | 4 |
| 3130 | | 616 | 4 |
| 3153 | | 608 | 4 |
| 3339 | | 602 | 4 |
| 3412 | | 670 | 4 |
| 3435 | | 758 | 4 |
| 3473 | | 702 | 4 |
| 3475 | | 674 | 4 |

1    **Thursday - October 2, 2025**                              **8:00 a.m.**

2                        **P R O C E E D I N G S**

3                              **---o0o---**

4    (Proceedings were heard out of the presence of the jury.)

5            **THE COURT:**  So anything from you all this morning?

6            **MS. REPLOGLE:**  Yes.  It's not too bad.

7        Your Honor, with one of the witnesses today, specifically

8    with Mr. Mooney, we intend to move into evidence the file

9    histories for both of the asserted patents.

10       In those file histories -- it's about over a thousand

11   pages long, of course -- at the very back end, though, on the

12   file history contains -- starts with the IPR, the petition, the

13   first final written decision, and that material.

14       We understand, of course, and respect your order and don't

15   intend to elicit any testimony from Mr. Mooney beyond the fact

16   that Boland was considered by the Patent Office, fully

17   consistent with the opening slide.

18       The details -- we just want to make clear and let

19   Your Honor know that what we agreed to do amongst the parties

20   is, before that exhibit is taken back to the jury room, confer

21   and raise this issue with you because we may remove all those

22   portions of the IPR from the file history to prevent a juror

23   to, you know, read it and kind of -- you know, that's our

24   concern, if you understand that.

25       So what we agreed to do is just to table that at the time

PROCEEDINGS

 1   that we end up moving the documents back to the jury room.

 2        **THE COURT:**  So --

 3        **MS. REPLOGLE:**  That's what we're trying to do.

 4        **THE COURT:**  Yeah, I understand what the problem is.

 5      I don't like documents going back to the jury that aren't

 6   used.  And a thousand pages of an IPR --

 7        **MS. REPLOGLE:**  No.

 8        **THE COURT:**  -- or of the prosecution history is

 9   something they could spend weeks trying to sort out and you

10   wouldn't have spent two minutes --

11        **MS. REPLOGLE:**  Sure.

12        **THE COURT:**  -- on it.

13      So I'm not excited about introducing the entire exhibit.

14      I think what you use would be useful.

15        **MS. REPLOGLE:**  Sure.

16        **THE COURT:**  And, hopefully, you can figure out what

17   that is.  But I'm not going to allow a thousand pages to go

18   back.

19        **MR. HAYNES:**  I think the parties can work together to

20   come up with a --

21        **MS. REPLOGLE:**  Me too.

22        **MR. HAYNES:**  -- much reduced number of pages that

23   actually are relevant to what was testified about and make a

24   proposal to Your Honor once we see what that testimony looks

25   like.

1        **THE COURT:**  Okay.  We'll do that.

2        **MS. REPLOGLE:**  But just for purposes of today, I just

3    wanted to be clear that I can move the JTX-3 and 4 into

4    evidence in order to display the pages that I do go through --

5        **THE COURT:**  Yes.

6        **MS. REPLOGLE:**  -- to the witness.

7        **THE COURT:**  As long as there's no objection.

8        **MR. HAYNES:**  No objection to that at all, Your Honor.

9        **THE COURT:**  Okay.

10        **MR. HAYNES:**  One other issue, just asking for

11    guidance.

12        The parties were talking about jury instructions and the

13    charge conference.

14        **THE COURT:**  Yes.

15        **MR. HAYNES:**  We just were wondering if you wanted us

16    to jointly submit any modifications based on things that have

17    happened thus far or whether you have already planned to tell

18    us what you're going to do.

19        **THE COURT:**  So I think -- here's what I'm planning to

20    do.  And, obviously, things that you agree on I'm most

21    interested in seeing.

22        What I'm planning to do is put a rough tentative draft of

23    the final instructions out today so that you can look at them

24    before the conference and tell me what's important about the

25    disagreements.  I mean, you had a lot of disagreements, but

1    most of them didn't seem very important to me.  But they may

2    be.  I may not understand the issues well enough, and you can

3    explain them all to me tomorrow afternoon.

4        And if there are things that you agree on or that you

5    need -- you want to have a different instruction or a

6    supplemental instruction, then please submit them whenever you

7    can.

8            **MR. HAYNES:**  Okay.

9            **THE COURT:**  Related to that -- so that's how -- what

10   my plan is, is to have the instruction conference tomorrow

11   afternoon and then revise the final instructions, put something

12   out and, on Monday afternoon, have you tell me where all the

13   typos are and those sorts of things.  So that's my idea.

14       With respect to the verdict form, I gave you my sense of

15   how I was looking at it.  I may have asked, I may not have

16   asked, but the big issue that remains in my mind is whether

17   individual theories for anticipation and obviousness need to be

18   in the verdict form or not.  And I'd like to know if there is

19   law on this topic or not.  So if you can figure that -- if you

20   can let me know, I'd appreciate that.

21       Okay.  So is that everything from both sides?

22           **MR. HAYNES:**  I don't believe --

23       Sorry.

24           **MS. REPLOGLE:**  That's everything that I'm aware of.

25           **MR. HAYNES:**  I don't think there's any other disputes,

**PROCEEDINGS**

1    Your Honor.

2          The other question we had, Your Honor, was when they close

3    their case tomorrow --

4          **THE COURT:**  Yes.

5          **MR. HAYNES:**  -- we understand your practice to be that

6    we would hold any 50(a) motions until the end of the day and

7    they would be deemed lodged at the close of their case.

8          **THE COURT:**  Yes.  And while I would love to think that

9    there won't be any post-trial briefing, I'm kind of guessing

10   that there will be.  So you don't need to say very much,

11   because I'm very unlikely to grant anything while the jury is

12   here, no matter how compelling the argument is.

13         **MR. HAYNES:**  Yeah.  Understood.

14         **THE COURT:**  And the one other thing that you should

15   know is that one of the jurors is sick and will not be joining

16   us for the rest of the case.  It is Juror Number 37, Mr. Che.

17   So we're down to nine.

18         **MR. HAYNES:**  All right.  Thank you, Your Honor.

19         **THE COURT:**  All right.  See you when everybody's here.

20                   (Recess taken at 8:07 a.m.)

21               (Proceedings resumed at 8:31 a.m.)

22      (Proceedings were heard out of the presence of the jury.)

23         **THE COURT:**  All right.  Mr. Woodman, why don't you

24   come on back up.

25         And are we ready to go?

1          **MR. HAYNES:**  Yes, Your Honor.

2          **MR. KEVILLE:**  We are, Your Honor.

3          **THE COURT:**  Good morning.

4          **THE WITNESS:**  Good morning.

5     (Proceedings were heard in the presence of the jury.)

6          **THE COURT:**  All right.  Please be seated, everybody.

7     Good morning, ladies and gentlemen.  Thank you for being

8     here as promptly as you are.  We're going to continue with the

9     examination of Mr. Woodman.

10    Mr. Keville?

11         **MR. HAYNES:**  Thank you, Your Honor.

12              **NICHOLAS D. WOODMAN,**

13    called as a witness for the Plaintiff, having been previously

14    duly sworn, testified further as follows:

15              **DIRECT EXAMINATION  (RESUMED)**

16    **BY MR. KEVILLE:**

17    **Q.**  Are you ready, Mr. Woodman?

18    **A.**  I am.  Thank you.

19    **Q.**  Let's step back a little bit from where we were yesterday;

20    okay?

21    **A.**  Okay.

22    **Q.**  Before you started GoPro in 1999, you started an Internet

23    gaming company Funbug.com; correct?

24    **A.**  I started GoPro in 2002, and I started an online gaming

25    company Funbug.com in 1999.

1    Q.    And you raised $4 million of other people's money and you

2    lost it all two years later?

3    A.    Yes, in the first dot-com bust.

4    Q.    And then you shut down the business and you sold the

5    assets for practically nothing?

6    A.    That's correct.

7    Q.    Funbug went out of business and you lost $4 million of the

8    investors' money; correct?

9    A.    That's correct.

10   Q.    And then you decided to take a five-month surfing trip to

11   Australia and Indonesia; correct?

12   A.    Yes, to look for inspiration for my next business idea.

13   Q.    Yes.  But just to be clear, you lost $4 million of

14   investors' money and the next thing you did was take a

15   five-month surfing trip to Australia and Indonesia?

16   A.    No, that's not correct.  I spent quite a bit of time

17   trying to determine what to do next with my life and career,

18   and then I had no inspiration.  And I'm a big believer that you

19   have some of your best ideas when you're doing what you love.

20   So I decided to take a five-month backpacking trip to look for

21   inspiration.

22   Q.    And on that surfing trip, you wanted to be able to take

23   pictures of yourself surfing, and then you made a camera with a

24   wrist strap to do that?

25   A.    More specifically, I wanted to take photographs of my

1  friend that I was traveling with; and, yes, I came up with the

2  idea for the first GoPro in preparation for that trip.

3  **Q.**   Okay.  All right.  Now, let's go forward more to the time

4  that's at issue in this case.

5       And I want to start a little timeline on a slide that your

6  side made.  Okay?

7       Now, yesterday, you told us that you are not claiming to

8  be the inventor of what's in Contour's patents; correct?

9  **A.**   That's correct.

10       **MR. KEVILLE:**  Can I have the document camera, please.

11       **THE COURTROOM DEPUTY:**  We're doing this just as a

12  demonstrative; right?

13       **MR. KEVILLE:**  Yes.

14  **BY MR. KEVILLE:**

15  **Q.**   Okay.  So the Woodman invention, you agree, is not the

16  same as the Contour invention?

17  **A.**   That's correct.

18  **Q.**   Okay.  All right.  Now, if we go back the other way.

19       During 2009, you released -- Contour released the first

20  HD action camera, the Contour HD; correct?

21  **A.**   I'm sorry.  Could you ask the question again?

22  **Q.**   Sure.  During 2009 or 2008, Contour released the first

23  HD action camera; correct?

24  **A.**   I'm not totally sure when they launched their first HD

25  action camera, but that sounds directionally accurate.

1        **MR. KEVILLE:**  Okay.  Can you show the witness

2   Plaintiffs' 367.

3   **BY MR. KEVILLE:**

4   **Q.**   Okay.  This is an email that you wrote; correct?

5   **A.**   Looks like it, yes.

6        **MR. KEVILLE:**  Your Honor, I move admission of Trial

7   Exhibit 367.

8        **MR. HAYNES:**  No objection.

9        **THE COURT:**  It's admitted.

10       (Trial Exhibit 367 received in evidence.)

11  **BY MR. KEVILLE:**

12  **Q.**   Okay.  And in this, you say you wanted to muscle out

13  VholdR; correct?

14  **A.**   Yes.

15  **Q.**   And you said Contour VholdR was doing a good job at

16  getting the word out, and you wanted to short-circuit any

17  momentum they were getting; correct?

18  **A.**   Yes.

19       **MR. KEVILLE:**  Allen, can you show the witness

20  Exhibit 363.

21  **BY MR. KEVILLE:**

22  **Q.**   This is another email that you wrote in 2009; correct?

23  **A.**   Yes.

24  **Q.**   And in here, you said you wanted to squash VholdR;

25  correct?

 1   **A.**   Yes.  But for context, at the time we were --

 2           **MR. KEVILLE:**  Your Honor --

 3           **THE WITNESS:**  -- 12 people in the company, so our

 4   ability to squash anybody is questionable.

 5   **BY MR. KEVILLE:**

 6   **Q.**   Well, how many people were in Contour at the time?

 7   **A.**   I have no idea.

 8   **Q.**   Okay.  But you did say you wanted to squash their company?

 9   **A.**   Yes.  We're very competitive.  And if you worked at GoPro,

10   you were either a family member or a college friend of mine,

11   and so, yeah, we wanted to beat them.

12           **MR. KEVILLE:**  Let's look at -- let's get back to our

13   time --

14                   (Co-counsel confer off the record.)

15           **MR. KEVILLE:**  Oh.  Your Honor, I move 363.

16           **MR. HAYNES:**  No objection.

17           **THE COURT:**  All right.  It's admitted.

18       (Trial Exhibit 363 received in evidence.)

19           **MR. KEVILLE:**  All right.  Can you show the witness

20   426.

21   **BY MR. KEVILLE:**

22   **Q.**   This is another set of emails including you?

23   **A.**   Yes.

24           **MR. KEVILLE:**  Your Honor, I move the admission of

25   Exhibit 426.

 1          **MR. HAYNES:**  No objection.

 2          **THE COURT:**  It's admitted.

 3      (Trial Exhibit 426 received in evidence.)

 4  **BY MR. KEVILLE:**

 5  **Q.**  Okay.  So on January 21st, 2009, you're conferring with

 6  Ambarella; correct?

 7  **A.**  Yes.

 8  **Q.**  And you say at the bottom [as read]:

 9          "Nipper and I are confused on A2's ability to

10      save HD video to the SD card at the same time as

11      outputting video to a TV, RF transmitter, et cetera."

12      Correct?

13  **A.**  Yes.

14  **Q.**  And you say [as read]:

15          "We know A2 can have two video streams at once."

16      Correct?

17  **A.**  Yes.

18  **Q.**  Okay.  And then if we move up, Ambarella's John Ju writes

19  back and tells you that the [as read]:

20          "A2 can output up to SD resolution during HD

21      encoding."

22      Correct?

23  **A.**  Yes.

24  **Q.**  So he disclosed to you back in January 2009 that the

25  Ambarella chip could have two streams; correct?

1    **A.**   Yes.

2    **Q.**   Okay.  All right.  Let's move on to Exhibit 304.

3         Exhibit 304 is an engineering specification for what

4    became the HD HERO; correct?

5    **A.**   Yes.

6              **MR. KEVILLE:**  Your Honor, I move the admission of

7    Exhibit 304.

8              **MR. HAYNES:**  No objection.

9              **THE COURT:**  It's admitted.

10        (Trial Exhibit 304 received in evidence.)

11   **BY MR. KEVILLE:**

12   **Q.**   Okay.  In January 2009, Mr. Donovan put together this

13   engineering requirements specification for the new HERO HD

14   camera; correct?

15   **A.**   Yes.

16   **Q.**   If we look at page 6, GoPro was considering using a Nordic

17   RF transceiver; correct?

18   **A.**   Yes.

19   **Q.**   "RF" stands for radiofrequency?

20   **A.**   Yes.

21   **Q.**   Okay.  And when we look at the section -- if you go to

22   page 21 where it says "Wireless RF plug-in module," it says

23   [as read]:

24             "Still TBD."

25        Do you see that?

**WOODMAN - DIRECT / KEVILLE**

1   **A.**   Mm-hmm.

2   **Q.**   And it says [as read]:

3         "Mechanical Requirements (TBD)."

4   Correct?

5   **A.**   Yes.

6   **Q.**   Okay.  And it says [as read]:

7         "Test Engineering Requirements (TBD)."

8   Correct?

9   **A.**   Yes.

10  **Q.**   And in fairness, "TBD" means to be determined; correct?

11  **A.**   That's correct.

12  **Q.**   Okay.  So if we can go back to the document camera, you

13  can see, using the timeline you guys gave us, in 2009,

14  January 2009, the HD HERO design as it related to the

15  RF component was TBD; correct?

16  **A.**   I'd have to see that document again, if you don't mind --

17        **MR. KEVILLE:**  Can you put up that last page, Allen.

18  **A.**   -- as it relates specifically to the RF module.

19  I don't think the RF module was TBD because we were

20  specifying the Nordic chip.

21  Oh, the module.

22  **Q.**   You agree you wrote -- or Mr. Donovan wrote [as read]:

23        "Still TBD."

24  Correct?  That's what he wrote?

25  **A.**   Yes.  The external RF plug-in module, the WiFi BacPac.

1    Q.   All right.  Let's go to Exhibit --

2            MR. KEVILLE:  Show the witness 2411.  And go to the

3    front.

4    BY MR. KEVILLE:

5    Q.   This is a February 2009 GoPro document regarding RF;

6    correct?

7    A.   Yes.

8            MR. KEVILLE:  Your Honor, I move the admission of

9    Exhibit 2411.

10            MR. HAYNES:  No objection.

11            THE COURT:  It's admitted.

12        (Trial Exhibit 2411 received in evidence.)

13   BY MR. KEVILLE:

14   Q.   All right.  And if we look at Mr. Donovan's thing, he says

15   he's unsure if GoPro could even send video from the camera to

16   an RF remote unit.  Right?  If we look at "2.  RF remote unit,"

17   he says [as read]:

18            "Ideally would like to send videos from camera

19        to RF remote wrist unit.  If not videos, then

20        photos."

21        Do you see that?

22   A.   I see that.  We were exploring any solution that would

23   work.

24   Q.   Right.  And he said, if we go down [as read]:

25            "The goal of the RF remote wrist unit would be

1          like a transceiver (send and receive data from a

2          camera).  In ideal situation, we would be able to

3          send video across this link."

4      Do you see that?

5  **A.**    I see that.

6  **Q.**    So at this point in 2009, to GoPro, sending video

7  wirelessly from a camera to something remote is an ideal, but

8  you're not sure whether it can happen?

9  **A.**    We're in the process of exploring and developing that

10  capability, yes.

11  **Q.**    And there's no mention anywhere in here of generating two

12  different quality streams of video; correct?

13  **A.**    I think -- no.  This is a high-level description of what

14  we're trying to achieve.

15  **Q.**    Okay.

16  **A.**    Not necessarily how we do it.

17          **MR. KEVILLE:**  Allen, if you'd go to page 6.

18  **BY MR. KEVILLE:**

19  **Q.**    In "Other Issues," what GoPro said is [as read]:

20          ". . . need to understand any software

21      development needed for HD camera for software work to

22      make short-range RF work with Ambarella A2S70

23      processor.  How does a driver or equivalent get

24      loaded on the Ambarella A2S70?  This needs to be

25      figured out."

1          Right?  That's what you guys wrote?

2    A.   Okay.

3    Q.   Okay.  Contour figured out how to code the firmware and

4    load a Bluetooth and WiFi driver on the Ambarella chip.

5          On the other hand, GoPro didn't know how to do it and

6    GoPro never wrote a driver for the Ambarella chip; correct?

7    A.   I don't know.

8    Q.   Okay.  All right.  Let's go to Exhibit 3339.

9          All right.  This is another series of emails including

10   you; correct?

11   A.   Yes.

12          MR. KEVILLE:  Your Honor, I move the admission of

13   Exhibit 3339.

14          MR. HAYNES:  No objection.

15          THE COURT:  It's admitted.

16          (Trial Exhibit 3339 received in evidence.)

17   BY MR. KEVILLE:

18   Q.   All right.  In March 2009, this says Mr. Donovan had a

19   meeting with Ambarella and said that after talking to team

20   GoPro, he wanted to get one frame of data to send 10 meters.

21   And Ambarella's initial answer was no.  Correct?

22   A.   Okay.

23   Q.   So at this point in 2009, Ambarella is telling GoPro that

24   you can't even send one frame of data 10 meters; correct?

25   A.   I'm not quite sure what they're saying no to.

WOODMAN - DIRECT / KEVILLE

1   **Q.**   Well --

2   **A.**   [As read]:

3              ". . . we wanted to have a way to be able to get

4         one frame of data to be able to send over a short

5         range (10 meters).  The initial answer was

6         no . . . ."

7   **Q.**   Right.  So he's referring back to the question of whether

8   you could get one frame of data sent over a short range of

9   10 meters; correct?

10  **A.**   Okay.  At this point in time, that seems to be the answer,

11  yeah.

12  **Q.**   Okay.  And then Mr. Donovan of GoPro goes on and he says

13  [as read]:

14             "GoPro wants to:  While no video playing or

15        picture taking or audio going on (so as not to use

16        Ambarella A2S70 processing power) take a single

17        snapshot frame (one frame at the lowest resolution)."

18        Do you see that?

19  **A.**   I do.

20  **Q.**   So that's a picture we're talking about, a low-resolution

21  picture?

22  **A.**   Yes.

23  **Q.**   Okay.  And then send that single picture in raw data

24  format.  Then short range circuit sends raw data over RF link

25  to a remote device.  Remote device converts a single snapshot

1    back.  [As read]:

2           "All the time no other processing being done on

3       the Ambarella."

4       Correct?

5    A.   That seems to be what he's asking for.

6    Q.   Okay.  So this is talking about trying to send one picture

7    while you're not doing anything else, no recording video, no

8    streaming, no anything; correct?  You're going to shut down all

9    the other Ambarella processing?

10   A.   Yep.

11   Q.   Okay.

12   A.   I can see that he wants to establish a baseline of what he

13   can do and then build from there.

14   Q.   Sure.  But that's what you guys were talking about at this

15   time?

16   A.   That appears to be the case, yeah.

17   Q.   Okay.  And then he said this could take --

18       [As read]:

19           "The transmission time could be three to four

20       seconds" -- do you see that? -- "to send one single

21       shot frame picture."

22   A.   I see that.

23   Q.   Okay.  So you're not talking about a real-time live

24   streaming or anything.  You're talking about three to four

25   seconds, can we send one picture without shutting down -- while

1    we shut down everything else on the processor; correct?

2    **A.**    In this one email, yes, that's what's being discussed.

3    **Q.**    Okay.  And he went on to say [as read]:

4          "Again, stress during the time to get this one

5          single snapshot frame, no other processing of

6          Ambarella is going on related to video out, audio

7          out, save to SD, et cetera."

8          So what you guys are talking about at this time is, how do

9    we get one single picture.  And I want to be clear what he says

10   is, during this time, there's no video being saved, no audio,

11   no nothing; correct?

12   **A.**    At this point in time, yes, that's what Nipper is

13   discussing.

14   **Q.**    All right.  So that is March 2009.  So we're going to add

15   to your timeline one picture, question mark, no processing, no

16   video.  And that's Exhibit 3339.  Show that where we are in the

17   timeline that you guys created.

18          **MR. KEVILLE:**  Can we put the Elmo on.

19   **BY MR. KEVILLE:**

20   **Q.**    All right.  So where we can see, January 2009 we were TBD.

21   March 2009, can we get one picture when no processing and no

22   video.  Fair?

23          That's kind of where you are at this time in your timeline

24   based on the exhibits we've seen?

25   **A.**    Okay.

```
 1              MR. KEVILLE:  Can we switch back, please.

 2        All right.  Can you show the witness Exhibit 2383.

 3   BY MR. KEVILLE:

 4   Q.   This is a document that Rudy Samuels of GoPro wrote;

 5   correct?

 6   A.   Yes.  Rudy Samuels was a contract product development --

 7              MR. KEVILLE:  Your Honor, I move the admission of

 8   Exhibit 2383.

 9              MR. HAYNES:  No objection.

10              THE COURT:  It's admitted.

11        (Trial Exhibit 2383 received in evidence.)

12   BY MR. KEVILLE:

13   Q.   All right.  So this is an April 2009 document, and Rudy

14   Samuels writes that the remote control unit would have a

15   picture preview; right?

16        And he says [as read]:

17             "We would send a QVGA 320 x 240 image to the RC,

18        remote control, unit.  This may or may not work while

19        unit is recording.  TBD."

20        Do you see that?

21   A.   I do.

22   Q.   Okay.  And to be clear, this talks about picture preview

23   and sending a QVGA image, which is a picture; correct?

24   A.   Yes.

25   Q.   So he's not talking about sending video here; correct?
```

1  **A.**   For this particular remote control device, no, we were not

2  pursuing video.  It was a basic remote control that wouldn't

3  necessarily be capable of doing that.

4       **MR. KEVILLE:**  So if we could have the document camera

5  back.

6  **BY MR. KEVILLE:**

7  **Q.**   May, April 2009 we're trying to get one picture, still

8  TBD, and that's Exhibit 2383.  Fair?

9  **A.**   Yes.  But for context, we were also working on products

10  that would be able to transmit video.

11  **Q.**   I'm talking about what we can see in the documents.

12  **A.**   Okay.  That's fair.

13       **MR. KEVILLE:**  All right.  If we could switch back.

14  All right.  Can you show the witness Exhibit 2381.

15  **BY MR. KEVILLE:**

16  **Q.**   This is a June email with you; correct?

17  **A.**   Yes.

18  **Q.**   All right.  So now we're into June --

19       **MR. KEVILLE:**  Oh, Your Honor, I move the admission of

20  Exhibit 2381.

21       **MR. HAYNES:**  No objection.

22       **THE COURT:**  It's admitted.

23       (Trial Exhibit 2381 received in evidence.)

24  **BY MR. KEVILLE:**

25  **Q.**   So now we're into June, and Mr. Donovan wrote to you that

1    the path for picture preview is Ambarella does a JPEG of a

2    certain resolution -- correct? -- of a resolution?  Yes?

3    **A.**    Okay.

4    **Q.**    Okay.  And to be clear, a JPEG is not video.  JPEG is a

5    compressed digital still image; correct?

6    **A.**    That's correct.

7    **Q.**    Okay.  So we're talking still about one picture --

8    correct? -- in June 2009?

9    **A.**    In this document, yes, that's what we're talking about.

10           **MR. KEVILLE:**  And let's show the witness Exhibit 3153,

11   please.

12   **BY MR. KEVILLE:**

13   **Q.**    All right.  Exhibit 3153 is another email between GoPro

14   and Ambarella and yourself; correct?

15   **A.**    Yes.

16           **MR. KEVILLE:**  Your Honor, I move the admission of

17   3153.

18           **MR. HAYNES:**  No objection.

19           **THE COURT:**  It's admitted.

20       (Trial Exhibit 3153 received in evidence.)

21   **BY MR. KEVILLE:**

22   **Q.**    All right.  And this is an email written by Paul Nipper

23   Donovan; correct?

24   **A.**    Yes.

25   **Q.**    And he was the guy in charge of developing the RF wireless

1    capability; correct?

2    **A.**   He was our contract engineer working on it, yes.

3    **Q.**   But he was the guy in charge of developing the RF wireless

4    capability; correct?

5    **A.**   Yeah, he was the lead.

6    **Q.**   Okay.  And he writes to Ambarella and says [as read]:

7           "The key is the protocols and features and

8    porting to Ambarella camera side.  We do not know how

9    to do this as we have no Ambarella development

10   system."

11   Correct?

12   **A.**   Can I take a moment to read it, please?

13   **Q.**   You may.

14   **A.**   (Witness examines document.)  Okay.  Your question again,

15   please?

16   **Q.**   Sure.  All I was asking was, Mr. Donovan wrote to

17   Ambarella and said [as read]:

18          "The key is the protocols and features and

19   porting to Ambarella camera side.  We do not know how

20   to do this as we have no Ambarella development

21   system."

