```
                                    Volume 5

                                 Pages 768 - 969

                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA

        Before The Honorable William H. Orrick, Judge

        CONTOUR IP HOLDING, LLC,        )
                                        )
                    Plaintiff,          )   CONSOLIDATED CASES
                                        )   NO. 3:17-CV-04738 WHO
          VS.                           )   NO. 3:21-CV-02143 WHO
                                        )
        GOPRO, INC.,                    )
                                        )
                    Defendant.          )
        _____)
```

```
                                 San Francisco, California
                                 Friday, October 3, 2025
```

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

```
For Plaintiff:
                        SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
                        845 Texas Avenue, 25th Floor
                        Houston, Texas 77002
                BY:   JOHN R. KEVILLE, ATTORNEY AT LAW
                      MICHELLE C. REPLOGLE, ATTORNEY AT LAW
                      SUNNY AKARAPU, ATTORNEY AT LAW
                      MICHAEL C. KRILL, ATTORNEY AT LAW


For Defendant:
                        ALSTON & BIRD LLP
                        One Atlantic Center
                        1201 West Peachtree Street
                        Atlanta, Georgia  30309
                BY:   JOHN D. HAYNES, ATTORNEY AT LAW
                      SLOANE S. KYRAZIS, ATTORNEY AT LAW

            (APPEARANCES CONTINUED ON FOLLOWING PAGE)
```

```
REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter
```

1    **APPEARANCES**:   (CONTINUED)

2    For Defendant:

3                          ALSTON & BIRD LLP
                          55 Second Street, Suite 2100
                          San Francisco, California 94105
4              BY:  **MICHELLE A. CLARK, ATTORNEY AT LAW**
                        **PHILIP C. DUCKER, ATTORNEY AT LAW**

5

6                          ALSTON & BIRD LLP
                          2828 North Harwood Street, Suite 1800
7                          Dallas, Texas  75201
              BY:  **ELLIOTT C. RICHES, ATTORNEY AT LAW**

8
                          ALSTON & BIRD LLP
9                          Vantage South End
                          1120 South Tryon Street, Suite 300
10                          Charlotte, North Carolina 28203
              BY:  **KARLEE N. WROBLEWSKI, ATTORNEY AT LAW**

11

12    **Also Present:**

                          Robert Mooney, Contour Corporate Rep
13                          Pablo Lema, GoPro Corporate Rep
                          Tyler Gee, Deputy General Counsel, GoPro
14                          Jesse Taylor, Trial Technician
                          Allen Eaton, Trial Technician
15                          Luke Arndt, Trial Technician
                          Sarah Moyer, Trial Technician

16

17

18

19

20

21

22

23

24

25

1                        <u>**I N D E X**</u>

2

3  Friday, October 3, 2025 - Volume 5

4
                                                    <u>**PAGE**</u>   <u>**VOL.**</u>
5
   Plaintiff  Rests                                  874      5
6  Charging Conference                               949      5

7

8  <u>**PLAINTIFF'S WITNESSES**</u>                            <u>**PAGE**</u>   <u>**VOL.**</u>

9  <u>**MOONEY, ROBERT PAUL KALMAR (RECALLED)**</u>
   (PREVIOUSLY SWORN)                                782      5
10 Cross-Examination resumed by Mr. Ducker           782      5
   Redirect Examination by Ms. Replogle              787      5

11

12 <u>**KAZHDAN, VLAD**</u>
   By Video Deposition (not reported)                791      5

13

14 <u>**HELFER, ROSS T.**</u>
   By Video Deposition (not reported)                792      5

15

16 <u>**UGONE, KEITH R.**</u>
   (SWORN)                                           792      5
17 Direct Examination by Ms. Replogle                793      5
   Cross-Examination by Ms. Clark                    822      5
18 Redirect Examination by Ms. Replogle              873      5

19

20 <u>**DEFENDANT'S WITNESSES**</u>                            <u>**PAGE**</u>   <u>**VOL.**</u>

21 <u>**LEMA, PABLO**</u>
   (SWORN)                                           874      5
   Direct Examination by Ms. Clark                   875      5
22 Cross-Examination by Mr. Krill                    903      5

23

24

25

1                          <u>I N D E X</u>

2

3    <u>DEFENDANT'S WITNESSES</u>                        <u>PAGE</u>    <u>VOL.</u>

4    <u>LIU, DICKY JI-AN</u>
     (SWORN)                                         922     5
5    Direct Examination by Mr. Ducker                922     5
     Cross-Examination by Mr. Krill                  941     5
6    Redirect Examination by Mr. Ducker              945     5

7

8    <u>O'DONNELL, LAURA</u>
     By Video Deposition (not reported)              946     5

9                       <u>E X H I B I T S</u>

10   <u>TRIAL EXHIBITS</u>                    <u>IDEN</u>    <u>EVID</u>    <u>VOL.</u>

11    14                                              951     5

12    702                                             792     5

13    1096                                            792     5

14    1117                                            792     5

15    1145                                            792     5

16    1228                                            909     5

17    1224                                            907     5

18    1272                                            782     5

19    2006                                            947     5

20    3950                                            965     5

21    4157                                            857     5

22    4289                                            898     5

23    4422                                            896     5

24    4505                                            888     5

25    4767                                            932     5

**<u>Friday - October 3, 2025</u>**                                    **<u>8:00 a.m.</u>**

**P R O C E E D I N G S**

**---o0o---**

1  (Proceedings were heard out of the presence of the jury.)

2          **THE COURT:**  Please be seated, everybody.

3      Good morning.

4          **MR. KEVILLE:**  Good morning.

5          **THE COURT:**  Do we have any business?

6          **MS. REPLOGLE:**  Good morning.

7          **THE COURT:**  Good morning, Ms. Replogle.

8          **MS. REPLOGLE:**  Yes.  As Your Honor knows, GoPro moved
in limine, their Motion in Limine Number 12, to exclude
references to the IPR proceeding.

    And as Your Honor's ruling held that if GoPro referenced
or opened the door by stating or implying that references were
not previously considered when they were, that we could come
forward with either rebuttal evidence and have this matter
addressed.

    And when I got the transcript of what happened yesterday,
as Your Honor knows, in the morning yesterday, I previewed
exactly how I was going to introduce the Boland reference and
the fact that it was considered.  So I previewed for their
cross-examination how that would proceed.

    And on counsel for GoPro's cross-examination, so, for
example, at page 750 of the final -- of the transcript, he

```
 1    was -- he asked Mr. Mooney [as read]:
 2         "QUESTION:  You gave some testimony about the Boland
 3         patent.  Do you recall that?
 4         "ANSWER:  Yes, sir."
 5         Then he continues at line 25 [as read]:
 6         "QUESTION:  And do you know when it was considered by the
 7         Patent Office?"
 8         Mr. Mooney says, "Yes, sir."
 9         And then he was asked [as read]:
10         "QUESTION:  And that was sometime in 2015; correct?"
11         That was their question.
12         Mr. Mooney said, "Yes, sir."
13         And then counsel continued [as read]:
14         "QUESTION:  And the patent issued in 2014; correct?"
15         To which Mr. Mooney answered [as read]:
16         "ANSWER:  The claims were allowed after reviewing the
17         Boland patent."
18         And then GoPro's counsel went further, and down at
19    page 751, line 16 to 17, he was asked [as read]:
20         "QUESTION:  Not at the same time?
21         "ANSWER:  Perhaps.  Perhaps not.  I'm not sure."
22         And then upon another question, Mr. Mooney answered
23    [as read]:
24         "ANSWER:  I understand that they issued -- they reviewed
25         both of them and issued the claims."
```

1    And GoPro's counsel followed up to do it again, and they

2    said -- and the question was [as read]:

3        **"QUESTION:** At different times.  They reviewed Ambarella

4        potentially before 2015 [sic] and Boland in 2015; right?"

5    And Mr. Mooney --

6        **THE COURT:** So, I remember this testimony.

7        **MS. REPLOGLE:** Yes.  And so now, at this point, very

8    concerned that what the jury is thinking, because they know the

9    patent issued in 2014.  I was careful not to introduce any

10   timing into it -- right? -- because then the jury's going to

11   ask:  Well, what happened after twenty- -- after the patents

12   issued?  Why is the Patent Office considering it?

13       And they put the timing of it directly, directly in issue.

14       And the fact of the matter is, is the only reason that the

15   Patent Office didn't consider Boland with Ambarella is because

16   upon GoPro's petition for the *inter partes* review, they get to

17   choose which references they put before the Patent Office and

18   they chose to put Boland in combination with GoPro's own

19   catalog.  So you would presume that they would select their

20   best prior art combination.  They chose it.  It wasn't

21   Ambarella and Boland.

22       And I can't elicit -- well, without the Court's, you know,

23   permission, I can't elicit that.

24       What I suggest, because I think the jury is just confused,

25   is perhaps a curative instruction of some type.  It doesn't

```
 1   have to be, of course, any time now.  I'm not asking that.

 2        But I have a proposal of some draft language.  But just,

 3   something needs to be done because of the timing, especially

 4   the fact they don't know.

 5        THE COURT:  And tell me, in general, what your

 6   curative instruction would be.

 7        MS. REPLOGLE:  Sure.  I have a proposal right here.

 8   And I sent this -- it was just this morning, so I don't expect

 9   a response directly from them.  But this morning I sent over to

10   the other side a proposal that says this [as read]:

11             "You have heard testimony that the Patent Office

12         considered the Boland patent and the Ambarella

13         patents and publications.  However, you heard from

14         GoPro's counsel yesterday that the Patent Office did

15         not consider them at the same time.  You are to

16         disregard the timing of when the Patent Office

17         considered these references and instead consider that

18         the Patent Office had both the Boland patent and the

19         Ambarella patents and publications during the

20         examination of the claims of the patents."

21        In other words, just to be -- like I was on my direct,

22   they had them both during the examination.  So we're not saying

23   that they had them at the same time, just during that process.

24   That was my suggestion.

25        THE COURT:  Okay.
```

1          **MR. HAYNES:**  Your Honor, the testimony that was just

2    read skipped over, I think, the most important part that

3    connected the timing to the point, which was this question,

4    which came in the middle of the parts that were just read.

5          [As read]:

6          "**QUESTION:**  But not Boland and Ambarella.  They didn't

7          look at Boland and Ambarella, the combination; correct?"

8          And the witness answered [as read]:

9          "**ANSWER:**  The Patent Office had Ambarella.  The

10         Patent Office also had Boland."

11         So I think the jury knows the Patent Office had both.  Our

12   position is they didn't look at them in combination.  And the

13   timing, I agree, may have caused confusion in that regard; but

14   I think with respect to the combination, that's what we're

15   saying, that the Patent Office did not consider those two

16   references in combination.

17         I'm not sure that there is confusion on this point, and

18   I think an instruction may actually cause more confusion.

19         I do know we have both experts still coming to talk about

20   Boland and Ambarella, so I expect that by the time the experts

21   are done, there will be absolutely no confusion on this point.

22         So my suggestion would be we can let it play out.  After

23   we see the experts, if we think at that point there's any

24   confusion on what our position is versus their position, I do

25   think it's very clear that the patent -- that the Patent Office

1    had before it both Boland and Ambarella, and we haven't

2    contested that at all.

3          THE COURT:  And I did think that that was the point of

4    the cross-examination.  Let's see how it plays out.

5          And I'm open to --

6          MS. REPLOGLE:  Yes.

7          THE COURT:  -- to your idea if it seems like there is

8    a problem.

9          But sometimes you all are much deeper in the weeds than

10   the jury is and than I am.  And so I was hearing something

11   different and wasn't confused about that.

12         But let's see how that plays out.

13         MS. REPLOGLE:  Okay.  I totally understand,

14   Your Honor.

15         Just to just reiterate one point while we think about and

16   see it going forward, again, it's especially the testimony that

17   was elicited twice that Boland was submitted after the patent

18   issued, because what happens after the patent issues during the

19   examination and --

20         THE COURT:  So the question is:  Will they care?  And

21   will the evidence that comes out through the experts clarify

22   things in a way that is useful, or do we have to say something

23   more?

24         MS. REPLOGLE:  Okay.  We have another issue with

25   respect to the O'Donnell deposition designations, and it

1   touches on -- because, again, GoPro's counsel yesterday, for

2   Mr. Mooney, touched on this issue as well that's already in.

3   So this is just doubled down on this particular issue.

4        And what it is, is that the Court bifurcated inequitable

5   conduct from this trial.  Right?  And so one of their bases or

6   grounds for their theory of inequitable conduct is that Contour

7   didn't tell -- their position is that Contour didn't tell the

8   examiner that the -- that the invention used actually the

9   Ambarella A5s chip, the use of that, which does not relate to

10  invalidity because that would deal with printed publications

11  and things like that.  Right?

12       So we elicited, of course, testimony that the Ambarella

13  publications were cited in front of the Patent Office.  But

14  their designations for O'Donnell, similar to a couple of

15  questions yesterday, goes directly to inequitable conduct.  So

16  at --

17       Do I have copies for the Judge?

18       I'll go ahead and read it, if that's all right.

19            **THE COURT:**  Go ahead.

20            **MS. REPLOGLE:**  The question for Ms. O'Donnell is

21  [as read]:

22       "**QUESTION:**  Do you have an explanation" --

23       This is at page 73, line 15 [as read]:

24       "**QUESTION:**  Do you have an explanation for why you do not

25       disclose Ambarella's WiFi capabilities of their chips to

1           the United States Patent Office in connection with the

2           prosecution of the '954 and '694 patents?"

3           And then the witness answered that question.

4           So, again, the question is just directly to an inequitable

5     conduct position [as read]:

6                "Do you have an explanation for why you do not

7           disclose Ambarella's WiFi capabilities of their chips

8           to the United States Patent -- United States

9           Patent Office in connection with the prosecution?"

10          So we object to the playing of just that last -- it's only

11    the last Q&A of Laura O'Donnell's deposition designations, from

12    73, line 15, down to 73, line 25 --

13          **THE COURT:**  Okay.

14          **MS. REPLOGLE:**  -- because it relates to inequitable

15    conduct.

16          **THE COURT:**  And what's the response?

17          **MS. WROBLEWSKI:**  Yes, Your Honor.

18          So the testimony that has been referenced is relevant in

19    addition to numerous aspects that are at issue in this case,

20    specifically improper inventorship and the general duty of

21    candor to disclose information to the Patent Office that an

22    inventor knows to be material.  And that is specifically in the

23    case *Minerva Surgical v. Hologic*.

24          **THE COURT:**  I'm going to allow this question.  I don't

25    think it goes just to inequitable conduct, and I --

1          **MS. REPLOGLE:**  But, Your Honor --

2          **THE COURT:**  I'm not troubled by this.

3          **MS. REPLOGLE:**  All right.  Any other questions?

4          **MR. KRILL:**  I have just one more, Your Honor.

5      Jesse, could you play just, like, the first -- sorry.

6      Michael Krill on behalf of Contour.

7          It relates to a demonstrative that GoPro intends to

8  introduce through Mr. Lema today.

9          And could you play like the first 30 seconds, just to get

10 the point.

11              (Video was played but not reported.)

12         **MR. KRILL:**  Okay.  Well, the video relates -- it's a

13 video of a child riding a bike with a GoPro mounted on it.

14         I understand the purpose is to show the versatility of the

15 GoPro.  That's true.  They don't have to put a little

16 five-year-old child, ten-year-old child riding a bike with the

17 video.  We just think it appeals to nothing but the jury's

18 sympathies for irrelevant issues.  They could have shown an

19 adult riding a bike.  They could have shown any number of

20 demonstratives other than a child riding a bike.  I don't see

21 the point of the demonstrative other than to unfairly prejudice

22 the jury on irrelevant issues.

23         **MS. WROBLEWSKI:**  Yes, Your Honor.

24         So as Mr. Krill mentioned, the video itself does show the

25 use cases that the GoPro products that are being accused in

 1    this case are capable of.

 2         During numerous videos that we've already seen in the

 3    case, we've seen other use cases being put at issue; and

 4    I believe during the opening, the use cases of SCUBA diving and

 5    skiing down a mountain were put at issue.  And this is another

 6    aspect of showing the features and capabilities that are in the

 7    products beyond those that are specifically being accused,

 8    which also goes to apportionment for purposes of damages.

 9         THE COURT:  So, looks like a cute kid.  I'm going to

10    allow --

11         MR. KRILL:  Okay.

12         THE COURT:  -- this.

13         You both are using evidence and insinuations that don't go

14    directly to the case, but they're the kinds of things that

15    occur in trials.  And it's okay.  I mean, that's just the way

16    that it is.  And this is not close to being beyond the pale.

17         MR. KRILL:  Okay.  Thank you, Your Honor.

18         THE COURT:  Mr. Keville?

19         MR. KEVILLE:  John Keville, for the record.

20         Just to make the record, Exhibit 1272 was entered in

21    Volume 2.

22         THE COURT:  Okay.  What does that mean?

23         THE COURTROOM DEPUTY:  It's just for the sake of the

24    transcript.

25         THE COURT:  Okay.  Great.  I'm delighted.

```
 1          (Trial Exhibit 1272 received in evidence.)
 2          THE COURT:  Is there anything else we need to do
 3  before the jury comes?
 4          MR. KEVILLE:  Not for plaintiff.
 5          THE COURT:  Okay.
 6                  (Recess taken at 8:14 a.m.)
 7              (Proceedings resumed at 8:29 a.m.)
 8      (Proceedings were heard out of the presence of the jury.)
 9          THE COURT:  Are we ready to proceed?
10          MR. HAYNES:  Yes, Your Honor.
11      (Proceedings were heard in the presence of the jury.)
12          THE COURT:  Please be seated, everybody.
13      Ladies and gentlemen, good morning.  Thank you very much
14  for being as prompt as you are.  It's great.  The trial is
15  moving along the way that it should.
16      So we're in the middle of the cross-examination of
17  Mr. Mooney.
18      Please proceed.
19              ROBERT PAUL KALMAR MOONEY,
20  called as a witness for the Plaintiff, having been previously
21  duly sworn, testified further as follows:
22              CROSS-EXAMINATION   (resumed)
23  BY MR. DUCKER:
24  Q.   Good morning, Mr. Mooney.
25  A.   Good morning.
```

**MOONEY - CROSS / DUCKER**

1    Q.   Yesterday you testified and we talked about the

2    receivership auction in which Clarke Capital purchased the

3    Contour, Inc. assets.  Do you recall that?

4    A.   Yes, sir.

5    Q.   Now, GoPro could have participated in that auction;

6    correct?

7    A.   No, it couldn't.

8    Q.   GoPro could not have participated in the auction in 2013?

9    A.   That is correct.

10   Q.   And how do you know that?

11   A.   Because it did not submit a qualifying bid in order to be

12   able to participate in the auction.

13   Q.   It could have submitted a qualifying bid in 2013?

14   A.   I can't speak for GoPro one way or the other.

15        MR. DUCKER:  Can we pull up TX-2309.

16   BY MR. DUCKER:

17   Q.   And we also talked about this document yesterday.  Do you

18   recall that?

19   A.   Yes.

20        THE COURTROOM DEPUTY:  So this is in, Mr. Ducker?

21        THE COURT:  Yes, it's in.

22        MR. DUCKER:  It's in.

23   BY MR. DUCKER:

24   Q.   And what we know is that in March of 2015, GoPro had told

25   UBS that it had indicated indifference -- sorry.  Let me start

1    that question again.

2         What we know is that at least in March 2015, UBS told

3    Contour that GoPro seemed to indicate indifference and declined

4    to make an offer; correct?

5    **A.**   Yes.  Once we moved over to a broader process that

6    included more parties than GoPro, as I -- if you remember, I

7    testified that we had extensive discussions with GoPro standing

8    alone from November and December and then even into January of

9    2015.  Once GoPro made it -- indicated that they weren't going

10   to continue to work with us in a direct basis and we expanded

11   that to more parties, it appears they made a response to UBS of

12   being indifferent.

13            **THE COURT:**  Mr. Mooney, stick to the question.  Okay?

14   **BY MR. DUCKER:**

15   **Q.**   And like GoPro, 28 other companies that UBS contacted,

16   including camera companies like Sony, as well as Apple and

17   Samsung, also chose not to make an offer; correct?

18   **A.**   Yes, sir.

19            **MR. DUCKER:**  Could we put up TX-463, please.

20   **BY MR. DUCKER:**

21   **Q.**   Mr. Mooney, were you in the room -- you were in the room

22   when Mr. Harrison testified about this document?

23   **A.**   Yes, sir.

24   **Q.**   And in this email, Mr. Harrison says [as read]:

25            "We have decided" --

1          At the top [as read]:

2               "We have decided to take Route 1b (see below)."

3          Do you see that?

4   **A.**   I see that, yes.

5   **Q.**   And on page 2 of this document, we see Mr. Harrison

6   explains Route b -- 1b is the fudge route; correct?

7   **A.**   Yes, sir.

8   **Q.**   And you're copied on this email?

9   **A.**   Yes, sir.

10            **MR. DUCKER:**  You can take that down.

11  **BY MR. DUCKER:**

12  **Q.**   Mr. Mooney, you understand the plaintiff in this case is

13  Contour IP Holdings, LLC; correct?

14  **A.**   Contour IP Holding, LLC.  Yes.

15  **Q.**   Yes.  Sorry.  I added an "S."

16         Contour IP Holding, LLC; correct?

17  **A.**   It's happened repeatedly.  No big deal.

18  **Q.**   And you are testifying as the corporate representative for

19  Contour IP Holding, LLC; correct?

20  **A.**   Yes, sir, I am.

21  **Q.**   You are not, however, employed by Contour IP Holding, LLC;

22  correct?

23  **A.**   That is correct.

24  **Q.**   And you are not working as a testifying expert for

25  Contour IP Holding, LLC either; correct?

1   **A.**   That's my understanding, yes.

2   **Q.**   And you are here as the representative of

3   Contour IP Holdings and to testify as to your memory of the

4   facts; correct?

5   **A.**   I'm here as the corp. representative.

6   **Q.**   But in part, you're testifying as your memory of facts

7   that occurred prior to today?

8   **A.**   In part, yes.

9   **Q.**   And as the corporate representative, you are being paid to

10  represent Contour IP Holdings and its interest in this case;

11  right?

12  **A.**   Say that one more time.

13  **Q.**   And as the corporate representative, you are being paid to

14  represent Contour IP Holdings in this case; right?

15  **A.**   I'm being paid for my time, yes.

16  **Q.**   And your time as the corporate representative?

17  **A.**   Yes.

18  **Q.**   And your time testifying today?

19  **A.**   Yes.

20  **Q.**   And your rate to serve as the corporate representative and

21  to testify is $600 an hour; correct?

22  **A.**   That is my rate, period, which is a lot less than I'd be

23  charging if I were still practicing with an international law

24  firm.

25  **Q.**   So you are being paid for all of your time in the

1  courtroom, on the stand, $600 an hour; correct?

2  **A.**  All of my work consulting for Contour IP Holding is being

3  compensated, yes.

4  **Q.**  The question is very simple.  You are being paid $600 an

5  hour for your time in the courtroom and testifying; correct?

6  **A.**  I think those are duplicative.  Yes.

7  **Q.**  So you're -- and you're being paid for every minute,

8  actually, that you're in the courtroom?

9  **A.**  Yes.

10  **Q.**  And since we've spent at least five hours a day in this

11  courtroom, you've earned over $12,000 just this week for being

12  here; correct?

13  **A.**  I haven't done the math, but it sounds like that could

14  be -- could be accurate.

15       **MR. DUCKER:**  Okay.  I have no further questions,

16  Your Honor.

17       **THE COURT:**  All right.

18     Ms. Replogle, anything further?

19       **MS. REPLOGLE:**  Yes, Your Honor.

20                    <u>**REDIRECT EXAMINATION**</u>

21       **MS. REPLOGLE:**  Let's just start right there at

22  TX-2309.  Could you put that up, please.

23     Could you put that up, please.

24  **BY MS. REPLOGLE:**

25  **Q.**  All right.  You were asked several questions about this

1    document, Project Cyclops, in March 2015, I think it's dated?

2    **A.**   Yes, ma'am.

3    **Q.**   All right.  Did Contour have a minimum dollar amount in

4    these discussions?

5    **A.**   Yes, ma'am.

6    **Q.**   What was that minimum amount?

7    **A.**   Mr. Clarke, the principal, had a minimum amount of,

8    I believe, $250 million.

9    **Q.**   Could you turn to TX-2136.

10       All right.  And you were asked some questions from GoPro's

11   counsel about the fact that the -- the last sentence there

12   [as read]:

13           "The value from Contour, LLC of these patents is

14           $30,000, and an entry has been made in Contour's

15           books to reduce its intangible assets by that

16           amount."

17       Do you remember that --

18   **A.**   Yes, ma'am.

19   **Q.**   -- testimony?

20       Recognizing the time limits that we have in this trial,

21   could you very briefly explain the difference between book

22   value of an asset and market value of an asset?

23           **MR. DUCKER:**  Object, Your Honor.  I think this calls

24   for expert testimony.

25           **THE COURT:**  You raised it.  If he knows the answer, he

 1   can answer it.

 2          **THE WITNESS:**  Yes, ma'am.  And, in fact, this

 3   transaction probably is really well representative.

 4          As has been established, we purchased Contour's assets out

 5   of receivership for just over $1.9 million.  With that came a

 6   bunch of tooling, inventory, cameras, a whole host of things.

 7          And if you have hard assets like that, you can't go and

 8   say your intangible assets are worth all of this because you

 9   can do that.  So you have a large entry for what you can

10   quantify as your tangible assets, and then you can do something

11   of intangible assets on your books to reflect the difference.

12   **BY MS. REPLOGLE:**

13   **Q.**  And would the intellectual property, the patents that are

14   asserted in this case, be considered an intangible asset?

15   **A.**  Yes, ma'am.

16          **MS. REPLOGLE:**  Okay.  Could you put up TX-2351,

17   please.

18   **BY MS. REPLOGLE:**

19   **Q.**  And do you recall being asked and directed to whether or

20   not Woodman's '251 patent had been disclosed to the

21   Patent Office during the prosecution of the patents asserted in

22   this case?  Do you recall that?

23   **A.**  Yes, ma'am.

24   **Q.**  Okay.  First question:  Had -- if Contour had known of the

25   '251 patent during the examination of either of the patents

1    asserted in this case, would Contour have disclosed that to the

2    Patent Office?

3    **A.**   Yes, ma'am.  In fact, we have a continuation of the

4    patents-in-suit where this is on the face of the patents.

5         **MS. REPLOGLE:**  Allen, could you put up U.S. Patent

6    9,742,975 for the witness.

7         And, Your Honor, I would move into evidence this

8    United States patent as TX-1255.  That's the next trial exhibit

9    number.

10        **THE COURT:**  Any objection?

11        **MR. DUCKER:**  Your Honor, we haven't seen this before

12   today.  Is it on the exhibit list?

13        **MS. REPLOGLE:**  No, Your Honor.  This is redirect from

14   his cross-examination.  Maybe I can lay a foundation for it?

15        **THE COURT:**  Maybe, but if it hasn't been on the

16   exhibit list, that's problematic.

17        **MS. REPLOGLE:**  Okay.  That's fine.  I'll just --

18        Put that down.

19   **BY MS. REPLOGLE:**

20   **Q.**   Does Contour have continuation applications to the

21   asserted patents in this case?

22   **A.**   Yes, ma'am.

23   **Q.**   And has Contour -- has the '251 Woodman patent come up in

24   the prosecution of the continuation application?

25   **A.**   Yeah.  It was brought to our attention afterwards, and so

1    it was discussed in later patents, yes.

2    **Q.**   And has Contour's continuation applications to the patents

3    asserted in this case been issued and allowed, despite the fact

4    that the Woodman '251 patent was cited?

5    **A.**   Yes, ma'am.

6              **MS. REPLOGLE:**  No further questions.

7              **THE COURT:**  All right.  Mr. Mooney, thank you.

8                        (Witness excused.)

9              **THE COURT:**  Who's next?

10             **MR. AKARAPU:**  Sunny Akarapu for the plaintiff,

11   Your Honor.

12       Contour calls Vlad Kazhdan by deposition, who is the

13   president of Element Electronics, a licensee of Contour's

14   patents.

15       This clip contains testimony designated by both of the

16   parties, and his deposition was taken in 2021.

17             **THE COURT:**  All right.  And about how long is it?

18             **MR. KEVILLE:**  11 minutes.

19             **THE COURT:**  Okay.  Thank you.

20       (Video deposition of Vlad Kazhdan was played but not

21   reported.)

22             **MR. AKARAPU:**  Your Honor, the deposition referenced

23   Exhibit 3, which is Trial Exhibit TX-1096; Exhibit A, which is

24   Trial Exhibit TX-1117; and Exhibit 16, which is Trial Exhibit

25   TX-1145.  Contour moves to admit Trial Exhibits TX-1096,

```
 1   TX-1117, and TX-1145.
 2           THE COURT:  Any objection?
 3           MR. HAYNES:  No objection, Your Honor.
 4           THE COURT:  All right.  They're all admitted.
 5       (Trial Exhibits 1096, 1117, and 1145 received in
 6   evidence.)
 7           MR. AKARAPU:  Further, Your Honor, Contour calls
 8   Ross Helfer of Contour by deposition.  This 17-minute video
 9   includes testimony designated by both parties from his
10   depositions taken in 2021 and 2025.
11           THE COURT:  Great.  Thank you.
12       (Video deposition of Ross T. Helfer was played but not
13   reported.)
14           MR. AKARAPU:  Your Honor, the deposition referenced
15   Exhibit 1, which is Trial Exhibit PTX-702.  Contour moves to
16   admit Trial Exhibit PTX-702.
17           MR. HAYNES:  No objection.
18           THE COURT:  It's admitted.
19       (Trial Exhibit 702 received in evidence.)
20           MS. REPLOGLE:  Your Honor, the plaintiffs call Keith
21   Ugone.
22                         KEITH R. UGONE,
23   called as a witness for the Plaintiff, having been duly sworn,
24   testified as follows:
25           THE WITNESS:  I do.
```

1          THE COURTROOM DEPUTY:  Be seated.

2          THE WITNESS:  Thank you.

3          THE COURTROOM DEPUTY:  And if you would begin, please,

4    by stating your full name and spelling it for the court

5    reporter.

