```
                                    Volume 6

                              Pages 970 - 1175

              UNITED STATES DISTRICT COURT

              NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

CONTOUR IP HOLDING, LLC,      )
                              )
            Plaintiff,        )   CONSOLIDATED CASES
                              )   NO. 3:17-CV-04738 WHO
    VS.                       )   NO. 3:21-CV-02143 WHO
                              )
GOPRO, INC.,                  )
                              )
            Defendant.        )
_____)


                              San Francisco, California
                              Monday, October 6, 2025

              TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiff:
                    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
                    845 Texas Avenue, 25th Floor
                    Houston, Texas 77002
              BY:   JOHN R. KEVILLE, ATTORNEY AT LAW
                    MICHELLE C. REPLOGLE, ATTORNEY AT LAW
                    SUNNY AKARAPU, ATTORNEY AT LAW
                    MICHAEL C. KRILL, ATTORNEY AT LAW

For Defendant:
                    ALSTON & BIRD LLP
                    One Atlantic Center
                    1201 West Peachtree Street
                    Atlanta, Georgia  30309
              BY:   JOHN D. HAYNES, ATTORNEY AT LAW
                    SLOANE S. KYRAZIS, ATTORNEY AT LAW

              (APPEARANCES CONTINUED ON FOLLOWING PAGE)

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter
```

1    **APPEARANCES**:   (CONTINUED)

2    For Defendant:

ALSTON & BIRD LLP
3                           55 Second Street, Suite 2100
San Francisco, California 94105
4              BY:   **MICHELLE A. CLARK, ATTORNEY AT LAW**
**PHILIP C. DUCKER, ATTORNEY AT LAW**
5

6                           ALSTON & BIRD LLP
2828 North Harwood Street, Suite 1800
7                           Dallas, Texas  75201
BY:   **ELLIOTT C. RICHES, ATTORNEY AT LAW**
8
ALSTON & BIRD LLP
9                           Vantage South End
1120 South Tryon Street, Suite 300
10                          Charlotte, North Carolina 28203
BY:   **KARLEE N. WROBLEWSKI, ATTORNEY AT LAW**
11

12   **Also Present:**

Robert Mooney, Contour Corporate Rep
13                          Pablo Lema, GoPro Corporate Rep
Tyler Gee, Deputy General Counsel, GoPro
14                          Jesse Taylor, Trial Technician
Allen Eaton, Trial Technician
15                          Luke Arndt, Trial Technician
Sarah Moyer, Trial Technician
16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3    Monday, October 6, 2025 - Volume 6

4

5    **DEFENDANT'S WITNESSES**                    **PAGE**  **VOL.**

6    **LEGALL, DIDIER**
     (SWORN)                                        998     6
7    Direct Examination by Mr. Haynes               999     6
     Cross-Examination by Mr. Keville              1039     6
8    Redirect Examination by Mr. Haynes            1068     6

9

10   **ALMEROTH, KEVIN CHRISTOPHER**
     (SWORN)                                       1074     6
11   Direct Examination by Ms. Clark               1075     6
     Cross-Examination by Mr. Keville              1154     6

12

13                        **E X H I B I T S**

14   **TRIAL EXHIBITS**                   **IDEN**  **EVID**  **VOL.**

15     495                                         1148     6

16     2006                                        1030     6

17     2007                                        1032     6

18     2032                                        1037     6

19     2039                                        1028     6

20     2041                                        1003     6

21     2046                                        1048     6

22     2047                                        1011     6

23     2048                                        1014     6

24     2049                                        1034     6

25     2350                                        1089     6

# I N D E X

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2479 | | 1019 | 6 |
| 3484 | | 1021 | 6 |
| 3885 | | 1023 | 6 |
| 3899 | | 1016 | 6 |
| 4154 | | 1091 | 6 |
| 4208 | | 1092 | 6 |
| 4214 | | 1095 | 6 |
| 4382 | | 1091 | 6 |

**Monday - October 6, 2025**                                    **7:59 a.m.**

P R O C E E D I N G S

---o0o---

(Proceedings were heard out of the presence of the jury.)

THE COURT:  Please be seated except for anybody who's got an issue.

MR. KEVILLE:  Good morning, Your Honor.

THE COURT:  Good morning, Mr. Keville.

MR. KEVILLE:  We have a fundamental disagreement on the role of experts when it comes to introducing documents.  If you recall, when Mr. Woodman was on the stand -- well, let me start with this.

We had an agreement that each side's documents that they produced that on their face appeared to be a document from either GoPro or Contour we would agree were authentic and business records.

And then I put the chart of competitors in front of Mr. Woodman, and they said, "Object.  He has no personal knowledge."  He said, "It's a company document.  I just don't remember seeing this document."  Your Honor kept it out.

Last night we got a list of 50 GoPro and other documents that they plan to admit through their expert, and I have problems with many of them; but to me, those don't come in through the expert.  The expert can say, "I relied on the document, I saw documents," but they don't come into evidence.

1    And we have a particular example.  Let me show you.

2        Can you put up Exhibit 2426.

3        This is one that they gave us that they are intending to

4    introduce through the expert.

5        May I hand this to the Court.

6            (Document handed up to the Court.)

7        **MR. KEVILLE:**  Okay.  What I've handed you is the

8    expert report, a couple of pages of Kevin Almeroth, the expert

9    they intend to get this in from; and you can see in

10   paragraph 344, he talks about Mr. Donovan, that was a GoPro

11   employee, who did this prototype.  And you can see he says:

12   Provided images of the prototype cameras that he used, which

13   were marked 7 and 8.  And that's the same picture we had the

14   argument about and we saw that it had a later date.  It wasn't

15   2009.  It was 2010.

16       Then if you turn to the second page, he says, "See also

17   GoPro..."  And then if you look at the last range, it ends in

18   12882.  That's this one that they intend to introduce as

19   evidence through Dr. Almeroth.

20       So he cited that as a "see also."  He provided no opinions

21   on it.  He didn't mention it.  And when we went to Donovan's

22   deposition, he said, "These two in the photograph, those are

23   the 2009 ones."  He didn't -- said he would rely on any other

24   one.

25       Okay.  Now, I went back, and this is why this is

1    important.

2        Could you put up, Jesse, the native of the image?

3        You can see in the image they gave us, it was grainy and

4    black and white.  This is the native of the image.

5        Can you zoom in on those letters.

6        Because I remember this from the time, that appears to me

7    to be clearly Photoshopped, a date.  Because if Your Honor

8    looks to the right, there's an edge on the board, and the zeros

9    don't break on the edge.  This writing doesn't correspond to

10   anything else.

11       It was our opinion when we first saw this that that was

12   Photoshopped in.  It still is.  But because Mr. Donovan at his

13   deposition said, "These are the two prototypes from 2009," we

14   didn't go through all the photos; we didn't go through the

15   others.

16       To have this expert come in and now apparently say, "Oh, I

17   want to put into evidence this document that's dated 2009,"

18   when I can't now say, "Doesn't this appear to be

19   Photoshopped" -- right? -- I don't get the ability to say, "I'd

20   like to see this actual prototype," because I would have -- I

21   expect we would have seen that that date did not appear on that

22   prototype.

23       And so that's kind of the starting point, Your Honor.

24   That's why experts don't get to just bring documents into

25   evidence and say, "We" -- you know, "We're admitting this into

1    evidence.  It's a business record of GoPro."

2        **THE COURT:**  Okay.  Mr. Haynes?

3        **MR. HAYNES:**  Your Honor, this morning just now is the

4    first time I've heard an allegation that there was

5    Photoshopping or tampering with evidence.  I'm, frankly, very

6    surprised to hear something like that for the first time as we

7    entered the courtroom today.

8        I can tell you, I personally have zero knowledge of any

9    Photoshopping.  This picture was cited by Dr. Almeroth in his

10   report.  They made a suggestion with Mr. Woodman, by showing

11   him a photo of one date of one prototype, that there was no

12   prototype in 2009 period.

13       And this is being shown to say, "Did you see other

14   prototypes?"  And our expert has personal knowledge of seeing

15   that device and taking a picture of it.

16       And we're going to have him -- all he's going to say about

17   that is, "I'm aware of other prototypes."  And that was

18   Mr. Woodman's testimony as well.

19       There was a series of 400 boards, is what Mr. Woodman

20   testified to, of different prototypes that they were developing

21   over time and that he witnessed one of those in operation.

22       And this is just to rebut the notion and suggestion -- and

23   there was actually a suggestion, Your Honor, during the

24   questioning of Mr. Woodman where he pointed at me when I was

25   sitting at this table, Mr. Keville, and said, "Are you aware

1  that your counsel" -- gesturing to me -- "didn't let us peel

2  back the sticker on that?"

3      And, first of all, I wasn't even on this case back when

4  that deposition was taken.  The only factual testimony about

5  what the sticker was and peeling off, or whatever, came from

6  Mr. Keville in his questioning when that happened.

7      So we're putting up the full picture for the jury to say,

8  including a prototype from 2009, to show that the suggestion

9  that there were no 2009 prototypes is just not true.  And if

10  they want to cross him about that, they're welcome to.  But the

11  notion that we Photoshopped an image is preposterous.

12      **MR. KEVILLE:**  I'm not accusing counsel of prototyping,

13  nor did I point to him.

14      In Dr. Hu's report, which they had, it showed the image

15  that said this is 2009.  They've claimed it's 2009.  This is

16  2010.  Here's the date, the same one we introduced as an

17  exhibit.

18      Also in her report she said, "We were not able to look at

19  the date on the other board because counsel for GoPro..."  And

20  that's what I said.  I didn't say "this counsel" or "this

21  gentleman."  All right?  So I did not say that.

22      But the problem with him coming in and saying this is, he

23  rendered no opinions on it.  He just listed it as a "see also."

24  And had there been opinions on it, we would have taken

25  someone's deposition on this and said, "Why does this appear to

1    be Photoshopped?"

2        I'm certainly not saying he Photoshopped it.  I'm saying

3    it doesn't appear to be legitimate.

4        And this is not the expert who can speak on it because

5    he's never rendered an opinion on it.

6            **MR. HAYNES:**  Your Honor, on that last point?

7            **THE COURT:**  Yeah.

8            **MR. HAYNES:**  Can we bring up the Elmo?

9        This is from our expert's appendices, which contains a

10   color copy of that photo.

11           **THE COURT:**  It's from your expert's what?

12           **MR. HAYNES:**  Expert report --

13           **THE COURT:**  Okay.

14           **MR. HAYNES:**  -- the appendix to his expert report

15   where he walks through each of the elements with respect to

16   Woodman's prior invention.

17       And the statement here says [as read]:

18           "Regardless, the Woodman invention discloses an

19       image sensor configured to capture light propagating

20       through the lens and representing a scene and produce

21       real-time video image data of the scene as claimed.

22       See e.g."

23       And that is the photo of what we plan to introduce.

24       So he did render an opinion on it.  They've known about

25   this opinion since at least 2021, and this is the first time

1  we're hearing of some Photoshopping allegation on the morning

2  of trial when our expert is going to take the stand.

3      **THE COURT:**  So I think there are two things.

4    He can -- it seems to me that an expert can testify about

5  the bases of his opinions and understanding of the evidence.

6    I don't think the photograph comes in.  I don't think he

7  can -- I don't think an expert is able to authenticate the

8  parties' documents, but I do think that -- I think you can ask

9  the questions and his understanding of them, and I don't know

10  where you go with that, Mr. Keville.

11    It's not obvious to me what the truth is about the

12  allegations that you've made.  It wasn't obvious to me before.

13  It's not obvious to me this morning.  And we are where we are.

14    So that would be my -- that would be my ruling on that.

15  And that's true for any other documents that he's relying on.

16  He can talk about them, but they won't go back with the jury.

17      **MR. KEVILLE:**  And I assume, then, that they can't

18  display them to the jury because they won't be admitted.

19  That's been our practice.  Even the comparison chart --

20      **THE COURT:**  Yeah, and it is a fact.  So I think

21  that's -- I think that's true.

22      **MR. KEVILLE:**  That they cannot --

23      **THE COURT:**  I think you -- you are correct --

24      **MR. KEVILLE:**  Thank you.

25      **THE COURT:**  -- in that.

1          **MR. KEVILLE:**  Okay.

2          **MR. HAYNES:**  Your Honor, I think there are some --

3    most of the evidence that our expert's going through has been

4    admitted already.  I do believe there are some exhibits that

5    may not fall directly in the same category of this that my

6    colleague Ms. Kyrazis would address independently from sort of

7    the general categories.

8          **THE COURT:**  Okay.

9          **MR. HAYNES:**  I believe with respect to Woodman and

10   Ambarella, that those exhibits that he's going to show the jury

11   are already in evidence through other witnesses or will be.

12         **THE COURT:**  Okay.

13         **MR. KEVILLE:**  And to be clear, I have no issue.  If

14   the exhibit's already in evidence, they can put it up; they can

15   show the exhibit.  As long as it's within the bounds of his

16   opinions that he's provided, I have no issue with that.

17         **MR. HAYNES:**  Your Honor, I would say on this point,

18   before Mr. Woodman took the stand, we had the photo that they

19   showed, this one, where we wanted to show the photo to

20   Mr. Woodman, and they said they would not object as long as all

21   photos of the prototype came in.

22         And then they showed up with new exhibits that had not

23   been seen before of photos that they put in with the 2010 date.

24   Those were not on the exhibit list at the time, and I did not

25   object to that because I said, "Okay.  Photos of the prototypes

1   come in."

2        This photo that we're trying to introduce is another photo

3   of the prototype that the parties agreed were -- we were going

4   to show the jury the photos of the prototypes.

5        **MR. KEVILLE:**  It's not a prototype per se, Your Honor.

6   That's not what his opinion said.  It said, "See also."  But if

7   you go back -- can you put that up again?  Thank you.

8        There is no RF board attached to this.  There are no

9   antennas.  There are no communications modules.  There is

10  nothing that establishes this was a prototype.

11       And if you read it, it says [as read]:

12           "The Woodman invention discloses an image sensor

13           configured to capture light propagating through the

14           lens."

15       There's nothing where he indicates this was a prototype

16  that they tried to do wireless transmission from.  This is just

17  him saying old GoPro cameras had an image sensor to capture

18  light and produce video.

19       There's nothing on this that would indicate this was ever

20  used as a prototype.  And that's my issue.  Donovan was very

21  clear that these are the two that were the prototypes from

22  2009.  Mr. Woodman testified, "These are the two that I saw in

23  2009."  And now they're trying to bring in something from 2009

24  that's not those prototypes.

25           **THE COURT:**  No.  You know, if you'd gone after this

1   issue earlier, we wouldn't be in this moment and --

2         **MR. KEVILLE:**  Your Honor, I put it in the expert

3   report.

4         **THE COURT:**  You didn't.  You decided -- you made a

5   choice not to try to figure out your Photoshopping allegations.

6   We're hearing about them now, and that's not -- it's not a good

7   place to be.

8      I'm not -- but my ruling stands.

9         **MR. HAYNES:**  Understood, Your Honor.

10        **MR. KEVILLE:**  Okay.  We have a number of issues with

11  their slides that relate to this, their expert slides.

12     Can you put up their -- can you guys put up your expert

13  slides?

14        **TRIAL TECH:**  Almeroth or --

15        **MR. KEVILLE:**  The Almeroth slides, yeah.

16        **TRIAL TECH:**  I'll need the --

17        **MR. KEVILLE:**  Oh, can we switch back to --

18        **TRIAL TECH:**  -- the Elmo -- sorry, the Elmo setup.

19        **MR. KEVILLE:**  All right.  Can we start on Slide 16?

20     Your Honor, this shows the Sony Handycam.  Your Honor

21  ruled in Docket 360 that the Sony Handycam was out.

22        **THE COURT:**  In Docket 360?

23        **MR. KEVILLE:**  Yes.

24        **MS. KYRAZIS:**  And, Your Honor, if I may.  Sloane

25  Kyrazis.

1      So this slide is sort of representative of a collection of

2  a swath of slides that Contour has objected to, and in -- well,

3  in this category, there -- this slide is a demonstrative

4  showing the evidence that Dr. Almeroth relied on in forming his

5  opinions.

6      We think that that's appropriate to publish to the jury

7  because the contents, for example, of the Sony Handycam

8  handbook is not shown on this slide, and we wouldn't seek to

9  admit the contents of the Sony Handycam handbook on this slide.

10      **MR. KEVILLE:**  As I understood, it was out as a

11  reference that they could use in Docket 360, so...

12      Want me to hand up a copy?

13      **THE COURT:**  Yeah, why don't you do that.

14          (Document handed up to the Court.)

15      **MS. KYRAZIS:**  And, Your Honor, in response to that as

16  well, we're only offering this handbook as evidence of state of

17  the art.  We're not asserting it as a prior art reference.

18      **THE COURT:**  Okay.  Let me just take a look at this.  I

19  appreciated Mr. Keville bringing up an order from five and a

20  half years ago.

21          (Pause in proceedings.)

22      **THE COURT:**  Well, if it's not being used as a

23  reference, it's okay.

24      **MR. KEVILLE:**  All right.  And the next slide, if you

25  would go to Slide 19, please.

PROCEEDINGS

1          Okay.  So there's a number of issues here, Your Honor.  In

2     the basic camera hardware -- first of all, on the right side,

3     you see all these.  It says, "Allegedly, I'm understanding to

4     be state of the art."  But on the right side it says,

5     "Submitted to the Patent Office.  No, no, no."

6          That's not state of the art.  That's going to invalidity

7     and inequitable conduct.

8          There's no issue of whether things should have been

9     submitted.  There's no -- been no questioning of whether we

10    knew of any of these things at the time.  They're clearly

11    making the impression that these are prior art that the

12    Patent Office should have considered or would have.  And that's

13    not state of the art.  That's invalidity.

14         And if you go to Slide 80 for a second, you can see what

15    they're doing.  They bring back that same color.  This is in

16    their invalidity section.  And they say pink, "Basic Camera

17    Hardware."  Right?

18         Now go back to slide 19, the one we were on.  "Basic

19    Camera Hardware" in pink.

20         They're tying it right into their invalidity argument.

21    It's not state of the art.  It's part of their invalidity

22    argument.

23              THE COURT:  Ms. Clark.

24              MS. CLARK:  That's just not true.  The state of the

25    art, as a matter of law, is a collection of prior art that

1    would have been, you know, sort of known in the knowledge of a

2    person of ordinary skill.  It would inform the way in which

3    they interpret and apply the obviousness combinations.

4        So Dr. Almeroth does intend to stand up and talk about

5    different categories of art that's in the state of the art;

6    but, you know, the reference to whether or not it was in front

7    of the Patent Office is simply -- in all candor, just we don't

8    want to mislead.  Right?  As we'll recall from Judge Fogle's

9    patent video, he mentions some art may have been missed.  We

10   don't want to be misleading about that and we want to be

11   candid.

12       THE COURT:  Don't make that argument.

13       But I don't see a -- I don't see a problem with this.  If

14   it's in his report, he's entitled to --

15       MR. KEVILLE:  I'm not sure there's anything in his

16   report about whether these were submitted to the Patent Office.

17       MS. CLARK:  Well, I can take a look.  If you don't

18   want him to say that they're not cited on the face of the

19   patent, then, I mean, okay.  Like, again, it's just state of

20   the art, so we're not --

21       THE COURT:  So I think I said earlier in a pretrial

22   conference, when it comes to the experts, you have to be tied

23   to the report.  If it's not in the report, you can't have it.

24   If it is in the report, you can have it.

25       MS. CLARK:  A hundred percent.  And, Your Honor, as I

1  recall, I think the way that Dr. Almeroth's report is laid

2  out -- I'm hoping to get an assist here -- is that for those

3  references, such as Eye-Fi or the Ambarella product sheet that

4  are cited on the face, Dr. Almeroth's report specifically says,

5  "Okay.  These were cited on the face."  And it's -- what I

6  can't remember is whether or not for the ones that aren't, he

7  says, "No, they weren't."  And, like I said, we're happy to not

8  have him say that part.

9              **THE COURT:**  Okay.  Then --

10             **MS. CLARK:**  Okay.

11             **THE COURT:**  Then don't have him say it.

12             **MR. KEVILLE:**  And then the column should come off if

13 it's not in his report.

14             **MS. CLARK:**  Okay.

15             **MR. KEVILLE:**  Okay.

16             **MS. CLARK:**  Sure.

17             **MR. KEVILLE:**  The second thing on this, Your Honor, if

18 you look at the "Date Evidence Considered" column, they have

19 "Canon DTX-4224."

20     No one has testified about it.  It's not a document that's

21 in evidence, and so he should not be able to put up those.  He

22 can say he understood there were Canon documents and he relied

23 on them, but they shouldn't be able to put them up.

24     And it's also listed on the list of exhibits they intend

25 to admit through him.  They subpoenaed documents from Canon.

 1  They got Canon documents.  They don't have a Canon witness

 2  here.  So the expert can't put in the Canon documents into

 3  evidence.

 4       THE COURT:  He's not putting in the Canon documents,

 5  but -- at least with this slide.  He's just saying where he got

 6  the information from.

 7       MR. KEVILLE:  Sure, but it's on the list of things

 8  that they said they intend to introduce into evidence through

 9  Dr. Almeroth.

10       MS. CLARK:  Your Honor, we have the declaration of

11  Andrew MacCallum, which is also cited in Dr. Almeroth's report,

12  providing custodial authentication of Canon documents as

13  business records.  It's the same basis on which we intend to

14  admit the Sony records pursuant to Federal Rule of

15  Evidence 902(11).

16       THE COURT:  And did you have an agreement that you

17  were going to allow third-party documents by declaration?

18       MS. CLARK:  We definitely discussed the Sony

19  documents.  We did not --

20       THE COURT:  I asked -- I asked:  Did you have an

21  agreement?

22       MS. CLARK:  For the Sony documents, yes.  For the

23  Canon documents, no.  Happy to not admit the Canon documents.

24       THE COURT:  Okay.  Just let's stick with the

25  agreements that you have.  And apparently, you need them in

1    writing, and so let's do it that way.

2        MR. KEVILLE:  And so that's all I'm asking.  So he can

3    put it on the chart that it's something he considered, but it

4    doesn't come into evidence is all I'm asking.

5        THE COURT:  Yes.

6        MR. KEVILLE:  Okay.

7        THE COURT:  That's what it sounds like.

8        MR. KEVILLE:  Okay.  That would apply -- and I guess

9    we can confer on it, but that applies to Looxcie.  That applies

10   to a number of other things throughout this --

11       MS. CLARK:  Yes, Your Honor.

12       MR. KEVILLE:  -- these slides.

13       MS. CLARK:  We were not intending -- sorry.

14   Yes.  We were not intending to have Dr. Almeroth admit

15   those.

16       MR. KEVILLE:  I want -- Your Honor, this one is

17   Slide 33.  This was one of their invalidity references until

18   the MIL order that said they had to reduce to six.

19   I don't know -- I guess this one, to me, it's the same

20   issue.  They dropped it as an invalidity reference, and yet

21   here they're calling it up and, you know, discussing the

22   details of it that were the same details he put in his report

23   on invalidity.

24   And now I assume they're going to say this is state of the

25   art, but it's also kind of the reason why I asked you, if you

 1   remember, why we need a clear verdict form with the

 2   combinations, because you can see there's all these references

 3   that they're calling state of the art, but they're calling out

 4   parts of them and then they list them in these colors and then,

 5   later, those colors appear in the infringement chart.

 6        And that was what I was saying my concern was, especially

 7   with this state-of-the-art argument, that now we're going to

 8   have a general verdict form and say, "Are these obvious?"  And

 9   he said, "Look at all this stuff that was in state of the art."

10   Right?  And that's why I think we need the chart on the verdict

11   form that says combination A and B.

12             THE COURT:  Well, we're not there yet.

13             MR. KEVILLE:  Understood.

14             THE COURT:  Ms. Clark, do you want to respond to this?

15             MS. CLARK:  Sure.  It's like Mr. Keville said.  It is

16   reference -- it is part of the state of the art, and this

17   section is called out with respect to Presler.  We're not

18   walking through Presler on an element-by-element basis.  We're

19   not presenting it as part of an obviousness combination.  We're

20   simply identifying, again, the background on the state of the

21   art.

22        And it is true that Presler discloses live preview along

23   with the general concept.  Right?  We're not, like, mapping it

24   to a particular claim.  We're saying it's the general concept

25   was known in the state of the art.

1          **MR. KEVILLE:**  This is exactly the point that he

2    pointed to invalidity to say, "This renders the claims obvious

3    adding this in."

4          **THE COURT:**  You have identified the six?

5          **MS. CLARK:**  Yes, sir.

6          **THE COURT:**  Okay.  This is not one of the six?

7          **MS. CLARK:**  No, sir.

8          **THE COURT:**  Okay.  Let's take it out.

9          **MS. CLARK:**  Sorry?

10          **THE COURT:**  Take it out.  Stick with the report that

11    he has and the number of references that you can make that I

12    allowed during the motions in limine.  If there's some other

13    reason why I should let it in, give it to me; but I really am

14    going to insist that you follow the orders that I've made.

15          **MS. CLARK:**  I understand, Your Honor.

16          I understood the order to narrow the number of

17    combinations that we -- and references that we could present as

18    invalidity.  State of the art is background.

19          There's plenty of evidence in this case that goes to

20    multiple issues.  They're allowed to bring in the iON

21    license, despite the fact that it's not relevant to damages.

22          Our argument is simply that Presler is relevant to

23    multiple issues.  They've had plenty of notice of it.  And one

24    of those issues is state of the art, which is distinct from the

25    specific obviousness combinations that are being presented.

1      And I believe -- and I apologize if I misunderstood the

2   order, but I believe that that is consistent with Your Honor's

3   prior orders, including the one Mr. Keville cited, which said

4   that we are allowed to rely on evidence as state of the art.

5   It's a distinct issue.

6          **THE COURT:**  All right.  Well, let's do this:  I am --

7   I will allow it.  I will, Mr. Keville, listen to you about what

8   the verdict form ought to show for the jury.

9          **MR. KEVILLE:**  Okay.  The next one is 36.  So if --

10  Your Honor, I don't know if you recall, but remember there was

11  an issue on summary judgment as to whether the Looxcie

12  documents were able to be introduced.  We said it's not prior

13  art because none of these documents were business records.

14  Your Honor said, "That will depend on how the testimony comes

15  in."

16      They subpoenaed the witness to testify about this, the one

17  who was deposed, Mr. Pereira, and now they've told us that he's

18  not going to appear; he's not going to be a witness.

19      So these documents were heavily disputed as to any of

20  these were authentic.  The Court said, "I'll wait to hear the

21  testimony.  Then we'll decide."  Now there's not going to be

22  any testimony, and so Dr. Almeroth shouldn't be able to put

23  them up and talk about them.

24          **MS. CLARK:**  Again, Dr. Almeroth is not attempting to

25  admit this document to evidence, but if it is -- but I think

 1    one reasonable compromise, this CoreLogic -- this CoreLogic

 2    processor cited on the face of Boland.  So happy to just

 3    replace the image with Boland.  Seems fine.

 4            **THE COURT:**  All right.

 5            **MR. KEVILLE:**  And then that would take out the quote,

 6    I assume, that comes from the Looxcie document.

 7            **MS. CLARK:**  Yeah.

 8            **MR. KEVILLE:**  There's a number on Ambarella, but their

 9    first witness I understand is the Ambarella witness, so we'll

10    see what comes up and then address those with him, you know,

11    after we see what comes in.

12        Oh, and I will have one question on that.  I think,

13    Your Honor, what we should do is probably confer with counsel

14    on the next break, in view of your rulings, and look at a new

15    set of slides and see what happens from there.

16            **THE COURT:**  Okay.

17            **MR. KEVILLE:**  Okay.  So there's one issue with the

18    Ambarella witness who should not be in the courtroom.  He's

19    not.

20        There's a number of emails they intend to introduce

21    through him that are emails that he was not on.  And in his

22    deposition, he said he had no dealings with GoPro prior to

23    2011.  And how does Your Honor want me to handle that?  Because

24    if I just stand up and object, you know, he may say, "No, I'm

25    familiar with this."  But then I would want to voir dire him

1    and say, "Do you remember you testified such?"  So I didn't

2    want to get into confusion during the trial.

3           **THE COURT:**  Okay.  Mr. Haynes.

4           **MR. HAYNES:**  Your Honor, I don't think that's going to

5    be an issue.  I think that based on what I'm expecting will

6    happen, his name is going to be on everything that's there, and

7    he will establish personal knowledge before he ever needs to

8    get there.  So I don't expect this is going to come up.

9           **THE COURT:**  Okay.  And if you have -- feel free to

10   object whenever you want to, whenever you think it's

11   appropriate.  And I probably won't let you voir dire the

12   witness.  And sometimes I allow exhibits conditionally,

13   dependent on what happens in cross.  Sometimes I say no because

14   I don't think they're going to get there.  But don't hesitate,

15   Mr. Keville.

16          **MR. KEVILLE:**  I just want -- if I ask to voir dire the

17   witness, I didn't know what you would think on that, so I

18   wanted to raise it to you.

19          **THE COURT:**  I would think it was a bad idea.

20          **MR. KEVILLE:**  That's what I was concerned about.

21      Thank you, Your Honor.

22          **THE COURT:**  All right.  Anything else?  We do have a

23   jury, I think, so...

24          **MR. RICHES:**  Yes, Your Honor.  Hopefully, I will be

25   brief on this issue.

 1          This relates to the deposition of Mr. Tyler Gee.  There

 2     was one counter-designation that Contour made.  I have a copy

 3     of it if you'd like me to hand it up.

 4          **THE COURT:**  All right.

 5               (Document handed up to the Court.)

 6          **MR. RICHES:**  And it's the testimony in red,

 7     Your Honor.

 8                    (Pause in proceedings.)

 9          **MR. RICHES:**  Once Your Honor's read it --

10          **THE COURT:**  Hang on just a second.

11                    (Pause in proceedings.)

12          **THE COURT:**  Okay.

13          **MR. RICHES:**  And, Your Honor, the issue on this one is

14     very simple.  The fact is Ambarella is not indemnifying GoPro

15     in this case, and so putting this testimony that suggests there

16     might be some indemnification is going to confuse the jury

17     under 403.  It's going to mislead them.

18          Courts have been very clear that the relevance of

19     indemnification is related to bias or prejudice.  There is no

20     indemnification, so there can be no bias or prejudice.  There's

21     a case directly on point from the District of Delaware where

22     there was no indemnification.  The Court found in a patent case

23     this shouldn't come in.  It's going to prejudice the jury.