22   **A.**   That's what he's saying.

23   **Q.**   Okay.

24   **A.**   I don't know what "porting to Ambarella cameras" --

25   "Ambarella camera side" means, though.  But, yeah, that's what

1    it says.

2    **Q.**    Okay.  So even today, you're not sure what Mr. Donovan is

3    talking about when he talks about porting to the Ambarella

4    camera side?

5    **A.**    He was doing his RF development with the Nordic chips in

6    parallel with the development of the HD HERO camera.  But this

7    was really early days, so getting coordination between Nipper

8    and the Chinese engineers at Sky Light was confusing at best.

9         So I think that there was -- as you can see through all

10    the email exchanges, this was pretty grassroots development.

11    **Q.**    I'm sorry.  Maybe it was me and my question wasn't clear.

12    I just asked:  Even today, you still don't know about porting

13    to the Ambarella camera side and what that means?

14    **A.**    That's true.

15         **MR. KEVILLE:**  Okay.  All right.  Can I have the

16    document camera back.

17    **BY MR. KEVILLE:**

18    **Q.**    All right.  Now we see in August 2009, from Exhibit 3153,

19    Mr. Donovan writes [as read]:

20         "We do not know how to do this."

21    Correct?

22    **A.**    On that particular topic, okay.

23    **Q.**    Right.  And that particular topic being how to get the

24    Nordic RF board to talk to the Ambarella chip; correct?

25    **A.**    I'm not going to characterize what Nipper -- or Paul meant

1   by that statement as I'm not an engineer and I didn't write

2   that email.

3          MR. KEVILLE:  Switch back, please.

4      Okay.  Let's show him Exhibit 2387, for the witness,

5   please.

6   BY MR. KEVILLE:

7   Q.   This is another email exchange, one that you wrote;

8   correct?

9   A.   Yes.

10         MR. KEVILLE:  Your Honor, I move the admission of

11  2387.

12         MR. HAYNES:  No objection.

13         THE COURT:  It's admitted.

14     (Trial Exhibit 2387 received in evidence.)

15  BY MR. KEVILLE:

16  Q.   Okay.  So we're still in August, and you were interested

17  in exploring a WiFi module that could stream video to either a

18  WiFi device or a 3G phone and the phone could then stream video

19  to a handheld WiFi viewer or a WiFi smartphone or the Web;

20  correct?

21  A.   Yes.

22  Q.   Okay.  So it's not that you never thought about streaming

23  video to a viewfinder.  You did think about it; correct?

24  A.   We actually began development of this concept as early as

25  March of that year, 2009.  So we'd been working on this for a

 1    while.

 2    Q.   Okay.  Let's see a little further what you said.  You said

 3    [as read]:

 4            "If doable, an iPhone app could be

 5         made . . . ."

 6            MR. KEVILLE:  Can you show him that, Allen.  It's at

 7    the bottom of the second page.

 8    BY MR. KEVILLE:

 9    Q.   [As read]:

10            "If doable, an iPhone app could be made to

11         allow iPhone to serve as a Web transmitter for the

12         camera, a live feed remote control for the camera

13         with real-time preview and a media viewer.

14         Craziness.  Love it."

15         So in this PPS, you said if doable, then you might be able

16    to do this; you didn't know.  And you hadn't even started

17    trying to see if you could develop an app to communicate with

18    an iPhone; correct?

19    A.   By there -- I believe what I mean, knowing the time, "if

20    doable" meaning if we, with our limited engineering

21    capabilities, were -- I knew that that was doable.  I didn't

22    know if this company GoPro was capable of doing it because,

23    again, we didn't even have an internal engineering department

24    at this time.  We're relying solely on a handful of contractors

25    and Sky Light.

1  Q.   In fairness, today you're saying "We knew it was doable."

2  Back then you said "if doable"; correct?

3  A.   Not if doable from a technology standpoint.  If doable,

4  like, are we, GoPro, capable of doing this.

5         MR. KEVILLE:  All right.  Let's see the follow-up,

6  Allen, on the top of the first page.

7  BY MR. KEVILLE:

8  Q.   You followed up, saying [as read]:

9         "If we have WiFi for the camera via a module and

10        could WiFi interface with an iPhone, we could

11        leverage existing and future iPhone apps . . . ."

12  Do you see that?

13  A.   I do.

14  Q.   Okay.  So lots of "ifs," correct, and lots of "if doables"

15  and "if we have this"; correct?

16  A.   1000 percent.  I mean, we were a pretty small company, so

17  a lot of this was a question of whether we, as a company, were

18  capable of it.  But these technologies were well-understood

19  back then.

20  Q.   Just not so much to GoPro?

21  A.   True.

22  Q.   Okay.  And no mention of configuring a camera processor to

23  generate two streams in parallel of different qualities and

24  streaming the lower streams -- there's no mention of this in

25  the email or anything we've seen?

1    A.    No.    This is a high-level email about concepts, not about

2    how you would actually get something like that to work.

3            MR. KEVILLE:    All right.    Let's go back to the

4    document camera, please.

5    BY MR. KEVILLE:

6    Q.    So, again, at the same time, in August, saying

7    "if doable"; right?

8    A.    Mm-hmm.

9    Q.    Okay.    And that's Exhibit 2387.

10           All right.    Let's move on.    Okay.    So I had another

11   question on your timeline.    So do you see on the timeline you

12   guys provided us, it says "2009 GoPro prototype A2s."    Do you

13   see that?

14   A.    I do.

15   Q.    When in -- those two prototypes were made in 2009?

16   A.    They were.

17   Q.    And do you know when in 2009?

18   A.    August, I believe.

19   Q.    Okay.    I'll just put that in.

20           And what is it that these two prototypes could do in

21   August 2009?

22   A.    They could record high-quality video to an SD card and

23   then transmit a lower-quality low-frame-rate video to a

24   separate device for live preview.

25   Q.    Now, you testified that this could do video, but all the

1   documents we saw said you were trying to get one picture;

2   correct?

3   **A.**   That's what we looked at, yeah.

4   **Q.**   Okay.  So even though all the documents said one picture,

5   you're telling us that this could do video, these two

6   prototypes, in August 2009?

7   **A.**   Yes.

8   **Q.**   And, by the way, the testimony was:  When we saw these

9   prototypes, that they didn't work; we couldn't test them out.

10  Correct?

11  **A.**   No.  The -- I witnessed the prototypes working at Paul's

12  lab.

13  **Q.**   No, no.  Excuse me.  Maybe my question wasn't clear.

14      When they were produced to us in this litigation years

15  later, you all said, "They don't work.  You can't test them"?

16  **A.**   That, I'm not clear.

17  **Q.**   Okay.  All right.  All right.  Let's switch back.

18      When you were deposed, you testified everything worked

19  well until mid-September when Ambarella made a firmware change.

20  Do you remember that?

21  **A.**   I do.

22  **Q.**   What change did Ambarella make to the firmware that caused

23  this problem that you said?

24  **A.**   I have no idea.

25          **MR. KEVILLE:**  Okay.  All right.  Let's go to

1    Exhibit -- show the witness 3130, please.

2    **BY MR. KEVILLE:**

3    **Q.**   And this is another email that you were involved with,

4    correct, in September of 2009?

5    **A.**   Yes.

6            **MR. KEVILLE:**   Your Honor, I move the admission of

7    Exhibit 3130.

8            **THE COURT:**   Any objection?

9            **MR. HAYNES:**   No objection, Your Honor.

10           **THE COURT:**   All right.   It's admitted.

11       (Trial Exhibit 3130 received in evidence.)

12   **BY MR. KEVILLE:**

13   **Q.**   Okay.   You told Nipper, if we look at Bullet 7,

14   Mr. Donovan, to talk about canceling GoPro's RF daughter card

15   order; correct?

16   **A.**   Yes.

17   **Q.**   And there's nothing in here about firmware issues;

18   correct?

19   **A.**   May I please take a moment to read the email?   I've not

20   seen this before.

21       (Witness examines document.)   Okay.   The question again,

22   please?

23   **Q.**   Sure.   There's no mention of a firmware problem in here.

24   In fact, you said [as read]:

25            "I just did a solid run through on the major

WOODMAN - DIRECT / KEVILLE

1          aspects of the firmware."

2          Correct?

3     A.   I'm not quite sure what I mean by that.

4          No, there's no mention of a -- I seem to be evaluating the

5     pros and cons of either putting the Nordic chip in the camera

6     itself versus pursuing the WiFi BacPac.  So I seem to be, in

7     this email, debating.  Path A is to stick with plan of record

8     of putting the RF chip in the camera directly, or Plan B,

9     Path B, developing primarily the WiFi BacPac.  That seems to be

10    my debate.

11    Q.   Okay.  But what we do know is you did a solid run-through

12    on the firmware and then you wanted Mr. Donovan to talk about

13    canceling GoPro's RF daughter card order; correct?

14    A.   Yes, but I don't know if my solid run-through was positive

15    or negative.  I can't tell from this email.

16    Q.   Well, "solid run-through" generally indicates it was

17    positive; right?

18    A.   No.  That means that I thoroughly went through it.  I

19    don't know if it was -- this could have been in response to

20    we're having a problem and I just did a solid run-through of

21    it, but I'm not sure.

22          MR. KEVILLE:  Allen, can you show the witness

23    Exhibit 3116.

24    BY MR. KEVILLE:

25    Q.   This is another email that you wrote; right, Mr. Woodman?

1    **A.**    Yes.

2    **MR. KEVILLE:**  Your Honor, I move the admission of

3    Exhibit 3116.

4    **THE COURT:**  Any objection?

5    **MR. HAYNES:**  No objection.

6    **THE COURT:**  It's admitted.

7    (Trial Exhibit 3116 received in evidence.)

8    **BY MR. KEVILLE:**

9    **Q.**    All right.  In here, this is now October, so a little bit

10    later; correct?

11    **A.**    Yes.

12    **Q.**    And you say the plan is [as read]:

13    ". . . using a simple remote with LCD similar to

14    what is currently on camera.  No picture preview,

15    et cetera, to keep the cost down."

16    Correct?

17    **A.**    This is referring to a simplified remote control, that's

18    correct.

19    **Q.**    Okay.  And no picture preview at all; correct?

20    **A.**    For that particular product, yes, but that doesn't mean we

21    weren't also working on other products that would have preview.

22    **Q.**    All right.  On the timeline you guys put together -- well,

23    let's do this.  Let me put the document camera back on.

24    So we saw in October 2009, you said no picture preview.

25    On the timeline that you guys gave us, there's nothing at

1   all in 2010.  Do you see that?

2   **A.**   There's nothing -- what do you mean by "there's nothing in

3   2010"?

4   **Q.**   There's no events shown, nothing that GoPro did in regard

5   to whatever the Woodman invention is in 2010.

6   **A.**   Oh, we had a lot of research going on in 2010 about --

7   **Q.**   I'm just saying on the timeline you gave us, there was

8   nothing; correct?

9   **A.**   There doesn't appear to be, no.

10       **MR. KEVILLE:**  All right.  Can we switch back, please.

11       Show the witness Exhibit 412, please.

12   **BY MR. KEVILLE:**

13   **Q.**   This is Paul Donovan's weekly status report from the week

14   of September 14th, 2010; correct?

15   **A.**   Where is that?

16   **Q.**   Paul Donovan weekly status report for September 14th;

17   correct?

18   **A.**   Yes.

19   **Q.**   And he says he highlights in pink active projects and he

20   highlights in gray idle projects; correct?

21   **A.**   Okay.

22       **MR. KEVILLE:**  And if we go to the fifth page, please.

23   Fifth page.

24       Oh.  Sorry.  Your Honor, I didn't move the admission,

25   they're telling me.  Exhibit 412 I move to admit.

 1          **MR. HAYNES:**  No objection.

 2          **THE COURT:**  It's admitted.

 3      (Trial Exhibit 412 received in evidence.)

 4  BY MR. KEVILLE:

 5  **Q.**  Okay.  So now the jury can see this.  This is

 6  Mr. Donovan's report for September 14th.  Pink highlights are

 7  active projects that are being worked on; gray highlights are

 8  idle projects; correct?

 9  **A.**  Yes.

10  **Q.**  Okay.  Then if we look at page 5 under "Wireless," it's

11  gray, which means it's an idle project; correct?

12  **A.**  Yes.  Still a project.

13  **Q.**  And under -- it's still a project but it's idle; correct?

14  **A.**  Yes.

15  **Q.**  And under "Accomplishments," he wrote "None"; correct?

16  **A.**  Yes.

17  **Q.**  Okay.  And we do know right around this time, you know,

18  correct, that Contour filed for patents on September 13th,

19  right, of 2010?

20  **A.**  Actually, under "Actions," it says we're [as read]:

21          "Awaiting direction from Zahid," who's another

22      contractor, "on building up and researching different

23      technologies as needed."

24      This is what was happening during 2010, was we were

25  evaluating all the new wireless protocols that were coming on

1   the market to make sure that we made the right choice for the

2   WiFi BacPac.

3   **Q.**   And Zahid, by the way, is the guy in the email we saw

4   yesterday who you said:  Let's get some Contour cameras so that

5   we can tear them apart, Zahid and Ben can tear them apart.

6   Correct?

7   **A.**   Yes, for evaluation.

8   **Q.**   Okay.  For product development; right?  That's what we saw

9   in the expense report.

10  **A.**   Yeah.

11  **Q.**   Okay.  So let me put on the timeline that Contour

12  patents -- you know the Contour patents were filed in September

13  of 2010; correct?

14  **A.**   I don't know that.

15  **Q.**   Okay.  Well, it is in evidence, so I'll just put that

16  here.

17         **MR. KEVILLE:**  All right.  Let's look at Exhibit 405

18  for the witness, please.

19  **BY MR. KEVILLE:**

20  **Q.**   This is another of Mr. Donovan's status reports.  This is

21  two months later; correct?

22  **A.**   Yes.

23         **MR. KEVILLE:**  All right.  Your Honor, I move the

24  admission of Exhibit 405.

25         **MR. HAYNES:**  No objection.

1          **THE COURT:**  It's admitted.

2          (Trial Exhibit 405 received in evidence.)

3     **BY MR. KEVILLE:**

4     **Q.**   All right.  And if we go to page 7, "Wireless," we see

5     still gray, still idle; correct?

6     **A.**   Still waiting for Zahid to --

7     **Q.**   Still "Accomplished:  None"?

8     **A.**   -- give us his research.

9     **Q.**   Hold on, sir.

10         Still "Accomplished:  None"; correct?

11    **A.**   That's what he said, but I do remember this period

12    distinctly.  It was pretty frustrating because being --

13    **Q.**   Sir --

14    **A.**   -- a smaller company, we were not able to move as quickly

15    on all fronts as we wanted to.

16    **Q.**   My apologies.  Maybe my question wasn't clear.  All I

17    wanted to know is:  Did Mr. Donovan say, in November 16th,

18    2010, the wireless project was idle and accomplishments were

19    none?

20    **A.**   He did.

21    **Q.**   And then you pointed out the actions from September.

22    Those same four actions are here two months later; correct?

23    **A.**   That's correct.

24    **Q.**   Okay.  And so in 2010, according to Mr. Donovan --

25         **MR. KEVILLE:**  If we could have the camera back.

1    BY MR. KEVILLE:

2    Q.   According to Mr. Donovan, it was idle, the wireless

3    project, and that's when Contour patents were filed.  Okay?  So

4    we add that to your timeline.

5    A.   Okay.

6    Q.   Okay.  All right.  Now, if we could --

7         Now, we saw yesterday that when Contour released the live

8    viewfinder and remote control --

9             MR. KEVILLE:  And if you'd put up, Allen, 2833, which

10   is in evidence.

11   Q.   You said [as read]:

12             "Do we have any of these units we can take

13        apart?  We should get Zahid and Ben each a unit to

14        disassemble and review."

15        Zahid's the guy we just saw, he's trying to develop

16   wireless for you; correct?

17   A.   That's correct.

18   Q.   And you're saying let's get him one of the Contour cameras

19   so he can disassemble and take it apart; correct?

20   A.   Yeah.  We were surprised that they were using Bluetooth

21   because it's not a good protocol, wireless protocol for

22   transmitting video due to its bandwidth constraints.  And we

23   were working on WiFi at this time.  So we wanted to understand

24   what they were doing.  And you can see here I'm excited that we

25   can leapfrog them with WiFi.

1  **Q.**    Actually, what you said is [as read]:

2          ". . . we should have been smarter and tapped

3      into the fact they'd be using dual stream . . . ."

4      Correct?

5  **A.**    There, I'm referencing we should have known that they

6  would release this feature because the A5 was capable of it.

7  **Q.**    Okay.  But that's not what you said.  You said "we should

8  have been smarter."

9          And, by the way, you knew about dual streaming back in, we

10 saw, January 2009, two years before Ambarella told you about

11 that; correct?

12 **A.**    That's why I'm saying we should have been smarter and

13 tapped into, meaning know, that they'd release this feature

14 because the A5 could do that.

15 **Q.**    Okay.

16 **A.**    Correct.

17 **Q.**    All right.  So if we look at Exhibit 283 [sic], you want

18 to covertly get cameras for Ben, correct, for Zahid and Ben?

19 **A.**    Yes.

20 **Q.**    And Zahid's the guy working on wireless for you; correct?

21 **A.**    Yes.

22 **Q.**    Okay.  And you say [as read]:

23          ". . . we should have been smarter . . . ."

24     Correct?

25 **A.**    We should have known they were going to launch that

1    feature, yes.

2         MR. KEVILLE:  All right.  If I could have the document

3    camera back.

4    BY MR. KEVILLE:

5    Q.   All right.  So on the timeline you guys gave us, it just

6    said in January 2011 LCD BacPac.  But if we look at

7    Exhibit 2833, this is the time period when you say:  Hey,

8    covertly get Contour cameras for Zahid and Ben.  We should have

9    been smarter.  Correct?

10   A.   Yes.

11   Q.   Okay.  All right.  Yesterday we saw Exhibit -- I believe

12   it's 263 is in evidence, the May 2011 email.

13        MR. KEVILLE:  Oh, can we have the screen back.

14   BY MR. KEVILLE:

15   Q.   Okay.  We saw this email yesterday where Mr. Samuels goes

16   out, gets the ContourGPS to test the Bluetooth streaming and

17   two Contour+s for testing and teardown; correct?

18   A.   Yes.

19   Q.   Okay.  Now, if we look at your response where you say

20   "Good," you said -- you noted that Contour's GPS was updated;

21   correct?  On the Contour model.

22   A.   Yes.

23   Q.   Okay.  And you didn't want to burden yourselves with the

24   development effort until more GPS interest is shown; correct?

25   A.   Yes.

1   Q.   Okay.  A few years later, you released the HERO with

2   built-in GPS; correct?

3   A.   Yes.

4   Q.   Okay.  Do you remember a GoPro software architect named

5   Keith Gurganus?

6   A.   I remember the last name, but I don't remember him.

7        MR. KEVILLE:  Okay.  Can you put up Exhibit 1, please,

8   Allen, which is in evidence.

9        There you go.

10  BY MR. KEVILLE:

11  Q.   Mr. Gurganus was a named inventor on the Contour patents;

12  correct?

13  A.   I don't know.

14  Q.   Okay.  You can see it right here.

15  A.   Okay.

16  Q.   All right.  And he worked on the Contour embedded GPS

17  format; correct?

18  A.   I don't know.

19  Q.   Okay.  Do you remember GoPro hired him as a software

20  architect?

21  A.   No.

22       MR. KEVILLE:  Okay.  Can you show the witness

23  Exhibit 269.

24  BY MR. KEVILLE:

25  Q.   Do you recognize Mr. Gurganus?

1    **A.**    I recognize his last name, but not him.

2    **Q.**    Do you know he was a principal software architect at

3    GoPro?

4    **A.**    I did not know that.

5    **Q.**    Okay.  All right.  This doesn't refresh your recollection

6    at all?

7    **A.**    No.

8    **Q.**    Okay.  In any event, you don't dispute that Mr. Gurganus

9    was a software architect for GoPro who was hired in 2014?

10    **A.**    If that's what the documents show, I don't dispute that.

11    **Q.**    Okay.  And you don't know one way or the other whether --

12    what his resume was?

13    **A.**    No.

14    **Q.**    Okay.  But shortly after you hired him, you came out with

15    the HERO5 with built-in GPS; correct?

16    **A.**    If that timeline lines up, then that would be correct.

17    **Q.**    And he worked on that project at GoPro; correct?

18    **A.**    I don't know.

19    **Q.**    Okay.  All right.  After -- let's go back to our timeline.

20         Let's do something else.  Let's go to 2011.

21         **MR. KEVILLE:**  Can we put up for the witness

22    Exhibit 369.

23         There we go.

24         Can you show him the top, Allen.

25    \\\

1  BY MR. KEVILLE:

2  **Q.**   This is a GoPro chart of competitors' products; correct?

3  **A.**   This looks like a chart of GoPro products.

4  **Q.**   Yeah.  This is a document, according to the metadata, that

5  was created by Damon Jones and others.  You can see a list --

6  **A.**   Oh, I see.  There are other competitive products.  Okay.

7         **MR. KEVILLE:**  Okay.  Your Honor, I move the admission

8  of Exhibit 369.

9         **MR. HAYNES:**  Your Honor, I object to this one.  I

10  object, Your Honor, at this time until he can lay foundation as

11  to whether Mr. Woodman is familiar with this document and what

12  it contains.

13         **THE COURT:**  Yes.

14     Lay a foundation, please.

15         **MR. KEVILLE:**  Sure.

16  BY MR. KEVILLE:

17  **Q.**   Mr. Woodman, this is a document that was updated regularly

18  by GoPro that you've seen that -- where GoPro kept track of

19  what competitors' products were and what their features were;

20  correct?

21  **A.**   I've never seen this document before.  But I don't dispute

22  that somebody at GoPro might have created it and kept it

23  updated.

24         **MR. KEVILLE:**  Okay.  Your Honor, I'd move its

25  admission.  He doesn't dispute it's a GoPro document.

 1              MR. HAYNES:  Same objection, Your Honor.

 2              THE COURT:  I don't think he's the right witness for

 3    this.

 4              MR. KEVILLE:  Okay.

 5    BY MR. KEVILLE:

 6    Q.   In this time in 2011, were you aware of a Go- -- of a

 7    competitor -- well, were you aware of a product made by a

 8    company called Looxcie?  Looxcie?

 9    A.   Vaguely recognize that name, but no, I don't --

10    Q.   Okay.

11    A.   -- I don't remember a particular competitor or product of

12    that name.

13    Q.   All right.  In October 2011, GoPro started announcing it

14    was going to be coming out with a WiFi BacPac; correct?

15    A.   I actually don't know when we announced that we'd be

16    launching the WiFi BacPac.

17    Q.   Okay.  Do you remember an interview you did in

18    October 2011 where you said later that winter GoPro would

19    release the WiFi BacPac and then users would have live

20    streaming?

21    A.   I don't remember the interview, but if there's

22    documentation of it, then --

23              MR. KEVILLE:  Allen, could you play that, please.

24              (Video was played but not reported.)

25    \\\

1    **BY MR. KEVILLE:**

2    **Q.**    Okay.  So do you remember that interview from

3    October 2011?

4    **A.**    I do now.

5    **Q.**    Okay.  And in October 2011, you said you'd released the

6    WiFi BacPac in the winter and, actually, you didn't get the

7    WiFi BacPac out until June 2012; correct?

8    **A.**    Correct.

9    **Q.**    And you didn't get the ability to stream live to a phone

10   until October 2012, a full year later; correct?

11   **A.**    When we launched the mobile app for the iPhone,

12   I believe that's correct.

13   **Q.**    Okay.  And this is the first time after you've now torn

14   apart Contour's cameras and bought them, that you mention using

15   dual stream; correct?

16   **A.**    Ask the question again.

17   **Q.**    Sure.  This is the first time we've seen that you mention

18   using dual stream, and it's only after you got the

19   Contour cameras and tore them apart?

20   **A.**    I don't think those two events are correlated.

21   **Q.**    Okay.  In this case, we've now seen that you learned from

22   Ambarella about the dual stream possibility in 2009.  You

23   learned that Contour had used it in January 2011.  You got

24   Contour cameras to take apart in June of 2011; correct?  All

25   that's correct?

1    **A.**   If the dates are as you say, then yes.

2    **Q.**   And you still didn't have this feature working until

3    October 2012; correct?

4    **A.**   No, that's not correct.

5    **Q.**   That's the first time you commercially released a product?

6    **A.**   In October 2012, we released the iPhone app.  In

7    June 2012, we released the WiFi BacPac, which could enable the

8    live preview.  And then also, the -- we enabled this via WiFi

9    and Contour enabled it via Bluetooth, which are two totally

10   different technologies.

11   **Q.**   Okay.  Let's just say this.  So in January 2009, Ambarella

12   tells you about the dual stream on the chip; correct?

13   **A.**   The A5, yes.

14   **Q.**   And then what you just said, June 2012 is the first time

15   you get a product with WiFi out; correct?

16   **A.**   June 2012 is the first time that we launched a product

17   that featured WiFi, that's correct.

18   **Q.**   Right.  So that's three and a half years.  Fair to say it

19   wasn't obvious to GoPro how to use the Ambarella chip to get a

20   dual stream transmitted wirelessly?

21   **A.**   It was work, but we also had different priorities.  We

22   launched a number of other products during that time.

23   **Q.**   Maybe my question wasn't clear.  I'll try again.

24       Fair to say it wasn't obvious to GoPro how to get an

25   Ambarella chip with a dual stream and use it to get WiFi

 1   transmission to a phone, because it took you three and a

 2   half years?

 3   **A.**   I don't know if "obvious" is the right word.  It was a lot

 4   of work.

 5   **Q.**   Okay.  Fair enough.

 6        Now, in that same interview, you talked about the WiFi

 7   remote camera kit coming out.

 8            **MR. KEVILLE:**  Allen, can you play that clip at

 9   six minutes, 23 seconds?

10                (Video was played but not reported.)

11   **BY MR. KEVILLE:**

12   **Q.**   All right.  So you were hoping to get it out in

13   October 2011.  It actually comes out June 2012.

14        But here's my question:  At the time, you said that adding

15   that WiFi BacPac would cost about $99; correct?

16   **A.**   I think I was -- the WiFi BacPac and remote --

17   **Q.**   Yeah.

18   **A.**   -- I think --

19   **Q.**   Yeah.

20   **A.**   -- is what I -- the combo kit?

21   **Q.**   Right.

22   **A.**   Yes.