6          THE WITNESS:  Okay.  Do you want me to do that now?

7          THE COURTROOM DEPUTY:  Yes.

8          THE WITNESS:  So my name's Keith Raymond Ugone.  First

9    name is spelled K-e-i-t-h; middle name R-a-y-m-o-n-d; last name

10   is spelled U-g-o-n-e.

11                         <u>DIRECT EXAMINATION</u>

12   BY MS. REPLOGLE:

13   **Q.**   Mr. Ugone, what do you do for a living?

14   **A.**   I'm an economist.

15   **Q.**   What does an economist do?

16   **A.**   Well, what I do as an economist, I'm an economist and

17   what's also known as a damage quantifier.  So what that means

18   is, it's often that companies, like Contour and GoPro, might

19   get into a dispute, and one of the companies might be claiming

20   economic harm, and so I go about evaluating that economic harm.

21   That's what I do as an economist, and the fancy term is "damage

22   quantifier."

23   **Q.**   Sure.  Could you just briefly describe your educational

24   background for the jury?

25   **A.**   Sure.  So I've got a slide on this.

1          But I received a bachelor's degree in economics from the

2    University of Notre Dame in 1977.  Then I got a master's degree

3    in economics from the University of Southern California in

4    1979.  And then I got my Ph.D. in economics from Arizona State

5    University in 1983.

6    **Q.**   Do you specialize, then, in economics and damages-related

7    work?

8    **A.**   Yes.  I work -- I do economic analysis in what I call a

9    dispute environment, where there's some sort of dispute between

10   companies, and so that's the area that I work in.

11   **Q.**   Do your fees in this matter depend in any way on your

12   conclusions that are presented here?

13   **A.**   No.

14   **Q.**   Let's turn to the work that you did in this case.

15        First of all, what were you asked to do?

16   **A.**   Yes.  So the easiest way to think about it is kind of in

17   line with what I was describing.

18        I was asked to evaluate the royalty damages owed to

19   Contour resulting from GoPro's infringement of the patents

20   we've been hearing about, the '954 and the '694 patents.

21   **Q.**   All right.  Does this slide fairly reflect the materials

22   and evidence that you reviewed in this case to assess the

23   appropriate amount of damages?

24   **A.**   Yes.  So I looked at a lot of different materials, and

25   we've listed some out here.  But there were legal documents.

1    There were documents from Contour.  There were documents from

2    GoPro.  There were other documents I looked at.

3        And I also talked to various people that are on the right

4    there, some of which you've heard here -- all of them you've

5    heard here at trial, either live or through deposition

6    testimony.

7    **Q.**  All right.  And what did you conclude for the appropriate

8    amount of damages?

9    **A.**  So, you know, I have a slide on that, that I really

10   provide two different numbers because I undertook two different

11   approaches to evaluating what we'll call the royalty damages.

12   So --

13             **THE COURT:**  Hang on.

14             **MS. CLARK:**  I believe this demonstrative was not

15   modified as per agreement of the parties and order of the Court

16   in response to objections in the morning.

17             **MS. REPLOGLE:**  Your Honor, I'm not aware of that.

18             **THE COURT:**  Could you show me the demonstrative that

19   you were looking at.

20             **MS. REPLOGLE:**  Sure.

21                 (Document handed up to the Court.)

22             **MS. REPLOGLE:**  It's his two conclusions.

23             **MS. CLARK:**  Counsel fixed it.

24             **THE COURT:**  Okay.

25             **MS. REPLOGLE:**  Can I get my time back?

1          **THE COURT:**  Overruled.

2     **BY MS. REPLOGLE:**

3     **Q.**   Okay.  All right.  So, Mr. Ugone, could you just please

4     recap.  What were the two different approaches that you took in

5     this case?

6     **A.**   So I'm really providing two opinions to the Court and to

7     the jury.  But basically, royalty damages in this case are

8     royalty rate times the number of accused units.

9          So when I undertook what I'll call sort of a profit

10    apportionment approach, the reasonable royalty rate was $3.60

11    per camera.  And if you multiply that times the number of

12    cameras that are accused, then you get a number of $64,512,187.

13         I also undertook a different type of approach called a --

14    kind of a comparative license approach; and when I took the

15    comparative license approach, the reasonable royalty rate per

16    camera was $9.71 per camera.  You multiple that times the

17    number of accused cameras and you get $174,003,705.

18         So that's my ultimate opinion, but I'll explain to the

19    jury, as we go on, how I came up with those numbers.

20    **Q.**   Understood.

21         And in this particular case, Dr. Ugone, are the -- is the

22    number of accused units in dispute between the parties?

23    **A.**   No.  The parties have agreed to the number of accused

24    cameras.

25    **Q.**   When do the patents expire in this case?

1   **A.**   So if you look at this chart, it says "Contour Patents."

2   But the far right column has the expiration date, which for

3   both the '954 and the '694 patents, they expire September 13th,

4   2031.

5   **Q.**   Okay.  And why does -- what does that matter with respect

6   to the expiration date, if anything?

7   **A.**   Well, it matters in the following sense:  that we're

8   calculating the royalty damages up to a certain point in time,

9   but the patents go on longer than today, just to kind of

10   figuratively say that.

11       And so unless GoPro were to somehow change their cameras

12   so they weren't infringing on the patents, there would have to

13   be kind of continuing compensation through when the patents

14   expire.  So that's why that date is important.

15   **Q.**   Do you recall if Dr. Hu explained that the accused

16   products could be placed into particular groups?

17   **A.**   Yes.

18   **Q.**   Okay.  What was the first group of GoPro products that

19   Dr. Hu explained?

20   **A.**   So this first slide here shows what we've entitled

21   "Live Preview Group 1 Products."

22       And what I should say is that what we're going to show in

23   these numbers match up with what Dr. Hu testified to in terms

24   of various categories of products.  So that's why we're going

25   to show you a couple of different slides.

1        But Live Preview Group 1 products, when you take all of

2    those together, total 12,997,023 accused camera units for

3    Live Preview Group 1 products, according to Dr. Hu.

4    **Q.**    And what was the second group of the GoPro products as

5    Dr. Hu categorized them?

6    **A.**    Yeah.  So these ones, as you could probably guess, are

7    called "Live Preview Group 2 Products."  And according to

8    Dr. Hu, there are certain products that fall into that

9    category.  And if you add all of those units together, you get

10   1,269,147 accused camera units for Live Preview Group 2

11   products.

12   **Q.**    Do you recall if Dr. Hu also separately addressed the

13   infringement of the HERO 4K product?

14   **A.**    She did.  She did have some discussions about the HERO 4K.

15   And that number is here separately.  So if someone were

16   interested in that number, it's the top line, far right, and

17   there were 125,366 units sold of the HERO 4K.

18   **Q.**    Okay.  And was there a third group, and final group, of

19   products as Dr. Hu categorized them?

20   **A.**    So the third group -- and we'll get that slide up here --

21   is called the "Live Streaming Products," and everything that

22   goes into -- if I could call it a bucket -- everything that

23   goes into that bucket totals 3,653,882 units.

24   **Q.**    Now, did you also total the amount of sales units and

25   determine what the average selling price was?

1  **A.**   Yes.  And I do also have a slide that shows some totals

2  here.  And I know these are a lot of numbers, but remember what

3  I said.  You have to take a royalty rate times the royalty

4  base, and so that's why I kind of have to go through the

5  numbers.  There's a lot of them.

6      But if you add together all the sales units in the three

7  different groups, there's 17,920,052 total accused units, and

8  those include the accused units and also the units where it's

9  already been found that Claim 11 of the '954 has been

10  infringed.  But if you look at all of those units, the average

11  price to GoPro was about $248 per unit on average.

12      And I will mention one more thing, that there's some

13  categories where a unit may show up in two categories.  So,

14  like, if you look at the number of models, you'll see 19, 5,

15  and 4.  Well, 19 plus 9 more is 28, but I have 26 at the

16  bottom.  So you might say:  Is that a math error?  No, that's

17  not a math error.  It's just that some units fall into both

18  categories.  But there's no double counting going on, just in

19  case you see something that looks odd.

20  **Q.**   Did that have something to do with how a product was --

21  the particular timing of when particular features in products

22  existed, the timing?

23  **A.**   Yeah, there could have been changes in the product that

24  put it into two different categories across time.

25  **Q.**   All right.  Let's turn to your analysis.  What approach

1    did you use to evaluate damages?

2    **A.**    I'm sorry.  One more --

3    **Q.**    What approach did you take to evaluate damages?

4    **A.**    Right.  So I was evaluating what's called royalty damages

5    or what a reasonable royalty rate would be.  And so a very

6    accepted methodology for that or approach is through something

7    called a hypothetical negotiation.

8    **Q.**    What were you -- were you required to make any assumptions

9    in order to calculate a reasonable royalty using a hypothetical

10   negotiation?

11   **A.**    Right.  There's been guidance provided by the courts in

12   terms what would one consider at a hypothetical negotiation.

13       Now, remember, what we're trying to do is simulate

14   something that didn't happen.  There wasn't a negotiated

15   agreement between the parties.  That's why it's called a

16   hypothetical negotiation.

17       But in this hypothetical negotiation between Contour and

18   GoPro, which is the foundation for my opinions, there's two

19   patents.  It has to simulate, you know, a real-world

20   negotiation.  The parties have to be willing to negotiate, and

21   they also go in smart.  They're prudent negotiators,

22   businesspeople.  They know the relevant facts because they're

23   going to be making a very important business decision, a very

24   important business contract.  And so those are the general

25   types of parameters, constraints, what goes on at a

1  hypothetical negotiation.

2  **Q.**   When would the hypothetical negotiation for this case take

3  place?  What time?

4  **A.**   Okay.  The hypothetical negotiation always takes place

5  right before kind of the first date of infringement, because if

6  you think about it, a party would need a license to not

7  infringe the patents, and so that negotiation has to occur

8  right before that first infringement.

9       So the patents have issued.  Someone wants to use the

10  technology.  So that would have occurred in November 2014,

11  around the date of the issuance of the two patents at issue.

12  **Q.**   Let's take a look at those 15 factors in *Georgia-Pacific*

13  that you mentioned.  Is that what's being presented here in

14  your slide?

15  **A.**   Yeah.  So this is part of the methodology as well.  In

16  other words, the courts have provided guidance as to:  Here's

17  some things you should look at during a hypothetical

18  negotiation.  They're called the *Georgia-Pacific* factors.

19  There's 15 of them.  So I'm going to say don't worry; we're not

20  going to go through all 15.  But I'm going to go through some

21  of them, the more important ones.

22       But you can see here the bolded ones -- and I'll cover

23  these in more detail later -- the bolded ones are the ones that

24  I put more weight on, because you don't have to put weight on

25  all of them.  The question is what's important for the analysis

1    you're trying to do.

2         But if you go all the way to Number 15 there, that's the

3    hypothetical negotiation, which I had introduced, you know, a

4    little bit earlier.

5    **Q.**   All right.  In addition to the *Georgia-Pacific* factors,

6    did you also identify any key factors that you should consider

7    in determining the outcome of the hypothetical negotiation?

8    **A.**   I did.  So I kind of combined these into a certain

9    number of factors, which we'll see on the next slide.  So I've

10   got five of them here of what I looked at.  And we'll go

11   through these five.

12        But on the far right of this chart, if you look over to

13   the right, you'll see that they do correspond to the

14   *Georgia-Pacific* factors.  I've just kind of put some of them

15   together for ease of talking about them.

16   **Q.**   Okay.  What was the most important feature that you

17   concluded with respect to this case?

18        Excuse me.  Let me go back.

19        What was the most important feature?

20   **A.**   Yes.  So we're talking about Live Preview & Remote

21   Control, and I'm going to go through that and help the jury

22   understand why I reached the determination that that was the

23   most important wireless feature that we're talking about with

24   these cameras.

25   **Q.**   Okay.  And what was some of the evidence and documents

1   that you -- that led you to that conclusion?

2   **A.**   Well, I looked at a lot of information, including GoPro

3   information.  So I was looking at their own, what I'll call,

4   contemporaneous documents.  What were they doing at the time?

5   What were they telling people?

6       So in this first slide, this comes from GoPro's tutorial

7   video, and it only advertises the Live Preview & Remote Control

8   that you've been hearing about throughout this trial.  And that

9   was the video that came out when the app was released.  And

10  they talk about connect, view, control, you know, all of the

11  things that we've been hearing about at trial.

12  **Q.**   And was there any additional evidence that you looked at?

13  **A.**   So then I looked at sort of another category.  So, first,

14  we looked at the tutorial for the cameras, but there's also

15  user manuals.

16      And when you look at the user manuals, it highlights the

17  ability to -- for the user to control the camera with this

18  wireless remote and to also live stream video.

19      So that's what this is telling us here.

20      But what I'm trying to show is these series of documents

21  within GoPro that place emphasis on the live preview plus

22  remote control wireless connectivity functionality.

23  **Q.**   Let's take a look at another one of your slides on this

24  point.

25  **A.**   So this next one, we're now looking at, you know, a press

1    release in October 2012 when they advertised Live

2    Preview & Remote Control.  So they were -- and it was the first

3    feature.  So they were putting a lot of weight on this concept

4    of Live Preview & Remote Control in the wireless environment.

5    **Q.**   Why would consumers want to control their camera or

6    preview video prior to and during recording?

7    **A.**   I'm sorry.  Could you ask the question again?

8    **Q.**   Why would consumers want to control their cameras or

9    preview video prior to and during recording?

10   **A.**   Well, you know, it's pretty intuitive.  You want to make

11   sure you get the right shot.

12        I mean, you've got the camera, for example, on your helmet

13   or on a motorbike or even a bicycle; and if you don't have a

14   way of framing the shot, then you don't know what you're going

15   to get.  And so you'll be all done doing your mountain biking

16   and go to look at it, and who knows what direction the camera

17   may have been.  And so you want to be able to do the live

18   preview while recording.

19   **Q.**   And during trial, did you hear some testimony on this

20   particular point?

21   **A.**   Yes.  So, actually, we heard from Mr. Harrison, and he

22   kind of went through what I just said.  You know, if you look

23   at the bullet points here, you know, you've got action cameras

24   that are mounted on helmets or bicycles or motorcycles or

25   your -- you could be snow skiing.

1       And at the time -- so if we take ourselves back to when

2  this first came out, at least with GoPro in 2012, this was --

3  you know, he called it a brilliant technology.  But, of course,

4  you know, the issue is, is with the patents, it's actually

5  Contour's technology, or at least that's what the dispute is in

6  this case.

7       But the point is that that was a new, brilliant

8  technology, and you could use that Live Preview & Remote

9  Control, like I said, to make sure your camera settings are

10  right and you're framing the shot properly.

11  **Q.**  Did GoPro also highlight this important feature?

12  **A.**  I'm sorry?

13  **Q.**  Did GoPro also highlight this important feature?

14  **A.**  Yes.  Yes, absolutely.

15       So, you know, they have product release events where they

16  talk about it.  A quote here [as read]:

17            "The new GoPro app enables full, 1-to-1, camera

18            control (start, stop, and settings), mode changes &

19            LIVE preview on Android/Apple smart devices."

20       And then they talk about live video and photo preview and

21  playback on smart devices making framing, setup and review

22  easy.

23       So that's how they're projecting their cameras and the app

24  to the -- what I'll call the consuming public, the people that

25  want to buy these cameras.

1   Q.   Did you consider a feature called -- it's GoPro's ProTune

2   feature?

3   A.   Right.   Protein was a -- ProTune was a way by which you

4   did all of this.   That might be the easy way to say it.   And so

5   that would allow you to have manual control over shutter speed

6   or white balance, the sensitivity of the sensor, the ISO,

7   audio, and color.   So those are all the things you could

8   control with ProTune.

9   Q.   Have you seen additional documents in the materials that

10  you've reviewed that led you to conclude that this feature is

11  important?

12  A.   Yes, I have.

13       So here's, you know, another sort of GoPro document.   And

14  it says, in GoPro's own words [as read]:

15           "GoPro's new ProTune firmware is game changing

16       for the industry, giving pro users more flexibility

17       than ever before."

18       So, again, this is kind of showing or indicating the

19  importance that GoPro themselves are placing on these

20  capabilities.

21  Q.   Okay.   So we've now looked at a couple of -- the

22  information related to how GoPro viewed this feature.

23       Did you also look at how consumers did?

24  A.   Yes, in a reverse sort of way.   Let's put it that way.

25  Q.   Okay.

1    **A.**    And so what this chart is showing us is consumers'

2    negative reactions after GoPro removed some of the camera

3    control settings.

4        And basically, I won't read the first one, but if we read

5    the second and third one, it says, you know, that removal

6    [as read]:

7            "Removed ProTune from mobile phone app,"

8        you know, "it makes the app quite useless."

9        And this other person is saying [as read]:

10            "It renders the camera virtually useless."

11        So these are in 2021 when that was removed, early 2021.

12    So, but it gives us an idea of the importance of that

13    capability.

14    **Q.**    And did you review additional materials on this particular

15    point?

16        I'll just flip to the next -- was there more than one

17    comment in the materials that you reviewed?

18    **A.**    Yeah.

19    **Q.**    We've got a few here.

20    **A.**    Yeah.  I think if you're asking were there only three and

21    did I just take the three, no, that's not true.  There were a

22    lot of different comments.

23        I've got one more slide here, just to give you an

24    indication that, you know, here's three more.

25        [As read]:

1           "Removing ProTune is an insult to every one of

2       your users.  Why would you do this?"

3       And you can read some of the other ones.  But there was a

4       substantial number of negative reactions to that change.

5  **Q.**   Okay.  Let's move to the second key consideration that we

6       discussed earlier, "Accused features provide significant

7       benefit."

8           What did you consider for this particular issue?

9  **A.**   Yes.  So I've got some slides that go through, showing us

10      why there's a substantial benefit.

11          And this slide shows a combination of people that we've

12      heard here at trial or that there was deposition.  But the

13      concept of this Live Preview + Remote Control, it was viewed as

14      a core differentiator.

15          Now, what does that mean?  Well, a core differentiator,

16      it's setting a product apart when you have something that

17      differentiates your product.  So that's why it was really

18      important.

19          But it was also viewed as a necessary feature for a

20      product to succeed in the marketplace.  In other words, if you

21      don't know what you're taking a video of, you know, that can

22      lead to some disappointing moments when you can't go back to

23      the top of the mountain and ski back down and you've missed,

24      you know, the skiing that you were doing.

25          And then we heard from, just the other day, you know,

1    Mr. Mander or Dr. Mander about that it was, you know, a very

2    incredible thing to have these capabilities.

3    **Q.**    Okay.  You also mentioned about GoPro's market share.  Can

4    you be more specific on how the accused features affected

5    GoPro's market share in the real world?

6    **A.**    Yeah.  I think the general sort of consensus is that with

7    this kind of core differentiator being put into the GoPro

8    cameras, that that caused a shift in the market share.  In

9    other words, Contour and GoPro were competing.  According to

10   Mr. Green, they were neck-and-neck.  You know, if there is an

11   incremental sale made or ten more sales, it would be split kind

12   of 50-50 between them.

13       But after the technology was embedded in GoPro's cameras,

14   then it started going 80-20 in favor of GoPro instead of the

15   50-50 split.  That was Mr. Green's testimony from his

16   deposition.

17   **Q.**    And do you recall whether Mr. Woodman provided some

18   testimony regarding the percent increase around the 2012-2013

19   time period?

20   **A.**    Yes.  He talked about also some of the financial

21   performance of the company around that time as well, yes.

22   **Q.**    Okay.  I want to fast-forward just a little bit to go to:

23   Did GoPro also provide any accessories associated with selling

24   the accused products?  Go to Slide 27.

25   **A.**    Yes.  So the way to think about this is that sometimes

1    when you have a product -- so I'm speaking generally, first --

2    sometimes when you have a product and you're selling that

3    product, that there'll be accessories that go along with the

4    product and people will buy the accessories.

5        So if you're able to go to the market with a really good

6    product that has accessories, you'll start making additional

7    sales beyond just the product in question.  And that's what was

8    happening with GoPro as well.

9        So what I have on this slide here is just some examples of

10   some of the accessories.  You know, you might need an

11   additional battery, or you may need a camera mount, or you may

12   want a case to go around the camera.  There's a GoPro

13   subscription where you can store your video, you know, in the

14   cloud.  Let's just say it that way.

15   **Q.**   Did you take into consideration the amount of sales with

16   respect to these ancillary devices?

17   **A.**   Yeah.  So what we have here is just to give you an idea of

18   the ancillary sales or these accessory sales that went along

19   with the accused product sales.  And you can see on the top

20   line, those are revenues from ancillary sales related to the

21   accused products.  And if you look at all the numbers,

22   you know, they range from about the $137 million as a low up to

23   $205 million in 2021 as a high.  But there's a substantial

24   amount of revenues.

25       And then below that would be the gross profits associated

1    with the revenues, and you can see that ranges from, roundly

2    speaking, $40 million in 2017 all the way up to $80 million in

3    2021.

4    Q.   All right.  Let's move on to the competitive relationship

5    with Contour, between GoPro and Contour.

6         What did you consider with respect to that feature?

7    A.   Yeah.  So all we're trying to show here -- and if you

8    think about it, this becomes important in a negotiation between

9    the parties.  That's why we're talking about all of this.

10        But here, we're just showing that they were competitors.

11   And you might be thinking:  Okay.  If I'm negotiating with a

12   competitor, you know, I'm going to be pushing, you know, for a

13   higher deal to get a higher type of payment on a royalty if I'm

14   going to be licensing my technology to a competitor who can

15   then use it.

16        So the point is we're establishing here that GoPro and

17   Contour identified each other as competitors.

18   Q.   And did you hear some trial testimony on this point as

19   well?

20   A.   Yes.  There was testimony on this that the jury has heard.

21   So, again, this was from Mr. Harrison.  He talks about the

22   market was really Contour and GoPro.  They were direct

23   competitors, and they were competitors sharing the market.

24   Q.   Okay.  You mentioned a little bit about Contour's lost

25   opportunities.  Did Contour have a plan to monetize the

1    patented technology and compete with GoPro in the 2014 time

2    period?

3    A.   Yes.  So on a going-forward business, they had a kind of a

4    strategy, a road map to success, I believe is what they called

5    it.  And you can just see -- I think we saw this document

6    earlier in the trial.  And the idea was that they wanted to

7    have -- you know, basically become Number -- the clear Number 2

8    player in the market.  And they had projections of sales

9    increases from 6 million in 2014 to 97 million in 2016.

10       So that was their road map to success or, basically, their

11   business strategy, is what we could call it.

12   Q.   Okay.  Let's move to the Contour license agreement with

13   Element.

14       All right.  Did you consider this --

15   A.   Yeah.  So --

16   Q.   -- as part of your analysis?

17   A.   Yeah, I can talk about this.  We've just heard this in one

18   of the videos just a couple of minutes ago, but there ended up

19   being a license agreement between Contour and Element

20   Electronics.

21       Now, again, to bring us a little full circle, remember I

22   did my valuation two different ways:  one, by looking at

23   license agreements that existed; the other is a profit

24   apportionment approach.  So this goes to the comparable license

25   approach.  That's why we're talking about this.

1    Q.    Okay.

2    A.    But, you know, the effective date -- I'm sorry.  If we

3    could go back.  The effective date was October 10th, 2021.

4    There were licensed patents, the '954 and the '694, as well as

5    others.  But specifically broken out were the two patents we're

6    talking about in the courtroom here.  And the royalty rate

7    specified in that agreement was 5 percent of the net sales.

8    Q.    And who was Element Electronics?

9    A.    So, you know, sometimes you don't hear about companies,

10   but they're actually out there making a lot of sales and doing

11   a lot of things.  But the best way to think about this is that

12   Element is an assembler of TV sets and smart TVs.  And so

13   that's what their business is.  And they actually sell,

14   you know, their products to major retailers:  Amazon, Costco,

15   Target, Walmart, and so forth.  And their product lines include

16   TVs, different types of TVs, sound bars, you know, you put on

17   your TV so you can hear better, and appliances and so forth.

18   Q.    Okay.  Did you evaluate the economic comparability of the

19   Element license?

20   A.    Yes, I did.

21   Q.    All right.  And can you describe how you did so?

22   A.    Yes.  So what I'm doing in this slide is, we have kind of

23   the real-world Contour-Element license.  That's the middle

24   column.  And then on the far right we have what we're calling

25   the hypothetical GoPro license.  So that's what we're trying to

1    simulate, in a sense, by using this comparable license.

2        And let me just say real quick.  It's almost like this

3    valuation methodology, if you're going out to sell your house

4    or rent your house out, one of the first questions you might

5    ask is:  Well, what did my neighbor sell their house for?  And

6    so that gives you guidance as to what maybe the value of your

7    house is.  So that's the methodology here.

8        We have this Contour-Element license, and does that serve

9    as a guidepost or give us guidance as to what the hypothetical

10   GoPro license would be.  So that's why we're doing this.  And

11   I'm comparing the two.

12   Q.   Now, were other patents, other than the two patents

13   asserted in this case, included in Element license agreement?

14   A.   Yes, but that was almost like a separate section, a

15   separate provision.  So there was a section that just dealt

16   with the two patents that are in dispute here, and so that's

17   what I was focusing on.

18   Q.   Okay.  And the jury heard, just some moments ago from a

19   couple of depositions, a lot of references to Exhibit A,

20   Exhibit A over and over again.  And also, I think Mr. Helfer

21   misspoke and said Section A.

22       What is Exhibit A specifically in the Element license?

23   A.   Yeah.  As you can imagine, license agreements have all

24   kinds of words.  They get complicated.  It's very hard to

25   follow.  But the idea is what they'll often do is put exhibits

1    at the end of the license agreements and say, "Here's the

2    patents that are covered by the agreement," and those are

3    explicitly written.

4         So Exhibit A has some licensed patents, and as you can

5    see, it's the '954 patent, the '694 patent.  And if we read

6    down below, what essentially it says is that the royalty to be

7    paid by Element for using the technology of the patents in

8    Exhibit A is the greater of either the 5 percent of net sales

9    that I talked about previously or $5, whichever is greater.  So

10   the 5 percent of the sales of the price of the camera or $5 per

11   camera.  And so that's what I'm trying to summarize here.

12   Q.   Okay.  And just to clarify too, if you look at the full

13   Exhibit A, which is on the left-hand side of your

14   demonstrative, were there any other patents listed in Exhibit A

15   other than the two patents asserted in this case?

16   A.   No.  So this is -- this is discussion of Exhibit A and the

17   consideration -- you can see that in Number 3 at the top on the

18   left -- considerations for the patents included in Exhibit A,

19   which are the two patents in this dispute.

20   Q.   Okay.  Did you also have an opinion or did you do anything

21   to determine the technical comparability of the Element license

22   versus this particular situation here?

23   A.   Well, I think -- so, you know, I want to be a little

24   careful here.  I'm an economist, so I deal with dollars and

25   cents and markets and competition.  I'm not the technical

1    expert.

2        But it's the same patents-in-suit as what we're talking

3    about here that, in the hypothetical negotiation with GoPro,

4    that's what they'd want to license.  And we're also talking

5    about, you know, consumer electronics.  GoPro has an action

6    camera, and Element wanted to get into making action cameras.

7    So from that perspective, you know, kind of the technical

8    hurdle was achieved or was met.

9    Q.    Can you also describe what steps you took in determining a

10   reasonable royalty rate based upon the Element license?

11   A.    So we're going to do a little math here but it's

12   straightforward, that the -- I showed you earlier that,

13   depending on the time period, the average prices move a little

14   bit.

15       But if you take an average price over this January 2015 to

16   September 2021 time period, the average price was roughly $242.

17   And that's -- when I say "average price," that's what GoPro

18   would charge, like, to its distributors.  The retail price

19   would be higher.  This is sort of the net sales price to GoPro.

20       So $242.  We saw there was a 5 percent royalty rate.  You

21   multiply that out.  You get $12.11 per camera sold on a

22   per-unit basis.  So we've taken the 5 percent and turned it

23   into dollars rather than a percentage.  So that's $12.11.

24       But, you know, I recognize that there could be some

25   differences between Element and Contour's negotiations and

1   between the GoPro Contour hypothetical negotiations.  So I made

2   another adjustment for that.  It's kind of like when the house

3   next door has one more bathroom.  Okay.  I've got to adjust for

4   that when I figure out the price I want to sell my house for.

5        And so I used a bargaining kind of share mathematical

6   methodology that told me that GoPro probably would have a

7   little bit more, let's say, negotiating strength than Element,

8   and so I would bring down that $12.11 to only 80 percent of

9   that, which ultimately leads to a $9.71 per unit reasonable

10  royalty rate.

11       So just real quick, we take the average price, we take

12  5 percent, we convert it to a per unit, we adjust for another

13  difference between Element and GoPro, and that comes down to

14  $9.71.

15  **Q.**  And, Mr. Ugone -- Dr. Ugone -- excuse me -- if you were to

16  do the math and calculate what that percentage would be for the

17  $9.71 as compared to the 5 percent for the Element license,

18  what would that math be?

19  **A.**  If we converted it back to a percent, it would be about

20  4 percent roughly.

21  **Q.**  And why is your opinions not with respect to a 4 percent

22  license rate?  Why do you not put 4 percent here instead of

23  $9.71?

24  **A.**  Well, I wanted to value the technology, but if you think

25  about it, camera prices could change for reasons unrelated to

1    the technology.  So if the camera goes up $50 in price but

2    unrelated to the technology, if you're using a percent, then

3    the royalty would go up without the technology changing.  And

4    so I was trying to control for that.

5         One way to control for that is use what's called a

6    per-unit approach.  $9.71 no matter what.  If you add a whole

7    bunch of features and the price of the camera doubles, still

8    $9.71.