24     It's going to make them think someone else is paying.

25          **MR. KEVILLE:**  May I address?

 1          This is the deposition testimony of Tyler Gee, which was

 2     taken after the two depositions where they subpoenaed the next

 3     witness, who's the Ambarella witness, Didier LeGall.

 4          So, apparently, at the time of all his depositions and at

 5     the time of Tyler Gee's deposition, there was an

 6     indemnification demand, which would go to whether there was

 7     bias.  It's clearly evidence that they're biased.

 8          The first time I heard that -- or potential bias.

 9          The first time I heard that they had denied

10     indemnification and that there is no pending indemnification

11     was when we met and conferred on this last night.

12          **MR. RICHES:**  Your Honor, as to the question of

13     potential bias, if you'll look at the Delaware case I

14     mentioned, it's *TQ Delta v. 2Wire*, 2019 Westlaw 13038199,

15     the Court actually addressed a similar issue there.

16          The fact that there might be indemnification, that

17     there -- potential for indemnification later was excluded under

18     403 because the fact of the matter was there was, in fact, no

19     indemnification.

20          And so I think that's the same issue Mr. Keville is

21     addressing.  The potential for indemnification simply isn't

22     enough to get past the 403 hurdle.

23          **MR. KEVILLE:**  Except I did not know it was only the

24     potential for indemnification until last night, so I haven't

25     gotten any opportunity to say:  What was the back-and-forth?

 1    What happened on that?  So...

 2         **THE COURT:**  Do you have a copy of that case?

 3         **MR. RICHES:**  I don't believe I have it.  I can print a

 4    copy, Your Honor, but I apologize, I don't have a copy in front

 5    of me.

 6         **THE COURT:**  And when is this going to be played?

 7         **MR. RICHES:**  Your Honor, we don't anticipate it until

 8    tomorrow morning potentially, depending on how long

 9    Dr. Almeroth goes, which I expect will probably be the majority

10    of the day.  So, at a minimum, we can wait until after a break.

11         **THE COURT:**  Okay.  So if you wouldn't mind printing a

12    copy for me.  I'm clerkless today.  So do that, and I'll take a

13    look at that.

14         **MR. RICHES:**  Yes, Your Honor.

15         **MR. KEVILLE:**  Thank you, Your Honor.

16         **THE COURT:**  All right.  We'll count jurors and then

17    get going.

18                   (Recess taken at 8:31 a.m.)

19                (Proceedings resumed at 8:35 a.m.)

20      (Proceedings were heard out of the presence of the jury.)

21         **THE COURT:**  All right.  Are we ready for the jury?

22         **MR. HAYNES:**  Yes, Your Honor.

23      (Proceedings were heard in the presence of the jury.)

24         **THE COURT:**  All right.  Please be seated, everybody.

25      Good morning, ladies and gentlemen.  Welcome back.  I hope

PROCEEDINGS

1   you had a good weekend.  I'm going to start your day off well

2   too.

3        I made a mistake at the end of Friday's hearing when I

4   told you that argument would occur on Thursday.  It actually

5   will occur on Wednesday.  So I apologize for that mistake.  And

6   because of that, again, you are entitled to stay -- to set your

7   own schedule with respect to Wednesday and Thursday and Friday.

8   So we'll talk more about that when it's time for closing, but I

9   did want to let you know that.

10       And, Mr. Haynes.

11       MR. HAYNES:  Your Honor, for our next witness, we call

12   Mr. Didier LeGall.

13   (Witness enters the courtroom and steps forward to be sworn.)

14                      **DIDIER LeGALL**,

15   called as a witness for the Defendant, having been duly sworn,

16   testified as follows:

17       THE WITNESS:  Yes.

18       THE COURTROOM DEPUTY:  Thank you.  Please be seated.

19       If you would please begin by stating your full name and

20   spelling it for the court reporter.

21       THE WITNESS:  My full name is Didier LeGall.  It's

22   spelled D-i-d-i-e-r and L-e-G-a-l-l.

23       MR. HAYNES:  Your Honor, may I hand up --

24       THE COURT:  Please, yeah.

25       THE WITNESS:  Oh, thank you.

1              <u>DIRECT EXAMINATION</u>

2    **BY MR. HAYNES:**

3    **Q.**   Good morning, Mr. LeGall.

4    **A.**   Good morning.

5    **Q.**   Could you just please introduce yourself to the jury?

6    **A.**   Well, I'm Didier LeGall.  I'm a retired engineer with a

7    long career.  So back maybe in the 1980s, I worked for the

8    phone company and developed some technology that we call MPEG.

9    This is the video that you see today on your phone and your PC.

10   And as a result of that, I left the phone company and joined a

11   startup in Silicon Valley in 1990.  So 35 years ago already.

12        And the startup did well, and the company was acquired in

13   2000.  And after that, I joined with some friends from that

14   company.  We formed a company called Ambarella in 2004, which

15   is relevant to this case.

16        So I'm an engineer.  I became also a bit of a business

17   leader, running some part of the company, including

18   engineering, sales, marketing, and even legal at one time.

19   **Q.**   Let me see if I can break that up a little bit.

20        You said you were an engineer.

21   **A.**   Yeah.

22   **Q.**   Do you have an engineering degree?

23   **A.**   Yeah, I have multiple engineering degrees.  I have a

24   degree from France and Germany and an M.S. and Ph.D. from UCLA.

25   **Q.**   Okay.  And in what type of engineering?

1    **A.**   This is all electrical engineering, but I ended up

2    focusing on video, digital video.

3    **Q.**   Okay.  After you graduated with an engineering degree,

4    what was your first employment?

5    **A.**   My first employment was in medical imaging.  I developed

6    computerized tomography scanner back in the 1980s.  That's

7    called CT scan those days.

8    **Q.**   Okay.  And at some point in time, were you a professor at

9    Columbia?

10   **A.**   Yes.  When I joined the phone company, I was also offered

11   the adjunct professorship at Columbia; and for about

12   five years, I taught every Wednesday at 6:00 p.m.

13   **Q.**   Okay.  What types of courses did you teach at Columbia?

14   **A.**   Well, I think they were all graduate courses, I believe.

15   Introduction level in signal processing and sometimes in video.

16   **Q.**   Okay.  And you mentioned that you did some work on MPEG.

17   Can you tell us a little bit more about that?

18   **A.**   Yes.  Well, MPEG is an activity within the ISO, which is

19   the International Standard Organization, and the goal was to

20   provide a format and an algorithm for video to be stored on

21   storage media or sent over a communication channel.  It's still

22   working today when if you talk to somebody over your phone,

23   you're still using MPEG or MPEG-related technology.

24   **Q.**   Now, I think you said you were a founder of Ambarella.  Do

25   you still work there today?

1  **A.**   No.  I'm retired.  I retired about two years ago.

2  **Q.**   Okay.  And when did you start Ambarella again?

3  **A.**   2004 when the company started.

4  **Q.**   So from that time period of 2004 to 2023, were you

5  employed by Ambarella that whole time?

6  **A.**   Yes.

7  **Q.**   So can you just explain to us in a little more detail what

8  is Ambarella and what kind of products does it make?

9  **A.**   Okay.  Well, Ambarella was created to promote and develop

10  products based on the newer compression standard at the time

11  called MPEG-4 or sometimes AVC.  So if you've seen the file on

12  your computer that is .mp4, that's it.

13      And we started early in 2004, and we worked really hard

14  and got a first chip to show working in early 2005.  This chip

15  was a bit of a breakthrough and found immediately a use in

16  broadcast system, like operator like DirecTV, Comcast started

17  using Ambarella chip to send HDTV.  There was a time where TV

18  was replaced by HDTV in everybody's home around 2005.

19      And --

20  **Q.**   Okay.  Now, in your role at Ambarella, did you interact

21  with customers and potential customers for Ambarella's chips?

22  **A.**   Yes.  I did run the business unit on broadcasting, and I

23  also -- at that time, it was small company -- I run sales and

24  marketing.

25  **Q.**   Okay.  I want to try to focus you in on a particular time

 1  period that -- and we've heard a lot about it in this case, the

 2  2008 to 2009-2010 time period.  Do you have that in mind?

 3  **A.**    Right.

 4  **Q.**    Do you have that in mind?

 5  **A.**    I'm sorry.  What -- what is your question?

 6  **Q.**    I want you to focus in that time period.  Do you have that

 7  time period in mind?

 8  **A.**    Yes, absolutely.

 9  **Q.**    Can you just describe at a high level what chips Ambarella

10  was working on in that time period?

11  **A.**    Well, I think in that time frame there was -- Ambarella

12  was shipping in volume a chip called A2, which was used both

13  for early -- early cameras.  You know, it was a time when the

14  camera abandoned the tape and went using flash memories.  That

15  was a big breakthrough in 2004.  All the cameras had the tape,

16  you know, VHS or Beta, all those things.  And by 2009, most

17  cameras had a flashcard.

18      And the other business unit was, again, that broadcast

19  thing.  And the A2 chip, the first chip that commercialized was

20  serving both markets.

21  **Q.**    Okay.  And when was the A2 chip launched commercially?

22  **A.**    I think 2005.

23      **MR. HAYNES:**  All right.  Let's bring up DTX-2041.  If

24  we could just show the witness the document first.

25  \\\

1  BY MR. HAYNES:

2  **Q.**   What is this document?

3  **A.**   Okay.  This is a -- well, I see only the first slide.  Oh,

4  yeah.  June 2008.

5       So this is a company presentation of the

6  Ambarella Corporation that I probably made at the time using

7  PowerPoint, and it was meant to present to customer or

8  potential customer.

9  **Q.**   Okay.  And did Ambarella create presentations like this in

10 the ordinary course of its business back in the 2008 time

11 period?

12 **A.**   Oh, yes, I did all the time.  Still does.

13 **Q.**   And were you familiar back in that time period with this

14 particular presentation that's in DTX-2041?

15 **A.**   I'm sorry?

16 **Q.**   Were you familiar with this presentation?

17 **A.**   Oh, yes, yes.  Again, I mentioned that I think I wrote it.

18       **MR. HAYNES:**  Okay.  We move to admit DTX-2041.

19       **MR. KEVILLE:**  No objection, Your Honor.

20       **THE COURT:**  It's admitted.

21   (Trial Exhibit 2041 received in evidence.)

22 BY MR. HAYNES:

23 **Q.**   Okay.  Now, you said this was presented to customers.  Do

24 you recall which customer this particular presentation -- we

25 can show it to the jury -- was presented to?

1   A.   Well, you know, we -- our largest market was at that time

2   in Asia, and there was Japan, Korea, and Taiwan were the big --

3   the big things.  So this was probably made for the Japanese and

4   the Koreans.  You'd probably give the same story to Sony,

5   Canon, and Samsung.

6   Q.   Let's turn to page 9 in this document.

7        Can you just describe what we're seeing here and how the

8   Ambarella chip fits into the overall architecture of a camera?

9   A.   Yes.  So this is the A2 chip, and the idea was to have a

10  chip that helped make a camera with essentially no other

11  silicon components.  So there was a lens; a CMOS sensor, which,

12  you know, is made of silicon but is a kind of different

13  technology; and at the other end, you have a storage media, a

14  flashcard.  You know, we still use those today.  And the chip

15  was trying to do everything else, you know, short of power

16  supply and things like that.

17  Q.   Okay.  And so the Ambarella chip, is that what is in the

18  Box A2 that we're seeing on this slide?

19  A.   Yes, the Ambarella chip.  And as you see, in this box,

20  there is, like, three big module.  One is this broadcast

21  quality video compression engine, the other one was the image

22  processing pipeline to take the data from the CMOS sensor, and

23  under it you have system function that dealt with the CPU and

24  all the peripherals and talked to the storage medium.

25  Q.   Okay.  And did the Ambarella A2 chip, did that have the

1  capability to record a higher-resolution video stream while

2  outputting a lower-resolution video stream?

3  **A.**   Well, it was possibly an idea, but frankly, this is the

4  reason why the A5 chip was designed.

5  **Q.**   Okay.  Now, just in general, in terms of -- we've been

6  hearing about camera processors like the A2 chip.  What is that

7  doing inside of the camera?  How would you describe it?

8  **A.**   Well, again, Ambarella produces a reference design, which

9  is a box that has the lens, the CMOS sensor, the chip, its

10  power supply, and the flashcard.  And that's a camera except

11  the form factor doesn't look right, but it's a camera.

12  **Q.**   All right.  Let's look at Slide 12 of the same

13  presentation.

14      Can you explain to us what we're seeing here on this

15  slide?

16  **A.**   Well, this is a rough diagram version of the previous

17  slide.  So you get the image sensor and the lens and the LCD

18  module, which is a display.  You know, in general, people like

19  a camera that shows the preview.  And at the end, you get the

20  flash memory, which is the storage device, SD card, something

21  like that.

22  **Q.**   Okay.  So you mentioned a preview.  Where would that

23  preview video be shown in this diagram?

24  **A.**   Where would it be shown?

25  **Q.**   Yeah.  What component?

1    **A.**   Well, you know, you get your camera, like today you have a
2    phone and there's a big screen and you see the picture there,
3    and that's the preview and that's the LCD module.
4    **Q.**   Okay.  All right.  Let's turn to page 40 of this document,
5    DTX-2041.  This is titled "Product Schedule."
6        Can you explain to us what is being illustrated here?
7    **A.**   Yes.  This is a time picture of the product line in 2008.
8    So A2 was a nice success and the company did well, but it was
9    too expensive for the market.  So there was A2s, which was
10   basically much of the same, a little bit cheaper.
11       And A3 was a chip that was made for the Japanese Toshiba,
12   and it turned out that there was a big turmoil in Japan at the
13   time, so Toshiba closed their camera business and we all moved
14   to A5.
15   **Q.**   Okay.  And what does this show in terms of Ambarella's
16   work schedule with respect to the A5?
17   **A.**   Well, you know, it shows here that A5 was shipping in
18   samples, at least, in Q4 2008.
19   **Q.**   Now, were there multiple versions of the A5 chipset?
20   **A.**   Well, this is a marketing issue.  Sometimes the
21   businesspeople use the same silicon and have a different grade.
22   They -- actually, the same silicon but the feature set and the
23   software that goes with it is a little bit different.  So there
24   was A550, A555, those type of things.
25   **Q.**   Are you familiar with a chip called the A5s?

1   **A.**   Yeah.  So the A5s is a 2009 chip that was like the A2s to

2   the A2.  It was a cost reduction that had a slightly different

3   CPU and was a better product overall.

4   **Q.**   Okay.  Let's go to Slide 29.

5        Now, at the top of this slide, there's a reference to

6   "Dual Stream HD & Mobile Recording."  Then below that it says,

7   "Simultaneous Full HD & Mobile Video Recording."

8        What is that referring to?

9   **A.**   Well, it was a very important contribution there.  It

10  turns out that the full HD, which is -- you know, HD is 1920 by

11  1080, so a big screen, 2 million pixel, generates -- at that

12  time it generated pretty big bit streams.  You know, the

13  compressed file was so big that you could not transmit it

14  easily and it would, you know, fill the storage device

15  relatively quickly.

16       So you also wanted to have a tinier one, you know, 320 by

17  240.  That's kind of a -- that's kind of a little window.  That

18  is much easier to share, transmit, and go over a network.  So

19  it was considered essential that you'd have at the same time a

20  high-resolution stream, you know, the source, and the lower

21  resolution.

22  **Q.**   I see there's an iPod pictured in the lower right.  At

23  this point in time in 2008, had Ambarella contemplated that its

24  A5 and A5s chips would be able to output a lower-resolution

25  video for display --

1    **A.**   Oh, yeah, they were able to, there's no question, and it

2    was demonstrated.

3    **Q.**   Now, at this point in time in 2008, had Ambarella

4    considered the concept of being able to transmit that

5    lower-resolution stream out from its chip so that the camera

6    could wirelessly send it to something like an iPod?

7    **A.**   Well, it's a complicated question.   Ambarella definitely

8    considered sending the lower-resolution stream over a network,

9    but sending it to the iPod was not something that was easy to

10   do, nor Apple was not really willing to cooperate on those type

11   of things.

12   **Q.**   So with respect to the iPod, when you say Apple wasn't

13   willing to do it, was that because the technology didn't exist

14   to do it or because Apple restricted the ability of third

15   parties to access their device?

16   **A.**   Well, Apple liked to own their own platform and all the

17   features.   That's not changed.

18   **Q.**   Okay.   But was -- in terms of technical capability of your

19   chip, was it capable of outputting a lower-resolution stream

20   for wireless transmission?

21   **A.**   Well, we would need an accessory chip, a wireless

22   transmitter, and I think we had identified a chip by Atheros at

23   the time.

24   **Q.**   Right.   So at this point in time, the A5 and A5s chips

25   themselves did not have a wireless transceiver on them; is that

1   right?

2   **A.**    That's right.

3   **Q.**    So in order to send the low-resolution stream wirelessly,

4   you would have to first send the stream to a wireless

5   transceiver chip that could then send it on?

6   **A.**    That's right.

7   **Q.**    And you mentioned Atheros.  At this point in time, was

8   Ambarella already talking to Atheros about using their WiFi

9   chip for that purpose?

10  **A.**    I don't know in 2008, but definitely in 2009 this is to

11  be -- it's a fact.

12  **Q.**    Now, you mentioned you did some work -- I think you said

13  Sony may have been one of the companies that saw this

14  presentation.  Did -- at this point in time, had Ambarella --

15  in 2008-2009, had Ambarella worked with Sony to transmit a

16  lower-resolution stream for sending out over the Internet?

17  **A.**    Well, that's a very loaded question with Sony.  We showed

18  the concept, and they liked the idea, but they wanted a

19  different chip, which we eventually worked on, that had a

20  stronger CPU.  But the concept was proven back then.

21  **Q.**    Okay.  Now, did Ambarella have a software stack that

22  would -- they would provide to customers that would enable

23  those customers to use their image processors to take the

24  lower-resolution stream and get it to a WiFi transceiver for

25  transmission?

1  **A.**  Well, here, again, very loaded question here.  You can

2  always do that, but it turned out that if you want to

3  communicate using WiFi in a protocol, you really need to run

4  Linux on the chip because only Linux has all the bells and

5  whistles to deal with exceptions, and there's many of those

6  in -- in WiFi.  So Ambarella decided to have a special software

7  stack that included Linux as well as the onboard OS.

8  **Q.**  Okay.  And was the purpose of including Linux to enable

9  the Ambarella image processors to be able to communicate with

10  an external WiFi chip, for example?

11  **A.**  Yes, with the -- for instance, the Atheros chip and then

12  run a proper, you know, Ethernet protocol or proper WiFi

13  protocol in this case.

14  **Q.**  And had Ambarella developed that Linux software stack

15  prior to December of 2009?

16  **A.**  I'm not sure about developed but definitely had conceived

17  it.  I don't think it was shipped at that time, but it got

18  shipped later.

19  **Q.**  Okay.  Now, this concept we looked at of the dual

20  recording and the lower -- the high-resolution stream and the

21  lower-resolution stream, is -- who came up with that?

22  **A.**  Well, I think, you know, there is maybe a debate in

23  Ambarella whether Fermi Wong, our CEO, or myself, the EVP,

24  invented.  Say we both did it together.

25  **Q.**  Okay.  Somebody at Ambarella.  Is that fair?

1   **A.**   At least two people at Ambarella.

2   **Q.**   Okay.  And we'll come back to that.

3        Let's look at another document.

4             **MR. HAYNES:**  If we could pull up DTX-2047.

5   **BY MR. HAYNES:**

6   **Q.**   Do you recognize this document?

7   **A.**   Yes.

8   **Q.**   And what do you recognize it to be?

9   **A.**   So this is a presentation a little bit later in 2009 that

10  introduced the A5s.  As I think I told you, A5s is a cost

11  reduction and slight enhancement of the A5.

12            **MR. HAYNES:**  I would offer DTX-2047.

13            **MR. KEVILLE:**  No objection, Your Honor.

14            **THE COURT:**  It's admitted.

15       (Trial Exhibit 2047 received in evidence.)

16  **BY MR. HAYNES:**

17  **Q.**   Okay.  And I think you said the date on this document is

18  November 15th, 2009; is that right?

19  **A.**   Yeah, that's what it said, so...

20  **Q.**   And then across this one on the front at a diagonal it

21  says "For Zoom Only."  What's that referring to?

22  **A.**   I'm sorry?  Oh, okay.  That's very interesting.

23       Zoom is a company in Japan that I worked with.  They --

24  they have a very interesting concept.  It didn't go very far in

25  terms of volume, but they had a very interesting concept of

 1  having a very, very good sound system associated with the

 2  camera.

 3  **Q.**   If we could turn to page 20 of this document.

 4      So on page 20 it references "Advanced Dual-Stream" and it

 5  states [as read]:

 6          "A5s dual stream is targeted for 'real'

 7      deployment."

 8      Then below that it states [as read]:

 9          "Low-resolution support CABAC and CAVLC

10      (iPod-Compatible)."

11      Do you see that?

12  **A.**   Yes.

13  **Q.**   What's that describing?

14  **A.**   Okay.  Well, that's getting into some detail of the MPEG

15  standard.  MPEG-4 AVC has two variable length code, CABAC and

16  CAVLC.  They are both variable length code.  And CABAC is more

17  difficult to implement.  And some cheaper product at the time

18  did support CABAC, and Ambarella chip initially only supported

19  CABAC.  So in A5s it was fixed, and we support both CABAC and

20  the CAVLC, which is the poor man's version.

21  **Q.**   So at least by November 2009, was the A5s chipset capable

22  of recording a high-resolution video while simultaneously

23  recording a low-resolution video that you could display on, for

24  example, iPod?

25  **A.**   Well, the iPod is a more complicated things because,

1  again, you -- the only way you would do it at the time would be

2  to store the device and feed it some other way to the iPod

3  because there was no wireless communication to the iPod.

4  **Q.**   Okay.  What about wireless devices in general?  Was

5  that -- had Ambarella at this point in time of November 2009

6  contemplated using their A5s chip to output a low-resolution

7  stream that could be wirelessly sent to a portable device for

8  display?

9  **A.**   Yes, but it was in -- more in different concept because

10  wireless to a phone device would not work in 2009, but you

11  could -- at least on paper.  I don't think it was made happen

12  until mid-2010.

13       But in 2009, you'd send the data over a wireless network,

14  like, for instance, talking -- if you have WiFi at home, you

15  could send to your PCs using WiFi.

16       **MR. HAYNES:**  Okay.  All right.  Let's bring up another

17  document, DTX-2048.

18  **BY MR. HAYNES:**

19  **Q.**   Do you recognize this document?

20  **A.**   Yes.

21  **Q.**   And what do you recognize this to be?

22  **A.**   Yes, I do.

23  **Q.**   What do you recognize it to be?

24  **A.**   It's -- it's a presentation, business presentation, about

25  the hybrid concept for Premier, which is a leading Taiwanese

1    OEM.

2    **Q.**   And was this document prepared in the ordinary course of

3    Ambarella's business?

4    **A.**   Yes.

5    **Q.**   And were you familiar with it at the time it was prepared?

6    **A.**   Yes.  It's probably a derivative of something I prepared.

7              **MR. HAYNES:**  Okay.  I would offer DTX-2048.

8              **MR. KEVILLE:**  No objection.

9              **THE COURT:**  It's admitted.

10    (Trial Exhibit 2048 received in evidence.)

11    **BY MR. HAYNES:**

12    **Q.**   All right.  Let's turn to the fourth page of this

13    document.  The title is "A5 Launched at CES 2009."

14         Can you explain what we're seeing here?

15    **A.**   Yes.  So in the consumer electronic, CES, which stands for

16    Consumer Electronic Show, which always happened the second week

17    of January in Las Vegas, is the big event.  It's a little bit

18    less big now, but back then, you know, a million people would

19    show up in Vegas just after the new year, and that's where a

20    company like Ambarella would introduce its product.

21         And all the Asian OEM -- that will be the Taiwanese, the

22    Korean, and the Japanese -- will come and schedule meeting and

23    watch the chip working and all its features.  So it was the big

24    show.

25         Typically, Ambarella would prepare CES three or

1    four months earlier and decide what to show in January 2010, or

2    2009 in this case.

3    **Q.**   Okay.  And so by January of 2009, had Ambarella publicly

4    launched the A5 chipset at CES?

5    **A.**   Definitely.

6    **Q.**   Let's look at page 7 of the same document.

7        And this is an Ambarella A5 block diagram, and I want to

8    ask you about the boxes that are on the right-hand side of this

9    diagram.  What are those representing?

10   **A.**   Well, they're all the interfaces for the developer and

11   also for the application.  So things like I2C, GPIO, I think

12   UART would be interfaces to exchange data with the outside

13   world, including a WiFi chip or another communication device.

14       **MR. HAYNES:**  And if we could turn to Slide 20.

15   **BY MR. HAYNES:**

16   **Q.**   It's a similar figure to what we saw before, but can you

17   just tell us what we're seeing here?

18   **A.**   Yes.  So dual stream, well, it's the same concept.  You

19   have the high-resolution HD, which is bulky.  You know, it's

20   about at that time maybe 10, 15 megabits per second, which,

21   you know, is large.  And you'd have the -- the small one, which

22   is 320 by 240 30P, which is much tinier.  It's probably

23   256 kilobits or something.  So something very easy to share.

24       And, you know, we still used at that time the concept of

25   iPod which, you know, probably became iPhone, but then Apple

1    didn't play game with us, so...

2    **Q.**   Fair to say that at this point in time, Ambarella had in

3    its mind the ability to transmit the low-resolution stream for

4    display on a portable device?

5    **A.**   Yes.

6    **Q.**   All right.  Let's look at DTX-3899.

7         It's a little small, but if you could just take a look and

8    tell me if you recognize what this is.

9    **A.**   Yeah.  So this is an extract of Ambarella's, you know,

10   sales system.  And it shows, you know, the customer, the

11   customer name, and, you know, when was the purchase order

12   generated and when was it invoiced, what was shipped, and even

13   the quantity and the price.  So maybe we're good to focus on

14   the first column.

15   **Q.**   Before we get to that, is this -- this type of sales

16   record something that Ambarella kept in the ordinary course of

17   its business back in the 2008, 2009, 2010 time frame?

18   **A.**   Well, it was on the computer system; and if you want to

19   write a report and ask a shipment of A5 product, you'll

20   generate a report like this.

21         **MR. HAYNES:**  Okay.  I offer DTX-3899.

22         **MR. KEVILLE:**  No objection.

23         **THE COURT:**  It's admitted.

24        (Trial Exhibit 3899 received in evidence.)

25   \\\

1  BY MR. HAYNES:

2  Q.  Okay.  So now let's look at some of the particular entries

3  of what was sold and when.  Okay?  And let's just start with

4  the very top line there.

5     There's an invoice date of July 4th, 2008.

6  A.  Yes.

7  Q.  Can you explain to us what was being invoiced there and

8  when it was shipped?

9  A.  So that was a sample of the chip -- hundred sample of the

10 A5 chip.  And the A599 is the generic version of the A5 that

11 does everything.  And the customer was actually SEC, which

12 stands for Samsung Electronic.

13 Q.  Okay.

14 A.  A big guy.

15 Q.  Okay.  So as of July 4th, 2008, had Ambarella sold the A5

16 chipset to customers?

17 A.  Well, yes.

18     MR. HAYNES:  Okay.  All right.  Let's go to page 6,

19 and if we could, just blow up the entries down about a third of

20 the way down where it says "BOSCH" in all caps.

21     THE WITNESS:  Yes.

22 BY MR. HAYNES:

23 Q.  Okay.  So looking at the two Bosch entries at the top, can

24 you tell us what's being sold there?

25 A.  Well, first, this is the first shipment of A5s.  And Bosch

1    is a very important German company that does automotive

2    electronic, but also is a key player in home security system --

3    professional security systems.

4         And Ambarella chip with the dual stream had the capability

5    of storing HD and shipping HD over a wireless -- a network.  It

6    was probably wired in the case of Bosch.  And there was the

7    IP Cam shipments.  So IP Cam is a very complex product that it

8    stands for Internet protocol camera.  And Bosch was the first

9    customer, and I'm very proud to say they still are today.

10   **Q.**   Down below there's a couple more entries.  The one at the

11   very bottom that we're seeing here says "A5s EVK."  Can you

12   tell us what that's referring to?

13   **A.**   Well, EVK stands for evaluation kit.  An evaluation kit is

14   actually the box I described earlier with a lens, a sensor, the

15   chip, power supply, and some interface so that our customer,

16   given the appropriate software, can play and explore the

17   capability and develop their own product.

18   **Q.**   So the date on the Bosch sale was November 5th, 2009; is

19   that right?

20   **A.**   Well, I have no idea.  This is -- I forgot what this two

21   column nine and -- anyway --

22   **Q.**   Yeah.

23   **A.**   -- November 2009.

24   **Q.**   Okay.  So at least by November 2009, Ambarella had sold

25   both the A5 chip to customers as well as the A5s chip to

1    customers; is that true?

2    **A.**    Samples, yes, all.

3    **Q.**    And in the samples that they sold, did those chips have

4    the dual-recording functionality that would record both a

5    high-resolution stream and a low-resolution stream?

6    **A.**    For Bosch, definitely it did, but it was a slightly

7    different software environment than for a camera.

8    **Q.**    Okay.  Let's look at another document, DTX-2479.

9           Do you recognize this document?

10   **A.**    Yes.  So -- oh, so this is a CES 2009 press release.

11   **Q.**    And what is the press release announcing?

12   **A.**    Well, this is the A5 announcement, and it described full

13   high-definition, HD, recording and simultaneous dual-resolution

14   for fast Internet sharing.

15           **MR. HAYNES:**  Okay.  Your Honor, we offer DTX-2479.

16           **MR. KEVILLE:**  No objection.

17           **THE COURT:**  It's admitted.

18       (Trial Exhibit 2479 received in evidence.)

19   **BY MR. HAYNES:**

20   **Q.**    Okay.  I think you started reading from a document.  Let's

21   see if we can bring up where you were reading from.

22       Do you see there there's a paragraph that begins [as

23   read]:

24           "The A5 platform enables key hybrid camera

25           functions such as 10 megapixel still images, full

1          high-definition (HD) recording, and simultaneous

2          dual-resolution recording for fast Internet sharing"?

3          Did I read that right?

4     **A.**    Yes.

5     **Q.**    Okay.  So at this point in time, had Ambarella told the

6     world in a press release that its A5 chip could record at two

7     resolutions and output the lower resolution over the Internet?