23   **Q.**   So at the time, at least, you were thinking the WiFi

24   remote and the WiFi BacPac was worth about $99?

25   **A.**   We were going to retail that combo kit for $99.

1    Q.   Okay.  All right.  I want to show you a slide we put up in

2    opening, Mr. Woodman.  I know you weren't here.

3            MR. KEVILLE:  Allen, can you put that up.

4    BY MR. KEVILLE:

5    Q.   All right.  This is our demonstrative Slide 61 from

6    opening.  The dates on the top, Mr. Woodman, have come from

7    other evidence and testimony.  I want to ask about the dates on

8    the bottom that involve you.

9        In June 2014, that was the GoPro IPO; correct?

10   A.   Yes.

11   Q.   Okay.  And you couldn't sell stock because of a lockup

12   period until December 22nd, 2014; correct?

13   A.   No, that's not correct.  I sold stock in the initial IPO

14   as a part of the IPO, I believe.

15   Q.   That's fair.  As part of the IPO, certain stock was sold.

16   But then after that, you couldn't sell any stock for 180 days;

17   correct?

18   A.   No.  I believe we sold -- I sold stock again in a

19   secondary offering that was managed by investment bankers.

20   Q.   We'll get there.  We'll get to the secondary offering.

21       But what I'm saying is, in the IPO, there was a lockup

22   period; correct?

23   A.   Yes.

24   Q.   And the lockup period was 180 days; correct?

25   A.   Yes.

1  **Q.**  Lasted until December 22nd, 2014; correct?

2  **A.**  I'm not sure, but if that's what the records show, then

3  that's correct.

4  **Q.**  Okay.  August 2014 is the first time that you or GoPro

5  asked to sell stock early; correct?

6  **A.**  I do not know when the secondary was -- first started to

7  be coordinated, if that's your question.

8  **Q.**  Yes.

9       **MR. KEVILLE:**  Can you put up for the witness

10  Exhibit 713.  And go to the bottom.  No, the last email.

11  **BY MR. KEVILLE:**

12  **Q.**  Okay.  This is an email between Jack Lazar and people at

13  JPMorgan.  And Jack Lazar was the CFO of GoPro; correct?

14  **A.**  The CFO, yes.

15       **MR. KEVILLE:**  Okay.  Your Honor, I move the admission

16  of Exhibit 713.

17       **MR. HAYNES:**  Your Honor, again, I'm not sure a proper

18  foundation has been laid for this one.  I don't see

19  Mr. Woodman's name on it.

20       **THE COURT:**  Sustained so far.

21    Can you lay a foundation?

22       **MR. KEVILLE:**  Yeah, sure.

23  **BY MR. KEVILLE:**

24  **Q.**  You were involved in these discussions about the secondary

25  or follow-on offering; correct?

1   **A.**   Yes.

2   **Q.**   And you were aware that your CFO, Jack Lazar, was having

3   them; correct?

4   **A.**   Yes.

5   **Q.**   Okay.  And the discussions between Jack Lazar and

6   JPMorgan, you were involved with; correct?

7   **A.**   Yes.

8   **Q.**   Okay.  Was Mr. Lazar, the CFO, talking to you at the time

9   he was talking to JPMorgan in 2014 about the secondary

10  offering?

11  **A.**   Yes.

12  **Q.**   Okay.  And Mr. Lazar, the CFO, reported to you; correct?

13  **A.**   Yes.

14          **MR. KEVILLE:**  Okay.  Your Honor, I move the admission,

15  again, of 713.

16          **MR. HAYNES:**  Same objection, Your Honor.

17          **THE COURT:**  Sustained.

18          **MR. KEVILLE:**  Okay.

19  BY MR. KEVILLE:

20  **Q.**   Mr. Woodman, outside of the document, do you have

21  knowledge that it was around late August, September when

22  GoPro's CFO, Jack Lazar, first requested that JPMorgan waive

23  the lockup restriction and allow you to sell shares early?

24  **A.**   I don't know when he first requested that.

25  **Q.**   Okay.  Does that sound about the right date to you?

 1   **A.**    I have no idea when he first requested it, so I can't say

 2   that sounds about right.

 3   **Q.**    Okay.  You sold large amounts of stock early rather than

 4   wait two more months until the lockup ended; correct?

 5   **A.**    I sold alongside at least 80 other GoPro investors and

 6   employees during the secondary, yes.

 7   **Q.**    Sure.  But there was no requirement for you to sell a

 8   single share of stock; correct?

 9   **A.**    No.

10   **Q.**    You didn't have to sell anything?

11   **A.**    No.

12   **Q.**    Okay.  You could have waited till the end of the lockup

13   period or even much later; correct?

14   **A.**    Sure.

15   **Q.**    Okay.  And you sold, on November 25th, 2014, 4.08 million

16   shares and received about $295 million; correct?

17   **A.**    If that's what the records show.

18   **Q.**    And when you were deposed under oath in January of 2020,

19   you testified that you had no recollection of ever selling

20   $300 million worth of GoPro stock at one time; correct?

21   **A.**    I don't remember when I sold what and how much I made.  I

22   was really fortunate, but that was a whirlwind time, so I don't

23   remember specifically when I sold what.

24   **Q.**    Receiving $300 million was not memorable to you?

25   **A.**    It was a big year.  It was a very fortunate time in my

 1    life.  But, no -- the question was do I remember when.  And the

 2    answer was true, no, I don't remember specifically when.

 3    **Q.**    Okay.  Do you remember that in November 2014 Contour

 4    disclosed the patents to GoPro?

 5    **A.**    No.

 6    **Q.**    Okay.

 7    **A.**    I have no knowledge of that.

 8    **Q.**    You don't remember that at all?

 9    **A.**    No.

10    **Q.**    Okay.

11    **A.**    I thought that they were out of business.

12    **Q.**    All right.  In December, on December 3rd, 2014, still in

13    advance of your lockup period, you sold another 837,000 shares

14    and received another 60 million; correct?

15    **A.**    If that's what the records show.

16    **Q.**    Okay.  In January 2015, you and others from GoPro were

17    scheduled to meet with Contour at the Consumer Electronics

18    Show.  Do you remember that?

19    **A.**    No.

20    **Q.**    Why didn't you -- nobody even told you there was supposed

21    to be a meeting?

22    **A.**    They may have, but I do not have any recollection of this.

23    **Q.**    You don't know why you didn't show up for that meeting

24    with Contour in January 2015?

25    **A.**    No idea.  Again, at that time, I thought they were out of

1   business.

2   **Q.**   Okay.  By the way, you used two manufacturers, Sky Light

3   and Chicony, up until 2014, correct, for the GoPros?

4   **A.**   We -- sure.

5   **Q.**   And then in 2014, for the first time, you used a company

6   called Jabil.  Do you recall that?

7   **A.**   Jabil, yes.

8   **Q.**   And that was -- the first time you used them was 2014;

9   correct?

10  **A.**   I don't know when the first time we worked with them was.

11  **Q.**   First time you worked with them was on the HERO4 Session.

12  Does that ring a bell?

13  **A.**   Again, we've worked with many contract manufacturers; but

14  if that's what the record shows, then I wouldn't dispute it.

15  **Q.**   All right.  GoPro did the IPO in June 2014 -- June -- yes,

16  2014.

17      GoPro's sales revenues from 2012 to 2013 went from

18  526 million to 986 million in 2013.  Does that sound right?

19  **A.**   Yes.

20  **Q.**   Almost a 90 percent increase; correct?

21  **A.**   Yes.

22  **Q.**   Okay.  And GoPro's net profit in that time, which is after

23  the remote control and live preview comes out, nearly doubled

24  from about 32 million in 2012 to over 60 million in 2013;

25  correct?

1   A.   If that's what the records show, yeah.

2   Q.   We talked about a case yesterday a little bit -- do you

3   remember? -- where GoPro said Contour's '954 patent, Claim 11

4   recites an improved POV camera?

5   A.   Yes.

6   Q.   And you recently talked about that case and you said

7   [as read]:

8            "GoPro will litigate to protect our IP when we

9        believe it's being infringed.  We will not sit idle

10       while we believe others unjustly take advantage of

11       our hard work, investment, and innovation."

12       Do you remember saying that?

13  A.   I do.

14  Q.   Okay.  Here, where it's been established that many GoPro

15  cameras meet every element of the '945 patent's Claim 11, the

16  claim you said was an improvement to point-of-view cameras, you

17  took the opposite approach and you never made changes to your

18  cameras, nor did you ever pay Contour; correct?

19  A.   Because I don't believe that we're -- we copied or are

20  infringing on that technology.

21  Q.   You understand that it's already been determined --

22  A.   I do.

23  Q.   Okay.  That all elements of Claim 11 are met?

24  A.   I understand that.

25  Q.   And that's the same claim that you guys said was an

1    improvement to point-of-view cameras; correct?

2    **A.**   Okay.

3    **Q.**   Okay.  Will you stand by your word and not take advantage

4    of the IP Contour created?

5    **A.**   I'll stand by my word 1000 percent.

6    **Q.**   You agree that companies should be compensated if their

7    patents are infringed; correct?

8    **A.**   I do.

9    **Q.**   And you agree that no company should make immense profits

10   off patented innovations of others without compensating them;

11   correct?

12   **A.**   That's correct.

13          **MR. KEVILLE:**  Okay.  Your Honor, I pass the witness.

14          **THE COURT:**  Okay.

15       Mr. Haynes?

16                          <u>**CROSS-EXAMINATION**</u>

17   **BY MR. HAYNES:**

18   **Q.**   Good morning, Mr. Woodman.

19   **A.**   Good morning.

20   **Q.**   Let me start with an easy one.  Can you -- to your

21   knowledge, can you infringe an invalid patent?

22   **A.**   No.

23   **Q.**   And if a patent is not valid, if it claims an idea that

24   was already well-known in the art, do you feel that GoPro

25   should be required to pay for that?

 1              MR. KEVILLE:  Your Honor --

 2              THE WITNESS:  No.

 3              MR. KEVILLE:  -- it's up to the Court to instruct on

 4      the law.  I would object to that.

 5              THE COURT:  Overruled.

 6          Let's proceed.

 7              MR. HAYNES:  I'm not sure if we got your answer out

 8      there or not, Your Honor.

 9              THE COURT:  You know, you're both being argumentative,

10      so let's just get to the case.  Okay?

11              MR. HAYNES:  Okay.  Let's just get to it.

12      BY MR. HAYNES:

13      Q.   All right.  During the direct there, you recall you were

14      walked through a bunch of emails, generally?  You remember

15      that?

16      A.   Yes.

17      Q.   And do you remember there was highlighted sentences in

18      each email where there was a few words that you were asked

19      about?  Do you remember that?

20      A.   Yes.

21      Q.   How many emails were you sending during this development

22      time period where you were working on all these products?

23      A.   Way too many.  Hundreds.  Hundreds.

24      Q.   And do you feel that the emails that you were shown today

25      presented an accurate picture of the development efforts that

1   were -- GoPro was undergoing?

2   **A.**   No, not even close.

3   **Q.**   And I think there was some discussion about, you know, a

4   remote that didn't have video; it was just images.  Do you

5   recall that generally?

6   **A.**   I do.

7   **Q.**   Is that the only product you were working on at that time?

8   **A.**   No.  One of many.

9   **Q.**   Okay.  All right.  I'm going to try to go back.  And you

10  actually -- we gave them a timeline in advance, and they showed

11  it to you.  But now I'm going to walk through a little slower

12  and see if we can talk about what you were developing.  Is that

13  all right?

14  **A.**   Yes.

15  **Q.**   So let me start -- I think you talked about your Funbug

16  venture that, unfortunately, went bankrupt.  Do you recall

17  that?

18  **A.**   I do.

19  **Q.**   And then when you got your camera idea for the portable

20  camera that you could wear on your wrist, did you know how to

21  build a camera at that time?

22  **A.**   No.

23  **Q.**   And what resources did you draw on to help you build

24  cameras?

25  **A.**   Well, I had the idea that if I could find a manufacturer

1    that was already making a camera close to what I wanted, that I

2    could work with them to make the small modifications to their

3    existing camera to meet the needs of the product that I wanted

4    to make, and that's what I went and did.

5    **Q.**   Okay.  So when you came up with the idea of having a wrist

6    camera and you got back to the United States, what was the

7    first thing you did?

8    **A.**   The first thing I did was drive to a Barnes & Noble and

9    buy a book called *Patent It Yourself*.  And I read that thing,

10   learned how to write GoPro's first patent, and wrote the very

11   first patent for my first product idea, my first invention.

12   **Q.**   Okay.  And what was GoPro's very first product?

13   **A.**   It was a 35-millimeter film camera that you could wear on

14   your wrist, and it could be released from a lockdown position

15   to an upright position so that you could take a photo, and then

16   you could lock it back down and it'd be secure while you were

17   surfing, snorkeling, kayaking, things like that.

18   **Q.**   Okay.  And when was that camera commercially released?

19   **A.**   September 2004.

20   **Q.**   After you released that first 35-millimeter camera, what

21   was GoPro's next product?

22   **A.**   Two years later, we launched our first digital HERO

23   camera, which was the same concept, for a little camera that

24   you could wear on your wrist and wear during sports and

25   activities.  And then every year thereafter, more or less, we

1  launched a new camera.  And that's still the same today.

2  **Q.**  Okay.  Let's fast-forward to the time period that we've

3  been talking about, the 2008 and 2009 time period.  Okay?

4      What camera were you working on at GoPro during that time?

5  **A.**  2008 was a pretty exciting time because we went from being

6  a wrist camera company to making mounts and accessories that

7  would allow you to take that little boxy wrist camera and mount

8  it anywhere for different use cases.  So, to your chest while

9  you're skiing, to your helmet, to the front of your surfboard,

10  and so on.

11      And then in 2009, we launched the first HD HERO camera,

12  which combined with those mounts and accessories to create a

13  magical product.

14  **Q.**  Okay.  Was -- did that HERO HD camera, did it have this

15  live preview while recording feature that we've been talking

16  about?

17  **A.**  No.

18  **Q.**  Okay.  How did that product do in the marketplace when you

19  launched it?

20  **A.**  It was phenomenally successful.

21  **Q.**  And how did the sales of that HD HERO camera compare to

22  the sales of the GoPro product cameras that had preceded it?

23  **A.**  In 2008, we did roughly 8 1/2 million in revenue; and then

24  in 2009, we did about 19 million in revenue.  And that's when

25  we launched the HD HERO, in November 2009, so we had a couple

1   of months of sales.  So we more than doubled.

2       And then in 2010, we did approximately 64 million in

3   revenue.  And that was the first full year of HD HERO sales, so

4   that was a huge jump from 19 to 64.

5       And then in 2011, we did 234 million.  So you could see

6   the HD HERO was a rocket ship.

7   **Q.**   Okay.  And did Contour have an HD camera market at the

8   time that you were competing with?

9   **A.**   They did.  They actually came out with one before us.

10  **Q.**   Okay.  And so even though there was a Contour product on

11  the market, GoPro's HD camera had acceptable sales?

12  **A.**   It had what?

13  **Q.**   Acceptable sales.

14  **A.**   It did very well, yeah.

15  **Q.**   Okay.  All right.  Now, how did you utilize the growth in

16  sales of the HERO HD to grow the company?

17  **A.**   Well, now we were making a lot more money, a lot more

18  profit, so we were able to invest more in product development

19  to develop more products in parallel to grow the business.

20      But we also poured an enormous amount of our profits back

21  into marketing to grow the brand and drive awareness and

22  excitement about the products.  We reinvested in marketing to

23  drive awareness of our brand and our products around the world.

24  Tried to be like Red Bull.

25  **Q.**   All right.  Let's take a step back.  What do you view --

1  or what is your role as -- at GoPro as the founder and CEO?

2  **A.**   As CEO, my main job is to come up with -- along with my

3  teammates, come up with a strategic vision for the business and

4  then align all of our employees to that vision, to get

5  everybody excited about it, and then we go make it happen.  And

6  then I'm also involved primarily in product development,

7  design, conception, and marketing.

8  **Q.**   And where is GoPro headquartered today?

9  **A.**   San Mateo, California.

10  **Q.**   And we've been talking a lot about patents, and I think

11  you mentioned you filed your first patent, but how many patents

12  does GoPro have today?

13  **A.**   GoPro has well over 2,000 patents globally.

14  **Q.**   Okay.  And what about you personally?  How many patents

15  are you a named inventor on?

16  **A.**   I have well over a hundred.

17  **Q.**   Okay.  So we talked a little bit about Contour and GoPro

18  competing in those early days.

19      Were there other competitors in the marketplace around

20  that time period?

21  **A.**   There were.  There were a handful.  Early on there was

22  Oregon Scientific, then there was Drift Innovations, Contour,

23  and GoPro primarily.

24  **Q.**   Okay.  And back in those days, 2008, 2009, '10, '11, did

25  GoPro stay informed about what its competitors were doing?

WOODMAN - CROSS / HAYNES

1    **A.**    Absolutely.

2    **Q.**    Why?

3    **A.**    Because you have to know what your competitors are doing

4    to know if you yourself are being competitive with your own

5    products.

6    **Q.**    Okay.  And do you view that competition as a good thing?

7    **A.**    I do.  It's frustrating.  It's scary, especially as an

8    entrepreneur in the early days.  I mean, it's scary today.  But

9    it forces companies like GoPro to invest in innovation and

10   continually improve our products that ultimately the end

11   user -- in our case, consumers -- benefit from.

12   **Q.**    In the early days, were you concerned -- you mentioned,

13   I think, you were a ten-person company.  Were you concerned

14   about being able to beat your competitors in the marketplace?

15   **A.**    Yeah.  A thousand percent.  In the year we were developing

16   the HD HERO, I think we were about 12 people.  And, yeah, I was

17   terrified that every morning I was going to read the news that

18   some new big competitor was going to come and beat us.

19   **Q.**    Okay.  And if you didn't beat -- I think we heard the word

20   "squash" -- what would happen to GoPro?

21   **A.**    We'd get squashed.

22   **Q.**    Okay.  Now, what sort of characteristics of GoPro's

23   cameras were a source of GoPro's success?

24   **A.**    I think the biggest advantage that we had in the market

25   was our boxy, rectangular shape that made a GoPro far more

1    versatile than any other camera.  You could wear a GoPro on the

2    wrist as equally well as on your chest or your helmet or mount

3    it to the front of your surfboard.  And I think that's why we

4    see virtually every GoPro competitor today copying that form

5    factor, that shape.

6    **Q.**   How did that form factor compare with the Contour camera

7    form factor?

8    **A.**   Contour, from the beginning, designed their cameras

9    specifically to be worn on the side of the helmet.  And for

10   that purpose, they worked really well.  It was a super elegant

11   design.  It kind of made a GoPro look kind of boxy and

12   utilitarian.  But, ultimately, Contour's elegant side-of-helmet

13   design, I think, was a competitive disadvantage for them

14   because it only worked well in that use case.

15       And as we've learned from our business, GoPro's been

16   successful because it's good for so many different use cases.

17   **Q.**   What about image quality and things like that?  Is that

18   important to success?

19   **A.**   Yes, 1000 percent.  And I believe we've always had the

20   best image quality in the industry.

21   **Q.**   Okay.  What about durability?

22   **A.**   Durability, battery life.  GoPros, back in that era, were

23   always used inside of a waterproof housing, which acted as a

24   thermos for the camera.  So that would keep the camera warmer

25   during winter sports.  So we had way better battery life than

**WOODMAN - CROSS / HAYNES**

1    Contour.  Contour didn't have a housing, so it's battery would

2    die after a few minutes in the cold.  That's obviously not good

3    for people that want to ski with it and wear it on the side of

4    their helmet.

5        Being in a housing also allowed us to have better audio

6    because the microphones were protected from the wind, and we

7    also had a much wider field of view, which let the user feel

8    like they were capturing IMAX-like quality footage of their

9    experience.  So across the board, I think we built a better

10   product.

11   **Q.**   Okay.  What about from a more business perspective as

12   opposed to camera features?  Do you feel that there were any

13   aspects of GoPro's business that set it apart from its

14   competitors?

15   **A.**   We invested way more in marketing than anybody else.

16   Because of the success of the HD HERO camera, we were able to

17   pour a ton of our profits back into marketing.

18       I was a huge fan of Red Bull and drank a lot of it during

19   those early years, and I wanted to build GoPro up to be like

20   Red Bull, and that took an enormous amount of investment in

21   marketing that drove awareness of our brand and products.

22       And I also operated the business very cautiously because

23   I'd failed twice in business before.  So we were very

24   thoughtful about our contracts.  We didn't offer

25   right-of-return to retailers.  We asked that our distributors

**WOODMAN - CROSS / HAYNES**

1   pay up-front, things like that.

2   **Q.**   All right.  Let's go back and actually build up that

3   timeline that you were shown during the questions from

4   Contour's counsel.

5         **MR. HAYNES:**  If we could bring up DDX-2.01.  Okay.

6   BY MR. HAYNES:

7   **Q.**   I think you told me earlier that GoPro was founded in

8   2002.  Is that right?

9   **A.**   That's correct.

10        **MR. HAYNES:**  Can we add that to the timeline, please.

11  BY MR. HAYNES:

12  **Q.**   All right.  Is that you in the picture there, Mr. Woodman?

13  **A.**   Early me with an early prototype.

14  **Q.**   And how old were you back in 2002?

15  **A.**   26.  I'm 50 now.  I've been at this a long time.

16  **Q.**   All right.  Okay.  Now, you were also asked some questions

17  about one of your patents.

18        **MR. HAYNES:**  If we could bring up DTX-2351.

19  BY MR. HAYNES:

20  **Q.**   Do you recall you were asked some questions about this

21  patent, Mr. Woodman?

22  **A.**   I do.

23  **Q.**   Now, what is the title of this patent?

24  **A.**   "Camera Housing with Integrated Expansion Module."

25  **Q.**   Okay.  Can you just explain to us and orient us, what is

1  the invention that you were describing in this particular

2  patent?

3  **A.**    This is my invention for a camera that could receive

4  expansion modules that would click onto the back and expand the

5  functionality of the camera.

6  **Q.**    And what types of things did you contemplate in your

7  invention that that expansion module could be used for?

8  **A.**    Expansion modules like an LCD display, because GoPros back

9  in that time didn't have displays on the back, if you can

10  believe that; an extended battery BacPac that would allow you

11  to have, you know, longer battery life; and a wireless BacPac

12  that would bring wireless capabilities to the camera.

13  **Q.**    Okay.  Now, let's turn to Figure 6.  And I think you were

14  shown this during Contour's counsel questioning.

15      Can you just explain to us what we're seeing in Figure 6?

16  **A.**    This illustration is showing the camera with the expansion

17  module clicked on the back, transmitting information back and

18  forth with a wrist-worn remote.

19  **Q.**    Okay.  So at this point in 2008, did you have in your mind

20  the idea that the BacPac could communicate with a portable

21  device and transmit a live video preview to that device?

22  **A.**    Yes.

23  **Q.**    Okay.  There was lots of questions about the word "invent"

24  earlier and did you invent the ideas.

25  **A.**    No.

1  **Q.**   Did you have those ideas in your head, is my question?

2  **A.**   I had the concepts, but that's not what this patent seeks

3  to invent.  But it does cover these concepts in that patent.

4  So, yes, I did have those ideas back then.

5  **Q.**   Okay.  So as you sit here today, do you know if you were

6  the very first person in the world to come up with the idea of

7  wirelessly transmitting a live preview to a portable device?

8  **A.**   No.

9  **Q.**   But did you have those ideas in 2008, regardless of

10  whether you were the first person?

11  **A.**   I clearly had those ideas.

12  **Q.**   Okay.  Now, you were only shown certain portions of this

13  patent that dealt with the actual mounting of the BacPac.  Do

14  you recall that?

15  **A.**   Yes.

16  **Q.**   Let's look at some other things that you described in your

17  patent that you were not shown.  Okay?

18  **A.**   Okay.

19  **Q.**   Let's go to Column 7, line 35.  You see here at the very

20  top it says, "Camera Housing with Wireless Module."  What's

21  that talking about?

22  **A.**   That's talking about the camera with a wireless BacPac

23  module that would attach to the camera to give it WiFi

24  capabilities or wireless capabilities.

25       **MR. HAYNES:**  Okay.  We can go ahead and highlight the

1    first sentence there, same paragraph.  Okay.

2    **BY MR. HAYNES:**

3    **Q.**   So is that what you just described, that the expansion

4    module was going to provide wireless functionality to a camera

5    that didn't have them before?

6    **A.**   Yes.

7    **Q.**   Okay.  Now, let's go to the next sentence.  It says

8    [as read]:

9            "The wireless module may include, for example, a

10          Bluetooth module, a Radio Frequency (RF) transceiver,

11          an infrared transceiver, an 802.11a/b/g/n

12          transceiver, or any other wireless device."

13          Do you see that?

14   **A.**   I do.

15   **Q.**   Okay.  What are you talking about there?

16   **A.**   There, I'm talking about all of the different wireless

17   protocols that could be included in the wireless expansion

18   module.

19   **Q.**   Okay.  So at this time, again, July 2008, did you have in

20   your mind the ability that you could use wireless protocol

21   devices to transmit video wirelessly for a wireless preview?

22   **A.**   Yes.

23   **Q.**   Okay.  Let's look at the next sentence.  It says

24   [as read]:

25          "For example, the wireless module could be used

1          to allow the user to wirelessly download stored

2          images and/or video from the camera to a personal

3          computer, e.g., a server computer, a desktop

4          computer, a laptop, a notebook, or a smartphone."

5          Did I read that right?

6    **A.**    Yes.

7    **Q.**    Okay.  So at this point in time, July 2008, did you have

8    in your mind the idea that you could wirelessly transmit this

9    live preview to a smartphone?

10   **A.**    Yes.

11   **Q.**    All right.  Let's go to the next sentence.  It says

12   [as read]:

13          "Alternatively, images and/or video can be

14          captured and wirelessly downloaded in real-time from

15          the camera."

16          What are you talking about there?

17   **A.**    The ability to send a live preview from the camera to a

18   separate device.

19   **Q.**    Okay.  And when you talk about real time, what's

20   real time -- what did you have in mind with real time in that

21   context?

22   **A.**    Showing a live preview of what the camera was seeing so

23   that you could view that on a display of another device.

24   **Q.**    Okay.  At this point in time, in July 2008, what was in

25   your mind as to why you would use this live preview?

1    **A.**    Because GoPros, their ability to be mounted in all these

2    different locations means that they're often not within reach

3    of the user; and so it can be helpful in certain use cases to

4    be able to remotely see what the camera is seeing and then,

5    you know, send command and control signals to that camera to

6    take control of it, like using your smartphone, for example, as

7    a remote control for the camera you can't reach.