9    **Q.**   All right.  Let's move to the last key consideration, the

10   profit apportionment that you considered.  How did you do that?

11   **A.**   Yeah.  So, again, just to bring us full circle, two

12   approaches:  comparable license approach; the other is a

13   proper -- profit apportionment approach.

14        And one way to do that is what's called benchmarking.  So,

15   for example, you find two cameras that are almost virtually

16   identical in every respect except for one feature, and then

17   look at the difference in revenues and profits between those

18   two cameras, and then you work with that to come up with a

19   royalty or the value of the technology.

20   **Q.**   And at the hypothetical negotiation, what did you

21   determine that Contour and GoPro would attribute the gross

22   profit difference would be for the incremental value of the

23   wireless connectivity?  What amount was that?

24   **A.**   Right.  So I compared the GoPro HERO, which came out in

25   2014, with the GoPro HERO+, which came out in 2015.  One had --

1   the HERO+ had WiFi capability; the HERO did not.

2        GoPro -- these are these own words -- described the HERO,

3   the middle column, as the "Perfect entry-level GoPro" and

4   described the GoPro HERO+ as a "Perfect entry-level GoPro with

5   WiFi."

6        To make a long story short, when you go through all the

7   math, it turns out that the gross profit difference between the

8   two is $26.98.  So the perfect entry-level GoPro plus WiFi on a

9   gross profit level made $26.98 more than the perfect

10  entry-level GoPro without WiFi.

11  **Q.**   Did you take any additional steps to determine the

12  incremental value to the patented features?

13  **A.**   Right.  So we don't want to just take that number.  We

14  want to make sure we tie it to the technology that's being

15  talked about, the technology of the patents-in-suit.

16        And so when I was looking at all the documentation and

17  also talking to Dr. Hu, basically, with the wireless

18  connectivity, you could talk about the features that were

19  enabled by the wireless connectivity.  And you've heard this.

20  There's Live Preview & Remote Control; there's Live

21  Streaming & Remote Control; there's display and playback, the

22  three that I have here.

23        Now, remember, the parties are going to be negotiating

24  over the negotiating table.  So basically, what do we do now

25  with that $26.98 when it has three different, you know,

1    functionalities that go along with the wireless?

2        And so what I'm saying is that the hypothetical

3    negotiation, since most of the emphasis we saw in all the

4    documents was on Live Preview & Remote Control, the parties

5    would say:  Let's just take a third of the $26.  Because

6    there's three here, we'll take 33 percent of that.

7    **Q.**    And is that what you're illustrating on this next slide

8    that you just took the third?  Go ahead.

9    **A.**    Right.  So here, you know, we have a little bit more math

10   to wrap things up.

11       The difference in the gross profit was $26.98.  We take a

12   third of that to apportion it to Live Preview & Remote Control.

13   That gives us, third line down, far right, $8.98.

14       But if you think about it, the parties would then

15   negotiate.  Okay.  If that's the value of the -- of the

16   patented technology, how is that going to be split between the

17   two parties?  Now, one side is going to be saying, "It goes all

18   to us," and the other side is saying, "Very little goes to

19   you."

20       But if you look at sort of a negotiated share of the

21   profits using sort of a bargaining-type methodology and model,

22   it turns out that 40 percent, roughly speaking, of the $8.98

23   would go to Contour in the form of a royalty and the remainder

24   would stay with GoPro.

25       So Contour would not be taking all of those profits.

1   They'd be taking 40 percent of the allocated profits, which

2   yields, coming full circle to what I said at the very

3   beginning, a royal rate of $3.60.

4   **Q.**   All right.  Overall, with all the evidence you analyzed,

5   what did you conclude would be a reasonable royalty rate for

6   GoPro to pay to Contour should the patents be found valid and

7   infringed?

8   **A.**   Right.  So here's our final math.  We have a per-unit

9   royalty of $3.60 on the apportioned profit approach times

10  roughly the 17 million accused product units, gives us what I

11  said at the very beginning, damages of -- royalty damages of

12  64,512,187.

13      If you use the comparable license approach, that's the

14  Contour Element license as adjusted, then you get a royalty --

15  per-unit royalty rate of $9.71 per unit times the roughly --

16  I'm rounding -- 17 million accused product sales, gives

17  reasonable royalty damages of $174,003,705.

18          **MS. REPLOGLE:**  Thank you.  I pass the witness.

19      **THE COURT:**  All right.  Before the witness goes to the

20  other side, let's take our break.  15 minutes.  Please

21  remember, don't talk about the case.  Enjoy yourselves.  See

22  you in 15 minutes.

23      (Proceedings were heard out of the presence of the jury.)

24          **THE COURT:**  All right.  We'll be in recess.

25      One thing.  For our jury instruction conference, I'd

```
1    scheduled it to be an hour after we stop.  I'm going to make it

2    half an hour so that we can all get out of here a little

3    sooner.

4          MR. KEVILLE:  Thank you, Your Honor.

5                (Recess taken at 9:59 a.m.)

6                (Proceedings resumed at 10:12 a.m.)

7       (Proceedings were heard out of the presence of the jury.)

8          THE COURT:  Are we ready to proceed?

9          MS. REPLOGLE:  Yes.

10         THE COURT:  Okay.

11      (Proceedings were heard in the presence of the jury.)

12         THE COURT:  All right.  Please be seated, everybody.

13      Is there cross-examination?

14                   CROSS-EXAMINATION

15   BY MS. CLARK:

16   Q.   Good morning, Dr. Ugone.

17   A.   How are you doing?

18   Q.   All right.  My name is Michelle Clarke.  I represent

19   GoPro.

20      Just wanted to clarify a couple of things with you.  Okay?

21   A.   Okay.

22   Q.   All right.  So you were hired by plaintiff, Contour IP

23   Holdings, to provide a damages evaluation in this case; right?

24   A.   Correct.  Yes.

25   Q.   And for that, they pay you --
```

1  **A.**  I'm sorry.  Could you speak up a little bit louder?

2  **Q.**  And for that, they pay you $770 an hour; right?

3  **A.**  Well, I mean, to be --

4  **Q.**  Let me try that again.  They pay the company you work for

5  $770 an hour; right?

6  **A.**  Yeah.  Here's where I want to be careful because I want to

7  answer truthfully.  That's an old rate.  Everybody knows we've

8  been working on this case a really long time.  But that was,

9  I believe, my original rate, yes.

10  **Q.**  They're paying a little more now?

11  **A.**  Yeah.  The rates have gone up as set by Analysis Group.

12  **Q.**  Fair enough.  My rate hasn't but...

13       So you're not an engineer; right?

14  **A.**  Correct.

15  **Q.**  All right.  And you're not an industry expert on action

16  cameras; right?

17  **A.**  Not on action cameras.  I'm an economist and damage

18  quantifier.

19  **Q.**  I think the last time we spoke, when you formed your

20  opinions about damages in this case, you'd never used a GoPro

21  camera, had you?

22  **A.**  I hadn't used one.  I've watched videos.  I now own one

23  and a head strap, and I've put the camera on and couldn't see

24  anything.  But, yes.

25  **Q.**  Welcome to the club.

UGONE - CROSS / CLARK

1          You're not here today offering any opinion on whether

2     GoPro infringes the CIPH's patents; right?

3     **A.**    I'm not providing any technical opinions, no.

4     **Q.**    You're not offering any opinion on whether the patents are

5     valid?

6     **A.**    Correct.

7     **Q.**    And you would agree that if the patents are found invalid,

8     then there's no reason for the jury to consider damages; right?

9     **A.**    Yeah.  My understanding is that infringement and validity

10    have to be found.  Then you answer the damages question.  So,

11    yeah, I agree with you.

12    **Q.**    Right.  So if the jury finds the patents not -- invalid,

13    then your testimony that you went through with all the numbers,

14    that becomes sort of irrelevant; right?

15    **A.**    Well, I always hate to say "irrelevant."  But the concept

16    is you only get to evaluate what I've said if you find

17    infringement and validity.

18    **Q.**    And so let's step through your damages analysis a little

19    bit.  I heard you testify that you rely on a hypothetical

20    negotiation framework to determine a reasonable royalty for a

21    license to the patents-in-suit; right?

22    **A.**    Correct.  Or the payment for a license.  The royalty rate

23    for a hypothetical license, yes.

24    **Q.**    It's one rate for those two patents; right?

25    **A.**    Correct.

1  **Q.**   All right.  And the hypothetical negotiation framework,

2  that determines what a willing licensor in Contour LLC's shoes

3  and a willing licensee in GoPro's shoes would have agreed to --

4  right? -- for a license as of the date of the first alleged

5  infringement; correct?

6  **A.**   Right.  So they would have gone into a room -- yeah, like

7  you're showing here, they would have gone into a room.  They

8  would have gone in smart and prepared to negotiate an important

9  business document.  And they'd negotiate back-and-forth, and

10 when they were all done, here's the rate they would agree to.

11 So that's --

12 **Q.**   And that --

13 **A.**   That's the concept.

14 **Q.**   And that rate, that's not meant to be punitive; right?

15 That's what reasonable people would have sat down and

16 negotiated?

17 **A.**   Yeah.  I mean, it's not punitive.  That's why it's called

18 a reasonable royalty rate.  What would the parties negotiate.

19 **Q.**   And that negotiation would have taken place in November of

20 2014 when Contour's patents issued; correct?

21 **A.**   Correct.

22 **Q.**   Because a party doesn't need a license before the patent

23 issues; right?

24 **A.**   Yeah.  It has to be -- yeah, patent rights have to have

25 issued before you could infringe.

UGONE - CROSS / CLARK

1    **Q.**    Thank you.

2        At the time, you agree that GoPro had a leadership

3    position in the action camera market; right?

4    **A.**    I think by then, yes, there was, as we've talked about, a

5    substantial shift in market shares.

6    **Q.**    And GoPro had released several products, including,

7    I think, the HERO2 with the WiFi BacPac, HERO HD, HERO+.  At

8    least those; right?

9    **A.**    They -- yes, they had issued -- they had issued -- there

10   were cameras that it -- I want to be careful how I say this.

11       The patents hadn't issued, but if they had issued earlier,

12   there would have been infringing cameras earlier that had the

13   technology.

14   **Q.**    So there were already cameras that had the technology that

15   you talk about at the time the patents issued; fair?

16   **A.**    I'm thinking of at least the camera with the BacPac.

17   **Q.**    And in September 2014, GoPro released the HERO4 cameras;

18   right?

19   **A.**    I will accept that, yes.

20   **Q.**    Okay.  I just missed that one.  Put it in.

21       You'd agree that from 2008 to 2011, GoPro had significant

22   revenue growth; right?

23   **A.**    Had significant revenue?

24   **Q.**    Mm-hmm.

25   **A.**    Sure.

1  Q.   And GoPro was good at marketing, and GoPro was viewed as

2  having a good product; right?

3  A.   Yeah.  Well, they -- and we saw -- I'm not disagreeing

4  with you.  They had significant revenues.  But their revenues

5  also made a huge jump after they started coming out with the

6  cameras with this technology.

7  Q.   My question was a little different.  As of 2014, we would

8  agree that GoPro was selling a good product, had good cameras;

9  right?

10 A.   I think they had products and they were successful in the

11 marketplace.  So the market was -- let's say it this way.

12 Rather than me saying whether the product was good or not, the

13 market was buying their cameras.

14 Q.   Right.  The market viewed them as having a good product?

15 A.   They were, at least given the attributes of the cameras,

16 that the market was buying their cameras, yes.

17 Q.   All right.  And let's talk about now who's on the other

18 side of the table.  That's Contour, LLC; right?

19 A.   Correct.

20 Q.   That's a different party than the plaintiff in this case.

21 It's Contour, LLC; correct?

22 A.   Yeah.  I mean, I don't want to get into the legalities of

23 the different parties.  But, yes, Contour, LLC is my

24 understanding.

25 Q.   So why don't we put up Figure 1 from your report.

 1          It's his October twenty- -- yes, that one.
 2          This is Figure 1 from your expert report; yes?
 3   A.    Looks familiar.
 4   Q.    Okay.  And the first date shown is when Contour, Inc. was
 5   formed in 2004; right?
 6   A.    Correct.
 7   Q.    In the 2011 to the 2013 time frame shown in that first
 8   bubble, Contour, Inc. made action cameras; right?
 9   A.    Yes.
10   Q.    Okay.  But in September 2013, Contour, Inc. was placed in
11   receivership by its creditors; right?
12   A.    That's correct.
13   Q.    Receivership is a court-appointed process where a third
14   party called a receiver takes control over the company's assets
15   usually because the company can't pay its debts; right?
16   A.    Yeah.  I think of it as kind of maybe even just running
17   the company and trying to turn it -- it's almost like a
18   turnaround.
19   Q.    Sometime -- and it's because of the amount or nature of
20   the company's debt; yes?
21   A.    I'm sorry.  I missed the question.
22   Q.    Right.  So receivership happens when a company has a
23   significant amount of debt?
24   A.    Oh.  Yeah, when they're in financial difficulty, yes.
25   Q.    Financial difficulty.  I like that.

1          So sometime in 2013, Contour, Inc.'s assets had been

2   placed into receivership, and a company called Clarke Capital

3   purchased Contour, Inc. for its assets for around $2 million;

4   right?

5   **A.**   So if you said did Clarke Capital purchase Contour for

6   around $2 million, I agree with that and, as it says here,

7   you know, was attempting to reboot the company as --

8   **Q.**   I'll get to that.

9   **A.**   -- Contour, LLC.

10  **Q.**   You're getting ahead of me.

11          **THE COURT:**   Just wait.   And you don't need to comment.

12  Just ask the questions.

13  **BY MS. CLARK:**

14  **Q.**   And when Clarke Capital purchased Contour, they moved the

15  company to Utah and reformed it as Contour, LLC; right?

16  **A.**   Yes.

17  **Q.**   And in your timeline, you call this the rebooted company;

18  right?

19  **A.**   Correct.

20  **Q.**   After Contour, LLC formed, it had ten employees as of

21  February 2014; correct?

22  **A.**   Correct.

23  **Q.**   All right.   And that's the company that would have

24  participated in the hypothetical negotiation in 2014; right?

25  **A.**   In November 2014, correct.

1  **Q.**   Suffice to say, at that time GoPro had more than 10

2  employees, 14 employees?

3  **A.**   Yeah.

4  **Q.**   Okay.

5  **A.**   Yes, they were a larger company.  But they also started

6  out with, like, 12 as we heard Mr. Woodman say.

7  **Q.**   On September 2014, this new entity, Contour, LLC, it

8  released a camera called the ROAM3 --

9  **A.**   I believe --

10  **Q.**   -- is that right?

11  **A.**   I believe so, yes.

12  **Q.**   And the ROAM3 did not have WiFi or Bluetooth capabilities;

13  right?

14  **A.**   My understanding, if I'm remembering correctly, I would

15  agree with you; but I think it was an underwater camera, so

16  that kind of made it irrelevant --

17  **Q.**   It wouldn't --

18  **A.**   -- that concept.

19  **Q.**   The ROAM3 couldn't wirelessly preview video to a mobile

20  device; right?

21  **A.**   Or at least that's my understanding.

22  **Q.**   Okay.  And you heard -- right? -- Mr. Harrison say that's

23  because it was designed to be an entry-level camera; right?

24  **A.**   Yes.

25  **Q.**   In the first month of sales, the ROAM3 sold 30 units; is

1  that right?

2  **A.**   I would have to look at the data.

3  **Q.**   Can you look at Trial Exhibit 2269.  You want to go to the

4  first page, actually, first.

5      Do you recognize this document?  It's titled "Contour

6  Shareholder Update" from September 2014.

7  **A.**   I'm sorry.  I missed your question.

8  **Q.**   I just said this document is titled "Shareholder Update,

9  September 2014."

10  **A.**   Yes.

11  **Q.**   Do you see this?

12      And if you look at page 2, do you recognize this?

13  **A.**   Yes.  I see the words on this page, sure.

14  **Q.**   Okay.  And does that refresh your recollection as to

15  whether or not the first month of sales, the ROAM3 sold only

16  30 units?

17  **A.**   That's what it says.

18  **Q.**   Do you have an awareness of, through your work in this

19  case -- you thoroughly evaluated all of the evidence that would

20  have contributed to the parties' bargaining positions; right?

21  **A.**   Yes.

22  **Q.**   Do you have an awareness of the number of sales that

23  Contour, LLC was making at the time of the hypothetical

24  negotiation?

25  **A.**   I think at the time of the hypothetical negotiation, I

1    know they had sales kind of throughout and even through 2014.

2    They weren't substantial, but they were still in the market at

3    the time.

4    Q.    The number 30 units, does that sound about right?

5    A.    Well, that says through -- well, we have to look at the

6    time period here.  But I would have said something higher than

7    that.  I thought they had revenues of, like, 6 million in 2014.

8    That's my recollection.

9    Q.    Why don't we look at -- you think they sold 6 million

10   units?

11   A.    No, no, no.  Dollars.

12   Q.    Okay.

13   A.    Dollars.

14   Q.    Throughout the course of --

15   A.    I'm doing this from memory.

16   Q.    Okay.

17   A.    So, yeah.

18   Q.    What about, you know, do you have an idea of the number of

19   units that were sold throughout 2014 of the ROAM3?

20   A.    No.  I mean, you could divide --

21   Q.    About 5,000?

22   A.    Yeah.

23   Q.    About 5,000?

24   A.    Sure.  Sure.

25   Q.    At the same time, in early and mid-2014, Contour's number

1    one goal was to find a manufacturer for its cameras; right?

2    **A.**    I'm sorry.  You said to find a manufacturer?

3    **Q.**    Yes.

4    **A.**    Yes.

5    **Q.**    It was also trying to find a source for camera processors;

6    right?

7    **A.**    Yeah.  I might phrase it a slightly different way.  We saw

8    their road map to success where they wanted to try to

9    revitalize the company and --

10    **Q.**    And one of the steps was to find a manufacturer?

11    **A.**    Yeah.  I just didn't want to --

12    **Q.**    And one of the steps was to find a source for camera

13    processors; right?

14    **A.**    Yes.  They wanted --

15    **Q.**    And that's because Ambarella, I think you heard earlier --

16    I also think it's in your report -- that Ambarella wouldn't

17    provide Contour, LLC with access to Ambarella's A7 chip; right?

18    So they needed a new source of camera processors?

19    **A.**    Yeah, there were a whole bunch of things you just said

20    there.

21         But what they were trying to do was reboot the company,

22    and that involved getting chips, a manufacturer, distribution,

23    and they got rid of their debt.  They described it --

24    **Q.**    Okay.

25    **A.**    -- as being lean and mean.

1        But I don't disagree with what you're saying.  It's just

2   that there's a number of steps that they were following through

3   on.

4   **Q.**   By November 2014, though, Contour had been unable to raise

5   the capital it needed for product development; right?

6   **A.**   I'm sorry.  They'd been unable to -- say that again.

7   **Q.**   Raise the capital required for product development; is

8   that correct?

9   **A.**   That's my understanding, that, yes, they were in financial

10  difficulty.

11  **Q.**   And by November of 2014, Contour's negotiations with

12  potential manufacturing partners had failed; right?

13  **A.**   They had not secured a manufacturer.  I'll agree with

14  that.

15  **Q.**   And you would agree that Contour's desire to reboot

16  ultimately was not successful; right?

17  **A.**   Yeah, ultimately, ultimately, it was not -- it was not

18  successful.  I mean, I don't think -- I mean, you're -- we're

19  not -- you know, there's not a claim for lost profits here.

20  We're not saying:  Here's the profits they would have made.

21      The issue is:  How much would you license this very

22  important core differentiator technology to a competitor when

23  you're trying to come into the market and be the number two

24  player?  That's the question we're addressing.

25          **THE COURT:**  Hang on.

1      Dr. Ugone, I'd appreciate it if you would just answer her

2 questions directly.

3      And I would appreciate it, Ms. Clarke, if you didn't step

4 on Dr. Ugone's answers to your questions.

5      Go ahead.

6           **THE WITNESS:**  Thank you.

7 **BY MS. CLARK:**

8 **Q.**   Within a month and a half of the hypothetical negotiation

9 date, so by January 2015, Contour had decided to stop investing

10 in cameras; is that right?  Contour, LLC.

11 **A.**   I think we've seen some documentation along those lines,

12 yes.

13 **Q.**   Okay.  But the fact that Contour, LLC -- let me phrase

14 this differently.

15      Now, I understand that you're not raising a claim for lost

16 profits; but you would agree, wouldn't you, that Contour, LLC

17 not having a practicing product, not having a manufacturer, not

18 having access to Ambarella chips, and then one month later

19 completely exiting the camera market, you would agree that that

20 would impact their bargaining power in the hypothetical

21 negotiation; right?

22 **A.**   Actually, my answer is that that's only half of the

23 equation because you have, on one side of the ledger, what

24 you're describing about Contour.  On the other side of the

25 ledger, you have the GoPro side.

UGONE - CROSS / CLARK

1   Q.    I was just asking about Contour.

2   A.    Yeah.  I'm saying that would be part of the negotiating

3   dynamics.

4   Q.    Thank you.

5         So once we've looked at the negotiating dynamics, the next

6   thing you did is you talked about how the parties, the

7   licensing parties at the table, they would try to determine

8   essentially the profits that they may get from -- right? --

9   having this feature and that Contour would talk about how they

10  would split those profits; right?

11  A.    I'm not sure I understand your question.

12  Q.    All right.  I'm not sure I did either.  Fair enough.

13        The starting place in your profit allocation damages

14  measure was looking at or trying to value the value of

15  wireless; right?

16  A.    Correct.  So --

17  Q.    And did you --

18  A.    -- in one of the two methodologies --

19        THE COURT:  Dr. Ugone --

20        THE WITNESS:  I'm sorry.

21        THE COURT:  -- you're doing great with the first thing

22  that's out of your mouth, but then don't go on.

23        THE WITNESS:  Okay.

24        THE COURT:  Just answer what's there.

25        Ms. Replogle can ask you anything where you have more to

1    say.  Okay?

2             **THE WITNESS:**  Thank you.

3    **BY MS. CLARK:**

4    **Q.**    All right.  So the starting point of your evaluation is

5    what you call a value of WiFi connectivity --

6    **A.**    Correct.

7    **Q.**    -- right?

8    **A.**    Correct.

9    **Q.**    You understand that WiFi, that's a wireless protocol that

10   allows compliant products to communicate wirelessly with each

11   other; right?

12   **A.**    Correct.

13   **Q.**    And you would agree that Contour did not invent WiFi;

14   right?  That's not the claimed invention?

15   **A.**    No, they did not invent WiFi.

16   **Q.**    You would agree that Contour didn't invent the WiFi or

17   wireless-enabled camera; right?

18   **A.**    Say that again.  I want to make sure I have it.

19   **Q.**    The claimed invention is not a wireless-enabled camera;

20   right?

21   **A.**    Well --

22   **Q.**    Yes?

23   **A.**    I'm not the technical person, but it's a -- I view the

24   patent as sort of this camera system that has various

25   components.  But, ultimately, we're getting down to this live

1    preview with remote control functionality.

2    **Q.**   My question was simpler.  It was just:  You understand the

3    claimed invention is not a wireless-enabled camera; right?

4    **A.**   I would not describe it that way, but that's -- the patent

5    talks about a camera.

6    **Q.**   Dr. Ugone, would you mind --

7          **MS. CLARK:**  Do we have a copy of his deposition

8    transcript that we can hand Mr. Ugone?

9    **BY MS. CLARK:**

10   **Q.**   Do you recall testifying in this case several times at

11   deposition?

12   **A.**   Yes.  Some of it was a long time ago.

13   **Q.**   For sure.

14         **MS. CLARK:**  Can we show Dr. Ugone his deposition

15   testimony at 55, lines 14 through 16, please.

16              (Document displayed to the witness.)

17   **BY MS. CLARK:**

18   **Q.**   Do you recall testifying to your understanding that the

19   claimed invention is not a wireless-enabled camera?

20   **A.**   Yeah.  I mean, I saw it very quickly.  But I don't think

21   what I was saying was different from that.  But I don't

22   disagree with what I said there.

23   **Q.**   All right.  And to get the profit allocated to the accused

24   functionality, you start with the market value of WiFi as a

25   guidepost; right?

1    **A.**    Correct.

2    **Q.**    The way you calculated that was to compare GoPro's HERO

3    and HERO+ cameras; right?

4    **A.**    Correct.

5    **Q.**    And the price difference was $70?

6    **A.**    Yes, at the retail level.

7    **Q.**    But you would agree that wireless is not the only

8    difference between those two cameras; right?

9    **A.**    I'm sorry.  That wireless is?

10   **Q.**    The WiFi capability was not the only difference between

11   those cameras; right?

12   **A.**    But it was -- yes, there were some other differences, but

13   pretty much they were described as kind of entry-level cameras,

14   one with WiFi, one without.

15   **Q.**    Well, the HERO+ had an 8 megapixel sensor -- right? -- as

16   opposed to only five megapixels in the HERO5 -- in the regular

17   HERO; right?

18   **A.**    I believe in Exhibit 12 to my report, I put all of that

19   out, and so I recognized all that.

20   **Q.**    You agree the megapixel's probably a pretty important

21   selling point to users of the cameras at the time; right?

22   **A.**    It could be to some people, but I'm saying what they were

23   marketing the differences as.

24   **Q.**    The HERO+, it could record at 60 frames per second, and

25   the HERO could only record at 30 frames per second; right?

1    **A.**   That is a difference.  I'm not denying that.

2    **Q.**   Megapixels and frames per second, those are factors that

3    contribute to image quality; right?

4    **A.**   They could, depending on the user.

5    **Q.**   And HERO+ supported a 64-gigabit memory slot, whereas the

6    HERO had a 32-gigabit --

7    **A.**   Correct.

8    **Q.**   -- storage; right?

9    **A.**   Yes.

10   **Q.**   Memory could be important to some users; right?

11   **A.**   Correct.

12   **Q.**   All right.  But you attribute the entire price difference

13   between HERO and HERO+ to WiFi for the purposes of your damages

14   analysis; right?

15   **A.**   And I tried -- so the answer is yes, and I tried to

16   explain to the jury why.

17   **Q.**   And based on that, you concluded that the gross profit

18   attributable to wireless is $26.98; right?

19   **A.**   Correct.

20   **Q.**   Now, you also calculated the gross profit GoPro earned

21   from what's called the WiFi BacPac.  Do you recall that?

22   **A.**   I do, yes.

23   **Q.**   The WiFi BacPac is the thing that clips on or inserts into

24   a HERO camera that enables wireless capability?

25   **A.**   It's an attachment, yes.

1    Q.    And that -- for that, you came up with a number of $18.40;

2    right?

3    A.    Correct.

4    Q.    But -- so I'm not as good at math as you are, but as I

5    understand it, that's $8.58 less than what you calculated for

6    the gross profit differential between HERO+ and HERO; right?

7    A.    It was a smaller one and I did a smaller gross profit, and

8    I ultimately, as I explained in my report, went with a HERO and

9    HERO+.  But I'm not going to deny you that I looked at a

10    number of different factors.

11    Q.    Right.  And you decided to go with the higher number;

12    right?

13    A.    Actually, I went with what I thought was the appropriate

14    number .

15    Q.    And after your calculation of the value of wireless

16    connectivity, WiFi connectivity, what you did is you identified

17    three categories of features encompassed within WiFi; right?

18    A.    I want to say yes, I used those, but those were in

19    consulta- -- you said that I identified.  It was also in

20    consultation with Dr. Hu.

21    Q.    Understood.

22        You also understand that there can be other features other

23    than those three categories that are enabled by WiFi

24    connectivity; right?

25    A.    Yes, I understand that there could be a number of uses for

1    wireless connectivity, but the primary ones that were being

2    marketed were the ones that were identified.

3    **Q.**    But there are unpatented features in the accused products

4    that enable WiFi connectivity.  We can agree on that?

5    **A.**    I'm not the technical person, but I took those into

6    account; like, for example, in the display and playback.

7    **Q.**    Okay.  You treat Live Preview + Remote Control as being

8    one-third of the value of WiFi; correct?

9    **A.**    I'm sorry.  Say that again.

10   **Q.**    You treat the feature that you define as Live

11   Preview & Remote Control as being one-third of the value of

12   WiFi; right?

13   **A.**    Correct.  Correct.

14   **Q.**    And you do this because, in your opinion, Live

15   Preview & Remote Control is the driver of demand for WiFi

16   connectivity?

17   **A.**    For all the reasons I testified to, I agree.

18   **Q.**    Okay.  Well, why don't we look at what you testified to.

19            **MS. CLARK:**  Let's pull up Dr. Ugone's Slide 14 again.

20   **BY MS. CLARK:**

21   **Q.**    So this is one of the documents you relied on; right?

22   It's the user manual for the WiFi BacPac and remote control

23   combo?

24   **A.**    Yeah, this was the user manual, yes.

25   **Q.**    Right.  It talks about enabling the WiFi remote; right?

1    **A.**    Correct.

2    **Q.**    That's not a patented feature; right?

3    **A.**    What -- let me -- show me exactly where you're pointing to

4    here.

5    **Q.**    So if you look at the figure on the right, there's the

6    WiFi BacPac; right?  There's a bunch of lines going out of it.

7    To the left, you see the WiFi remote.  Do you see that?

8    **A.**    Yes.

9    **Q.**    Doesn't have a screen on it?

10    **A.**    I see that, if that's what you're asking.

11    **Q.**    That's not a patented feature; right?  That's not

12    something that you can put into your damages measure?

13    **A.**    I don't believe it is, but I'm not the technical person,

14    but that's my understanding.

15    **Q.**    And then in the box that you have here, you say [as read]:

16          "WiFi enables your GoPro camera" -- "WiFi enable

17       your GoPro camera and control it with your WiFi

18       remote."

19       So we agree that the WiFi remote is not part of the

20    damages measure; right?