8     **A.**    That's correct.

9               **MR. HAYNES:**  All right.  Let's bring up DTX-3848.

10    **Q.**    Do you recognize this document, Mr. LeGall?

11    **A.**    Yes.  This is a similar document a year later with A5s.

12    **Q.**    Okay.  And I called you Mr. LeGall.  You're -- is it

13    Dr. LeGall or Mr. LeGall?

14    **A.**    It's Dr. LeGall.

15    **Q.**    Doctor.  I apologize for calling you Mister.

16    **A.**    However, Dr. LeGall in the U.S. is for M.D.s  So my son

17    is Dr. LeGall, but I'm just engineer.

18    **Q.**    Fair enough.

19               **MR. HAYNES:**  Okay.  I offer DTX-3484.

20               **MR. KEVILLE:**  Object, Your Honor.  This is not a

21    document that came from Ambarella.

22               **MR. HAYNES:**  Well, I'll lay a more --

23               **THE COURT:**  Do you want to lay a foundation?

24               **MR. HAYNES:**  Sure, I'll lay a foundation.

25    \\\

 1    **BY MR. HAYNES:**

 2    **Q.**    Do you recognize this document?

 3    **A.**    This one?

 4    **Q.**    Yes.

 5    **A.**    The A5s press release?

 6    **Q.**    Yes.

 7    **A.**    Yes.

 8    **Q.**    Do you recognize it?

 9    **A.**    Yes.  It was a --

10    **Q.**    What do you recognize it to be?

11    **A.**    This was a press release made by Ambarella to be shared to

12    the press a few days prior to CES, and the purpose was to have

13    the technical press mention it --

14    **Q.**    Okay.  And was this --

15    **A.**    -- to generate traffic.

16    **Q.**    Was this prepared in or around January of 2010?

17    **A.**    It was probably prepared way before that.

18    **Q.**    Was it at least in January of 2010?

19    **A.**    Definitely.  But typically, those things are finalized way

20    before Christmas.

21    **Q.**    Okay.  Fair enough.

22          **THE COURT:**  All right.  It's admitted.

23          (Trial Exhibit 3484 received in evidence.)

24          **MR. HAYNES:**  And, again, if we would, let's just look

25    down at the bottom where it says -- I think it may be on the

1    next page.

2        Go back up to the front.  To the top, please.

3    **BY MR. HAYNES:**

4    **Q.**  Yeah, beginning right around here, three-quarters in that

5    first paragraph, it says [as read]:

6            "The new A5s delivers full high-definition (HD)

7        recording, 14 megapixels of still photography, and

8        the ability to capture HD and Internet video

9        simultaneously."

10       Do you see that?

11   **A.**  Yes.

12   **Q.**  So at this point in time in January of 2010, had Ambarella

13   announced to the world that its A5s image processor could

14   record two video streams, one at high resolution, one at low

15   resolution, and share the low resolution over the Internet?

16   **A.**  Yes.

17   **Q.**  Okay.  Let's look at another document, DTX-3885.

18       Are you familiar with this document?

19   **A.**  Well, yes.  Yes.

20   **Q.**  Okay.  And what do you -- what is this document?

21   **A.**  That's what in technical term is called a data sheet.  So

22   this a one-sheet document that summarized the feature to be

23   shared with customers.  So if you show up at the Ambarella

24   booth at CES, you'll get a demo, the box doing this, and you

25   get to keep this.

1    Q.    Okay.  And does this document reflect the capabilities of

2    the A5s chipset back in that time?

3    A.    Definitely.  Ambarella is pretty rigorous in not

4    announcing things that do not exist.

5    Q.    Okay.  Let's --

6         MR. HAYNES:  Your Honor, I would offer DTX-3885.

7         MR. KEVILLE:  No objection.

8         THE COURT:  It's admitted.

9         (Trial Exhibit 3885 received in evidence.)

10        MR. HAYNES:  All right.  Let's blow up, if we would,

11   the block diagram at the bottom.

12   BY MR. HAYNES:

13   Q.    And I want to focus you specifically on what's happening

14   here on the right.  Do you see there's a box labeled "SDIO x2"?

15   A.    Yes.

16   Q.    What does that SDIO box represent?

17   A.    Well, SDIO is an interface that can be used to send the

18   data on the SD card.  This is a standard interface.  And it was

19   also used to send data to a wireless chip like the Atheros.

20   Q.    Okay.  And if you look to the right of that, you see

21   there's a line coming out of the SDIO that goes into a box

22   labeled "Wireless."  What is that representing?

23   A.    Huh?  Yes?

24   Q.    You see -- what does that wireless box there that's

25   blocked in red now, what does that represent?

1    **A.**    That represent a chip, a processor, like I said the

2    Atheros, that take the data and sends them over WiFi --

3    **Q.**    Okay.

4    **A.**    -- using an 802.11n standard.

5    **Q.**    You got ahead of me there.

6         There's a reference to 802.11n.  What do you understand

7    that to refer to?

8    **A.**    This is -- was at that time the most advanced WiFi

9    protocol.

10    **Q.**    Oaky.  So in the data sheet for the A5s, was Ambarella

11    explaining to the world that you could output a low-resolution

12    video stream wirelessly over WiFi?

13    **A.**    Yes.

14         **MR. HAYNES:**  All right.  Let's turn to the next page

15    and, if we could, just bring -- blow up the very bottom part

16    that has the picture there.

17    **Q.**    Now, this says [as read]:

18         "The A5s IP Camera Development Platform contains

19         the necessary tools, software, hardware and

20         documentation to develop a professional IP camera

21         design."

22         Do you see that?

23    **A.**    Yes.

24    **Q.**    What's that talking about?

25    **A.**    Well, this is the product that Ambarella -- actually, this

1   is what was shipped to Bosch in November 2009, and it includes

2   an evaluation kit hardware, you see the picture here, lens,

3   sensor, and a board with some peripherals.

4   **Q.**   Let me break that up.

5        So you mentioned an evaluation kit hardware.  I think we

6   talked about that before as the EVK --

7   **A.**   Yes.

8   **Q.**   -- is that right?

9   **A.**   Yeah.  That's what it's called, EVK.

10  **Q.**   EVK.

11       And is what we're seeing on the right here, is that --

12  what is that in the picture?

13  **A.**   I'm sorry.  What?

14  **Q.**   In the picture where we see a circuit board with a lens

15  sticking out of it, what is that?

16  **A.**   Well, this is the EVK.  The rest is the lens and the CMOS

17  sensor.

18  **Q.**   Okay.  And then down below it, it references a software

19  development kit, or SDK.  Do you see that?

20  **A.**   Yes, uh-huh.

21  **Q.**   And when it's talking about that SDK, it mentions [as

22  read]:

23       "Royalty-free IP camera application with

24       source."

25       What's that referring to?

1   **A.**   Okay.  First, what is the SDK?  SDK is a -- is a stack of

2   software that can enable our customer, our Ambarella customer,

3   to develop a product.  And when you say "with source," it means

4   that Ambarella doesn't keep secret; it gives the whole source

5   code of the device so that the customer can differentiate.

6   **Q.**   Okay.  And then if you skip a line, it goes -- it says [as

7   read]:

8           "Linux 2.6.32 (or later) with drivers, kernel

9       patches, and toolchain."

10      What's that referring to?

11  **A.**   Well, as I mentioned earlier, if you want to go talk to

12  WiFi, you absolutely need Linux because only Linux has all the

13  software layers to deal with exceptions in WiFi.  You know, the

14  signal goes up, down, all those things.

15      So this device, this SDK here, the one shipped to Bosch,

16  included Linux and could talk to WiFi.

17  **Q.**   Okay.

18  **A.**   Or to Ethernet in general but --

19  **Q.**   Okay.  I'm sorry.  You said that shipped to Bosch.  Is

20  that what was shipped to Bosch in 2009?

21  **A.**   Yes.  That's what it says here.

22  **Q.**   And this package of materials that could be sent along

23  with the A5s chip, was that available to potential customers

24  and customers alike at this time period?

25  **A.**   Well, you know, this is an IP Cam SDK, and therefore,

1    you know, you would not give it automatically to -- to a camera

2    SDK.  It will be a little bit different.

3    Q.   And did you have camera SDKs at the same -- at this time

4    as well?

5    A.   Very similar time.  It was certainly showed at CES.

6    Q.   Now, we talked about those interfaces in one of the prior

7    documents.  Did Ambarella's camera processors at the time have

8    interfaces that would allow Ambarella's customers to send

9    control commands to change the functions of the camera?

10   A.   Yes.  You need user interface, and this is part of the

11   code and the solution that is delivered as part of the SDK plus

12   EVK.

13   Q.   Okay.  So for the SDK that Ambarella was shipping with its

14   chips, did you provide software for a user interface?

15   A.   Yeah, demo software.

16        MR. HAYNES:  All right.  Let's go back to DTX-3899.

17   And if we could, let's blow up the line that includes Funai

18   dated November 19th, '09.

19   BY MR. HAYNES:

20   Q.   Okay.  So here there's a reference to a sale of an A5s EVK

21   on November 19th, '09.

22   A.   Yes.

23   Q.   What does that -- does that mean that Ambarella had sold

24   an A5s EVK by November of 2009?

25   A.   Yes, that's what it says.  And it was shipped to Funai, a

 1  Japanese company, which developed a camera.  So the EVK was

 2  essentially the same hardware as what shipped to Bosch, but the

 3  software was different.

 4  **Q.**   Okay.  And did you ship software in November of 2009 as

 5  well?

 6  **A.**   Yes.  When you buy the EVK, you need to have an SDK too to

 7  use the EVK.

 8         **MR. HAYNES:**  Okay.  Let's pull up DTX-2039.

 9  **BY MR. HAYNES:**

10  **Q.**   Do you recognize this document?

11  **A.**   I'm not sure yet, but if you show me more, I will

12  recognize.

13         **MR. HAYNES:**  If you could just flip through the pages

14  so he can see better.

15         **THE WITNESS:**  Oh, this is the SDK document, yes.

16  **BY MR. HAYNES:**

17  **Q.**   Okay.  And is this a document that was prepared and

18  maintained in the ordinary course of Ambarella's business?

19  **A.**   Yes.

20         **MR. HAYNES:**  We offer DTX-2039.

21         **MR. KEVILLE:**  No objection.

22         **THE COURT:**  It's admitted.

23     (Trial Exhibit 2039 received in evidence.)

24  **BY MR. HAYNES:**

25  **Q.**   Okay.  This document is dated March 22nd, 2010.  Do you

1    see that?

2    **A.**    Yes.

3    **Q.**    And it is being distributed for SDK.  So what's this

4    document generally used for at Ambarella?

5    **A.**    Well, this is a manual.  As, again, I mentioned, SDK is a

6    pile of software with source code; and this is, like, the user

7    manual for that source code to say what the file do, et cetera.

8    And this is where at least 1.1, which was done, again, in

9    March 2010, or at least 1.0 was probably shipped later in 2009.

10   **Q.**    Okay.  Let me shift gears a little bit and talk about

11   Ambarella's work with Contour.

12        Were you involved in discussions with Contour in the 2009

13   and 2010 time frame?

14   **A.**    Yes, I was.

15   **Q.**    And when do you -- when do you recall first interacting

16   with Contour?

17   **A.**    I -- I remember some exchange with the Contour technical

18   person probably in September 2009.

19   **Q.**    Okay.  And who did you primarily interact with at Contour

20   in that time period?

21   **A.**    Their technical lead was Laura O'Donnell.

22   **Q.**    Now, when you were interacting with Ms. O'Donnell in late

23   2009, did you share with her the capability of Ambarella's A5

24   and A5s chips?

25   **A.**    Yes.

```
 1            MR. HAYNES:  All right.  If we could, let's pull up
 2   DTX-2006.
 3   BY MR. HAYNES:
 4   Q.   Do you recognize this exchange?
 5   A.   Yes.
 6   Q.   Okay.  And is that Didier LeGall that's identified in the
 7   "to" line, is that you?
 8   A.   Yes.
 9            MR. HAYNES:  We would offer DTX-2006.
10            MR. KEVILLE:  No objection.
11            THE COURT:  It's admitted.
12       (Trial Exhibit 2006 received in evidence.)
13   BY MR. HAYNES:
14   Q.   This is an email from Laura O'Donnell to you, Dr. LeGall,
15   as well as some others at Ambarella.  Do you see that?
16   A.   Hmm?
17   Q.   This is an email from Laura O'Donnell --
18   A.   Yeah.
19   Q.   -- to you dated August 15th, 2009; is that right?
20   A.   That's right.
21   Q.   Okay.  In the first sentence, Ms. O'Donnell states [as
22   read]:
23            "I appreciate your time yesterday.  With the
24       reference designs you have, it is relatively easy to
25       produce HD cameras these days . . . ."
```

1     What did you understand Ms. O'Donnell to be referring to

2  when she discusses "the reference designs" in this email?

3  **A.**   Well, I think, considering the date, it was probably the

4  A5 SDK and reference design.

5  **Q.**   Okay.  And if we look down a little bit further, in the

6  second paragraph, it says [as read]:

7          "But even more than those improvements, I am

8      excited about the dual-stream mode and GPS

9      integration.  Customers enjoy higher-quality video,

10     but it is difficult to get them to upgrade for the

11     more subtle improvements."

12     What do you understand Ms. O'Donnell to refer to there

13 when she's referring to "dual-stream mode"?

14 **A.**   Well, I think Laura was excited about the capability of

15 having a high-quality HD and, at the same time, a lower-quality

16 more shareable piece of data.

17 **Q.**   Okay.  And is that idea, that dual-stream mode, is that

18 something that Ms. O'Donnell told to you first, or did you tell

19 it to her first?

20 **A.**   We told it to her first.

21 **Q.**   And at the time you were having this conversation in

22 August 15th -- or this email exchange in August 15th, 2009, had

23 Ambarella already been selling its A5 chipset that had that

24 dual-stream recording functionality?

25 **A.**   Yes.

 1              **MR. HAYNES:**  All right.  Let's look at another

 2   document, DTX-2007.  And if you'll scroll down in the chain.

 3   **BY MR. HAYNES:**

 4   **Q.**   And just take a look at what's shown on the screen there.

 5   Do you recognize this --

 6   **A.**   Yes.

 7   **Q.**   -- email?

 8         And is that your name in the "to" line of this email?

 9   **A.**   This is my name, yes.

10              **MR. HAYNES:**  Okay.  I would offer DTX-2007.

11              **MR. KEVILLE:**  No objection, Your Honor.

12              **THE COURT:**  It's admitted.

13         (Trial Exhibit 2007 received in evidence.)

14   **BY MR. HAYNES:**

15   **Q.**   Okay.  So now we've moved forward a little bit in time.

16   The date on this email is December 12th, 2009; is that right?

17   **A.**   Yes.

18   **Q.**   Okay.  And, again, this is an email from Laura O'Donnell

19   to John and Didier.  The "Didier" there is you?

20   **A.**   Yeah.

21   **Q.**   And who's the John that's referenced there?

22   **A.**   He's the VP of software at Ambarella.

23   **Q.**   Okay.  Is that John Ju?

24   **A.**   Yeah.

25   **Q.**   Okay.  Now, in the first line, Ms. O'Donnell states [as

1  read]:

2          "Thank you again for the opportunity to meet

3      this week.  I'm very pleased to hear the A5s is

4      already in Mass Production and that the SDK is at a

5      point where the functionality required for the core

6      aspects of our camera is already supported."

7      Do you see that?

8  **A.**   Yes.

9  **Q.**   What do you understand -- what did you understand

10  Ms. O'Donnell to be referring to in that sentence?

11  **A.**   Well, there's many things here.  So A5s already in mass

12  production.  You know, considering the date, we had shipped A5s

13  to a few customers.  We've seen before Funai and Bosch.

14      And the -- and the functionality requirement for the core

15  aspect is supported, this Web feature included in the SDK.

16  **Q.**   So at this point in time, had you told Ms. O'Donnell at

17  Contour that -- the capabilities of your chip, as well as that

18  you had support in your SDK for the core functions of the

19  camera?

20  **A.**   Yes.

21  **Q.**   And that software in the SDK, is that something that

22  Ambarella developed or is that something that Contour

23  developed?

24  **A.**   Ambarella developed everything there.

25  **Q.**   Now, at this point in time, I think you said that

1    Ambarella was looking at WiFi for its wireless support; is that

2    right?

3    **A.**   It was working on WiFi mostly in the context of IP Cam at

4    that time.

5    **Q.**   Yeah.  But at this point in time, had Ambarella developed

6    support for Bluetooth wireless devices?

7    **A.**   Probably not.

8    **Q.**   Okay.  And at this point in time, do you recall which

9    wireless protocol Contour was most interested in?

10   **A.**   I'm not sure they knew.

11   **Q.**   Okay.  All right.  Let's go to DTX-2049.  Do you recognize

12   this document?

13   **A.**   Yes.

14   **Q.**   And what do you recognize it to be?

15   **A.**   A data sheet for the A5s.

16   **Q.**   Okay.  And there's -- and is this document prepared in the

17   ordinary course of business at Ambarella?

18   **A.**   Yes.  That's a very standard document that's --

19   **Q.**   Yeah.

20          **MR. HAYNES:**  If we could bring up -- or I offer

21   DTX-2049.

22          **MR. KEVILLE:**  No objection.

23          **THE COURT:**  It's admitted.

24      (Trial Exhibit 2049 received in evidence.)

25          **MR. HAYNES:**  Okay.  If we could bring that up for the

LeGALL - DIRECT / HAYNES

1   jury.

2   **BY MR. HAYNES:**

3   Q.   You see here there's another watermark going diagonally

4   across the page.  It's a little hard to read, but it says "For

5   Contour/VholdR Only."  Do you see that?

6   A.   Yes.

7   Q.   What does that reflect?

8   A.   Well, at that time Contour was a brand and VholdR was the

9   name of the corporation that owned the brand.

10  Q.   And so is this -- was this document provided by Ambarella

11  to Contour?

12  A.   Yes.  That's why it was watermarked.

13  Q.   And this was --

14  A.   It was under NDA.

15  Q.   Right.

16       And this was provided, the date of the document is

17  November 19th, 2009; is that right?

18  A.   I'm sorry.  I said under NDA, non-disclosure agreement.

19  Q.   Okay.

20  A.   That's what the diagonal shows here.

21  Q.   Okay.  So in November 19th, 2009, had Ambarella provided

22  Contour with this document relating to the capabilities of the

23  Ambarella A5S55 chipset?

24  A.   Yes.

25            **MR. HAYNES:**  If we could, let's bring up another

1    document.  This is DTX-2032.

2    **BY MR. HAYNES:**

3    **Q.**   Do you recognize this document?

4    **A.**   (Witness examines document.)  Yes, I guess.  Yes.  Yeah.

5    **Q.**   And what do you recognize it to be?

6    **A.**   Well, this is -- this is the solution that Ambarella found

7    to have a coexistence of the software stack for the camera

8    application and Linux at the same time.  So it has a

9    dual-operating system microITRON, which is a standard RTOS, and

10   Linux, which is needed to do a -- operate Internet or WiFi.

11   **Q.**   Okay.  So is this -- the Linux that's being referenced

12   here, is that related to when you were describing you needed

13   Linux to talk to an external WiFi chip?

14   **A.**   Yes.

15   **Q.**   And is this document -- well, what does this document

16   describe about Ambarella's development of that Linux software

17   to communicate with external WiFi chips?

18   **A.**   (Witness examines document.)

19   **Q.**   Sorry.

20   **A.**   Sorry?

21   **Q.**   Let me ask a slightly different question.

22   **A.**   I was not sure it was a question.

23   **Q.**   Oh.

24        **MR. HAYNES:**  Your Honor, I would offer DTX-2032.

25        **MR. KEVILLE:**  No objection.

1              **THE COURT:**  It's admitted.

2         (Trial Exhibit 2032 received in evidence.)

3   **BY MR. HAYNES:**

4   **Q.**   Okay.  Now that the jury can see it, I think you mentioned

5   Ultron.  Is that the box that's on the left over here?

6   **A.**   Yeah, it's micro.  The "U" stands for the microITRON.

7   This is a Japanese-based operating system that Ambarella used

8   based on request from Japanese customers.

9   **Q.**   Okay.  And then on the right there it says, "Linux User

10  Space."  What was the Linux user space being used for?

11  **A.**   Well, again, as I mentioned, it was necessary to run Linux

12  to have reliable wireless or even Ethernet communication on a

13  cable, and Linux was used in the Bosch product that was shipped

14  already by then.

15             **MR. HAYNES:**  If we could turn to page 10 of this

16  document.

17  **BY MR. HAYNES:**

18  **Q.**   Here it says "Streaming Description," and it says [as

19  read]:

20             "While Video Recording, the secondary stream

21        will be streamed out and played by client on PC or

22        smartphone."

23        Do you see that?

24  **A.**   Yes.

25  **Q.**   What's that describing?

1    **A.**    Well, we already discussed, I think, at length the concept

2    of secondary stream, the small one that is easy to share and it

3    will be streamed out on the PC or on a smartphone.  It turned

4    out, as Ambarella found out later, that going to the smartphone

5    would be more difficult.

6    **Q.**    And, again, was that difficulty because of a lack of

7    capability in the Ambarella chips, or did it have something to

8    do with restrictions that Apple put in place on its iPhone?

9    **A.**    It had to do with restriction at the time --

10    **Q.**    Okay.

11    **A.**    -- that --

12    **Q.**    Now, do you recall when Ambarella began working with GoPro

13    to make use of Ambarella's chips in GoPro's cameras?

14    **A.**    Yes, I was aware of it.

15    **Q.**    Okay.  And approximately when were those discussions

16    taking place?

17    **A.**    About the same time, 2009.

18    **Q.**    Okay.  And were you the point person for GoPro during this

19    time period for Ambarella?

20    **A.**    No, I wasn't the point person.  I had some meeting.  But I

21    was the point person for Contour.

22    **Q.**    Okay.  And in your discussions with Contour, were you

23    sharing with Contour what GoPro was working on back in that

24    time?

25    **A.**    No.

1    Q.    Okay.  Let me just ask one final question.

2          With respect to the capability of the Ambarella chip to

3    record a high-resolution stream and a low-resolution stream

4    simultaneously and output the lower-resolution stream

5    wirelessly, is that an idea that Ambarella had on its own or is

6    that something that it learned from Contour?

7    A.    It was an idea Ambarella had on its own way before it ever

8    met Contour.

9    Q.    And with respect to the generation of those two streams --

10   the high-resolution stream, the low-resolution stream -- was

11   the development of how to build those two streams and the way

12   in which they were generated simultaneously something that

13   Ambarella developed or something that Contour suggested?

14   A.    It was something Ambarella developed with dedicated

15   hardware to have full-motion video on both streams.

16   Q.    Okay.  And did Ambarella already have that capability

17   before it ever met with Contour?

18   A.    Yes.

19         MR. HAYNES:  Pass the witness, Your Honor.

20         THE COURT:  All right.  Mr. Keville.

21         MR. KEVILLE:  Thank you, Your Honor.

22                   CROSS-EXAMINATION

23   BY MR. KEVILLE:

24   Q.    Good morning, Mr. LeGall.

25   A.    Hi.

1    Q.   After GoPro added the wireless preview and control feature

2    to its cameras, GoPro's percent of Ambarella's total sales went

3    from about 5 percent to 42 percent; correct?

4              MR. HAYNES:  Objection.  Lacks foundation.

5              THE COURT:  If you know, you can answer.

6              THE WITNESS:  Hmm?  It was a question?

7    BY MR. KEVILLE:

8    Q.   After GoPro added the Contour wireless preview and control

9    feature to its cameras, GoPro's percent of Ambarella's total

10   sales went from about 5 percent to about 42 percent; correct?

11   A.   Well, I think you are suggesting that this is a Contour

12   technology, which I don't think is correct.

13        Now, there's a time probably by 2011 or 2012 where GoPro

14   was a very large customer of Ambarella.

15   Q.   You understand that Contour was the first to commercially

16   release a product with the wireless preview and control

17   feature?

18   A.   In a way, using --

19   Q.   Contour came out with that product in January 2011;

20   correct?

21   A.   This is likely, yes.

22   Q.   GoPro first came out with a product with wireless control

23   and preview feature in October 2012; correct?

24   A.   I think that's correct.

25   Q.   Okay.  And then after GoPro did that, GoPro's percent of

1    Ambarella's total sales went from about 5 percent of your total

2    sales to about 42 percent; correct?

3    **A.**    That's correct but --

4         **THE COURT:**    Okay.    Yeah, just stick with the question.

5    **BY MR. KEVILLE:**

6    **Q.**    In 2014, GoPro accounted for about 35 percent of

7    Ambarella's total revenue or about $55 million; correct?

8    **A.**    I think that's correct.

9    **Q.**    And that's why Ambarella wouldn't sell the A7 chips to

10    Contour after it came out of receivership in 2014; correct?

11    Ambarella had become very closely tied with GoPro.

12    **A.**    This is incorrect.

13    **Q.**    Okay.

14    **A.**    Ambarella never sold the A7 chip to anyone.

15    **Q.**    Okay.    You refused, you and Ambarella didn't sell to

16    Contour in 2014 because you had become closely tied with GoPro

17    and they'd become such a big part of your business; correct?

18    **A.**    This is incorrect.

19    **Q.**    Okay.    In 2015, GoPro accounted for about 30 percent of

20    Ambarella's total, which was then about 65 million; correct?

21    **A.**    That's very likely.

22    **Q.**    You all made a lot of money making chips for GoPro;

23    correct?

24    **A.**    Hmm?

25    **Q.**    You made a lot of money making chips for GoPro; correct?

1    **A.**    I suppose, yes.

2    **Q.**    Okay.  And you testified at deposition twice in this case;

3    correct?

4    **A.**    Yes.

5    **Q.**    Both times at GoPro's request; correct?

6    **A.**    I suppose, yes.  I was subpoenaed in both cases.

7    **Q.**    Both times you said you had not read the Contour patents

8    at all; correct?

9    **A.**    No, I haven't.

10   **Q.**    And that's still true today, you've never read the

11   Contour --

12   **A.**    That's still true.

13   **Q.**    You have to wait till I finish.  Otherwise, she can't take

14   down what I'm saying.

15   **A.**    This is correct, I didn't read the Contour patent.

16   **Q.**    You've never read them?

17   **A.**    No.

18   **Q.**    Okay.  In the Ambarella A5 and A5s chips that you've been

19   talking about, ARM, A-R-M, provides the CPU in that chip;

20   correct?  And the Ambarella system on a chip is controlled by

21   the ARM CPU?

22   **A.**    This is true.

23   **Q.**    Do you or anyone else from Ambarella ever identify ARM as

24   an inventor on any of your chip patents?

25   **A.**    We -- we definitely mention the ARM chip in the data

 1  sheet, and we had the license -- Ambarella had the license from

 2  ARM through Samsung.

 3  **Q.**   I'm sorry.  Maybe my question wasn't clear.

 4      Do you or anyone else at Ambarella ever identify ARM as an

 5  inventor on Ambarella's patents on its chip?

 6  **A.**   No.

 7  **Q.**   Ambarella was a vendor to Contour; right?

 8  **A.**   Yes.

 9  **Q.**   Just like ARM is a vendor to Ambarella; yes?

10  **A.**   Yes.  Actually, Ambarella was a vendor to Selex, who was

11  selling to Contour.

12  **Q.**   Okay.  Okay.  But, in any event, it's the same

13  relationship.  ARM is a vendor that you use in your products;

14  you were a vendor that Contour used in its products.  Correct?

15  **A.**   This is maybe stretching it.

16  **Q.**   Okay.  You have -- are you aware that GoPro is contending

17  someone from Ambarella -- I'm not sure who -- should have been

18  identified as an inventor on Contour's patents?

19  **A.**   No.

20  **Q.**   Okay.  You have no opinion as to whether someone from

21  Ambarella should or should not have been identified as an

22  inventor on Contour's patents, correct, because you never read

23  them?

24  **A.**   Sorry?  Can you repeat your question again?

25  **Q.**   Sure.

1    You have no opinion as to whether someone from Ambarella

2  should or should not have been identified as an inventor on

3  Contour's patents?

4  **A.**   I don't have an opinion, no.

5  **Q.**   Okay.  Ambarella chips have been used in many GoPro

6  cameras; correct?  We established that.

7  **A.**   Yeah, among others, many other customers too.

8  **Q.**   Does Ambarella consider itself or any of its employees to

9  be inventors on GoPro patents that were developed using

10  Ambarella chips?

11  **A.**   No.

12       **MR. KEVILLE:**  All right.  Can we put up -- well, hang

13  on.  Let me go to one first.

14            (Pause in proceedings.)

15       **MR. KEVILLE:**  Okay.  Can we put up 3885, which has

16  been admitted.

17  **BY MR. KEVILLE:**

18  **Q.**   Okay.  This document has no date on it; correct?

19  **A.**   Well, I think because the product was introduced at CES in

20  January 2009, this is probably dated January 2009.

21  **Q.**   I'm sorry.  Did you say the A5s was introduced at CES in

22  January 2009?

23  **A.**   Yes.

24  **Q.**   Okay.  When you were deposed in 2021, you couldn't

25  remember the date of this document?

1  **A.**   That's correct.

2  **Q.**   And today you said -- I believe in your earlier testimony

3  you said this was a January 2010 document.  Are you now saying

4  it's January 2009?

5  **A.**   This was a mistake I made at the time.  I got corrected by

6  showing the sales shipment.  You know, we had actually shipped

7  A5s late in 2009, yes.

8  **Q.**   Okay.  Is that what's making you think this is a 2009

9  document?

10 **A.**   Okay.  So this document was prepared in 2009 and shown at

11 CES on January 2010.  I made a mistake.

12 **Q.**   Oh, okay.  So you made a mistake.

13    Now you think this document is no earlier than

14 January 2010?

15 **A.**   Well, obviously, it was made earlier than that, but yeah.

16 **Q.**   Well, you don't know when it was made or who made it;

17 correct?

18 **A.**   Well, again, I was running sales and marketing, and we

19 were preparing Ambarella's CES.  So we had all the collaterals

20 ready definitely by, you know, November 2009, just to make it

21 to the show.  You don't go to a big show like this and

22 improvise at the last minute.

23 **Q.**   Sure.  And we've seen press releases that have dates, and

24 I've been through the Ambarella website and there are many old

25 documents with dates on them.  This one is not on the Ambarella

1   website.  Can you explain that?

2   **A.**   No.

3   **Q.**   And we went on the Wayback Machine.  Do you know what that

4   is?