8    **Q.**    Now, at this point in time -- we looked at some of these

9    wireless protocols.  At this point in time, what was the

10   bandwidth that was available for video transmission, to your

11   knowledge?

12   **A.**    Well, that was the challenge, was that bandwidths were

13   constrained.  So you'd have to use a lower-quality video stream

14   using less data to have a good user experience.

15   **Q.**    Okay.  Did you actually write into your description of

16   your idea that you would have to use a lower-quality stream

17   when you sent it wirelessly?

18   **A.**    No, because that was also well-understood at this point.

19   **Q.**    Now, what we just looked at that you described in your

20   patent in July of 2008, just to be clear, did you get any of

21   those ideas from anyone at Contour?

22   **A.**    No.

23   **Q.**    Did you get any of those ideas from looking at any Contour

24   product?

25   **A.**    No.

1    Q.   At this point in time, in July 2008, was there even a

2    Contour product that could do wireless streaming of anything?

3    A.   No.

4    Q.   All right.  Now, there was also some questions by

5    Contour's counsel about whether or not you invented a camera

6    processor and described that in your 2008 patent.  Do you

7    recall those generally?  Okay.

8    A.   Yes.

9    Q.   Mr. Woodman, are you claiming to be the inventor of a

10   camera processor in this courtroom?

11   A.   No.

12   Q.   Okay.  But when you described your invention in July of

13   2008, did camera processors exist?

14   A.   Yes.

15   Q.   Okay.  And were there camera processors in 2008 that you

16   were aware of that could output video streams suitable for

17   wireless transmission?

18   A.   Yes.

19   Q.   Okay.  So -- and when you actually -- well, did you build

20   the concepts that you described in your July 2008 patent?  Did

21   you get those into a commercial product?

22   A.   Yes.

23   Q.   And when you put those in a commercial product at that

24   time, did you have to invent your own camera image processor?

25   A.   Thankfully, no.

1   **Q.**   And why not?

2   **A.**   Because they already existed.

3   **Q.**   Okay.  And who did you end up using for that camera

4   processor?

5   **A.**   Ambarella.

6   **Q.**   Okay.  We're going to get back to that but...

7          **THE COURT:**  Mr. Haynes, when you come to a good point.

8          **MR. HAYNES:**  Actually, this will be a perfect stopping

9   point, Your Honor.

10         **THE COURT:**  Okay.  Good.

11      Ladies and gentlemen, we'll take our first break of the

12   morning, 15 minutes.

13      (Proceedings were heard out of the presence of the jury.)

14         **THE COURT:**  We're in recess.

15                  (Recess taken at 10:01 a.m.)

16               (Proceedings resumed at 10:15 a.m.)

17      (Proceedings were heard out of the presence of the jury.)

18         **THE COURT:**  Okay.  Let's get the jury.

19      (Proceedings were heard in the presence of the jury.)

20         **THE COURT:**  All right.  Please be seated, everybody.

21         **MR. HAYNES:**  May I proceed, Your Honor?

22         **THE COURT:**  Mr. Haynes?

23   **BY MR. HAYNES:**

24   **Q.**   Mr. Woodman, do you recall yesterday that you were asked

25   some questions about the file history, the back-and-forth

1    between GoPro's lawyers and the Patent Office?

2    **A.**    Yes.

3    **Q.**    Let's take a look at that.

4         **MR. HAYNES:**  If we can go to TX-3431.  I believe it

5    was admitted yesterday.

6    **BY MR. HAYNES:**

7    **Q.**    Now, Mr. Woodman, you were shown, I believe, paragraph 42,

8    maybe 41 and 42, on page 171.

9         **MR. HAYNES:**  Can we pull those up.

10   **BY MR. HAYNES:**

11   **Q.**    And just looking at paragraph 42, do you recall being

12   asked some questions about the "alternatively" sentence there?

13   It says [as read]:

14        "Alternatively, the communication interface may

15        be a one-way communication such that the remote

16        preview screen 604 only receives and displays image

17        information from the camera . . . ."

18   **A.**    Yes.

19   **Q.**    Do you recall being asked about that?

20   **A.**    I do.

21   **Q.**    And you, I think, suggested in your answer that that might

22   be video, and there was a back-and-forth.  Do you remember that

23   generally?

24   **A.**    Yes.

25   **Q.**    Okay.  Now, let's go to the very next page of this

1  document.  And do you recall being shown paragraph 43 on the

2  very next page yesterday?

3  **A.**  No.

4  **Q.**  Okay.  Let's look and see what came right after the part

5  that Contour's counsel showed you yesterday.

6       And what's being described, in general, in paragraph 43 of

7  the file history?

8  **A.**  I'll read it.

9       (Witness examines document.)  This is describing a

10  wireless BacPac which could use a wireless protocol to enable

11  video transmission from the camera to another device, including

12  real-time preview.

13  **Q.**  Okay.  And does this paragraph, is it limited to

14  transmitting the preview as an image as opposed to video?

15  **A.**  No.  It clearly says here "stored images and/or video from

16  the camera."

17  **Q.**  And, again, down below here where it says "images and/or

18  video can be captured and wirelessly downloaded in real-time

19  from the camera," what's your understanding of what that's

20  describing?

21  **A.**  Live preview.

22  **Q.**  Of what?

23  **A.**  Of video.  Of what the camera sees.

24  **Q.**  Okay.  Now, what about remote control operation of the

25  camera to use a portable device to control the camera features

1    remotely?  Is that an idea that you had in your July 2008

2    patent?

3    **A.**    Yes.  It says it in the next sentence [as read]:

4              "The wireless module 430 may also allow a user

5         to wirelessly control operation of the camera."

6    **Q.**    Okay.  So, again, in July of 2008, did you have in your

7    mind the concept of a camera that could remote -- could receive

8    remote commands to control camera functions, record a

9    high-resolution video, and transmit wirelessly a low-resolution

10   video for use as a live preview?

11   **A.**    Yes.  That's clearly described in this patent.

12   **Q.**    Okay.  Did you write claims in your July 2008 patent to

13   attempt to get ownership of the combination of those particular

14   ideas?

15   **A.**    No, because that's not what the patent is about.  The

16   patent was for the BacPacs to attach to the back of the camera

17   that could enable these things to happen, but the patent didn't

18   seek to invent what you described.

19   **Q.**    Okay.  And at that time, July 2008, did you think you were

20   the only person in the camera industry that had had those

21   ideas?

22   **A.**    No.

23   **Q.**    Okay.  Okay.  Let's go back to your timeline, which is

24   DDX-2.03, and let's add in the Woodman patent filing in July of

25   2008 and see what comes next.

**WOODMAN - CROSS / HAYNES**

1    So we've got your patent in July 2008.  Did you launch any

2   commercial products that embodied the ideas that were described

3   in your July 2008 patent?

4   **A.**   Yes, several.

5   **Q.**   Okay.  Can you just walk us through what those products

6   were and when they were launched?

7   **A.**   In January 2011, we launched the LCD BacPac shown here,

8   which provided an LCD display that could be attached to the

9   back of the camera.

10      Then a few months later, in March 2011, we launched the

11   battery BacPac that extended the runtime of the camera.

12      And then in June 2012, we launched the WiFi BacPac which

13   enabled the cameras that we had on the market at the time with

14   WiFi capabilities and, in the case of the HD HERO2, live video

15   preview and remote control.

16   **Q.**   Okay.  So I have here --

17         **MR. HAYNES:**  Your Honor, may I approach?

18         **THE COURT:**  Yes.

19   **BY MR. HAYNES:**

20   **Q.**   Mr. Woodman, can you just tell us what we're looking at

21   there in that box?

22   **A.**   This is the WiFi BacPac that we launched in June 2012.

23         **MR. HAYNES:**  And, Your Honor, I would move or offer

24   DDX-2.101.

25         **THE COURT:**  Any objection?

 1              MR. KEVILLE:  No objection.

 2              THE COURT:  All right.  It's admitted.

 3          (Trial Exhibit 1000 received in evidence.)

 4   BY MR. HAYNES:

 5   Q.   We're going to come back to that guy in a little bit, but

 6   let's put him there for now.

 7          Okay.  Now --

 8              THE COURT:  And what exhibit number are we going to

 9   refer to it as?

10              MR. HAYNES:  Let's call it PTX -- or DT- -- have a

11   different physical name.  Let's call it Defendant's Physical

12   Exhibit 1000, Your Honor.  I'm confident there's not one of

13   those.

14              THE COURT:  Okay.

15   BY MR. HAYNES:

16   Q.   Okay.  Now, around this -- in this same time window, did

17   you launch any new GoPro cameras?

18   A.   We did.

19   Q.   Okay.  What cameras were launched in the window that we're

20   seeing on our timeline?

21   A.   Oh.  In November 2009, we launched the HD HERO, and then

22   in October 2011, we launched the HD HERO2.

23   Q.   Okay.  And what was the camera processor that was in the

24   GoPro HD HERO?

25   A.   Ambarella's A2s processor.

1  Q.   And what was the camera processor that was in the GoPro

2  HERO2 camera?

3  A.   Ambarella's A5s processor.

4  Q.   Now, is there a reason why you launched the cameras and

5  the different BacPac modules in that sequence?

6  A.   Yes.  That was strategic.  We launched the LCD BacPac and

7  the battery BacPac first because they could expand the

8  capabilities of the HD HERO camera and help drive, you know,

9  further sales of that product.

10     And then we launched the WiFi BacPac after the launch of

11  the HD HERO2 because the WiFi BacPac could take full advantage

12  of the HERO2's wireless preview capabilities in addition to the

13  remote control capabilities.

14  Q.   All right.  Let's go back through and walk through some of

15  the development work that you were doing with respect to the

16  WiFi BacPac module and the development of wireless video.

17  Okay?

18  A.   Okay.

19  Q.   But before I do that, you were shown some documents about

20  products that didn't have video.  Were you also considering

21  those and developing those products around this same time

22  frame?

23  A.   Yeah.  We were looking at a number of different approaches

24  because this is all, you know, new to us as a small company and

25  we wanted to make sure that we were right -- making the right

WOODMAN - CROSS / HAYNES

 1  decision and that we have a fallback plan so that if one

 2  approach didn't work, we would have another approach that we

 3  could rely on.

 4  **Q.**   Okay.  So were you developing multiple products in

 5  parallel?

 6  **A.**   Absolutely.

 7  **Q.**   All right.  Let's look at DTX-3383.  Actually, can we

 8  just --

 9       I think this was already admitted with a different exhibit

10  number, but can you just tell us what it is?

11  **A.**   This is an engineering requirements document for what

12  would eventually become the HD HERO.

13  **Q.**   Okay.  And so that name up there at the top, YHDC5170,

14  what's that?

15  **A.**   That's, like, the -- I think it was the model number for

16  the HD HERO.

17       **MR. HAYNES:**  Okay.  Just so the record's complete,

18  I believe this was introduced previously as Plaintiff's

19  Exhibit 304.

20       **THE COURT:**  Okay.

21  BY MR. HAYNES:

22  **Q.**   And what's the date on this document?

23  **A.**   January 13th, 2009.

24  **Q.**   And did you personally write this document?

25  **A.**   No.  But I was involved in its creation.

1   Q.   Okay.  And who else was involved in the creation of this

2   document?

3   A.   I think this would have been probably Rudy, Sky Light,

4   potentially Paul Donovan.

5   Q.   So what is this type of document used for within GoPro?

6   A.   This is explaining, detailing out the engineering that

7   would go into the HD HERO camera to have it meet the user

8   experience that we desired for the product at launch.

9   Q.   Okay.  Let's look at some of the features that you were

10  looking at for the HERO HD.

11       MR. HAYNES:  If we could turn to page 6 of the

12  document and just bring up that Section 1.0 "Introduction"

13  there.

14  BY MR. HAYNES:

15  Q.   Now, at this point in time, in January of 2009, had --

16  were you considering including wireless features in that HERO

17  HD camera?

18  A.   Yes.  That's line 1.2.4, the Nordic transceiver, that's an

19  RF chip.

20  Q.   Okay.  And that Nordic RF transceiver, what were you

21  contemplating using it for in January of 2009?

22  A.   For enabling wireless remote control of the camera and

23  live preview from the camera to another device.

24       MR. HAYNES:  Okay.  If we could go to Section 2.0 of

25  this document and just highlight, basically, that whole

 1   Section 2.0 down -- just that page right there at the bottom.

 2   Thanks.

 3   **BY MR. HAYNES:**

 4   **Q.**   Okay.  You see there it says "Product Design Objectives"?

 5   **A.**   I do.

 6   **Q.**   Okay.  And if you look down --

 7        **MR. HAYNES:**  If we could highlight -- actually,

 8   I think it may be wrapped over to the next page.

 9        There we go.

10        A little bit further down on the next page.

11        This paragraph right here that starts "The YHD."  There we

12   go.

13   **BY MR. HAYNES:**

14   **Q.**   Okay.  Explain to us what objective is being described in

15   this paragraph where it says [as read]:

16        "The YHD5170 provides several image transfer

17        options to TV or computer, including HDMI, YPbPr and

18        CVBS and an optional RF wireless module.  The HERO HD

19        camera also provides the capability to record at HD

20        resolution and output at a lower resolution

21        simultaneously."

22        Explain to us what you're describing there in January of

23   2009.

24   **A.**   I'm describing our desire to have the camera be able to

25   both record a high-quality stream to the camera's SD card while

1  simultaneously outputting to a lower resolution for the purpose

2  of live preview.

3  **Q.**  Okay.  And did you have some particular resolutions in

4  mind, if you look at the next sentence?

5  **A.**  Yes.  I say, for example, the camera can save to the HD

6  card -- sorry -- SD card in 1080 PHD while at the same time is

7  outputting 640 x 480 VGA, video resolution, which is a much

8  lower resolution, to an RF transceiver.

9  **Q.**  Okay.  So when we looked at your patent from July 2008,

10  you didn't specifically call out the higher quality and the

11  lower quality.  Do you recall that?

12  **A.**  I do.

13  **Q.**  Okay.  By this time, in January of 2009 when you were

14  writing your product specification, did you specifically call

15  out that it was going to store a higher-quality video and

16  output a lower-quality video wirelessly?

17  **A.**  That's exactly what I'm describing right here.

18  **Q.**  Okay.  And you were shown this document by Contour's

19  counsel, but they didn't ask you anything about this section of

20  the document, did they?

21  **A.**  No, they did not.

22          **MR. HAYNES:**  Okay.  Now, if we go -- I think it's on

23  the next paragraph under 1.5.  Just reduce the blow-up.  Yeah,

24  if we can just look at the part that talks about remote control

25  there, the paragraph beginning here.

1   BY MR. HAYNES:

2   Q.   Okay.  In this section, it talks about having a handheld

3   wireless remote module with a 2-inch LCD display, and then it

4   says [as read]:

5            "This RF handheld remote will allow for

6       real-time viewing of the audio video signal and also

7       allows for playback of saved files on the camera via

8       the 2-inch LCD."

9       So what are you talking about here when you're talking

10  about this remote control module?

11  A.   This is an idea that we had for a remote that would both

12  serve as a remote control for controlling the camera as well as

13  receiving a live preview from the camera that would be shown up

14  on that 2-inch LCD display that would be a part of the remote.

15  Q.   Okay.  So in your 2008 patent, we looked at where you

16  talked about you could have the smartphone be what you

17  displayed; but in this section, you're talking about GoPro

18  developing its own remote with a display to do that?

19  A.   That's correct.

20  Q.   Okay.  And if we just go down a little bit below that, it

21  says [as read]:

22           "Remote control should include . . . ."

23      What features -- or what functions in the camera were you

24  contemplating the remote would control?

25  A.   All of the functions of the camera.  Here, I'm just

 1   listing a few of them.

 2            MR. HAYNES:  Okay.  Okay.  So just to take a step

 3   back, if we can go back to our timeline very quickly.  At this

 4   point in -- if we can add in the requirements specification we

 5   just looked at.  Okay.

 6   BY MR. HAYNES:

 7   Q.   So we saw your patent in 2008.  Now we're in January of

 8   2009.  At this point in time, was Contour -- or, sorry -- was

 9   GoPro actually building a camera that could do -- that would

10   receive commands remotely and be able to record a

11   high-resolution stream on the camera and transmit wirelessly a

12   low-resolution stream to a remote device for live preview?

13   A.   Yes.  That's what that document illustrates.

14   Q.   And this document, January 2009, anyone in Contour or

15   anything about Contour or any information from Contour used at

16   all at any part in this document?

17   A.   No.

18   Q.   Okay.  Okay.  So now, once you had the specification, did

19   you start working on that product?

20   A.   No.

21   Q.   All right.  Let's see what happened next.  If we can look

22   at DTX-3412.  This is an email -- well, what is this document?

23   A.   This is an email exchange between me and Mike Huang, who

24   was my point of contact at Sky Light who was our contract

25   manufacturer at this time.

1          **MR. HAYNES:**  I'm not sure if this has been admitted,

2     Your Honor, so I would offer DTX-3412.

3          **MR. KEVILLE:**  No objection.

4          **THE COURT:**  It's admitted.

5          (Trial Exhibit 3412 received in evidence.)

6     **BY MR. HAYNES:**

7     **Q.**   Okay.  Let's go to the first email in the chain, which

8     is -- I think actually starts at the bottom of page 1 and rolls

9     over to page 2.  And if you just look starting at the sentence

10    that begins, "As for resolutions," the top of page 2 there.

11         [As read]:

12              "As for resolutions to output, the camera should

13         be cable of outputting the same resolution to SD

14         card, TV out, RF out, et cetera."

15         Do you see that?

16    **A.**   I do.

17    **Q.**   What are you discussing generally in this email between

18    you and the folks at Sky Light?

19    **A.**   Just the various resolutions that we'd want the camera to

20    be able to output, including over RF, wirelessly.

21    **Q.**   Okay.  Let's go down to the bottom of this email.  There's

22    a paragraph that begins "However."

23         [As read]:

24              "However" --

25         Well, let's start with the sentence before that.  It says

1   [as read]:

2        "So for this reason, the camera must be able to

3      output through a rear port on all resolutions, likely

4      matching the mode being used on the camera."

5      Do you see that?

6   **A.**   I do.

7   **Q.**   [as read]:

8        "However, there should be the option for the

9      user to select "RECORD TO SD CARD RESOLUTION" and

10     "OUTPUT TO RF RESOLUTION" so that two different

11     resolutions can be used simultaneously.  This may be

12     the trick."

13     Do you see that?

14  **A.**   I do.

15  **Q.**   What are you describing there?

16  **A.**   I'm describing the idea that we make it possible for the

17  user to choose different resolutions, one to be recorded to the

18  SD card, a higher resolution, and a lower resolution for

19  transmitting wirelessly, but both of these things happening

20  simultaneously for the purpose of enabling live preview of what

21  the camera is seeing and recording.

22  **Q.**   Okay.  Now, this is a discussion with Sky Light.  Can you

23  remind us who they were?

24  **A.**   Sky Light was our contract manufacturer at the time.

25  **Q.**   Okay.  So here in this email on January 1st, 2009, you're

1  telling Sky Light, "Hey, what you're building for us needs to

2  have the ability to record at a higher resolution and send

3  wirelessly in a low resolution"?

4  A.   Absolutely.

5           MR. HAYNES:   Okay.  All right.  Let's go next to

6  DTX-3378.

7       And, for the record, I believe this document, same

8  document, was previously admitted as Trial Exhibit 426.

9  BY MR. HAYNES:

10 Q.   Okay.  So I think this is one of the emails you were asked

11 about on your direct, Mr. Woodman.

12 A.   Yes.

13 Q.   And what do you -- and this is an email chain that you're

14 copied on between you and John Ju at Ambarella; is that right?

15 A.   Yes.

16 Q.   Okay.  What are you describing here in this document as it

17 pertains to the development of wireless capabilities in the

18 HERO HD?

19 A.   Well, John Ju was the head of software development at

20 Ambarella, and I am expressing my enthusiasm for working with

21 them on their A2 -- on working on cameras that would feature

22 their A2 and, eventually, A5 processors.

23 Q.   Okay.  And, again, the date on this document,

24 January 21st, 2009; is that right?

25 A.   Yes.

WOODMAN - CROSS / HAYNES

1   Q.   Okay.  So in January -- by January 21st, 2009, any doubt

2   in your mind that you were aware that Ambarella had commercial

3   camera processors, including the A2 and the A5?

4   A.   No doubt whatsoever.

5   Q.   And were you aware, as of this time in January of 2009,

6   whether or not the A5 chip was capable of recording two streams

7   in parallel that had a high-resolution stream saved to the

8   SD card and a lower-resolution stream that could be output to

9   an external device such as a wireless device?

10  A.   No doubt.  I was informed.

11  Q.   Now, did you consider putting that Ambarella A5 chip into

12  the HERO HD?

13  A.   We did, but it was a brand-new chip and Sky Light, our

14  contract manufacturer, had more experience with the A2 chip.

15  So I made the conservative call to have them include the

16  A2 chip in the HD HERO to play it safe.

17  Q.   Okay.  Were you hoping to be able to implement the

18  real-time wireless preview functionality that you contemplated

19  back in 2008 using Ambarella's A2 chip?

20  A.   Yes.

21  Q.   And were you working with the A2 chip when you were doing

22  your product development work on the first HERO HD camera?

23  A.   Yes.

24  Q.   Okay.  All right.  I think you were asked on your direct.

25  Did you ever build a prototype of the HERO HD camera that

1    included the ability to wirelessly transmit video?

2    **A.**    Yes.

3         **MR. HAYNES:**  If we could bring up DTX-3475.

4    **BY MR. HAYNES:**

5    **Q.**    Is what's shown in DTX-3475 an accurate image of what the

6    prototypes that you built back in -- not you built -- that you

7    observed back in 2009?

8    **A.**    Yes.

9         **THE COURT:**  Mr. Keville?

10        **MR. KEVILLE:**  Yes.  I have an objection, Your Honor,

11    but I think we might be able to handle it.  I know he didn't

12    take these pictures.  There's no foundation.  But if we can put

13    in all the pictures of these prototypes, then I'm fine.

14        **MR. HAYNES:**  If it's -- as long as it's a picture of a

15    prototype, I'm fine.

16        **MR. KEVILLE:**  Understood.  Thank you.

17        **MR. HAYNES:**  Okay.

18        **THE COURT:**  All right.

19        **MR. HAYNES:**  So I would offer, Your Honor, DTX-3475.

20        **THE COURT:**  All right.  It's admitted.

21       (Trial Exhibit 3475 received in evidence.)

22    **BY MR. HAYNES:**

23    **Q.**    Okay.  So in this prototype picture, you've got the camera

24    shell, and it says "HERO" on it.  So what -- this was a

25    prototype for which HERO camera?

1  **A.**   The first HD HERO camera.

2  **Q.**   Okay.  And the one on the left looks like somebody

3  actually drilled through your outer shell there.  Do you know

4  why there's a hole there?

5  **A.**   That's where the -- below that is where the Nordic chipset

6  was.  You see the camera board on the left has a big white

7  rectangle.  That is missing the Nordic board.  And then the one

8  on the right, you see the -- that white rectangle is filled

9  with a computer board.  That's the Nordic chipset board.

10 **Q.**   Okay.  And can you remind us, when were -- when did you

11 observe these prototypes in operation in Mr. Donovan's lab?

12 **A.**   August 2009.

13 **Q.**   Now, when you were in his lab, did you observe these

14 prototypes being able to record at a high-resolution video

15 while transmitting a lower-quality video remotely?

16 **A.**   I did.

17 **Q.**   And was that done using the Nordic RF chip at the time?

18 **A.**   It was.

19 **Q.**   And what was the video like that was being transmitted

20 wirelessly in the prototype test that you saw?

21 **A.**   It was low frame rate, two frames a second, pretty jerky,

22 but it was suitable for what we were wanting it for.

23 **Q.**   Okay.  There was some discussion in your direct about

24 JPEG.  Were you sending JPEG video at that point, or was it

25 something else?

WOODMAN - CROSS / HAYNES

1  **A.**   I don't know.  But it was a series of frames,

2  two-frames-per-second video.

3  **Q.**   Okay.  If you're sending two frames per second, do you

4  consider that to be video?

5  **A.**   I do.  As you moved the camera around, it would update it

6  and show you the new framing of the camera.

7  **Q.**   Okay.  And in the prototype that you actually built, what

8  was the camera processor, the image processor contained in

9  that?

10  **A.**   The A2s.

11        **MR. HAYNES:**  Okay.  Let's go back to the timeline, and

12  let's put on there the prototype in August of 2009.

13        Okay.  So...

14  **BY MR. HAYNES:**

15  **Q.**   All right.  So did the HERO -- did you actually launch the

16  GoPro HERO HD camera?

17  **A.**   Yes.

18  **Q.**   Okay.  And when you actually launched the HERO HD camera,

19  did you keep that Nordic RF chip in it so that it would have

20  wirelessly capability?

21  **A.**   No.

22  **Q.**   Can you just explain to us what happened and why you

23  didn't include that functionality?

24  **A.**   Like towards the very end of development, Ambarella

25  changed something in the firmware and -- which is the software

 1   that runs the camera, and something stopped working.  And we

 2   didn't know what that was, and we didn't have time to figure it

 3   out.  So I made the decision to remove the Nordic chipset from

 4   the camera and launch without it, because I believed that

 5   HD HERO camera would be successful without it.

 6   **Q.**   Now, just looking at the timeline, you observed that

 7   prototype in August of 2009, and then you launched the GoPro

 8   HERO HD in November of 2009.  So how much space was in between

 9   that prototype and the launch?

10   **A.**   September, October.  Three months.

11   **Q.**   Three months.  Okay.  So over that three-month period, you

12   weren't comfortable that the wireless functionality was market

13   ready.  Is that fair?

14   **A.**   Yeah.  I mean, there was a period where we were confident.

15   We built, I think, 400 SMT boards, which is the green computer

16   board that's inside the camera, with the Nordic chipset.  We

17   were geared up, ready to go.

18       And then late in the game, there was that firmware change

19   by Ambarella that they stopped working the way that we needed

20   to.  So I just said, "Hey, let's go forward without it.  We can

21   be successful without it."

22   **Q.**   Okay.  Now, when you decided to pull that wireless

23   functionality out of the HERO HD, did you say, "You know what?

24   Wireless is dead to us.  It didn't -- it's not reliable.  We're

25   not going to do it anymore"?