21    **A.**    It's the capability between all of these and the ability

22    to control is what I'm valuing.  But I'm not saying the remote

23    by itself is an accused product, if that's what you're asking.

24    **Q.**    So the WiFi remote by itself, that's not part of your

25    damages value?

1    **A.**   Well, yeah, there wouldn't be a royalty on the remote.

2    It's basically Live Preview & Remote Control.  And that

3    capability within the camera is my understanding of what the

4    technology covers.

5    **Q.**   But it has to be remote control from a device where you

6    can also display a preview; right?

7         If you have a separate remote, that's not going to be

8    patented; right?  We can have a separate remote and no

9    infringement, no damages; correct?

10   **A.**   It's the -- like I've been trying to say, it's the ability

11   to do the things we've been talking about, of having a preview

12   and also having remote control from a -- I'll call it a mobile

13   device.  That's my understanding.

14   **Q.**   Did you include the value of a WiFi remote in your damages

15   measure?

16   **A.**   Is the value of the remote in the damages number?

17        What I'm valuing is the value -- licensing value of the

18   patents-in-suit.  So it's the ability to have Live

19   Preview & Remote Control wirelessly, and it's enabled by, for

20   example, WiFi.

21        But it's that concept where you can frame the shot, is

22   what I'm looking at, and what's the value of that, but it's

23   also tied to and has a footprint with the patents in dispute.

24   **Q.**   I may be the only one that's confused, but I don't

25   understand that answer.

1          **THE COURT:**  Just ask the --

2     **BY MS. CLARK:**

3     **Q.**  Does your damages --

4          **THE COURT:**  Please, Ms. Clark --

5     **BY MS. CLARK:**

6     **Q.**  -- model include --

7          **THE COURT:**  Ms. Clark, please just ask the question.

8     Your personal comments aren't helpful.  Just ask the question.

9          **MS. CLARK:**  I agree.  I'm sorry, Your Honor.

10    **BY MS. CLARK:**

11    **Q.**  I just want a "yes" or "no."  Did you include the value of

12    the ability to connect to the WiFi remote in the number of

13    damages that you think GoPro should pay?

14    **A.**  I'm trying to answer it the best way I can, which is, I

15    looked at the value of the capability of being able to --

16    what's the value of Live Preview + Remote Control?  That's what

17    I valued, that ability.

18    **Q.**  So that includes the WiFi remote?

19    **A.**  Well, I wouldn't say it one way or another.  It's the

20    ability to do it.

21    **Q.**  So the ability to use the WiFi remote is part of your

22    damages measure?

23    **A.**  That's not what I'm saying, no.

24    **Q.**  What about this other feature here?  It says you can --

25    in the box, it says [as read]:

UGONE - CROSS / CLARK

```
1              "You can also live stream video and share photos
2         and video to the Web."
3         Do you see that?
4    A.   I'm not sure where you're pointing to.
5    Q.   Back on the slide.  I think it's your Slide 14 in the red
6    box.
7    A.   Okay.
8    Q.   It says [as read]:
9              "You can also live stream video and share photos
10        and video to the Web."
11   A.   Yes, I see that, yes.
12   Q.   All right.  Now, sharing photos --
13   A.   I'm sorry?
14   Q.   -- that is definitely not part of the claimed invention;
15   right?
16   A.   I'm going to need your question again.
17   Q.   Where it says "sharing photos," that's definitely not --
18   A.   Oh, oh, sharing photos.
19   Q.   -- part of the claimed invention; right?
20   A.   No, I don't understand that to be part of the patented
21   invention.
22   Q.   And so that should not contribute any measure to your
23   damages measure; correct?
24   A.   No.  So what I'm looking -- correct.
25   Q.   Okay.  Do you recall that -- you're familiar with the
```

1    accused products in this case; right?

2    **A.**   I'm sorry.  Familiar with?

3    **Q.**   The accused products in this case.

4    **A.**   Yes.

5    **Q.**   You're familiar with HERO9?

6    **A.**   Yes.

7    **Q.**   And HERO9 was sold without live preview while recording;

8    is that correct?

9    **A.**   That's my understanding.

10   **Q.**   GoPro sold about 1.5 million units of the HERO9?

11   **A.**   Correct.

12   **Q.**   And the HERO10, that was also sold without the ability to

13   live preview while recording?

14   **A.**   Right.  These would --

15   **Q.**   Right.

16   **A.**   I think you're getting at the grouping of more live

17   streaming rather than live preview.

18   **Q.**   GoPro sold 1.25 million units of HERO10; right?

19   **A.**   I believe that's roughly correct.

20   **Q.**   You haven't seen any complaints about the lack of live

21   preview while recording in the HERO10?

22   **A.**   Not that specifically, no.

23   **Q.**   Okay.  And I think we agree that HERO11, that was

24   initially sold without live preview as well; right?

25   **A.**   It would be everything in that category is what I'm

1   saying.

2   **Q.**   Right.  And when GoPro released a firmware update in 2024

3   that allowed people to use live preview while recording, that

4   feature, did they charge anything for adding that feature?

5   **A.**   I'm going to -- I need your question again.

6   **Q.**   Did GoPro charge any -- did GoPro charge its customers

7   anything for updating the firmware to HERO11?

8   **A.**   Oh.  Not that I'm aware of, no.

9   **Q.**   From HERO11 -- from the time HERO11 was released in spring

10  of 2024 until the firmware update, you hadn't seen any customer

11  complaints relating to lack of live preview while recording;

12  right?

13  **A.**   From what date are you saying?

14  **Q.**   The date of release to spring of 2024, when they updated

15  it.

16  **A.**   Yeah, the complaints that I talked about had to do with

17  the ProTune and removing those features as opposed to any other

18  change.

19  **Q.**   Okay.  So you didn't see any complaints relating to live

20  preview while recording; right?

21  **A.**   I'm not sure.  What do you mean, I haven't seen any

22  complaints about -- you mean how it functioned?  Whether they

23  liked it or not?

24  **Q.**   So as we agreed, there are products that are sold without

25  the feature live preview while recording --

1    **A.**   Right.

2    **Q.**   -- right?

3    **A.**   Yeah, yeah.  No, I thought you were asking a different

4    question.  But go ahead.

5    **Q.**   And you have never cited or identified, at least as far as

6    I know, any complaints from customers that were the result of

7    those cameras not having live preview while recording; correct?

8    **A.**   That's correct.  There's a reason why, but that's correct.

9    **Q.**   Well, can we -- okay.

10       All right.  And so that's how -- so the live preview while

11   recording valuation, that's how you got to the $3.62 number;

12   right?

13   **A.**   $3.60.

14   **Q.**   Thank you.

15       There's another number, the Element license; right?

16   **A.**   Right.

17          **MS. CLARK:**  All right.  Mr. Arndt, can you pull up

18   DDX-1026 -- 1026?  1027?

19       There we go.  That's the one.

20   **Q.**   Do you recognize this slide?

21   **A.**   I do recognize this slide.  I might have even made it

22   myself.

23   **Q.**   I like it.  Let's just talk a little bit about the summary

24   that's provided by this slide.

25       The hypothetical negotiation between -- the hypothetical

1    negotiation in this case, it's between GoPro and Contour, LLC;

2    right?

3    **A.**    Correct.

4    **Q.**    And the Element license, that's between Element and

5    Contour IP Holdings; correct?

6    **A.**    Correct.

7    **Q.**    Okay.  So GoPro isn't a party to the Element license;

8    right?

9    **A.**    Well, I'm not going to get into the legal differences; but

10   the -- you know, the economic incentives I'm reviewing were

11   aligned.

12   **Q.**    Okay.

13   **A.**    In other words, you're trying to figure out the licensing

14   value for the patents.  I'm sorry to interrupt.

15   **Q.**    Oh, no.  It's okay.  My question was simple.  I just said

16   GoPro wasn't a party to the Element license.  I think that's

17   pretty --

18   **A.**    Oh, oh.

19   **Q.**    -- obvious.

20   **A.**    I'm sorry.  Yeah, GoPro was not a party to the Element

21   license.  I thought you were making a distinction on Contour.

22   **Q.**    No, but we can fix that really quick.

23        So it's Contour IP Holdings versus Contour, LLC.  That's

24   okay.  They're separate entities; right?  They are separate

25   entities?

1   **A.**    Yeah.

2   **Q.**    Okay.  And Element --

3         **THE COURT:**  Wait just a second.

4         **MS. CLARK:**  Oh, I thought he said "yeah."

5         **THE COURT:**  You posed a question.  It needs an answer.

6   It needs a "yes" or a "no" and not an explanation.

7         It would be really great if the rest of this testimony ran

8   in a normal fashion.  All right?

9         So the question, I believe, was:  Are the two Contour

10  entities separate entities?

11        **THE WITNESS:**  That's my understanding.

12  **BY MS. CLARK:**

13  **Q.**    Okay.  And Element Electronics, they are a producer and

14  manufacturer of smart TVs; right?

15  **A.**    Of smart TVs, correct.

16  **Q.**    Right.  And they entered into an agreement with Contour

17  IP Holdings in October of 2021; correct?

18  **A.**    Correct.

19  **Q.**    That's seven years after the date of the hypothetical

20  negotiation?

21  **A.**    Yes.

22  **Q.**    Since it was executed in October of 2021, you aren't aware

23  of Element making any action cameras; right?

24  **A.**    Correct.

25  **Q.**    So to the best of your understanding, Element has never

1    made -- does not now and has never made any action cameras;

2    right?

3    **A.**    There might be a little bit of an asterisk on that, but

4    I'll agree with you.

5    **Q.**    Okay.  Well, you haven't seen any evidence of a timeline

6    or product road map where Element has documented anything about

7    starting to manufacture action cameras; right?

8    **A.**    Yeah, we haven't seen any documentation on that.

9    **Q.**    Okay.  The Element license -- well, let's say the

10    hypothetical license between GoPro and Element -- or GoPro and

11    Contour, that would include -- that would be a bare license --

12    right? --

13    **A.**    Correct.

14    **Q.**    -- to just the -- sorry; I'm sorry -- to just the '694 and

15    '954 patents; right?

16    **A.**    Yeah.  What's called a bare patent license, yes.

17    **Q.**    Okay.  The Element license includes more than just the two

18    asserted patents; right?

19          Can we show what's been admitted --

20    **A.**    It's hard for me to answer that yes or no.  There was more

21    in the agreement, but there was a section on the '694 and the

22    '954.  I apologize.  I just can't answer it "yes" or "no."

23          **MS. CLARK:**  Can we go ahead and pull up TX-702 at

24    Exhibit B, which has previously been admitted into evidence.

25    \\\

1   BY MS. CLARK:

2   Q.   Exhibit B, do you recognize this exhibit to the Element

3   license?

4   A.   Yeah, absolutely, yes.

5   Q.   It says "Licensed Patents" at the top?

6   A.   Yeah.  These are Exhibit B licensed patents, yes.

7   Q.   And it lists a number of patents and patent applications

8   that are also subject to the license agreement; correct?

9   A.   I agree 100 percent.

10  Q.   All right.  And you heard -- I think I saw you back there.

11  You heard Mr. Kazhdan testify by video that the parties

12  discussed more than just the '954 patent when they were

13  negotiating the license; right?

14  A.   Discussed more than the two patents in dispute here, yes.

15  Q.   And you heard Mr. Kazhdan say that Element was investing

16  in a portfolio license; right?

17  A.   Yes.

18  Q.   And it was Contour, Mr. Helfer, who divided the licensed

19  patents into Exhibit A and into Exhibit B for legal reasons;

20  right?

21  A.   I need your question again specifically.

22  Q.   You heard Mr. Kazhdan testify that it was Contour's

23  representative who divided the licensed patents into Exhibit A

24  and Exhibit B for legal reasons; right?

25  A.   Yes, I did hear that.

1    Q.    Okay.  So let's just go back to DDX -- I think we're on

2    1030 now.

3        And also, Element received an exclusive license for

4    certain products in the Element field of use; right?

5    A.    Yes.  If I'm answering "yes" or "no" if we're talking

6    about the entire agreement that has multiple parts, I'm not

7    going to disagree with you.

8    Q.    Okay.  But you would agree that what GoPro would be

9    getting from a hypothetical license is just a

10   non-exclusive U.S.-only license; right?

11   A.    Yeah.  The hypothetical license would be non-exclusive

12   U.S. only, yes.

13   Q.    Okay.  And you understand that to date, Contour has

14   paid -- or Element has paid Contour $1.5 million; right?

15   A.    That's correct.

16   Q.    That was a flat fee payment; right?

17   A.    I mean, they made it in installments, but it's a -- the

18   equivalent of a lump sum.

19   Q.    Okay.  And they haven't paid the 5 percent royalty on any

20   licensed products; right?

21   A.    Oh, I agree with that.

22   Q.    Okay.  Are you familiar with a company called SkyBell?

23   A.    Have I heard of them?  Yes.

24   Q.    Okay.  Now, you would agree that for a license to be the

25   basis for patent damages, it has to be comparable to the

1  hypothetical -- the hypothetical license; right?

2  **A.**    Yes.

3  **Q.**    And in the hypothetical negotiation, the licensor and the

4  licensee, they're on different sides of the table, negotiating

5  at arm's length; right?

6  **A.**    Correct.

7  **Q.**    You would agree, though, that Element and Contour

8  IP Holdings, they are not competitors; right?

9  **A.**    Correct.

10  **Q.**    Okay.  And at the same time as Contour IP Holdings and

11  Element were negotiating a license, Element was also

12  negotiating with a company called SkyBell; right?

13  **A.**    Yes.

14  **Q.**    And SkyBell -- in fact, Mr. Helfer, who we heard from a

15  little earlier, he was representing both SkyBell and Element --

16  sorry -- he was representing both SkyBell and Contour

17  IP Holdings in those negotiations with Element; right?

18  **A.**    I think I understand what you're saying, but why don't you

19  just ask me again.

20  **Q.**    Sure.  You heard the testimony of Mr. Ron Helfer; right?

21  **A.**    Yes.

22  **Q.**    Okay.  And Mr. Helfer testified that when Contour and

23  SkyBell were negotiating with Element, he was the

24  representative for both Contour and SkyBell; right?

25  **A.**    That's what I inferred from what he said, yes.

1  Q.   And at the time, both Contour IP Holdings and SkyBell at

2  the time had the same CEO, Mr. Garriques; right?

3  A.   Yes.  Yes.

4  Q.   And there was a company called VIP Holdings that owned

5  both Contour and had an ownership stake in SkyBell; correct?

6  A.   At least that's what I understood the testimony to be.

7  Q.   Got it.

8       And under the supply agreement, SkyBell agreed to make a

9  payment to Element of $2.25 million; right?

10  A.   I would -- I would have to see that agreement again.  I

11  don't recall at this point.

12          MS. CLARK:  Can we pull up TX-4157.  It's

13  paragraph 3.4.

14  BY MS. CLARK:

15  Q.   Do you recall looking at this agreement when you were

16  preparing your opinions in this case?

17  A.   Yes, I -- yes.

18  Q.   I'd like to direct you to the middle of the paragraph

19  where it says [as read]:

20          ". . . Purchaser agrees to pay Supplier an

21       unconditional, non-refundable, up-front, lump sum fee

22       of $2,250,000 . . . ."

23       Do you see that?

24  A.   I do see that, yes.

25  Q.   Does that refresh your recollection as to whether SkyBell

1    agreed to pay Element $2.25 million?

2    **A.**   I'm sorry.  Say that again.

3    **Q.**   Does that refresh your recollection as to whether SkyBell

4    agreed to make payment to Element $2.25 million?

5    **A.**   I mean, that's what it says here.

6    **Q.**   Okay.  Now, on the other side, we have the Contour

7    IP Holdings-Element license agreement.  And under that

8    agreement, I believe you testified --

9         **MS. CLARK:**  Oh, at this time I'd like to offer TX-4157

10   into evidence, please.

11        **THE COURT:**  Any objection?

12        **MS. REPLOGLE:**  No objection.

13        **THE COURT:**  It's admitted.

14   (Trial Exhibit 4157 received in evidence.)

15   **BY MS. CLARK:**

16   **Q.**   Under the Contour IP Holdings and Element license, Element

17   was supposed to then turn around and pay -- or was supposed to

18   pay Contour $2 million in up-front payments; right?

19   **A.**   Yeah, if we -- I think you took away the turn around part

20   of it.  But that agreement, in isolation, in aggregate, was

21   2 million.

22   **Q.**   Okay.  So to recap, let's look at DDX-10.41.  Under this

23   agreement, SkyBell paid element $2.25 million, Element paid

24   Contour 1.5 -- or Element was supposed to pay Contour

25   $1.5 million; right?

UGONE - CROSS / CLARK

1   **A.**   I think --

2   **Q.**   The payment numbers --

3   **A.**   I'm not going to -- I'm not going to agree with the way

4   you're asking the question.  I can't agree.

5   **Q.**   You disagree that SkyBell was supposed to pay

6   Element $2.25 million?

7   **A.**    No.  I'm just saying that we have these separate

8   agreements that were made between the various parties.  I don't

9   disagree with some of the numbers you're saying.

10  **Q.**   Okay.

11  **A.**   But I can't speak to these flow of funds that you're

12  implying.

13  **Q.**   You're right.  There is actually a problem with this.

14       You know that Element actually only paid Contour

15  $1.5 million; right?

16  **A.**   I do know -- I do know they paid 1.5 million.

17  **Q.**   So as between SkyBell, Contour, and Element, if you look

18  at all three of these agreements, Element's the only company

19  that's gotten paid anything in net; right?

20  **A.**    That Element was the only company that got paid anything?

21  Is that what you asked?

22  **Q.**   They made a -- Element ended up with a net contribution of

23  $750,000; right?

24  **A.**   I can't speak to SkyBell's payments.  So I can't answer

25  that question.

UGONE - CROSS / CLARK

1  Q.   You didn't put any weight on the Element-SkyBell agreement

2  in your damages analysis; right?

3  A.   I will admit, I looked at the Element-Contour license

4  agreement in isolation.  That was separately negotiated.

5      So I did not put weight on the SkyBell side, to answer

6  your question.

7  Q.   You would agree that it was negotiated at the same time

8  temporally; correct?

9  A.   But they were separate agreements.  That's why I answered

10 as I did.

11 Q.   It was negotiated by the same person -- right? --

12 Mr. Helfer?

13 A.   In some different roles.

14 Q.   Okay.  According to your calculation, I believe you said

15 that GoPro makes $8.98 of profit from including Live Preview

16 with Remote Control in its products; right?

17 A.   You'll have to say that again.

18 Q.   I believe under your calculations, you say GoPro earns

19 about $8.98 of profit from, including Live Preview with Remote

20 Control in its products; is that --

21 A.   Under the --

22 Q.   -- right?

23 A.   Under the profit apportionment approach, yes.

24 Q.   Right.  Based on the Element license, you conclude GoPro

25 would agree to pay $9.71 units -- or, sorry -- $9.71 per unit

1   for the two asserted patents; right?

2   **A.**   Correct.

3   **Q.**   Let's look at DDX-1010.

4   So your conclusion is that under the market rate of $9.71,

5   GoPro would pay more than the profit it earns from including

6   Live Preview while Remote Control -- with Remote Control?

7   **A.**   So if you compare these numbers -- I'm not going to agree

8   with the way you characterized it.  If you asked me

9   mathematically is 9.71 greater than 8.98, yes.  But I don't

10  agree with how it's been characterized.

11  **Q.**   But we can at least agree that $9.71 is more than $8 --

12  **A.**   If you ask me about math, I agree with you.

13          **MS. CLARK:**  All right.  We can take that down.

14  **BY MS. CLARK:**

15  **Q.**   Now, you agree that patent damages have to be based on the

16  value attributable to the patented invention; right?  That's

17  the law.

18  **A.**   Yes.

19  **Q.**   Okay.  Damages have to be -- and to get to the value of

20  the patented invention, you have to make sure that you've done

21  what's called an apportionment; right?

22  **A.**   Yes.  So there -- there has to be -- yes.

23  **Q.**   One step of the apportionment is making sure that you

24  haven't taken any value from unpatented features of the accused

25  product as distinct from the patented features; right?

1    **A.**    Yes.  You're valuing the patented invention.  So, yes.

2    **Q.**    Right.  So, for example, there are wireless features that

3    Dr. Mander and the other inventors didn't invent or claim in

4    their patents; correct?

5    **A.**    Yes.

6    **Q.**    And you agree -- we'll take an example.  The ability to

7    turn the camera on and off with the wireless remote, that's not

8    part of the patented invention; right?

9    **A.**    That's my understanding, yes.

10    **Q.**    So that has to be excluded from any damages measure;

11    right?

12    **A.**    You would not put a licensing value on that, is how I

13    would describe it.

14    **Q.**    Okay.  And similarly, the ability to wirelessly start and

15    stop recording a video through a mobile device, that's not

16    claimed in the patents-in-suit; right?

17    **A.**    Correct.

18    **Q.**    So you don't put any licensing value on that?

19    **A.**    Correct.

20    **Q.**    And you would also agree that there are features of

21    display and playback that are not patented; correct?

22    **A.**    Right, and I took those out.  But yes.

23    **Q.**    Right.  And so you would take out the unclaimed features?

24    **A.**    Correct.

25    **Q.**    Okay.  When a patent claim covers an infringing product as

1    a whole but the claims recite some conventional elements, you

2    would agree, sir, wouldn't you, that you still have to account

3    for the relative value of the patentee's invention in

4    comparison to the conventional elements?  Right?

5    **A.**    I don't fully understand what you're asking when you

6    started with a predicate of when the patent covers the product

7    as a whole.  Then, to me, the rest of the question wasn't

8    working with that predicate, so I can't answer that.

9    **Q.**    Do you agree that under the damage -- under damages law,

10   people don't get damages for things they didn't invent?

11   **A.**    They -- in -- I can't answer that "yes" or "no" because

12   there's times there's an entire market value rule that may

13   bring that in.  And so that's why I can't answer your question

14   categorically.

15        But generally, you would want a royalty that's

16   commensurate with the footprint of the patent.  I will say it

17   that way.

18   **Q.**    There's no entire market value rule analysis in this case;

19   right?

20   **A.**    No, no, no, no.  I'm just saying the way you asked the

21   question wasn't allowing me to answer the question.

22   **Q.**    So in this particular case, you would agree that there has

23   to be some apportionment between the footprint of the claimed

24   invention and the conventional features; right?

25   **A.**    So we're trying to figure out the incremental value and

1    have a royalty on that.

2    **Q.**   Right.  So for things that existed before the patented

3    invention, you wouldn't attribute patent damages to those

4    things; right?

5    **A.**   I can't answer that question the way it's asked.

6    **Q.**   Let me -- let me be a little more concrete.  All right?

7          **MS. CLARK:**  Let's start with DDX-10.14.

8    **BY MS. CLARK:**

9    **Q.**   You were here when Dr. Mander and Dr. Hu testified; right?

10   **A.**   Yes.

11   **Q.**   I believe you testified earlier that you rely on Dr. Hu

12   for technical analysis that is the foundation of your opinions;

13   correct?

14   **A.**   Correct.  Yes.

15   **Q.**   So you heard Dr. Hu and Dr. Mander testify that certain

16   things, like the lens, the image sensor, those were known in

17   the art; right?

18   **A.**   Yeah.  I don't disagree with that.

19   **Q.**   So you don't attribute value to the lens and the image

20   sensor in your damages measure; right?  That's not what was

21   invented?

22   **A.**   I ultimately took the approach of valuing the Live

23   Preview + Remote Control, even though I understand or at least

24   my understanding is that there's -- it's a camera system, but I

25   looked at just one component of it.

UGONE - CROSS / CLARK

1   Q.   And part of the reason you did that was because you agree

2   that patent damages requires you to limit the scope of damages

3   to the footprint of the invention; right?

4   A.   We were looking at the incremental value of the invention

5   with respect to those attributes.

6   Q.   Okay.  And so you would agree, too, that --

7          MS. CLARK:  Let's go to DDX-16.

8   BY MS. CLARK:

9   Q.   So Dr. Mander, he testified that Contour didn't invent a

10  new wireless chip; right?  They bought that on the market.

11         So the concept of wirelessly -- actually, let's go to the

12  next slide.

13         So the concept of wirelessly transmitting video from a

14  camera to a portable device, that was known before the patent

15  too; right?

16  A.   Yeah.  Let me just read --

17  Q.   That's something --

18  A.   You were going kind of quick.  Let me read it.

19  Q.   Okay.

20  A.   (Witness examines document.)  Okay.  So, I mean, I don't

21  disagree.  I don't have any reason to disagree with Dr. Mander.

22  Q.   Right.  And so the damages measure can't be for the

23  concept of sending wireless video by itself because that was

24  part of the prior art; right?

25  A.   If that's all you were looking at, if that was it, I would

**UGONE - CROSS / CLARK**

1    agree with you.

2    **Q.**   Okay.  The same thing goes for the camera processor and

3    the ability to output a higher-quality video stream and a

4    lower-quality video stream; right?

5        Let me ask a --

6    **A.**   Are you asking about the quote --

7    **Q.**   -- better question.

8        Mr. Mander testified that that was not something that the

9    Contour inventors invented; correct?

10   **A.**   Can I -- you want me to look at the quote under

11   Dr. Mander?  Can I read that?

12   **Q.**   Sure.

13   **A.**   (Witness examines document.)  I mean, that's what he said.

14   I mean, I can't speak to the technical side, but that's what he

15   said.

16   **Q.**   Okay.  And so since the ability to output a higher-quality

17   video stream and a lower-quality video stream is not Contour's

18   invention, again, that's not what you have put your damages

19   number on; right?  That's not what you're valuing here today?

20   **A.**   I think, as I described, I'm valuing something else, not

21   that in isolation.

22   **Q.**   Okay.  Same thing.  Dr. Hu testified that there isn't a

23   patented -- there isn't a patent claim that says "software" in

24   it; right?

25   **A.**   Let me read the quote.

UGONE - CROSS / CLARK

 1  **Q.**   Okay.

 2  **A.**   You're familiar with these.  I'm not.  Let me read them.

 3       (Witness examines document.)  Yeah.  So I'm not going to

 4  disagree with Dr. Hu, yeah.

 5  **Q.**   Right.  And so, again, your damages opinion isn't based on

 6  software that isn't in the patent; fair enough?

 7  **A.**   Not in isolation, correct.

 8  **Q.**   Well, if the software isn't part of the patent claim,

 9  that's something you would not value for damages; right?

10  **A.**   Yeah.  That's why I keep saying "not in isolation."

11  Because we're looking at Live Preview + Remote Control and what

12  value that brings, and that's what I'm valuing as opposed to

13  the individual components that you're looking at.  So I'm not

14  valuing those.

15  **Q.**   My question was more a step back from that; right?

16       If there's no software claimed in the patent -- right? --

17  if a patent doesn't have a claim directed to software, it's an

18  unpatented feature that would have to be apportioned out and

19  not considered for damages; right?

20  **A.**   I think I would agree with that.  I remember some

21  questions about hardware and software with Dr. Hu, but that's a

22  technical side.

23  **Q.**   Okay.  Thanks.

24       Let's talk very briefly about non-infringing alternatives.

25       **MS. CLARK:**  Can we look at DDX-1025.

 1   BY MS. CLARK:

 2   Q.   I believe you heard Dr. Hu testify that -- well, let me

 3   start with one question.

 4        Are you familiar with non-infringing alternatives?

 5   A.   (No response.)

 6   Q.   And so under the concept --

 7             (Reporter interrupts to clarify the record.)

 8             THE WITNESS:  I'm sorry.  Go ahead.  Start again.

 9   BY MS. CLARK:

10   Q.   Sorry.  I said you're familiar with the concept of

11   non-infringing --

12   A.   Oh, yes.

13   Q.   -- alternatives?

14   A.   Yes, yes, yes.

15   Q.   Under the concept of non-infringing alternatives, you look

16   at, as part of your damages analysis, whether there were

17   technologically viable and commer- -- technologically and

18   commercially viable alternatives to the patented invention at

19   the time of the hypothetical negotiation?

20   A.   One consideration is whether there's an acceptable

21   non-infringing alternative.  That would be the phraseology.

22   Q.   Thank you.

23   A.   Yeah.

24   Q.   And you would agree that -- and I'm not asking for your

25   opinion on whether it would be acceptable.  But you would agree

1    that at least one non-infringing alternative would include just

2    not recording -- or just turning off the live preview while

3    recording.  Is that fair?

4    **A.**   If you're -- my understanding of what you're saying is if

5    you just take the feature out, it's not infringing.  I'm not

6    going to disagree with that.  So I'll agree with you, if you

7    just take the feature out, then it's not -- then it doesn't

8    meet the requirements.

9    **Q.**   So, for example, if you had a camera that sent a preview

10   image -- right? -- and let you make adjustments but then turned

11   off the preview as soon as you hit record, no license needed;

12   right?

13   **A.**   I'm not -- if it doesn't meet the claims of the patent,

14   then it wouldn't be infringing.  That's the best I can say.

15   **Q.**   Okay.  And you heard -- now we can go to --

16   **A.**   And just for -- I'm sorry.  I didn't mean to interrupt.

17        But from a technical point of view.  You asked me to set

18   aside acceptability.

19   **Q.**   Right.  From a technical point of view, a camera that had

20   a wireless preview video that allowed somebody to make

21   adjustments, including remote -- you know, changing image

22   settings, up until the minute you hit record, that would not

23   infringe; right?

24   **A.**   That's a technical question.  You would have to ask Dr. Hu

25   about that.

1  Q.   What about removing, in firmware, the ability to control

2  lighting, color, and audio settings?  Would you agree that that

3  avoids infringement?

4  A.   So my understanding is, like it says here, is that there's

5  certain elements that have to be met; and if the elements are

6  not met, then it would not be found to be infringing.

7  Q.   You heard Dr. Hu testify that GoPro could sell --

8          MS. CLARK:  Let's go to the next slide.

9      Right.  Good.

10 BY MS. CLARK:

11 Q.   You heard Dr. Hu testify that GoPro could sell a camera

12 with live preview while recording as long as it removed the

13 ability to control lighting, color, and audio settings

14 remotely; correct?