5   **A.**   I'm sorry?

6   **Q.**   Do you know what the Wayback Machine is, the Internet

7   Archive?

8   **A.**   Yeah.

9   **Q.**   Okay.  This doesn't appear ever on any Ambarella website.

10  Can you explain that?

11  **A.**   No, no.  I mean, but a document like this one was

12  definitely showed at CES in January 5th, 2010.

13  **Q.**   And I agree there are documents from January 2010 that

14  were shown at CES that have dates on them.  This one has no

15  date.  And the ones that we've seen from January 2010 that were

16  on the CES -- or released at CES -- can you put that back up,

17  please -- don't have wireless on them.

18      Are you sure this isn't a later document that came out

19  sometime later in 2010?

20  **A.**   I have no idea, but, again --

21  **Q.**   No idea.  Thank you.

22          **THE COURT:**  Let him finish, please.

23      Was there something more that you wanted to add?

24          **THE WITNESS:**  Again, wireless was shipped to Bosch

25  earlier, so...

1    BY MR. KEVILLE:

2    Q.   We'll get to that, sir, I promise.

3         But you have no idea when this document was made or who

4    made it or when it was released?

5    A.   I don't see a date on this document today.

6    Q.   And you also have no idea who made this or when it was

7    released?

8    A.   It was made by the marketing team, obviously.

9    Q.   Right.  And you have no idea when it was released?

10   A.   My guess would be CES 2010.

11   Q.   I don't want you to guess.

12        You have no actual facts, no idea when this was released?

13   A.   I don't have facts.  You don't have facts.  We don't know.

14        MR. KEVILLE:  All right.  Let's put up Exhibit 2047.

15   BY MR. KEVILLE:

16   Q.   You talked with GoPro's counsel, and you said this was

17   from 2009; correct?

18   A.   Yeah.

19   Q.   All right.  I want to put up an earlier one.

20        MR. KEVILLE:  Can we put up 2046.

21   BY MR. KEVILLE:

22   Q.   This is a similar document that you had for Samsung;

23   correct?

24   A.   Yes.

25        MR. KEVILLE:  Your Honor, I'd offer Defendant's 2046.

1          **MR. HAYNES:**  No objection.

2          **THE COURT:**  It's admitted.

3       (Trial Exhibit 2046 received in evidence.)

4    BY MR. KEVILLE:

5    **Q.**   And this is substantially the same document with the same

6    date; correct?

7    **A.**   I suppose, yes.

8    **Q.**   Okay.  In 2009, Samsung was producing and selling mobile

9    phones and cameras; correct?

10   **A.**   Yes.

11   **Q.**   And you guys were trying to sell something to them; right?

12   **A.**   No.  We were shipping with Samsung.

13   **Q.**   Okay.  Were you shipping A5s?

14   **A.**   Nobody was shipping A5s in 2009.

15   **Q.**   Okay.  All right.

16   **A.**   It was being sampled.

17   **Q.**   All right.  Here's my question:  You went to Samsung with

18   this document in 2009 showing the potential for dual stream, a

19   high-resolution and a low-resolution stream, in the A5s;

20   correct?

21   **A.**   Yes.

22   **Q.**   Okay.  And Samsung didn't put out its first WiFi-capable

23   camera until 2012; correct?

24   **A.**   Yes.

25   **Q.**   More than a year after Contour; correct?  Yes?

1   **A.**   If I'm correct, Samsung didn't ship with WiFi -- Contour

2   didn't ship with WiFi.

3   **Q.**   January 2011 was when Contour put out a commercial product

4   with wireless capability -- thank you -- Bluetooth?

5   **A.**   With Bluetooth.  This was quite a difference.

6   **Q.**   And Samsung didn't come out with a camera with wireless

7   until 2012; correct?

8   **A.**   That's correct.

9   **Q.**   Okay.  So it wasn't obvious to them, having this 2009

10   document, that they were immediately able to put out a wireless

11   camera; correct?

12   **A.**   The difficulty came from talking to a cell phone.

13   **Q.**   This specific document has never been publicly published

14   in the United States; correct?

15   **A.**   This is a document under NDA, so it would never be

16   published.  It would be breaking the NDA.

17   **Q.**   Okay.  And just for the jury, an NDA is a non-disclosure

18   agreement; correct?

19   **A.**   Yes.

20   **Q.**   So before you gave this presentation to Samsung, they had

21   a non-disclosure agreement that said they couldn't tell anyone

22   about this; correct?

23   **A.**   Yes.

24   **Q.**   And this document and every communication you had about

25   the A5s prior to CES on January 7th, 2010, was under an NDA;

1    correct?

2    **A.**   That's correct.

3    **Q.**   All right.  Let's go to 2047.

4        This document also was under a non-disclosure agreement;

5    correct?

6    **A.**   Yes.

7    **Q.**   So this is not a public document in the United States in

8    2009; correct?

9    **A.**   No.  This is a confidential document.

10   **Q.**   Okay.  Then let's go to 2049.

11       This document was also subject to a non-disclosure

12   agreement with Contour; correct?

13   **A.**   Yes.

14   **Q.**   And this was not published in the United States in 2009;

15   correct?

16   **A.**   That's correct.

17   **Q.**   Okay.  And, by the way, in this 54-page document on the

18   A5s, you agree there's not a single mention of wireless;

19   correct?

20   **A.**   I don't know.  We should look inside.

21   **Q.**   I have, and I will tell you I've searched the whole

22   document.

23       Does it surprise you that there's not a single mention of

24   wireless in this document that you provided to Contour in

25   November 2009?

1    A.    Not necessarily, yeah.

2    Q.    No mention of WiFi, does that surprise you?

3    A.    I believe the product shipped to Bosch in 2000 included

4    Ethernet and wireless.

5    Q.    I promise we'll get to Bosch.

6         In this document, this non-public document that you sent

7    to Contour in 2009, there's no mention of WiFi; right?

8    A.    No mention of WiFi.

9    Q.    No mention of 802.11?

10   A.    Possibly as a block diagram, since we have seen one

11   before.

12   Q.    I've searched this document.  I'll tell you I didn't find

13   it.  Do you promise that you'll come back in counsel's and

14   point it out if it's in there?

15   A.    Okay.  I take your word for it.

16   Q.    Okay.  No mention of Bluetooth?

17   A.    Definitely not.

18   Q.    Okay.  You have a number of patents, Mr. LeGall; correct?

19   A.    That's correct.

20   Q.    And you understand that for something to be prior art, it

21   has to be public; correct?

22   A.    It's maybe a gray area.

23   Q.    Okay.  It has to be before the date of invention; correct?

24   A.    It has to be before the date of invention.

25   Q.    Okay.  And --

 1   **A.**    However, I believe -- anyway...

 2            **MR. KEVILLE:**  Okay.  Your Honor, do you want to take

 3   our break now, or do you want me to keep going?

 4            **THE COURT:**  No.  I want you to keep going.

 5            **MR. KEVILLE:**  Okay.

 6   **BY MR. KEVILLE:**

 7   **Q.**    Let's go to 2041.  Okay.  This document was confidential

 8   to Canon delivered under a non-disclosure agreement; correct?

 9   **A.**    This was the one to Canon?  It doesn't say so.  You tell

10   me this is a Canon document?

11   **Q.**    Can you turn to the second page.

12   **A.**    Yeah.  Canon.

13   **Q.**    Okay.  This was a confidential document delivered under a

14   non-disclosure agreement with Canon; correct?

15   **A.**    Yes.

16   **Q.**    Okay.  So this is also never public in the United States;

17   correct?

18   **A.**    This is not a public document because it's confidential.

19   **Q.**    Right.  So this document was never public in the

20   United States, to your knowledge?

21   **A.**    That's right.

22   **Q.**    And it's marked "Ambarella Property [sic].  Exclusively

23   Prepared for Canon"; correct?

24   **A.**    Yes.

25   **Q.**    And, heck, when you guys produced it in this case, you

1  marked it "Confidential - Attorneys' Eyes Only"; correct?

2  A.    Yep.

3  Q.    So similar to the question I asked before, if Ambarella

4  gave this document to Canon in -- can you go to the first

5  page? -- June 2008 and you said it discloses the dual stream,

6  how come Canon didn't introduce a camera with built-in wireless

7  until 2012?

8  A.    Oh, I can't tell you that.  Canon is very keen on not

9  depending on foreign vendors, and they listened to us but never

10  used us.

11  Q.    Okay.  So that's why they never took this and said, "Oh,

12  it has dual stream.  We can do wireless"; correct?

13  A.    They never shipped that, yeah.

14  Q.    Okay.  All right.  Let's turn to pages -- page 29.

15       Okay.  You previously testified that this shows what

16  Ambarella called triple play; correct?

17  A.    Well, there's triple play and dual play.  The difference

18  is that triple play includes a still image, high-resolution

19  still image, and this is the two video streams.  So triple play

20  is the combination of two video streams and high-resolution

21  still image.

22  Q.    Okay.  And you testified you were one of the inventors of

23  one of the key features of triple play generating multiple

24  resolution, and you filed a patent for that in 2004, you said;

25  correct?

1   **A.**   I filed a patent using resampling of video in 2005,

2   I think, or 2004.

3          **MR. KEVILLE:**  Okay.  Can we show, Allen, the patents

4   on the Elmo?  On this screen.  Sorry.

5          **THE COURTROOM DEPUTY:**  You want --

6          **MR. KEVILLE:**  No, I don't want the Elmo.  My

7   apologies.

8          **THE COURTROOM DEPUTY:**  All right.

9          **MR. KEVILLE:**  And can you highlight for Mr. LeGall how

10  many of his patents were disclosed to the Patent Office?

11  **BY MR. KEVILLE:**

12  **Q.**   Those are all Ambarella patents; correct?

13  **A.**   We have had many patents.  So over 300, I think.

14  **Q.**   That wasn't my question.

15      What's shown here are all Ambarella patents that were

16  disclosed to the Patent Office in the Contour patents; correct?

17  Can you look at the screen and just confirm there's a lot of

18  Ambarella patents?

19  **A.**   Oh, I see, yeah.  I wasn't aware of this document, so...

20  **Q.**   Can you confirm those are all Ambarella patents?

21  **A.**   I think all the patents outlined here are Ambarella

22  patents.

23  **Q.**   And do you recall that 7,688,364, shown on the right, is

24  the patent that you said was for the triple play?

25  **A.**   Well, I don't know about this patent, but, sure, I believe

1    that.

2    **Q.**   And this would include patents that covered the

3    dual-stream feature that was invented by Ambarella, you said;

4    correct?  Having two streams?

5    **A.**   Well, Ambarella didn't necessarily have to file a patent

6    to implement something as simple as dual play.

7    **Q.**   Okay.  But whatever you had in the generating two streams

8    would be in these patents; correct?

9    **A.**   Yes.

10   **Q.**   And those were all disclosed to the Patent Office;

11   correct?

12   **A.**   Oh, yes.

13   **Q.**   Okay.  Thank you.

14        You agree -- let's go back to the 2041 that we were

15   looking at.  You agree at the time of this document, in late

16   2008, talking from a camera to a phone in 2008, that was

17   wishful thinking; correct?

18   **A.**   This is correct, to a phone.

19   **Q.**   Okay.  And do you agree -- we're looking here at an

20   iPod -- that acquiring a solution for a wireless communication

21   to a phone or to an iPod in 2008 would be ahead of its time?

22   **A.**   In 2008, I think this is correct.

23   **Q.**   Okay.  Let's look at 2006.  And that's already in

24   evidence.  If we could go to page 5.

25        And Ms. O'Donnell is explaining under "Additional nice to

 1  haves" that the dual-stream encode would be more compelling if

 2  WiFi Direct becomes a reality.  Do you see that?

 3  **A.**   Yes.

 4  **Q.**   WiFi Direct didn't work in 2009; correct?

 5  **A.**   This is correct.

 6  **Q.**   Okay.  And because of how that related to the dual-stream

 7  encode functionality, because of the difficulty, Ambarella

 8  shelved the idea of sharing the second stream wirelessly until

 9  about sometime in 2011.  Do you recall you testified to that?

10  **A.**   The reason WiFi Direct didn't work was due to Apple

11  blocking the use of WiFi in such a scenario.

12  **Q.**   All right.  So what you understood, it took two or

13  three years from this time until sometime in 2011 before you

14  guys shelved the idea of streaming that lower stream wirelessly

15  until then?

16  **A.**   It wasn't shelved.  It was prototyped.

17  **Q.**   Okay.  Do you recall you testified differently?

18  **A.**   Hmm?

19  **Q.**   Do you recall you testified differently in your

20  deposition?

21  **A.**   Well, I'm not sure, but I know it wasn't shelved.  We did

22  a lot of work on it.

23          **MR. KEVILLE:**  Okay.  Allen, could you play his

24  deposition testimony at 142:24 to 143:16?

25              (Video was played but not reported.)

1  **BY MR. KEVILLE:**

2  **Q.**   Do you stand by your testimony that the idea --

3  **A.**   I stand by this testimony, but it doesn't mean we didn't

4  work on it.  We worked a lot to make it happen.  Again, Apple

5  blocked WiFi Direct.

6           **THE COURT:**  Mr. Keville, when you come to a good

7  stopping point, let me know.

8           **MR. KEVILLE:**  This is fine.  Thank you.

9           **THE COURT:**  Okay.

10     All right.  Ladies and gentlemen, we'll take our first

11  break in the morning, 15 minutes.

12    (Proceedings were heard out of the presence of the jury.)

13           **THE COURT:**  Mr. LeGall, you can step down.  We're in

14  recess now.

15     Are you ready to talk about Dr. Almeroth, or do you want

16  to -- when shall we do that, the remaining slides?

17           **MR. KRILL:**  Five minutes.

18           **THE COURT:**  Okay.  So -- and how long will it take?

19  Five minutes?

20           **MR. KEVILLE:**  Are we close?

21     I haven't looked at the revised slides.

22           **MR. KRILL:**  I think we're close.  Just five minutes to

23  confer and --

24           **THE COURT:**  Okay.  So I'll be back in ten minutes.

25  I'm counting on you to keep it within five minutes.

1          **MR. KEVILLE:**  Thank you, Your Honor.

2          **MR. KRILL:**  Thank you, Your Honor.

3                    (Recess taken at 10:08 a.m.)

4                    (Proceedings resumed at 10:20 a.m.)

5          (Proceedings were heard out of the presence of the jury.)

6          **THE COURT:**  Problems resolved?

7          **MR. KEVILLE:**  Yes.

8          **THE COURT:**  All right.  So then why don't we get the

9   jury.

10         Mr. LeGall -- Dr. LeGall, why don't you come on back up.

11         (Proceedings were heard in the presence of the jury.)

12         **THE COURT:**  All right.  Please be seated, everybody.

13    Mr. Keville, please proceed.

14         **MR. KEVILLE:**  Thank you, Your Honor.

15         Could we put, Allen, back up 2041 at page 29.

16   **BY MR. KEVILLE:**

17   **Q.**   Now, earlier when you talked about this, you said you

18   couldn't do wireless to the iPod because you needed Apple

19   permission, I think you said; is that correct?

20   **A.**   Yes.

21   **Q.**   Okay.

22   **A.**   Oh, sorry.  Yes.

23   **Q.**   I have an iPod here.  It's the same one shown in this

24   from the same year.  Happy to hand it to you, or I can put it

25   on the Elmo.

1    But you agree this iPod, same one you showed in the

2    presentation, had no wireless capability; correct?

3    **A.**    That's correct.

4    **Q.**    Okay.  So you couldn't do wireless to this.  What you're

5    talking about here is downloading low-quality video from your

6    camera to your computer -- right? -- through a cable connected

7    to your computer and then using your iTunes, putting it onto

8    your iPod?

9    **A.**    Yeah, so let me answer your question more precisely.

10    This Canon presentation was early in 2008, and we --

11    Ambarella used iPod.  But when it was considered doing WiFi,

12    we looked at iPhone.  And iPhone had this WiFi Direct mode

13    which eventually didn't work because Apple didn't let a third

14    party access WiFi network.

15    **Q.**    I'm talking about the presentation and what you showed to

16    people in 2009.  This presentation shows an iPod.  So you're

17    not talking about wirelessly streaming that -- correct? -- that

18    low resolution?

19    **A.**    On this presentation to Canon, that's correct.

20    **Q.**    Okay.  And you had no presentations, we haven't seen any,

21    where you talked about wirelessly streaming to an iPhone;

22    correct?  We haven't seen any today?

23    **A.**    Well --

24    **Q.**    That's correct?

25    **A.**    We haven't seen it yet.

1              **MR. KEVILLE:**  Okay.  Let's -- can you, Allen, put up

2     Defendant's 207?

3              **MR. EATON:**  Defendant's 207?

4              **MR. KEVILLE:**  Exhibit 207.  Sorry.  No.  Sorry.  2007.

5     My bad.

6         Okay.  This is -- is this in?

7     **BY MR. KEVILLE:**

8     **Q.**   Okay.  This is a December email from Laura O'Donnell to --

9     **A.**   Yes.

10    **Q.**   -- you and John Ju; correct?

11        Yes?

12    **A.**   Yes.

13    **Q.**   And she said [as read]:

14              "As we discussed Twenty20" --

15        That's the company that became Contour; right?

16    **A.**   Yes.

17    **Q.**   [as read]:

18        -- "has also engaged additional experts to support

19        this development and detailed documentation . . . ."

20        So they've hired people to work on the products that they

21    want to put out; correct?

22    **A.**   This is correct.  They hired one consultant in

23    New Zealand.

24    **Q.**   We're going to get to him.

25        And it says they want to help with "unique development we

1   would desire on your OS."

2       Do you see that?

3   **A.**   Yeah.

4   **Q.**   Okay.  So -- and that's --

5           THE COURT:  Are you offering this, or is it in

6   evidence?

7           MR. KEVILLE:  I think it's already in, Your Honor.

8           THE COURT:  Okay.

9           MR. KEVILLE:  That's what I was checking.

10          THE COURT:  Okay.

11  **BY MR. KEVILLE:**

12  **Q.**   And then she lists below [as read]:

13          ". . . I have listed below some of the

14      capabilities we would like to see in the A5s SDK."

15      Do you see that?

16  **A.**   Yes.

17  **Q.**   And then she lists seven points.  And if we go to the next

18  page, we can see that that includes some specific things they

19  want in Number 5 about the second encode file.  Do you see

20  that?

21  **A.**   Yes.

22  **Q.**   This is Ms. O'Donnell telling Ambarella, "Hey, here's some

23  things we would like to see in the SDK"; correct?

24  **A.**   Well, she says, "Please confirm parameters."

25  **Q.**   Correct.  Okay.

1    **A.**    So...

2    **Q.**    And, by the way, SDK is software development kit, to be

3    precise?

4    **A.**    Yes.

5    **Q.**    Okay.  And then she talks about the Bluetooth host;

6    correct?

7    **A.**    Yes.

8    **Q.**    So these are things that Contour is coming to you about;

9    correct?

10   **A.**    Well, on the second encode, you notice that her request is

11   confirm parameters.

12   **Q.**    Right.  Because Contour wants certain things that they

13   want to be able to do, and they're saying, "Hey, we want to

14   have these parameters available in the software development

15   kit.  So can you confirm that those will be available to us?"

16   **A.**    Well, again, you misinterpreted.

17       [As read]:

18           "Please confirm parameters for this file,

19       bitrate, additional power requirements . . . ."

20       This is a request from Contour to have Ambarella tell them

21   what can be done in dual stream.

22   **Q.**    Two separate things; right?

23       [As read]:

24       "Second encode file (please confirm parameters . . . .)"

25       And then [as read]:

1           "(a) Independent controls from primary file."

2      And [as read]:

3           "(b) Option to enable or disable second mode."

4      Those are the things they're suggesting to you?

5  A.   That's correct.

6  Q.   All right.  And then let's go to 2032.

7      All right.  Now, this document has no date; correct?

8  A.   I don't see a date, yes.

9  Q.   And you don't know who created this; correct?

10 A.   Oh, I know who did.

11 Q.   Who created it?

12 A.   It's an engineer called Jason Huang.

13 Q.   Okay.  Oh, let's go back -- sorry -- to 20 -- 2007.  I

14 forgot one thing because that name rang a bell.

15     If you look at the top of this document, there's an email

16 from John Ju to Rio Chang and Jason Huang, who you just

17 mentioned.

18     None of those three individuals are Ambarella lawyers;

19 correct?  Those are all engineers?

20 A.   They're all engineers.

21 Q.   Okay.  And yet Ambarella redacted what these three

22 engineers said in response to Ms. O'Donnell's email; correct?

23 A.   I -- I don't -- I was certainly not involved with it.  I

24 don't know who redacted it.

25 Q.   Okay.  It came this way from Ambarella.  You have no

1    explanation?

2            **THE COURT:**  We're not doing discovery, Mr. Keville.

3            **MR. KEVILLE:**  All right.

4    **BY MR. KEVILLE:**

5    **Q.**   Let's go to -- back to 2832 -- 2032, yep.  Now, you

6    mentioned one of Contour's engineers from New Zealand.  Is that

7    Ben Bodley you were referring to?

8    **A.**   Yeah.  He was an employee of a company called Teknique.

9    **Q.**   And he was hired to work for Contour on the development of

10   their product; correct?

11   **A.**   Yes.

12   **Q.**   And he actually came and spent several weeks in Taiwan to

13   write --

14   **A.**   That's correct.

15           **THE COURT:**  You've got to wait for the question,

16   please.

17   **BY MR. KEVILLE:**

18   **Q.**   He spent several weeks in Taiwan with Ambarella writing

19   the code for the Bluetooth driver; correct?

20   **A.**   Yes.

21   **Q.**   And this document was made after Ben Bodley spent

22   those weeks in Taiwan with the Ambarella engineers; correct?

23   **A.**   There's no relation because this is a Linux issue and not

24   a Bluetooth issue.

25   **Q.**   No.  My question was different.

1        This document was made after Mr. Bodley spent time at

2   Ambarella with the engineers in Taiwan?  Or if you don't know,

3   you don't know.

4   **A.**   I don't know, but around the same time.

5   **Q.**   All right.  Let's go to 2039.  We talked about this

6   document from March 2010.  This document, I don't know if

7   you've looked at it, but I couldn't find the words "wireless,"

8   "WiFi," "802.11," or "Bluetooth" anywhere in there.  Does that

9   surprise you?

10  **A.**   No, because this is an SDK document.

11  **Q.**   Okay.  And let's look at Exhibit 8.  And in the middle it

12  refers to a prototype demonstration, the Bluetooth

13  demonstration.

14       [As read]:

15            "It was a big hit and won Didier over the

16       Bluetooth for our product."

17       Do you remember a demonstration that Contour did showing

18  you could actually communicate over Bluetooth the video image?

19  **A.**   Yes.

20  **Q.**   And it was after that demonstration that Ambarella started

21  marketing in its documents the wireless capability; correct --

22  **A.**   This is incorrect.

23  **Q.**   -- once you saw it worked?

24  **A.**   This is incorrect.

25       **MR. HAYNES:**  Okay.  Your Honor, I'm not sure if this

1    is stuff that's been admitted into evidence yet.

2              MR. KEVILLE:  I believe that is in.

3              THE COURTROOM DEPUTY:  It is.

4              THE COURT:  All right.  Do you want to offer it?

5              MR. KEVILLE:  I'm pretty sure it's in, Exhibit 8.

6              THE COURTROOM DEPUTY:  Yes.  On the 30th, I think it

7    came in.

8              THE COURT:  Okay.

9              MR. KEVILLE:  All right.  And, lastly, I want to go to

10   3889.  No.  3899.

11   BY MR. KEVILLE:

12   Q.   Now, you talked about these Bosch, and you said, "Oh,

13   those were the shipment dates."

14        But, actually, at the top, do you see that column says

15   "Invoice Date"?

16   A.   Yeah.

17   Q.   Do you know what date it was actually shipped?

18   A.   PO date, invoice date...  I think when things are shipped,

19   an invoice get generated.  This is the way it happens.

20   Q.   Okay.  So around the same time?

21   A.   Yeah.

22   Q.   By the way, the EVK shipments, those were also made under

23   an NDA; correct?

24   A.   Yes.  The code definitely is proprietary to Ambarella.

25   Q.   So when you talked about this stuff going out in 2009,

1   that was under an NDA?

2   **A.**   But it is offered for sale, which is maybe a bit

3   different.

4   **Q.**   But it wasn't offered for sale publicly until after the

5   CES announcements, which didn't happen until January 7th of

6   2010; correct?

7   **A.**   That's possible.

8         **MR. KEVILLE:**   Okay.   And if we would, on the first

9   page, Allen, highlight "Polycom" and the $35,000 entry.   Yep,

10  that one.

11  **BY MR. KEVILLE:**

12  **Q.**   Okay.   That's Ambarella charging Polycom for the software

13  development kit; correct?

14  **A.**   Yes.

15  **Q.**   The software development kit is very expense; correct?

16  That was $35,000?

17  **A.**   Yeah.   Well, depending on the request of the customer and

18  some other aspect.   Like, Funai paid less for a similar thing.

19  Oh, yeah.

20  **Q.**   Well, what we can tell is you charged Polycom $35,000 for

21  the software development kit; correct?

22  **A.**   Yeah.

23  **Q.**   And is it your recollection that GoPro didn't have -- even

24  have an Ambarella software development kit until sometime in

25  2012?

1   **A.**   There's no -- wait a minute.

2   **Q.**   It's not on this document.  I'm asking if you recall that

3   GoPro did purchase a software development kit from Ambarella

4   until 2012.

5   **A.**   I don't recall what GoPro bought or who bought it from

6   because I wasn't working directly with GoPro.

7              **MR. KEVILLE:**  Your Honor, I pass the witness.

8              **THE COURT:**  Okay.  Mr. Haynes.

9                        <u>**REDIRECT EXAMINATION**</u>

10  BY MR. HAYNES:

11  **Q.**   All right.  I'm going to try to address a few of the

12  points that were raised here and see if we can clear up some of

13  the confusion.  All right?

14  **A.**   Good.

15  **Q.**   Let's start with an easy one.

16       Did you receive a subpoena compelling you to testify here

17  today?

18  **A.**   Yes.

19  **Q.**   Okay.  Are you here because you have some sort of special

20  relationship with GoPro?

21  **A.**   No.

22              **MR. HAYNES:**  Can we bring up TX-3885.

23  BY MR. HAYNES:

24  **Q.**   Do you recall there was some testimony about this

25  document?

**LeGALL - REDIRECT / HAYNES**

1    **A.**    Yes.

2    **Q.**    And there may have been a suggestion that somehow this

3    document did not exist back in the January 2010 when the A5s

4    was launched at CES.

5        These types of documents, data sheets, are those the types

6    of things you would have given to people at your booth at CES

7    when you launched a product?

8    **A.**    Yes.

9    **Q.**    And did you -- do you recall we looked at the press

10    release that announced that product at CES?

11    **A.**    Yes.

12    **Q.**    Okay.  Looking at this document, does this look like a

13    fake document to you, or is this a document that Ambarella

14    created around the time in the ordinary course of its business?

15    **A.**    It's a document Ambarella created prior to CES.

16    **Q.**    Okay.  Let's look at TX-2049.  You were asked some

17    questions about this, and I think counsel indicated it's a

18    50-something-page document that doesn't mention WiFi, and you

19    took his representation on that.  Do you recall that?

20    **A.**    Yeah.

21        **MR. HAYNES:**  Let's look at page 8 of this document.

22    If we could just blow up at the bottom down there, that whole

23    bottom row.

24    **BY MR. HAYNES:**

25    **Q.**    Okay.  And do you see there's a reference there to

1    Ethernet?

2    **A.**    Yes.

3    **Q.**    Okay.  Is that a protocol that you could use to transmit

4    IP data?

5    **A.**    That's correct.

6    **Q.**    Okay.  Do you remember we also talked about that interface

7    that was used for WiFi called SDIO?  Do you remember that?

8    **A.**    Yeah.

9    **Q.**    Okay.  Do you see SDIO in this document at all?

10    **A.**    Yeah.

11    **Q.**    Okay.  So does this document talk about the interface that

12    is on the Ambarella chip that is used to output a WiFi signal?

13    **A.**    Well, Ethernet signal at least.

14    **Q.**    Well, for SDIO is what I'm talking about.

15    **A.**    Oh, I see.

16    **Q.**    So that SDIO we looked at, that's what you were using to

17    output for wireless transmission; true?

18    **A.**    (No audible response.)

19    **Q.**    You have to answer, sir.

20    **A.**    Yes.  Yes.

21    **Q.**    Okay.  There was also a lot of discussion about you met

22    with customers and then they didn't launch a commercial product

23    right away.  Sometimes it took a couple of years, three years

24    even.  Is that abnormal in your business?

25    **A.**    No.

1  Q.   Can you just explain why?  What's the normal product

2  development cycle from when somebody first learns about the

3  capabilities of your chip to when they're able to launch a

4  commercial product?

5  A.   Well, when you are dealing with a Japanese or a Korean,

6  they take a very long time, and typically, they do not listen

7  to the input of the vendor.  They have their own planning

8  department that decides when and how the product will be

9  launched.

10 Q.   Is it easy to launch a commercial consumer electronics

11 product like a camera using your A5 and A5s chips?

12 A.   Well, technically, it's not difficult.  Marketing-wise,

13 it's quite difficult.  There is this statement in -- in

14 technology that says:  New technology, new market, instant

15 suicide.  You don't combine new technology and new market and

16 expect a win.

17 Q.   So does the fact that it took some of your customers a

18 couple of years to build a commercial product, does that

19 indicate to you that they had abandoned their efforts to build

20 a product using your chip in all instances?

21 A.   No.  Actually, Sony did launch a very strange product

22 called Broggy that had WiFi in it.  They used it to talk to a

23 server.  It wasn't exactly a winner.

24 Q.   Okay.  And you know that GoPro launched a commercial

25 product that used WiFi and an Ambarella A5s chip.  You're aware

1   of that?

2   **A.**   Yeah.   And I'm not sure how much of a winner it was.

3   **Q.**   Yeah.   And you know that Contour launched a product using

4   Ambarella's A5 or A5s chip; right?

5   **A.**   Yes.

6   **Q.**   But in the Contour product, they didn't use WiFi.   They

7   used Bluetooth for their wireless protocol; right?

8   **A.**   Yes.   Yes.

9   **Q.**   Now, you were also shown the face of one of the

10   patents-in-suit and asked if it listed a bunch of Ambarella

11   patents.   Do you remember that?

12   **A.**   Yes.