1    **A.**    No.  We'd been working in parallel on the WiFi BacPac --

2    well, at that time it was a wireless -- right? -- because we

3    weren't totally locked yet on using WiFi but we thought that we

4    were going to use WiFi.  That development started as early as

5    March 2009.  And so we shifted our focus to development of that

6    after we pulled it from the HD HERO.

7    **Q.**    Okay.  So let's look at DTX-3127.  And can you tell us

8    what this is.

9    **A.**    Another email between myself and Mike Huang of Sky Light.

10   **Q.**    Okay.  And what's the date on this email exchange?

11   **A.**    September 16th, 2009.

12           **MR. HAYNES:**  Your Honor, we offer DTX-3127.

13           **MR. KEVILLE:**  No objection.

14           **THE COURT:**  It's admitted.

15       (Trial Exhibit 3127 received in evidence.)

16   **BY MR. HAYNES:**

17   **Q.**    I want to look down at the second email in this chain,

18   which is on the next page, and this one is dated 9/17/2009.  Do

19   you see that?

20   **A.**    I do.

21   **Q.**    Okay.  Let's look at the first sentence there -- well,

22   first of all, who are you communicating with here?

23   **A.**    I'm communicating with internal, Rudy and Paul Donovan,

24   who are contractors, and Terry, who is the CEO of Sky Light, in

25   addition to Mike Huang, who's my contact at Sky Light.

1    Q.    Okay.  So let's look at the first sentence here -- well,

2    first, the title says [as read]:

3                "RF canceled.  Hurry to MP, please."

4        What does that mean?

5    A.    That means I'm canceling the RF feature of the HD HERO.

6    Hurry to mass production, please.

7    Q.    Okay.  What camera are you trying to hurry out in mass

8    production at this point in September?

9    A.    The original HD HERO.

10    Q.    Okay.  And then the first sentence, it says [as read]:

11                "We have decided to cancel the RF board inside

12            of the camera.  It is too risky at this point and it

13            is more important to release the main camera on

14            time."

15        Do you see that?

16    A.    I do.

17    Q.    Is that describing what you've already explained to us,

18    that you pulled it out?

19    A.    Yes.

20    Q.    Okay.  And then the next sentence begins [as read]:

21                "GoPro will know" -- "will know focus" -- maybe

22            a typo.

23    A.    Now focus.

24    Q.    [As read]:

25                -- "will now focus on developing a WiFi HERO BUS

1          module with Ambarella, allowing for higher

2          performance wireless video streaming and remote

3          control of the YDHC5170 camera.  Our goal is that his

4          project is not a burden for Sky Light and that we can

5          together focus on our existing products and also the

6          camera that William and I were developing together.

7          This, too, we hope to have include the WiFi functions

8          that GoPro/Ambarella will be developing for the

9          YDHC5170."

10         Do you see that?

11    **A.**    I do.

12    **Q.**    Tell us what you're talking about.

13    **A.**    I'm saying that we're now going to primarily focus on the

14    development of the WiFi HERO bus module, which I'm describing

15    the WiFi BacPac.  The HERO bus was a port on the back of the

16    camera that the BacPacs would plug into.  Said, "Hey, we're

17    shifting all of our focus to this.  It'll have higher

18    performance."

19         **MR. HAYNES:**  Okay.  Your Honor, may I approach the

20    witness?

21         **THE COURT:**  You may.

22    **BY MR. HAYNES:**

23    **Q.**    What I've handed you is the original HERO HD and the WiFi

24    BacPac that we looked at before.

25    **A.**    Yes.

1   **Q.**   Do you see that?

2       Okay.  And can you just illustrate to the jury, when you

3   talk about that HERO bus, what are you talking about?

4   **A.**   The HERO bus -- "bus" is just a fancy name for a port.

5   That's the bus.  And then here's the male end, and it goes

6   together like that, and, boom, now you have a WiFi-enabled

7   camera.

8       It was pretty sweet back in the day.

9   **Q.**   I would hand this to the jury.  Unfortunately, it's kind

10  of sticky, and I don't want you guys to get your fingers.  But

11  if you do want to examine it, we can pass it around at the end

12  of when I'm done.  Sticky.

13      Okay.  Let's turn now to DTX-2384.

14      Do you recognize this document?

15  **A.**   I do.

16  **Q.**   And what is this document?

17  **A.**   This is a design document related to what would ultimately

18  become the WiFi BacPac.

19  **Q.**   Okay.  And what's the date on this document?

20  **A.**   March 24th, 2009.

21      **MR. HAYNES:**  I offer DTX-2384.

22      **MR. KEVILLE:**  Your Honor, I don't think a proper

23  foundation has been laid.  This document says Paul Donovan

24  Consulting on it.

25      **THE COURT:**  You have to lay a foundation.

1          **MR. HAYNES:**  Happy to lay a foundation, Your Honor.

2          **THE COURT:**  Go ahead.

3  BY MR. HAYNES:

4  **Q.**   Who's Paul Donovan Consulting?

5  **A.**   Paul Donovan is the contract engineer that we worked with

6  to help us develop some of our products, including the WiFi

7  BacPac.

8  **Q.**   Okay.  And as part of his work for you, did he prepare

9  documents that describe some of the projects that he was

10 working on?

11 **A.**   Yes.

12 **Q.**   Okay.  Is this one of those types of documents?

13 **A.**   Yes.

14 **Q.**   And is this a document that you would have seen back in

15 2009 as you were working with Mr. Donovan?

16 **A.**   Yes.

17         **MR. HAYNES:**  I'd offer 2384 again, Your Honor.

18         **MR. KEVILLE:**  No objection.

19         **THE COURT:**  It's admitted.

20     (Trial Exhibit 2384 received in evidence.)

21 BY MR. HAYNES:

22 **Q.**   Okay.  So now we're in March 24th, 2009.  Well, I guess

23 first, when it talks about long-range RF video expansion module

24 design analysis, when it says "expansion module," what's that

25 talking about?

1  **A.**   That's the expansion module that I originally mention in

2  my patent in July 2008 and that we eventually commercialized as

3  the WiFi BacPac in June of 2012.

4  **Q.**   Okay.  So let's look at page 3 of this document and look

5  at the introduction again.  And the first sentence says

6  [as read]:

7          "The long-range RF video transmitter expansion

8      module and wireless video receiver module will be

9      based on an implementation of the dual-band

10     802.11a/g/n WLAN protocol which combines the benefits

11     of the latest 802.11n technology with the enhanced

12     noise immunity characteristics and increased

13     bandwidth of the 5 gigahertz band."

14     Do you see that?

15 **A.**   I do.

16 **Q.**   What are you talking about here in March of 2009?

17 **A.**   This is just explaining that we intend to use WiFi for the

18 wireless protocol featured in the WiFi BacPac.  802.11a/g/n is

19 a technical name for WiFi.

20 **Q.**   Okay.  And then down below there in the first bullet, it

21 says [as read]:

22         "Transmitter and receiver modules will be

23     capable of bidirectional communications."

24     What are you talking about there?

25 **A.**   Bidirectional -- that means that the WiFi BacPac will be

1    able to both send and receive information, bidirectional.

2    **Q.**    And what information were you contemplating sending using

3    WiFi?

4    **A.**    Video.

5    **Q.**    And what information were you contemplating receiving at

6    the camera using WiFi?

7    **A.**    Command and control signals to remote control the camera

8    from another device.

9    **Q.**    Okay.  All right.  Let's now bring up DTX-2387.

10    Okay.  Do you recognize this document, Mr. Woodman?

11    **A.**    I do.

12    **Q.**    And what's the date on this?

13    **A.**    August 29th, 2009.

14    **Q.**    Okay.  And who's this communication between?

15    **A.**    Myself and internal GoPro employee and contractors.

16    **Q.**    Now, we fast-forward a little bit in time and we're now

17    looking at August 29th, 2009.  Do you see that?

18    **A.**    I do.

19    **Q.**    Okay.  And there's a number of bulleted items that are

20    being addressed here, but it starts with [as read]:

21    "To add to the idea documentation for WiFi

22    enabling the camera with a:"

23    Right?  Do you see that?

24    **A.**    I do.

25    **Q.**    Okay.  When it says "add to the idea documentation,"

1   what's this email suggesting?

2   **A.**   That we're adding ideas to documentation of the WiFi

3   BacPac that we've been developing.   This is just like a --

4   we're continuing to grow the idea.

5           **MR. HAYNES:**   Okay.   Your Honor, I would offer

6   DTX-2387.

7           **MR. KEVILLE:**   No objection.

8           **THE COURT:**   It's admitted.

9       (Trial Exhibit 2387 received in evidence.)

10  **BY MR. HAYNES:**

11  **Q.**   Okay.   Now, you were asked about this document on direct,

12  and they focused you on some portions --

13          **MR. HAYNES:**   If you go, scroll down just a little bit.

14  **BY MR. HAYNES:**

15  **Q.**   -- of -- I believe it was in this section where it was

16  talking about sending -- saving to the camera and there was

17  some issues there.

18      But you weren't asked about this section where it talks

19  about "Remote control, with preview/real-time video feed."   Do

20  you see that?

21  **A.**   I do.

22  **Q.**   What is that referencing?

23  **A.**   Well, this email, I'm talking about the ability to use an

24  iPhone running an app to enable these kind of features; and

25  one of the features I'm talking about the app being able to

**WOODMAN - CROSS / HAYNES**

1  function as is as a remote control of the GoPro camera with

2  preview real-time video as one of the features.

3  **Q.**   Okay.  Not a lot of description of those features in this

4  email.  Do you see that?

5  **A.**   Mm-hmm.

6  **Q.**   Have those features been described anywhere else before

7  this?

8  **A.**   Yes.

9  **Q.**   For example, were those features discussed in that

10  document we looked at back in March?

11  **A.**   Yes.  This was already a well-understood concept at GoPro.

12  **Q.**   Okay.  Now, this is 2009.  And if we could just go back to

13  our timeline for a second.

14      Okay.  You were asked some questions on direct about how

15  come there's no documents here in the 2010 time frame.  Do you

16  recall that?

17  **A.**   I do.

18  **Q.**   Did you just completely stop working in 2010 on the WiFi

19  BacPac?

20  **A.**   No.

21  **Q.**   What were you doing?

22  **A.**   We were researching all of the new and available wireless

23  protocols that were coming on the market that we could maybe

24  use.  You probably remember 3G was kind of a big deal.  That

25  had just popped up.  Zigbee was another wireless protocol that

1  became available.

2       And it's easy to think, oh, in today's world, WiFi is

3  everything.  Why weren't you just only focused on that?  But

4  this was, you know, back in 2010, when a lot of these protocols

5  were new, and we wanted to make sure that we were picking the

6  right one for the wireless BacPac.

7  **Q.**  Okay.  So at this point in time, you know, you just pulled

8  that RF Nordic chip out of the HERO HD.  Were you taking any

9  steps to bulk up the engineering capabilities of the company?

10 **A.**  Yes.  The fact that at the very last moment we had that

11 problem with Ambarella changing the firmware and the Nordic

12 chip not working as well as we wanted to and us not

13 understanding what was happening, that was a big warning sign

14 to me that, hey, we've got to really improve our engineering

15 capabilities.

16      And so we started to hire engineers internally to help us

17 develop our products and not only rely on a handful of

18 contractors and Sky Light.

19      So in addition to dealing with the growth of the company

20 and developing multiple products in parallel, we were also

21 hiring people.

22 **Q.**  Okay.  You were shown a bunch of documents that reflected

23 Mr. Donovan's personal consulting work and what he was working

24 on through this time period.  Do you recall those?

25 **A.**  I do.

1  Q.    Was Mr. Donovan the main person at this point in time with

2  regard to the development work on the WiFi BacPac?

3  A.    I believe that we also had Zahid, who's mentioned, who was

4  researching the various protocols and telling us what he

5  thought would work well.  And as you could see, we were waiting

6  for his feedback.  And we also had other people working as

7  well.

8  Q.    What about Rudy Samuels?  Was he involved at all?

9  A.    Yeah.  Rudy was involved as -- he was my right-hand man.

10 He was involved in everything.

11 Q.    So during this time, 2010, you said you were evaluating a

12 bunch of products.

13      At any point in that period did you look up and say,

14 "You know what?  We should just scrap wireless altogether and

15 forget sending a wireless live preview"?

16 A.    No, absolutely not.

17 Q.    And the work that you were doing in 2010 where you were

18 evaluating different wireless technologies, what was your

19 ultimate goal of all that work?

20 A.    To make the best decision to produce the best product

21 possible.

22 Q.    All right.  Let's now go forward a little bit in time and

23 look at DTX-2378.

24      Do you recognize this document?

25 A.    I do.

1   Q.   And what do you recognize it to be?

2   A.   This is a product requirement document for what would

3   eventually become the WiFi BacPac.

4   Q.   Okay.  So we looked at a different specification document

5   from very early on for the WiFi BacPac.  What's the difference

6   between that one and this one?

7   A.   This is Revision 1.7.

8   Q.   And if we could, let's go to the --

9           MR. HAYNES:  Well, I would offer DTX-2378, Your Honor.

10          MR. KEVILLE:  No objection.

11          THE COURT:  It's admitted.

12      (Trial Exhibit 2378 received in evidence.)

13  BY MR. HAYNES:

14  Q.   Let's look at the last -- let's look at the last page.

15          MR. HAYNES:  And if anybody else wants to stand up, I

16  know people are getting tired.

17  BY MR. HAYNES:

18  Q.   If you look at the very last page here, does this show the

19  revision history of this document?

20  A.   It does.

21  Q.   Okay.  So in May -- sorry -- April 20th, 2011, what

22  version were you on then?

23  A.   May, we were on 1.7.  Sorry.

24  Q.   Maybe --

25  A.   April, May, yeah, 1.7.

WOODMAN - CROSS / HAYNES

1   **Q.**   April 1.4, May 1.6, and then --

2   **A.**   You got it.

3   **Q.**   -- also May 1.7; is that right?

4   **A.**   Two Mays.

5   **Q.**   Okay.  So at this point in time, we're in April/May time

6   frame of 2011, and now you've got a wireless BacPac product

7   requirement document; is that right?

8   **A.**   Yeah.  This is just showing back-and-forth with us moving

9   the idea forward.

10  **Q.**   All right.  Let's go back to our timeline and see if we

11  can put some of these -- well, before I get to that.

12      Throughout this entire process, were you continuously

13  working on the development of a WiFi BacPac that could remotely

14  control -- receive remote commands to control the camera and

15  transmit wireless video?

16  **A.**   Absolutely.

17  **Q.**   Right.  So let's add in some of the WiFi BacPac

18  specification docs.  Did I get those placed right here?

19  **A.**   Yes.

20  **Q.**   Now, Mr. Woodman, I've put just a handful of documents on

21  this timeline.  And Contour's counsel showed you some emails; I

22  showed you some emails.  Did we get them all?

23  **A.**   Not even close.

24  **Q.**   Okay.  So, again, how many documents exist that are

25  showing the work of all the different projects you were doing

1  in this window of time?

2  **A.**   Hundreds.

3  **Q.**   How would you describe the growth and activity at GoPro

4  through this time window of 2008 to 2012?

5  **A.**   Explosive.

6  **Q.**   A little crazy back then?

7  **A.**   Super crazy.

8  **Q.**   We didn't talk about the timestamps.  But if you look at

9  some of the timestamps on the email, I think some of them show

10 you were working, sending them at 2:00 and 3:00 in the morning?

11 **A.**   Yeah.  And, you know, I think it's important to note that

12 we were a small business.  In 2009, 12 people.  In 2010, 35

13 people.  In 2011, I'm thinking about -- by the end of the

14 year -- let's see.  2010, yeah, 35.  And then a hundred people

15 in 2011.

16      So even though from the outside it seems like -- and we

17 were marketing like crazy.  Behind the scenes, we were a pretty

18 small company.

19 **Q.**   Okay.  All right.  Let's go back to the product.  So you

20 launched the WiFi BacPac in June of 2012, and you released the

21 HERO2 camera with the A5s in October 2011.  You see that?

22 **A.**   I do.

23 **Q.**   Okay.  And remind us.  Why was it that GoPro moved from

24 the A2 processor that had been used in the HERO HD to the A5s

25 processor that was in the HERO2?

1    **A.**    Well, it had overall more performance.  You could have a

2    higher resolution at wider field of views.  It allowed higher

3    frame rates.  And it also was designed specifically to enable

4    dual-stream video for the purpose of recording high resolution

5    or high quality to the SD card while providing a second stream

6    for live preview.

7    **Q.**    Okay.  So in connection of the development of the

8    WiFi BacPac, were you also developing in parallel the HERO2

9    camera that was going to interact with that BacPac?

10   **A.**    Yes.

11   **Q.**    All right.  Taking a step back, we've now walked through

12   the timeline.

13         As you sit here today, Mr. Woodman, and based on the

14   documents we just looked at, any doubt in your mind that you

15   had come up with the idea of using WiFi to transmit a

16   lower-resolution video for a live preview while simultaneously

17   recording a higher-resolution video onto the camera's SD card?

18   **A.**    Zero doubt in my mind whatsoever.

19   **Q.**    Now, we've got a lot of dates on this, but one of the

20   dates that was on the timeline that Contour showed you was

21   their alleged conception date, the date that they believed that

22   they had these ideas in their mind.

23         Do you recall he asked you about that date and you weren't

24   sure when it was?

25   **A.**    Yes.  I don't know.

1  Q.   Okay.  Well, let me just ask you to assume -- or just take

2  this date, December of 2009.

3       So before December of 2009, had you come -- did you have

4  all of the ideas that we've talked about firmly in your mind

5  and described in documents that would allow remote control of

6  the camera features, wireless live preview while recording a

7  higher-resolution stream, and transmission of that

8  lower-resolution stream wirelessly to a remote device that

9  could live preview it while recording?

10 A.   Without a doubt.

11 Q.   Now, there's some suggestion that you may have had the

12 ideas, but why did it take so long to build the camera.  Can

13 you just explain to us why it takes time to build cameras?

14 A.   Well, actually, when I look at this, I'm impressed that we

15 were able to develop and launch so many products in that time

16 frame with such a small team as the business was growing.  And,

17 honestly, even by today's standards, GoPro's 650 employees,

18 this is faster development than we're capable of today.  So I

19 do not see this as a long development timeline.  I think it's

20 actually pretty awesome.

21 Q.   Okay.  Now, walk through sort of what you did and what

22 actually happened.  You were shown some emails with some

23 inflammatory words like "squash" and "covert."  So I want to

24 walk through a few of those and give you a chance to just

25 explain what you were talking about at the time.  Okay?

WOODMAN - CROSS / HAYNES

1    **A.**    Yes.

2    **Q.**    All right.  Let's go first to TX-367.  And when this was

3    first shown to you, I believe you were -- they highlighted just

4    the sentence there that says [as read]:

5              "We need to muscle out VholdR and get a test

6         going with EMS, the opp is there as you can see."

7         So that's what they focused on.  I want you to take a

8    second and look at the email and then explain to the jury what

9    you're actually talking about here.

10   **A.**    Eastern Mountain Sports, EMS, is a -- I don't even know if

11   they're still in business, but they're a small region- -- they

12   were a regional outdoor retailer in the northeast.  And this

13   also shows you how small both GoPro and VholdR were at the

14   time, that EMS is, like, this super-important retailer for us.

15        And I'm describing how we have to demonstrate to the buyer

16   at EMS how our products are better, we believe them to be, and

17   we needed to win that account.  That's a small retailer that's

18   only going to carry one of us.

19   **Q.**    Okay.  So let's look right below what they showed you

20   where it says [as read]:

21              "PS - the list of advantages the HD HERO has is

22         exhaustive."

23        What are you talking about there?

24   **A.**    I'm explaining that we believe our product to be way

25   better than Contour's.

1  Q.   Okay.  So when you're talking about muscling them out, is

2  that something nefarious, or are you just trying to compete

3  with them and prove your products are better?

4  A.   That is the definition of competition.

5  Q.   Okay.  All right.  Let's go to TX-303.  This is another

6  email you were talked to about, and lots of questions about

7  this -- about some of the words that are in here.

8       MR. HAYNES:  If we could look further down in the

9  chain to the email that's dated July 6, 2009.  So looking for

10 the email in the chain July 6, 2009, 5:22 p.m.

11      Okay.  That's it.

12 BY MR. HAYNES:

13 Q.   All right.  You were actually shown this sentence down

14 here at the bottom where it says [as read]:

15       "I want to squash VholdR, and if that means

16       letting the cat out of the bag a bit early, so be

17       it."

18      All right.  You recall lots of questions and lots of

19 inferences about that statement?

20 A.   Yes.

21 Q.   Okay.  Take a second --

22      THE COURTROOM DEPUTY:  Mr. Haynes, is this admitted?

23      MR. HAYNES:  It's already in.

24      THE COURT:  It's in.

25      (Trial Exhibit 303 received in evidence.)

1  BY MR. HAYNES:

2  **Q.**   Mr. Woodman, can you just explain to the jury the context

3  of that statement?

4  **A.**   Yes.  This is another example of us -- me being

5  competitive and wanting to win against our competitors.  And

6  what I'm saying here is if that means letting the cat out of

7  the bag a bit early, that means -- if that means debuting the

8  HD HERO and all that it can do early to show everybody at

9  Tucker Rocky how much better or product is, then let's do it,

10  because we didn't want to let our competitor impress Tucker

11  Rocky and build up a momentum with them.  Knowing what we were

12  going to come out with, we'd let Tucker Rocky know about the HD

13  HERO early so they would choose us, not Contour.

14  **Q.**   Okay.  Tucker Rocky, I don't think we've heard a whole lot

15  about them.  Who was that and why were you interested in making

16  sure that --

17  **A.**   Yeah.

18  **Q.**   -- they were aware of your product before they got too

19  locked into VholdR?

20  **A.**   They were a national distributor to motorcycle shops.

21  **Q.**   And, again, if you don't go in and get that account and

22  Contour does, is that good for your business?

23  **A.**   No.  We wanted to win that account, just like we wanted to

24  win the Eastern Mountain Sports, because Tucker Rocky would

25  only pick one.

1   Q.   Okay.  And the idea you had here in this email for how to

2   make sure you won that account was to let the cat out of the

3   bag.  What was the cat?

4   A.   The cat was the HD HERO.  And this is July, and we didn't

5   formally let anybody know about the HD HERO until we launched

6   it in November.  So this would have been giving -- letting the

7   cat out of the bag would have been giving Tucker Rocky an

8   advanced preview of what the HD HERO camera was going to be so

9   that they would choose us, not our competition, based on the

10  merits of our products versus theirs.

11       MR. HAYNES:  Okay.  Let's look at another one,

12  DTX-2833, and I believe this has already been admitted as well.

13  Show it to you.

14       If we could go down to the email in this chain that's

15  January 5th, 2011, 9:39.  Top of the email starts, "Do we have

16  any."

17  BY MR. HAYNES:

18  Q.   Okay.  Do you remember being shown this email and asked

19  some questions by Contour's counsel?

20  A.   I do.

21  Q.   Okay.  And there was a lot of talk about that first

22  sentence there that says [as read]:

23       "Do we have any of these units that we can take

24       apart?"

25       Do you see that?

1    **A.**   I do.

2    **Q.**   Okay.  Can you, again, read the email and just explain to

3    the jury the context of this email and what's really going on?

4    **A.**   Yeah.  So I was asking -- Contour had just launched their

5    product that had wireless preview capability, and I'm

6    acknowledging, ah, we knew that their camera was going to be

7    based on a 5.  We should have been smarter and tapped into the

8    fact.  We should have known that they'd be launching a

9    dual-stream live preview feature.  Guys, can you get a couple

10   of these, take them apart, and determine how they're doing it.

11        We were pretty sure they were using Bluetooth, and that,

12   we saw as a shortcoming for them.  And that -- because their

13   range was going to be short.  Their frame rate, image, and so

14   forth, was going to be compromised because Bluetooth's

15   bandwidth was way smaller than WiFi, which we were working on.

16        And then I say [as read]:

17        "We can leapfrog them with WiFi that'll have

18        improved range, data rate, frame rate," and so on,

19        "thanks to being WiFi and not Bluetooth."

20        So I'm actually, I remember, relieved at this point, like:

21   Sweet, what we're working on is better; but let's still go

22   check out their products, see what they're doing, because we

23   were both surprised, one, that they chose Bluetooth because of

24   its data rate constraints; and, two, that it was even working

25   well enough.  So we just wanted to check it out for ourselves.

1  Q.  Okay.  So when you told them, "Hey, go buy this product,"

2  were you looking to copy their slow frame rate, compromised

3  image, or -- is that something you were trying to do there?

4  A.  No.  I'm clearly stoked that they're basing their solution

5  on Bluetooth and we'd been working on WiFi all this time.

6  Q.  Okay.  Now, a lot of emphasis has been placed on this word

7  at the bottom here where it says "covertly getting."  Okay.

8  Why did you say you were going to get it covertly?

9  A.  We were still pretty small companies, and anytime one of

10  us would buy products from each other's website, you'd see the

11  other person's email address.  And you didn't want to give the

12  other company the benefit -- the satisfaction of knowing that

13  you were buying and checking their products out.  Right?  You

14  were just, like, dude, we don't want them to know that we're

15  even acknowledging them.  That's what "covertly" means.

16      We would see other companies buy our products all the time

17  and be like, "Hey, so-and-so is checking us out."

18  Q.  Okay.  So just to be clear, when you asked somebody to buy

19  those products, was it to try to copy them in any way, shape,

20  or form?

21  A.  No.  I didn't want to copy them because they were -- well,

22  one, I wouldn't copy people; and, number two, I thought that

23  the path they were taking with Bluetooth was flawed.

24  Q.  All right.  Let's look at TX-259.  It's another related

25  document that we looked at.  And you were shown the language

1  down there at the bottom where it says [as read]:

2        "Secret shopper competitive product."

3     Do you see that?

4  **A.**   Yes.

5  **Q.**   Again, some colorful language, secret shopper.  Again, you

6  were focused on the bottom here; but if you look up, there's

7  some other products that you're buying as well.  You see that?

8  **A.**   Yes.

9  **Q.**   Okay.  So you're buying some -- a Fisheye lens for Kodak.

10 You're looking at flash drives and USB keys.

11 **A.**   The Kodak Playsport was another competitive product.

12 **Q.**   So why are you buying all these competitor products?  What

13 are you trying to do?

14 **A.**   We're trying to assess the competition and see how

15 competitive we are with them.  We still do this today.

16 **Q.**   Just to be clear, is it important -- do you think it's --

17 to succeed in business, that you need to be aware of what your

18 competitors are doing in the marketplace?

19 **A.**   It would be irresponsible not to.