15 A.   Is it -- can I read the quote?  Is that --

16 Q.   Absolutely.

17 A.   (Witness examines document.)  Yeah.

18          THE WITNESS:  May I answer her?

19 BY MS. CLARK:

20 Q.   So if --

21 A.   If it's okay to answer, I don't disagree with what she's

22 saying.  That's my understanding.  And that's why I keep saying

23 that, you know, if you don't meet the elements of a claim, then

24 my understanding is -- but she's the technical person -- then

25 it wouldn't be infringing.

1    Q.    Okay.  So a camera that could do live preview while

2    recording but simply removed the lighting, color, and audio

3    setting functionalities, if that happened, there would be no

4    need for a license; right?

5    A.    These are -- my understanding is, I'll just say again, if

6    they don't meet the elements of the claim, then it's not

7    infringing.

8         So if you're saying you changed something, and if Dr. Hu

9    looked at that and said, "Okay, the elements and the claim are

10   no longer fulfilled," then that would be non-infringing.

11   Q.    You testified --

12   A.    That's my understanding.  I'm not the technical person.

13   Q.    And you testified earlier, though, that you didn't believe

14   this alternative would be commercially acceptable; right?

15   A.    That's an important consideration, yes.

16   Q.    You're not an expert in the camera market, action camera

17   market specifically; right?

18   A.    I'm an economist and so I understand how markets work, but

19   I'm not a specialist with action cameras.

20        **MS. CLARK:**  Let's look at Slide 19 of his slides.  Do

21   we have his?  There we go.

22   BY MS. CLARK:

23   Q.    You show this slide about ProTune settings?

24   A.    Yes.

25   Q.    You understood that ProTunes is the bundle of settings

UGONE - CROSS / CLARK

1    that include lighting, color, and audio settings --

2    **A.**    Correct.

3    **Q.**    -- correct?

4    **A.**    Correct.

5    **Q.**    And I think you said that adding ProTunes is important to

6    give users more flexibility; right?

7    **A.**    Actually, I said GoPro said that.

8    **Q.**    Okay.  Fair enough.

9         But it says pro users here; right?

10   **A.**    Yes.

11   **Q.**    And if you look, I know it's kind of small, but the next

12   line says that it benefits professional -- the professional

13   production market; right?

14   **A.**    Yeah.  And it talks about filmmakers, and so forth, and

15   cinematic uses.

16   **Q.**    Right.  Have you ever used ProTunes on a GoPro camera?

17   **A.**    I have not used it, no.

18   **Q.**    Do you know, roughly, how many complaints GoPro got about

19   removing ProTune settings from certain --

20   **A.**    I'm sorry.  How many?

21   **Q.**    Complaints GoPro received when it disabled ProTune

22   settings in certain of its cameras?

23   **A.**    I think I do.

24   **Q.**    Does .02 percent of GoPro app users in Q1 of 2021 sound

25   about right to you?

**UGONE - CROSS / CLARK**

1  **A.**   Well, by your math.  I know there were, like, 950

2  complaints they received, like, in a two-month period.

3  **Q.**   Right.

4  **A.**   Those are the numbers I know.

5  **Q.**   941?  Is that about right?

6  **A.**   Yeah.  I rounded to 950.

7  **Q.**   Okay.  And that -- but it wouldn't surprise you that that

8  would be about .02 percent of all GoPro app users in that

9  period; right?

10  **A.**   I've seen that math.  So if you want to go with that math,

11  I'm not going to disagree mathematically.  But, obviously,

12  there's other considerations.

13  **Q.**   Well, let me ask you this:  If GoPro had to make a choice

14  between paying $65 million or removing the ability to control

15  those three camera settings remotely, don't you think a

16  reasonable business would choose the option of just removing

17  the lighting, color, and audio settings?

18  **A.**   Are you asking me if they had a choice of paying

19  65 million or removing those settings?  Is that what you're

20  asking me?

21       **MS. CLARK:**  I'll withdraw the question.

22       Thank you.  Pass the witness.

23       **THE COURT:**  All right.  Any redirect?

24       **MS. REPLOGLE:**  Yes.  Just briefly, Your Honor.

25

1                      <u>**REDIRECT EXAMINATION**</u>

2     **BY MS. REPLOGLE:**

3     **Q.**   Starting just right there where we finished, on -- with

4     respect to ProTunes, after receiving those complaints during

5     that two-month period of time, did GoPro put the feature back?

6     **A.**   Yes.

7     **Q.**   You were also asked a series of questions about a SkyBell

8     supply agreement.  It was Trial Exhibit 4157.  Do you recall

9     that?

10    **A.**   Yes.

11    **Q.**   Okay.  And counsel for GoPro, when she went through that

12    series of questions, was -- do you recall that she would phrase

13    it as "SkyBell was supposed to pay $2.5 million to Element"?

14    Do you recall that?

15    **A.**   Yes.

16    **Q.**   Have you seen any evidence at all to date at trial that

17    SkyBell ever paid the 2.5 million --

18    **A.**   No.

19    **Q.**   -- to Element?

20    **A.**   No.  In fact, that's why I was having difficulties with

21    all those questions.

22    **Q.**   Okay.  And even if they had, is it unusual at all for

23    companies to negotiate more than one agreement at a time?

24    **A.**   No.  Companies do it all the time.

25    **Q.**   Okay.  Dr. Ugone, to be clear about another series of

```
 1   questions that was at the very beginning of your
 2   cross-examination today, if the jury finds any one claim that
 3   is valid and infringed, do they then go forward and determine a
 4   damages amount, if it's any one claim?
 5   A.   Yeah, all you need is one claim to infringe.  That's my
 6   understanding.
 7   Q.   And has it already been determined that all of the
 8   elements of Claim 11 of the '954 patent have been met by the
 9   products in Group 1?
10   A.   Yes.
11              MS. REPLOGLE:   No further questions.
12              THE COURT:   All right.  Dr. Ugone, you can step down.
13   Thank you.
14              THE WITNESS:   Thank you.
15                         (Witness excused.)
16              MR. KEVILLE:   With that, Your Honor, Contour rests its
17   case-in-chief, subject to our rebuttal.
18              THE COURT:   Okay.
19      Mr. Haynes, who's up?
20              MR. HAYNES:   Your Honor, our first witness will be
21   Mr. Pablo Lema.
22                  (Witness steps forward to be sworn.)
23                         PABLO LEMA,
24   called as a witness for the Defendant, having been duly sworn,
25   testified as follows:
```

LEMA - DIRECT / CLARK

1          **THE WITNESS:**  I do.

2          **THE COURTROOM DEPUTY:**  Be seated, please.

3          **THE WITNESS:**  Thank you.

4          **THE COURTROOM DEPUTY:**  And if you would please begin

5     by stating your full name and spelling it for the court

6     reporter.

7          **THE WITNESS:**  Yeah.  It's Pablo Lema, and it's

8     P-a-b-l-o, and last name, l-e-m, as in "Mary," -a.

9                         DIRECT EXAMINATION

10    BY MS. CLARK:

11    **Q.**   Good morning, Mr. Lema, or is it afternoon?

12    **A.**   Good morning.

13    **Q.**   Would you please state your name and spell your last.

14    **A.**   It's Pablo Lema, L-e-m, as in "Mary," -a.

15    **Q.**   Where do you live, Mr. Lema?

16    **A.**   I live in San Mateo, California.

17    **Q.**   Have you lived in the Bay Area your whole life?

18    **A.**   I have not.  I am originally from a small country called

19    Uruguay in South America.  I grew up in Brazil, and then I did

20    high school in Canada.

21    **Q.**   Did you end up going to college?

22    **A.**   I did.  I went to college in Philadelphia at the

23    University of Pennsylvania, where I met my wife, a long time

24    ago.  And we have three kids.  I got a B.S. in economics from

25    the University of Pennsylvania, and then later I got an M.B.A.

1    from the University of Pennsylvania as well.

2    **Q.**    Are you an employee of GoPro today?

3    **A.**    I am, yes.

4    **Q.**    When did you join GoPro?

5    **A.**    I joined GoPro in June of 2014.

6    **Q.**    How did you end up working with GoPro?

7    **A.**    I was an active user in probably the 2009, 2010, 2012

8    area.  I'm a very big drone enthusiast.  I like drones.  So at

9    that time, I was trying to figure out how to put cameras onto

10   drones, and I was working at a drone start-up in Berkeley.

11        And through an acquaintance, I met Nick, the founder of

12   GoPro.  And at that time, they were looking to start a drone

13   product, and I was pretty well-versed in that sector as a

14   product person.  And so through a series of interviews, I

15   joined the company and a few months later to start that product

16   line.

17   **Q.**    Does GoPro still have a drone business unit today?

18   **A.**    We do not.

19   **Q.**    But you stayed on at GoPro?

20   **A.**    I did.  So towards the end of the drone program, I started

21   taking on more responsibilities, managing more of our hardware

22   products, and eventually moved into my current position where I

23   oversee all product, all user experience, and all the

24   industrial design teams.

25   **Q.**    What is your title at GoPro today?

1    **A.**    My title is senior vice president of product.

2    **Q.**    And briefly, what do you do in that role?

3    **A.**    My role and my team's role is to understand the markets

4    that GoPro sells and the types of users we make products for,

5    understand their needs and what they want to capture in their

6    lives, and then decide on features and products we can help

7    make to help them capture something.

8    **Q.**    At a high level, how does GoPro decide which features goes

9    into its products?

10    **A.**    Yeah.  It's an intense process where we review -- we do

11    firsthand research with users.  We do focus groups.  We read

12    reviews.  And we also do quite a bit of analytics on our own

13    existing user base, which is so big, and that gets us a lot of

14    information of what we want to do next.

15    **Q.**    Mr. Lema, did you prepare some demonstrative slides to

16    assist your testimony today?

17    **A.**    I did, yes.

18        **MS. CLARK:**  Can we pull up DDX-3.2, please.

19    **BY MS. CLARK:**

20    **Q.**    Is this one of your slides?

21    **A.**    It is, yes.

22    **Q.**    What is shown on DDX-3.2?

23    **A.**    It shows the variety of use cases and the ways that we

24    help people capture and celebrate something that they like.

25    That's kind of our mission.

1          We do this by creating these very versatile, incredibly

2     high-image-quality and durable devices, and those allow you to

3     capture life in a way that a phone can't really do.

4     **Q.**    Why don't we go to your next slide, DDX3.3.  What's this

5     slide?

6     **A.**    This slide shows a summary of our main product launches

7     since 2009 through 2024.

8     **Q.**    Are GoPro cameras the same today as they were when you

9     joined the company in 2014?

10    **A.**    Most certainly not.  They've -- since I joined the

11    company, we've done a tremendous amount of innovation in our

12    products.  We try to keep to that same mission of helping

13    people capture and celebrate something they love.

14         And to do that, we've had to attack those areas that I

15    describe, which is:  How do we make the cameras more versatile?

16    How do we make the image quality much better?  And how do we

17    continue to make them durable and waterproof?

18    **Q.**    Then why do they look the same?

19    **A.**    They look the same, in my opinion, for two reasons.

20         One, it's iconic.  Right?  We've created this rectangular

21    shape that is easily recognizable.  So I think a lot of people

22    in this room could see a camera, and if it looks like this,

23    they probably would think it's a GoPro.  And that helps us.

24    That's helps users understand who they are.  They trust that

25    shape.

1    And then there's a very functional reason for why the

2    camera wants to be in that format.  The little rectangular

3    shape helps you put the camera in more places and be at home in

4    that mounting.  So if you're putting it under a skateboard, in

5    the wheel well of a car, on your helmet, on the end of a selfie

6    pole, that shape is kind of the best -- the Goldilocks, the

7    best of both worlds.

8    **Q.**    Has GoPro received any industry recognition for its

9    cameras?

10   **A.**    Yeah.  We've had the honor of receiving quite a bit over

11   the years.  We've received CES awards for our products; we've

12   received Red Dot awards; we've received Lucie photography

13   awards; and we've received Emmys.

14   **Q.**    You can receive Emmys for cameras?

15   **A.**    Yeah.  It's not like the main Emmys.  The main Emmys are

16   actors and actresses and directors.  But below that, there is

17   another series of awards called the Technical Emmys, and that's

18   all the technology that enables the creation of TV production,

19   which is a pretty intense kind of cinematography.  And we've

20   won a few of those awards over the years.

21        **MS. CLARK:**  Can we show DDX-3.4, please.

22   **BY MS. CLARK:**

23   **Q.**    Mr. Lema, what is shown on DDX-3.4?

24   **A.**    This is me.  This is a photo I sent to my mom in April of

25   2021.  This is right after I had the honor of accepting the

1   technical Emmy for our HyperSmooth image stabilization that was

2   first launched in HERO7 Black.

3   **Q.**   What's HyperSmooth?

4   **A.**   So HyperSmooth is a form of image stabilization.  So

5   cameras of this type, you can imagine they're shaking quite a

6   bit.  If you don't correct for that shake, the image is not

7   really enjoyable.

8       So we spent a lot of time inventing a new way of making

9   that footage smooth, and it was so good that we called it

10  HyperSmooth.

11  **Q.**   How important to GoPro is winning awards?

12  **A.**   We love the recognition.  It's a good validation of all

13  the hard work we do.  There's a difference in the awards.

14      CES-type awards, for example, they're amazing.  They tend

15  to be about the product announcement and what was described in

16  the product.

17      Emmys are really super powerful for us because it shows

18  that the industry used the product, they loved it enough, and

19  then gave us the recognition.  So these Technical Emmys were a

20  pretty big moment for us.

21  **Q.**   Let's switch topics a little bit.

22      Mr. Lema, you've been sitting in the courtroom every day

23  of trial; right?

24  **A.**   I have, yes.

25  **Q.**   Why?

1   **A.**   As I understand, this is a matter about patents; and at

2   GoPro, we take patents very seriously.  And so myself and a few

3   others at the company and some experts are here to speak to the

4   jury about this matter, and I'm here to kind of talk to you all

5   about our products and how they're used.

6   **Q.**   As the corporate representative for GoPro, does GoPro

7   think it should be liable for infringing the asserted patents?

8   **A.**   No, we don't think we should be liable for infringing the

9   patents because our position is the patents are not valid.

10  **Q.**   How did GoPro come to that conclusion?

11  **A.**   There's -- so we reviewed the products that are in

12  consideration in this matter.  We consulted with our

13  engineering team, and you'll hear from some members of our team

14  later on.  We hired experts, like Dr. Kevin Almeroth, and we

15  consulted with internal and external counsel.

16  **Q.**   Do you know how long this dispute's been going on?

17  **A.**   I'm not sure exactly, but I believe it goes back to 2015.

18  **Q.**   Has GoPro's position on the validity of the patents

19  changed at all over the course of this dispute since 2015?

20  **A.**   No, our position hasn't changed since 2015.

21  **Q.**   Let's look back at DDX-3.3.  Does GoPro have a main

22  product line?

23  **A.**   The slide's not up on the screen.

24        Sorry.  The question again, please?

25  **Q.**   Oh, sorry.  I said, does GoPro have a main product line?

**LEMA - DIRECT / CLARK**

1  **A.**  We do.  It's the -- most of the cameras that are shown

2  here, the rectangular cameras, we call those our flagship

3  camera.  In the market, you would have known them as the HERO

4  something, HERO number.

5  **Q.**  About how much of GoPro's business is attributable to the

6  HERO flagship camera line?

7  **A.**  About 70 to 75 percent, on average.

8  **Q.**  How would you characterize the commercial performance of

9  GoPro's HERO product line?

10  **A.**  It's been a really successful business.  Even after I

11  joined, it continued to be successful.  We've become almost a

12  verb in this category, to "GoPro" something.  We've made

13  inventions that have changed the way people capture, like

14  HyperSmooth.

15       And something I'm very proud of is that we're one of the

16  last remaining independent hardware companies that are

17  successful.  Everyone else seems to have gotten acquired by

18  Google, Apple, Meta, whoever it is.  So...

19  **Q.**  Does GoPro have any competitors?

20  **A.**  Yeah, we have many competitors.  Cell phone makers are big

21  competitors for us as someone would expect.  Over the years,

22  our competitors have changed.  In the past, we had -- when I

23  joined, it was Garmin, it was Sony.  Those are kind of the ones

24  I remember.

25       And today we have two main Chinese competitors called

 1  Insta360 and DJI.

 2  **Q.**   Is Contour a competitor of GoPro?

 3  **A.**   Contour is not a current competitor of GoPro.

 4  **Q.**   Do you have an understanding, in your role as the head of

 5  product, of what features make people buy a GoPro camera as

 6  opposed to a competitor camera?

 7  **A.**   Yeah.  That's my -- that's my role.

 8  **Q.**   What are those features?

 9  **A.**   So if you remember, I said the reason people come to buy

10  our cameras is they want a durable, high-image-quality, and

11  versatile camera.  That's consistently been the themes over

12  the years.  And that's because people are going to go do

13  something that they like, and those attributes fit perfectly

14  for their needs.

15  **Q.**   Do you know what WiFi is?

16  **A.**   I absolutely know what WiFi is, yes.

17  **Q.**   Would you consider WiFi to be a key driver of GoPro's

18  commercial success?

19  **A.**   I don't think WiFi is a driver of our success, no.

20  **Q.**   But you would agree, wouldn't you, that there are certain

21  features of GoPro cameras that are enabled by WiFi?

22  **A.**   Absolutely.  There are certain features in our products

23  that are enabled by WiFi, yes.

24  **Q.**   And what is an example of those features?

25  **A.**   There are a few.  So the main one is, when you shoot with

1  our camera, you want to be able to see that footage, edit it,

2  and then send it somewhere -- sorry -- send it somewhere like

3  Facebook, WhatsApp messaging.

4      So transferring the footage from your camera and doing

5  some editing tends to be the main one.  We obviously can update

6  your camera over WiFi.  You can live stream with our camera.

7  That's been discussed here.

8      And we have a new feature where if you plug your camera at

9  home after a day of use, it pulls up all the content to the

10  cloud over WiFi.  So those are some of the mains ones.

11  **Q.**   Are you aware of a feature called live preview or phone

12  preview?

13  **A.**   Oh, yeah.  And live preview, yes, I'm aware of it.

14  **Q.**   Can you preview -- does live preview work while you're

15  recording?

16  **A.**   In certain cameras and in certain resolutions and frame

17  rates, you can live preview while recording.

18  **Q.**   Starting with HERO9 and going through cameras released

19  through 2024, can you tell me which cameras allow you to

20  preview while recording?

21  **A.**   So starting with HERO9, HERO9 Black does not.

22      HERO10 Black does not.

23      HERO11 Black did not initially.  HERO11 Black Mini did not

24  initially, and then we updated the firmware to allow it.

25      HERO12 back allows it, and HERO13 Black allows it, and --

1    sorry -- HERO4K allows it.

2    **Q.**   Why don't HERO9 and HERO10 support live preview while

3    recording?

4    **A.**   They don't for a technical reasons.  So HERO9 -- the jump

5    from HERO8 to HERO9 was a much larger resolution sensor.  We

6    became the first in the industry to release 5.3K, which is more

7    K than most people can think of.  And so to process all that

8    image and do our stabilization, we didn't have the ability to

9    do both, so to do live preview while recording and also record

10   and stabilize this newer sensor.

11        And so we had to make a decision that, you know, we don't

12   need live preview while recording.  We should introduce the

13   stabiliz- -- the other features.

14   **Q.**   You mentioned that HERO11 also didn't support live preview

15   while recording at launch; is that right?

16   **A.**   That's correct.

17   **Q.**   But eventually, GoPro decided to update the firmware to

18   support that feature; is that correct?

19   **A.**   That's correct.

20   **Q.**   When was that update?

21   **A.**   So we updated HERO11 Black in March of 2024 and

22   HERO11 Black Mini, the smaller version, in May of 2024.

23   **Q.**   Why did GoPro decide to put live preview while recording

24   back into HERO11?

25   **A.**   Yeah.  So GoPros are a collection of a ton of features.

1    And we have an idea we call feature continuity.  So for some

2    users, live preview while recording is something that they like

3    to use.  So we had the ability in HERO11 Black and Black Mini

4    to introduce it, and it wasn't a trade-off with another

5    feature, so we put it back in.

6    **Q.**    When you updated the HERO11 Black firmware, did you make

7    an announcement of the change anywhere?

8    **A.**    No.

9    **Q.**    Did you advertise the return of live preview while

10   recording anywhere?

11   **A.**    No.  We wouldn't advertise that.

12   **Q.**    Why not?

13   **A.**    We have limited resources when we advertise, even though

14   GoPro's a big brand, and so we like to steer our advertising

15   pretty mathematically to the features that we know people want

16   to buy our products.  And that's where I've said high image

17   quality, our stabilization, our durability, and the versatility

18   of the products.

19   **Q.**    Does GoPro consider live preview while recording to be an

20   important feature to its products?

21   **A.**    I think it's important for some users and some use cases,

22   but for the vast majority of our users, it's not a feature that

23   is important.

24   **Q.**    Are you aware of any evidence demonstrating the relative

25   value of whether live preview while recording is important?

1   **A.**   Yeah.   I think one was discussed here earlier, that I

2   would look at the sales performance of HERO9 and HERO10 Black.

3   Those products did not have that feature, and we sold

4   essentially the same as the product that came before it that

5   had it, even though it was COVID and during COVID, a lot of

6   people did not buy things.   So that's a good evidence.

7        And then we also understand how our users use the product.

8        **MS. CLARK:**   Permission to approach the witness to

9   provide a binder?

10       Can I approach the witness to provide --

11       **THE COURT:**   Yes, you may.

12       **MS. CLARK:**   Thanks.

13  **BY MS. CLARK:**

14  **Q.**   Mr. Lema, I'd like you to turn to what's been marked as

15  DTX-4505 in your binder, the binder that I just handed you.

16  **A.**   Yes.

17  **Q.**   Do you recognize this document?

18  **A.**   I do.

19  **Q.**   What is it?

20  **A.**   This is a data poll showing metrics related to how users

21  start captures in our products.   And it's some data that we

22  keep on the ordinary course of business at GoPro.

23       **MS. CLARK:**   Move to admit DTX-4505.

24       **MR. KRILL:**   No objection.

25       **THE COURT:**   It's admitted.

1          (Trial Exhibit 4505 received in evidence.)

2    **BY MS. CLARK:**

3    **Q.**   Can you explain to us a little bit about what this

4    spreadsheet shows.

5    **A.**   So the spreadsheet shows, by camera model -- pointing your

6    eyes towards the last two columns.  So it says the percentage

7    of video captured by the mobile app, so what was started --

8    what captures were started in the mobile app versus what

9    percentage of videos were started by other methods that are not

10   the app.

11   **Q.**   What other methods of capturing video does GoPro support?

12   **A.**   So we have several.  We have the main one, the big red

13   shutter button on the camera.  That's the most common one.  We

14   also have a series of remotes that you can buy and control over

15   Bluetooth.  We can also talk to the camera.  So you can say

16   "GoPro, capture" and it will start capturing.  And then you can

17   start in the app.

18   **Q.**   What, if anything, does the percentage of capture by app

19   versus other methods of capture tell you about the relative

20   importance of live preview?

21   **A.**   So it shows you in the last -- in the second-to-last

22   column, on average, from 4 to, I'd say, 6 percent for most

23   cameras, that's -- those videos are started from the mobile

24   app.  So for the vast majority of users, they're starting and

25   stopping their capture -- sorry.  I should be clear -- starting

1   their capture, based on this data, somewhere else.  Most likely

2   the big red button on the camera.

3   **Q.**   If someone starts capturing on the mobile app, does that

4   mean they're necessarily using live preview while recording?

5   **A.**   No.  It would be, a subset of these groups of people would

6   be doing live preview while recording.

7   **Q.**   Earlier today -- or earlier this week, do you recall

8   hearing testimony about live preview being foundational?

9   **A.**   I did, yes.

10  **Q.**   Do you agree with that?

11  **A.**   I don't.

12  **Q.**   Do you recall hearing testimony about how you need to be

13  able to wirelessly preview your video in order to aim it and

14  ensure that you get a good shot?

15  **A.**   I remember hearing that testimony, yes.

16  **Q.**   Do you agree with that?

17  **A.**   I do not agree with that.

18  **Q.**   Do you agree with that for GoPro cameras?

19  **A.**   Sorry.  Can you ask again?

20  **Q.**   Do you think that GoPro cameras rely on wireless preview

21  in order to be able to frame the shot -- in order to allow its

22  users to reframe its shot?

23  **A.**   They do not for the majority of use cases.

24  **Q.**   Why not?

25  **A.**   So our cameras -- users -- our cameras are very wide, so

1  they capture a lot of the world.  So seeing some of the

2  examples were said, if you put the camera on a helmet, you need

3  to be able to see where its view is going to point so you can

4  actually get good footage.  That makes sense if the camera has

5  a narrower field of view.

6      But our cameras are very wide field of view so they see a

7  lot.  So we actually enable that so that users can go into our

8  app later and not have to think about it.  They just capture

9  everything, and then they likely got everything they needed.

10  That's --

11      MS. CLARK:  Can we put up DDX-3.5, please.

12  BY MS. CLARK:

13  Q.  Do you recognize -- what is being shown in DDX-3.5?

14  A.  Yeah, what's being shown here is what I said about field

15  of view.  So if you are not aware what that is, that is how

16  much a camera sees of the world.

17      Our cameras are very wide, and sometimes people even don't

18  like that they're too wide.  And that's good because that means

19  we capture everything around you, and you don't have to worry

20  about framing it.  So if you put it on a helmet, you're going

21  to capture the skiing and the mountain biking so long as it's

22  generally pointed in the right direction.

23  Q.  Do you know what a point-of-view camera is?

24  A.  Yes.

25  Q.  Would you consider GoPro cameras point-of-view cameras?

1          Let me correct that.  Would you consider GoPro cameras

2     HERO9 to present to be point-of-view digital cameras?

3     **A.**    No.  I think our cameras are way more than point-of-view

4     cameras.  If you remember, early on I said about versatility

5     being one of our key drivers.  So this camera is one that can

6     go on a rocket.  It can go underwater.  It can be put on the

7     bike of a kid facing the kid.  So that versatility means it's

8     way more than just what is considered a traditional

9     point-of-view camera.

10    **Q.**    Have you heard the phrase "point-of-view footage"?

11    **A.**    Yes, of course.

12    **Q.**    Can GoPro cameras shoot point-of-view footage?

13    **A.**    Absolutely.

14    **Q.**    Does that make them a point-of-view digital camera?

15    **A.**    It does not.  We enable some features that make it a

16    point-of-view shot, like HyperView and SuperView that's said

17    here, but our cameras are used for a lot more than that.

18              **THE COURT:**  Ms. Clark, is this a good time to take a

19    break?

20              **MS. CLARK:**  Sure, absolutely.

21              **THE COURT:**  All right.  Ladies and gentlemen, we'll

22    take our second break for the day.  15 minutes.  Be back around

23    noon.

24         (Proceedings were heard out of the presence of the jury.)

25              **THE COURT:**  All right.  We're in recess.

```
 1              (Recess taken at 11:45 a.m.)

 2            (Proceedings resumed at 12:00 p.m.)

 3         THE COURT:  All set?

 4      (Proceedings were heard in the presence of the jury.)

 5         THE COURT:  All right.  Please be seated, everybody.

 6      Ms. Clark, go ahead.

 7         MS. CLARK:  Thank you, sir.

 8  BY MS. CLARK:

 9  Q.   Starting in September of 2014 with HERO for Silver, have

10  GoPro's HERO model cameras had at least one display on them?

11  A.   Have -- yes.

12  Q.   Does having a display on board the camera impact the value

13  of wireless preview?

14  A.   Yeah, I think so, because once you have a display, you are

15  able to do most of the preview that you want to do on the

16  camera itself.  You can do other things, change settings.  And

17  then that is matched by how we see users behaving.  Ever since

18  then, people have used the screens as their main form of

19  interaction with the camera.

20  Q.   Are you familiar with a feature called live streaming?

21  A.   Yes, I am.

22  Q.   Can you explain a little bit about how live streaming

23  works?

24  A.   So live streaming is typically when you want to send your

25  videos to Facebook, Twitch, YouTube.  Those tend to be the main
```

1    places.

2        What you do is you tell the camera, "Hey, I want to go

3    live to Facebook."  The camera will then join a wireless

4    network that you tell it to.  And when you say "Start

5    streaming," it'll start sending whatever it sees up through the

6    cloud, up to Facebook, and then down to audiences wherever they

7    are.

8    **Q.**   How do the cameras -- how are GoPro cameras able to

9    connect to the Internet for the purpose of live streaming?

10   **A.**   So for live streaming, they use the WiFi capabilities of

11   the camera.  So through the app, you tell it to join a wireless

12   network.  That could be typically the routers in your homes or

13   wherever you are.  And then in some cases, you can use the

14   hot spot on your phone to pretend to be a wireless network to

15   also send video up that way.

16   **Q.**   Is using your phone as a WiFi hot spot the typical use

17   case for live streaming?

18   **A.**   Not in our experience and knowledge of our users, and

19   there's a few reasons for that.  So when you connect over a

20   mobile hot spot, you're relying on the network quality of the

21   hot spot and that can vary quite a bit.  And if the network

22   drops, you have to start the whole process again.

23       And the other reason is it tends -- it'll consume more of

24   your phone battery.  So our users have tended to say:  I'd

25   rather connect somehow through a wireless network somewhere.

**LEMA - DIRECT / CLARK**

1  Q.   But if you're outside skiing, wouldn't it be true that you

2  wouldn't have access to a wireless router necessarily, in which

3  case WiFi hot spot becomes useful for live streaming?

4  A.   You -- yeah, you more likely wouldn't have access to a

5  wireless network, but you still wouldn't want -- you wouldn't

6  have the ability to actually check that the connection is

7  stable.  So if you ski, you likely put the phone in your

8  pocket, go skiing.  If you lose connection during that process,

9  the live stream stops and you have to start again.  So we end

10 up finding that users don't really do that.