13   **Q.**   How many patents does Ambarella have?

14   **A.**   About 2- to 300.   I would say 300.

15   **Q.**   Okay.   Did that -- on the face of the patent, did that

16   list all of Ambarella's patents that existed at the time?   Were

17   you able to determine that while you were sitting here today?

18   **A.**   No.

19   **Q.**   Okay.   All right.   Let me just ask one final question,

20   maybe two.

21       Did Ambarella itself come up with the idea of creating a

22   high-resolution stream and a low-resolution stream

23   simultaneously?

24   **A.**   Definitely.

25   **Q.**   And did Ambarella, prior to December 2009, have the idea

1    of transmitting the lower-resolution stream wirelessly?

2    **A.**    I'm not sure because the detail for the wireless were not

3    resolved.

4    **Q.**    Okay.  But were you working on wireless transmission at

5    that time period?

6    **A.**    Again, I'm not sure.  I remember some long series of

7    debate.  Ambarella proposed, you know, this dual-OS solution,

8    and eventually it didn't go anywhere.

9    **Q.**    Okay.  So at that time that you proposed -- when you say

10   you proposed a dual-OS resolution, did you propose that to

11   Contour?

12   **A.**    To Contour and other people.

13   **Q.**    Okay.  And what was -- was the purpose of that dual-OS

14   resolution to enable the use of Linux to send a video stream to

15   an external wireless chip?

16   **A.**    The purpose was to use WiFi Direct, which was advertised

17   but not enabled by Apple in the iPhone.

18   **Q.**    Now, WiFi Direct, is that the same thing as WiFi, or is

19   that a particular implementation of WiFi technology?

20   **A.**    If you look at your iPhone today, you can use your

21   iPhone to be a WiFi server; and at that time, it was not

22   possible.

23   **Q.**    Okay.  What about WiFi in general and the ability to

24   transmit information over WiFi?  Was that available in the

25   2008-2009 time frame?

1    **A.**    A lot more, but the product scenario doesn't work very

2    well.  You are on a surfing or on a ski trip and you don't have

3    WiFi.  Then you may have an iPhone somewhere but you don't

4    have WiFi.

5    **Q.**    Okay.  But WiFi was available for use at this time?

6    **A.**    Yes.  That's why we developed this dual-OS thing, which

7    was a lot of work and eventually didn't yield too many results

8    until 2012.

9              **MR. HAYNES:**  Okay.  Thank you.

10        No further questions, Your Honor.

11             **THE COURT:**  All right.  Dr. LeGall, you can step down.

12   Thank you.

13             **THE WITNESS:**  Oh, thank you.

14             **THE COURT:**  You're excused.

15             **THE WITNESS:**  Is that for me or for you?

16             **THE COURT:**  You could leave it there, and we'll deal

17   with it.

18        Thank you.

19                        (Witness excused.)

20             **THE COURT:**  Ms. Clark, who's next?

21        **MS. CLARK:**  GoPro calls Dr. Kevin Almeroth.

22                  (Witness steps forward to be sworn.)

23             **KEVIN CHRISTOPHER ALMEROTH,**

24   called as a witness for the Defendant, having been duly sworn,

25   testified as follows:

1          **THE WITNESS:**  Yes, ma'am, I do.

2          **THE COURTROOM DEPUTY:**  Please be seated.

3      And if you would please state your full name and spell it

4   for the court reporter.

5          **THE WITNESS:**  Sure.  Kevin Christopher Almeroth,

6   K-e-v-i-n, C-h-r-i-s-t-o-p-h-e-r, A-l-m-e-r-o-t-h.

7                    <u>DIRECT EXAMINATION</u>

8   **BY MS. CLARK:**

9   **Q.**   Good morning, Dr. Almeroth.

10      Would you introduce yourself to the jury, please.

11  **A.**   Yes.  My name is Kevin Almeroth.  I'm a professor emeritus

12  at UC Santa Barbara.

13  **Q.**   What's a professor emeritus?

14  **A.**   A professor emeritus is kind of at the end of the

15  promotion range.  It's essentially working my way into

16  retirement.  So I don't have the responsibilities of teaching

17  and doing research, but I still have a professor title with the

18  university.

19  **Q.**   Have you prepared slides to help with your testimony

20  today?

21  **A.**   Yes, I have.

22          **THE COURT:**  Could you bring your mic a little closer

23  to you?

24          **MS. CLARK:**  Permission to publish his slides and

25  permission to approach?

1      **THE COURT:**  Please.

2   **BY MS. CLARK:**

3   **Q.**   Dr. Almeroth, can you please tell the jury about your

4   background and qualifications?

5   **A.**   Sure.  I started at Georgia Tech in about 1988.  I was

6   there for nine years and earned three degrees:  Bachelor's,

7   Master's, and then ultimately a Ph.D. in computer science in

8   1997.

9       After that, I was interested in teaching and doing

10  research and wanted to stay at a university, so I went

11  to UC Santa Barbara pretty much straight away and have been

12  there ever since.

13      I started off as an assistant professor, earned tenure,

14  got promoted to full professor, and then did various

15  administrative positions in the department along the way.

16  **Q.**   What does a professor do?

17  **A.**   A professor will do teaching, teaching classes, undergrad

18  and graduate classes.  Also I'll do research, try and solve

19  problems, in my case in the Internet and how the Internet

20  works, and then also to work in the field.

21  **Q.**   Were any of the courses you taught relevant to this case?

22  **A.**   Yes.  From the very beginning, I was teaching courses in

23  networking.  I also taught specialized courses in networking

24  for multimedia, which meant sending audio and video streaming

25  over the Internet to various kinds of devices.  Initially, it

1  was really just cable set-top boxes and then eventually PCs and

2  then eventually mobile devices as well.

3  **Q.**   Does your research relate to the technology in this case?

4  **A.**   Yes.  Since the mid-90s, I've been trying to work on

5  getting video on the Internet.  In the early days, it was kind

6  of difficult to do.  It was pretty low bandwidth, and so we had

7  the challenges of being able to compress the data down as small

8  as possible.

9       Over time, as the Internet capability expanded, it created

10 new opportunities to use video, to send video to wireless

11 devices.  There was the Internet of things, where light

12 switches could have Internet capability.  You could use remote

13 cameras for security, doorbells.  So I was active in research

14 in those areas as well.

15 **Q.**   I think the third thing you said was work in the field.

16 What do you mean by that?

17 **A.**   As a trainer of undergrads and graduate students, one of

18 the things that I was interested in was not just publishing

19 papers and building prototypes, but working with the companies

20 in my area to see the things that I and my students were doing

21 make it out into the real world.

22       And so what that meant is getting outside of the

23 classroom, outside of the lab, going to standards

24 organizations, talking about my ideas, collaborating with

25 companies in exchange for funding and working with them, giving

1  them our ideas about how to make the Internet better, how to

2  make streaming audio and video better, and how to enable new

3  kinds of applications.

4  **Q.**   Would you summarize how your experience relates to the

5  video camera technology at issue in this case?

6  **A.**   Yes.  As I said, sort of from the mid-90s when I first

7  started doing research and teaching, I was very much interested

8  in how to get video from all kinds of different sources; from

9  movies, to videoconferencing, to using cameras in classrooms to

10  do distance learning.

11       And over the course of trying to solve those kinds of

12  problems, I've worked on all of the underlying technology and

13  even some of the kinds of particular devices that existed

14  before these patents came along.

15       **MS. CLARK:**  At this time, Your Honor, I'd like to

16  tender Dr. Almeroth as an expert in the field of video data

17  processing and delivery.

18       **MR. KEVILLE:**  No objection.

19       **THE COURT:**  You may proceed.

20  **BY MS. CLARK:**

21  **Q.**   Dr. Almeroth, are you being compensated for your work on

22  this case?

23  **A.**   Yes, I am.

24  **Q.**   Is that compensation dependent on anything that happens at

25  trial?

1  **A.**   No.  I'm an independent consultant.  I get paid regardless

2  of who wins or loses.

3  **Q.**   What were you asked to do in this case?

4  **A.**   I was asked to do three things.  One, to assess whether or

5  not the Contour patents were valid or not, whether or not they

6  should have been issued by the Patent Office.

7         The second was to answer questions around whether or not

8  the accused GoPro Live Streaming and the Live Preview Group 2

9  products infringe the Contour patents.

10        And then I was asked to answer some very specific

11 questions that would be used as input for damages analysis.

12 **Q.**   Very briefly, what conclusions did you come to?

13 **A.**   Based on all of the analysis that I did, I concluded that

14 the claimed technology in the Contour patents was not new and

15 was obvious and should not have been in issued patent claims.

16        For infringement, I determined that the Live Streaming and

17 Live Preview Group 2 products did not infringe for quite a few

18 reasons.

19        And then, ultimately, the accused functionality is not

20 important to GoPro.

21 **Q.**   This jury has already heard quite a lot about the

22 patents-in-suit.  Can you just confirm what patents and claims

23 your opinions cover, please.

24 **A.**   Yes.  There's two patents, the '954 patent and the '694

25 patent.  There's two asserted claims from the '954 patent,

1  Claims 11 and 12; and one claim from the '694 patent, Claim 6.

2  **Q.**    Now, you heard Dr. Hu testify earlier in the trial.  How

3  did she characterize the claimed invention?

4  **A.**    This was one of the slides from Dr. Hu's testimony.  It

5  was titled "Contour's Invention," and it included the

6  components of a lens, an image sensor, a camera processor that

7  would generate a high-quality video for storage and then a

8  low-quality video for transmission over a wireless device

9  ultimately to a device that would then -- would provide remote

10  control functions.

11  **Q.**    Do you generally agree with Dr. Hu's characterization of

12  the claimed invention?

13  **A.**    Yes.  At this high of a level, I think it pretty much

14  covers what the invention is.

15  **Q.**    You understand that the patent claims define the scope of

16  the claimed invention, though; right?

17  **A.**    That's right.  In a patent, you heard from the video last

18  week, there's the first part of the patent, the figures and

19  what's called the specification.  Those provide some details

20  about the way it could be implemented.  And then at the end of

21  the patent are the claims, and it's the claim language and the

22  asserted claims that's most important for assessing

23  infringement and validity.

24  **Q.**    Can you show us the claims?

25  **A.**    Yes.  So at the end of the patent, these are Claims 11 and

1    12 from the '954 patent and then Claim 6 from the '694 patent.

2    They're in this single-spaced double-columned format, and

3    there's some indenting to identify what the elements of the

4    claims are that set forth the specific requirements that have

5    to be met.

6         Now, one of the things that I've done is taken, for

7    example, one of these claims and put it on a slide here.  This

8    is Slide 9 where it shows, in a little bit easier to read font

9    size, all of the words of Claim 11 of the '954 patent.

10        And you see at the beginning here that I've added some

11   numbers and letters.  The number is the patent claim, and then

12   the letter is just a sequential letter so that I can refer to

13   the elements of the claim.

14   **Q.**   Is the numbering that you've put on the left-hand column

15   the same as the numbering of the elements that Dr. Hu used?

16   **A.**   Yes, it is.

17   **Q.**   So there are a lot of words in these claims.  Do you have

18   any way of thinking about them or grouping the elements just to

19   make them more understandable?

20   **A.**   Yes.  So I've done some color coding here.  There's kind

21   of a first set of elements, and then what I've done is I've

22   added sort of some words to kind of summarize what those

23   elements cover.

24        So there's the preamble and then 11.a and 11.b that cover

25   the point-of-view digital camera, the lens, and then an image

1    sensor that has to do the rest of what those words say.

2         11.c covers a wireless connection protocol device

3    configured to do two things:  to send the real-time image

4    content by wireless transmission directly to; and then the

5    second thing, receive control signals or data signals by

6    wireless transmission directly from a personal portable

7    computing device executing on an application.

8         There's then the grouping for the camera processor

9    elements.  That has to be able to receive, generate, and then

10   cause the wireless connection protocol device to send some

11   information.  And I'll get into the specific requirements of

12   the camera processor.

13        There are also then the last three elements -- 11.h, 11.i,

14   and 11.j -- that relate to remote control commands that are to

15   be processed by the camera processor.  So receiving them, being

16   able to act on those remote control commands.

17        So all of these elements together are what Claim 11 of the

18   '954 patent require.

19   Q.   Do these groupings apply to other -- the other asserted

20   claims as well?

21   A.   Yes.  So Claim 12 is what's called a dependent claim.  So

22   it requires everything in 11 to be true and also requires the

23   additional requirements of 12.a and 12.b.  And as you see, I've

24   colored those green because they're associated with the camera

25   processor.

1    So, for example, that requires that there has to be a

2    first video image content, second video image content, and that

3    the first and second have to be at different resolutions or

4    different frame rates.

5    **Q.**   And how about the claims of the '694 patent?

6    **A.**   So the one asserted claim in the '694 patent is Claim 6.

7    That requires all of 6 and then all of Claim 3.  I've done some

8    similar kinds of color coding.

9        There's some additional requirements within this claim

10   that I'll get to when I talk specifically about Claim 6, but

11   generally, it's -- at least some of it is very similar to

12   Claims 11 and 12 of the '594 patent.

13   **Q.**   Do you have a graphical representation that would remind

14   us of the concepts as we walk through our analysis?

15   **A.**   Yes.  So you have a camera.  It has the basic camera

16   hardware, the camera processor, and the wireless components.

17   It's very similar to what Dr. Hu said was the Contour

18   invention.  And so these are kind of the components that would

19   exist in the camera and then would interface with the remote

20   control.

21   **Q.**   As one point of clarification, are the -- is the claimed

22   invention the camera or the phone or both?

23   **A.**   It's -- it's just the camera.  So the claims relate to

24   just what's inside of the camera, including being able to

25   receive remote control commands.  So there is a remote control,

1  but it's not part of what's specifically required by the claim.

2  **Q.**   Now, are you replacing the limitations of the claims with

3  these labels you've provided?

4  **A.**   No.  I'll -- I can't say it enough.  The most important

5  thing is the actual words of the claims themselves.  Those are

6  the things that, as an expert, I am using to analyze and

7  determine the question of validity and infringement.

8  **Q.**   What is the priority date afforded to the claims at issue?

9  **A.**   So the priority date is September 13th, 2010.  That's

10 really the date of which you consider the invention to have

11 been created or conceived of.

12 **Q.**   And what's the importance of the priority date?

13 **A.**   So think about today.  If you wanted to invent technology

14 around a driverless car or a battery-powered car, you would

15 have to invent something that was better or different or

16 non-obvious than everything that existed out there already, and

17 so that would be for today for a new invention.

18       When this patent and the provisional was filed, the

19 question becomes:  What was happening right before this date?

20 What was happening at that time to then start to consider

21 whether or not the patent would have been new and not obvious?

22 **Q.**   Has Contour suggested there should be a different priority

23 date than the provisional?

24 **A.**   Yes.  So I've heard a bit of testimony that there is

25 allegedly an earlier conception date for Contour that puts it

1    about ten months earlier in December of 2009.  So then you

2    would think about that as the date for when Contour conceived

3    of the ideas that ultimately went into the claims of the

4    patent.

5    **Q.**    Do you believe that Contour has presented evidence that it

6    should be afforded a priority date of December 2009 rather than

7    the one on the face of the patent?

8    **A.**    Not yet.  It's quite possible that Dr. Hu will come back

9    and offer evidence and walk through support for why each of the

10   elements of the claims merits a December 2009 priority date.

11       I've -- as I've gone through my analysis, I've considered

12   both dates.  It doesn't have a significant impact on my

13   opinions, but where there's kind of a difference in those two

14   dates, I will mention it.

15   **Q.**    Are you familiar with the concept of the state of the art?

16   **A.**    Yes, I am.

17   **Q.**    Can you explain to the jury what the state of the art is

18   generally?

19   **A.**    Sure.  It's a term that sometimes gets used in ordinary

20   day-to-day.  You say, "Oh, I bought a state-of-the-art TV."

21   It's one that has all of the best technology in it at the time.

22   You heard in the patent video they called it prior art.

23       So it's kind of those two terms.  The state of the art is

24   the collection of everything that was happening, and then prior

25   art would be individual references or systems that existed that

1  were part of the state of the art.

2  **Q.**   Can you give me some examples of the prior art in this

3  case?

4  **A.**   Sure.  So there are examples of things that were happening

5  before even December 2009.  You've heard a lot of testimony

6  this morning and last week about what was happening before that

7  date, and it becomes critical to questions of validity.

8       And so some of the things that existed would be patent

9  applications that were filed before December 2009, patents

10  themselves.  You've heard about the Woodman patent.

11      There's also products that were available on the market:

12  Canon cameras, Sony cameras.

13      You've heard a lot about the Ambarella chip.  That's been

14  established to have been on sale, and there was information

15  available about it before December 2009.

16      And so those are some examples of what would be part of

17  state of the art.

18  **Q.**   Does prior art have to be a commercialized product?

19  **A.**   No.  And that's an important question.  It's really about

20  the conception of the idea.  Once you've conceived of the idea

21  and have all of the pieces, that's really when the invention

22  takes place.

23      Now, there is certainly a lot that has to be done to

24  commercialize a product.  There's a lot of decisions about

25  components, how they should be priced, what size you make the

1  device, how it's marketed; but those all happen as part of the

2  separate process of commercializing and bringing those ideas to

3  the market.

4  **Q.**  Okay.  Let's start simply.

5      You talked about basic camera hardware.  Can you tell me

6  about some of the basic camera hardware that was in the state

7  of the art as of December 2009?

8  **A.**  Yes.  So for basic camera hardware, I think I actually

9  have some examples that I can show the jury.

10      **MS. CLARK:**  Permission to approach, Your Honor.

11      **THE COURT:**  Yes.

12      **THE WITNESS:**  Okay.  You asked about basic camera

13  hardware.  Here's an example of a camera.  And you saw the

14  first things in the claim were things like a lens and an image

15  processor.  This is a digital camera.  So it has an image

16  processor.  Instead of taking it on a roll of film, it's a

17  digital camera.  So this is the Canon EOS 7D as kind of a

18  standard digital camera that existed before 2009.

19  **BY MS. CLARK:**

20  **Q.**  And do all cameras have to look like that, like a camera?

21  **A.**  No.  There are other kinds of cameras.  I've got another

22  one.  This is also another kind of camera.  It's a Sony Ipela,

23  and it's a camera that can swivel, it can tilt-up and down,

24  zoom in and out.  It also has a lens.  It also has an image

25  processor on it.  So it's another style of camera that would

1    have existed before 2009.

2    **Q.**    Anything else?

3    **A.**    Yes.  There's also like this device.  This is what's

4    called a Looxcie.  It's a smaller camera.  It has an audio

5    speaker on it and it clips to your ear, and then you can see

6    the video.  It's kind of like an early version of a

7    Google Glass.  But this also is a camera.  It has a lens on it

8    and it has an image processor on the inside.

9    **Q.**    Can all of the cameras that you just showed be mounted?

10   **A.**    Yes.  So the Sony can be mounted -- or sorry.  The Canon

11   can be mounted on a tripod.

12        The Sony, you can see at the bottom, has a mount interface

13   for it.  It can be mounted like this.  It actually can be

14   mounted upside down and then the image flipped so that you can

15   mount it on a ceiling.  I did something like that in my

16   classroom.

17        And then also this, the Looxcie can just be mounted on

18   your ear.

19   **Q.**    So those are commercial products.

20        What about patents?  Did you consider any patents or

21   patent applications in your analysis of the state of the art?

22   **A.**    Yes.  So example would be a U.S. patent application from a

23   first inventor whose name was Justin Boland.  So I'll refer

24   that to as the Boland patent, and I've shown a picture of it on

25   Slide 18.  The title is "A Video Recording Headset."  It was

 1   filed in November 5th, 2009.  So that's before Contour's first

 2   earliest alleged priority date.

 3       And you can see it's kind of a camera that can be mounted

 4   on someone's ear.  It has a lens on it.  And that's some of the

 5   things that the Looxcie can -- or, sorry -- that Boland

 6   describes.

 7            MS. CLARK:  Move to admit DTX-2350.

 8            THE COURT:  Say it again.

 9            MS. CLARK:  Move to admit DTX-2350, the Boland patent

10   application.

11            MR. KEVILLE:  No objection.

12            THE COURT:  It's admitted.

13       (Trial Exhibit 2350 received in evidence.)

14   BY MS. CLARK:

15   Q.   Do you have a summary slide where you go through the

16   various evidence that you just talked about?

17   A.   Yes.  So this slide is describing the cameras that I just

18   described.  You see here pictures of kind of those cameras, the

19   picture of Boland.

20       And then there's also additional material.  Like, most of

21   these cameras will come with a user manual or some sort of

22   information describing what the device is, and so there's a

23   column for that under "Additional Materials."

24       And then among all of that different information, that

25   also helps establish the date when these devices were on sale.

1    **Q.**    Why is there no additional material next to Boland, the

2    patent application?

3    **A.**    That column is blank because the patent application

4    describes all of the information inside of that single

5    document.

6    **Q.**    Next I want to ask you about the remote control concept.

7         Do you have any examples of prior art cameras that could

8    be wirelessly controlled?

9    **A.**    Yes.  So a good example of that is the Sony Ipela.  It

10   actually had wireless connectivity to it.  And so I've got a

11   slide here, Number 21, that includes pages from the manual for

12   the Sony Ipela, and what it shows is that you can monitor the

13   camera image on the monitor window of the main viewer.  And

14   that was a piece of software that ran on a computer.  It would

15   send those images wirelessly and they could be displayed on the

16   screen.  And then you could also control the frame rate of the

17   video.  So there it says 30 frames per second.  It was a menu

18   that you could pull down and adjust the frame rate.

19   **Q.**    Do you know when the Sony Ipela camera was first available

20   for sale?

21   **A.**    Yes.  On Slide 22, there's some evidence based on the

22   camera manual, there are some sales records, and there's also a

23   declaration from Ms. Susan West verifying those sales

24   information.  And you see there that there's a 2007 date,

25   September 2007, where it has the camera plus the wireless

 1  portion.

 2          MS. CLARK:  Move to admit DTX-4145, 4382, and 4583.

 3          THE COURT:  Any objection?

 4          MR. KEVILLE:  No objection on 4154 or 4382,

 5  Your Honor, but the --

 6          MS. CLARK:  Counsel's right.  I withdraw 4583.

 7          THE COURT:  Okay.  So those two are admitted.

 8      (Trial Exhibits 4154 and 4382 received in evidence.)

 9  BY MS. CLARK:

10  Q.   Can you give me any other examples of cameras with remote

11  controls?

12  A.   Yes.  There's another one, the Sony Handycam.  So the

13  Handycam is one that you just hold in your hand and can do

14  video; and in the manual, it describes that it has wireless

15  connectivity.  I don't have one in my box so I've just got to

16  do a picture.

17  Q.   And what about patents?  Were there patents that described

18  wirelessly controlling a video camera?

19  A.   Yes.  So Boland again.  And just to remind you the date,

20  November 5th, 2009.  There's a Figure 3B in Boland, and I've

21  highlighted the portions where it shows a wireless

22  communication handset.

23      So there was the headset that goes on your ear, and the

24  handset that you hold in your hand that would be like a phone

25  or something and it would show the preview and could show that

1  you could do audio, video, and also video controls via that

2  handset.

3  **Q.**   Anything else?

4  **A.**   There was also a patent application from Kurosawa, and

5  that's shown on Slide 25.  It has a Figure 18 that shows the

6  remote control with the video display.  It shows that you have

7  commands like backlight compensation toggle.  And then

8  Figure 12 shows that the camera itself could receive and act on

9  the user's controls or manipulations.

10        **MS. CLARK:**  Move to admit DTX-4208.

11        **MR. KEVILLE:**  No objection.

12        **THE COURT:**  It's admitted.

13     (Trial Exhibit 4208 received in evidence.)

14  **BY MS. CLARK:**

15  **Q.**   Okay.  I think that's enough on remote control.

16     Can you summarize the references you considered as part of

17  the state of the art?

18  **A.**   Sure.  Slide 26 shows that it's the Sony Ipela, the Sony

19  Handycam, the Boland patent application, and the Kurosawa

20  patent application, and the dates are shown there based on the

21  additional materials that I considered.

22  **Q.**   The next concept, I believe, is wireless.  Were there

23  cameras in the market in December 2009 that had wireless

24  capability?

25  **A.**   Yes.  So back to the Sony Ipela.  It actually has a card,

1  and this was part of what was sold was a little wireless card

2  that would go into a slot and would allow the images to be

3  shown over wireless connectivity.

4  Q.   Were there any other available cameras with wireless

5  connectivity?

6  A.   Yes.  Another one was the Sony Cybershot, another camera

7  that was released in September 16th, 2009, or around that time,

8  and allowed you to send images by WiFi.

9  Q.   Do you have one of those in your box?

10  A.   No, I don't have one of those in my box.

11  Q.   Anything else?

12  A.   Yes.  This one I do have.  It's called an Eye-Fi, E-y-e,

13  dash, F-i.  And this is an SD card that normally is just a

14  memory card you would put into a camera, but they built an SD

15  card with WiFi on it so that you could put this into any camera

16  into its storage SD slot and images that were saved to the SD

17  card it could send wirelessly.

18      So it was another -- it was technology that was kind of

19  available again in this time frame that would allow you to put

20  wireless onto a camera.  Again, kind of demonstrating what the

21  state of the art was and what people were thinking about at

22  that time and what commercial products and functionality

23  existed in that time frame.

24  Q.   Were there any patents that disclosed wirelessly

25  communicating between camera and a remote device?

1    **A.**    Yes.  Boland again.  So Figure 2A, I've highlighted there

2    the radio, the communication channel, and the wireless

3    communication handset, again, on Slide 30.

4    **Q.**    Was there any prior art that discussed wireless streaming

5    of a preview video?

6    **A.**    Yes.  So back to the Sony Ipela, and you can see on

7    Slide 31 some of the same kinds of things that I showed before

8    where on the PC, you could monitor that camera image.  You see

9    what the screen would look like.  It could do JPEG or MPEG-4 at

10   multiple frames per second, and so you could wirelessly

11   transmit what the camera was seeing at the same time that you

12   were also recording.

13   **Q.**    Would the Sony Ipela allow a person to remotely preview

14   what was being recorded?

15   **A.**    Yes.  That's what you see on the screenshot here in the

16   lower right.  You could record, and then you could also see

17   what the camera was being pointed at.

18   **Q.**    Now, do any of the patents you reviewed talk about live

19   preview?

20   **A.**    Yes.  So Boland does, Figure 3A, again, that I showed

21   previously.  And then there's a paragraph 9 in Boland that

22   reads in part that the handset can be configured to serve as a

23   viewfinder for the wireless video recording headset.  So right

24   there on the handset, you could wirelessly preview the video

25   image.

1    Q.    Any other examples?

2    A.    Yes.  There's another patent by Presler that's shown on

3    Slide 33, and it had live preview functionality described in

4    that patent publication.

5    Q.    Can you summarize the state-of-the-art evidence you

6    presented for wireless-enabled cameras?

7    A.    Yes.  So here's the summary slide on 34.  It shows these

8    products again.  It has the additional material for the dates

9    and then the patents applications and publications for Boland

10   and Presler.

11          MS. CLARK:  Move to admit DTX-4214.

12          MR. KEVILLE:  No objection.

13          THE COURT:  It's admitted.

14       (Trial Exhibit 4214 received in evidence.)

15   BY MS. CLARK:

16   Q.    There's one last concept now on your concept slide that

17   you indicated as relevant to your assessment of the state of

18   the art.  It says "Camera Processor."

19       Are you aware of any camera processors that were available

20   in the prior art?

21   A.    Yes, I am.  There were a number of camera processors that

22   were available.

23   Q.    Can you identify some of them?

24   A.    Yes.  One of them was described in the Boland patent

25   application at paragraph 50.  It talks about the functionality

1  of the processor, the camera processor in Boland could be

2  provided by a CoreLogic 9020 chip commercially available, and

3  then it would be paired with other kinds of chips, or then it

4  says that you could use other chips.

5      It will be appreciated, however, that various

6  functionalities may be incorporated into any number of

7  different application processing platforms, and the present

8  invention in Boland is not limited to just the CoreLogic chip.

9  **Q.**  What are some of the other processing platforms that would

10  have been available in November of 2009?

11  **A.**  One of which would have been the Ambarella A5.  I actually

12  have one here.  It's probably too small to see, but it gives

13  you sort of a sense of what this chip looks like.  It's about

14  the size of a postage stamp.  And so there's a blown-up version

15  on the screen there.  It's the kind of chip that could go into

16  any of the kinds of products that you've heard about.

17      We've heard a lot about the Ambarella A5.  There's also an

18  A5s.  And so those are two additional examples of camera

19  processors that were available in the marketplace prior to

20  December 2009, that earliest conception date that Contour has

21  alleged.

22  **Q.**  Can you summarize some of the evidence you've just walked

23  through with respect to camera processors available in the

24  state of the art?

25  **A.**  Yes.  Another summary slide, so it's got the CoreLogic

1   CL9020 on there.  It's got the Ambarella A5.  And then you also

2   heard testimony about the Ambarella A5s.  There's materials

3   that supports the dates for each of those.

4       And then you heard Dr. LeGall just testify and offer

5   testimony about various documents and what they said,

6   supporting both the dates and the functionality of those chips.

7   **Q.**  Now, would someone who knows about this technology be able

8   to use the processors you looked at in a camera?

9   **A.**  Yes.  So the idea here for certain is that Ambarella was

10  selling these chips and marketing them.  The expectation, the

11  commonsense expectation, is that somebody would know how to use

12  those chips and put them into a product as part of the

13  development cycle.

14      And so the idea of working backwards to when was the

15  conception to use the chip and its functionality and then to go

16  through the process of building a commercialized version that

17  made all of the decisions on what the product should look like

18  in the marketplace, that was something that could happen after.

19  **Q.**  So beyond all the art that you just talked about, is there

20  anything else you can think of that discloses the idea of

21  sending a lower-quality preview video while also recording a

22  higher-quality video?

23  **A.**  Yes.  This one was actually pretty neat.  There was

24  actually a NASA article in the lead-up to landing on the moon.

25  And NASA developed, essentially, a camera that could record in

 1    a higher quality and then transmit wirelessly all the way back

 2    to earth a lower-quality version.  And that was actually

 3    something that was eventually used for the Apollo 11 moon

 4    landing, but it was on Apollo 10 that they really had this kind

 5    of camera.