20 **Q.**   Okay.  Next thing I want to cover, you were asked some

21 questions about your sale of stock, and there was some

22 suggestion made that that sale or those sales of stock had

23 something to do with Contour or Contour's patents.  Do you

24 recall those questions generally?

25 **A.**   I do.

**WOODMAN - CROSS / HAYNES**

1  **Q.**   Okay.  To be very clear, did your sale of stock or the

2  timing of the sale of your stock have anything to do with

3  Contour, Contour's products, or Contour's patents?

4  **A.**   No.  And I thought they were out of business at that

5  point.  Well, they were.

6  **Q.**   Okay.  Now, with regard to the timing of when you sold

7  your stock, was that your decision?

8  **A.**   No.

9  **Q.**   Whose decision was it?

10  **A.**   The bankers'.

11  **Q.**   Why are the bankers deciding when you can sell stock?

12  **A.**   Because the IPO process and any subsequent sales during a

13  certain period of time is highly regulated, and that process

14  and all the decisions around it are managed by lawyers and

15  bankers because of the regulations.

16  **Q.**   Okay.  So in terms of the precise dates on which the stock

17  was sold, did you choose those dates or did the bankers choose

18  those dates?

19  **A.**   The bankers chose those dates.

20  **Q.**   Okay.  And I think you mentioned that a lot of the bigger

21  sales were part of a secondary offering.  Can you just explain

22  to us what a secondary offering is in this context?

23  **A.**   It's what it sounds like.  It's the second offering that's

24  associated with an IPO, the IPO being the initial public

25  offering.  The secondary offering is the second sale of shares

 1   that sometimes happens in which a lot of employees and

 2   investors can participate.  And I was one of the employees that

 3   participated.  There were more than 80 of us.

 4        **MR. HAYNES:**  Your Honor, I think I failed to offer the

 5   physical HERO camera.  I would offer that as DTX-3473.

 6        **MR. KEVILLE:**  No objection.

 7        **THE COURT:**  All right.  What are we going to call it?

 8        **MR. HAYNES:**  DTX-3473.  It was already pre-labeled as

 9   a physical exhibit.

10        **THE COURT:**  What a lovely name for an exhibit.

11   All right.

12        (Trial Exhibit 3473 received in evidence.)

13        **MR. HAYNES:**  It's the HERO HD, Your Honor.

14        I think I'm done.  Give me one second to confer with my

15   colleague.

16        I have no further questions, Your Honor.  I'll pass the

17   witness.

18        **THE COURT:**  Okay.

19        Mr. Keville, anything else?

20        **MR. KEVILLE:**  Yes, Your Honor.

21                        <u>**REDIRECT EXAMINATION**</u>

22   BY MR. KEVILLE:

23   **Q.**  Mr. Woodman, let's pick up where you ended, the stock

24   sales.

25        The bankers chose the date of the stock sale at the

1    request of Jack Lazar, your CFO; correct?

2    **A.**    I don't know.

3    **Q.**    And is it your testimony -- well, let me ask this:  You

4    didn't sell anything close to those amounts, 300 million,

5    60 million, ever again; correct?

6    **A.**    I don't know.  I've had stock sales, but not many.

7    **Q.**    I've looked at your stock sales years later.  They were

8    2 million, 6 million.  Does that sound right?

9    **A.**    Yeah.  The stock was not as high as it was then, and I'm a

10    big believer in the future of the company so I'm holding out.

11    **Q.**    It's a complete coincidence that all these big stock

12    sales -- is that your testimony? -- happened right at the time

13    Contour's applications published and Contour came to you?

14    **A.**    I think if you look at the stock price, it shot to the

15    moon, and I took advantage of that along with many other GoPro

16    employees and investors.  That timing was very strategic, and

17    I'm super lucky that I got to do it.

18    **Q.**    The stock price was still at the moon in December 22nd and

19    after in 2014 when you were free of the lockup and you didn't

20    have to have special permission; correct?

21    **A.**    That would not have looked good to have the CEO of the

22    company selling stock outside of a larger group sale because it

23    would show a lack of confidence.  So I took advantage of the

24    IPO and the secondary, because I was selling alongside so many

25    other employees and investors, that it would not look bad for

1  the CEO to be selling.  If I were to sell later, that makes

2  people think I'm worried about the company.

3  **Q.**  And when you sold all these shares in this time period,

4  you didn't tell any of the shareholders about these Contour

5  patents; correct?

6  **A.**  I didn't even know about the Contour patents.

7  **Q.**  Even though you were supposed to have a meeting with

8  Contour at the end of this period?

9  **A.**  I'm not sure I was supposed to have a meeting with

10  Contour.  I was not aware of it.

11  **Q.**  Okay.  All right.  Can we put back up 3412 that you looked

12  at.  And you were looking at this document, but we didn't look

13  at what with Ambarella told you -- or Sky Light.  Mike Huang of

14  Sky Light said [as read]:

15      "Dear Nick."

16    **MR. KEVILLE:**  Can you highlight the top.

17  **BY MR. KEVILLE:**

18  **Q.**  [As read]:

19      "Yes, the cameras can be capable of outputting

20     resolution to SD card, TV out, RF output, but they

21     cannot make the output with different resolutions

22     separately."

23    So despite the questions you were asked about, oh, you

24  always thought about it, here you're being told that you can't

25  do it; correct?

WOODMAN - REDIRECT / KEVILLE

1   **A.**   And I'd also been told by John Ju of Ambarella that we

2   could.

3   **Q.**   Okay.

4   **A.**   It was a lot of unknowns at this time.

5   **Q.**   Right.  It was a difficult and not obvious process to make

6   this work; correct?

7   **A.**   I wouldn't describe it that way.

8   **Q.**   Okay.  Let's look at your patent, which is 2351.

9          **MR. KEVILLE:**  And if you would, Allen, go to the

10  Claims.  All right.  Claims 9 -- Claim 9 particularly, blow

11  that up.  Yeah.

12  **BY MR. KEVILLE:**

13  **Q.**   So what your patent claimed was these expansion modules;

14  correct?  And you showed us some of those, the WiFi BacPacs.

15  **A.**   Yes.

16  **Q.**   Okay.  And here, you have a removable display screen that

17  comprises a wireless module; correct?

18  **A.**   Yes.

19  **Q.**   You never made a removable display screen that comprises a

20  wireless module; correct?

21  **A.**   No.

22  **Q.**   You made a WiFi BacPac; correct?  And you showed us that?

23  Yes?

24  **A.**   Yes.

25  **Q.**   Okay.  And the WiFi BacPac was sold to be used with the

**WOODMAN - REDIRECT / KEVILLE**

1  HERO2; correct?

2  **A.**   And the HERO.

3  **Q.**   Yes.  And then you put out the HERO3; correct?

4  **A.**   Yes.

5  **Q.**   And you got rid of the WiFi BacPac?

6  **A.**   We kept selling it to support the original HD HERO and the

7  HD HERO2.

8  **Q.**   So after the HERO3 came out, GoPro didn't use its own

9  invention or this patent; correct?

10  **A.**   We did.  We kept selling that product for the HERO and the

11  HERO2.

12  **Q.**   Right.  But all future products didn't use what this

13  patent is talking about, these expansion modules; correct?

14  **A.**   No.  They did.  We made an LCD BacPac for the HERO3 and

15  the HERO4, because those cameras didn't all have rear displays.

16  We also kept selling the battery BacPac for HERO3 and HERO4 as

17  well.

18  **Q.**   Okay.  Ultimately, you never used what's in your patent, a

19  wireless display screen that has WiFi in it; correct?

20  **A.**   That one particular description, no, we did not make that

21  product.

22  **Q.**   That's the only wireless thing you claimed in your patent;

23  correct?

24  **A.**   I don't believe so.

25  **Q.**   Okay.  Let's shift a little bit.  You talked about the

1   prototype.  We saw no 2009 documents that said the prototype

2   worked; correct?

3   **A.**   I don't know if you've seen documents that said it worked.

4   I said it worked.

5   **Q.**   I heard you said it worked.  I'm saying we saw no

6   documents here in trial; correct?

7   **A.**   We saw pictures of it, but I'm not aware of what other

8   documents you've seen or haven't seen that described it working

9   or not.

10  **Q.**   And we saw no documents, when you talked with your

11  counsel, from 2009 that said Ambarella firmware change caused

12  the function to stop working; correct?

13  **A.**   I believe I have seen emails that talked about that.

14  **Q.**   In your testimony today?

15  **A.**   It might have been in the emails that we didn't read over,

16  but I can't say.

17  **Q.**   Okay.  Today you said the prototypes were August 2009.

18         **MR. KEVILLE:**  Can we put up the picture of the

19  prototypes.  What exhibit is that?  There we go.

20  **BY MR. KEVILLE:**

21  **Q.**   You said these were the prototypes from August 2009;

22  correct?

23  **A.**   Yes.

24  **Q.**   And that you observed them working in 2009; correct?

25  **A.**   Yes.

1          **MR. KEVILLE:**  Okay.  I'm handing the witness, and for

2   the Court, what I'm marking for identification as Exhibits 1294

3   and 1295.

4   **BY MR. KEVILLE:**

5   **Q.**   You produced these prototypes for inspection in this case.

6   These are pictures taken by one of my associates.  If you look

7   at the first one, the one that has the white place where the

8   other board would sit on top.

9   **A.**   Yes.

10  **Q.**   That's in your picture you previously sent?

11  **A.**   Yes.

12  **Q.**   Can you tell us the date on the top of the board?

13  **A.**   November...

14          **MR. KEVILLE:**  Can I have the Elmo, please.

15          **THE COURTROOM DEPUTY:**  Sure.

16          **THE WITNESS:**  November 16th, 2010.

17  **BY MR. KEVILLE:**

18  **Q.**   How is it possible, Mr. Woodman, that you saw this

19  prototype and this was made in 2009 and you saw it working when

20  the date on the circuit board is November 16th, 2010?

21  **A.**   I don't know.  This might be one of the 400 -- remember I

22  mentioned we made 400 boards for production that we ended up

23  not using because we pulled the feature?  It's possible that

24  this is one of those.

25  **Q.**   Sir, you produced the prototypes that were in the picture

1    your counsel showed.  You testified those were 2009 prototypes.

2    You gave those same two for us to inspect.  And when we pulled

3    back the foam seal, we saw the board was not made until

4    November 2010.

5         So your testimony was not accurate, was it?  The

6    prototypes you gave us that you said were 2009 didn't exist at

7    that time.

8    A.   I know that we had prototypes then.  What's in the photo,

9    I'd have to see those and evaluate that.  But I'm...

10   Q.   You have no explanation why you gave us a photo and

11   produced the two items in the photo for inspection?  You told

12   us they were 2009.  And when we peeled back the foam, we saw it

13   didn't exist in 2009.  You have no explanation for that?

14   A.   I have no explanation for that.

15   Q.   Do you have an explanation for why the other one, 1295,

16   when we tried to peel back the foam, your attorneys said, "No,

17   you're not allowed to look at what's under there"?

18        Do you have an explanation for that?

19   A.   I have no explanation for that.

20            MR. KEVILLE:  Pass the witness.  No further questions.

21                    RECROSS-EXAMINATION

22   BY MR. HAYNES:

23   Q.   Mr. Woodman, just come back to the prototypes.  How many

24   of these boards were built?

25   A.   Including the prototypes, over 400.

1  **Q.**  How many of -- Mr. Nipper and his lab, did he just have

2  two of these, or were there a bunch of them that were being

3  worked on over time?

4  **A.**  Several.

5  **Q.**  Okay.  And did you have an opportunity to talk to

6  Mr. Nipper about the prototypes in his lab?

7  **A.**  No.  Oh, yes.  He demonstrated them for me.  Sorry.

8  **Q.**  And in the context of -- well, let me just ask you very

9  clearly.  Regardless of what -- whether it was the board in

10  that picture or another board that looks just like it, did you

11  witness it transmitting video?

12  **A.**  I did.

13  **Q.**  Okay.  And just to be clear, putting that board aside,

14  let's just pretend that never existed.  Did you build in the

15  WiFi BacPac a wireless WiFi transceiver that would transmit

16  low-resolution video, receive control commands from the camera,

17  and record high-resolution video in parallel with a

18  low-resolution video?

19  **A.**  Yes, we did.

20  **Q.**  And this prototype, that had an A2 chip; is that right?

21  **A.**  Yes.

22  **Q.**  And in what actually had the recording in parallel in the

23  product that you actually built and sold commercially, what was

24  the chip in that?

25  **A.**  A5s.

1    Q.    Okay.  So -- all right.  Let me shift gears now.

2          So with respect to the stock sale -- actually, sorry.

3          With respect to the meeting with Contour, there's been

4    several statements by counsel in his questions that you

5    personally were supposed to meet with Contour at some point in

6    time.  Do you recall those questions?

7    A.    I do.

8    Q.    Okay.  Do you recall at any point having a meeting

9    scheduled with Contour in the 2014 and 2015 time period?

10   A.    No.

11   Q.    And in the 2014-2015 time period, from your personal

12   knowledge, what was the status of Contour?

13   A.    I thought they were still out of business after going

14   bankrupt in 2013.

15   Q.    Okay.  Now, is it possible that somebody else at GoPro,

16   sort of like a salesperson or something, may have agreed to

17   talk to somebody at Contour?

18   A.    Yes.

19   Q.    Okay.  Would you necessarily know about that if it had

20   happened?

21   A.    No.

22   Q.    Okay.

23   A.    By that time, we were 6- or 800 employees, I imagine.

24          MR. HAYNES:  One second.

25                    (Pause in proceedings.)

1          **MR. HAYNES:**  If we can look at DTX-426.  And I believe

2     this has already been admitted.

3          It has.  We can show it to the jury as well.

4     **BY MR. HAYNES:**

5     **Q.**   Mr. Woodman, if you look down -- you mentioned in your

6     questioning just a second ago from Mr. Keville that there might

7     have been an email involving John Ju where he told you it could

8     output at two different resolutions.  Do you remember that?

9     **A.**   Yes.  And John was head of Ambarella's software

10    department.

11    **Q.**   Okay.  Is this the email that you were trying to

12    recollect?

13    **A.**   Yes.  It says it right there.

14    **Q.**   All right.  Let's go down to the part in blue in the email

15    at the bottom.  Look at the question that you asked.

16         [As read]:

17              "Can the A2 save HD video to the SD card and

18         also output HD to a TV or RF transmitter (or any

19         other video out device)?  Or does it not have the

20         power to do that" -- or, sorry -- "to save HD to SD

21         card and line-out video in HD resolution at the same

22         time?  Only line-out resolution in lower resolution?"

23         So those are -- and then it says [as read]:

24              "If so, what is max line-out resolution possible

25         when saving HD to SD card?"

1      That's the question you asked; right?

2  **A.**   Yes.

3  **Q.**   What is Mr. Ju's answer, if we can go to the top of the

4  email.

5  **A.**   [As read]:

6          "A2 can output up to standard definition

7      resolution during HD encoding."

8      So he's confirming that A2 can both save to the --

9  encoding saving to the SD card HD resolution and output up to

10 standard definition as a second stream simultaneously.  So he's

11 confirming it can do that.

12          **MR. HAYNES:**   Okay.  No further questions, Your Honor.

13          **THE COURT:**   All right.

14          **MR. KEVILLE:**   Your Honor, our next witness will be by

15 video.  Do you want to take a break?

16          **THE COURT:**   Okay.  Hang on just a second.

17      Mr. Woodman, you're excused.  Thank you.

18          **THE WITNESS:**   Thank you.

19                         (Witness excused.)

20          **MR. KEVILLE:**   Or we can play a video, whichever

21 Your Honor prefers.

22          **THE COURT:**   And how long is the video?

23          **MR. KEVILLE:**   15 minutes.

24          **THE COURT:**   Okay.  Why don't we take our break now for

25 15 minutes, and we'll be back at about 11:50.

**PROCEEDINGS**

 1        (Proceedings were heard out of the presence of the jury.)

 2              **THE COURT:**  All right.  We'll be in recess.

 3              **MR. HAYNES:**  Can I ask one question?  Is he released

 4    now, Mr. Woodman?

 5              **THE COURT:**  Yes.

 6              **MR. HAYNES:**  Okay.  I just want to be sure.

 7                    (Recess taken at 11:36 a.m.)

 8              (Proceedings resumed at 11:52 a.m.)

 9        (Proceedings were heard out of the presence of the jury.)

10              **THE COURT:**  Are you ready for the jury?

11              **MR. KEVILLE:**  Your Honor, I didn't move to admit the

12    pictures, but we had an agreement.  Do you want me to do it in

13    front of the jury or just do it now?  How --

14              **THE COURT:**  You can just do it right now.  Step up so

15    you can be heard.

16              **MR. KEVILLE:**  Your Honor, we move to admit

17    Exhibits 1294 and 1295.

18              **MR. HAYNES:**  No objection.

19              **THE COURT:**  All right.  They're admitted.

20          (Trial Exhibits 1294 and 1295 received in evidence.)

21          (Proceedings were heard in the presence of the jury.)

22              **THE COURT:**  All right.  Please be seated, everybody.

23        Mr. Keville what's next?

24              **MR. AKARAPU:**  Your Honor, Contour calls

25    Mr. Jason Green by deposition.

1          **THE COURT:**  Great.  Could you introduce yourself?

2          **MR. AKARAPU:**  Sure.  My name is Sunny Akarapu.

3      This clip includes testimony designated by both of the

4  parties.  Mr. Green co-founded Contour, Inc., with Mr. Barros

5  in 2013, who we all saw on Tuesday.  And this deposition was

6  taken in 2020.

7          **THE COURT:**  Great.  Thank you.

8      (Video deposition of Jason Green was played but not

9  reported.)

10         **THE COURT:**  All right.  Ladies and gentlemen, I should

11  have told you before this, but you may see more depositions

12  later.

13     A deposition is testimony that's taken, obviously, outside

14  the courtroom.  The lawyers on both sides were there and able

15  to ask questions, make objections.  It's taken under oath.

16     And the parties have brought a portion of that to you.

17  You should treat that testimony the same way that you would

18  treat the testimony of anybody who was appearing in court

19  today.

20     All right.  Mr. Keville?

21         **MS. REPLOGLE:**  Your Honor, the plaintiff calls its

22  next witness, Rob Mooney, corporate representative.

23         **THE COURT:**  Great.  Come on up, Mr. Mooney.

24         **THE COURTROOM DEPUTY:**  Raise your right hand, please.

25  \\\

MOONEY - DIRECT / REPLOGLE

1          **ROBERT PAUL KALMAR MOONEY**,

2  called as a witness for the Plaintiff, having been duly sworn,

3  testified as follows:

4          **THE WITNESS:**  Yes.

5          **THE COURTROOM DEPUTY:**  Be seated.

6      Please begin by stating your full name and spelling it for

7  the court reporter.

8          **THE WITNESS:**  It's Robert, R-o-b-e-r-t; Paul, P-a-u-l;

9  Kalmar, K-a-l-m-a-r; Mooney, M-o-o-n-e-y.

10          **MS. REPLOGLE:**  Your Honor, if I may approach the

11  witness.

12          **THE COURT:**  Please.

13          **DIRECT EXAMINATION**

14  BY MS. REPLOGLE:

15  **Q.**  All right.  Good afternoon, Mr. Mooney.

16  **A.**  Good afternoon.

17  **Q.**  All right.  Could you introduce yourself to the jury.

18  **A.**  Yeah.  I'm Rob Mooney.  I'm the former general counsel for

19  Contour.

20  **Q.**  And you said you were the former general counsel of

21  Contour.  What are you doing now?

22  **A.**  So I work with a non-profit organization that works with

23  foster children.  I grew up in the foster care system, changed

24  homes 20 times, was in for about 12 years and aged out.  I

25  wrote a book to foster kids, and I go around the country

1  speaking to groups of them as to how to be successful after

2  aging out of the foster care system.

3      And then I do business and legal consulting.

4  **Q.**  And are you here today as the corporate representative for

5  Contour?

6  **A.**  Yes, ma'am.

7  **Q.**  Okay.  When were you first introduced to Contour cameras?

8  **A.**  I was first introduced in 2012.  My biggest client was an

9  investor in Contour and loved the cameras, loved the form

10  function of them, and spoke very, very excitedly about them to

11  anyone who would listen.  And so I learned about them in 2012.

12  **Q.**  And what was the name of that investor?

13  **A.**  James Clarke.

14  **Q.**  Okay.  Now, moving forward a little bit in time, when did

15  you become general counsel of Contour?

16  **A.**  Upon its formation.

17  **Q.**  Okay.  And do you recall the time frame of that?

18  **A.**  Yeah.  That would have been at the end of 2013.

19  **Q.**  Okay.  And when you started as general counsel, were the

20  applications that led to the asserted patents in this case

21  still pending before the Patent Office?

22  **A.**  Yes, they were still pending.

23  **Q.**  In your role as general counsel, were you responsible for

24  the prosecution of those patent applications?

25  **A.**  Yes, ma'am.  I was responsible for overseeing that.

1  **Q.**   Were you kept informed of the progress of those

2  applications as they went through the Patent Office?

3  **A.**   Yes, ma'am.

4  **Q.**   Did you make any changes related to the prosecution of

5  those applications when you joined as general counsel?

6  **A.**   I did.  Previously the patents had been held by a

7  predecessor.  You've heard testimony about it going into

8  receivership.  Contour had previously used a firm called

9  Stoel Rives.  I replaced them out with a firm called Knobbe

10 Martens.

11 **Q.**   Any particular reason that you decided to go ahead and

12 just replace the attorneys prosecuting the applications?

13 **A.**   Yeah.  I looked at it.  I wasn't pleased with the progress

14 of the -- of the applications, and I had some really good

15 experiences with the patent attorneys at Knobbe Martens.

16 **Q.**   In your experience, you know, from your prior years as

17 working as an attorney, is that uncommon, to switch and switch

18 out attorneys perhaps prosecuting applications?

19 **A.**   No.

20 **Q.**   All right.  Let's take a look at JTX-1 on the cover.

21       And just to start, when was the '954 patent first filed,

22 that provisional application?

23 **A.**   So that was filed in September -- on September 13, 2010.

24 **Q.**   And after a provisional application is filed, just

25 briefly, could you just explain to the jury what happens next?

1    **A.**    Sure.   The provisional application becomes -- at some

2    point you need to file a non-provisional application.   And then

3    that eventually moves to a publication.

4    **Q.**   Okay.   And after a non-provisional application is filed,

5    does the examiner then review the pending claims?

6    **A.**    Yes.

7            **MS. REPLOGLE:**   Okay.   I'd like to put on the screen

8    for the witness JTX-3.

9    **BY MS. REPLOGLE:**

10   **Q.**   And, Mr. Mooney, could you identify what is Joint Trial

11   Exhibit 3?

12   **A.**   This is the file history, otherwise known as the file

13   wrapper, for the '954 patent.

14           **MS. REPLOGLE:**   I'd like to move into evidence Joint

15   Trial Exhibit 3.

16           **THE COURT:**   Any objection?

17           **MR. HAYNES:**   No objection, subject to the discussions

18   we had this morning, Your Honor.

19           **THE COURT:**   All right.   It's admitted.

20       (Trial Exhibit 3 received in evidence.)

21   **BY MS. REPLOGLE:**

22   **Q.**   When you file a patent application, Mr. Mooney, is it

23   secret for a period of time?

24   **A.**    Yes.

25   **Q.**    Okay.   And when does a patent application generally no

 1   longer stay secret?

 2   **A.**   Once it's published.

 3   **Q.**   Okay.  Can you determine, from just the face of a patent,

 4   when an application is published so that anyone could obtain

 5   access to that application?

 6   **A.**   Yes, ma'am.

 7          **MS. REPLOGLE:**  Okay.  So, Allen, if you could put on

 8   the screen as well JTX- -- go back to JTX-1, just to see the

 9   face of it.  It's a little easier.  JTX-1, which is the

10   patent -- go to the front page of the patent, Allen.  Yeah,

11   there.

12       Yeah, there you go.

13   **BY MS. REPLOGLE:**

14   **Q.**   All right.  So, Mr. Mooney, can you identify what is the

15   publication dates on this?  I think this one actually has two

16   of them.

17   **A.**   Yeah.  So it was first publicly published in March 22nd,

18   2012.

19   **Q.**   And then is there a second publication date on this one?

20   **A.**   There was a fir- -- another publication on February 20th,

21   2014.

22   **Q.**   Okay.  So on February 20th, 2014, and March 22nd, 2012,

23   the application was -- it was public for everyone to read?

24   **A.**   Yes, ma'am.

25   **Q.**   Okay.  When reviewing patent applications, do examiners

1  perform searches of prior art?

2  **A.**   Generally, yes.

3  **Q.**   Okay.  And, likewise, do patent applicants, like Contour,

4  also disclose prior art and other documents and information to

5  the Patent Office?

6  **A.**   They should.  We certainly did.

7  **Q.**   Okay.  If we could go back to JTX-3 at page 1261.  And

8  what -- first of all, just what are we seeing here?  What type

9  of document is this?

10  **A.**   This is an Information Disclosure Statement that an

11  applicant would give to the Patent Office to disclose different

12  types of prior art.

13  **Q.**   And what -- can you tell from the face of this patent if

14  this is an Information Disclosure Statement that the applicant,

15  Contour, provides to the Patent Office?

16  **A.**   Yes.  Yeah.  So, again, the Information Disclosure

17  Statement came from us.

18  **Q.**   Now, the jury has heard a little bit from Mr. Woodman as

19  well as GoPro's opening statement.

20      Did you disclose patents issued to Mr. Woodman to the

21  Patent Office during the prosecution of the applications that

22  led to Contour's asserted patents in this case?

23  **A.**   We did, yes.

24  **Q.**   Okay.  Can you identify those on the page here?

25  **A.**   That second line, Woodman '321 patent, I believe, is to

**MOONEY - DIRECT / REPLOGLE**

 1    Mr. Woodman.

 2         The '736 patent to Woodman, we listed it with the

 3    incorrect date there.  We had it as November 2nd.  The patent

 4    examiner changed that to December 2nd.

 5         And then let's see.  I think we've got down there the '656

 6    patent to Mr. Woodman in 2011.

 7         Looks like an application in 2011 to Mr. Woodman.

 8         Then the '501 patent to Mr. Woodman.

 9    **Q.**    Okay.  So suffice it to say Contour disclosed several of

10    Mr. Woodman's patents and publications?

11    **A.**    Yes.

12    **Q.**    Now, you kind of jumped ahead of me, but I just did want

13    to focus on this.