11 Q.   In your experience as a product -- as the head of product,

12 do most people who use the live streaming feature of GoPro

13 cameras that support it, are they live streaming while skiing

14 or away from a wireless router?

15 A.   No.  We've tended to find that users who live stream end

16 up in a smaller corner of our use cases.  Think yoga, fitness

17 studios, someone who's trying to demonstrate a class, a gamer.

18 And the reason for that is because when you're live streaming,

19 if you think about it, if you go live on TikTok, you actually

20 want to be responding to your audience.  That's kind of the

21 main part of the experience is you want to see what people are

22 saying, respond.  And you can't do that with a GoPro.  But if

23 you're, say, a gamer, live streaming your gaming session,

24 you'll have access to the live stream on your computer and you

25 can react there.

1       So we've tended to find that that is where we see people

2    really wanting to live stream with our products.

3    **Q.**   Could you use a live stream as a wireless preview to aim

4    your shots?

5    **A.**   I don't think you could.  It wouldn't be effective.  So

6    the reason for that is, say you're trying to frame a shot with

7    live streaming through Facebook.  And I think an example here

8    in the courtroom was someone moved a camera.  So when you moved

9    a camera, it would actually probably take about eight, ten,

10   probably a little bit more, seconds for that response to happen

11   on the Facebook stream.

12       So if I move the camera to the side, I'd have to go "one

13   1,000, two 1,000, three 1,000" and then the image would change

14   again.  So it's not a very effective preview, so it can't

15   really be used for that use.

16   **Q.**   How popular, in general, is live streaming as a feature to

17   GoPro customers -- with GoPro customers?

18   **A.**   Given the limitations I described, it's not very popular.

19   **Q.**   Would you turn to DTX-4422 in your binder, please.

20       Mr. Lema, do you recognize this document?

21   **A.**   I do.

22   **Q.**   What is it?

23   **A.**   This is a data pull -- poll -- sorry -- of some of the

24   metrics we track in the ordinary course of GoPro's business

25   related to how people use live streaming.

1  **Q.**   What is the date range for this data?

2  **A.**   It goes by month, and it goes from 2021 to 2024.

3       **MS. CLARK:**  Move to admit DTX-4422.

4       **MR. KRILL:**  No objection, Your Honor.

5       **THE COURT:**  It's admitted.

6  (Trial Exhibit 4422 received in evidence.)

7  **BY MS. CLARK:**

8  **Q.**   What does "MAU" stand for?

9  **A.**   So "MAU" is a common industry term.  It means millions of

10  active users.  You may have heard that from companies like

11  Facebook.

12  What that means to us is any time you come into the GoPro

13  app and you do something in the GoPro app, like edit your

14  footage, you're counted as an active user for that month.  So

15  if you started a live stream in that month, you have been

16  counted on the fourth column here as a live stream user in that

17  month.

18  **Q.**   What does this document tell you, if anything, about the

19  percentage of GoPro app users that live stream?

20  **A.**   It shows that it's very low.  It's about 1 -- just over

21  1 percent on average of our monthly active users.

22  **Q.**   Is that a lot or a little relative to other features?

23  **A.**   It's not big compared to the main features that people use

24  our app for.

25  **Q.**   Let me ask you about another set of features of GoPro

**LEMA - DIRECT / CLARK**

1    cameras.  Are you familiar with the remote control features of

2    GoPro cameras?

3    **A.**    Yes.

4    **Q.**    Can you describe the various ways that GoPro camera

5    settings can be changed?

6    **A.**    So settings on the camera can be changed -- the main way

7    is the back of the screen.  So you can do all the -- change

8    everything on the camera there.

9         You can do certain setting changes on our Bluetooth

10   remotes.  We have a special firmware called GoPro apps that

11   allows you to show a QR code to the camera with different

12   settings.  And then you can change settings through the GoPro

13   app as well.

14   **Q.**    When using the GoPro app, does the app connect to the

15   GoPro camera through Bluetooth or through WiFi for the purpose

16   of changing camera settings?

17   **A.**    For camera settings, we use the Bluetooth protocol.

18   **Q.**    Can a user change image settings like color, lighting, or

19   audio while using live preview while recording?

20   **A.**    No.  Once you're recording, you can't change any settings.

21   **Q.**    Can a user change image settings while live streaming and

22   recording?

23   **A.**    No.  Once the live stream starts, you can only stop the

24   stream.

25   **Q.**    Could GoPro design a camera so that it could only change

1    settings, image settings, either on the camera or through a

2    GoPro remote control that did not have a display?

3    **A.**    Yes, we could.

4    **Q.**    Would that change be expensive?

5    **A.**    It'd be some firmware work, in my opinion, but probably

6    not very expensive.

7    **Q.**    Would that change impact demand for GoPro cameras?

8    **A.**    No, I don't think it would change the demand

9    significantly.  People buy for -- buy our cameras for other

10   reasons.

11   **Q.**    Would you turn to DTX-4289.  Mr. Lema, do you recognize

12   this document?

13   **A.**    I do, yes.

14   **Q.**    What does it show?

15   **A.**    This shows a summary of ProTune settings usage for the

16   HERO9 Black camera, and this is info that we track in our

17   ordinary course of business.

18           **MS. CLARK:**  Move to admit DTX-4289.

19           **MR. KRILL:**  No objection.

20           **THE COURT:**  It's admitted.

21       (Trial Exhibit 4289 received in evidence.)

22   **BY MS. CLARK:**

23   **Q.**    Mr. Lema, what are ProTune settings?

24   **A.**    So ProTune settings were described earlier, and these are

25   advantaged image settings that you can make the camera change

1    the way it captures videos and photos.  You kind of really have

2    to know what you're doing.  These are things like ISO and white

3    balance and bit rate.  I think most people in this room would

4    have no idea what those things are.  And so we call those

5    ProTunes.  They're kind of a professional set of settings.

6    **Q.**   Are lighting, color, and audio settings ProTune settings?

7    **A.**   Yes, we consider them ProTune settings.

8    **Q.**   Are there any lighting, color, or audio settings that you

9    don't see on this document?

10   **A.**   No.

11   **Q.**   And does this schematic show all ProTune settings usage or

12   just usage of ProTune settings by app users?

13   **A.**   It's my understanding this tracks any changes to ProTune

14   settings, whether they were from --

15   **Q.**   What, if anything, does this document show regarding the

16   frequency of use of lighting, color, and audio settings?

17   **A.**   So it follows I think what I may have said earlier.  Most

18   people don't know what these things do and they don't care to

19   know.  Most of our users just want to push our big red button

20   and capture something.

21        And if you look at the metrics, anywhere from 90 to, I'd

22   say, 99 percent of these settings are never changed by the user

23   once they get the camera.  So that means it's not -- a lot of

24   people don't know what these things are or use them.

25   **Q.**   Are you familiar with the term "capture in default"?

1   **A.**   Yes.

2   **Q.**   What does that mean?

3   **A.**   Capture in default means -- the camera comes with a

4   certain set of settings out of the box, and those settings are

5   known as default.  So if you don't change it, it will always

6   capture in that setting.

7   **Q.**   Does GoPro invest resources in ensuring that users can

8   capture in default?

9   **A.**   Sorry.  Can you repeat the question?

10  **Q.**   Sure.  Does GoPro invest resources in ensuring that when

11  users get a camera, they can capture in default; they don't

12  have to change settings?

13  **A.**   Yeah, you don't.  That's the magic of a GoPro is we do all

14  the work, a lot of analysis in the processor and in our

15  software to determine what the best settings are for skiing,

16  SCUBA, skydiving, all automatically.  So all you have to do is

17  press the big red button and you're going to get good footage.

18  **Q.**   Were you here when Dr. Ugone testified about something

19  called the hypothetical negotiation?

20  **A.**   Yes.

21  **Q.**   And did you hear him opine that based on that negotiation,

22  he believes the parties would have agreed to a royalty rate of

23  $3.62 per camera in 2014?

24  **A.**   I do.

25  **Q.**   How does $3.60 compare to the cost of other components in

1  GoPro cameras?

2  **A.**   It would be quite high.  It would probably be a top six

3  component, or top six or five or seven after the lens, the

4  sensor, the processor, the battery, and the display.  Then

5  you're getting to that $3.60 area after that.

6  **Q.**   And how does, in your opinion, live preview while

7  recording compare to the importance of things like a lens,

8  sensor, processor to GoPro cameras?

9  **A.**   It has a lot lower value.  So when we design our products,

10  we have a limited amount of money we can put into the product.

11  And what we -- our job is to do these trade-offs.  Right?

12  Figure out what should we put in the camera.  And if you put

13  something in there, it comes at an expense of something else.

14      So live preview while recording has a lot lower value

15  than, say, the quality of the image sensor we can put in there

16  or a better lens or a much larger battery, which users always

17  want.

18  **Q.**   Do you like working at GoPro?

19  **A.**   I love working at GoPro.  It's hard, but I actually really

20  love working at GoPro.

21  **Q.**   What makes it challenging?

22  **A.**   It's challenging because we have a simple mission, to help

23  people capture and celebrate something that they love.  I'm a

24  parent.  I love doing it.  I love capturing my life in unique

25  ways.  But consumer electronics is very hard.  We all have very

1    demanding needs, and we want our products to be perfect, and we

2    can't make cameras that are specific to a single person.

3         For us to be successful as a business, we kind of make the

4    Swiss Army Knife, this big camera that sells millions and

5    millions of units.  And that's really the cool and the hard

6    part of my job is to figure out that balance of what goes into

7    our products.

8    Q.   Okay.  What do you like the most about working at GoPro?

9    A.   I like the end result.  So I've been a video and

10   photography nerd my whole life.  I lived in a photo lab as a

11   kid.  And I generally get a strong personal reaction when

12   someone captures something that they like.  And to know that

13   myself and our teams have enabled that perspective and that

14   memory is a very personally rewarding thing.

15   Q.   That reminds me.  Can we go back to DDX-3.2.

16        You prepared this slide; right, Mr. Lema?

17   A.   I did, yeah.

18   Q.   I see that there's an embedded video in it.  Would you

19   like to play it?

20   A.   Yes, let's do it.

21             (Video was played but not reported.)

22   BY MS. CLARK:

23   Q.   Why did you include this video in your slide, Mr. Lema?

24   A.   That's Rex.  You should all get to know Rex.  He's

25   awesome.

**LEMA - CROSS / KRILL**

1    I include it because that video to me is one of my

2    favorite videos that we've ever seen because it encapsulates

3    everything we do.  In that video is a kid riding, doing

4    something that's probably hard for him to do.  And using our

5    products and the technologies we put into our cameras, they've

6    been able to capture something that's unique.

7        So you saw at one point the dad came by.  That film --

8    that camera could have been -- that moment could have been

9    filmed from a cell phone from the side, and I don't think you

10   would have gotten the kid's expressions, the kid's face, the

11   kid's audio of what they're doing.

12       So it really -- it makes me proud to be able to make

13   products that give that versatility, that well-stabilized

14   footage, that image quality that makes stuff like that

15   possible.

16           **MS. CLARK:**  Thank you Mr. Lema.

17       Pass the witness.

18           **THE WITNESS:**  Thank you.

19                       <u>**CROSS-EXAMINATION**</u>

20   **BY MR. KRILL:**

21   **Q.**   Good afternoon.

22   **A.**   How are you?

23   **Q.**   I'm doing well.  How are you?

24   **A.**   I'm well.  Thank you.

25           **MR. KRILL:**  Allen, could you pull up DDX-.3, Slide 3.

1    BY MR. KRILL:

2    **Q.**    You've been sitting here throughout this entire trial;

3    correct, Mr. Lema?

4    **A.**    That's correct.

5    **Q.**    Okay.  Now, on this slide, you have the HERO2 with

6    WiFi BacPac in 2011.  But the HERO WiFi BacPac was actually

7    released in 2012; correct?

8    **A.**    That's before my time.  I don't know the exact date it was

9    released.

10   **Q.**    Okay.  You understand that 20 camera models from the HERO2

11   with WiFi BacPac all the way to the HERO8 Black and Max in 2019

12   have been found to meet all elements of Claim 11 of the '954

13   patent asserted here; correct?

14   **A.**    Yeah.  I'm not a patent lawyer, but I understand that

15   the Court has found that they -- we practice the claims in the

16   patents.

17        **MR. KRILL:**  Allen, could you draw a line between 2019

18   and 2020.

19   **BY MR. KRILL:**

20   **Q.**    After the HERO8 and HERO MAX, GoPro released seven more

21   accused camera models:  The HERO9, 10, 11, 11 Mini, 12, 13, and

22   HERO4K; correct?

23   **A.**    We released those products in that timeline, yes.

24   **Q.**    The HERO9 was released in 2020, as shown by your timeline;

25   correct?

**LEMA - CROSS / KRILL**

1   **A.**   That's correct.

2   **Q.**   Now, when GoPro released the HERO9, 10, and 11 models,

3   those did not have live preview while recording; correct?

4   **A.**   They did not.

5   **Q.**   And the 9 and 10 still do not to this day; correct?

6   **A.**   They do not.

7   **Q.**   Then in twenty- -- I'm sorry.  Then in 2023, GoPro

8   released the HERO12 Black which did have live preview while

9   recording; correct?

10   **A.**   Yes.

11   **Q.**   In 2024, GoPro released an update for the HERO11 cameras

12   that added back live preview while recording; correct?

13   **A.**   Yes.

14   **Q.**   Then in 2024, GoPro released the HERO4K and the

15   HERO13 Black, both of which have live preview while recording;

16   correct?

17   **A.**   That's correct.

18   **Q.**   So earlier you testified that live preview while recording

19   was not an important feature, but GoPro actually removed the

20   feature and then added it back in 2023; correct?

21   **A.**   That's not correct.  We weren't able to put it in

22   HERO9 Black and HERO10 Black.  We had to develop -- we

23   introduced the new sensors in those cameras, new processors, so

24   we had to figure out how to make that work because those are

25   more important to our products.  So we didn't remove the

1    feature.  We were able to put it in later.

2    **Q.**    And you could have put it in the HERO11 Black and

3    11 Black Mini, you said, because you released a firmware update

4    later on to add that feature back in; correct?

5    **A.**    We -- when we got to our firmware resource -- our firmware

6    resources were able to get to that feature.  That's when we

7    added it into that product.

8    **Q.**    And the reason you added it back was because of customer

9    complaints; isn't that correct?

10   **A.**    No.

11         **MR. KRILL:**  Allen, could you show the witness, let's

12   start with PTX-1224.

13   **BY MR. KRILL:**

14   **Q.**    You are familiar with a GoPro support hub; correct?

15   **A.**    I am, yes.

16   **Q.**    The GoPro support hub is a website where we -- excuse me.

17   The GoPro support hub is a website where GoPro hosts a forum in

18   which people can come in and discuss all kinds of things about

19   GoPro products; correct?

20   **A.**    Yes.

21   **Q.**    And the support hub is maintained by GoPro; correct?

22   **A.**    I believe so, yes.

23   **Q.**    Now, can you read the title of this post here on the GoPro

24   support hub?

25   **A.**    [As read]:

```
 1              "Live preview in the GoPro app while recording
 2         using HERO10 Black is not supported."
 3    Q.    Now, if you could go to page 2 --
 4              MR. KRILL:  Your Honor, I move the admission of
 5    PTX-1224.
 6              THE COURT:  Any objection?
 7              MS. CLARK:  If they establish foundation, then no, but
 8    I haven't heard it yet.
 9              THE COURT:  Overruled.  It's admitted.
10         (Trial Exhibit 1224 received in evidence.)
11              MR. KRILL:  Allen, could you go to page 2, the second
12    comment from the bottom, actually.
13    BY MR. KRILL:
14    Q.    Do you see where it says [as read]:
15              "I've had many GoPros over the years and I will
16         not buy any new ones until that feature is added
17         back"?
18         Do you see that?
19    A.    I see that it says that, yes.
20              MR. KRILL:  Allen, could you zoom out.
21         Could you go to the third page, first comment.
22    BY MR. KRILL:
23    Q.    Do you see how this customer is also complaining that
24    there are features [as read]:
25              ". . . with no more live stream, why should I
```

1          buy a GoPro with no live, no GPS, no live

2          feed . . . ."?

3          Do you see that?

4     A.   I see that, yes.

5               MR. KRILL:  Allen, the fourth comment from the bottom.

6          I'm sorry the one below that.

7     BY MR. KRILL:

8     Q.   Do you see how this customer says [as read]:

9               "I bought a 9 when they first came out.  I was

10         incredibly disappointed to discover that live

11         monitoring for a device that is meant to be used away

12         from one's eyes was not enabled"?

13         Do you see that?

14    A.   May I read it?

15    Q.   Yes, absolutely.

16    A.   (Witness examines document.)  Yes, I see it.

17              MR. KRILL:  Allen, could you show just the witness

18    PTX-1228.

19    BY MR. KRILL:

20    Q.   PTX-1228 is another post from the GoPro support hub;

21    correct?

22    A.   That's -- the website at the top seems to say the GoPro

23    hub.  I'm not sure this document is exactly from it, but

24    I believe that.

25              MR. KRILL:  Okay.  Your Honor, I move the admission of

```
 1    PTX-1228.

 2              THE COURT:  Any objection?

 3              MS. CLARK:  No objection.

 4              THE COURT:  It's admitted.

 5         (Trial Exhibit 1228 received in evidence.)

 6    BY MR. KRILL:

 7    Q.   Do you see how the title of this post is "Preview Not

 8    Available On HERO10 Black"?  Correct?

 9    A.   I do see that, yes.

10              MR. KRILL:  Now, if you go to page 2, Allen.

11    BY MR. KRILL:

12    Q.   Do you see how the first customer complains [as read]:

13              "That is beyond ridiculous.  I had a GoPro4

14         Black and preview while recording on an

15         eight-year-old camera.  This is a deal breaker for

16         me.  I'm going to return it"?

17         Do you see that?

18    A.   I do, yes.

19    Q.   So the HERO9 Black was the first --

20              MR. KRILL:  Allen, can you take that down.

21    BY MR. KRILL:

22    Q.   The HERO9 Black was the first camera that did not have

23    live preview while recording; correct?

24    A.   That's correct.

25    Q.   So there are customer complaints about removing live
```

1    preview while recording; correct?

2    **A.**   I would expect that.  We get complaints about a lot of

3    things in our products.

4    **Q.**   So earlier you testified that live preview while recording

5    was not an important feature; is that right?

6    **A.**   I think my testimony was it's important for certain users

7    and certain use cases, yes.

8    **Q.**   GoPro has been in this litigation for ten years.  If it

9    was not important -- or if it was only important to certain

10   users and overall not important, why haven't you completely

11   removed it?

12   **A.**   We have not removed the feature because I think, as we

13   stated, our position is that we are -- the patents are not

14   valid and we can't infringe on a non-valid patent.  So why

15   would we remove the feature?

16   **Q.**   Well, we saw customers complaining about it; correct?  So

17   if you removed the feature, you'd have customer complaints.

18   And GoPro does not want customer complaints; correct?

19   **A.**   I don't want customer complaints ever.  I mean, it's part

20   of our product thing.  We get complaints every day about our

21   products, and -- but we have 5 million-plus active users a

22   month.  In there are people who complain about all things.

23        Our main complaints will tend to be the camera doesn't run

24   for long enough.  I wish you would higher resolution.  Those

25   are really meaningful complaints as well.

1    Q.    Sir, but regardless, you've been in ten years of

2    litigation and your cameras still support live preview while

3    recording; correct?

4    A.    Some of our cameras in certain modes still support live

5    preview while recording.

6    Q.    Specifically, all but two cameras, the HERO9 and the

7    HERO10 that are accused in this case; correct?

8    A.    There are certain modes in cameras, I believe, that are

9    not able to do live preview while recording.

10    Q.    And live streaming while recording, you released that with

11    the HERO7 Black; is that correct?

12    A.    I believe that's the case, yes.

13    Q.    And that's been in every camera model all the way up to

14    the HERO13 Black released in 2024; correct?

15    A.    Yes.

16    Q.    Now, we heard in this Court that the HERO9 Black and

17    forward, all cameras after the HERO9 Black and including the

18    HERO9 Black, which was released in 2020, have Bluetooth-only

19    controls unlike the other older cameras.  Do you remember that?

20    A.    We made a change to our app at one point that made it so

21    it's only Bluetooth control and change camera settings, yes.

22    Q.    So that app change was made for other cameras in addition

23    to the HERO9 Black, such as the HERO8 and the HERO MAX cameras;

24    correct?

25    A.    I don't remember if our new Bluetooth control is before

1    those cameras as well.

2    **Q.**    Let me ask you first.  You sometimes interact with

3    customers online such as on Reddit; correct?

4    **A.**    I do, yes.

5    **Q.**    You've done AMAs or "Ask Me Anything" on Reddit; correct?

6    **A.**    I have, yes.

7    **Q.**    An AMA is an event where you go on Reddit and customers or

8    users or whoever is on Reddit go in and they ask you questions

9    and you respond; correct?

10    **A.**    That's correct.

11    **Q.**    And you participated in an AMA for the HERO9 Black after

12    its launch in late 2020; correct?

13    **A.**    I don't remember if I participated for that camera.  I

14    likely would have.

15          **MR. KRILL:**  Your Honor, may I approach the witness?

16          **THE COURT:**  You may.

17    **BY MR. KRILL:**

18    **Q.**    I have handed you what's been marked as Exhibit 1297,

19    which is an "Ask Me Anything," or AMA, on Reddit I believe from

20    2020.  Does this look familiar to you?

21    **A.**    I've not seen this, but I think -- can I take a moment to

22    review it?

23    **Q.**    Sure.

24    **A.**    (Witness examines document.)

25    **Q.**    And I only have one specific question for you, sir, about

1  a comment that you made in here, and I can direct you to it if

2  you would like.

3  **A.**   I'm almost done.

4      (Witness examines document.)  Okay.  I see this is a

5  printout of parts of the AMA, I think.

6  **Q.**   Right.  And it's entitled "AMA with Pablo Lema, GoPro's VP

7  of Product Management."  That's you; correct?

8  **A.**   Yes.  I was a VP back then, yes.

9  **Q.**   And the name GoPro -- the username GoPro-Pablo, that's

10 you; correct?

11 **A.**   That's an account I created to be able to participate in

12 these.

13     **MR. KRILL:**  Your Honor, I move the admission of

14 Exhibit 1297.

15     **MS. CLARK:**  Objection.  This document is neither in

16 the production nor on their exhibit list.

17     **MR. KRILL:**  It's an impeachment exhibit, Your Honor.

18     **THE COURT:**  But when was it produced to the other

19 side?

20     **MR. KRILL:**  It wasn't produced, Your Honor.  The

21 witness just said that the Bluetooth controls -- or he didn't

22 recall if the Bluetooth controls existed for earlier camera

23 models.  This document --

24     **THE COURT:**  Why don't you use it in a different way.

25     I sustain the objection.

1          **MR. KRILL:**  Okay.

2     **BY MR. KRILL:**

3     **Q.**   Well, sir, could you flip to page 6 and just review -- I'm

4     sorry.  Page 8.  And do you see a post from GoPro-Pablo at the

5     bottom?

6     **A.**   Yes.

7     **Q.**   And can you review to yourself the sentence that begins,

8     that you wrote, with "however" in the middle of the second

9     paragraph.

10    **A.**   Yep.

11         [As read]:

12              "However, we have recently" --

13              **THE COURT:**  Read it to yourself.

14              **THE WITNESS:**  Oh, sorry.

15         (Witness examines document.)  Yep, I see the comment.

16    **BY MR. KRILL:**

17    **Q.**   Okay.  So the HERO8 Black and HERO MAX, according to you,

18    have Bluetooth-only camera controls; correct?

19    **A.**   Yeah.  This refreshes my memory of the timing of when we

20    introduced that BLE-only command.  So we have it for HERO8,

21    MAX, and HERO9 at that time.

22    **Q.**   So it's false to say that only the HERO9 Black and camera

23    models released after that are capable of Bluetooth-only

24    controls; correct?

25    **A.**   I don't think I said that.  I said that we introduced

1    Bluetooth -- we split the connection between Bluetooth and WiFi

2    starting with HERO8 Black.

3    **Q.**    For control signals with HERO8 Black, you're saying

4    control signals go over Bluetooth and WiFi?

5    **A.**    I don't know.  I'm not the technical expert on this.  I

6    know that for a user experience, you connect to Bluetooth, set

7    controls there, and then WiFi for other features.

8    **Q.**    Bluetooth-only camera control does not mean Bluetooth only

9    to you?

10   **A.**    Bluetooth-only control.  I don't understand the question.

11   **Q.**    I'm just reading your words, sir.

12   **A.**    So what we did is we -- the app -- users don't want to

13   connect to the app via WiFi only.  They want to be able to

14   quickly get -- start and stop the camera.  That happens over

15   Bluetooth.  And then transfer content over WiFi.  So we made

16   that split at this time.

17   **Q.**    So, sir, yes or no, the HERO8 Black and the HERO MAX are

18   configured with Bluetooth-only camera control; correct?

19   **A.**    I don't know that.  I think you'd have to ask -- I don't

20   know if its engineer would say that it's Bluetooth only.

21   **Q.**    Fair enough.

22        The two newest question -- strike that.

23        The two newest cameras in this case are the HERO13 Black

24   and HERO4K which GoPro released in 2024; correct?

25   **A.**    That's correct.

1  **Q.**   The HERO13 Black is one of those cameras that -- I think

2  it was in your slides -- had so many features that made it

3  GoPro's flagship camera.  Is that fair?

4  **A.**   HERO13 Black was our flagship camera for last year.

5  **Q.**   But even for GoPro's newest flagship cameras or at least

6  for 2024 like the HERO13, you agree that the base product

7  remains the same; correct?

8  **A.**   Can you ask the question again?  I don't think I agree

9  with that.

10  **Q.**   Sure.  Even for GoPro's flagship camera like the

11  HERO13 Black, you agree that the base product remains the same,

12  even though it has additional features; correct?

13  **A.**   Absolutely not.  Our products are completely different.

14  **Q.**   Let me just make sure I understand.  Do you agree or

15  disagree that the base product remains the same but the lenses

16  allow users to vary the type of footage they want to capture,

17  referring to the HERO13 Black?

18  **A.**   Sorry.  Which cameras are you comparing in that question?

19  **Q.**   I'm just asking the HERO13 Black, does the base product

20  remain the same, according to you, even though it has

21  additional features?

22  **A.**   The same relative to what?

23       **THE COURT:**  I'm sorry.  Would you rephrase that?  It

24  has to be the same as something.

25  \\\

1   **BY MR. KRILL:**

2   **Q.**    Okay.  The same as GoPro's prior cameras before the

3   HERO13 Black.

4   **A.**    No, I don't think that's correct.

5         So we've had several features introduced over the years.

6   We introduced HyperSmooth.  We've introduced additional lens

7   mods to make the camera wider.  We've introduced better

8   mounting abilities.  We've introduced better stabilization,

9   horizon leveling.  Cameras have changed quite a bit over

10  the years.  Some have had slightly different differences from

11  generation to generation, but they've been very different.

12  **Q.**    The HERO or the HERO4K the 21 -- the one that was released

13  in 2024, how do you refer to it?

14  **A.**    So we call that our -- the naming is inconvenient.  It's a

15  HERO4K.  It's our small camera.  It is not in the same class as

16  our flagship cameras, the Black series.

17  **Q.**    You agree that the HERO4K was born from the idea of making

18  the GoPro experience more accessible because we, GoPro, observe

19  that many user wanted a GoPro to capture perspectives they

20  couldn't get with their phones but they didn't need all the

21  features of our flagship models; correct?

22  **A.**    Can you repeat that so I understand it?  Because I think

23  you're describing some of our marketing.

24  **Q.**    Tell me if you agree or disagree.  We, as GoPro, observe

25  that many users wanted a GoPro to capture perspectives they

1  couldn't get with their phones but they needed all the

2  advanced -- but they didn't need all the advanced features of

3  our flagship models.  Is that correct?

4  **A.**   I, Pablo, my opinion is HERO4K was meant to be a more

5  simple product at a lower price point that users don't have to

6  know a lot about settings and also had the benefit of being

7  smaller and lighter weight.

8  **Q.**   And that's because users did not want -- many users did

9  not want all the advance features of your flagship models;

10  correct?

11  **A.**   That's not correct.  So most of our users want high image

12  quality that's stabilized in a waterproof and rugged device.

13  HERO4K is that.

14      What the advance features they probably don't want, things

15  like ProTunes or even understanding what resolutions and frame

16  rates are.  That's not something that a lot of users even care

17  to know about.

18  **Q.**   But you still released a HERO4K camera in 2024 that didn't

19  have many of the advance features you were discussing.  Is that

20  fair?

21  **A.**   It didn't have things like ProTunes.  It has really good

22  image stabilization.  It has a wide angle lens.  So we released

23  that camera, yeah.

24  **Q.**   And it also has live preview while recording; correct?

25  **A.**   I believe it does have live preview while recording.

1    Q.    Speaking of remote control, you explained that GoPro could

2    remove the ability to remotely change settings from its camera

3    and that would not be very expensive.  Is that fair?

4    A.    Yeah.  I don't know the exact amount, but in the -- in the

5    question was whether we could make remotes that only -- remotes

6    where the camera only accepts setting changes in the camera

7    itself or remotes.  I don't think that would be a big project

8    for us.

9    Q.    And to be clear, GoPro has never made any of those changes

10   that you discussed; correct?

11   A.    It was a hypothetical.  So, no, I don't think we've made

12   any of those changes.

13        MR. KRILL:  Allen, could you pull up PTX -- or, I'm

14   sorry -- DTX-4289, which was admitted in his direct.

15   BY MR. KRILL:

16   Q.    Do you remember discussing this with counsel?

17   A.    I did, yes.

18        MR. KRILL:  Allen, could you highlight or zoom in on

19   the date at the very top right, H9 Black with video ProTune.