 6        So the concept of you want a high-quality version stored

 7    locally that you could use and then send a low quality

 8    wirelessly, even from the moon to the earth, was something that

 9    NASA was thinking about in the late '60s.  They even had a

10    remote control monitor that they had within the capsule so that

11    they could see what was being recorded.

12        So the kind of the basic concept of the Contour invention

13    is something that has been around for a long time.

14    Q.    Can you sort of summarize the landscape of the prior art

15    concepts and evidence you just talked about?

16    A.    Yes.  So I've put all of these things onto a timeline.

17    That's shown on Slide 40.  You can see all of this is kind of

18    on the dates when I've identified.

19        I've added a red December 2009.  I think the date should

20    be September 2010.  The only thing that it would really affect

21    if Contour successfully argued an earlier conception date would

22    be that the commercial Looxcie would not be something to be

23    considered on this timeline.  Everything else was before even

24    the earliest date that Contour alleges they came up with the

25    invention.

1  **Q.**   Now, are these references that you discussed, is that the

2  universe of prior art that makes up the state of the art at the

3  time of the invention?

4  **A.**   No, it's not.

5  **Q.**   How does GoPro fit into the state of the art?

6  **A.**   GoPro fits into the state of the art.  They were working

7  on technology before even this December 2009 time frame.  You

8  heard Mr. Woodman testify, and he talked about the -- when the

9  company was founded, the first HERO camera, its evolution.  He

10 talked about the Woodman patent.  He talked about some of the

11 specifications that were identified.  And, generally, those

12 kind of overlap with the four general categories I talked about

13 earlier as something that Mr. Woodman and GoPro were working on

14 even before December 2009.

15 **Q.**   So did GoPro have all the concepts you described as being

16 part of the state of the art by December of 2009?

17 **A.**   Yes.  The evidence that has come in through Mr. Woodman's

18 testimony and the documents that he was asked about all

19 demonstrate that the basic camera hardware, wireless preview,

20 multiple different video streams of different resolutions,

21 remote controls, were things that GoPro was working on, had

22 conceived of prior to December 2009.

23 **Q.**   Did it take GoPro some time to take those ideas and make

24 them into a product that was commercially viable?

25 **A.**   Yes.  As you would expect, once you've conceived of an

1  idea, it takes time to get something to market.  There are

2  decisions that have to be made in the process of deciding the

3  form factor, the shape and size, what functionality to include,

4  in what versions of the products you're offering.  Those are

5  all kinds of decisions that need to be made in the

6  commercialization phase.

7  **Q.**  Does it matter -- does the state-of-the-art analysis look

8  at when an idea was conceived or when it was ultimately

9  commercialized?

10 **A.**  For validity, it's conception, when you come up with the

11 idea, not all of the steps to releasing a commercial product.

12 **Q.**  Did you see any evidence that GoPro worked diligently to

13 reduce its idea to practice?

14 **A.**  Yes.  There was testimony from Mr. Woodman that talked

15 about where certain features were included in which products

16 and then, ultimately, when a product like HERO2 with the WiFi

17 BacPac was released.

18 **Q.**  Did you see any prototypes?

19 **A.**  Yes, I did.  There was testimony on prototypes.  I think

20 they ordered something like 400 boards.  You could imagine a

21 company would go through various phases of prototyping

22 different functionality over the course of time.  There were a

23 number of prototypes that were produced in this case from the

24 original time frame in 2009 over 16 years ago.

25 **Q.**  Do you recall seeing any prototypes or inspecting any

1  prototypes that were dated 2009?

2  **A.**    Yes, I did.  I think they were produced in this case.  I

3  took pictures of them and included some of those in my reports.

4  **Q.**    Do you recall -- how did the prototypes that you inspected

5  inform your opinions?

6  **A.**    The only thing that it really mattered to me on the

7  prototypes was that it demonstrated GoPro was working to test

8  the ideas that it had conceived of.  So there was already

9  evidence that they had conceived of all of the things that were

10  required to build one of these cameras, and the prototypes

11  served to demonstrate, over time, efforts to put those things

12  onto an actual circuit board.

13  **Q.**    Did the prototypes you saw work?

14  **A.**    No.  I mean, I can barely get my phone from two years ago

15  to work.  The battery's dead.  Prototypes from 16 years ago are

16  very unlikely to be able to be restarted and actually get them

17  to work.

18  **Q.**    Can you summarize the state of the art and where GoPro fit

19  in before December 2009?

20  **A.**    Yes.  So when you put all of this together, it gets to be

21  a fairly busy slide, but that's really the point.  The state of

22  the art that existed before the earliest date that Contour

23  alleges they conceived of the inventions in the '954 and '694

24  patents was rife with commercial examples, patent applications

25  that cover all of the core technology that was identified in

ALMEROTH - DIRECT / CLARK

1   the Contour patents.

2   **Q.**   Now, did you do a formal analysis of whether each

3   limitation of the asserted claims is invalid in view of the

4   state of the art?

5   **A.**   Yes, ma'am, I did.

6   **Q.**   And what did you conclude?

7   **A.**   So based on the analysis, there's a formal set of steps to

8   go through.  It was my conclusion that the three claims at

9   issue here are not new and were obvious.

10  **Q.**   Can you describe your methodology or the formal set of

11  steps you went through?

12  **A.**   Yes.  That's shown on Slide 47.  It's a question of:

13  Would each claim as a whole, all of the elements taken

14  together, have been obvious to a person of ordinary skill in

15  the art at the time of the invention?  And there's really four

16  steps to go through.

17       The first is to look at the scope and content of prior

18  art, what existed at the time.

19       What the level of ordinary skill in the art at the time of

20  the invention was.

21       Differences between the claimed invention in the Contour

22  patents and the teachings of the prior art.

23       And then there's something called objective evidence of

24  non-obviousness.

25  **Q.**   How did you do the first step, analyzing the scope and

1   content of the prior art?

2   **A.**   So the first step was really what I spent the first

3   30 minutes talking about.  What existed in the state of the

4   art?  What existed and was there that would help inform someone

5   about what was going on right before the patents were allegedly

6   conceived of?

7   **Q.**   Can you describe the next factor you looked at?

8   **A.**   Yes.  The next one is what's called the level of ordinary

9   skill in the art.  So the idea here is patents are written not

10  for everybody in a community to read.  They're meant to be read

11  by people with technical skill sets.  So if you remember the

12  handshake of the patent was you disclose something new and

13  non-obvious; in exchange for that, you get patent protection.

14      So that disclosure is read by somebody with some skills to

15  understand what's being described in the patent, and that's

16  what's called a person of ordinary skill in the art.  It's not

17  extraordinary or necessarily someone with a Ph.D., though it

18  could be, but it's someone who has ordinary skill and ordinary

19  creativity in assessing the technology.

20      For this case, it would be somebody with a bachelor's or

21  master's or Ph.D., a bachelor's degree computer science,

22  electrical engineering, somebody who goes through a university

23  program, earns a degree, and then also one to three years of

24  experience in digital video cameras, image processing, and

25  transmission of multimedia content between devices.

1    And that would be as measured by somebody in

2    September 2010, as early as December 2009.  So putting myself

3    back into that time frame, using just this level of skill,

4    that's a consideration as to whether or not to that person, the

5    inventions would be obvious or not.

6    **Q.**    Did the Court issue certain claim constructions in this

7    case that also have to be applied when you consider the claims?

8    **A.**    Yes.  There's something called claim constructions.  It's

9    just a different word for "definitions."  So there are certain

10   terms in the claims where the Court has given definitions to.

11   And that's something I absolutely applied in my analysis, to

12   take those constructions from the Court and apply them in

13   understanding what the claims are.

14       For terms that are not construed by the Court, you use the

15   plain and ordinary meaning as understood by a person of

16   ordinary skill in the art at the time of the alleged invention.

17       So the question of validity is really trying to figure out

18   exactly what was happening in December 2009 and to look at that

19   state of the art through the eyes of a person at that time.

20   **Q.**    Would your opinion regarding the level of skill in the art

21   change if the priority date were December 2009 rather than

22   September 2010?

23   **A.**    No, it wouldn't.  It's about a ten-month difference.  It

24   would not change any of my ultimate conclusions.

25   **Q.**    Now, the next step in your methodology says you look at

 1  differences between the claimed invention and teachings of the

 2  prior art.  Did you do this?

 3  **A.**   Yes, ma'am, I did.

 4  **Q.**   Can you describe generally what you did?

 5  **A.**   Yes.  So I looked at two specific pieces of prior art,

 6  that Boland patent application and then the Ambarella A5 or the

 7  Ambarella A5s as a camera processor chip that was available at

 8  the time, and those are shown on Slide 53.

 9  **Q.**   Are Boland and Ambarella the only combinations or

10  references you looked at?

11  **A.**   It's not.  I considered other combinations of other

12  references, but I'm going to step through Boland and Ambarella

13  in the level of detail required for a validity analysis.

14  **Q.**   Let's start with -- can you just tell us, quickly remind

15  us, what Boland and Ambarella are?

16  **A.**   Yes.  So -- sorry.

17        Boland is that patent application.  It was the one where

18  it had the headset on the side of your ear.  And then

19  Ambarella, the A5 or the A5s, that's the chip, the camera

20  processor, that could do dual encoding that you've heard

21  extensive testimony about.

22  **Q.**   Is there any dispute that Boland is prior art to the

23  asserted patents?

24  **A.**   No, I don't believe there is.

25  **Q.**   Is there any dispute that Ambarella's A5 platform is prior

1  art to the asserted patents?

2  **A.**   No, I don't believe there is.

3  **Q.**   In order to determine whether Boland and Ambarella

4  rendered obvious the asserted claims, what did you do?

5  **A.**   So I have to look at every word of every limitation for

6  all three claims and go through and do an assessment of what

7  Boland says and what Ambarella says.

8  **Q.**   Can you explain to the jury why we have to show evidence

9  for each and every element?

10  **A.**   That is the requirement for the Step 3 of the obviousness

11  analysis.  You have to look at every word of each claim.  If

12  you only looked at some of the requirements of the claim, it

13  would be a different invention.  And so all of the claim

14  elements form requirements for what defines what the invention

15  is.

16  **Q.**   Is there any way to streamline walking through every

17  single claim element of every single asserted claim?

18  **A.**   Yes.  There is a -- one -- one way to do it.  I've taken

19  Claim 11 and 12 of the '954 patent, put them on the left side,

20  linked them to elements in the '694 patent, Claim 6, on the

21  right side to show where there is overlap in the elements so I

22  can do kind of the two overlapping sets together.

23      And then for the '694 patent, it includes additional

24  requirements related to a mount, to a preview, to a record

25  command, and then also to a lighting setting.

1      So if I go through all of the elements kind of in that

2  way, I can demonstrate how the prior art discloses the

3  elements.

4  **Q.**   Okay.  Let's start with Boland.  At a high level, what is

5  Boland describing for us?

6  **A.**   So Boland is this patent application.  It's the camera

7  that sits on the side of your head.  There's the Figure 2A.

8  And you'll start to notice, as I read out some of the elements

9  in Figure 2A, how they map to things you've heard about as it

10  relates to the invention.

11      So you see here on Slide 57, there's a lens under here.

12  There's an image processor.  There's a signal from the image

13  processor to what's called the processor, the MMAP.  There's

14  also storage down here.  And then there are lines that show

15  video control and video data going to a radio and then out to

16  the wireless communication handset.

17  **Q.**   And what are the first limitations of the claims that you

18  considered with respect to Boland?

19  **A.**   Okay.  So now I'm going to start marching through the

20  elements of the claims.  Unfortunately, it's a pretty tedious

21  process.  There's probably about 15 slides, but I think it's

22  critical to showing the support for my analysis that these

23  elements were inside of Boland.  I'll try not to speak too

24  fast.

25      So you have the '954 patent, Claim 11 preamble, 11.a,

1    11.b; Claim '694, 6, 3 preamble, 3.a, 3.b, and 3.c.  That's the

2    portable view of the digital camera with a lens and an image

3    sensor.  So that's shown in Figure 2A, and it's also shown in

4    words described in the abstract [as read]:

5         "A wireless video recording camera headset providing

6    hands-free video recording . . . ."

7         It's got image sensors 205 to provide an input signal to

8    the processor 210 which then encodes the video.

9    **Q.**   And what is your conclusion with respect to Boland and

10   these claim elements?

11   **A.**   That all of the elements that I show on Slide 58 are met.

12   **Q.**   What's the next element you considered?

13   **A.**   This is 11.c and 3.e for the wireless connection protocol

14   device and the requirements of that device.  Paragraph 73 of

15   Boland describes [as read]:

16        ". . . the wireless connection between the

17        headset and the handset is of sufficient bandwidth

18        (e.g. WiFi), the video data may include video frames

19        streamed from the headset in substantially real

20        time."

21        In paragraph 74 it talks about how that wireless

22   connectivity can be WiFi or Wi-Max, and you can use that same

23   protocol between the headset and the handset.

24        In paragraph 79 it talks about streaming the video frames

25   in real time as they are recorded.

1    And then in 46 it talks about the camera receiving control

2    commands, such as video control commands from the radio for

3    wireless reception of the video control command traffic over

4    the communication channel.

5    So those four paragraphs are examples within the Boland

6    specification and figures of where the concepts of 11.c and 3.e

7    are described.

8    **Q.**    And what is your conclusion with respect to Boland and

9    this claim limitation?

10   **A.**    That those limitations on Slide 59 are met.

11   **Q.**    Is there a camera processor in Boland?

12   **A.**    There is.  It is that MMAP processor Box 210.  That's

13   shown in Figure A and described in paragraph 49 as configured

14   to control the video data from the imaging pipeline and convert

15   it into a compressed format that can be recorded to the storage

16   medium.

17   And in paragraph 45, it says that processor provides -- is

18   to provide the video data to the radio for wireless

19   transmission of the image data traffic.

20   So it does have a camera processor in it.

21   **Q.**    And what is your conclusion with respect to Boland and

22   this claim element?

23   **A.**    11.d and 3.h are met by Boland --

24   **Q.**    What's next?

25   **A.**    -- for the first part.

1    The next limitations are 11.e and 3.d.  That's where you

2   receive the video image data directly from the image sensor.

3   And similar in 3.d of the '694 patent, that's shown in

4   Figure 2A via that signal line 209.

5   **Q.**   What is your conclusion with respect to Boland and this

6   claim element?

7   **A.**   Those limitations are met as shown on Slide 61.

8   **Q.**   What's the next element you considered?

9   **A.**   The next one is 11.g of the '954 patent and 3.i of the

10  '694 patent.  This has limitations dealing with sending the two

11  video streams from the wireless connection protocol device.

12    You see that in Figure 3.b, between the headset and the

13  handset, there's a line 216A for video, and then it shows the

14  view 303 on that handset, and that functionality is described

15  in paragraph 74:  Video data 216B may be transferred from the

16  headset to a personal computing platform, and it describes the

17  use of WiFi between the headset and the handset.

18  **Q.**   And what's your conclusion with respect to Boland and this

19  claim element?

20  **A.**   That 11.g and 3.i are met as shown on Slide 62.

21  **Q.**   What's the next element?

22  **A.**   The next one is 11.h and 3.k.  Those are elements that

23  talk about the reception of certain kinds of control signals.

24    And I won't read through them, but those are the ones

25  shown in 11.a and 3.k, two groups of which one from each group

1    has to be disclosed.

2         That's shown in paragraph 11 to start with where it talks

3    about a method of configuring a wireless communication handset

4    to control a wireless headset and receiving headset control

5    commands issued from the handset using the application on the

6    handset.

7         Paragraph 63 talks about what those video control commands

8    can be.  They can include any number of commands which control

9    and/or configure the video recording capabilities of the video

10   recording headset, and it says:  Generally any command employed

11   in a conventional digital video recorder may be included in

12   those commands.

13        So that you would look across the state of the art to

14   understand what those conventional commands would be, and they

15   would be things like lighting and frame alignment, audio

16   settings, the typical things you could set for a video camera.

17        And then in paragraph 59, it describes how that handset is

18   configured to do things like start or stop the headset video

19   recording or to configure headset video capture parameters like

20   recording rates, levels, image formats, zooms.  And those are

21   examples that are also identified within the claim language of

22   11.h and 3.k.

23   Q.   What's your conclusion with respect to Boland and this

24   claim element?

25   A.   That those elements are met as shown on Slide 63.

1    **Q.**    What is the next claim element?

2    **A.**    The next one is with respect to 11.i and 11.j and 3.l for

3    receiving the control commands and adjusting one or more

4    setting, so receiving in the camera those settings and then

5    acting on them.  And it's the same evidence that I just

6    described with respect to Figure 59 of Boland.

7    **Q.**    What is your conclusion with respect to Boland and this

8    claim element?

9    **A.**    That the elements are met as shown on Slide 64.

10    **Q.**    Moving on to the next element, can you describe what you

11    looked at?

12    **A.**    Yes.  For 3.f and 3.g of the '694 patent, that's the part

13    that had additional elements related to the mount.  You see

14    here in Figure 1 that it's mounted to the head, and paragraph 6

15    says:  To record a video from a user's perspective, that user

16    may have various wearable form factors, such as a necklace, a

17    brooch, or as a headset.  So that description covers the

18    requirements of 3.f and 3.g.

19    **Q.**    What is your conclusion with respect to Boland and this

20    claim element?

21    **A.**    Those elements are met for the reasons I've shown on

22    Slide 65.

23    **Q.**    What's the next element?

24    **A.**    This is the additional requirement of Claim 6 of the '694

25    patent that requires being able to manually adjust the video

1  camera and to have a preview.  That's described in 61.  The

2  user's video recorder control interface with the view screen

3  can serve as a preview screen or a viewfinder similar to a

4  conventional video recorder.  And then paragraph 9, it can be

5  configured to serve as a viewfinder for the wireless video

6  recording headset and/or control operation.

7  **Q.**   What's your conclusion with respect to whether this claim

8  is met?

9  **A.**   For the evidence I cited on Slide 66, those elements --

10  that element is met.

11  **Q.**   What's the next element that you evaluated?

12  **A.**   The next one, the record command, is shown in 3.m of the

13  '694 patent, Claim 6.  That's described in paragraph 63 where

14  the video control commands can include, but are not limited to,

15  record on/off, toggling the video recorder from a recording

16  state to a non-recording state, and paragraph 59 where that

17  headset can communicate those commands -- receive those

18  commands in the headset from the handset.

19  **Q.**   And what is your conclusion with respect to Boland and

20  this claim element?

21  **A.**   That they're met based on the evidence I've shown on

22  Slide 67.

23  **Q.**   Can you summarize for me the elements you believe are

24  disclosed in Boland?

25  **A.**   Okay.  Phew.  Those are all shown on Slide 69.

1    And there's checkmarks for all of the elements that I went

2    through and I described that, word for word that I read, are

3    shown in the specification of Boland, and so you can check off

4    all of those limitations as being present in the prior art.

5    **Q.**   You recall we discussed Dr. Hu's characterization of the

6    claim as live preview while recording.  Does Boland disclose

7    the functionality of live preview while recording?

8    **A.**   Yes, it does.  That's really the purpose of having the

9    headset and then also the handset where you can preview what

10   you're recording while you're recording it.

11   **Q.**   Does Boland say anything about using different camera

12   processors in its system?

13   **A.**   Yes, it does.  So on Slide 70, it describes paragraph 49

14   where it says that the processor -- that that camera processor

15   can be implemented as one or more microcontrollers and digital

16   signal processors; for example, as a system on a chip.

17       I know we've heard that term a little bit.  A system on a

18   chip is where you have multiple components or devices all put

19   onto the same chip.  And so instead of just a single set of

20   transistors, you can have, like, a WiFi device on it, you can

21   have a Bluetooth device on it, multiple components that go on

22   to the same chip.  And that's what distinguishes it as a system

23   on a chip versus just a chip.

24       Then in paragraph 50 it says [as read]:

25           "As shown, the functionality of the processor is

1          provided by a multimedia application processor" --

2          that's what MMAP stands for -- "such as the CoreLogic

3          9020 chip that's commercially available . . . ."

4       So it identifies one chip that could be used as the camera

5    processor that would fit into the invention of Boland.

6          It also says [as read]:

7              "It will be appreciated, however, that various

8          functionalities may be incorporated into any

9          number of different application processing platforms

10         and the present invention is not limited in the

11         respect," of a CoreLogic 9020 chip but other chips

12         could be used as the camera processor in the context

13         of Boland.

14   **Q.**  Now, if a person of ordinary skill in the art with Boland

15   was looking to implement that system, what other processors

16   would he or she have, hypothetically, been aware of?

17   **A.**  So a person of skill in the art would have looked across

18   the state of the art to see what other kinds of camera

19   processors existed.  And you've heard about a variety of camera

20   processors that were available in the marketplace, but one that

21   I want to particularly focus on is the Ambarella A5 and A5s

22   that you heard testimony about last week in the context of what

23   GoPro and Contour were using it for and then also what

24   Dr. LeGall testified this morning about what Ambarella, as the

25   company, was doing with respect to the A5 and the A5s chips.

1          THE COURT:  Ms. Clark, would this be a good time to

2    take a break?

3          MS. CLARK:  Yes, Your Honor.  Thank you.

4          THE COURT:  All right.  Ladies and gentlemen, let's

5    take our second break.  15 minutes.

6       (Proceedings were heard out of the presence of the jury.)

7          THE COURT:  All right.  We're in recess.

8                   (Recess taken at 11:49 a.m.)

9                (Proceedings resumed at 12:06 p.m.)

10      (Proceedings were heard out of the presence of the jury.)

11         THE COURT:  Ready to go?

12         MS. CLARK:  Yes, Your Honor.

13      (Proceedings were heard in the presence of the jury.)

14         THE COURT:  All right.  Please be seated, everybody.

15      Ms. Clark, go ahead.

16         MS. CLARK:  My apologies.  I missed a claim element.

17      Could we please, Mr. Arndt, put up DDX-5668.

18   BY MS. CLARK:

19   Q.   Dr. Almeroth, did you analyze this claim element as well?

20   A.   Yes.  This was for the dependent portion of Claim 6 of the

21   '694 patent.  This has to do with the lighting setting.  That's

22   in paragraph 59 when it talks about the settings generally and

23   then in 63 when it says [as read]:

24          "Generally, any command employed in conventional

25       digital video recorder may be included in the video

1        control commands . . . ."

2        And then it goes on, "such as but not limited to."

3        Lighting is one of those settings that was in conventional

4    digital video recorders.

5    **Q.**   What is your conclusion with respect to Boland and this

6    claim element?

7    **A.**   That it's met for the reasons identified on Slide 68.

8    **Q.**   Okay.  Let's go back to -- right, here we are.

9        Can you just remind us again of the materials that you

10   considered in evaluating Ambarella and its availability to a

11   person of skill in the art at the time of the invention?

12   **A.**   Yes.  So in considering the Ambarella A5 and the A5s,

13   there's a variety of documents that have been entered into

14   evidence in this case over the past week, including this

15   morning.  That's kind of shown on the left side of Slide 71.

16       Then there's a variety of sales records that Dr. LeGall

17   testified about that helped establish when those chips, the A5

18   and the A5s, were specifically on sale and that they were on

19   sale before the earliest conception date of December 2009.

20   **Q.**   And can you describe to me how Ambarella discloses the

21   additional claim limitations?

22   **A.**   Yes.  So based on all of that material, the idea of what's

23   described in limitations 11.f and 12 of the '954 patent and 3.h

24   of the '694 patent, generating video image data as a first

25   image data stream and a second image data stream wherein the

1    second image data stream is a higher quality than the first

2    image data stream, that's 11.f.

3        And then the additional requirements of 12 and of 3.h are

4    identified in those Ambarella materials, some of examples of

5    which are shown here on the screen on Slide 72 about its dual

6    record with preview capability and the idea that Ambarella was

7    envisioned to be used in a setting where video would be

8    delivered wirelessly over a network.

9    **Q.**    Have you heard any other evidence during the course of

10   this trial that substantiates your opinion about Ambarella's

11   disclosure?

12   **A.**    Yes.  There's been a lot of testimony about the Ambarella

13   A5.  You might now start to understand why so many people have

14   talked about it.

15       But Dr. Mander testified about it as the inventor on the

16   Contour patents, Mr. LeGall this morning from Ambarella about

17   its capabilities, Mr. Woodman and GoPro's contemplation in the

18   use of that A5 chip, Ms. O'Donnell from Contour, and then also

19   Mr. Harrison who was the first to testify last Tuesday.

20   **Q.**    What is your conclusion with respect to Ambarella and this

21   claim element?

22   **A.**    That based on all of the evidence, it meets those camera

23   processor limitations 11.f, 12, and 3.h.

24   **Q.**    Was Ambarella touting the use of its A5 and A5s platforms

25   for camera systems like the one in Boland?

1   **A.**   Yes.   That's what Mr. LeGall testified about this morning,

2   that they worked with a lot of different companies.   They had

3   press releases.   They had demonstrations at the Consumer

4   Electronic Show.   That's what you would expect a company to do

5   when it had created a chip -- a system on a chip for various of

6   its customers to use as a camera processor in the devices that

7   were in the marketplace and that were being developed at the

8   time.

9   **Q.**   In your opinion, does the combination of Boland and

10   Ambarella disclose every limitation of the asserted claims?

11   **A.**   Yes, ma'am, they do.   For all of the reasons I've gone

12   through in detail, all of the limitations of the three asserted

13   claims are in that combination of Boland and Ambarella.

14   **Q.**   Now that you've established the basis for your conclusion

15   that the asserted claims are disclosed in Boland and Ambarella,

16   are there any other steps you have to take in determining

17   whether the invention was obvious?

18   **A.**   Yes.   There's that last, fourth step, this objective

19   evidence of non-obviousness.   And sometimes there are factors

20   that are happening at the time that would suggest that this

21   invention wasn't obvious after all, and there's a variety of

22   factors that can be considered as secondary indicia.

23   **Q.**   Did any of the secondary evidence you considered rise to

24   the level of overcoming your conclusion that Ambarella and

25   Boland render the claims obvious?

1    **A.**    No.  I think that the clear teaching in Boland and then

2    the clear evidence that Ambarella was available and it was

3    being used exactly how Ambarella was describing it, that there

4    aren't any indicia secondary considerations that would overcome

5    the obviousness of that combination.

6    **Q.**    Now, you've heard plaintiff's counsel suggest that

7    Mr. Woodman copied Contour's invention before the patents

8    issued.  Do you recall that?

9    **A.**    Yes, I do.

10    **Q.**    Do you believe the evidence shows that Mr. Woodman or

11    anyone at GoPro copied the claimed invention?

12    **A.**    No.  The evidence doesn't provide any evidence of copying.

13    **Q.**    Why not?

14    **A.**    Well, when you go back to this slide, this timeline of

15    things that GoPro was doing, and you look at the products that

16    they had, the evolution of those products, the trajectory of

17    what GoPro was trying to do, what it was thinking about, what

18    it had conceived of, what it was working on, there's evidence

19    from as far back as 2004 on the basic camera hardware.

20         You see the Woodman patent that talks about wireless

21    preview and remote control.  There's the GoPro specification

22    from January of 2009, nine months before this earliest

23    conception by Contour.  There's also emails through that period

24    of time.

25         GoPro was working on these ideas and this technology

1    exactly in the time frame in the years leading up to the

2    earliest possible conception date for Contour.  So GoPro had

3    established its vision and what it was trying to do as

4    evidenced by these documents, and you can't copy something if

5    you're doing it first.

6    **Q.**    Well, if GoPro had obtained samples of Contour's product

7    in January of 2011, would that change your opinion as to

8    whether evidence of copying undermines a finding of

9    obviousness?

10   **A.**    No.  The fact that more than a year later they were buying

11   samples to tear down doesn't evidence of copy because you have

12   to look at what GoPro was already established as doing before

13   the patents came along.

14   **Q.**    Do you recall Mr. Green's testimony by video deposition

15   played in trial?

16   **A.**    Yes.

17   **Q.**    Do you recall that he said Contour was also purchasing

18   GoPro products for evaluation?

19   **A.**    Yes.  It's what happens in a competitive marketplace.  You

20   want to see what features someone else does.  You better

21   believe Apple is looking at Samsung, Samsung is looking at

22   Apple.  All of these companies, when they have products in this

23   space, look at what their competitors are doing to see if it's

24   something worth doing.

25   **Q.**    Did GoPro ever come out with a commercial product that

1  copied the ContourGPS?

2  **A.**   No, because the ContourGPS did Bluetooth and the GoPro

3  products used WiFi.  So that was a decision that GoPro made

4  that took it in a different direction than what Contour was

5  doing.

6  **Q.**   Having considered all the evidence, what is your ultimate

7  conclusion as to whether the asserted claims are obvious in

8  view of Boland and Ambarella?

9  **A.**   In view of Ambarella and Boland, Boland and Ambarella,

10  that the claims, the three claims, would have been obvious.

11  **Q.**   Okay.  Let's just stay on this slide for a second, though.

12      In evaluating the evidence, did you form any opinion

13  regarding whether Mr. Woodman had already conceived or come up

14  with ideas that are recited in the asserted patents?

15  **A.**   Yes.  I also did an analysis.  You start to see the first

16  part of it on this slide with respect to looking for whether or

17  not Mr. Woodman had conceived of all of the elements of the

18  Contour patent claims before Contour did.

19  **Q.**   And what did you conclude?

20  **A.**   That I did.  I concluded that all of the elements, when

21  you kind of look at the core documents -- the Woodman patent,

22  that GoPro spec, and some of the GoPro emails -- that all of

23  the elements of the Contour claims are all described in those

24  documents.  And those documents predate even the early

25  December 2009 date offered by Contour.  They were already in

 1  those documents by Mr. Woodman.

 2  **Q.**  Were you here for Mr. Woodman's testimony?

 3  **A.**  Yes, I was.

 4  **Q.**  Okay.  So without going back through all of that, can we

 5  take a minute to just see how Mr. Woodman's documents and his

 6  testimony match up to the claimed concepts?

 7          **MS. CLARK:**  Can we bring up DDX-5.80, please.

 8      Thank you.

 9  **BY MS. CLARK:**

10  **Q.**  Let's talk first about the basic camera hardware and

11  wireless capability.  I think that's Elements 11, preamble,

12  through 11.c.

13      Did Mr. Woodman have the idea for these elements?

14  **A.**  Yes.  The portable point-of-view digital camera, the lens,

15  and the image sensor, as it's described here, that was

16  described in the Woodman patent, for example.

17  **Q.**  Had GoPro also sold products that included those basic

18  hardware components?

19  **A.**  Yes.  In the earlier products in the earlier timeline,

20  they had a lens and an image sensor as its described in 11.b.