14         If you take a look at the very bottom of the screen, in

15    all caps there, what does that say?  Could you just read it for

16    the record?

17    **A.**    Yeah.

18         [As read]:

19              "ALL REFERENCES CONSIDERED EXCEPT WHERE LINED

20              THROUGH."

21    **Q.**    In kind of more plain English, what does that mean to you?

22    **A.**    That the examiner examined all the references that were

23    cited.

24    **Q.**    And so when we take a look at the second Woodman patent on

25    the screen, you pointed out that there was, like, a cross-out,

1   a strike-out of the date; and then it's written over there, the

2   right-hand side, December 2nd, 2008, and there's a noted change

3   on the left-hand side.  What's your understanding of what that

4   is?

5   **A.**   Yeah.  When there is perhaps an error in the submission,

6   sometimes the examiner will go and address those and fix those.

7   And here we had a mistyped date.

8   **Q.**   So fair to say the examiner took a look at that patent and

9   corrected the date that's on there?

10   **A.**   Yes, ma'am.

11   **Q.**   All right.  Let's turn to Ambarella.  We've heard,

12   you know, several times discussions about Ambarella.

13         **MS. REPLOGLE:**   Can you go to it JTX-3 at pages 1182

14   and 1183.

15   **BY MS. REPLOGLE:**

16   **Q.**   Okay.  Again, what is this document?

17   **A.**   This is an Information Disclosure Statement that we

18   submitted to the Patent Office.

19   **Q.**   Okay.  And in this Information Disclosure Statement, did

20   Contour provide the examiner with any patents issued to

21   Ambarella?

22   **A.**   Yes, ma'am.

23   **Q.**   And can you identify any patents that are issued to the

24   company Ambarella on this Information Disclosure Statement?

25   **A.**   Yeah.  Citation Number 1, the patent '760 to Linzer.

1          Citation Number 2 -- excuse me.  I apologize.  Not 2.  3.

2    '910 to Linzer.

3          Number 4, '550 to Linzer.

4          Number 5, '364 to LeGall.

5          Number 6, '776 to LeGall.

6          Number 7, the '967 to Linzer, the '573 to Linzer, '888 to

7    Linzer, '788 to Linzer, '071 to Linzer, '171 to LeGall.

8          And then Number 15, the '57 -- '547 to Linzer.

9          And then on the next page, Number 16 to Linzer, 17 to

10   Linzer, and 19 to Linzer.

11   **Q.**   All right.  So in addition to all of these patents to

12   Ambarella, did Contour also provide the examiner with any

13   publications describing Ambarella's processor chips?

14   **A.**   Yes, ma'am.

15   **Q.**   Let's take a look at pages 1179 and 1180.

16         Could you identify on the screen publications describing

17   Ambarella's processor chips that you, Contour, provided to the

18   Patent Office?

19   **A.**   Yeah, we submitted Cite Number 55, an Ambarella product

20   brief.

21         Number 53, Ambarella product brief.

22         Number 54, Ambarella product brief.

23         Number 56, Ambarella company fact sheet.

24         Number 5, an online article for the A5 hybrid camera.

25         Number 58, Number 59, Number 60, Number 61, and 62.

1   Q.   So did the examiner consider the Ambarella patents and

2   publications that Contour disclosed during the examination of

3   Contour's claims?

4   A.   Yes, ma'am.

5   Q.   Now I wanted to turn to another patent that the jury has

6   heard, they heard it in GoPro's opening, called the Boland

7   patent.

8        Have you heard reference to the Boland patent during your

9   time visiting us at trial?

10  A.   Yes, ma'am.

11  Q.   Okay.  And are you familiar, again, with the prosecution

12  of both of these patents at issue as the asserted patents in

13  this case?

14  A.   Yes, ma'am.

15  Q.   Okay.  And was the Boland patent considered during

16  examination of the claims of the '954 patent?

17  A.   Yes, ma'am.

18  Q.   Okay.  Were the claims of the '954 patent ultimately

19  allowed?

20  A.   Yes, ma'am.

21  Q.   Okay.  So let's take a look at what that document looks

22  like.

23          MS. REPLOGLE:  JTX-3 at page 1160.

24  BY MS. REPLOGLE:

25  Q.   What is this document?  Could you explain it to the jury,

1   please?

2   **A.**   Yeah.  So when the patent examiner has decided to allow

3   the claims of the application, you'll receive a Notice of

4   Allowance letting the applicant know that the claims are being

5   allowed.

6   **Q.**   Okay.  And what is the date that this Notice of Allowance

7   was mailed?

8   **A.**   It was mailed on September 25th, 2014.

9        **MS. REPLOGLE:**   Okay.  All right.  Can you turn to

10  page 1247 and 1248 now in this document -- in the file history

11  of the '954 patent.

12  **BY MS. REPLOGLE:**

13  **Q.**   Okay.  What are we seeing here?  What type of document is

14  this?

15  **A.**   So during the prosecution history, you can have an

16  interview.  And this is a summary of that -- of an interview

17  that our patent counsel had with the patent examiner on

18  September 18th, 2014.

19  **Q.**   Okay.  And I just want you to take a look on the

20  right-hand side of the screen and the second paragraph below

21  "Identification of Art Disclosed."

22  **A.**   Yes.

23  **Q.**   Yeah.  "Of Art Discussed."  Excuse me.

24       Could you read what the second sentence is that concludes

25  that paragraph, for the jury, please?

1  **A.**  It says [as read]:

2         "In addition, as noted in the Notice of

3      Allowance, prior to allowing the application, the

4      examiner considered the references cited in the

5      Information Disclosure Statements filed May 3rd,

6      2014; March 27, 2014; July 16, 2014; July 23rd, 2014;

7      and September 16, 2014."

8  **Q.**  I want to turn to -- did Contour file a continuation

9  application to the '954 patent?

10  **A.**  Yes.

11         **MS. REPLOGLE:**  Can we take a look at JTX-4, just for

12  the witness, please.

13  **BY MS. REPLOGLE:**

14  **Q.**  Mr. Mooney, can you identify what is Joint Trial

15  Exhibit 4?

16  **A.**  This is the file history, otherwise known as the file

17  wrapper, of the -- of the '694 patent.

18  **Q.**  Okay.  And did this application, like the '954 that we

19  just discussed, also eventually publish?

20  **A.**  Yes, ma'am.

21  **Q.**  Okay.  Can we take a look at JTX-2, which is the front

22  page of this -- excuse me -- of the '694 patent, and let's just

23  take a look and see when that was published as well.

24  **A.**  I believe this one was published August 28th, 2014.

25  **Q.**  Perfect.

1    All right.  Likewise, were you familiar with the

2  prosecution as you were kept apprised of it for the '694

3  patent?

4  **A.**   Generally, yes.

5  **Q.**   Okay.  And so did the -- are you -- do you know whether

6  the Patent Office also considered the Boland patent during the

7  examination of the claims of the '694 patent?

8  **A.**   Yes, ma'am, it did.

9  **Q.**   Okay.  And now, did the Patent Office similarly also allow

10  the claims of the '694 patent at one point?

11  **A.**   Yes, ma'am.

12         **MS. REPLOGLE:**  Okay.  So can we take a look at page --

13         **THE COURT:**  Do you want to offer Exhibit 4?

14         **MS. REPLOGLE:**  Oh, excuse me.  Yes.

15     Move to admit Joint Trial Exhibit 4.

16         **MR. DUCKER:**  No objection, Your Honor.

17         **THE COURT:**  All right.  It's admitted.

18     (Trial Exhibit 4 received in evidence.)

19  **BY MS. REPLOGLE:**

20  **Q.**   Okay.  So let's take a look -- I'm sorry.  Where we were

21  at, we were at page 676.  And what document are we reviewing

22  here?

23  **A.**   This is the Notice of Allowance.

24  **Q.**   Okay.  And what date was the Notice of Allowance for the

25  '694 patent mailed?

1   **A.**   Seven -- July 30th, 2014.

2   **Q.**   Okay.  Now, when the patent -- or any patent issues, do

3   references cited during the prosecution of those applications

4   appear on the face -- face of the patent or the first few

5   pages?

6   **A.**   Yes, ma'am.

7   **Q.**   Okay.  So let's take a look at JTX-2, and let's scroll to

8   where the references begin, please.  This is pretty small type

9   here so we'll see what we can do.

10       Let's first start just on the left-hand side.  Could you

11   identify any of the patents in the name of Nick Woodman or

12   Ambarella that you can see on the '694 patent, the face of it?

13   **A.**   Yeah.  So if you look on the left-hand side, a little bit

14   past -- halfway down, there's the '484 issued October 2015 to

15   Woodman.

16       There's another one in 2007 to Mr. Woodman.

17       There's the August 2008 to Linzer, et al.

18       There's the December 2008 to Woodman.

19       Then if we look at the next side, January 2010 to Linzer,

20   March 2010 to Linzer, March 2010 to LeGall, February 2011 to

21   LeGall, 2011 to Linzer, another 2011 to Linzer, another 2011 to

22   Linzer and another one, a 2011 to Woodman, 2011 to Woodman,

23   2012 to Linzer, 2012 --

24           (Reporter interrupts to clarify the record.)

25   \\\

1  BY MS. REPLOGLE:

2  Q.   Go slow.  Sorry.

3  A.   I apologize.

4       Another 2011 to Woodman, March 2012 to Linzer, August 2012

5  to LeGall, April 2013 to Linzer, March 24th to Linzer, another

6  one in March of '24 to Linzer.  May of 2014 to Linzer.

7       Sorry, I said '24.  I meant 2014.  I apologize.

8       And I think we got them all.

9  Q.   Captured all the patents?

10 A.   Oh, no.  There's another one.  There's an application to

11 Woodman in 2011.

12 Q.   Okay.  And can we also see the printed publications that

13 were before the Patent Office during the prosecution of the

14 '694 patent on the face of the patent too?

15 A.   Yes, ma'am.

16 Q.   Okay.  And can you identify, then, any of the publications

17 that Contour disclosed describing Ambarella's processor chips?

18 A.   Yeah.  If you look over to about the middle of that second

19 column, starting with the Ambarella product brief, you see

20 several.  The A5 product brief, A7 product brief, company fact

21 sheet, articles about the A5 camera hybrid, articles about the

22 A5s with high speed.  Again, just a number of non-patent

23 publications.

24 Q.   Yeah.  And in particular, the processor chip, the A5s has

25 come up at trial, or do you recall that?

1    **A.**    Yes, ma'am.

2    **Q.**    Okay.  And so just specifically, was any printed

3    publications regarding Ambarella's A5s disclosed to the

4    Patent Office by Contour?

5    **A.**    Several, yes.

6    **Q.**    Okay.  And is that the case as well if we put up the front

7    page or the publication page of the other patent that's

8    asserted in this case?

9    **A.**    Yes, ma'am.  And, again, these were ones that we supplied

10   to the Patent Office.

11   **Q.**    And did, in fact, the Patent Office allow the claims of

12   both of those pending applications, despite the fact that you

13   had cited the Ambarella's printed publications describing their

14   processor chips?

15   **A.**    Yes, ma'am.

16   **Q.**    Okay.  At some point during the prosecution of these

17   patent applications, did an interview with the patent examiner

18   take place?

19   **A.**    Yes, ma'am.

20   **Q.**    Okay.  And at one of those interviews, did Contour perform

21   a demonstration?

22   **A.**    I understand it did, yes.

23   **Q.**    Okay.  What did Contour demonstrate to the examiner?  What

24   was it specifically?

25   **A.**    It was the live preview function that's been discussed a

1    lot in this case.

2    **Q.**    And how did Contour -- well, first of all, who attended

3    this presentation?

4    **A.**    So Jason Green, who we just heard testimony from, was

5    there.  Lynn Knesek, who's our patent counsel, and then Todd

6    Kinard, who is our associate general counsel.

7    **Q.**    And did Mr. Green bring any Contour camera with him to his

8    interview with the examiner?

9    **A.**    Yes, ma'am.

10    **Q.**    And what Contour camera model number did Jason Green bring

11    with him?

12    **A.**    Well, the product was a Contour+2.

13    **Q.**    Okay.  And so at the time of the interview, was that

14    Contour+2 a camera that was available to the public on sale?

15    **A.**    Yes, we were selling the Contour+2 at that time.

16    **Q.**    Okay.  And do you recall the timing of that interview,

17    what year?

18    **A.**    It was, I want to say, somewhere around July 2014 is my

19    best -- June or July 2014.

20    **Q.**    Okay.  Now, at some point, did GoPro launch a product with

21    a live preview feature that you became aware of?

22    **A.**    Yes, ma'am.

23    **Q.**    And what was the first product, GoPro product that you're

24    aware of that had that wireless live preview feature associated

25    with it?

1  **A.**   I understand.  It was the BacPac attachment that enabled

2  the camera to do that.

3  **Q.**   Right.  Do you know -- I mean, well, are you aware of

4  whether GoPro has patents in the same space as Contour's,

5  meaning related to the wireless live preview feature and

6  functionality that the jury has been hearing about for a

7  few days now?

8  **A.**   Yeah.  I'm -- I'm not aware of any.  I'm confident they

9  don't.

10  **Q.**   And have you done any review of that particular -- of

11  their patents in order to make that conclusion?

12  **A.**   Yes, ma'am.

13  **Q.**   Okay.  And did you -- did you ask certain individuals to

14  take on that task, to take a look to see if, in fact, GoPro had

15  any patents in that space?

16  **A.**   Yes, ma'am.

17  **Q.**   Okay.  And what were their conclusions?  What was your

18  conclusion from that review?

19  **A.**   That they did not have patents in that space.

20  **Q.**   Okay.  You -- again, as corporate witness, you've been

21  here and you've heard several of the witnesses testify; is that

22  right?

23  **A.**   Yes, ma'am.

24  **Q.**   Okay.  And so did you hear when Mr. Green, the co-founder

25  of Contour, discussed -- I think he talked about that, yeah,

1   that Contour had reviewed public information and had bought and

2   tested some GoPro products.  Do you recall that?

3   **A.**   Yes.

4   **Q.**   Do you recall as well testimony from Mr. Woodman about an

5   email dated January 5th, 2011?  Do you recall that?

6   **A.**   I remember there was an email from Mr. Woodman, yes.

7   **Q.**   Okay.  And do you recall that that email was the same time

8   frame -- or was it the same time frame -- let me ask it that

9   way -- as when Contour had announced its wireless live preview

10   functionality with its connect view card?

11         **MR. DUCKER:**  Objection, Your Honor.  The question

12   lacks foundation.  They haven't established that this witness

13   has any personal knowledge.

14         **THE COURT:**  Overruled.  We're talking about

15   January 5th, 2011, and it's a do-you-recall question.

16      So you can answer the question --

17         **THE WITNESS:**  Yes, ma'am.

18         **THE COURT:**  -- if you remember, it.

19         **THE WITNESS:**  Yes, ma'am.

20   **BY MS. REPLOGLE:**

21   **Q.**   Okay.  Do you recall --

22      Go ahead.

23      On January 5th, 2011 -- let me just take a step back for a

24   second.

25      Do you recall Mr. Woodman testifying about an email of

1   GoPro's that was dated January 5th, 2011, discussing buying --

2   or asking an individual to buy Contour cameras covertly?

3   **A.**   Yes, ma'am.

4   **Q.**   Okay.  Is there, in your mind, a difference between the

5   two situations discussed with respect to Mr. Green's testimony

6   and with respect to Mr. Woodman's testimony in 2011?

7   **A.**   Oh, for sure.  Mr. Green testified about the -- you know,

8   understanding what your competitors are doing, user features

9   and the like.

10       Mr. Woodman was very explicit to buy it to tear it down,

11  break it down and see how the inner workings work.  That's

12  much, much different than understanding the user features.

13  There's a what-it-does versus how-it-does-it.

14  **Q.**   And as of January 5th, 2011, to your knowledge, had GoPro

15  had any cameras released with that wireless live preview

16  feature at that time?

17  **A.**   No, ma'am, it hadn't.

18  **Q.**   How long after that date, January 5th, 2011, did GoPro

19  release the first camera that had the wireless live preview

20  feature?

21  **A.**   Approximately a year and a half.

22  **Q.**   A year and a half later?

23  **A.**   Yes, ma'am.

24  **Q.**   All right.  After GoPro had released products with the

25  wireless live preview feature, did GoPro at one point change

1  course and release a camera without that feature?  Do you

2  recall whether that happened?

3  **A.**    I do recall it happening, yes.

4  **Q.**    Okay.  And what was that product?

5  **A.**    So it was announced, I believe, at the end of 2014.  It

6  was called the HERO without a number on it.  GoPro marketed it

7  as an entry-level product that did not have the wireless

8  preview capability that we've been discussing today.

9  **Q.**    Are you aware of whether GoPro later released a HERO

10  camera but with the wireless live preview feature?

11  **A.**    Yes, ma'am.

12  **Q.**    And what was that product called?

13  **A.**    That was the HERO+.

14  **Q.**    Did you review literature that was in the public domain

15  about the features of both of those products?

16  **A.**    Yes, ma'am.

17  **Q.**    Okay.  And what was the primary difference in features, as

18  GoPro marketed it, between the HERO and the HERO+?

19  **A.**    Yeah.  GoPro marketed the HERO as an entry-level camera

20  and the HERO+ as a perfect entry-level camera plus WiFi.

21        **THE COURT:**  Are you asking questions about his

22  knowledge at the time, or is he testifying as an expert?  What

23  are we -- help me temporally with this.

24        **MS. REPLOGLE:**  Sure.

25  \\\

1  BY MS. REPLOGLE:

2  **Q.**   When did you become aware of the HERO and the HERO+

3  products that GoPro released?  Can you just describe the

4  circumstances and the timing?

5  **A.**   I read the press releases when they came out.

6  **Q.**   And do you recall -- I think you've already said this, but

7  just to be clear, when they came out, when did the HERO and

8  then the HERO+ products come out?

9  **A.**   Yeah.  If I remember correctly, the HERO was announced at

10  the end of 2014; and then the HERO+ was announced the following

11  year, about a year later.

12  **Q.**   Okay.  And so the record's clean, did you review the press

13  releases at or near the time of when both those products were

14  released by GoPro?

15  **A.**   Yes, ma'am.

16  **Q.**   Okay.  And as GoPro marketed the particular features of

17  both products, what was the primary difference in the feature

18  functionality between the HERO and the HERO+?

19  **A.**   The HERO+ had the wireless capabilities that we've been

20  discussing that are subject to Contour's patents.

21  **Q.**   Okay.  And did GoPro also release information about the

22  MSRP -- and what does that stand for, first?

23  **A.**   The manufacturer's suggested retail price.

24  **Q.**   Okay.  Do you know what the difference in the

25  manufacturer's suggested retail price was between the HERO and

1   the HERO+?

2   **A.**   Yes, ma'am.  It was approximately $70.

3   **Q.**   Okay.  And which one of those two products was the

4   higher-priced product?

5   **A.**   The one that had the WiFi capability was priced $70 more.

6   **Q.**   I want to transition to another topic.  You were here when

7   James Harrison testified, the first witness in Contour's case?

8   **A.**   Yes, ma'am.

9   **Q.**   Okay.  Do you recall him deferring to you on a couple of

10  questions that he was asked about Contour IP Holdings?  I think

11  he was asked those questions from GoPro's counsel.

12  **A.**   Yes, ma'am.

13  **Q.**   Okay.  Did you set up the corporate entity Contour IP

14  Holdings?

15  **A.**   Yes, ma'am.  I formed it.

16  **Q.**   Okay.  And what time frame did you form Contour IP

17  Holdings?

18  **A.**   I formed that in the middle of -- what was it? -- June

19  or -- very, very early June 2015.

20  **Q.**   And why -- can you explain to the jury, why did you set up

21  Contour IP Holdings?  What was the purpose?

22  **A.**   We were in the process of doing a merger with another

23  sports action camera manufacturing company, but we did not want

24  our intellectual property, specifically our patents, to fall

25  under the control of another entity.  We weren't willing to do

1   that.

2       And so as part of the negotiations in the merger, we

3   ensured that we kept that intellectual property out so that the

4   other company couldn't borrow against it, encumber it, or

5   license it out to other people.  We wanted to make sure we

6   protected our intellectual property.

7   **Q.**   And did that turn out to be a good choice, to set up the

8   entity Contour IP Holdings because of the circumstances then?

9   **A.**   Yes, that was a very good choice.

10  **Q.**   And why do you say that now?

11  **A.**   The merger did not go well.  iON had a number of issues,

12  and within a year, we had to unwind that merger, but we

13  weren't -- we didn't have to worry about any encumbrances on

14  our patents because we had put it in the holding entity.

15  **Q.**   Okay.  Transition to another topic for you.  Did there

16  come a time that you believed that GoPro had taken Contour's

17  live preview technology?

18  **A.**   Yes, ma'am.

19  **Q.**   And when did you come to that belief?

20  **A.**   In 2013, when we acquired the assets of Contour.  Shortly

21  thereafter.

22  **Q.**   Okay.  So late 2013, is that what you just said?

23  **A.**   Yes, ma'am.

24  **Q.**   Okay.  So when did the two patents issue in this case?

25  **A.**   The patents issued in 2014, November 2014.

1  Q.   I'm sorry.  So by the time the first patent issued, at

2  that point, how long had GoPro been selling cameras that

3  contained the live preview feature in its HERO cameras, to your

4  knowledge?

5  A.   Not quite two and a half years.

6  Q.   Did Contour at any point reach out to GoPro to discuss the

7  '954 and the '694 patents when they issued?

8  A.   Yes, ma'am.

9  Q.   Okay.  Who led those discussions and what time frame?  Can

10  you describe?

11  A.   So before the patents issued, we recognized that they

12  would be exceptionally valuable for us, but they could also be

13  exceptionally valuable for GoPro.

14       GoPro had recently gone public.  The significant

15  criticisms from analysts at the time of GoPro was that it

16  lacked meaningful patent coverage on a lot of the products.

17  This was something that we realized they were marketing as

18  super important to their products.  And so if we could help

19  them have that protection, that's something that could be

20  exceptionally valuable to them.  And so we reached out to them

21  in November of 2014.

22  Q.   And who specifically did the reach-out the first time?

23  A.   The initial reach-out was a director over at the

24  investment bank USB [sic].  We had worked with USB on other

25  transactions, and we found that a principal at USB had a very,

MOONEY - DIRECT / REPLOGLE

1    very high-level contact within GoPro.  It was Jack Lazar, the

2    CFO of -- excuse me -- of GoPro.  I apologize.  The investment

3    banker had a high-level contact with a high-level executive in

4    GoPro, who was Jack Lazar at GoPro, who's their CFO.

5    **Q.**  Okay.  Were there -- what was the number of discussions

6    that took place?  Can you just describe?  Was it just one or

7    was it multiple?

8    **A.**  Oh, no.  We had a lot.  So Mr. Lazar directed us to work

9    with Colin Born, who I understand was their vice president of

10   business development.

11       And I reached out personally and was introduced to GoPro's

12   associate general -- or deputy general counsel, Eve Saltman,

13   and additionally was introduced to GoPro's general counsel,

14   Sharon, I want to say Zezima.  I apologize if I mispronounced

15   that.  And we had a number of discussions, both phone calls and

16   email correspondence, throughout December of 2014.

17   **Q.**  Okay.  So if I heard you correctly -- and you correct me

18   if I heard wrong -- did Contour, via through you or your

19   authorized representative, have discussions with GoPro's deputy

20   general counsel, GoPro's general counsel, and GoPro's

21   vice president of business development?  And did you have

22   discussions as well with the CFO?

23   **A.**  Yes, ma'am.

24   **Q.**  Were you here, I think, when GoPro's counsel asked

25   Mr. Woodman -- well, scratch that.

1       Mr. Woodman testified a little earlier -- let me see if

2   you recall this -- that he thought that Contour was out of

3   business in November 2014.

4   **A.**   Yes, ma'am.

5   **Q.**   Do you recall that?

6   **A.**   I do.

7   **Q.**   When were these discussions occurring between Contour and

8   GoPro and occurring with GoPro's deputy counsel general --

9   deputy general counsel, general counsel, vice president of

10  business development, and the CFO?  What was the time frame?

11  **A.**   They started in November of 2014.  They continued through

12  December of 2014.  They'd indicated that they were likely to

13  make an offer for either the company or the assets and that

14  they expected it would come in towards the end of the year.

15      We waited on that and had discussions.  We had a data room

16  that was available, and they spent a lot of time in our data

17  room, looking -- data room is where you put files related to

18  a --

19          **THE COURT:**  I'm sorry.  Mr. Mooney, let's wait for the

20  question --

21          **THE WITNESS:**  Oh.

22          **THE COURT:**  -- and then you can make that answer.

23          **THE WITNESS:**  Sure.

24  **BY MS. REPLOGLE:**

25  **Q.**   You mentioned a data room that Contour had set up.  Could

1    you explain to the jury what is a data room in this particular

2    situation when you're looking at buying and selling?

3    **A.**    Yes, ma'am.

4        So we put into a data room that made it available for

5    GoPro to see a bunch of information regarding our assets.

6    **Q.**    And what kinds of information would have been contained in

7    that data room or were contained in that data room?

8    **A.**    Includes -- it included a lot of things about the patents,

9    the file wrappers, probably some additional information.  Not

10    necessarily everything but, you know, the file -- everything

11    related to the patents.

12    **Q.**    And what about with respect to Contour's cameras and that

13    type of assets?

14    **A.**    For sure.

15    **Q.**    Okay.  So what happened?  Did you receive an offer from

16    GoPro by the end of the year as you had expected?

17    **A.**    No, we did not.

18    **Q.**    Okay.  So what steps did you take next?

19    **A.**    Well, our patents had issued.  We needed to enforce our --

20    you know, protect our intellectual property.

21        So on January 5th, 2015, we named GoPro in a patent

22    infringement action on the two patents-in-suit here.

23    **Q.**    And on --

24    **A.**    And because --

25    **Q.**    I didn't mean to interrupt you.  I was just going to say,

1  when you filed that complaint against GoPro for patent

2  infringement on the two patents asserted in this case, did you

3  inform GoPro directly yourself about that filing?

4  **A.**    Yes, ma'am.

5  **Q.**    And how did you go about doing that?

6  **A.**    Because of our -- what I felt was an amicable

7  relationship, working relationship through November-December

8  with GoPro, specifically GoPro's associate -- or deputy general

9  counsel and general counsel, I felt it appropriate that they

10  hear it directly from me.

11         And so I emailed Ms. Saltman and her boss, the general

12  counsel, our complaint naming GoPro in a patent infringement

13  lawsuit and then the two patents at issue in this case and

14  expressed my desire to be able to continue working amicably

15  with them.