20   BY MR. KRILL:

21   Q.    Do you see how the date range of this document is

22   September 16th, 2020, to August 3rd, 2021?

23   A.    That's correct.

24   Q.    And this is discussing ProTunes settings usage between

25   those two dates; correct?

1   **A.**    I believe so, yes.

2   **Q.**    But you know that GoPro removed the ability to change

3   ProTune settings from its mobile application on January 7th,

4   2021, through at least beyond August 3rd, 2021; correct?

5   **A.**    I don't recall the exact date when we did that.  You said

6   January 7th?

7   **Q.**    According to GoPro, it was January 7th, 2021.

8   **A.**    Correct.

9   **Q.**    Okay.

10  **A.**    I understand.

11  **Q.**    So -- I'm sorry?

12  **A.**    I understand that, yes.

13  **Q.**    So what you showed the jury purported to include 11 months

14  of data, but eight of those 11 months would have zero usage

15  data whatsoever because GoPro removed the ability to change

16  settings from the app; correct?

17  **A.**    No.  It would have the usage data from those setting

18  changes that happened on camera as well, I believe.

19  **Q.**    Okay.  But not from the mobile app; correct?

20  **A.**    If the period includes the time after we removed the

21  ability to do it in the app, then this would not be inclusive

22  for that period of those changes, yes.

23  **Q.**    Right.  And GoPro -- speaking about app changes and

24  settings changes, GoPro actually added back the feature where

25  you can change control settings from the app; correct?

**LEMA - CROSS / KRILL**

1   **A.**   We did, yes.

2   **Q.**   Okay.  Last question for you, sir.

3        You were here yesterday when we found out that the

4   prototype that we -- that was produced to us that was

5   purportedly from 2009, as GoPro represented, we found out that

6   that prototype was actually dated November 11 -- November 16,

7   2010.

8        Are there any 2009 prototypes that you brought with you

9   today to show us?

10  **A.**   I wasn't involved -- I wasn't at the company at this time.

11  I haven't -- don't personally have any prototypes.

12  **Q.**   So, no, you did not bring any 2009 prototypes with you

13  today to show the jury?

14  **A.**   Me, Pablo Lema, I don't have any prototypes.  I wasn't

15  involved in any of this at the company.

16           **MR. KRILL:**  No further questions, Your Honor.

17           **THE COURT:**  Any redirect?

18           **MS. CLARK:**  No, Your Honor.

19           **THE COURT:**  All right.  Mr. Lema, you can step down.

20           **THE WITNESS:**  Thank you.

21                    (Witness excused.)

22           **THE COURT:**  Who's next?

23           **MS. CLARK:**  Defendants call Pablo -- Dicky Liu.

24           **THE COURT:**  I'm sorry?

25           **MS. CLARK:**  Defendant GoPro calls Dicky Liu.

LIU - DIRECT / DUCKER

```
 1      (Witness enters the courtroom and steps forward to be sworn.)
 2                      DICKY JI-AN LIU,
 3    called as a witness for the Defendant, having been duly sworn,
 4    testified as follows:
 5              THE WITNESS:  I do.
 6              THE COURTROOM DEPUTY:  Be seated, please.
 7         And in you would please state your full name for the
 8    record and spell it for the court reporter.
 9              THE WITNESS:  My name is Dicky Ji-An Liu.  It's
10    D-i-c-k-y, middle name is J-i dash A-n, last name is L-i-u.
11                      DIRECT EXAMINATION
12    BY MR. DUCKER:
13    Q.   Good afternoon, Mr. Liu.  Can you please introduce
14    yourself to the jury and tell them your full name.
15    A.   Hello.  Yeah.  My name is Dicky Ji-An Liu.
16    Q.   Where do you live, Mr. Liu?
17    A.   I live in San Diego, California.
18    Q.   And have you always lived in San Diego?
19    A.   I have not.
20    Q.   And when did you move to California?
21    A.   I moved to California in 2000.
22    Q.   Did you go to college in California?
23    A.   I did not.
24    Q.   Where did you go to college?
25    A.   I went to college at the University of Illinois at
```

 1   Urbana-Champaign.

 2   **Q.**   And did you graduate?

 3   **A.**   I did.

 4   **Q.**   And what degree did you receive?

 5   **A.**   I received a bachelor's of science in computer

 6   engineering.

 7   **Q.**   Who do you currently work for, Mr. Liu?

 8   **A.**   I work for GoPro.

 9   **Q.**   And how long have you worked at GoPro?

10   **A.**   I've worked at GoPro since June of 2015, so just over

11   ten years.

12   **Q.**   What is your current job title at GoPro?

13   **A.**   I'm a director of software engineering.

14   **Q.**   And what do you do in your role as the director of

15   software engineering?

16   **A.**   In my role as director of software engineering, I'm

17   responsible for maintaining connectivity with our GoPro cameras

18   and our GoPro apps and our GoPro ecosystem.  I'm also

19   responsible for architecting new features, and I also, like, am

20   responsible for driving innovation when we can.

21   **Q.**   Have you worked on a GoPro smartphone application?

22   **A.**   I have.

23   **Q.**   And what application have you worked on?

24   **A.**   That would be the GoPro Quik App.

25   **Q.**   At a high level, could you tell the jury how the GoPro

1  camera works with the GoPro Quik App?

2  **A.**    Yeah.  At a very high level, the GoPro Quik App

3  communicates wirelessly and wired with the GoPro camera.

4  **Q.**    Since you started at GoPro in 2015, has GoPro made changes

5  to its cameras?

6  **A.**    Oh, absolutely.

7  **Q.**    And what are some of the changes to GoPro cameras that

8  have been made since you've been there since 2015?

9  **A.**    Oh, we've definitely had, like, improvements in

10 connectivity.  We've had, like, hardware changes, improvements

11 in SoCs, our chips that are used there, improvements in battery

12 life.  Yeah.  So...

13 **Q.**    And why is it -- is it important -- let me ask this.  Is

14 it important to GoPro that its cameras change?

15 **A.**    Absolutely, because we have to keep up with the needs of

16 customers, yeah.

17 **Q.**    Are you familiar with the GoPro HERO13?

18 **A.**    I am.

19 **Q.**    And what is the HERO13?

20 **A.**    The HERO13 is our current flagship camera.

21 **Q.**    Are you aware of the SoC in the HERO13?

22 **A.**    I am.

23 **Q.**    And what SoC does the HERO -- an SoC, let me say, is

24 system on chip -- does the HERO13 include?

25 **A.**    The HERO13 includes a GP2.

1  **Q.**   And who makes the GP2 chip?

2  **A.**   It's a company called Socionext.

3  **Q.**   When was the GP2 SoC first used in a GoPro camera?

4  **A.**   The GP2 was first used in a GoPro camera in HERO10, and

5  that would have been fall of 2021.

6  **Q.**   Has GP2 been included in every camera since the HERO10?

7  **A.**   Actually, no.

8  **Q.**   What camera does not include the HERO10 [sic]?

9  **A.**   Yeah.  The HERO4K, introduced last year, does not.

10  **Q.**   And what processor does the HERO4K use?

11  **A.**   It includes an Ambarella H22 chip.

12       **MR. DUCKER:**  Could we bring up TX-1259.

13  **BY MR. DUCKER:**

14  **Q.**   And, Mr. Liu, I can give a binder, if you prefer, or you

15  can view it on the screen.

16  **A.**   Maybe the binder, please.

17       **MR. DUCKER:**  Your Honor, may I approach the witness?

18       **THE COURT:**  Please.

19       **THE WITNESS:**  Thank you.

20  **BY MR. DUCKER:**

21  **Q.**   Mr. Liu, do you recognize what's been marked and admitted

22  as PTX-1259?

23  **A.**   Yes, I see this on the screen.  Yes, I recognize this.

24  **Q.**   What does the title of this slide deck refer to?

25  **A.**   CPK use cases is referring to CPK, and CPK is the internal

1    GoPro code name for the GP2 chip.  It was the use cases for

2    this GP2 chip, and that's what the document is about.

3    **Q.**   And what is date of this document?

4    **A.**   It says July 1st, 2019.

5    **Q.**   And, again, when was the first HERO product released that

6    included the GP2 processor?

7    **A.**   That would have been HERO10 in fall of 2021.

8    **Q.**   And just for everyone's sake, is that before or after --

9    was the document drafted before or after the release of the

10   first product with theGP2?

11   **A.**   The document was drafted well before.

12         **MR. DUCKER:**  Can we turn off the public monitors?

13      I'm going to show one slide.

14         **THE COURT:**  Okay.

15   **BY MR. DUCKER:**

16   **Q.**   If we can go to Slide 19.  Do you see that, Mr. Liu?

17   **A.**   Yes.  Let me get here.  Slide 19.

18         **THE COURTROOM DEPUTY:**  Now, Mr. Ducker, the jury is

19   not seeing this right now.  You want them to see it and not the

20   gallery?

21         **MR. DUCKER:**  Correct.

22         **THE COURTROOM DEPUTY:**  That has to be done manually.

23      Oh, you've got that.  Okay.

24   **BY MR. DUCKER:**

25   **Q.**   At a high level, what does this slide show?

1   **A.**   This is actually showing a 4K 60 video processing pipeline

2   for the GP2.

3   **Q.**   Does this slide show exactly how the GP2 in a GoPro camera

4   is actually implemented?

5   **A.**   No.

6   **Q.**   How do you know that this doesn't show exactly how a GP2

7   chip is implemented in a GoPro camera?

8   **A.**   There's definitely some examples here.

9       One example that I could point out would be, if you look

10  at the box in the -- the yellow box up in the upper right-hand

11  corner, there's a phone preview -- yes, if it's blown up right

12  there.  The orange box says 4 megabits per second there.  We

13  know that the phone preview is receiving at 3 megabits per

14  second, for example.

15  **Q.**   And you mentioned phone preview.  Are you familiar with

16  the feature phone preview?

17  **A.**   I am.

18  **Q.**   Is a general use case for phone preview shown on the

19  slide?

20  **A.**   The general use case is shown in the "Live Processing" box

21  at the top.

22  **Q.**   Okay.  And above the "Live Processing" -- and on my hard

23  slide, it's purple, but it looks white here -- there's another

24  section called "Delayed Processing."  Do you see that?

25  **A.**   I do.

1    **Q.**   What is delayed processing?

2    **A.**   The delayed processing represents the pipeline that the

3    video goes through when it gets to the SD card in the record

4    case; and then there's the LRV case, which is the

5    low-resolution video that goes to the SD card; and the Facebook

6    live streaming case indicated here.  The "FB" is Facebook.

7              **THE COURT:**  Sir, you've got to go as slow as you

8    possibly can in order to make sure --

9              **THE WITNESS:**  I'm sorry.

10             **THE COURT:**  It's okay.

11             **THE WITNESS:**  I'll go slower.  I'm sorry.

12   **BY MR. DUCKER:**

13   **Q.**   So why does GoPro implement delayed processing in its GP2

14   chips?

15   **A.**   Oh, the delayed processing is very important here because

16   if you look at the green buffers here on the left side of the

17   screen, like, these represent, like, storage for, like, the --

18   like a buffer that we need for the GoPro, like, HyperSmooth

19   stabilization.

20   **Q.**   And you mentioned stabilization.  What is stabilization?

21   **A.**   The example I would give for stabilization is the ability

22   for GoPro to actually take a video -- so let's say if you were

23   riding your bike down a mountain when it was really bumpy.

24   Right?  And then, like, what would happen is, like, we store

25   that -- we store video into that buffer, and then what we do is

LIU - DIRECT / DUCKER

1   perform operations to make it smooth.

2       So if you didn't have the stabilization, it would be

3   very -- it would be a very shaky video; and because of

4   HyperSmooth stabilization, it looks like your bicycle is going

5   down a smooth road down the mountain.

6   **Q.**   And then in the record stream on the top of this delayed

7   processing box, is the record stream in the delayed processing

8   box generated from real-time data?

9   **A.**   It is actually delayed by a second.  So, no.

10  **Q.**   And so, again, why is it not real-time data?

11  **A.**   Yeah.  Because there's a one-second buffer there to

12  process that information.  That's how much processing time we

13  need to get that -- to achieve our HyperSmooth stabilization.

14  **Q.**   How does the processing in the record stream in the top of

15  this figure compare to the processing of the phone preview

16  stream that we looked at before that is on the bottom of this

17  document?

18  **A.**   The phone preview stream, it's very important to be, like,

19  as quick as possible.  Right?  So there is no one-second delay

20  on the live processing stream in the yellow section.

21  **Q.**   Does GoPro consider a one-second delay to be a significant

22  delay?

23  **A.**   Yes.

24  **Q.**   All right.  So we talked a little bit earlier, I think you

25  mentioned the box in the live processing said 4 Mbps?

1   **A.**   Yes.

2   **Q.**   And I think you said that was a 3 Mbps?

3   **A.**   Yes.  It should be 3 megabits per second, yeah.

4   **Q.**   What does that box represent?

5   **A.**   Yeah.  The box itself is representing a buffer where the

6   output of the codec is temporarily stored for the purpose of

7   having, like, other operations done on it, such as combining it

8   with audio and attaching, like, a video header on there so that

9   the phone preview can understand it.

10  **Q.**   And when you say it's temporarily stored, what do you

11  mean?

12  **A.**   What I mean is, like, the data that goes to that buffer,

13  like, once it's operated upon, it is sent to the mobile app, at

14  which point new data from the codec is input into that buffer.

15       It's a pipeline that just keeps going over and over.  As

16  it sends out, we overwrite.  As it sends out, we overwrite.  So

17  it's temporary.

18  **Q.**   Does that buffer store a video stream?

19  **A.**   No.

20  **Q.**   Can that buffer store -- excuse me.  Can that buffer store

21  more than one frame of data?

22  **A.**   No.

23  **Q.**   Generally, do you know how long data remains in that

24  buffer?

25  **A.**   Yes.  Like, we keep buffer in there far less than a

1  quarter of a second.

2  **Q.**   I'd like to ask a question about -- well, you testified

3  earlier that part of your job is working on the -- how the app

4  interacts with the camera; correct?

5  **A.**   Correct.

6  **Q.**   How are controls from the app currently sent to the

7  camera?

8  **A.**   They're sent wirelessly and wired.

9  **Q.**   And what -- is there a protocol that's used to send the

10  controls from the app to the camera?

11  **A.**   Yes.  It's Bluetooth.

12  **Q.**   And are there controls sent over WiFi, using the app, to

13  the camera?

14  **A.**   No.

15  **Q.**   And when did GoPro first introduce the ability to send

16  only Bluetooth commands from the app to the phone?

17  **A.**   Yeah.  That was --

18  **Q.**   From the app on the phone to the camera.  Excuse me.

19  **A.**   Yes.  That would have been the change we did for HERO9.

20  **Q.**   And when was HERO9, if you remember, released?

21  **A.**   HERO9 would have been fall of 2020.

22  **Q.**   When GoPro switched for the HERO9, did it also make the

23  change compatible with some of its older cameras, including the

24  HERO8 and the MAX?

25  **A.**   Yes.  Yeah, the change on the mobile app was done, and

1    then, yes, it did -- we could take it back to, I believe it was

2    HERO5.

3    **Q.**    Again, when was that change first introduced?

4    **A.**    It was actually when we -- after, like, we introduced

5    HERO9.

6    **Q.**    Could you turn in your binder to the tab DTX-4767.

7    **A.**    Okay.

8    **Q.**    And do you recognize that figure?

9    **A.**    I do.

10   **Q.**    What is shown in this figure?

11   **A.**    This is a flow diagram for the GoPro live stream setup.

12   **Q.**    And who created this?

13   **A.**    GoPro did.

14   **Q.**    Does GoPro create these types of diagrams in the ordinary

15   course of business?

16   **A.**    Yes.

17           **MR. DUCKER:**  Your Honor, we would move to admit

18   DTX-4767 into evidence.

19           **MR. KRILL:**  No objection.

20           **THE COURT:**  It's admitted.

21      (Trial Exhibit 4767 received in evidence.)

22   **BY MR. DUCKER:**

23   **Q.**    At the very top of this figure, there's something labeled

24   "AWS Starfruit."  Do you see that?

25   **A.**    Yes.

LIU - DIRECT / DUCKER

1  Q.   What is AWS?

2  A.   AWS is Amazon Web Services.

3  Q.   Is there ever a situation where the video used for the

4  live stream that we're looking at here is sent from the GoPro

5  camera directly to the mobile phone for display?

6  A.   No.

7  Q.   Where are the video files sent from the camera?

8  A.   The video files from the camera -- the video data is sent

9  directly to Amazon in this case.

10 Q.   And how do you know that the video files are sent directly

11 to Amazon when they leave the camera?

12 A.   Yeah.  As part of the GoPro setup, like if you look in

13 Step 1, the GoPro app, like, negotiates with, like, our GoPro

14 backend and Amazon to get two addresses.  One address would be

15 where to send the data to, and one address would be where users

16 could view the data.

17      So in this case, like, the destination of the video is

18 sent to the camera, and that is going to be Amazon in this

19 case.

20 Q.   In the bottom right-hand corner, we see what's called

21 stream viewers.  Do you see that?

22 A.   Yes.

23 Q.   And who are the stream viewers?

24 A.   These are recipients of this address for that -- when the

25 GoPro user first goes to the mobile app and sets up live

1    stream, he has an address that he can send to people who he

2    wants to see the video.

3         So, for example, if I was live streaming my daughter's

4    rehearsal -- right? -- or something, like, I would get that

5    address during that and I would send that address to my sister,

6    and then she could log in with a web browser and view that.

7    **Q.**    Is there any delay between what the viewers viewing the

8    live stream are seeing and the action of the scene that the

9    camera is capturing?

10   **A.**    Yes, there is.

11   **Q.**    And why is -- why is that?

12   **A.**    There's actually considerable delay.  In addition to the

13   one second of HyperSmooth processing on the camera side,

14   there's also the fact that your camera is connected to a

15   network now, so you have, like, bandwidth -- upload bandwidth

16   limits.

17        So you've got -- whatever Internet service you have,

18   there's, like -- there's limits on how much -- how fast you're

19   going to be able to push the data up to Amazon.

20        Once it gets to Amazon, it has to unpack the video data;

21   and also, like, the -- it has to repackage it into a form that

22   the stream viewers can view.  And there's going to be some

23   latency for when the stream viewers access, like, Amazon.

24   **Q.**    Once the video content is sent out from the camera for

25   live streaming, does GoPro have any control over how that

1  content gets sent to the device where it is ultimately

2  displayed?

3  **A.**    No, it does not.

4  **Q.**    In this diagram, is there any connection showing the live

5  stream going from the GoPro camera directly to a phone for

6  display?

7  **A.**    No.

8  **Q.**    If a user is in the GoPro app on their mobile device and

9  they connect to a GoPro camera that is live streaming, can the

10  user view the live stream in the GoPro app on that phone?

11  **A.**    No.

12  **Q.**    And why not?

13  **A.**    What happens there is, like, the link that I was referring

14  to before for the stream viewers, it's available on the mobile

15  app; and you can actually -- like, there's a button there.

16      When you're looking at the Quik App's live view stream

17  while the camera is streaming, you can click the button to say

18  view the stream.  But it opens up a web browser on your phone.

19  Right?  And that web browser opens up the link.  And from that

20  web browser, you can view.

21  **Q.**    If we could pull up the Slide 82.  This is a slide that we

22  saw earlier in the week.  I know you didn't see it.

23  **A.**    Okay.

24  **Q.**    But I want to know, do you recognize the image in the

25  middle of this slide?

LIU - DIRECT / DUCKER

1    **A.**    Yes.    That would be the GoPro Quik App while the camera is

2    live streaming.

3    **Q.**    And how does the live stream go out?    Sorry.    Let me ask a

4    better question.

5        How does the user start the live stream on their -- on the

6    app?

7    **A.**    If you look at the screen on the left, that would be,

8    like -- actually, there's one more step before this where they

9    select what live stream service they want.

10       They could have selected gopro.com.    They could have

11   selected Amazon.    Or, I'm sorry.    Actually, Twitch would be an

12   option also.    YouTube would be an option.    Right?

13       But once they select that, they'll land on this screen.

14   And then that's -- for example, if you look at the top, there's

15   also, like -- it says JJH2 -- H12.    Sorry.    JJH12 in this case.

16   Right?    That represents the network that we're telling the

17   camera to connect to.

18       So that's how the data would go out.    The camera would

19   connect to that network, and then it would send data through

20   that network.

21   **Q.**    Is it possible to view the -- again, I think we talked

22   about this before.    Is it possible to view the live stream from

23   the GoPro app?

24   **A.**    No.

25   **Q.**    So do you see the button in the middle says "View your

1    stream"?

2    **A.**    Yes.

3    **Q.**    What happens if you press that button "View your stream"?

4    **A.**    That would be the button that opens up the web browser.

5    And the web browser, I believe -- yeah, this is shown on the

6    right.

7    **Q.**    Is it possible to start recording a video after you've

8    started the live stream?

9    **A.**    No.  That option, if you look over here -- it's slightly

10   covered up here, but that option is the "Save a high-res

11   version of my" -- "to my SD card."  And that can only be done

12   before you start a live stream.

13          **MR. DUCKER:**  You can take that down.  Thank you.

14   **BY MR. DUCKER:**

15   **Q.**    Are you familiar with GoPro cameras using a hot spot mode?

16   **A.**    I am.

17   **Q.**    And how does hot spot mode work?

18   **A.**    Yeah.  So the hot spot, this would typically be on your

19   mobile phone.  It could be a separate device.  Right?

20          But for hot spot mode, what you would need to do is, your

21   hot spot is acting as, like -- for example, on that screen on

22   the right where I said, you know, you pick a network.  That,

23   like, when you enable your phone's hot spot, like, and then you

24   went to that tab to click on, like, your network, your phone's

25   hot spot would show up there.  And then that would tell the

**LIU - DIRECT / DUCKER**

 1  camera to connect to the hot spot.

 2  **Q.**   In hot spot mode is the video data sent from the GoPro

 3  camera to the phone -- or to the app for display?

 4  **A.**   No.   The data in that case is sent through the mobile

 5  phone's hot spot.

 6  **Q.**   And how do you know it's sent through the mobile phone's

 7  hot spot?

 8  **A.**   There's like a -- like as I said before, there's a

 9  destination address that's negotiated during the live stream

10  setup.  And then that address, like, you know, is, in the case

11  of this diagram -- it's not shown on the screen now -- but in

12  the case of the diagram, it is going directly to Amazon.  So it

13  goes through the phone's hot spot to Amazon.

14  **Q.**   In hot spot mode does the user or does GoPro -- sorry --

15  does the user have any idea where the video data transmitted

16  from the camera is ultimately going to be displayed?

17  **A.**   Not -- no.

18  **Q.**   I want to turn back to the interaction between the app and

19  the camera.  You know, we were discussing communications

20  between the camera and the app.  And you work on

21  the transmission -- do you work on the transmission of control

22  signals from a phone to a GoPro camera?

23  **A.**   Yes.

24  **Q.**   Can you currently control settings like color, audio, and

25  lighting of the camera remotely using the GoPro Quik App?

1  **A.**   Yes.

2  **Q.**   And do you know whether you can control these settings

3  during live preview while recording?

4  **A.**   No, you cannot.

5  **Q.**   In 2014, were there other ways to remotely control those

6  color, audio, and lighting settings on a GoPro camera?

7  **A.**   Yes, there was.

8        **MR. DUCKER:**   Could we pull up, I think it's DDX-4.2.

9  **BY MR. DUCKER:**

10  **Q.**   And, Mr. Liu, did you create this slide?

11  **A.**   No, I did not.

12  **Q.**   Could you tell me what is shown on this image?

13  **A.**   That's actually a GoPro smart remote.

14  **Q.**   Does this remote have a preview screen?

15  **A.**   It does not have a preview screen.

16  **Q.**   Was it possible to use this remote in 2014 to change

17  color, audio, and lighting settings?

18  **A.**   It was, yes.

19  **Q.**   Would it have been possible in 2014 to design a GoPro

20  camera so that it could not receive signals changing color,

21  audio, and lighting from the GoPro app?

22  **A.**   Yes.

23  **Q.**   Would that be a difficult change to make?

24  **A.**   No, not terribly difficult.

25  **Q.**   And why not?

1   **A.**   Well, the steps involved here in that process would be

2   to -- like, we would have to, like, figure out what settings we

3   wanted to block.

4       So once we had that list, we would have to make a software

5   update.  To make the software change itself, we'd have to,

6   like, apply it to a firmware.  And then we would have to --

7   like, the firmware would go onto the camera.  Right?  So that

8   new firmware would filter out those settings that we determined

9   that we needed to block.

10  **Q.**   And how long would it take to make that change?

11  **A.**   It's roughly a couple of days consolidating the

12  information and making the change itself.

13  **Q.**   And would there be any other analysis that the change had

14  to undergo before it's released?

15  **A.**   Yeah, we definitely -- GoPro definitely has quality

16  assurance.  Right?  So we would have to have it go through

17  quality assurance -- QA for short -- so we make sure that we

18  didn't break anything else.

19  **Q.**   How long, total, between the engineering and the quality

20  assurance, generally, would the change take?

21  **A.**   In my experience, it'd be roughly two weeks.

22  **Q.**   Mr. Liu, are you proud of the work you've done at GoPro?

23  **A.**   I am very proud of my work at GoPro.

24  **Q.**   Why are you proud of my work at GoPro?

25  **A.**   I'm proud of my work at GoPro because, like, I'm not a --

1    I'm not, like, a surfer or a -- or I don't jump out of planes;

2    but, like, I love my GoPro itself.  I love what GoPro does.  I

3    love that GoPro is at the forefront of innovation.  We're the

4    pioneers in HyperSmooth.  We're the pioneers in 360 video.  So

5    I am indeed very proud to work at GoPro.

6    **Q.**   While you have been at GoPro, have you ever copied someone

7    else's ideas?

8    **A.**   Absolutely not.

9          **MR. DUCKER:**  Your Honor, I pass the witness.

10         **THE COURT:**  All right.

11                    **CROSS-EXAMINATION**

12   **BY MR. KRILL:**

13   **Q.**   Good afternoon.

14   **A.**   Good afternoon.

15   **Q.**   You mentioned that since you've been at GoPro, you've

16   never copied somebody else's ideas; correct?

17   **A.**   Yes.

18   **Q.**   And you said that you could have changed the app in

19   2014 -- or GoPro could have changed the app in 2014 to remove

20   settings; correct?

21   **A.**   I stated that GoPro could have changed the camera in 2014

22   to remove the settings.

23   **Q.**   The camera.  Okay.  Your experience -- actually, let me

24   back up.

25         You started at GoPro in 2015 --

**LIU - CROSS / KRILL**

1   **A.**   That's correct.

2   **Q.**   Let me finish my question, please.

3   **A.**   Sorry.

4   **Q.**   You started at GoPro in 2015; correct?

5   **A.**   That is true.

6   **Q.**   So you lack personal knowledge about what happens at GoPro

7   prior to 2015; correct?  You weren't there?

8   **A.**   I wasn't there at 2015, but we have --

9   **Q.**   That's my question, sir.  Thank you.

10   **A.**   All right.

11   **Q.**   And you also discussed firmware changes; isn't that

12   correct?

13   **A.**   Yes.

14   **Q.**   But you're not the guy who does firmware changes; right?

15   You're on the software side?

16   **A.**   Actually, my team works on both the app side -- the app

17   side, which is iOS and Android, and the firmware side.

18   **Q.**   Your team does, sir, but you yourself, you are not

19   knowledgeable on the firmware side of the camera; isn't that

20   true?

21   **A.**   Oh, actually, when I started in 2015, I was indeed working

22   on the camera firmware.  That was before I was the director of

23   software engineering.

24   **Q.**   And when you were presented with the option of changing,

25   back in 2021, either the app to remove settings or changing the

LIU - CROSS / KRILL

1    camera firmware to remove settings, GoPro chose to change the

2    app; correct?

3    **A.**    GoPro did decide to change the app.

4    **Q.**    And that's because it was easier to change the app than

5    the firmware of the camera; correct?

6    **A.**    I would say that given at the time, it was probably equal

7    amount of work engineering team-wise.

8            **MR. KRILL:**    Allen, could you play his deposition at

9    58:8 to 16.

10            **THE COURTROOM DEPUTY:**    Mr. Krill, how do you want

11    this?  Do you want the volume to go to the room?

12            **MR. KRILL:**    The room.

13                (Video was played but not reported.)

14   **BY MR. KRILL:**

15   **Q.**    Now, you also talked -- and, Allen, do not pull this up --

16   about Trial Exhibit 1259, that pipeline flow diagram for the

17   use cases.  Do you remember that?

18   **A.**    Yes.

19   **Q.**    And you identified one inaccuracy in that document;

20   correct?

21   **A.**    That is correct.

22   **Q.**    Surely GoPro does keep accurate documents and drawings of

23   its products; correct?

24   **A.**    Yes.

25   **Q.**    GoPro didn't produce an accurate drawing of its products

1   in this case?

2   **A.**   Well, this is actually -- the document that we're

3   referring to now would be a CPK use cases document.  So it was

4   a -- it's a theoretical use case for the CPK chip.

5   **Q.**   So GoPro produced a theoretical document, not an actual

6   document, for its actual products?

7   **A.**   I think, like, in this case, this was the -- this was the

8   CPK document that we're referring to.

9   **Q.**   Okay.  But you said it was for a theoretical product, not

10  an actual product; fair?

11  **A.**   No.  Actually, it's for a real chip.  The GP2 is real,

12  mm-hmm.

13  **Q.**   Is there an accurate document like this for the actual

14  camera?

15  **A.**   I don't know.

16  **Q.**   In then mobile hot spot scenario for live streaming that

17  you were discussing, the preview video is going directly from

18  the camera to the phone's hot spot to get to the Internet;

19  correct?

20  **A.**   It is going through the hot spot, yes.

21  **Q.**   Do you recall you testified differently at your

22  deposition?