21  **Q.**  Let's look at DDX-5.81.  Are you familiar with

22  Mr. Woodman's patent '251?

23  **A.**  Yes.

24  **Q.**  It was first filed in July of 2008.  That's more than a

25  year before Contour's priority date; correct?

1  **A.**    Yes.

2  **Q.**    And what does this section on the slide show?

3  **A.**    So it describes that the wireless interface transmits the

4  image currently in view of the camera lens to the remote

5  preview screen for display.  It has a two-way interface so it

6  can communicate between the camera and the remote preview

7  screen.  The user can control various camera operations, and it

8  describes it as being done by wireless, including RF,

9  802.11a/b/g or n as examples of the wireless standard, and the

10  video can be captured and downloaded in real time from the

11  camera and be able to be viewed on that wireless control

12  operation remote control.

13  **Q.**    And does this disclosure from 2008 inform your opinion at

14  all as to whether GoPro, or Mr. Woodman specifically, had the

15  idea and published the idea for Live Preview with Remote

16  Control before 2009?

17  **A.**    Yes.  It was all in the provisional application as an

18  example.

19  **Q.**    All right.  Let's look at DDX-5.82.  Did Mr. Woodman

20  already have in mind Elements A through C?

21  **A.**    Yes.  So that's for the basic camera hardware, the

22  Preamble A and B.  And then even for C for the wireless

23  connection protocol device, that was described in the Woodman

24  provisional as well.

25  **Q.**    Let's look at processor -- the processor limitations 11.d

1    through g.  Did you see any evidence that Mr. Woodman had in

2    his mind the concept of including these elements?

3    **A.**    Yes.  He had conceived of those concepts, and that was in

4    his testimony and also in the evidence as well.

5    **Q.**    Let's look at DDX-5.83.  Are you familiar with this

6    document?

7    **A.**    Yes, ma'am.

8    **Q.**    What does it show?

9    **A.**    This is the GoPro HERO HD camera system proposal,

10   January 13th, 2009.  It's what they were thinking of about

11   nine months, ten months before the December 2009 date.

12        And it says in there that [as read]:

13        "The HERO HD camera provides the capability to

14        record at HD resolution and output at a lower

15        resolution simultaneously.  For example, the camera

16        can be shooting in HD to the SD card, stored on the

17        SD card at the same time it's outputting 640 by 480

18        VGA video to the RF transceiver."

19        And then it also talks about what that handheld wireless

20   remote module with a 2-inch LCD display can also be displaying.

21   **Q.**    Does HD 144 by -- is the 1080p a higher-quality video than

22   the VGA video to the RF transceiver?

23   **A.**    Yes.

24   **Q.**    What does this document show with respect to whether

25   Mr. Woodman had come up with the idea of remotely controlling

1   the camera?

2   **A.**   That's shown in that second portion on Slide 83 where it

3   has a remote power on and off, a camera on and off, volume

4   selectors, and different kinds of controls that would have

5   existed on the remote control.

6   **Q.**   Can we turn to DDX-5.85.  Did Mr. Woodman have any

7   specific camera processors in mind when he was developing the

8   implementation of his idea?

9   **A.**   Yes.  On Slide 85, it shows that there was contemplation

10  of the use of the A2 and the A5 SoC solutions within that

11  platform, within that camera.

12  **Q.**   And can you remind us, could the Ambarella A5 processing

13  platform record two video streams in parallel and output the

14  lower-resolution stream so it could be sent to a mobile device?

15  **A.**   Yes.  That's what Dr. LeGall testified about this morning,

16  and that was what I had determined as well.

17  **Q.**   Okay.  Let's go back to the claim language, DDX-5.86.

18  What is your conclusion as to whether or not Mr. Woodman had

19  conceived the Elements 11.d through 11.g?

20  **A.**   He had.

21  **Q.**   And, finally, the Elements .h through 11.j --

22  **A.**   Yes.

23  **Q.**   -- did Mr. Woodman have those concepts in mind as well?

24  **A.**   Yes, he did.  That was based on the evidence we looked at

25  for the remote control aspects of what the camera processor

1    could handle.

2    **Q.**    Did GoPro ever build a product that contained all the

3    concepts recited in Claim 11?

4    **A.**    Yes, it did.  The HERO2 with the WiFi BacPac.

5    **Q.**    Is there any dispute that the HERO2 with the WiFi BacPac

6    reflected these claim elements?

7    **A.**    No, it's not.  It's one of the products where Judge Orrick

8    identified all the limitations are already being met.

9    **Q.**    Okay.  Let's look very quickly through the rest of the

10   claims, DDX-5.87.  What's shown here?

11   **A.**    This is my mapping then where we have to cover the mount,

12   the preview, the record, and the lighting to get all of the

13   other limitations from Claim 6 and then the preview from

14   Claim 12.

15   **Q.**    Did you hear testimony from Mr. Woodman regarding whether

16   he had these ideas as well?

17   **A.**    Yes, certainly, for the mount.  And then we saw the

18   document that said that it was supposed to be used as a

19   preview.  We saw the document, the GoPro design, that said the

20   remote control was to do the record.  And then the lighting was

21   also one of the settings that would have been described within

22   the Woodman patent.

23   **Q.**    Is there anything that's recited in any of the asserted

24   claims that Mr. Woodman did not testify to having in mind prior

25   to December 2009?

1  **A.**    No.  His testimony walked through all of the concepts that

2  are across the three claims.

3  **Q.**    Now, do you recall Mr. Woodman saying that he didn't think

4  he was an inventor on Contour's patent or he shouldn't be an

5  inventor?

6  **A.**    Yes.

7  **Q.**    Are there concepts reflected herein that Mr. Woodman did

8  not invent?

9  **A.**    That's correct.  That was my understanding of what he

10  said, that there were concepts already in the prior art.  He

11  had conceived of putting those together, but that's what he

12  thought he was trying to do.

13  **Q.**    Is one of the concepts that was already in the prior art

14  the image processing functionality of the Ambarella A5

15  platform?

16  **A.**    Yes, ma'am.

17  **Q.**    Does the fact that the A5 platform already existed mean

18  Mr. Woodman had not conceived of all of the elements or didn't

19  have in his mind all of the elements reflected in Contour's

20  patents?

21  **A.**    No.  It was Mr. Woodman's idea to put the A5 chip into the

22  system he was trying to design and build.

23  **Q.**    If Mr. Woodman conceived of the elements of the claims

24  before Contour, and then GoPro diligently worked to put those

25  ideas into a product like the HERO2, can the asserted claims be

1   valid?

2   **A.**   They cannot.

3   **Q.**   Does it matter if a product was built and launched after

4   the ContourGPS?

5   **A.**   No.  What matters is the conception to come up with that

6   idea of all of those things together.

7   **Q.**   Now, you understand that the Patent Office reviewed the

8   applications and issued Contour's patents, though; right?

9   **A.**   Yes.  The Contour patents are currently valid.

10   **Q.**   Do you disagree with the Patent Office's conclusions?

11   **A.**   Yes, I do.  I think the Patent Office made a mistake.

12          **MS. CLARK:**  Can we put up DDX-5.78, please.

13                (Video was played but not reported.)

14          **MS. CLARK:**  Can we pause it.

15   **BY MS. CLARK:**

16   **Q.**   Dr. Almeroth, why, in your opinion, did the Patent Office

17   get it wrong?

18   **A.**   So this is the video from last week -- it seems forever

19   ago -- but it mentioned three things that could contribute to

20   why the patent could have been issued incorrectly, the first of

21   which is that there was art that the Patent Office didn't have

22   available to it in terms of its consideration; that when the

23   patent was originally prosecuted, there wasn't someone there to

24   explain on behalf of someone who was accused of infringement

25   why it might be obvious; and then the third is the video said

1    that, you know, that sometimes the Patent Office does make

2    mistakes.

3    **Q.**    Should we play the video?

4    **A.**    I think so.

5    **Q.**    Okay.

6                    (Video was played but not reported.)

7    **BY MS. CLARK:**

8    **Q.**    Having walked through the entire methodology, what

9    conclusion did you draw regarding the validity of the asserted

10   claim?

11   **A.**    It's my ultimate conclusion that Claims 11 and 12 of the

12   '954 patent and Claim 6 of the '694 patent are invalid.

13   **Q.**    Let's move on to the next question you were asked to

14   address.

15        Were you asked to evaluate infringement of certain GoPro

16   products?

17   **A.**    Yes.  I was asked to look at Dr. Hu's testimony and decide

18   whether or not the GoPro Live Streaming and the Live Preview

19   Group 2 products infringed those three asserted claims.

20   **Q.**    Before we move on to address the new cameras, is it your

21   understanding that the Court found GoPro cameras sold between

22   December 2015 and September 2019 practice the elements of

23   Claim 11 of the '954?

24   **A.**    Yes, that's my understanding.

25   **Q.**    Do you believe GoPro should be liable for the cameras

1   found to practice the elements of Claim 11?

2   **A.**   No, because I believe the patents are invalid, the three

3   asserted claims are invalid.  And for invalid claims, there

4   would be no liability.

5   **Q.**   Are you offering any non-infringement opinions today

6   regarding the '95 -- the old products?

7   **A.**   No, I'm not offering any non-infringement opinions for the

8   Live Preview Group 1 products.

9   **Q.**   And why is that?

10   **A.**   They've already been determined to meet all of the

11   limitations of at least one of the claims, and whether or not

12   they meet the limitations of the other claims doesn't matter.

13   Once you've infringed one claim, then additional considerations

14   don't matter.

15   **Q.**   You were here for Dr. Ugone's testimony; correct?

16   **A.**   Yes, ma'am.

17   **Q.**   His damages opinions are based on one claim; right?

18   **A.**   That's correct.

19   **Q.**   Okay.  Has GoPro launched any additional cameras since

20   September 2019, though?

21   **A.**   Yes.  The cameras that exist in the Live Streaming Group

22   and also the Live Preview Group 2.

23   **Q.**   And did you do an evaluation of whether the Group 2 and

24   Group 3 cameras infringe the asserted claims?

25   **A.**   Yes, I did.

1    **Q.**    What was your conclusion?

2    **A.**    That they do not infringe for at least a couple of

3    reasons.

4    **Q.**    Did you have a formal methodology for evaluating

5    infringement like you did for invalidity?

6    **A.**    Yes.  So there's a methodology here.  It has the same

7    Step 1 where you consider the claim language and the Court's

8    claim constructions to figure out the claim scope.  That would

9    include things, again, like that person of ordinary skill in

10    the art that I described earlier, the faithful application of

11    the Court's definitions or claim constructions.

12        And then there's Step 2, and that is to compare the claims

13    as to what Dr. Hu said on behalf of Contour and whether or not

14    the GoPro Group 2 or the live streaming product meet all of the

15    limitations of the claims.

16    **Q.**    Now, if a camera meets most, but not all of the claim

17    elements, does it still infringe?

18    **A.**    No.  Just like I did with invalidity where you have to

19    walk through and show all of the limitations, for infringement,

20    if there's even one limitation that's missing, then it's a

21    different product.

22        Sometimes there's an analogy, like if all the claims said

23    that you had to have a red soccer ball and instead you had a

24    blue soccer ball, then it wouldn't be the same as what the

25    claims covered, and so that would be a reason why there would

1  be non-infringement.

2      Dr. Hu tried to go through all of the claims and identify

3  that all of the limitations were met, but I disagree with her

4  in a couple of specific regards.

5  **Q.**  What types of information did you rely on to analyze how

6  the claims apply to GoPro's new cameras?

7  **A.**  I relied on everything that Dr. Hu said she considered.  I

8  also relied on the testimony that -- of witnesses, some of

9  which you heard testified live at trial.  I also did my own

10  testing of some of these products to understand how they were

11  being accused of infringement and what scenarios they

12  specifically covered.

13  **Q.**  Let's start with the Group 2 products.  What is the

14  accused functionality of the Group 2 products?

15  **A.**  The Group 2 products is the live preview while recording

16  scenario.

17  **Q.**  Can you describe that functionality?

18  **A.**  Sure.  And it's important to understand the difference

19  between live preview before you start recording and then live

20  preview while recording.

21      One of the common use cases for a GoPro is not to use the

22  mobile phone at all; that all of the Live Preview Group 2 has a

23  display on the camera itself, and so you can line up your shot

24  using that digital video display on the camera itself.  In

25  fact, many of them have one on the front and on the back of the

1    camera.

2        The other scenario that was described by most of the

3    witnesses was live preview before recording, in which case you

4    haven't started recording yet but you have the camera mounted

5    and you want to make sure that it's in the proper position

6    before you start skiing.

7        If you're live preview before recording, that's only one

8    stream because you're not simultaneously recording.  So then

9    what you have to do is you have to record, start recording --

10    that's the one stream -- and then you also have to be streaming

11    to the phone.

12        The problem is that's often not what the case is.  And you

13    heard lots of use cases about SCUBA diving and snow skiing.

14    This is kind of the slide, and then I added over here in the

15    corner kind of this use case is you're skiing down, it's

16    recording one stream, but you're also checking your phone to

17    get that second live preview stream.

18        So the use case of where you're doing live preview while

19    recording and you're checking your phone while you're skiing,

20    while you're surfing, while you're SCUBA diving, while you're

21    driving is not the typical use case for live preview on a

22    phone.

23        You do do it beforehand where there's only one stream, the

24    live preview, but you don't have live preview simultaneously

25    with recording at the same time.

1    **Q.**   Are the claims at issue today limited to the live preview

2    while recording aspect?

3    **A.**   Yes, that's the only use case scenario that would be

4    covered.

5    **Q.**   Did you hear any testimony regarding the usage of either

6    live preview while recording or live preview in general?

7    **A.**   Yes.  Mr. Lema testified and showed that the video

8    captured from Quik, so that would be using the app to do the

9    live recording and control it and use a live preview, was a

10   very small percentage.

11       And then it wouldn't even be all of those instances

12   because you could still do video captured from the app but then

13   not seeing the live preview on the phone because you've put it

14   away to actually ski or dive or drive or surf.

15   **Q.**   For HERO9 cameras and forwards -- so 10, 11, 12, 4K --

16   does the camera automatically connect by WiFi and show a live

17   preview?

18   **A.**   No.  What's happened in this Live Preview Group 2 is you

19   heard testimony from Mr. Liu where they made changes starting

20   in HERO9 going forward.  As you would expect, there's an

21   evolution of the camera and what it could do.  So they had

22   actually started off with a version of the camera processor

23   that couldn't do live preview.  So that phone didn't even have

24   that functionality.

25       And so that was a different program, set of firmware in a

1  chip going forward starting with HERO9 as compared with the

2  Live Preview Group 1 products.

3  **Q.**   The next group of accused products, I think they're called

4  Live Streaming Products Group 3?

5  **A.**   Yes.

6  **Q.**   What is the accused functionality in the live streaming

7  products?

8  **A.**   So just to back up, I'm not sure everyone has a lot of

9  familiarity with live streaming.  It's probably the slightly

10  younger generation.  But live streaming is where you have an

11  influencer and, instead of posting a video that they've

12  recorded, they do a live stream.  And there's platforms to do

13  this.  Like Twitch does gaming.  Amazon, YouTube has live

14  streaming.  Facebook.

15      And so in those applications, you have somebody probably

16  in a studio, an influencer, trying to describe something that's

17  happening.  And then it's broadcast out to all of that person's

18  subscribers, and so all of their subscribers can then watch the

19  live stream.

20      So it's a very different use case than the idea that you

21  have a camera on your head and you want to use your phone to do

22  a live preview to adjust it.  It's kind of a whole production

23  that's set up with respect to live streaming.

24  **Q.**   I just want to be clear.  The accused cameras in the live

25  streaming group, those four cameras, do those have live preview

 1  while recording?

 2  **A.**  They don't.  Until two of them, they had live streaming --

 3  live preview later.

 4  **Q.**  Okay.  And that's why they are shown in both the live

 5  streaming and the Group 2?

 6  **A.**  That's correct.

 7  **Q.**  Okay.  Now, with respect to the live streaming cameras

 8  that don't have live preview, is all of live streaming accused,

 9  or are there additional requirements that plaintiff is relying

10  on to meet the claim limitations?

11  **A.**  It's not all scenarios.  Okay.  So there was some

12  discussion of this, and let me slow down and try and explain

13  it.

14      Normally, if you're doing live streaming, you would go

15  from a camera to some Internet access point.  If you're in your

16  house or a studio, it'd be like a WiFi router that you would

17  get from Cox or Comcast or a cable company, maybe by Verizon or

18  something like that, but that's not what's accused in this

19  situation.

20      What's accused is where you go from the GoPro to a phone,

21  but the phone is acting as a hot spot.  So there's a data plan

22  you can get from Verizon, or something like that, where you can

23  turn your phone into a hot spot and you can connect your

24  computer to your phone like in an Internet connection, and

25  sometimes you'll do that if there's no WiFi connection around.

1    So the only accused scenario for live streaming is where

2  you go from the GoPro to the phone acting as a hot spot; and

3  then from the hot spot, the phone, to a cell tower; and then

4  from the cell tower to whatever service is doing the live

5  streaming -- Facebook, YouTube, Twitch -- and then from there

6  it goes to all the subscribers.

7    But the scenario is that one of those people watching the

8  live streaming is the person giving the live streaming.  That's

9  this use case scenario.  And so it's kind of bizarre in the

10  sense of, again, comparing it to "I've got a GoPro on my head

11  and I'm trying to see if I'm going to record the right thing

12  when I start the live preview."

13    Live previews are high production.  Right?  You know,

14  you -- as soon as you go live on the live preview, everybody

15  can see it.  It's the live stream.  It's not really the time at

16  that point to try and make adjustments.  And certainly, people

17  watching the live streaming can't remote control the live

18  stream.  That's going to be the person -- the influencer who's

19  going to want to do that.

20  **Q.**  Have you seen any evidence regarding the popularity of

21  live streaming in general, whether it's the specific use case

22  via hot spot or via normal WiFi hub?

23  **A.**  Yes.  So this is data that Mr. Lema talked about last

24  Friday.  Across all of the GoPro users each month, the average

25  active users live streaming is 1.4 percent.  That's for all

1    live streams.  So now you have to take a fraction of the

2    1.4 percent to get it just through the live streamer's phone

3    acting as a hot spot.  And so it's a very, very small

4    percentage of any kind of use of the infringing scenario that

5    Contour has alleged.

6    Q.   So focusing on the infringing use scenarios, have you

7    drawn any conclusions about whether the live stream or Group 2

8    live preview products infringe; that is, meet all the claim

9    limitations?

10   A.   Yes.  I've identified a number of non-infringing reasons,

11   several in fact.  But for purposes of sort of just pointing one

12   as an example, because it only takes one for each category to

13   demonstrate non-infringement, I've identified just two that I

14   will present.

15       The first is -- relates to 11.c and 3.e.  That covers all

16   three claims and the wireless connection protocol device

17   element.  That applies to both groups, Live Streaming

18   Group 2 -- sorry -- Live Preview Group 2 and live streaming.

19       And then also the live streaming cameras do not meet '694

20   patent Claim 3.i and 3.j.  That's the only claim that's

21   asserted against the live streaming cameras.

22   Q.   What -- can you show us the claim element that your first

23   opinion relates to?

24   A.   Sure.  For the first one, it's 11.c and 3.e.  That will

25   cover the two claims from the '954 patent and 3.e from Claim 6

1  of the '694 patent.  Both have very similar language.  They

2  require a wireless connection protocol device configured to

3  send real-time image content -- that's the video -- by wireless

4  transmission directly to and receive control signals or data

5  signals by wireless transmission directly from a personal

6  portable computing device executing an application.

7       So that wireless connection protocol device has to do both

8  things.  There's an "and" there.

9  **Q.**  And what does Dr. Hu point to for this element?

10 **A.**  So this is one of Dr. Hu's slides.  What she points to is

11 that Qualcomm QCA9377 at least for five of the seven Live

12 Preview Group 2 products, and what she's showing here is:

13 Well, it uses the same chip, and so, therefore, because that

14 limitation has already been met for Group 1, it should be met

15 for Group 2 as well.

16      But that's not the case because the chip is used and

17 configured differently.

18 **Q.**  Did Dr. Hu say anything else about the functionality of

19 the wireless SoC in Group 2 and Group 3?

20 **A.**  Yes.  She did recognize that there was a difference

21 between Live Preview Group 1 and the remaining seven accused

22 cameras.  And she was asked in her testimony the question

23 [as read]:

24           "But you know, don't you, that in the accused

25      products starting with the HERO9, when you were

1  sending video wirelessly, that is being sent over the

2  WiFi protocol; correct?"

3  And she said, "That's correct."

4  [As read]:

5      "And when you are -- from the HERO9 going

6  forward, when you are receiving control commands,

7  that is being received over the Bluetooth protocol;

8  correct?"

9  And she said, "That's correct."

10  And so HERO9 is that first product of the remaining seven

11  accused cameras that are in the Live Preview Group 2.  So from

12  there forward, data was going over WiFi and control was coming

13  back in through Bluetooth.

14  **Q.**   Were you present for Mr. Dicky Liu's testimony?

15  **A.**   Yes, I was.

16  **Q.**   Do you recall him testifying about HERO8?

17  **A.**   Yes, I was.

18  **Q.**   And do you recall him testifying that an app change was

19  made for the earlier cameras?

20  **A.**   Yes, I do.

21  **Q.**   And can you explain how that relates to the change made

22  for HERO9 and forward?

23  **A.**   Right.  So there's two sides to the equation.  You can

24  make changes in the app and you can make changes in the

25  firmware.  What's relevant to my non-infringement positions is

1  the changes that were made in the firmware relative to HERO9

2  going forward.

3     There were changes made in the app, but that doesn't --

4  that's not the basis for my non-infringement position.  It's

5  the changes in the firmware that were made as a result of HERO9

6  going forward, that's what's most important, because that's the

7  part that has that wireless connection protocol device and

8  that's where the limitation has to be met in the camera and in

9  the wireless protocol itself.

10 Q.  Have you seen any additional evidence to support your

11 opinion that there's no single wireless connection protocol

12 device configured to both send image content and receive

13 control signals or data signals?

14 A.  Yes.  That's in this Qualcomm QCA9377, the WiFi Bluetooth

15 system on a chip specification and what it specifically says.

16 Q.  And how does this support your opinion?

17 A.  So a couple things.  First of all, it's a system on a

18 chip.  I described that earlier.  You can have multiple

19 components or devices that are put onto the same chip, but it's

20 still separate devices.

21     Kind of the analogy I think about is if you have two

22 people go into a house, they're still two separate people but

23 they're within the same structure of the house.

24     The same thing happens here on the QCA9377.  You see that

25 it's got WLAN technology and Bluetooth technology and that

1    those are different interfaces.

2         And then what you see is on the back of that document is

3    the block diagram, and the block diagram is shown on Slide 111

4    and it shows that there's portions for WLAN, and I've

5    identified those this red, and that there are portions for

6    Bluetooth that I've shown in yellow.

7         So what you see is that there are different devices, there

8    are different wireless connection protocol devices:  a

9    protocol device for WiFi and a protocol device for Bluetooth.

10   It's in the claim language itself that it's a protocol device.

11        Because GoPro's 9 going forward have one protocol for

12   Bluetooth for the commands and one protocol device for WiFi,

13   there is not a wireless connection protocol device that meets

14   the requirements of both being able to send and receive -- send

15   image data and receive control signals.

16   **Q.**   And what conclusion can you draw from that?

17   **A.**   So based on that, '954 patent, Claim 11.c, which is also

18   in 12, and '694 patent, Claim 3.e, are not met by the next

19   generation of GoPro products that use wireless protocol -- or

20   Bluetooth protocol and then WiFi protocol for two different

21   functions.

22   **Q.**   What is the next opinion you'd like to address?

23   **A.**   So the next one is this live streaming protocol, and that

24   relates to the elements shown on the screen.  And the relevant

25   portions of 3.i and 3.j are to cause the wireless connection

1    protocol device to send the first video image content directly

2    to the personal portable computing device for display on a

3    display.

4        And then in 3.j it's that that first image content

5    comprises a preview image of the scene.

6        That is not something that happens in the live streaming

7    scenario.

8    **Q.**    Can you explain your opinion that this is not something

9    that happens in the live streaming scenario?

10   **A.**    Yes.  So it's back to this slide again.

11       Remember, the scenario is you have to be -- have your

12   phone acting as a hot spot.  And what Dr. Hu tried to suggest

13   is that WiFi signal is going to the phone for display, and

14   that's not how it works.  It goes through the phone.  It goes

15   to the phone on its way to the cloud.  But as it goes through

16   the phone, it's not available for display on the phone.  The

17   path that it would have to take is the GoPro through the

18   hot spot to the cloud and then back down to the phone for

19   display.

20       But if you look specifically at the claim language again,

21   it says that it's sent directly to the personal portable

22   computing device for display on the display.  And that makes

23   sense in the context of what this invention is supposed to be

24   about.  Right?  You've got a phone with a live preview and you

25   adjust the camera and you can see it adjusting and you get the

1   preview on the phone.

2        The idea that it's going through your phone up into the

3   cloud and through cell towers and then back down around is not

4   that kind of scenario.  It's not the requirement of the claim

5   language.

6   **Q.**   Does GoPro have any documentary evidence showing the

7   manner in which the video is transmitted wirelessly in live

8   streaming?

9   **A.**   Yes.  So there are documents from GoPro that Mr. Liu

10  testified about on Friday that shows the path, the indirect

11  path, that the video takes in order to get to the cloud, the

12  Web services, that would then send out the video to all of the

13  subscribers of whosever doing the live stream.

14  **Q.**   Can the data that's transmitted through the mobile device

15  when it's configured as a hot spot, can it be displayed on the

16  mobile device before it goes to the cloud?

17  **A.**   No.  It's going through the phone to the cloud.  When the

18  phone is configured as a hot spot, that's all that that phone

19  can do at that point.

20  **Q.**   And does Dr. Hu dispute that the video data has to go to

21  the cloud before anyone can see it in live streaming?

22  **A.**   No.  She recognized that as the way that it operated.

23  **Q.**   Based on the evidence that you've reviewed, what is your

24  conclusion regarding whether or not live streaming meets the

25  asserted claim elements?

1    **A.**    That the accused live streaming products do not meet

2    limitations or elements 3.i or 3.j of the '694 patent, and so

3    there's no infringement of the live streaming products as they

4    have been accused.

5    **Q.**    What is your ultimate conclusion as to whether the jury

6    should find infringement of the new GoPro products?

7    **A.**    That the live streaming products do not infringe any of

8    the claims.  The only one asserted against the live streaming

9    was Claim 6 of the '694 patent.  And the Live Preview Group 2

10   products do not infringe any of the asserted claims of the '954

11   or '694 patents for the reasons I've identified.

12   **Q.**    Let's talk about damages.

13       Did you offer any opinions relating to damages?

14   **A.**    Yes, I did.

15   **Q.**    If the jury doesn't find infringement of any valid claims,

16   would the jury still consider testimony about damages?

17   **A.**    No.  If the patents are invalid or there's no

18   infringement, then there would not be damages questions for

19   live streaming or Group 2 products.

20   **Q.**    Were you asked to answer three fairly specific questions

21   relating to damages in this case?

22   **A.**    Yes, I was.

23       The first question was -- there's a license from MPV

24   Kodak, and the question was whether or not it was technically

25   comparable to the hypothetical license between Contour and

1  GoPro.

2      The second is:  Were there non-infringing alternatives

3  available to GoPro at the time of the hypothetical negotiation?

4      And the third is the question of what incremental

5  technological improvement does the claim over the -- does the

6  patent claim over the prior art.

7  **Q.**   Why is the question of technological comparability

8  relevant to a damages analysis?

9  **A.**   It's my understanding that it's one of the factors that

10 the damages experts can use to determine if there is a

11 comparable license both technologically and economically.  It

12 can form a consideration that goes into their analysis.

13 **Q.**   Did you have a methodology for assessing technological

14 comparability?

15 **A.**   Yes.  So I looked at the licensed technology and compared

16 them to the asserted claims.  I considered how that licensed

17 technology was being used, and then I evaluated the differences

18 between the claimed invention and the licensed technology.

19 **Q.**   What material did you evaluate -- or did you consider in

20 evaluating technological comparability?

21 **A.**   I considered the license agreement between MPV and slash

22 Kodak and GoPro.  It identified 14 licensed patents.

23     I also considered other evidence, like testimony from

24 Mr. Gee, the deputy general counsel for GoPro, and also the

25 GoPro products and the functionality that they had.

1           **MS. CLARK:**  Move to admit DTX-495.

2           **MR. KEVILLE:**  No objection.

3           **THE COURT:**  It's admitted.

4       (Trial Exhibit 495 received in evidence.)

5   **BY MS. CLARK:**

6   **Q.**   What is your conclusion regarding whether the MPV license

7   is technologically comparable to the hypothetical license?

8   **A.**   So I looked at those patents, all 14 of them, and

9   generally grouped most of them into a couple of different

10  categories.

11          There were patents that were related to prerecorded and

12  real-time content that GoPro had licensed, there were exemplary

13  patents relating to the editing of image data, and there were

14  also patents related to controlling cameras.  And those

15  licenses are -- or those patents that are part of the license

16  are shown in the groups on Slide 128.

17          Based on those categories and the way that the products

18  were being used, the GoPro products were being used, I reached

19  a conclusion for technical comparability that these patents in

20  this license was technically comparable to the hypothetical

21  license that would be negotiated between Contour and GoPro.

22  **Q.**   Now, are there any differences between the MPV license

23  patents and the asserted patents?

24  **A.**   There are.  So these patents cover a broader range of

25  technical solutions than just what are in the GoPro products.

1  Q.  Did you -- so next you were asked about non-infringing

2  alternatives.

3  A.  Yes.

4  Q.  Why are non-infringing alternatives important?

5  A.  So it's another consideration that goes into this

6  hypothetical damages consideration.  And logically, if Contour

7  and GoPro are sitting down to negotiate and Contour says,

8  "You're infringing our patents," one of the things that GoPro

9  would do is to look to the engineers and say, "Is there a way

10 that we could implement this functionality, technically

11 comparable functionality, but not infringe the patents?  To do

12 something that would carry GoPro's products outside what the

13 claims specifically cover?"

14      And if the answer was yes, there was something -- actually

15 something GoPro could have done, that would have an impact on

16 what that negotiation would be.

17      And so that's something I can do from a technical

18 perspective, and then provide that information to the damages

19 experts to do their analysis whether or not there was a

20 technically comparable non-infringing alternative available at

21 the time of the hypothetical negotiation.