16  **Q.**    Okay.  So what happened next after you emailed the

17  complaint with the asserted patents to GoPro January 5th, 2015?

18  What happened next?

19  **A.**    Ms. Saltman responded, expressed some disappointment that

20  we hadn't been able to do a deal yet, and offered to broker a

21  meeting with GoPro's top executives.

22  **Q.**    Okay.  And when was that meeting supposed to occur?

23  **A.**    It was supposed to occur at CES in Las Vegas.  I want to

24  say it was, like, a week and a half later, something like that,

25  after my email sending the complaint to GoPro's general

1    counsel.

2    **Q.**    Okay.  So was the meeting set for somewhere the second

3    week of January, then, 2015?

4    **A.**    I believe so, yes.

5    **Q.**    Okay.  And did Ms. Saltman convey to you who would be

6    attending that meeting on behalf of GoPro?

7    **A.**    Both Ms. Saltman did, I believe, and then also Mr. Born,

8    Colin Born did as well.  And, again, I understand he was the

9    vice president of business development at GoPro.

10   **Q.**    And let me make sure I'm clear.  Was it Ms. Saltman and

11   Colin Born that were supposed to meet you at the CES

12   conference, or are those the individuals that conveyed to you

13   who would be present at that meeting?

14   **A.**    A little bit of both.  So the meeting was intended -- it

15   was conveyed to us the attendees of the meeting on GoPro's side

16   were going to be Tony Bates, who was the president of GoPro,

17   and Jack Lazar, the CFO of GoPro.  And I understood that

18   Mr. Born was also going to be in attendance, I believe.

19   **Q.**    Okay.  So your expectations -- what were your expectations

20   as far as the individuals that were going to be meeting with

21   you at the CES conference January 2015?  Who were they supposed

22   to be that you expected?

23   **A.**    Yeah.  I expected it to be our chairman from Contour's

24   side and myself, possibly our CEO, and then their president,

25   Tony Bates, and Jack Lazar, their CFO.

1    Q.    Now, you were here for Mr. Woodman's testimony, so I know

2    you would have heard the testimony, which Mr. Woodman was

3    careful to say that he personally wasn't supposed to be at that

4    meeting.  Do you recall that?

5    A.    Yes, ma'am.

6    Q.    Okay.  And then did you hear GoPro's counsel ask him right

7    at the very end if it could have been, quote, sort of like a

8    salesperson, end quote, that may have agreed to take that

9    meeting with -- with Contour?  Do you recall that?

10   A.    I heard that, yes.

11   Q.    And what was your reaction when you heard that?

12   A.    I don't view the chief financial officer of a publicly

13   traded company to be a salesperson, nor do I view the president

14   of a publicly traded company to be a mere salesperson.

15   Q.    All right.  Did you attend the CES conference in

16   January 2015?

17   A.    Yes, ma'am.

18   Q.    And did GoPro show up to that meeting?

19   A.    No.  They let us know the day before that they weren't

20   going to be able to make the schedules work, something of that

21   nature.

22   Q.    Okay.  And as of today, to date, have you ever been able

23   to resolve this dispute with GoPro over this, now, ten years?

24   A.    No.  We've tried many times.

25   Q.    Okay.  So, Mr. Mooney, look, you've been away from Contour

 1   I know for several years.  Why come here and testify today?

 2   **A.**   I don't like bullies.  When people work really hard, like

 3   Mr. Mander, to go and create something new and novel that

 4   people were amazed by -- they won awards; they won a CES

 5   award -- and then to have a larger, more well-funded competitor

 6   come and utilize that and not give the credit to where it

 7   belongs, to not pay the fair value for that and to drag us

 8   along for a long time as though they're going to, I don't think

 9   it's right.

10          **MS. REPLOGLE:**  Pass the witness.

11                          **CROSS-EXAMINATION**

12   **BY MR. DUCKER:**

13   **Q.**   Good afternoon, Mr. Mooney.

14   **A.**   Good afternoon.

15   **Q.**   Sorry.  Just checking the time.

16          So you testified about the prosecution history.  Do you

17   recall that?

18   **A.**   Yes, sir.

19   **Q.**   And you identified multiple patents, correct, that you

20   believe were -- that were from Mr. Woodman; correct?

21   **A.**   Yes, sir.

22          **MR. DUCKER:**  Could we pull up JTX-1.

23          Actually, sorry.  Could we pull up JTX-2351.

24   **BY MR. DUCKER:**

25   **Q.**   So your counsel asked a lot of questions about what you

1    heard from Mr. Woodman.  Did you hear Mr. Woodman testify about

2    this patent, the 8,199,251?

3    **A.**    Yes, sir.

4         **MR. DUCKER:**  Okay.  If we could go to -- now go to

5    JTX-1 and page 3.

6         And if you would scroll down to the bottom on the left.

7    **BY MR. DUCKER:**

8    **Q.**    Is that patent, the '251 patent, listed here?

9    **A.**    I'm sorry.  Say that again.

10   **Q.**    Is the patent that Mr. Woodman discussed during his

11   testimony today listed within -- on the face -- or on the face

12   of the '954 patent?

13   **A.**    I don't believe so.

14         **MR. DUCKER:**  Could we go back to JTX-2351.  And if we

15   could go down to about right there.

16   **BY MR. DUCKER:**

17   **Q.**    Do you see where it says "Prior Publication Date"?

18   **A.**    Yes, sir.

19   **Q.**    And could you read that date for us?

20   **A.**    March 11, 2010.

21   **Q.**    And was that before or after the two patents that are at

22   issue in this case were filed?

23   **A.**    Before.

24   **Q.**    Right.  And it was -- as you testified, when it's

25   published, it's publicly available; right?

**MOONEY - CROSS / DUCKER**

1    **A.**    Sure.

2    **Q.**    And so anyone can go and find it?

3    **A.**    Sure.

4    **Q.**    And yet this patent that Mr. Woodman describes his

5    wireless transmission invention was not cited on the face of

6    the '954 patent; correct?

7    **A.**    I heard Mr. Woodman testify himself that his invention

8    wasn't our invention.

9    **Q.**    But you're not listening to the question.

10        Mr. -- the '251 patent that discloses the wireless

11    transmission of video data was not cited on the face of the

12    '954 patent; correct?

13    **A.**    The two -- what's Mr. Woodman's patent number again?

14    '251?

15    **Q.**    Yes.

16    **A.**    The '251 patent was not cited on the face of our

17    patents-in-suit here.

18    **Q.**    I'm sorry.  What did you say at the end?

19    **A.**    The patents-in-suit --

20    **Q.**    Oh.

21    **A.**    -- here.

22    **Q.**    And yet it was publicly available before you filed -- or

23    before the two patents-in-suit were filed; correct?

24    **A.**    Yes.

25    **Q.**    If we could go back to JTX-1.  And you testified about the

1  publication date for the '954 patent.  Do you recall that?

2  A.  Yes, sir.

3  Q.  And do you recall -- and you testified that it was

4  published -- there were two publication dates, but the first

5  one was March 22nd, 2012; correct?

6  A.  Yes, sir.

7  Q.  And that patent was not publicly available prior to

8  March 22nd, 2012; correct?

9  A.  Correct.

10 Q.  So no one could find it before March 22nd, 2012?

11 A.  I think that's fair.

12       MR. DUCKER:  If you would just scroll down a little

13 bit.

14 BY MR. DUCKER:

15 Q.  There's the provisional application.  Do you see that?

16 A.  Yes, sir.

17 Q.  That's also not publicly available; correct?

18 A.  That is correct.

19 Q.  You gave some testimony about the Boland patent.  Do you

20 recall that?

21 A.  Yes, sir.

22 Q.  And you testified that it was considered by the

23 Patent Office?

24 A.  Yes, sir.

25 Q.  And do you know when it was considered by the

1    Patent Office?

2    **A.**    Yes, sir.

3    **Q.**    And that was sometime in 2015; correct?

4    **A.**    Yes, sir.

5    **Q.**    And the patent issued in 2014; correct?

6    **A.**    The claims were allowed after reviewing the Boland patent.

7    **Q.**    So there's no -- you're not testifying that the examiner

8    or the Patent Office ever had both Boland and Ambarella at the

9    same time; correct?

10    **A.**    I am testifying very clearly that the Patent Office had

11    the Boland patent and allowed our claims.

12    **Q.**    But not Boland and Ambarella.  They didn't look at Boland

13    and Ambarella, the combination; correct?

14    **A.**    The Patent Office had Ambarella.  The Patent Office also

15    had Boland.

16    **Q.**    Not at the same time?

17    **A.**    Perhaps.  Perhaps not.  I'm not sure.

18    **Q.**    You don't know?

19    **A.**    I know they considered both of them and issued the claims.

20    **Q.**    So you know when it considered them, but you don't know if

21    it had them at the same time?

22    **A.**    I understand that they issued -- they reviewed both of

23    them and issued the claims.

24    **Q.**    At different times.  They reviewed Ambarella potentially

25    before 2014 and Boland in 2015; right?

1    **A.**    Again, perhaps.  But all I know is that our claims were

2    allowed after reviewing the Boland patent.  Our claims were

3    allowed after reviewing all of the Ambarella materials that we

4    submitted.

5    **Q.**    Yes.  But not at the same time?

6    **A.**    I'm not sure.

7    **Q.**    Okay.  You gave some testimony -- excuse me.  I left one

8    binder back there.

9        Apologies.

10       So you gave some testimony about some interviews that

11   happened with the examiner during the prosecution of the '954

12   patent.  Do you recall that?

13   **A.**    Yes, sir.

14         **MR. DUCKER:**  Could we bring up JTX-3 and,

15   specifically, page 514, please.

16   **BY MR. DUCKER:**

17   **Q.**    So JTX-3 is the prosecution history for the '954 patent;

18   correct?

19   **A.**    I believe so, yes.

20   **Q.**    And so during the prosecution, you testified that there

21   was -- the applicant initiated an interview with the examiner;

22   right?

23   **A.**    There was an interview, yes.

24   **Q.**    And do you understand that this page is showing the

25   examiner's summary of that interview?

1              **MR. DUCKER:**  Could you scroll down, please.

2              **THE WITNESS:**  It appears so, yes.

3    **BY MR. DUCKER:**

4    **Q.**   And you testified that the applicant gave the patent

5    examiner a demonstration of a Contour product; right?

6    **A.**   Yes, sir.

7    **Q.**   And that Contour product was alleged to include the

8    invention, the purported invention in this case?

9    **A.**   It was the Contour+2.

10   **Q.**   And do you believe -- I guess -- you testified that that,

11   you believe, had the wireless transmission capability?

12   **A.**   Yes, sir.

13   **Q.**   And the product that was demo'd, the Contour+2, that had

14   an A- -- Ambarella A5s chip in it; right?

15   **A.**   I'm less familiar with what was on the inside of the

16   camera, only what the camera could do.

17   **Q.**   Did you hear Mr. Green's testimony earlier?

18   **A.**   Yes.

19   **Q.**   And he testified that it -- that the demo unit had an A5

20   chip in it?

21   **A.**   Okay.

22   **Q.**   Do you have any reason to doubt that it had an A5s chip in

23   it?

24   **A.**   No, sir.

25   **Q.**   If you would -- and so this, again, is the summary, this

**MOONEY - CROSS / DUCKER**

1    is the examiner's summary of what happened at the interview;

2    correct?

3    **A.**    That's my understanding, yes.

4    **Q.**    All right.  And the examiner, in the third line, the

5    third, fourth, and fifth line, talks about the demo.  Do you

6    see that?

7    **A.**    Yes, sir.

8    **Q.**    And the examiner says [as read]:

9              "According to the applicant, the claimed camera

10         in the instant application performs some unique image

11         processing and also stores the high-quality video

12         image."

13         Do you see that?

14    **A.**    I see that, yes.

15    **Q.**    So the camera has some unique image processing, and that

16    was demonstrated with the Contour+2; correct?

17    **A.**    According to the examiner's notes here, that's what he's

18    saying.  I don't know that there was a demonstration of unique

19    image processing other than showing the live preview.  And so

20    I guess that could be considered unique image processing.

21    **Q.**    Well, the examiner said that the applicant told him that

22    the camera had some unique image processing.  That's what the

23    examiner said; right?

24    **A.**    So I thought your last question was what was performed.

25    **Q.**    Right.  The demo unit --

**MOONEY - CROSS / DUCKER**

1   **A.**   Okay.

2   **Q.**   -- had unique image processing capabilities.

3   **A.**   Sure.

4   **Q.**   And that was, according to the examiner, the novel feature

5   of -- what he was told was the novel feature of the patent;

6   right?

7   **A.**   I don't see that here necessarily, no.

8   **Q.**   Can we go to the next line [as read]:

9           "Examiner concluded that if these features are

10          incorporated in the claim, that it would overcome

11          prior art references Curry."

12          Do you see that?

13  **A.**   Okay.

14  **Q.**   So he was told that the camera had unique processing

15  features, and then he concluded if that was incorporated into

16  the claim, that it would overcome the prior art; correct?

17  **A.**   I can read the claim, and the claim very specifically

18  doesn't say "unique image processing."

19  **Q.**   Again, the examiner was told that the camera had unique

20  image processing capabilities; correct?  That's what the

21  examiner says in JTX-3.

22  **A.**   That's what he summarizes.

23  **Q.**   Yes.  And that if you incorporated that into the claim, it

24  would overcome the prior art; correct?

25  **A.**   Says that that -- if it was incorporated in the

1    complaint [sic], it would overcome prior references.

2    **Q.**    And, again, the Contour+2 had an A5 or an -- had an A5s

3    processor in it; right?

4    **A.**    Apparently.

5    **Q.**    And an Ambarella A5s processor does image processing?

6    **A.**    According to the testimony I've heard.

7    **Q.**    And yet there's no evidence that the examiner was ever

8    told that the camera that was demo'd for him which had the

9    unique image processing included an Ambarella chip?  You didn't

10    point to anything in there.  And I'll posit I've never seen it.

11    So there's no evidence that the examiner was told that the

12    unique image processing came from the A5s?

13    **A.**    I think we've supplied extensive evidence that we provided

14    the patent examiner with massive amounts of Ambarella A5

15    processor chip documentation.

16    **Q.**    We'll get to that in a minute.

17        But no one told the examiner that the camera that was

18    demo'd had the A5s in it?

19    **A.**    I don't know that that's the case or not.

20    **Q.**    So I think you talked about you used to work at

21    Clarke Capital.

22    **A.**    Yes, sir.

23    **Q.**    And at some point, Clarke Capital entered into an auction,

24    I believe, for Contour, Inc.'s assets; is that correct?

25    **A.**    Yes.

1  Q.   And in 2013, you were the chief legal officer of

2  Clarke Capital; right?

3  A.   My title changed, but that was my role.  I think -- I

4  don't remember if I was the managing director and chief legal

5  officer at the time or executive vice president/general

6  counsel, but my role was the same.

7  Q.   And you were involved in the decision to acquire Contour's

8  assets out of receivership; correct?

9  A.   Yes, sir, I was.

10 Q.   And among the assets that were in the receivership were

11 pending applications and issued patents of Contour; correct?

12 A.   Yes, sir.

13 Q.   And what Clarke Capital paid, or what they bid, was around

14 1.8 million?

15 A.   1.8, 1.9 million.

16 Q.   And that bid was successful?

17 A.   Yes, sir.

18 Q.   And that auction was open to any investor?

19 A.   No.

20 Q.   It was not open to any investor?  It was a...

21       MR. DUCKER:  Could we bring up, not for everyone,

22 DTX-3435, please.

23       THE COURT:  Is that just for the witness?

24       MR. DUCKER:  Yes.

25 \\\

MOONEY - CROSS / DUCKER

1   BY MR. DUCKER:

2   **Q.**   Do you recognize this exhibit?  I'm sorry.  Can you see

3   it?

4   **A.**   I'm sorry.  Could you just do it one page at a time and

5   let me go through the pages?  Thank you.

6       Can you slow down, please.

7       Okay.  1.925, I see that.

8       I'm sorry.  Can you please stop scrolling around?

9          **THE COURT:**  Is the question does he recognize the

10  document?

11         **MR. DUCKER:**  Yeah, does he recognize this document?

12         **THE COURT:**  So start with that.

13         **THE WITNESS:**  I believe so.  I need to see the whole

14  thing, but I believe so, yes.

15  BY MR. DUCKER:

16  **Q.**   And did you review this back in the 2013 time frame?

17  **A.**   If it's the final order there, yes.

18         **MR. DUCKER:**  Your Honor, we would move to admit

19  DTX-3435.

20         **MS. REPLOGLE:**  No objection, Your Honor.

21         **THE COURT:**  All right.  It's admitted.

22      (Trial Exhibit 3435 received in evidence.)

23         **MR. DUCKER:**  And if you would turn to page 3 of this

24  document and the paragraph 9 specifically.

25      And -- actually, could you go back to paragraph 7.  I

 1  apologize.

 2  **BY MR. DUCKER:**

 3  **Q.**  In the last sentence, it says [as read]:

 4          "Pursuant to the Auction Order, the Court

 5      authorized the Receiver to accept bids and, if

 6      necessary, hold an auction for the sale of Contour's

 7      assets."

 8      Do you see that?

 9  **A.**  Yes, sir.

10  **Q.**  And then if you would go to paragraph 9, it says [as

11  read]:

12          "The Receiver conducted an Auction on

13      October 17th, 2013."

14  **A.**  Yes.

15  **Q.**  And so people were able to bid on these assets beyond just

16  Clarke Capital?

17  **A.**  Counsel, your question was different.  You asked me if

18  anyone in the public could bid at the auction, and I said no.

19  **Q.**  And I'm asking you now, people other than Clarke Capital

20  could have put bids in during this auction?

21  **A.**  Anyone who did a qualified bid could bid at the auction.

22  **Q.**  And Clarke Capital's bid was the winning bid; correct?

23  **A.**  Yes, sir.

24  **Q.**  And that was for $1.8 million?

25  **A.**  $1,925,000.

1    Q.   1,925,000.  And that included all of the patents,

2    including applications that ultimately came out as the asserted

3    patents in this case?

4    A.   Among other things, yes.  It was all of the assets, not

5    including the company's accounts receivables, cash, and a

6    couple of other retained assets.

7         MR. DUCKER:  Could you pull up DTX-2136 just for the

8    witness.

9    BY MR. DUCKER:

10   Q.   And, Mr. Mooney, this is an email that you were copied on;

11   correct?

12   A.   Yes, sir.

13   Q.   Do you recall this email?

14   A.   Yes, sir.

15        MR. DUCKER:  We would move to admit Trial Exhibit

16   DTX-2136.

17        MS. REPLOGLE:  No objection.

18        THE COURT:  It's admitted.

19        (Trial Exhibit 2136 received in evidence.)

20   BY MR. DUCKER:

21   Q.   And so this email is dated June 9th, 2015; correct?

22   A.   Yes, sir.

23   Q.   And it's from Ken Kaufman to Nora Anderson, and then

24   you're copied?

25   A.   Yes, sir.

MOONEY - CROSS / DUCKER

1  **Q.**  And this is after the patents have issued?

2  **A.**  Yes, sir.

3  **Q.**  Okay.  And it says [as read]:

4        "In accordance with the Contour IP Holdings, LLC

5      Operating Agreement and the Contribution Agreement

6      between Contour LLC and Contour IP Holdings, LLC, as

7      of June 6, 2015, Contour LLC has contributed all of

8      its patents to Contour IP Holdings, LLC."

9      Do you see that?

10  **A.**  Yes.

11  **Q.**  And then it says, the next question -- the next sentence

12  [as read]:

13        "The value from Contour, LLC of these patents is

14      $30,000 . . . ."

15      Correct?  That's what it says?

16  **A.**  You have to read the entire sentence.

17  **Q.**  [As read]:

18        ". . . and an entry has been made in Contour's

19      books to reduce its intangible assets by that

20      amount."

21  **A.**  Yes.  So the --

22  **Q.**  So it says --

23  **A.**  The intangible book asset was $30,000.

24  **Q.**  The patents were worth $30,000 to Contour LLC?

25  **A.**  No, sir.

1  Q.  The book value to Contour LLC was $30,000?

2  A.  That is correct.

3  Q.  And that's in 2015?

4  A.  Yes, sir.

5  Q.  So you gave some testimony earlier about a data room.

6  A.  Yes, sir.

7  Q.  Do you recall that?

8      Do you recall who set up the data room?

9  A.  What do you mean by "who set up the data room"?

10 Q.  Well, Clarke Capital didn't set up the data room; correct?

11 A.  What do you mean by "set up the data room"?

12 Q.  You said there was a data room available?

13 A.  Yes, sir.

14 Q.  So who was -- I'm saying Clarke Capital did not create the

15 data room in which the documents you were speaking about

16 earlier were available?

17 A.  No.  It was a publicly available data room platform, so we

18 didn't create that, no.

19 Q.  But the actual data room in which the documents were kept,

20 that wasn't created by Clarke Capital?

21 A.  I don't know who necessarily pulled the trigger to say

22 "Go."  We supplied all the documents to it.

23 Q.  And that was through a company called UBS?

24 A.  Yes, sir.

25 Q.  And so in November 2014, Contour LLC started talking to

1  UBS about selling the company; correct?

2  **A.**   Not -- not necessarily, no.

3  **Q.**   Let me show you --

4          **MR. DUCKER:**  Could we bring up for the witness

5  DTX-2309.

6  **BY MR. DUCKER:**

7  **Q.**   Do you see DTX-2309?

8  **A.**   Yes, sir.

9  **Q.**   And you've seen this document before?

10 **A.**   Yes, sir.

11         **MR. DUCKER:**  We would move to admit DTX-2309.

12         **MS. REPLOGLE:**  No objection.

13         **THE COURT:**  It's admitted.

14     (Trial Exhibit 2309 received in evidence.)

15 **BY MR. DUCKER:**

16 **Q.**   This document is labeled "Project Cyclops."  Do you see

17 that?

18 **A.**   Yes, sir.

19 **Q.**   And it's true Clarke Capital had hired UBS to engage in a

20 potential sale of itself or and/or its patents; correct?

21 **A.**   At this time, the engagement had shifted from our initial

22 engagement, which was to reach out to GoPro specifically and

23 see if we could broker a transaction -- I testified about that

24 before -- in November and December of 2014.

25     By March of 2015, after it was clear that we were kind of

 1   getting jerked around by GoPro, we expanded that engagement to

 2   a number of other potentials.

 3   **Q.**   And the data room that you were talking about earlier,

 4   that was set up by UBS?

 5   **A.**   Again, you mean they're the ones who pulled the trigger on

 6   it, I guess?  Is that what you're saying?

 7   **Q.**   Sure.  Yes.

 8   **A.**   Sure.

 9   **Q.**   The data room in which the documents were loaded was set

10   up by UBS?

11   **A.**   Sure.

12   **Q.**   And if we could go to page 4 of this document, and in that

13   second row there, we see -- these are the people, at least some

14   of them, that you said you were going to meet with; correct?

15   **A.**   I don't with remember Mehrshad Mansouri.  I do know that

16   Jack Lazar, the CFO; Tony Bates, the president; and Colin Born

17   were supposed to meet in person with us, yes.

18   **Q.**   And then the next column, it says "Data Room Access";

19   correct?

20   **A.**   Yes, sir.

21   **Q.**   And there's a check?

22   **A.**   Yes, sir.

23   **Q.**   So that means GoPro, according to you, accessed the data

24   room; correct?

25   **A.**   Yes.

1    Q.    And then there's -- the next column says "Bid Date

2    Declined" and there's an X.

3    A.    Yes, sir.

4    Q.    And then in the last one, "Commentary," right?

5         [As read]:

6              "Initial approach on preemptive basis, seem to

7         indicate indifference, declined."

8         Do you see that?

9    A.    Yes.

10   Q.    Now, you testified that GoPro was extremely interested in

11   these patents, but UBS was telling you something completely

12   different; correct?

13   A.    No.  No, USB wasn't telling us something completely

14   different.

15        So in March of '13, I think as we launched the more formal

16   process, at that point they may have shown indifference, but

17   that point we've had to name them in a patent infringement

18   lawsuit.

19   Q.    Right.  But you testified that GoPro was interested, and

20   UBS was telling you that they seemed indifferent.

21   A.    I testified that in November 2014, December 2014, and the

22   first part of January 2015, GoPro was exceptionally interested.

23   But by March of 2015, they did not appear to be interested.

24   Q.    Right.  But the UBS -- the data room was by UBS, and UBS,

25   at least in part, did the outreach to these companies?

MOONEY - CROSS / DUCKER

1    **A.**    In part?

2    **Q.**    Well, UBS did make an outreach to all of these companies;

3    correct?

4    **A.**    I would presume so.

5    **Q.**    Okay.  Could we go to page 2.  And so in March 2015, UBS

6    had reached out to 29 potential buyers; correct?

7    **A.**    If that's the number here.

8    **Q.**    And 12 of them declined any sort of interest?

9    **A.**    Yes, that's correct.

10   **Q.**    14 received process letters?

11   **A.**    Yes.

12   **Q.**    And three just didn't respond at all?

13   **A.**    That's correct.

14   **Q.**    Now, did anyone make any bid for any -- for any of the

15   assets in the Contour portfolio at this time?

16   **A.**    No.  No -- no, they didn't.

17   **Q.**    Okay.  So you believed that the assets were extremely --

18   you testified that you believed that the assets were extremely

19   valuable; correct?

20   **A.**    Yes, sir.

21   **Q.**    And yet 29 companies -- and these are major companies;

22   correct?

23   **A.**    Yes, sir.

24   **Q.**    -- looked at these and chose not to make an offer for the

25   assets; correct?

1    **A.**    It appears to be that way, yes.

2         **THE COURT:**  So is this a good time to take our break

3    for the day?

4         **MR. DUCKER:**  Oh, yes, Your Honor.

5         **THE COURT:**  Okay.

6     Ladies and gentlemen, there's still a way to go.  So

7    remember the admonitions.  Go enjoy your life, don't think

8    about the case, definitely don't research anything, don't

9    communicate with anybody about it.  Come back tomorrow as you

10   came back today.  And we're making good progress.  So have a

11   good afternoon.

12     (Proceedings were heard out of the presence of the jury.)

13         **THE COURT:**  All right.  You can step down, Mr. Mooney.

14              (Proceedings adjourned at 1:27 p.m.)

15                    ---o0o---

16

17

18

19

20

21

22

23

24

25

**<u>CERTIFICATE OF REPORTER</u>**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Friday, October 3, 2025


_____

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

CSR No. 7445, Official United States Reporter