23  **A.**   I do not.

24          **MR. KRILL:**  Allen can you play 77, 17 to 25.

25                (Video was played but not reported.)

LIU - REDIRECT / DUCKER

1   BY MR. KRILL:

2   Q.   And then you also talked about some changes that GoPro

3   could have made related to control settings; correct?

4   A.   Perhaps you, like -- yeah.  Like, you have to remind me.

5   Q.   In your -- not at your deposition.  Here today, you talked

6   about changes that could be made to the camera and phone to

7   remove the ability to change certain settings; correct?

8   A.   Today I believe I was referring to the camera side.

9   Q.   Okay.  The camera side.

10      GoPro hasn't made any of those changes; correct?

11  A.   No.

12         MR. KRILL:  No further questions.

13         THE COURT:  All right.  Redirect?

14         MR. DUCKER:  Just a couple of quick questions.

15                    REDIRECT EXAMINATION

16  BY MR. DUCKER:

17  Q.   Since you started at GoPro in 2015, have you been able to

18  work on cameras that were available before 2015?

19  A.   Yes, actually.

20  Q.   Would that include cameras that -- cameras and devices

21  that were available in 2014?

22  A.   Yes.

23  Q.   I think counsel for Contour played some deposition

24  testimony for you -- do you recall that? -- regarding the

25  hot spot.

```
 1    A.    I do.

 2    Q.    Was your testimony that it goes directly to the phone for

 3    display?

 4    A.    Absolutely not.

 5    Q.    And when the camera is transmitting video through a

 6    hot spot, where does the video go?

 7    A.    Yeah.  So once again, the camera -- the video from the

 8    camera does go directly to Amazon in the live stream case, as

 9    illustrated.

10          MR. DUCKER:  Okay.  No further questions.

11          THE COURT:  All right.

12                     (Witness excused.)

13          THE COURT:  Who's next?

14          MS. WROBLEWSKI:  GoPro calls Laura O'Donnell by

15    deposition.

16       She is a former employee of Contour, Inc. and a named

17    inventor on the asserted patents in this case.

18       And total time is approximately ten and a half minutes.

19          THE COURT:  Very well.  Let's go.

20       (Video deposition of Laura O'Donnell was played but not

21    reported.)

22          MS. WROBLEWSKI:  During Ms. O'Donnell's deposition,

23    the exhibit reference is Trial Exhibit 2006, and we move to

24    admit that as evidence at this time.

25          MR. AKARAPU:  No objection, Your Honor.
```

1        **THE COURT:**  All right.  It's admitted.

2        (Trial Exhibit 2006 received in evidence.)

3        **THE COURT:**  Ladies and gentlemen, that comes to the

4   end of testimony for the week.

5        Let me tell you a couple of things.

6        First, the case is going in very well.  It's my

7   expectation right now that if all continues to go as it is, on

8   Wednesday, I'll be instructing you on the law and Thursday

9   there will be arguments and then you'll begin deliberations.

10        So it's my hope that you will figure out amongst

11   yourselves -- it's your decision on how late you stay during

12   the course of any day and deliberate.  If you figure out that

13   you can say until later on Thursday, that would be great, and

14   Friday as well, depending on how long things take.  But the

15   deliberations are yours to determine.

16        And the case might go in a different way next week, but

17   that would be my expectation.  So I wanted you to know that.

18        And the other thing I wanted you to know is that there's

19   still more to come.  So keep an open mind.  And during the

20   course of the weekend, have that mind do something other than

21   think about this case.

22        Have a good weekend.  Don't communicate with anybody about

23   the case.  Don't do any research in any way about this.  And

24   come on Monday morning with the same punctuality that you've

25   shown, and this case will be to you before you know it.

 1       Have a good weekend.

 2     (Proceedings were heard out of the presence of the jury.)

 3          **THE COURT:**  All right.  So we'll be in recess.  We'll

 4   take about 30 minutes and then come back.

 5               (Recess taken at 1:32 p.m.)

 6            (Proceedings resumed at 2:01 p.m.)

 7     (Proceedings were heard out of the presence of the jury.)

 8          **THE COURT:**  You can be seated or stand up.  Do

 9   whatever you want.

10       One thing.  Before we get going, I realize, I think I

11   miscalculated.  I'm thinking you might be arguing Wednesday

12   instead of Thursday.

13          **MR. HAYNES:**  I'm very happy to hear you say that,

14   Your Honor.  It's possible we'll roll over, but I think it may

15   be Wednesday.

16          **THE COURT:**  Yes.  I just was thinking about it wrong.

17   So --

18          **MR. KEVILLE:**  That'll make nine people happy.

19          **THE COURT:**  Yes.

20          **MR. KEVILLE:**  Not these people, but that'll make those

21   people very happy.

22          **THE COURT:**  Well, I heard somebody on the jury say:

23   Oh, God, we're going to have to stay all night on Thursday

24   because I want to have a day off.

25       And so I thought:  Oh, I'm wrong.

1       But I didn't tell them that, but I will tell them that on

2   Monday.  So I apologize for that.

3       Okay.  So the tentative final instructions, you have a

4   draft.

5       And, Mr. Keville, do you want to -- have you guys talked

6   about --

7           **MR. KEVILLE:**  We were just doing that when you came

8   in.

9           **THE COURT:**  Great.

10          **MR. KEVILLE:**  But we've got through some of it.

11          **THE COURT:**  You go any way you want to go.

12          **MR. KEVILLE:**  So I think Number 13, we don't need.

13          **THE COURT:**  Okay.  Oh, let me -- before we get there,

14  Number 11 are the stipulations of fact.  And I'm wondering what

15  stipulations --

16          **MR. HAYNES:**  Yeah.  Your Honor, my --

17          **MR. KEVILLE:**  If I may, Dr. Ugone testified today

18  there was an agreement on the number of units.

19          **MR. HAYNES:**  Yes.

20          **MR. KEVILLE:**  I think that's the only one I'm thinking

21  of.

22          **MR. HAYNES:**  That's exactly what we had in mind,

23  Your Honor.  And I think the parties are in agreement that we

24  would just show that to them as opposed to trying to read them

25  the numbers.  Just give them stipulation as that exhibit.

1        **THE COURT:**  Okay.  So should this just become a

2   stipulation to the number of units?

3        **MR. KEVILLE:**  Yes.  Maybe it says:  The parties have

4   stipulated to the number of units are correct in Exhibit

5   whatever it is.  Something like that.

6        **THE COURT:**  Okay.

7        **MR. KEVILLE:**  We can work out some language if you

8   want.

9        **THE COURT:**  Okay.  Why don't you -- why don't we just

10  do it right now.

11       **MR. KEVILLE:**  Okay.

12       **THE COURT:**  Number of units that affect the damages

13  calculation?  What do you want to say?

14       **MR. KEVILLE:**  Come on up.

15       **MS. REPLOGLE:**  Sorry.  Your Honor, what did you say?

16       **THE COURT:**  How would you like the stipulation with

17  respect to the number of units to be referred to in the

18  instructions?

19       **MR. HAYNES:**  Your Honor, our preference would be to

20  just say, "Have stipulated to the number of total units sold

21  for each camera model," or something like that, without sort of

22  getting into how they're supposed to use it.  I think the other

23  things will say you look at -- the damages experts have said

24  how they're supposed to use it.

25       **MS. REPLOGLE:**  Right.  Definitely, we're in agreement.

 1    It's just with respect to the units.  And what it is,

 2    Your Honor, for what counsel is referring to, it's just a

 3    table, and it lists -- it's very similar, quite frankly, to

 4    some of the slides that Dr. Ugone presented where it had a

 5    table with all the accused products and it had the number of

 6    units for each of those accused products and it has a total on

 7    the bottom.  So it fits on one page.

 8        We definitely wouldn't want to -- I think we do want to

 9    make it an exhibit.

10        **THE COURT:**  Why don't we make it an exhibit, and then

11    we won't have to use this instruction at all.

12        **MR. HAYNES:**  I think that's fine with us.

13        **MS. REPLOGLE:**  Is that fine?

14        **THE COURT:**  I'll just instruct at the time that the

15    stipulation goes in.

16        **MS. REPLOGLE:**  All right.  Then I think it could be

17    Joint Trial Exhibit 14.  Joint exhibit.  Okay?

18        (Trial Exhibit 14 received in evidence.)

19        **THE COURT:**  Okay.  So now which number were you?

20        **MR. KEVILLE:**  That was 13, we don't think we need.

21        **THE COURT:**  Okay.

22        **MR. KEVILLE:**  14, we just conferred on 14, use of

23    interrogatories.  I don't have any intention of

24    interrogatories.  They said they're not sure yet but --

25        **MR. HAYNES:**  It seems very unlikely we will need this

1    one, Your Honor.  I'm not a hundred percent sure to commit to

2    that today.  I suspect that we will be dropping it, however.

3            THE COURT:  Okay.

4            MR. KEVILLE:  So the next one I have, Your Honor, is

5    24.

6            THE COURT:  And before we get there, I like to name

7    the witnesses, the expert witnesses.  So in 15, I assume there

8    are two for Contour and two for GoPro.

9            MR. KEVILLE:  Yes.

10           THE COURT:  Okay.  So I know those names, so we can

11   put those in.

12       Okay.  And now, Mr. Keville, where were you?

13           MR. KEVILLE:  24, invalidity burden of proof.

14           THE COURT:  Okay.

15           MR. KEVILLE:  So it doesn't track 16 exactly, which is

16   the burden.  At the bottom of paragraph 1, it says [as read]:

17           "To prove invalidity of any patent claim, GoPro

18       must persuade you that it is highly probable that the

19       claim is invalid."

20       But the burden instruction says [as read]:

21           "It must lead you to a firm belief or conviction

22       that it is highly probable."

23       So I'd just like to insert that language back here.  So

24   [as read]:

25           "GoPro must persuade you to a firm belief or

1        conviction that it is highly probable.

2            **THE COURT:**  Mr. Haynes, do you have any comment?

3            **MR. HAYNES:**  Your Honor, I was telling Mr. Keville

4     when you came in, I think you addressed this issue in a prior

5     case about do we need to keep repeating sort of the whole

6     thing, like highly probable being sort of the standard and

7     adding additional words is not necessary.  So that's our view.

8        I don't think it's an incorrect statement of the law that

9     Mr. Keville said.

10           **THE COURT:**  I'm inclined to put the entire phrase in

11    there.  So I'll do that.

12           **MR. KEVILLE:**  Thank you.

13       On 26, anticipation, the fourth, kind of, paragraph with

14    Bullet 1 under it [as read]:

15            "In this case, GoPro can show that a patent

16        claim . . . ."

17       And then it has Bullet 1 and 1, 2, 3.

18           **THE COURT:**  Mm-hmm.

19           **MR. KEVILLE:**  GoPro proposes deleting that, we agree,

20    because I don't think -- this is an issue that I think we're

21    going to have to address.  I don't think you can have prior

22    invention by companies.  There has to be an inventor.

23       So we couldn't have Woodman Labs, GoPro, or Ambarella.

24    And Looxcie/Vidcie was out on one of your orders.

25       So they just right now say strike that whole thing.  We

 1  agree with that.

 2          **THE COURT:**  Okay.  So starting at "In this case"?

 3          **MR. KEVILLE:**  Yes.  And then ending right at

 4  "Looxcie/Vidcie."

 5          **THE COURT:**  Okay.

 6          **MR. HAYNES:**  Your Honor, this may come up when we get

 7  back to the verdict form, but to the extent we want to instruct

 8  the jury on the specific pieces in this instruction, we would

 9  propose that the parties agree on what that is once we get

10  closer to the close of evidence, once we know, because it's not

11  going to be what's listed in here.  I can tell you that much.

12  Because, for example, Looxcie/Vidcie is not part of the case

13  anymore.

14      And I think we would be able to do -- be able to set

15  forth -- to the extent you want to instruct them on what they

16  should be looking at for anticipation, we can provide the

17  specific reference for each one.

18          **THE COURT:**  Okay.

19          **MR. KEVILLE:**  So then they've also proposed, and we

20  agree, taking out Number 2 with those two items underneath it.

21          **THE COURT:**  Oh, the whole thing?

22          **MR. KEVILLE:**  Yes.

23          **MR. HAYNES:**  The whole thing.

24          **THE COURT:**  Okay.

25          **MR. HAYNES:**  That's the same issue, Your Honor.

 1          THE COURT:  Yes.  Okay.

 2          MR. KEVILLE:  Okay.  That takes us to 27.  And this is

 3    the same thing.  So it's the third paragraph, "GoPro contends."

 4          THE COURT:  Yeah.

 5          MR. KEVILLE:  All the way to the start of the next

 6    paragraph.

 7          THE COURT:  Okay.

 8          MR. KEVILLE:  So it would go right to "If the prior

 9    invention."  That stays.

10          MR. HAYNES:  Sorry.  I didn't hear.  Can you say that

11    one more time?

12          MR. KEVILLE:  Sure.  It's this section here that you

13    proposed deleting.

14          MR. HAYNES:  Okay.  Yeah.

15          THE COURT:  All right.

16          MR. KEVILLE:  And then 28, obviousness.  There's a lot

17    in here that's not right.  I'd suggest the parties work with it

18    as we get closer to the end of trial and just try and come up

19    with what really came in, what the combinations were.

20          THE COURT:  And that makes perfect sense to me.

21       If we are able to instruct and argue on Wednesday, that

22    means that the close of all the evidence is very soon.

23          MR. KEVILLE:  Yes.

24          THE COURT:  And I don't want to -- if we're able to go

25    on Wednesday morning, I don't want to get delayed because we're

 1   still fussing around with the instructions.

 2        **MR. HAYNES:**  I expect as soon as our expert is off the

 3   stand, that will be pretty much locked in.  And so we should be

 4   able to get that to you -- I think he will be off -- I need to

 5   go check the timing, Your Honor, but I think that should happen

 6   on Tuesday, which means we could --

 7        **MR. KEVILLE:**  Is he after --

 8        **MR. HAYNES:**  -- provide any --

 9                  (Simultaneous cross-talk.)

10        (Reporter interrupts to clarify the record.)

11        **MR. HAYNES:**  We should be able to provide, you know,

12   confirmation on what the jury actually should look at by the

13   end of the day Tuesday, once our expert has completed his

14   testimony.

15        **THE COURT:**  Okay.  So I'm going to be instructing

16   Wednesday morning under this scenario.

17        And maybe -- Ms. Davis, I don't have my calendar up, but

18   on Tuesday, after case management --

19        (Discussion off the record between the Courtroom Deputy

20   and the Court.)

21        **MR. HAYNES:**  Sorry.  We were trying to confer and get

22   something solved, Your Honor.

23        **THE COURT:**  So I think what I'd like to do is then set

24   a final session at 3:30 on Tuesday, and that should give you

25   enough time to work things through.

1          **MR. HAYNES:**  And then, Your Honor, before we move past

2   27, there was one other issue that we wanted to raise, and

3   Ms. Wroblewski is going to address it for us.

4          **THE COURT:**  Okay.

5          **MS. WROBLEWSKI:**  So with respect to Instruction

6   Number 27, the only item we wanted to raise is at line 12, that

7   final sentence says, "GoPro must show each of these elements by

8   clear and convincing evidence."

9      And it's our understanding that under the law, there's

10  actually a burden shifting that happens there, where we will

11  establish reduction to practice by clear and convincing

12  evidence, and then the burden shifts to Contour to demonstrate

13  that that burden has not been met.

14     And so we just wanted to add two clarifying sentences in

15  lieu of that sentence to make that clear.

16     We haven't conferred on this yet.

17         **MR. HAYNES:**  It's either that, Your Honor, or we just

18  delete the sentence.

19     The issue is that if we put on our prima facie case of

20  conception and reduction to practice, and they want to argue

21  that it was abandoned, suppressed, or concealed, that becomes

22  their burden.

23     So we don't want any confusion by the jurors on that

24  issue, so we would propose either deleting the sentence or

25  clarifying that issue with another sentence.

1          **MR. KEVILLE:**  I would like to review the cases before

2    we talk about this.  I know it's always the defendant's burden

3    to prove invalidity by clear and convincing evidence.

4          So I suggest we meet and confer over the weekend.

5          **THE COURT:**  Okay.  That's fine.

6          **MS. REPLOGLE:**  Are there any others between 27 and 42?

7          **MS. WROBLEWSKI:**  The other aspect, and it pertains to

8    the same instruction, so --

9          Sorry.  Can you hear me now?

10          **THE COURT:**  Take it from the top.

11          **MS. WROBLEWSKI:**  Yes.  So it really relates to the

12    same instruction.

13          Your Honor included Instruction Number 27 but then, with

14    respect to Instruction Number 29, stated that no instruction

15    will be given.

16          We don't really care whether it be a separate instruction

17    or part of the Instruction 27 that you've already provided.

18    But the proposal that we made on the date of invention -- and

19    this is at page 64 of the final jury instructions that we had

20    submitted to the Court a couple of weeks ago -- we had provided

21    language from the Federal Circuit Bar Association Model Patent

22    Jury Instructions that are especially useful in this instance.

23          Specifically, the jury has been provided with facts

24    related to both Contour and GoPro's efforts to, after they've

25    conceived of the idea, then reduce that idea to practice,

1    either to establish an earlier priority date or to establish an

2    earlier invention on the side of GoPro.

3        And this includes additional statements of the law that

4    would assist the jurors in evaluating those facts.  It

5    specifically talks about the requirements for diligence, states

6    that conception is the mental part of an inventive act, the

7    formation in the mind of the inventor of a definite and

8    permanent idea.  I won't read it to you unless you want me to.

9        But we'd ask that some iteration of that be added back

10   into the instructions to assist the jury.

11           **THE COURT:**  So adding in the concept of diligence --

12           **MS. WROBLEWSKI:**  Adding in --

13           **THE COURT:**  -- is basically what you're looking for.

14           **MS. WROBLEWSKI:**  Adding in the concept of -- here

15   specifically, conception is key; but then, yes, the details

16   with respect to diligence and what's appropriate to evaluate in

17   that context.

18           **THE COURT:**  So I think diligence may well need to go

19   in there.  I thought everything else was there in 27.  So why

20   don't you work on that and see whether you actually have a

21   disagreement with respect to --

22           **MS. REPLOGLE:**  That's exactly what I was going to

23   refer to.  We will.

24           **MS. WROBLEWSKI:**  Sounds good.

25           **MR. HAYNES:**  Well, I think our next one was before 42.

1      So Mr. Riches is going to address the next one, which is

2  33, I believe.

3          **MR. RICHES:**  Yes.

4      Good afternoon, Your Honor.

5          **THE COURT:**  Afternoon.

6          **MR. RICHES:**  So with respect to Instruction Number 33,

7  Your Honor, this is part of the NDCA model instruction for this

8  section.  There are portions of that instruction that were not

9  included.  So we'd request, if Your Honor is going to give this

10  instruction, that you give simply the entirety of the model

11  instruction.  There's specific portions about some of the

12  factors the jury should consider in their determination on

13  damages, such as the value the claimed invention contributes to

14  the product, the value of factors other than the claimed

15  invention contribute to the product, as well as comparable

16  license agreements.

17      The jury has been presented evidence of each of these

18  things.  So we think it would be helpful for the jury to be

19  instructed that those are things to consider.

20      And as I mentioned, it is part of the entirety of

21  Section 5.7 of the Model NDCA order -- or Jury Instructions.

22          **MR. KEVILLE:**  I think that's another confer over the

23  weekend.  I don't know what they're actually proposing to add,

24  so...

25          **MR. HAYNES:**  We can confer over the weekend.  It's the

 1   three bullets in the middle that are part of the model order.

 2           **MS. REPLOGLE:**  Okay.

 3           **THE COURT:**  See what you need that you haven't already

 4   agreed to in some other form, like the number of units.

 5           **MS. REPLOGLE:**  Your Honor, I did have one other

 6   change, but it's actually a really easy one.

 7           **MR. KEVILLE:**  It's the most critical one.

 8           **MS. REPLOGLE:**  Number 42.  Just simply the phrase

 9   "verdict form," there's a typo there.  It says "forma" in the

10   second line there.

11           **THE COURT:**  I'm sorry.  Say it again.

12           **MS. REPLOGLE:**  There's a typo in the second line.

13   Where it says "verdict form," there's an extra "a" there,

14   forma.

15           **THE COURT:**  Forma.  It's the Latin version.

16           **MR. KEVILLE:**  I was going to say, it's the Latin

17   instructions.

18           **THE COURT:**  Thank you.

19           **MS. REPLOGLE:**  You're welcome.

20           **THE COURT:**  Okay.  Is that it?

21           **MR. KEVILLE:**  That's it.

22           **THE COURT:**  This is the easiest final jury instruction

23   conference that I've ever had.

24           **MR. HAYNES:**  We've taken your advice, Your Honor.

25   We're now working very closely together to avoid these

 1    conflicts.

 2           THE COURT:  It's actually shocking to me that this is

 3    the case where it is, and congratulations to you all.

 4       So I will look forward to --

 5           MR. HAYNES:  Your Honor, I did have two other issues.

 6           THE COURT:  Okay.

 7           MR. HAYNES:  Just ask how you want to address them.

 8       The first is with respect to the proffer that we talked

 9    about before.  We have prepared a written proffer on the issue

10    of infringement to preserve the arguments that you already

11    ruled on on summary judgment.

12       Our proposal would be to just submit that electronically

13    today so that you can read it.  If you want us to read it in

14    the record somehow otherwise, we can do that.  But that's --

15    how would you like us to --

16           THE COURT:  So what you're talking about doing is

17    putting it on ECF.

18           MR. HAYNES:  Yes.

19           THE COURT:  Saying, "This is the proffer where you are

20    making a mistake."

21           MR. HAYNES:  I don't think we're going to use the word

22    "mistake," Your Honor, but we are going to make a proffer.

23           THE COURT:  Why don't you do that, and then I can

24    figure out what I want to do with it.  But otherwise, it'll be

25    in a place where you can refer to it.

1          **MR. HAYNES:**  Okay.  Great, Your Honor.

2      And then the final issue is, they closed their

3  case-in-chief.  We would like to go ahead and preserve our

4  objections with respect to that.  Should we do that now?

5          **THE COURT:**  Do you want to do that?

6          **MR. HAYNES:**  Or we can do it in writing if that's

7  easier.

8          **THE COURT:**  No.  If you're prepared to do it now, we

9  might as well just go forward.

10          **MR. HAYNES:**  I personally am not prepared, but

11  Mr. Riches, behind me, has told me that he is.  So --

12          **THE COURT:**  Excellent.

13          **MR. HAYNES:**  -- I'm going to step aside and let him do

14  it.

15          **MR. RICHES:**  Good afternoon, Your Honor.  Elliott

16  Riches on behalf of GoPro.

17      Your Honor, at the close of plaintiff's case, GoPro moves

18  under Rule 50(a) for judgment as a matter of law on the

19  following issues:

20      No infringement by the Group 1 Live Preview Products with

21  respect to Claim 12 of the '954 patent and Claim 6 of the '694

22  patent.

23      No infringement by the Group 2 Live Preview Products with

24  respect to all asserted claims.

25      No infringement by the Live Streaming Products with

1  respect to Claim 6 of the '694 patent.

2      No infringement by the HERO4K camera with respect to

3  Claims 11 and 12 of the '954 patent.

4      There's been no evidence of knowledge of the asserted

5  patents sufficient to support any jury determination of

6  pre-suit willful infringement.

7      There's been no evidence presented of willfulness for

8  either pre- or post-suit infringement.

9      Contour has not presented a legally cognizable theory of

10  damages.

11      And, finally, to the extent necessary, that there's

12  insufficient evidence to establish a priority date earlier than

13  that stated on the face of the patents-in-suit.

14      So we'd move on those issues, Your Honor.

15          **THE COURT:**  All right.  Mr. Keville, would you like to

16  be heard at this time?

17          **MR. KEVILLE:**  Yes, Your Honor.

18      As to infringement, we put in a very detailed case with

19  Dr. Hu on all claims, and I did not hear any direct rebuttal to

20  any of that.

21      As to willfulness, we put in on issues of copying; we put

22  in the stock sales.  So there's evidence from which a jury

23  could find willfulness.

24      As to -- I lost where you went after that -- damages, we

25  just heard from Dr. Ugone.  He had two recognizable theories.

1    So I would ask that JMOL be denied on all those grounds.

2    **THE COURT:**  Okay.  So I am going to look forward to

3  the jury's verdict and to your post-trial briefing, and

4  thank you for making the argument.

5    **MR. RICHES:**  Yes, Your Honor.

6    And then we had one more just logistics issue.  During

7  Mr. Helfer's deposition, there was one exhibit that was

8  referenced that the parties were still conferring on.  The

9  document that we had provided previously was slightly

10  incomplete.  We've met and conferred.  They've agreed that

11  TX-3950 should be admitted by that deposition, and we're going

12  to provide a replacement full copy before it goes back to the

13  jury.

14    **THE COURT:**  Okay.  All right.  That sounds good.

15    (Trial Exhibit 3950 received in evidence.)

16    **MR. KEVILLE:**  Thank you, Your Honor.

17    **MR. HAYNES:**  One more issue.  Sorry.

18    On the verdict form, you had asked us a question about

19  could we consider that issue and go do some research.

20    We did some research.  There's not a lot out there on it.

21  But what we did find is that the general practice with a

22  general verdict is that you need to make sure you are asking

23  the jury under each legal theory.

24    So infringement, you can't just say:  Do you infringe?

25  You have to say:  Did you infringe this patent?  Because that's

1    a separate legal allegation of infringement.

2         With respect to defenses, we did not find anything

3    directly on point on that; but our view is that the ultimate

4    decision for the jury is:  Is this claim infringed?  And is

5    this claim valid?  And that that's what the verdict form should

6    reflect, not each individual basis under which the claim should

7    be invalid.

8         We don't believe that there is a requirement for a finding

9    of unanimity with respect to every single invalidity theory

10   since the theory is either the claim is anticipated or it is

11   obvious.

12        And this also goes to the 102(g) ground of invalidity,

13   Your Honor.  102(g) is a way to qualify something as prior art.

14   If it qualifies under 102(g), it can be used for either

15   anticipation or obviousness.

16        But we don't think it's appropriate to ask the jury to

17   issue a ruling on the predicate of whether a piece of prior art

18   qualifies as prior art as a separate question on the verdict

19   form, which is what 102(g) is essentially doing.

20        Is it prior art?  What Mr. Woodman did, is that prior art

21   or not?  If it is prior art, then it counts for either

22   anticipation or obviousness.

23        **MR. KEVILLE:**  So a couple of things.

24        Number one, we did some research as well.  I agree there's

25   not a lot out there.  It is discretionary to you.

 1    We found cases where it's broken out.  We found cases

 2  where it hasn't been.

 3    Here's my concern and what it has always been.  The

 4  theories have shifted a lot in here.  As Your Honor

 5  remembered -- will remember, there's been a lot of times when

 6  they said:  We want to bring in this as evidence of

 7  obviousness.  Pick one.  Nikon.  Or if it's not evidence of

 8  obviousness, it's evidence of state of the art.

 9    And Your Honor has said in the past that, yes, they will

10  be able to bring in things as state of the art as long as they

11  don't cross the line.  And that's a very fuzzy line.

12    And that's why I think it would be unfair for the jury to

13  go back and they've heard Boland plus Ambarella, Sony plus

14  Ambarella, Nick Woodman invented it first, and we're just going

15  to go back and say:  Figure it out, all this stuff.  And we've

16  heard Nikon is state of the art, and we've heard other things

17  are state of the art.

18    So it may be resolved if we get the instructions done,

19  right, that these are the combinations that GoPro is putting

20  forward.  These are the things that they say anticipate.

21    Part of my problem was I took Dr. Almeroth's deposition.

22  His whole report says, "These things either anticipate or

23  render obvious."  And so when I take his deposition I say,

24  "Okay.  This one, which one is it, anticipation or

25  obviousness?"  He says, "I defer to my report."  That's it.

1    So I think we need clarity at the end of this case so the

2    jury doesn't go back and say:  We heard about a whole lot of

3    stuff, and now we're just supposed to decide, if you throw all

4    that together, is it obvious.

5        **MR. HAYNES:**  So just to respond briefly to that,

6    Your Honor, I believe Dr. Almeroth will testify about the state

7    of the art.  It'll be very clear that that's what he's talking

8    about.  Then he will present specific grounds under either

9    anticipation or obviousness.

10    And based on that testimony, we will, at our next charge

11    conference, present to Your Honor:  Here are the basis that we

12    believe -- and we can write those into the jury instruction --

13    that addresses:  For anticipation, you can consider this.  For

14    obviousness, you can consider this.  And that will be based on

15    the evidence that's presented in the trial to them.  That would

16    solve the concern that Mr. Keville just raised.

17        **THE COURT:**  Go ahead.

18        **MR. KEVILLE:**  I mean, that may do it.  Let's see where

19    we get to.

20        **THE COURT:**  Yeah.  So I'll just give you my general

21    perspective on this, which is, I would, in other contexts, have

22    it in the jury instructions, and then have the jury refer to

23    the jury instructions, but have a general verdict form.

24    I think that's just -- that's the way that I like to do it.

25    But I don't have a -- I don't have a practice that I can

1    think of in patent cases.  So I'll appreciate your agreement,

2    and if you can't agree, we'll just decide it on Tuesday

3    afternoon.

4            **MR. KEVILLE:**  Very good.

5            **MR. HAYNES:**  Thank you very much, Your Honor.

6            **THE COURT:**  All right.  Have a good weekend,

7    everybody.

8            **MR. KEVILLE:**  You do the same.

9            (Proceedings adjourned at 2:28 p.m.)

10                       ---o0o---

11

12                **CERTIFICATE OF REPORTER**

13        I certify that the foregoing is a correct transcript

14    from the record of proceedings in the above-entitled matter.

15

16    DATE:  Saturday, October 4, 2025

17

18

19

20              *Ana Dub*

21    _____

22          Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

23        CSR No. 7445, Official United States Reporter

24

25