22 Q.  What requirements have to be met to qualify as an

23 available non-infringing alternative?

24 A.  The ones that I just mentioned.  So the idea it had to be

25 available as of November 2014, it had to be commercially

1    acceptable, and then also non-infringing.

2    **Q.**    And when we say "commercially acceptable," do we mean it

3    has to be exactly the same, just as good?

4    **A.**    It has to offer the same level of functionality to be

5    technically comparable for users to be able to use it.

6    **Q.**    Have you identified any particular non-infringing

7    alternatives?

8    **A.**    I have.  I've identified a bunch of non-infringing

9    alternatives.  I think you've seen some of those.  I can

10   present one as an example of what an alternative would be.

11       So if we go back to the claims, Claim 11 of the '954

12   patent has this requirement as to one of the remote control

13   signals it can receive or is configured to receive is at least

14   one of a lighting setting, a color setting, and an audio

15   setting.

16       If the cameras were changed to not include that

17   functionality, and as Mr. Liu testified to and Mr. Lema

18   testified to on Friday, that that was something they could do

19   in 2014, that would be useful information that would go into a

20   damages analysis.

21   **Q.**    Does Dr. Hu dispute that removing the lighting, color, and

22   audio settings from the remote control, that that would be

23   non-infringing?

24   **A.**    No, she does not.  She says that it would not be

25   commercially acceptable to do that.

1    **Q.**   Well, let me ask you.  Does this non-infringing

2    alternative entirely remove the user's ability to change

3    lighting, color, and audio settings?

4    **A.**   No.  There's -- on the camera itself is part of the

5    display.  You can make those changes on the camera itself.  So

6    that functionality is still there.  It's just not functionality

7    that could be received from outside of the camera.

8    **Q.**   Could you also make changes from a remote control that

9    simply didn't have live preview?

10   **A.**   Yes.  That's another non-infringing alternative that could

11   have been implemented and, in fact, was implemented in some of

12   the products.

13   **Q.**   Are there other non-infringing alternatives that were

14   available to GoPro?

15   **A.**   Yes.  There are a variety that I went through.  I've

16   presented these as just a couple of examples because they

17   demonstrate the concept of GoPro having alternatives in that

18   November 2014 hypothetical meeting between the parties, and I

19   understand that would have an impact on the damages analysis.

20   **Q.**   But does the fact that GoPro hasn't implemented any of the

21   non-infringing alternatives affect your opinions regarding

22   their availability?

23   **A.**   No.  This is a question, it's a hypothetical question

24   about what could have been done in 2014 as part of the

25   negotiation.  The fact that they haven't gone through and

1   implemented these changes now in the current setting doesn't

2   have an impact on what could have been done in 2014.

3   **Q.**   What did you conclude regarding the availability of

4   non-infringing alternatives?

5   **A.**   That there were non-infringing alternatives available to

6   GoPro at the hypothetical negotiation.

7   **Q.**   Now, the last question relates to the incremental benefit

8   of the claimed invention.  Why is that important?

9   **A.**   Well, this goes to the question -- or the scenario I

10  talked about earlier.  If you were trying to do a patent today

11  on, say, a battery-powered car or a driverless taxi, you would

12  have an invention that would have an improvement -- it would

13  have to have an improvement over what already existed.

14  But when you calculated damages in that scenario, you

15  wouldn't claim credit for all of the technology of a driverless

16  car or a battery-powered car.  What you'd want to look at is

17  what in technological improvement was incrementally added

18  because of that invention.

19  And so it's the same question for the Contour patents back

20  in the 2010 time frame, comparing it to what already existed at

21  the time, and then what was the technological improvement over

22  what the patent claimed versus what already existed.

23  **Q.**   How did you evaluate the incremental technological benefit

24  of the claimed invention?

25  **A.**   Two steps.  The same Step 1 as I did for invalidity and

1  non-infringement, and then the second step is to separate the

2  patented improvement from the conventional components of the

3  claimed product.

4  **Q.**   You heard Dr. Ugone testify that what he valued was

5  something he called the combination of live preview with remote

6  control.  He allocated the value of all of live preview and all

7  of remote control to the asserted patents.

8      Do you agree that that's the technological benefit of the

9  claimed invention?

10  **A.**   No.  I think it was Mr. Ugone.

11  **Q.**   That's what I meant.  Dr. Ugone.

12  **A.**   Yes.  I looked at that, and I think that he included

13  everything instead of looking at the improvement over the

14  conventional components of the claimed products.

15  **Q.**   Can you, as a technical expert, identify the technological

16  benefit of the claimed invention?

17  **A.**   So the first thing is to, again, show what I thought the

18  state of the art was and what existed there to just kind of

19  remind you that that existed, that was the conventional

20  components.  And then to look at the question of:  Well, what

21  was supposed to be the incremental improvement of the patents?

22      Well, I believe the patents are invalid to start with, but

23  the assumption when you get to damages and what the damages

24  experts assume is that the patents are valid and that they're

25  infringed.  And so you have to look, then, at what the

1    technological difference is.

2        I don't believe Contour has identified what that

3    difference over the state of the art is.  Mr. Ugone has not

4    done that analysis.  And so it really is a question:

5    Considering everything in the state of the art, assuming for

6    damages that the patents are valid, what's the incremental

7    improvement?  And I don't think Contour and Mr. Ugone have

8    identified that.

9    **Q.**    Let me ask you one final question.  Did the Contour

10   inventors contribute the concept of live preview while

11   recording to the state of the art?

12   **A.**    They did not.  It already existed in the state of the art.

13           **MS. CLARK:**  Thank you.

14   I pass the witness.

15           **THE COURT:**  All right.  Mr. Keville.

16           **MR. KEVILLE:**  Thank you, Your Honor.

17   Can I have the document camera for a minute, please.

18                    <u>**CROSS-EXAMINATION**</u>

19   BY MR. KEVILLE:

20   **Q.**    You just talked about this slide a minute ago; correct?

21   **A.**    Yes, sir.

22   **Q.**    And you said that it would be very easy to change to this

23   non-infringing alternative; correct?

24   **A.**    Yes.  I think that's what Mr. Liu testified to.

25   **Q.**    And you said it was not very important to have these

1   features?

2   **A.**   Yes, I believe I said that, at least on the remote.

3   **Q.**   This litigation has been going on ten years; correct?

4   **A.**   Yes, sir.

5   **Q.**   GoPro has spent millions of dollars; correct?

6   **A.**   They have.

7   **Q.**   They're paying you $800 an hour to come here and testify;

8   correct?

9   **A.**   Yes, sir.

10  **Q.**   And yet you say they could have made this very simple

11  change at any time and avoided this whole litigation, and we're

12  supposed to believe that; correct?

13  **A.**   No.  That's not what I said.

14  **Q.**   Okay.  They never did make this change; correct?

15  **A.**   That's correct because this is a hypothetical NIA.

16  **Q.**   Right.  Instead, they've spent millions of dollars

17  litigating against Contour; correct?

18  **A.**   They did.

19          **MR. KEVILLE:**  Okay.  We can switch back.

20  **BY MR. KEVILLE:**

21  **Q.**   And you've been in this case for something like

22  five years?

23  **A.**   Six years, five or six years.

24  **Q.**   Okay.  And in that time, you've repeatedly claimed that

25  Nick Woodman invented what is claimed in the Contour patents;

1    correct?

2    **A.**    I have.  That he conceived of what's in the patents.

3    **Q.**    Sure.  You didn't talk about the other parts, that he

4    never abandoned it and diligently reduced it to practice;

5    correct?

6    **A.**    I did in part, but I think it was largely his testimony

7    that established that.

8    **Q.**    Okay.  And that's, by the way, the only prior art you're

9    contending anticipates any claims is the Woodman prior

10    invention; correct?

11    **A.**    That's correct.

12         **MR. KEVILLE:**  Okay.  Can you put on the screen, Allen,

13    the trial, Volume 3, at 55:1 -- 551:19 to 21.

14         **THE COURTROOM DEPUTY:**  Just for the witness?

15         **MR. KEVILLE:**  Oh, no.  I think we can publish it.

16    It's trial testimony.

17    **BY MR. KEVILLE:**

18    **Q.**    Mr. Woodman was asked [as read]:

19         **"QUESTION:**  Are you not contending you are the first

20         inventor of what's claimed in these patents?"

21         He said [as read]:

22         **"ANSWER:**  No, I am not the inventor."

23         Do you see that?  You were here for that.

24    **A.**    Yes.  I mean, you're just asking me to read the -- confirm

25    that's what he said at that point?

1  **Q.**   Yes, sir.

2  **A.**   Okay.  Yes, that's what he said at that point.

3  **Q.**   And today you said:  My understanding of what he said -- I

4  tried to write it down -- that these were concepts already in

5  the prior art.  He had conceived of things, putting things

6  together, but that's what he thought he was trying to do.

7       So you added a lot of words to what Mr. Woodman said;

8  correct?

9  **A.**   He actually said that in the very next question.

10 **Q.**   Okay.  He did say in this question that he's not

11 contending be to be the first inventor of what is claimed in

12 these patents?

13 **A.**   He said, "No, I am not the inventor."

14 **Q.**   Right.

15 **A.**   That's his answer in that question.

16 **Q.**   And that didn't change your mind at all?

17 **A.**   No, especially if you look at the next few questions and

18 answers.

19 **Q.**   We will.  Let's look at the next question [as read]:

20      "**QUESTION:**  Okay.  And you didn't invent the subject

21      matter of what's claimed in these patents?

22      "**ANSWER:**  What patents are you referring to?

23      "**QUESTION:**  The two Contour patents that are at issue in

24      this case.  You're not claiming that you invented first

25      what is claimed in the patents in this case?"

1      And he said [as read]:

2      **"ANSWER:** I believe I had a concept for what is claimed in

3      the patents but, no, I'm not claiming to be the inventor

4      of those concepts."

5      Correct?

6  **A.**    That's what he said.  I think that's relevant.

7          **MR. KEVILLE:**  And then, Allen, would you go to

8  page 594 at lines 15 to 17.

9  **Q.**    And he said, the Woodman invention, he agreed, is not the

10 same as the Contour invention; correct?

11 **A.**    That's what he said.

12 **Q.**    And it didn't change your opinion at all when on Thursday,

13 for the first time in six years you've been in this case,

14 Mr. Woodman agreed his invention is not the same as Contour's

15 invention?

16 **A.**    I think there he was talking about the patent alone.

17 **Q.**    I'm sorry?

18 **A.**    I think when he talked about the Woodman invention, he

19 wasn't considering all of the material that I did in terms of

20 what you're asking in terms of the question.

21 **Q.**    So you're adding to what Mr. Woodman said because you

22 think you've seen other things Mr. Woodman wrote.

23      But Mr. Woodman, you heard his testimony clearly, he's not

24 claiming his invention is the same as the Contour invention;

25 correct?

 1  **A.**    I saw and heard his testimony.  I think it's consistent

 2  with what I've said in my opinions.

 3  **Q.**    You understand GoPro has the burden of clear and

 4  convincing evidence to prove that any claim is invalid;

 5  correct?

 6  **A.**    Yes, sir, that's correct.

 7  **Q.**    You agree there can be differences of opinion as to

 8  whether all the claim elements are met by what you call the

 9  prior invention by Nick Woodman; correct?

10  **A.**    Yes, experts often have differences of opinion.

11  **Q.**    And you and GoPro's CEO have a complete difference of

12  opinion on whether he is the prior inventor; correct?

13  **A.**    I disagree.  It's not a complete difference.

14  **Q.**    Okay.  He certainly agreed it's different; right?

15  Mr. Woodman said he's not the inventor, the inventions are not

16  the same.  You're here telling us the inventions are the same

17  and he is the inventor; correct?

18  **A.**    No, that's not what I'm telling you.  I'm telling you it's

19  the conception aspects of what Mr. Woodman did.

20  **Q.**    Okay.  Let's put the conception aspects up-front here now.

21      Do you agree that a conception of an invention is complete

22  when the inventor has formed the idea of how to make and use

23  every aspect of the claimed invention, and all that is required

24  is that it be made without the need for any further inventive

25  effort?

1    **A.**    Yes.  I think that's the language I have seen before.

2    **Q.**    And that's the standard you used to evaluate whether

3    Mr. Woodman was the prior inventor; correct?

4    **A.**    Yes, sir.

5    **Q.**    Okay.  And for having conception of the invention, you

6    believe it has to discuss capturing the two video streams in

7    parallel; correct?

8    **A.**    I do.

9    **Q.**    Okay.  In -- have you seen a single document where

10   Mr. Woodman identified recording the two video streams in

11   parallel?

12   **A.**    Yes, I have.

13   **Q.**    Which document is that?

14   **A.**    That was the third document that I identified.  It was the

15   emails where he discussed the use of the A2 or the A5 Ambarella

16   chip.  The A5 Ambarella chip had that capability in it.

17   **Q.**    Now you're saying the chip had the capability, and we'll

18   get to that.  But Mr. Woodman never mentioned recording two

19   streams in parallel; correct?

20   **A.**    That's what he was contemplating by reference to the A2

21   and the A5 chip and their capabilities.

22   **Q.**    It does not say anywhere in the document -- in any

23   document you've seen that Mr. Woodman was contemplating

24   generating two streams in parallel?

25   **A.**    I think that's what those documents show.

1    Q.    So you're saying the mere mention of A5 is enough to show

2    Woodman himself conceived of generating two streams in

3    parallel?

4    A.    No, not that in isolation.  It's the collection of

5    materials that I testified about.

6    Q.    What other documents show that Woodman had the idea of

7    generating two streams in parallel?

8    A.    The minimum set is probably the Woodman patent and then

9    the GoPro specification and then also those emails that I was

10   just discussing.  Across those three documents, you understand

11   what he was trying to propose.  And then the use of A5 in the

12   context of what he had proposed was support for the conception.

13   Q.    You agree the '251 patent -- we talked about this

14   previously at your deposition; correct?

15   A.    Yes, sir.

16   Q.    And you agree it doesn't say anything in there at all

17   about generating two streams of video; correct?

18   A.    That's correct, that document in isolation.

19   Q.    It certainly doesn't say anything about generating two

20   streams in parallel; correct?

21   A.    I don't believe it does, or I don't recall that it does.

22   Q.    Now, the email you talked about talks about the Ambarella

23   A2 chip and the A5 chip; correct?

24   A.    Yes, sir.

25   Q.    And what Woodman decided to go with was the A2 chip;

1    correct?

2    **A.**    Eventually, when he put it into a commercial product, that

3    was what he decided, but he had conceived of the use of the A5.

4    **Q.**    Actually, back in 2009 when you say they conceived of the

5    A5, Woodman actually decided, "Let's not use the A5.  Let's use

6    the A2"; correct?

7    **A.**    Oh, that's right.  For the products he was releasing at

8    that time, he decided to go with A2.

9    **Q.**    And even for trying to develop this prototype that we've

10   heard about, they used the A2; correct?

11   **A.**    For the prototypes, yes, the A2.

12   **Q.**    And the A2 could not generate two streams; correct?

13   **A.**    I actually thought it could.

14        **MR. KEVILLE:**    Okay.  Allen, can you pull up

15   Exhibit 2041.  And if you would go to page 39.

16   **BY MR. KEVILLE:**

17   **Q.**    You've seen this Ambarella document before; correct?

18   **A.**    Yes, I have.

19   **Q.**    And if we look at the A2, we have a first stream, the

20   Max H.264 encode.  And the A2 has that; correct?

21   **A.**    Yes.

22   **Q.**    And the A3 and the A5 have that as well; correct?

23   **A.**    Yes.

24   **Q.**    The second stream would be the full duplex code.  And the

25   A5 has that, the A3 has that, but the A2 says "No."  Do you see

1  that?

2  **A.**   I do see that.  I don't think that full duplex codec means

3  dual stream.

4  **Q.**   There is no -- can you identify where there's a second

5  encoded stream in the A2?

6  **A.**   I can go back and look at the documentation.  I wouldn't

7  rely on just this page.

8  **Q.**   Well, this page certainly shows that the A2 does not have

9  a second encoded stream; correct?

10  **A.**   It does not not show that.  It says what it says.  It

11  doesn't say that it can't support dual encode.

12  **Q.**   Where the second full duplex code shows that second stream

13  for the A5, it says "No" under A2; correct?

14  **A.**   That's what it says.  I think you're misinterpreting the

15  document.

16          **MR. KEVILLE:**  Okay.  Let's go to page 9, please,

17  Allen.

18  **BY MR. KEVILLE:**

19  **Q.**   Page 9 shows the A2; correct?

20  **A.**   It does.

21  **Q.**   And this shows having broadcast quality HD video

22  processing and high-quality still image processing; correct?

23  **A.**   Yes, it does.

24  **Q.**   It doesn't say that there's a second video processing;

25  correct?

1    **A.**   Not on this slide.

2    **Q.**   Okay.  If the A2 couldn't produce a second low-resolution

3    stream at the same time it was producing the high-resolution

4    stream, then there would be no way there could have been a

5    functioning prototype in 2009 using the A2; correct?

6    **A.**   I disagree.

7    **Q.**   Okay.  Now, you talked a lot about things that are known,

8    and you went through and you said, "Well, in the state of the

9    art, all these things are known."

10           **MR. KEVILLE:**  And, Allen, do you have the

11   demonstrative they had with the Xs?

12   **BY MR. KEVILLE:**

13   **Q.**   Do you remember this was shown by counsel for GoPro?

14   **A.**   Yes.

15   **Q.**   And this is kind of what you were saying, that like all of

16   these pieces are known; correct?

17   **A.**   I was saying more than that.

18   **Q.**   Okay.  But this is essentially what you're saying and

19   GoPro is saying, that all the pieces of the invention were

20   known?

21   **A.**   I am saying more than that.

22   **Q.**   Okay.

23   **A.**   It's not just the pieces.  It's combinations of the pieces

24   in various products that existed.

25           **MR. KEVILLE:**  Okay.  Could I have the document camera,

1   please.

2       Let me just show this to the witness.  Well, it's a

3   demonstrative.  I'm going to make this a demonstrative.

4       **THE COURT:**  Okay.

5   **BY MR. KEVILLE:**

6   **Q.**   Okay.  Do you recognize this?

7   **A.**   I do.

8   **Q.**   This is Thomas Edison's patent on the lightbulb; correct?

9   **A.**   Yes, sir.

10  **Q.**   This is one of the most famous patented inventions ever;

11  correct?

12  **A.**   I believe so.

13  **Q.**   And it consists of carbon filament connected to electric

14  wires, glass, and a vacuum; correct?

15  **A.**   I believe so.

16  **Q.**   Edison didn't invent carbon filament, did he?

17  **A.**   I don't believe so.

18  **Q.**   No.  Carbon filaments were used for telegraphs and

19  resistors long before Edison; correct?

20  **A.**   I suspect they were.

21  **Q.**   And certainly you agree that Edison didn't invent glass;

22  correct?  That goes back to the Egyptians.

23  **A.**   That's correct.

24  **Q.**   Vacuums occur in nature; right?  So Edison didn't invent a

25  vacuum?

1  **A.**   They -- that is correct.

2  **Q.**   And there was electricity before element -- before Edison;

3  right?

4  **A.**   There was.

5  **Q.**   Okay.  You agree that most inventions are made by putting

6  together known things in new ways; correct?

7  **A.**   That is a good way to do it.

8        **MR. KEVILLE:**  Okay.  Let me switch from the camera

9  now.

10      All right.  Allen, can you put the patent with the

11  highlighted Ambarella references on there.

12      And can you put up the highlighted Ambarella patents and

13  documents.

14  **BY MR. KEVILLE:**

15  **Q.**   Okay.  Do these Ambarella patents cited on Contour's

16  patents generally disclose the concepts of video stream

17  processing, down conversion to create lower resolution, and

18  wireless transmission?

19  **A.**   It depends on the patent.  There's quite a few patents in

20  here that are not particularly related to the characterization

21  you just gave.

22        **MR. KEVILLE:**  Allen, could you show us his invalidity

23  report from February 28th, '20, at paragraph 103.

24  **BY MR. KEVILLE:**

25  **Q.**   So did you say [as read]:

1          "For example, this patent discloses generating

2      an intermediate frame by digitally processing the

3      source frame where the intermediate frame has

4      intermediate resolution and intermediate color space

5      generating a video frame by down sampling the

6      intermediate frame and generating the video stream by

7      compressing the video frame with the video encoding

8      technique"?

9      Did you say all those things?

10  **A.**   Yes, I did, for the '550 patent.

11  **Q.**   You agree the Patent Office had a volume of Ambarella

12  information that it considered before allowing the Contour

13  patent claims; correct?

14          **MR. KEVILLE:**  There we go.  That's the quote I was

15  looking for.  Thank you.

16  **BY MR. KEVILLE:**

17  **Q.**   Did you not say [as read]:

18          "The Ambarella patents that Contour cited on the

19      face of the patents-in-suit generally discuss the

20      concepts of video stream processing, down conversion

21      to create lower resolution or subordinate color space

22      versions of those streams" -- "or excerpts of those

23      streams, and wireless transmission of the identified

24      media"?

25  **A.**   I did say that.

1  Q.    Okay.  So all of those things that were disclosed in

2  Ambarella, wireless and down converting and the concepts of

3  video stream processing, all of those were disclosed to the

4  Patent Office; correct?

5  A.    They were included in the patents, the Ambarella patents,

6  on the face of the patents.

7  Q.    And after considering all that information, the

8  Patent Office allowed the patents; correct?

9  A.    They did.

10  Q.    Okay.  And it is your contention that the Ambarella A5 and

11  A5s both disclosed dual-resolution recording; correct?

12  A.    Yes.

13  Q.    Okay.  And that's part of what you said added the

14  "generate" term; correct?  The part you said adds to Boland.

15  A.    That -- yes, that you would rely on that portion of

16  Ambarella for the portion of the claims combined with

17  Ambarella.

18         MR. KEVILLE:  Okay.  Allen, can you highlight the

19  product data sheets for the Ambarella A5 and A5s that were

20  considered by the Patent Office.

21  BY MR. KEVILLE:

22  Q.    Do you see here on the left we have an article about the

23  Ambarella A5s?  Do you see that?

24  A.    Yes.  The one that says "No date provided"?

25  Q.    No, sir.  The first one [as read]:

1           "Happich, Julien.  Ambarella targets

2      pocket-sized hybrid camera with its A5s."

3      Do you see that?

4   **A.**   Okay.  I do see that one.

5   **Q.**   Okay.  And then we have Ambarella product brief A5s.  Do

6   you see that?

7   **A.**   I do.

8   **Q.**   And, heck, that's the same one that Mr. LeGall told us

9   today he couldn't tell us what date that was; correct?

10  **A.**   I'm not sure it's the same.  You'd have to show me so that

11  I could -- I could look at it.

12  **Q.**   Okay.  But Mr. LeGall said he didn't know the date of that

13  product brief, and Contour told the Patent Office, "We don't

14  know the date of that product brief"; correct?

15  **A.**   Again, you're saying "that product brief."  I'm not sure

16  it's the same one.  You'd have to show me the one that was

17  in -- referenced here versus the one he was shown this morning.

18  **Q.**   Okay.  But no doubt Contour gave the Patent Office

19  Ambarella's own product brief on the A5s; correct?

20  **A.**   That's what it says.

21  **Q.**   And then they gave them the Ambarella A5 hybrid camera

22  platform from Ambarella's website; correct?

23  **A.**   That's what it says.

24  **Q.**   And then another one on the A5; correct?

25  **A.**   Yes.

1  **Q.**  Another one on the A5s; correct?

2  **A.**  That's also there.

3  **Q.**  Another one on the A5s?

4  **A.**  Also there.

5  **Q.**  And then if we go to the right, we see them as well;

6  correct?

7  **A.**  It looks like they're the same ones.

8  **Q.**  Right.  Both patents; correct?

9  **A.**  Oh, I see what you're doing.

10  Yes, they would be in both patents.

11  **Q.**  And the Patent Office, after considering all of this

12  information on the Ambarella A5 and A5s, allowed the claims;

13  correct?

14  **A.**  They did.

15  **Q.**  And the Patent Office never said anything about Ambarella

16  invented this first.  They looked at all this information and

17  they allowed Contour's patents; correct?

18  **A.**  They did allow the patents.

19  **Q.**  Okay.  Let's talk a little bit about Boland and --

20  **MR. KEVILLE:**  Well, Your Honor, I'm switching gears.

21  Would this be a good time?  We're about a couple of minutes

22  early.

23  **THE COURT:**  Yes.

24  I'm going to let you out about three minutes early.

25  Ladies and gentlemen, you have heard a lot and there's

 1  still more to come, so keep an open mind.  Have a lovely

 2  afternoon.  Come back -- I'm really so impressed by the way

 3  that you have been managing yourselves during the course of

 4  this trial, and I encourage you to keep it up because tomorrow

 5  the evidence will be done, and Wednesday you'll get your

 6  instructions on the law, you'll hear the final arguments, and

 7  you'll be able, for the first time, to talk to each other about

 8  what you've learned over the last week and a half.

 9       So have a good afternoon, and I'll look forward to seeing

10  you in the morning.

11       (Proceedings were heard out of the presence of the jury.)

12       **THE COURT:**  You can step down, Dr. Almeroth.

13       How lovely to see you.

14       Sit down, everybody.

15       I do have a question before you say whatever you want to

16  say, which is:  Did you talk about the remaining jury

17  instructions?  Have you met and conferred about those, or are

18  you doing that today?

19       **MR. KEVILLE:**  We did some, and we plan to talk again

20  after today.

21       **THE COURT:**  Okay.

22       **MR. KEVILLE:**  We've made some progress.

23       **THE COURT:**  Okay.

24       **MR. KEVILLE:**  And I will say, Your Honor, in view of

25  the testimony today, we have a very narrow set of what are the

1  invalidity contentions.  It's one anticipation and one

2  obviousness combination.  So I think we should be able to work

3  that out as well.

4          **THE COURT:**  All right.  Mr. Haynes.

5          **MR. HAYNES:**  My question was just procedural,

6  Your Honor.

7      Dr. Almeroth was still on the stand on cross.  We're going

8  to get Dr. Hu's rebuttal slides tonight --

9          **THE COURT:**  Okay.

10         **MR. HAYNES:**  -- and Dr. Almeroth will be going up

11  again on surrebuttal --

12         **THE COURT:**  Yeah.

13         **MR. HAYNES:**  -- to address what Dr. Hu's going to say

14  in her slides.

15     My question is:  We don't want to talk to him about what

16  he testified today, but we would like to discuss Dr. Hu's

17  slides that we're going to get at, I guess, 5:00 p.m. tonight

18  for purpose -- because there's not going to be hardly any time

19  between when he leaves the stand and when he's going to have to

20  go back on the stand tomorrow.

21         **MR. KEVILLE:**  That seems improper to me since she's

22  rebutting him and hasn't heard everything, and now she's going

23  to give him her rebuttal while he's still on the stand.

24         **THE COURT:**  Yeah.  Well, so tomorrow -- how long --

25         **MR. KEVILLE:**  I may have a solution.

 1        **THE COURT:**  Yeah, how long will the testimony be

 2   overall tomorrow?

 3        **MR. KEVILLE:**  Well, so after Dr. Almeroth is done,

 4   they have a video they want to play of Tyler Gee.  Then we have

 5   Kennedy.  And then we would then have Dr. Hu in the rebuttal.

 6        So I would think we could give them the slides when he's

 7   done.  When they're playing Tyler Gee, when Kennedy's on the

 8   stand and being crossed, they can look at those and address

 9   them then.

10        **MR. HAYNES:**  Your Honor, one potential exception to

11   that might be, well, you've not heard anything from Dr. Hu yet

12   about her conception -- Contour's conception dates and looking

13   at Contour conception, and he didn't really testify about that

14   today other than to say it hadn't happened yet.

15        Can we at last discuss that portion?  Because he didn't

16   testify about that at all.  And so that is directly -- will be

17   his rebuttal to whatever their conception is going to be.  He

18   hasn't given testimony about what their conception theory is

19   because we haven't heard it yet.

20        **MR. KEVILLE:**  I heard him testify that he didn't agree

21   with that date, and so --

22        **THE COURT:**  Right.  But there isn't -- that hasn't

23   been presented.

24        **MR. KEVILLE:**  I thought we did put in evidence of

25   conception in our case-in-chief.  I'll go back and look, but

 1    I'm fairly certain we did.

 2        So whatever is in our case-in-chief, they can address

 3    that's for sure.

 4            **THE COURT:**  So I actually -- I think there's going to

 5    be enough time tomorrow for you to consult with Dr. Almeroth

 6    about the slides after he finishes testifying.  And I think,

 7    even with the very best of -- just the appearance of it isn't

 8    good.  And I'm sure you would do your best to avoid things, but

 9    I think why don't we leave it that way.

10            **MR. HAYNES:**  Okay.  Can I ask one point of

11    clarification just to --

12            **THE COURT:**  Yes.  Go ahead.

13            **MR. HAYNES:**  I don't think this is what Mr. Keville

14    meant, but we're still going to -- the lawyers are going to get

15    the slides on the normal exchange today; correct?

16            **MR. KEVILLE:**  Yeah, that's fine.

17            **MR. HAYNES:**  Okay.  I just wanted to clarify that.

18            **MR. KEVILLE:**  As long as you don't share them with the

19    witness, yeah.

20            **MR. HAYNES:**  Yeah.  We just -- we will not confer with

21    Dr. Almeroth.

22            **THE COURT:**  Okay.  Ms. Clark.

23            **MS. CLARK:**  Can I ask one minor point of

24    clarification?

25        If Dr. Almeroth doesn't get the rebuttal slides until he

1    gets off the stand, which I understand, would he have -- he

2    likes slides -- would he have the opportunity to make a couple

3    of slides on his own if he wants to?

4          **THE COURT:**  Sure.

5          **MS. CLARK:**  Thank you.

6          **THE COURT:**  Just disclose them.

7          **MS. CLARK:**  Yes, of course, sir.

8          **THE COURT:**  Okay.

9       All right.  See you in the morning.

10          **MR. KEVILLE:**  Thank you, Your Honor.

11             (Proceedings adjourned at 1:30 p.m.)

12                   ---o0o---

13

14             **CERTIFICATE OF REPORTER**

15       I certify that the foregoing is a correct transcript

16    from the record of proceedings in the above-entitled matter.

17

18    DATE:  Tuesday, October 7, 2025

19

20

21

22    _____

23       Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

24    CSR No. 7445, Official United States Reporter

25