```
                                    Volume 8

                                 Pages 1392 - 1581

                   UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

CONTOUR IP HOLDING, LLC,        )
                                )
          Plaintiff,            )   CONSOLIDATED CASES
                                )   NO. 3:17-CV-04738 WHO
   VS.                          )   NO. 3:21-CV-02143 WHO
                                )
GOPRO, INC.,                    )
                                )
          Defendant.            )
_____)

                            San Francisco, California
                            Wednesday, October 8, 2025

                 TRANSCRIPT OF JURY TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiff:
                    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
                    845 Texas Avenue, 25th Floor
                    Houston, Texas 77002
               BY:  JOHN R. KEVILLE, ATTORNEY AT LAW
                    MICHELLE C. REPLOGLE, ATTORNEY AT LAW
                    SUNNY AKARAPU, ATTORNEY AT LAW
                    MICHAEL C. KRILL, ATTORNEY AT LAW

For Defendant:
                    ALSTON & BIRD LLP
                    One Atlantic Center
                    1201 West Peachtree Street
                    Atlanta, Georgia  30309
               BY:  JOHN D. HAYNES, ATTORNEY AT LAW
                    SLOANE S. KYRAZIS, ATTORNEY AT LAW

            (APPEARANCES CONTINUED ON FOLLOWING PAGE)

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter
```

1    **APPEARANCES**:  (CONTINUED)

2    For Defendant:

                         ALSTON & BIRD LLP
3                        55 Second Street, Suite 2100
                         San Francisco, California 94105
4              BY:  **MICHELLE A. CLARK, ATTORNEY AT LAW**
                    **PHILIP C. DUCKER, ATTORNEY AT LAW**

5

6                        ALSTON & BIRD LLP
                         2828 North Harwood Street, Suite 1800
7                        Dallas, Texas  75201
               BY:  **ELLIOTT C. RICHES, ATTORNEY AT LAW**

8
                         ALSTON & BIRD LLP
9                        Vantage South End
                         1120 South Tryon Street, Suite 300
10                       Charlotte, North Carolina 28203
               BY:  **KARLEE N. WROBLEWSKI, ATTORNEY AT LAW**

11

12   **Also Present:**

                         Robert Mooney, Contour Corporate Rep
13                       Pablo Lema, GoPro Corporate Rep
                         Tyler Gee, Deputy General Counsel, GoPro
14                       Jesse Taylor, Trial Technician
                         Allen Eaton, Trial Technician
15                       Luke Arndt, Trial Technician
                         Sarah Moyer, Trial Technician

16

17

18

19

20

21

22

23

24

25

1        **I N D E X**

2

3   Wednesday, October 8, 2025 - Volume 8

4                                                    **PAGE**   **VOL.**

5   Plaintiff Rests Rebuttal                          1415     8
    Defendant Rests Surrebuttal                       1435     8
6   Jury Instructions                                 1435     8
    Closing Argument by Mr. Keville                   1473     8
7   Closing Argument by Mr. Haynes                    1517     8
    Rebuttal Argument by Mr. Keville                  1570     8
8   Final Jury Instructions                           1577     8

9

10  **PLAINTIFF'S REBUTTAL WITNESSES**                 **PAGE**   **VOL.**

11  **HU, JING (RECALLED IN REBUTTAL)**
    (PREVIOUSLY SWORN)                                1402     8
12  Cross-Examination resumed by Mr. Haynes           1402     8
    Redirect Examination by Mr. Krill                 1413     8

13

14

15  **DEFENDANT'S REBUTTAL WITNESSES**                 **PAGE**   **VOL.**

16  **ALMEROTH, KEVIN CHRISTOPHER (RECALLED IN SURREBUTTAL)**
    (PREVIOUSLY SWORN)                                1415     8
17  Direct Examination by Ms. Clark                   1416     8
    Cross-Examination by Mr. Keville                  1428     8
18  Redirect Examination by Ms. Clark                 1433     8

19

20

21

22

23

24

25

1    <u>Wednesday - October 8, 2025</u>                    <u>8:01 a.m.</u>

2                    <u>P R O C E E D I N G S</u>

3                        ---o0o---

4        (Proceedings were heard out of the presence of the jury.)

5            **THE COURT:**  Good morning, everybody.

6            **ALL:**  Good morning, Your Honor.

7            **THE COURT:**  Please be seated.

8        All right.  We have several things to do.

9        You have seen what I suggested for the claim construction

10   term.  I do think it's necessary.  I also think it's somewhat

11   ironic that Contour asked for it yesterday and it was opposed

12   by GoPro when, during the motions for summary judgment, the

13   parties were reversed in that situation.  But I do think it's

14   necessary, and so I want to hear what you all think about that.

15       The verdict form, I think you've been provided with where

16   I came down, which I'm not inclined to ask the question on

17   Woodman's inventorship.

18       The instructions themselves, with respect to the

19   non-infringing alternatives, there was argument yesterday.  I

20   was looking around because I thought we'd said something about

21   non-infringing alternatives, and I couldn't find it because we

22   hadn't, and so I've proposed something.  We should talk about

23   that.

24       And with the disagreement -- I appreciated that the

25   parties came together, for the most part, with respect to the

 1  instructions, and that's a real help.  I wish you'd done it

 2  earlier, but I'm very grateful that you did do it.  I did

 3  choose GoPro's language with respect to the obviousness, the

 4  one issue that you had disagreed on in there.

 5       And I'm not inclined to give the curative instruction that

 6  Contour has requested.  I think Dr. Almeroth has been clear

 7  that Ambarella discloses the generate limitations, not Boland.

 8       So let's start with the claim construction.  Is there

 9  unanimous approval?

10       **MR. KRILL:**  Your Honor, we're good with the claim

11  construction.  "A" means one or more in claim construction

12  parlance, and I believe that construction reflects that, so...

13       **THE COURT:**  Okay.  Mr. Ducker?

14       **MR. DUCKER:**  Your Honor, we're generally okay with the

15  construction.  I have a couple of slides.

16       Could we put up -- do you have my slides? -- Slide 2.

17       **THE COURT:**  I am going to take the semicolon out

18  between "to" and "and."

19       **MR. DUCKER:**  I have a copy.

20       **MR. KRILL:**  That's fine with us, Your Honor.

21       **MR. DUCKER:**  So, Your Honor, we would -- GoPro would

22  propose that you put "wireless connection protocol" back into

23  the construction.

24       **THE COURT:**  Say it again.  I'm sorry, Mr. Ducker.

25       **MR. DUCKER:**  The term -- the word -- I'm on Slide 2,

**PROCEEDINGS**

1    Your Honor.  And we would propose that you put the "wireless

2    connection protocol" language back into the construction.  And

3    that's because, you know, under Federal Circuit law -- and if

4    we go to the next slide -- all words of the claim have meaning

5    and that a claim construction that gives meaning to all the

6    terms is preferred over one that does not do so.

7              **THE COURT:**  Okay.

8              **MR. KRILL:**  We have no problem with putting --

9              **THE COURT:**  Yes, let's do that.

10        Okay.  Next, let's do the curative instruction.  Does

11   anybody want to argue about that?

12             **MR. KRILL:**  Your Honor, we understand Your Honor's

13   ruling, and, you know, we won't argue it any further.

14             **THE COURT:**  Okay.  Next, the non-infringing

15   alternatives.  My notion, in light of your briefing, was to try

16   to combine the two and put it in as a reasonable factor.  Does

17   anybody want to talk about that?

18             **MR. RICHES:**  I think we're good with the proposal from

19   the Court, Your Honor.

20             **THE COURT:**  Wow.

21             **MS. REPLOGLE:**  Yes, Your Honor.  Same over here too.

22             **THE COURT:**  Okay.  That's great.

23        And does anybody have any other things that they want to

24   say with respect to the verdict form or my choice with respect

25   to the instructions?

1    **MS. REPLOGLE:**  Yes, but it's a very easy one.

2    We have conferred with the other side, and both sides are

3    in agreement.  It's just a typo.  In the willful infringement

4    instruction, Number 22 --

5        **THE COURT:**  Hang on just a sec.

6    Okay.  Okay.  So why do I have that as inval- -- so you

7    guys missed a couple of numbers.

8        **MS. REPLOGLE:**  The numbering?

9        **THE COURT:**  The instructions for willful infringement

10   now are 20 because you had taken out two numbers but not

11   changed the --

12       **MS. REPLOGLE:**  Okay.  Understood.

13   So Instruction Number 20, then, for willful infringement,

14   in the second paragraph, that first instance of "willful," it

15   needs to just be struck because as it reads now, it states

16   [as read]:

17           "In addition to proving willful infringement of

18       a claim, Contour must persuade you . . . ."

19   And it goes on to state the standard for finding willful

20   infringement.  So it's, in effect, kind of double-downing, if

21   you will.  It's just -- it just shouldn't be there.

22       **THE COURT:**  So how do you want the language to read?

23       **MS. REPLOGLE:**  It should [as read]:

24           "In addition to proving infringement of a claim,

25       Contour must persuade you that it is more likely true

 1          than not that GoPro intentionally ignored or

 2          recklessly disregarded that claim."

 3          That's the standard for willful infringement, so...

 4              THE COURT:  Okay.  All right.  I will make that

 5     change.

 6          Anything else?

 7              MR. HAYNES:  Your Honor, just one logistical issue

 8     when we get to the closings.

 9              THE COURT:  Yes.

10              MR. HAYNES:  Do you give warnings, or should we be

11     clocking ourselves?  How do you want us to handle the timing

12     issue of those closings?

13              THE COURT:  I'll start getting agitated.

14              MR. HAYNES:  Look out for flying objects?

15              THE COURT:  If you want me to give you a five-minute

16     warning, or something like that, and say something like "Time

17     to wrap up," I'm happy to do that.  If you don't -- so I will

18     do that if it -- I will do that at five minutes.

19              MR. HAYNES:  Yes.

20              THE COURT:  Okay.

21              MR. KEVILLE:  One thing on closing, Your Honor.  So I

22     understand we have a slight disagreement on time.  We're off

23     by, like, 15 minutes between the Court and ours.  I'm just

24     hopeful the Court is not going to say, "That's your

25     last minute.  Stop here," if I'm five minutes long or

1    something.  I don't intend to be long, I don't, but...

2        **THE COURT:**  Yeah.  No.  So I'll give you what I think

3    is the five minutes, and I'll expect that you'll be there.

4        How long do you think your opening closing is?

5        **MR. KEVILLE:**  My close is probably about 50 minutes.

6        **THE COURT:**  Okay.

7        **MR. KEVILLE:**  Five, zero.

8        **THE COURT:**  Yeah.  So I think you'll have plenty of

9    time for whatever rebuttal --

10        **MR. KEVILLE:**  That's what I thought as well.

11        **THE COURT:**  -- you're going to do.

12        **MR. KEVILLE:**  And does Your Honor do it that I close,

13   they close, and then I get a short rebuttal?

14        **THE COURT:**  Yeah.

15        **MR. KEVILLE:**  Okay.

16        **THE COURT:**  That's the way that I do it.

17        **MR. HAYNES:**  All right.  Thank you, Your Honor.

18        **MS. WROBLEWSKI:**  Just one more thing, Your Honor.

19        **THE COURT:**  Mm-hmm.

20        **MS. WROBLEWSKI:**  As you know, we lodged our JMOL

21   50(a)s yesterday.  I just wanted to make sure that was

22   sufficient for purposes of preservation or if we should relodge

23   them informally after the formal close of evidence today.

24        **THE COURT:**  I'm deeming them done.

25        **MS. WROBLEWSKI:**  Wonderful.

1      And then we had filed a proffer of evidence on Friday

2  evening, and I wanted to make sure that that was also sort of

3  included as being lodged --

4          **THE COURT:**  That was --

5          **MS. WROBLEWSKI:**  -- timely.

6          **THE COURT:**  Yes, it is.

7          **MS. WROBLEWSKI:**  Okay.  Thank you, Your Honor.

8          **THE COURT:**  Okay.

9      All right.  So off we go.  When the jury is here, I'll be

10 back.

11              (Recess taken at 8:10 a.m.)

12              (Proceedings resumed at 8:35 a.m.)

13     (Proceedings were heard out of the presence of the jury.)

14         **THE COURT:**  So one thing that I forgot to tell you, or

15 I may have told you before, when I read the final instructions

16 to the jury, I stop before the instructions about how they're

17 supposed to deliberate, and I show them the verdict form so

18 that they will have seen it before you argue.  Okay?

19     And are you ready to proceed?

20         **MR. HAYNES:**  We are, Your Honor.

21         **THE COURT:**  Okay.  Let's get the jury.

22 Good morning, Doctor.

23 (Proceedings were heard in the presence of the jury.)

24         **THE COURT:**  All right.  Please be seated, everybody.

25 Good morning, ladies and gentlemen.  Thank you for being

1    here.

2        We are amidst the cross-examination of Dr. Hu.

3        Mr. Haynes, please proceed.

4                        **JING HU**,

5    called as a witness for the Plaintiff, having been previously

6    duly sworn, testified further in rebuttal as follows:

7                  **CROSS-EXAMINATION**    (resumed)

8    BY MR. HAYNES:

9    Q.    Good morning, Dr. Hu.

10   A.    Good morning.

11   Q.    I want to pick back up with one of the things we were

12   talking about yesterday which relates to Mr. Woodman's prior

13   development work on the WiFi BacPac.

14        Do you recall we were talking about that yesterday?

15   A.    Yes.

16   Q.    And you understand that Mr. Woodman's prior work, for that

17   to matter for invalidity, what we have to look at is whether he

18   had conceived of the ideas in Contour's patents.  Do you

19   understand that?

20   A.    That's one of the issues we need to look at.

21   Q.    Okay.  And conception is when -- when did he have the

22   ideas in the patent in his mind, is generally what conception

23   is talking about; right?  That's the mental part?

24   A.    Right, but it needs to be a definite and permanent idea of

25   a complete and operative invention.

1   **Q.**   Exactly.

2       And then -- so that's one question:  Did he have the ideas

3   in his mind?

4       Then the other question is:  Was he diligently working to

5   reduce those ideas to practice in a product?  Right?

6   **A.**   That's correct.

7   **Q.**   Okay.  And one of your criticisms of Mr. Woodman's work is

8   that you believe that he wasn't diligent because he abandoned

9   his work on the WiFi BacPac; is that right?

10  **A.**   That is one of the reasons.

11  **Q.**   Okay.  But we know for a fact that he launched the WiFi

12  BacPac; right?  That happened?

13  **A.**   Much later, in 2012.  And that was a different technology

14  from the prototype and the design in 2009.

15  **Q.**   Correct.  But we know for a fact he conceived of the WiFi

16  BacPac in July 2008 and he launched the WiFi BacPac later in

17  time; right?

18  **A.**   On the outside, that's correct, but the chips were

19  different and the WiFi chip were different as well.

20  **Q.**   Right.  Because he was looking at different WiFi chips and

21  different wireless technologies that could be used in his

22  invention; right?

23  **A.**   You could put it that way, but there's a large gap without

24  much documentation evidence in between.

25  **Q.**   Okay.  You were here when Mr. Woodman testified about the

1    work he was doing; right?

2    A.   Yes.

3         MR. HAYNES:  All right.  Can we bring up DDX-11.47.

4    BY MR. HAYNES:

5    Q.   And you recall I asked him [as read]:

6         "Did you just stop working in 2010 on the WiFi

7    BacPac?"

8    And his answer was, "No."

9    I said [as read]:

10        "What were you doing?"

11   He said [as read]:

12        "We were researching all of the new and

13   available wireless protocols that were coming out on

14   the market that we could maybe use."

15   Now, you agree at this time period in 2010, wireless

16   technologies were rapidly coming out and there were lots of

17   different wireless options that Mr. Woodman could consider in

18   that period; right?

19   A.   There were a couple such as WiFi Direct and Zigbee that

20   were being considered, but WiFi Direct in particular wasn't

21   standardized until October 2010.

22   Q.   Right.  And 3G technology, cellular wireless capabilities

23   that could transmit data, those were coming online in this

24   period too; right?

25   A.   That's correct, but that's irrelevant to the direct

1    connection between the camera and the phone.

2    **Q.**   Well, you --

3    **A.**   That would be camera to a cell tower.

4    **Q.**   So with respect to investigating wireless technologies

5    that could be used in his wireless BacPac, you agree that work

6    investigating those technologies, that shows diligence; right?

7    **A.**   But that's not part of the invention.  So the invention

8    requires the direct connection between the camera and the

9    phone.  So whether the technology is -- enables the camera to

10   talk to the cell tower and, through that cell tower, to a

11   phone, that is outside of the scope of Contour's invention.

12   **Q.**   I understand that when you have a phone, you can connect

13   to a cell tower with 3G.  But if I put a cellular transceiver

14   in a camera, I can connect to the phone using 3G that way too,

15   can't I?

16   **A.**   But that's not a direct connection.  As we have heard in

17   the Contour patents, it said wirelessly transmit directly from

18   the camera to the phone and, vice versa, the control signals

19   directly from the phone to the camera, not through a cell

20   tower.

21   **Q.**   All right.  Let me go back to my question.

22        You agree with me that work investigating different

23   wireless technologies shows diligence?

24   **A.**   If it's -- it looks like, from that paragraph you showed

25   me, Mr. Woodman wasn't set on whether it was a direct

1    connection between camera and phone or it could be an indirect

2    connection between the camera, then through the cell tower and

3    to the phone.

4         So that didn't show me that his so-called conception

5    of the invention to be definite and permanent to start with.

6    Sounds like he was thinking about direct connection wirelessly

7    as well as through a cell tower indirectly.

8    Q.   He was investigating how to build his invention.  That's

9    diligence; right?

10   A.   But his invention is not complete and definite, even at

11   that point.

12   Q.   Let me ask you this question:  There was some testimony

13   about a gap in 2010 where there wasn't a lot of documents that

14   were shown so far in this case.

15        You, yourself, have reviewed emails in that 2010 time

16   period that shows that Mr. Woodman was investigating wireless

17   technologies such as Zigbee and different types of Wi-Fi;

18   correct?

19   A.   I saw that, for a short period of time, they did look at

20   Zigbee and abandoned that as well.

21   Q.   Well, if you're investigating whether to use WiFi or

22   Zigbee, that evaluation is diligence; right?

23   A.   But there is almost two years' gap in the evidence between

24   the Zigbee effort and the WiFi BacPac eventually came out in

25   2012.

1   Q.   Dr. Hu, my question is very simple.  If he was working on

2   evaluating those technologies, figuring out how to build them

3   into his product, that's diligence.  He's working on the

4   invention; right?

5   A.   But there's no evidence of that for two years.

6   Q.   Well, you saw emails in 2010, you saw them in February,

7   you saw them in November where he's investigating technologies.

8   You actually quoted some of those in your report; right?

9   A.   That's right, but there was nothing between -- then after

10  that until the WiFi BacPac came out in 2012.  There was a

11  two-year gap that I didn't see any emails.

12  Q.   Okay.  So let's just be clear.  You understand that he was

13  working on the HERO HD2 camera during this time period because

14  that's part of what you need for this invention.  You need the

15  lens and the image processor in that; right?

16  A.   That, I agree with.

17  Q.   Okay.  He was also working on the WiFi BacPac add-on

18  module in this period; right?

19  A.   I haven't seen much email or other documentation evidence

20  about that in relation to what they claim that they have

21  conceived, which should contain the key elements of Contour's

22  invention.

23  Q.   So you agree, don't you, that in February -- late

24  February 2010, Mr. Woodman had laid out his work.  And he

25  specifically talked about the ongoing projects, and that

1  included the HD HERO2 and developing WiFi expansion module;

2  right?

3  **A.**   I don't remember the exact date, but I'll take your word

4  for that, but that's still early 2010.

5  **Q.**   Well, you agree that later in 2010, December 2010, you had

6  emails in your report where you talked about he's investigating

7  Zigbee for that wireless protocol, see if that works better

8  than WiFi?  You remember that; right?

9  **A.**   Right.  And that was abandoned shortly after that.

10  **Q.**   Zigbee was abandoned, but he did not abandon wireless.

11  And you understand the patent says any wireless technology;

12  right?

13  **A.**   That's correct.

14  **Q.**   Okay.

15  **A.**   Sorry.  You asked me two questions.  I said that's correct

16  to the patent doesn't require any wireless technology.

17  **Q.**   Okay.  Let me shift gears on you a little bit, and I want

18  to talk about -- you were in the courtroom when there's been

19  some testimony about how certain Ambarella documents were cited

20  on the face of the patents-in-suit.  You recall that?

21  **A.**   Yes, of course.

22       **MR. HAYNES:**   And if we could bring up JTX-3, page 514.

23  BY MR. HAYNES:

24  **Q.**   You're familiar with this document?

25  **A.**   Thanks.

1          (Witness examines document.)  Yes, I am.

2     **Q.**   Okay.  And this is part of the back-and-forth between

3     Contour and the Patent Office; right?

4     **A.**   Yes.

5     **Q.**   Okay.  And what this is talking about is, sometimes in

6     that back-and-forth, the inventors or the lawyers for the

7     inventors will go and meet with representatives of the Patent

8     Office and try to explain their invention to them and what's

9     new about it; right?

10    **A.**   That's correct.

11    **Q.**   Okay.  And that's what this document is describing.  This

12    is an applicant-initiated interview summary; right?

13    **A.**   Yes.

14    **Q.**   Okay.  And this is in 2014.  So Dr. Mander and

15    Ms. O'Donnell, they're not at Contour anymore when this

16    happened; right?

17    **A.**   I don't recall the exact date that they left the company.

18    **Q.**   Okay.  Now, what I want -- I want to focus -- well, let me

19    just ask you.  You're aware that at this meeting, Contour

20    showed the Patent Office a sample of its ContourGPS camera and

21    how it could work; right?

22    **A.**   I recall that they showed the Patent Office a Contour

23    camera.  I don't recall exactly it was GPS or + or +2.

24    **Q.**   Okay.  But whatever they showed them, that had an

25    Ambarella A5 or A5s chipset in it; right?

1    A.    That's correct.

2          MR. HAYNES:   Okay.  And I want to, if we could, blow

3    up the paragraph that begins "Applicant presented a brief

4    demo."

5    BY MR. HAYNES:

6    Q.    So this is the examiner's summary of what happened in that

7    interview; right?  This is the person that -- the examiner at

8    the Patent Office describing what happened; right?

9    A.    Yes.

10   Q.    Okay.  And the examiner said that [as read]:

11         "The applicant" -- that's somebody representing

12         Contour -- "presented a brief demo of the product

13         consisting of a camera remotely controlled via mobile

14         phone.  Applicant did agree that the references

15         cited, alone or in combination, does teach or suggest

16         the claimed limitation.  Applicant brief pointed out

17         the unique features of the invention."

18         Do you see that?

19   A.    Yes, I do see that.

20   Q.    Okay.  Then the examiner said [as read]:

21         "According to the applicant, claimed camera in

22         the instant application performs some unique image

23         processing and also stores the high-quality video

24         image."

25         Do you see that?

1    **A.**    Yes, I do.

2    **Q.**    [As read]:

3            "Examiner concluded that if these features are

4        incorporated in the claim, then it would overcome the

5        prior art references that they were considering at

6        the time."

7        That's what it says; right?

8    **A.**    Yeah, those are the words we see here.

9    **Q.**    Okay.  Now, those unique image processing features that

10   store the high-quality video, that is done by the Ambarella

11   chip; right?

12   **A.**    I don't know if the examiner here particularly includes

13   stores the high-quality video because it says "some unique

14   image processing and also stores the high-quality video."

15   **Q.**    Right.  But that is what the Ambarella chip does.  That's

16   the processor.  So any unique image processing is being done by

17   the Ambarella chip; right?

18   **A.**    It's hard to tell from this paragraph alone.  But as we

19   just looked at, the demo also showed the camera remotely

20   controlled via mobile phone.  And even if the unique image

21   processing, in the examiner's mind, refer to what's done in the

22   Ambarella chip, the inventors disclosed many documents of the

23   Ambarella chips to the Patent Office, explain the dual encoding

24   functionality to the Patent Office.

25   **Q.**    Yeah.  So at some point after this interview took place,

1    Contour cited some Ambarella documents.

2        But when they're sitting in the interview telling the

3    Patent Office, "We have unique image processing features," they

4    did not tell the Patent Office that those came from Ambarella,

5    did they?

6    **A.**   It's not shown in this summary, but we cannot tell, one

7    way or the other, it came up in the meeting with the

8    Patent Office.

9    **Q.**   Well, in fact, what the examiner said was, "If you put

10   those unique image processing features into your claim

11   language, that might make them allowable over the prior art";

12   right?

13   **A.**   The unique image processing is one of the integral part of

14   Contour's inventions.

15   **Q.**   Right.  But that limitation -- that's the generating

16   limitation that we're talking about; right?  Generating two

17   image sequences -- or video streams recorded in parallel.

18   That's the generating limitation; right?

19   **A.**   Not necessarily.  As we have seen in the diagrams of

20   Ambarella's chip, there is a lot of image processing that goes

21   in there, and as well as the image sensor that can be

22   considered as part of the image processing as well.  You just

23   process the light signal to generate video.

24   **Q.**   You think that they're talking about the image sensor when

25   they're talking about unique image processing?

HU - REDIRECT / KRILL

1    **A.**    They could be talking about the entire image processing

2    pipeline.

3    **Q.**    Okay.   In response to this discussion where they talked

4    about their unique image processing, they added to the claim

5    language the generating limitations that you agree are

6    necessary for the patent to have been issued; correct?

7    **A.**    The "generate" -- the "generate" term is an integral part

8    of Contour's invention.

9    **Q.**    Right.   And they got that from Ambarella; right?

10    **A.**    Ambarella provided a prior art chip that enabled that

11    feature.

12            **MR. HAYNES:**    Thank you.

13        Pass the witness, Your Honor.

14            **THE COURT:**    All right.   Mr. Krill.

15            **MR. KRILL:**    Very briefly, Your Honor.

16                    <u>REDIRECT EXAMINATION</u>

17    BY MR. KRILL:

18    **Q.**    Good morning, Dr. Hu.

19    **A.**    Good morning.

20    **Q.**    Yesterday you were shown a photograph that GoPro referred

21    to as a picture of a prototype dated April 27, 2009.   Do you

22    remember that?

23    **A.**    Yes, I do.

24    **Q.**    Did the photograph that you were shown yesterday have any

25    indication of whether it was a prototype, as GoPro referred to

1  it?

2  **A.**   I have no indication -- I have seen no indication of that.

3         **MR. KRILL:**  Allen, could you pull up GoPro's opening

4  slides at page 7.

5  **BY MR. KRILL:**

6  **Q.**   When was the HD HERO released?

7  **A.**   It was released in 2009.

8  **Q.**   Did the HD HERO, released in 2009, have any wireless

9  capabilities?

10  **A.**   No, it did not.

11  **Q.**   Did the photograph you were shown yesterday by GoPro have

12  any wireless capabilities on it?

13  **A.**   No, it did not.

14         **MR. KRILL:**  Allen, can you pull up TX-1294 and 1295.

15  **BY MR. KRILL:**

16  **Q.**   Did the photographs you were shown yesterday look anything

17  like these two alleged prototypes that were produced for

18  inspection in this case, either the one on the left that's

19  dated November 2010 or the one on the right?

20  **A.**   No.  They weren't for the same devices.

21  **Q.**   GoPro also stated that what we do know from Mr. Woodman's

22  testimony was that there were about 400 prototype boards that

23  were built.  Do you recall that?

24  **A.**   Yes, I do.

25  **Q.**   Have you seen any evidence during this trial of those

PROCEEDINGS

1  alleged 400 prototype boards?

2  **A.**  No, not at all.

3  **Q.**  Has the jury seen any evidence at this trial corroborating

4  Mr. Woodman's testimony that he had a working -- or that he was

5  working on the WiFi BacPac in 2010?

6  **A.**  No.

7  **Q.**  Last question.  Do you consider wireless streaming and

8  remote control to be unique image processing?

9  **A.**  Yes.

10      **MR. KRILL:**  Pass the witness, Your Honor.

11      **THE COURT:**  All right.  Dr. Hu, you may step down.

12  Thank you.

13                  (Witness excused.)

14      **THE COURT:**  Does Contour have anything else?

15      **MR. KRILL:**  Your Honor, we rest our rebuttal case.

16      **THE COURT:**  Okay.

17      **MR. HAYNES:**  Your Honor, for our surrebuttal case, we

18  call Dr. Almeroth back to the stand.

19      **THE COURT:**  Okay.

20          **KEVIN CHRISTOPHER ALMEROTH**,

21  called as a witness for the Defendant, having been previously

22  duly sworn, testified further in surrebuttal as follows:

23      **THE COURT:**  Doctor, you're still under oath.

24      **THE WITNESS:**  Yes, Your Honor.

25  \\\

<u>DIRECT EXAMINATION</u>

**BY MS. CLARK:**

**Q.**  Welcome back, Dr. Almeroth.

        **MS. CLARK:**  Can we put up DDX-5.5, please.

**BY MS. CLARK:**

**Q.**  Why are you back today?

**A.**  I am back today to respond to the opinions of Dr. Hu as it relates to validity.  The way this is set up is I don't respond to what she said on infringement or damages.  I'm just doing validity right now.

**Q.**  Okay.  Let me first ask you, did anything about Dr. Hu's testimony change your mind about your conclusions?

**A.**  No.  I stand by my conclusions that the three claims of the asserted patents are invalid.

**Q.**  DDX-5.43, please.

        **THE COURT:**  Could you pull the mic a little closer to you.

**BY MS. CLARK:**

**Q.**  Let's first talk about the issues that Dr. Hu did not dispute in your testimony.

        Did Dr. Hu provide any rebuttal regarding your state of the art?

**A.**  No.  I listened very carefully to what she said, and she never disputed all of the things that I identified that were in the state of the art and that I summarized on this Slide 43.

1   Q.   Did Dr. Hu present any evidence to support the

2   December 2009 date of conception that Contour advocated for?

3   A.   No.  She didn't go through a limitation-by-limitation

4   analysis to establish December 2009.  Obviously, what

5   Mr. Woodman had done for GoPro, there's been lots of evidence,

6   there's been lots of testimony on it.  Dr. Hu did nothing

7   similar for Contour.

8            MS. CLARK:  Can we put up DDX-5.74.

9   BY MS. CLARK:

10  Q.   Let's talk about the first ground on which you concluded

11  the patents were obvious, Boland with Ambarella.

12       Did Dr. Hu dispute that Boland and Ambarella collectively

13  disclose each and every limitation of the asserted claims?

14  A.   She did not.  I went through the 15 or so slides and

15  showed where Ambarella disclosed each -- or, sorry -- Boland

16  disclosed each of the limitations except for around the

17  generate limitations, and then I switched to Ambarella and

18  showed that Ambarella disclosed those limitations.

19       I don't believe she offered any testimony that any of

20  those limitations were not met by the combination of Boland and

21  Ambarella.

22  Q.   Next is DDX-5.70, "Motivation to Combine."  Did Dr. Hu

23  present any testimony regarding a lack of motivation to combine

24  Boland and Ambarella?

25  A.   No.  I had offered the opinion that these paragraphs 49

1    and 50 from Boland provided the motivation for a person of

2    skill in the art to look to other commercial chips that were

3    available as a way of implementing that camera processor in

4    Boland.

5    **Q.**    And DDX-5.77.  Now, looking back at your methodology

6    slide, can you summarize what Dr. Hu addressed and what she did

7    not address with respect to Boland and Ambarella?

8    **A.**    Yes.  So for the first three, the scope and content of the

9    prior art, the level of ordinary skill in the art at the time

10   of the invention, and the differences between the claimed

11   invention and the teachings of prior art, I don't believe she

12   offered any rebuttal to the opinions I offered.

13        She did offer two instances of objective evidence of

14   non-obvious that she felt existed.  One was the failure of

15   others, and then the second one was copying.

16   **Q.**    Assuming that Dr. Hu had some evidence of these secondary

17   indicia, would that affect your conclusions about the

18   obviousness of the asserted claims in view of Boland with

19   Ambarella?

20   **A.**    No.  Remember, it's two steps.  One, to show that there is

21   evidence of non-obviousness, that there were secondary

22   considerations.  I disagree with that.

23        The second part, though, is even if she were right, she

24   has to provide evidence for why that would overcome the

25   motivation to combine the references in the obviousness

1  analysis that I presented, and that's something she didn't even

2  refute.

3  **Q.**   Okay.  But let me ask you.  Do you agree with Dr. Hu that

4  there is evidence of failure by others to conceive of the

5  claimed invention?

6  **A.**   No, there was not evidence to that effect.

7  **Q.**   What was the problem identified in the patents that -- to

8  be -- the problem to be solved that's identified in the

9  asserted patents?

10 **A.**   Right.  The problem, again, was -- I think the best

11 example was, if you have a camera mounted to a ski helmet and

12 you couldn't see what it was pointing at, you wanted a remote

13 control that you could look at and see what it was pointing to,

14 and then you could make adjustments to it.

15      So the problem was how to point a camera that didn't have

16 a viewfinder or a display on it so that you could adjust it

17 properly.

18 **Q.**   Did anyone else have this idea of being able to view

19 something remotely while it was recording so that those

20 adjustments could be made?

21 **A.**   Yes.  There were a number of efforts in the state of the

22 art, in the prior art, that had identified that problem and had

23 proposed solutions to it.

24      The Sony Ipela, that was the camera that did the swivel,

25 pan, zoom, and tilt, and it had the PC application where you

1    could see the preview and you could control it.

2        There was also Boland, the patent application.

3        There was also Looxcie, the actual product that would go

4    on your head and then would have a handset that you could look

5    at.

6        There was also Presler, the patent that had live preview

7    in it.

8        And then, of course, GoPro had also proposed solutions to

9    that same problem.

10   **Q.**   Did Dr. Hu refute any of that state-of-the-art evidence

11   showing live preview while recording clearly existed before

12   Contour invented it?

13   **A.**   She did not.

14   **Q.**   Is the time that it took GoPro to implement the idea of a

15   wireless preview into a commercial product, is that indicative

16   of failure of others?

17   **A.**   No.  Just because you have products that don't include

18   wireless, like the HERO HD, doesn't mean that that product was

19   a failure.  GoPro came out with wireless later.

20       And it's not a failure if a company, in trying to

21   determine what features to put into a product, makes choices.

22   Those are normal in the course of deciding a product that's

23   going to be commercialized:  its size, its color, its battery

24   power, what features it has.  So it's not a failure on behalf

25   of GoPro to have a wireless device in the GoPro HD.  They came

1    out with one.

2         And as Mr. Mooney testified last week, sometimes it takes

3    three years for products to come out from inception.  So what

4    happened with the GoPro HD and the HERO2 are not examples of

5    failure of others as it relates to the claims.

6         **MS. CLARK:**  Let's put up DDX-5.76.

7    **BY MS. CLARK:**

8    **Q.**   Dr. Hu also mentioned copying.  Do you recall that?

9    **A.**   Yes, I do.

10   **Q.**   Did Dr. Hu provide any explanation for how there could be

11   copying, even though GoPro had been working on its own wireless

12   solutions years before it allegedly bought a ContourGPS on the

13   market?

14   **A.**   No.  She didn't have an explanation as it related to

15   copying for all of the work that GoPro was already doing.

16   **Q.**   Did Dr. Hu identify what GoPro allegedly learned from the

17   supposed teardown of the Contour product in 2011?

18   **A.**   No.  So the first allegation of copying seems to come from

19   this January 11th, 2011, teardown, but she didn't identify any

20   aspect of what was in that device that GoPro would have

21   allegedly copied.  In fact, that device had Bluetooth, and

22   GoPro made the decision to do WiFi and had made that decision

23   long before that date, as all of this evidence on Slide 76

24   demonstrates.

25   **Q.**   I know you've said this before, but you would agree that

1    the law requires that -- or the law mandates that it's the

2    claims that define the invention; right?

3    **A.**    That's correct.

4    **Q.**    Did Dr. Hu identify any element of the claims that GoPro

5    had not conceived and only learned about from looking at

6    Contour's product?

7    **A.**    No, she didn't identify anything with specificity on what

8    was supposed to have been copied.

9    **Q.**    If the jury agrees with you that Boland and Ambarella in

10   combination render obvious the asserted claims, what happens?

11   **A.**    At that point, the patents would be invalid, and there's

12   no reason to consider questions of infringement or damages.

13   **Q.**    Okay.  Even though that's true, I'd still like to take a

14   few minutes to talk about this Woodman prior invention.

15       Can you remind the jury what documents are the basis for

16   your Woodman conception opinions?

17   **A.**    It's really the three that I discussed previously.  It's

18   the Woodman patent, it's also the January 2009 GoPro spec, and

19   then the GoPro emails that are identified here.  I think it's

20   the Exhibit 426.

21   **Q.**    During cross-examination, did Dr. Hu identify anything she

22   felt was missing from the disclosure in the three documents and

23   the preceding camera products that would suggest there was no

24   conception?

25   **A.**    Not in her direct testimony.

1    Q.    How about on cross?

2    A.    On cross-examination, she tried to raise the issue of

3    remote camera controls.

4    Q.    Is that something Contour's ever alleged they invented?

5    A.    Yes.  It's in both the Woodman patent and it's also in the

6    GoPro spec.

7    Q.    Let's look at Trial Exhibit 304.

8          This specification is dated January 13th, 2009.  That's

9    about a year before Contour said it conceived of the claimed

10   invention; right?

11   A.    Yes, ma'am.

12   Q.    I'd like to direct your attention to page 11.

13          MS. CLARK:  And can we zoom in on the lower part of

14   the -- perfect.

15   BY MS. CLARK:

16   Q.    What does this show?

17   A.    This is one of the figures.  And you see here it has the

18   remote control device.  I think one of the things she testified

19   to is that it -- that the GoPro spec only said it had a couple

20   of buttons on it.  You see here multiple buttons, and then you

21   also see the display.  And then those buttons -- a little hard

22   to read -- are described over there in the corner.

23   Q.    And Dr. Hu was directing our attention to page 20; right?

24   Can we look at that?

25          Do you see the second bullet where it discloses mode

1  selection buttons?

2  **A.**    Yes.

3  **Q.**    Does this suggest to you that the remote control had the

4  same multifunction button setup as the camera?

5  **A.**    It does.  And if you take a second and read it, it says

6  that this remote, this handheld wireless remote, had a camera

7  on/off button combined with a mode select button so it

8  functions the same as the camera buttons.

9         And so what it's saying is you could do with the remote

10  and the buttons on the remote everything that you could do on

11  the camera.  And then the camera would have settings on it, and

12  so the remote being able to mimic that functionality is

13  something that that remote would have had.

14  **Q.**    Would those settings include a lighting setting, for

15  example?

16  **A.**    Yes, they would.  Those would be the kinds of settings you

17  have on a camera.

18  **Q.**    Okay.  What is the consequence of Dr. Hu's failure to

19  consider all of the relevant material presented regarding

20  Mr. Woodman's invention?

21  **A.**    The result is at the end of the day, I believe I've shown

22  where all of the elements of the Contour patent claims were

23  things that had already been conceived of by GoPro, and that

24  would be another independent reason why the Contour patents

25  would be invalid.

ALMEROTH - DIRECT / CLARK

1   Q.   Did Dr. Hu's testimony about work done after the 2008-2009

2   time period have any impact on whether Mr. Woodman conceived of

3   the claimed invention before the priority date?

4   A.   No.   There's clear evidence of conception, and then

5   there's clear evidence of diligence and reduction to practice

6   that comes later.

7   Q.   So what significance, if any, does the work that came

8   after conception have?

9   A.   It shows diligence in reduction to practice, the efforts

10  to figure out how to build and commercialize one of these

11  products.   And that was something that was ongoing from

12  conception up until at least the HERO2 with the WiFi BacPac.

13  Q.   Now, Dr. Hu testified that GoPro was still making a

14  number of design choices, changing wireless standards.   Do you

15  recall that?

16  A.   Yes.

17  Q.   Does that undermine conception?   Can you un-conceive

18  something?

19  A.   No.   Conception had been established, and the

20  considerations that GoPro was going through at the time was

21  what features and which specific kinds of chips, what specific

22  kinds of wireless would go into particular products.

23  Q.   Other than her opinions, did Dr. Hu present any actual

24  evidence that GoPro had abandoned development of a wireless

25  preview and remote control?

ALMEROTH - DIRECT / CLARK

1    A.    There were a couple of weekly status reports that showed

2    that wireless activity was inactive.

3    Q.    Oh, let's look at those.

4            MS. CLARK:    Can we look at Trial Exhibit 405.

5    BY MS. CLARK:

6    Q.    Is this the status report you're talking about?

7    A.    Yes, it is.

8    Q.    And what does it say?

9    A.    If you go to the top, it says that this is the GoPro Paul

10   Donovan consulting weekly status report.  And for

11   November 16th, 2010, it shows that he, in particular, was

12   inactive with respect to the wireless functionality.

13   Q.    Does it say anything about GoPro's other employees?

14   A.    No.  It's just for Mr. Donovan.

15   Q.    And is this consistent with Mr. Donovan's testimony

16   yesterday?

17   A.    Yes.  In the videotaped testimony yesterday, Mr. Donovan

18   testified that there were actually other people working on the

19   wireless portion, that he was largely responsible for the

20   camera portion, but the wireless aspect was handled by others

21   like Mr. Woodman.

22           MS. CLARK:    Can we put up Mr. Donovan's clip report at

23   51:15 through 52:10.

24   BY MS. CLARK:

25   Q.    Sorry.  It's kind of hard to read.  But is this the

1  testimony you were talking about?

2  **A.**   Yes.   He was asked the question [as read]:

3          "In 2009, though, the GoPro BacPac, who was

4      primarily responsible for that product?"

5      And Mr. Donovan said [as read]:

6          "Nicholas Woodman, Rudy, and myself supporting

7      as needed."

8          **MS. CLARK:**   Thank you.   You can take that down.

9  **BY MS. CLARK:**

10  **Q.**   Does that mean that GoPro or Mr. Woodman abandoned his

11  prior invention?

12  **A.**   It means that it was not abandoned by Mr. Woodman and

13  GoPro.

14  **Q.**   And DDX-5.88.   Can you please explain what's the result if

15  the jury agrees with your analysis of Mr. Woodman's invention

16  and the work GoPro collectively did to reduce it to practice?

17  **A.**   That that is another reason why I believe the three claims

18  of the two Contour patents are ultimately invalid by clear and

19  convincing evidence.

20  **Q.**   If the jury concludes that either Boland and Ambarella or

21  Mr. Woodman came up with the invention that renders the patent

22  invalid, then what happens?

23  **A.**   Then there's no need to assess whether or not there is

24  infringement, and there would be no damages for an invalid

25  patent.

1          **MS. CLARK:**  Thank you, Dr. Almeroth.

2          **THE COURT:**  Mr. Keville.

3          **MR. KEVILLE:**  Thank you, Your Honor.

4                          **CROSS-EXAMINATION**

5    BY MR. KEVILLE:

6    **Q.**  Dr. Almeroth, I want to be brief.  So I want to show you

7    some documents and just see if you agree this is what GoPro

8    actually said in their documents.  Okay?

9    **A.**  Okay.  And to be clear, you don't want any analysis?  You

10   just want me --

11   **Q.**  Sir, I want --

12   **A.**  -- to see what they read?

13   **Q.**  That's exactly what I said.

14   **A.**  Okay.

15         **MR. KEVILLE:**  Okay.  So, Allen, can you put up

16   Exhibit 426 from January 2009.

17   BY MR. KEVILLE:

18   **Q.**  You agree that it says Woodman and others at GoPro knew of

19   the A5 processor in January 2009; correct?

20   **A.**  They did know of those processors.

21         **MR. KEVILLE:**  All right.  Can you pull up

22   Exhibit 3339.

23   BY MR. KEVILLE:

24   **Q.**  You agree that this says GoPro tried developing a camera

25   with wireless picture preview using the A2 processor in

1   March 2009; correct?

2   **A.**   Yes, that was one of the things they were doing.

3        **MR. KEVILLE:**  All right.  Can you pull up

4   Exhibit 2383.

5   **BY MR. KEVILLE:**

6   **Q.**   Do you agree that GoPro wrote its picture preview concept

7   may or may not work while the unit is recording, in April 2009,

8   TBD; correct?

9   **A.**   Yes.  As of April, that's correct.

10  **Q.**   All right.  And then let's move on to Exhibit 3153 at

11  page 4.  You agree that in August 2009, Mr. Donovan wrote that,

12  quote [as read]:

13        "The key is the protocols and features and

14       porting to Ambarella camera side.  We do not know how

15       to do this as we have no Ambarella development

16       system"?

17  **A.**   Yes, back in August, that is what they wrote.

18  **Q.**   All right.  Let's move on later in August.

19        **MR. KEVILLE:**  Pull up Exhibit 2387 at page 2.

20  **BY MR. KEVILLE:**

21  **Q.**   You agree that in August 2009, Mr. Woodman wrote that he

22  was, quote [as read]:

23        ". . . interested in exploring a WiFi module for

24       the HERO BUS that would allow the camera to stream

25       video to another WiFi device."

ALMEROTH - CROSS / KEVILLE

```
 1        Correct?
 2   A.   Yes, that's what he was looking at.
 3   Q.   And further down, Mr. Woodman says [as read]:
 4             "Since we know we can get the video streaming
 5        over USB, the question is if we could build a WiFi
 6        module to pull that video from the HERO BUS."
 7        That's what he wrote; correct?
 8   A.   That's part of what it says.
 9   Q.   Okay.  Let's move on to September.
10             MR. KEVILLE:  Put up Exhibit 3127.
11   BY MR. KEVILLE:
12   Q.   You agree that in September 2009, Mr. Woodman wrote an
13   email titled "RF Canceled"; correct?
14   A.   Yes.
15   Q.   And he wrote [as read]:
16             "GoPro will now focus" -- it says "know" but
17        I think that's "now" -- "focus on developing a WiFi
18        HERO BUS module with Ambarella . . . ."
19        Correct?
20   A.   That's the first part of that sentence.
21   Q.   Okay.  And you agree that Mike Huang responded to
22   Mr. Woodman, stating [as read]:
23             "We need to do some pre-research and plan the
24        camera carefully to avoid failure."
25        Correct?
```

1  **A.**   Yes.  For development, that's true.

2  **Q.**   Okay.  And then the next month, if we look at

3  Exhibit 3116, we see that Mr. Woodman wrote on October 26,

4  2009, GoPro released a camera with "no picture preview,

5  et cetera, to keep cost down."  Correct?

6  **A.**   Yes, for that version of what was released.

7  **Q.**   All right.  Let's look at Exhibit 412, which is a year

8  later, in September 2009.

9      You agree that this document says that as of

10  September 14th, 2010, wireless was an idle project with no work

11  accomplished.  And [as read]:

12          "Actions:  Awaiting direction from Zahid on

13      building up and researching different technologies as

14      needed."

15      Correct?

16  **A.**   That's what it says in the Paul Donovan Consulting weekly

17  status report.

18  **Q.**   Sure.  And you were asked whether this report says

19  anything about other employees, and you said, "No, it does

20  not"; correct?

21  **A.**   That's correct.

22  **Q.**   But you understand Zahid was an employee, correct, of

23  GoPro?

24  **A.**   He was doing the research.  He hadn't reported on that

25  effort yet.

1  Q.  Sure.  And he was the guy that Mr. Woodman said, "Hey, go

2  get the Contour cameras so Zahid can tear them down for product

3  development"; correct?

4  A.  I think that was the same Zahid.

5  Q.  Okay.  Same Zahid.  And so the product is idle.

6      And then let's turn to Defendant's Exhibit --

7  A.  Oh, sorry.

8  Q.  -- or Trial Exhibit 2378.

9      And this is, you agree, a WiFi -- a wireless BacPac

10 product requirements document dated in 2011; correct?

11 A.  Yes.

12 Q.  Okay.  And you agree that the jury has seen not one single

13 document showing that GoPro was working on WiFi BacPac between

14 September 2009, when Nick Woodman stated GoPro would shift its

15 focus to the WiFi BacPac, and this document in 2011; correct?

16 A.  I disagree.  I think there were documents in that time

17 frame, and I think they -- some of them were actually shown to

18 the jury by Mr. Woodman in his testimony.

19 Q.  I'm sure when your counsel comes back up, she'll point

20 those out.  I haven't seen any.  Can you identify them for us?

21 A.  I don't have the exhibit numbers off the top of my head.

22 Q.  Okay.  And you agree that GoPro knew of the Ambarella A5

23 chip since January 2009, and you claim GoPro's first reduction

24 to practice was June 2012, the HERO2 with the WiFi BacPac;

25 correct?

1  A.   That was the first reduction to practice.

2         MR. KEVILLE:  Okay.  No further questions.

3         THE COURT:  All right.

4                    **REDIRECT EXAMINATION**

5  BY MS. CLARK:

6  Q.   Is the development of other products or functionalities,

7  like picture preview or remote control or, you know, other

8  parts of the camera, does that undermine the idea that GoPro

9  also continued working on developing a wireless preview?

10  A.   No, it doesn't.  You can work on multiple products in

11  parallel.  That's what the actual testimony and the documents

12  all show.

13        So pointing to the fact that there was picture preview as

14  one of the features that GoPro was working on doesn't change

15  the fact that there were other features that the testimony and

16  documents also support were being worked on.

17  Q.   Is testing and maybe switching wireless protocols as well

18  as developing a specific driver for WiFi, would you also

19  consider that to be a normal part of reduction to practice?

20  A.   That's what commercialization is, when you make the

21  decisions about what specifically to put in a product.

22  Q.   And if you decide -- if a company decides a feature isn't

23  good enough to go to market and decides to pull it and continue

24  developing until it can release something better, does that

25  suggest that there hasn't been diligence in reduction to

1  practice?

2  **A.**    No.  In fact, it's a strategic choice to either put

3  something out that doesn't work that well or to hold it back

4  and put it out when it's well vetted and works correctly.

5  We've seen examples of those kinds of things in the

6  marketplace, and they had different levels of success.

7  **Q.**    Counsel put up something like -- well, my count may be a

8  little off -- 10 or 11 emails from September 2009 through -- or

9  in the period up to September 2009.  Does that suggest that

10  there was any lack of diligence?

11  **A.**    No.  And I think it -- Mr. Keville seemed to suggest that

12  GoPro and Mr. Woodman didn't have that clear and permanent idea

13  because they were working on other things.  But, again, of

14  those eight or nine things, none of them were the three things

15  that I believe established conception.  Certainly, GoPro was

16  working on other things at the time.

17  **Q.**    And then he showed a PRD or a product document -- planning

18  document from 2011.

19       In your experience in the field, is -- could a product,

20  you know, have come out of nowhere between 2009 and 2011?  Is

21  that a normal development timeline?  Short?  Long?

22  **A.**    It's not a long amount of time.  And that document is

23  evidence of what the state was at that point in time.  Clearly,

24  there was work on that prior to that point in time as well.

25  **Q.**    Ultimately, do you agree that Mr. Woodman's invention was

1    ever abandoned?

2    **A.**    I do have an opinion.  I don't think it was.  I think

3    there was continued work by Mr. Woodman and GoPro from the

4    point of conception all the way to reduction of practice.

5        **MS. CLARK:**  Thank you so much.

6    Nothing further.

7        **THE COURT:**  All right.  You may step down.

8        **THE WITNESS:**  Thank you, Your Honor.

9            (Witness excused.)

10        **MR. HAYNES:**  Your Honor, GoPro rests its surrebuttal

11    case.

12        **THE COURT:**  Okay.  So that, ladies and gentlemen, is

13    the evidence in the case, and so I think we can move -- why

14    don't we move now to the instructions, and then we'll take a

15    break, and then the argument of counsel will occur after that.

16                **JURY INSTRUCTIONS**

17        **THE COURT:**  All right.  Here we go.

18        Members of the jury, now that you've heard all the

19    evidence, it's my duty to instruct you on the law that applies

20    to this case.

21        A copy of these instructions will be sent to the jury room

22    for you to consult during your deliberations.

23        It's your duty to find the facts from all the evidence in

24    the case.  To those facts you'll apply the law as I give it to

25    you.  You must follow the law as I give it to you whether you

agree with it or not.  And you must not be influenced by any

personal likes or dislikes, opinions, prejudices or sympathy.

That means you must decide the case solely on the evidence

before you.  You'll recall you took an oath to do so.

Please don't read into these instructions or anything that

I may say or do or have said or done that I have an opinion

regarding the evidence or what your verdict should be.

The evidence you're to consider in deciding what the facts

are consists of the sworn testimony of any witness, the

exhibits that are admitted into evidence, any facts to which

the lawyers have agreed, and any facts that I may instruct you

to accept as proved.

In reaching your verdict, you may consider only the

testimony and exhibits received into evidence.  Certain things

are not evidence, and you may not consider them in deciding

what the facts are.  I will list them for you.

Number one, arguments and statements by lawyers are not

evidence.  I repeated that for you in the earlier instructions.

I repeat it for you now.  The lawyers are not witnesses.  What

they said in their opening statements, what they will say in

their closing arguments and at other times is intended to help

you interpret the evidence, but it's not evidence.  If the

facts as you remember them differ from the way the lawyers

state them, your memory of them controls.

Number two, questions and objections by lawyers aren't

1  evidence.  Attorneys have a duty to their clients to object

2  when they believe a question's improper under the rules of

3  evidence.  You shouldn't be influenced by the objection or by

4  the Court's ruling on it.

5      Number three, testimony that's excluded or stricken or

6  that you've been instructed to disregard is not evidence and

7  must not be considered.  In addition, some evidence was

8  received only for a limited purpose -- I'm not sure whether

9  that's true; but if I instructed you to consider certain

10  evidence only for a limited purpose, you must do so, and you

11  may not consider that evidence for any other purpose.

12      Number four, anything you may have seen or heard when

13  the court was not in session is not evidence.  You're to decide

14  the case solely on the evidence received at trial.

15      Again, a standard instruction is that some evidence may

16  have been admitted only for a limited purpose.  To the extent

17  that I instructed you that way, you must consider it only for

18  that limited purpose and not for any other purpose.

19      Certain charts and summaries have been received into

20  evidence to illustrate information brought out in trial.

21  Charts and summaries are only as good as the underlying

22  evidence that supports them.  You should, therefore, give them

23  only such weight as you think the underlying evidence deserves.

24      Certain demonstrative slides or illustrative aids, charts,

25  and summaries not received in evidence have been shown to you

1  in order to help explain the contents of books, records,

2  documents, or other evidence in the case.  Slides, charts, and

3  summaries are only as good as the underlying evidence that

4  supports them.  In other words, these demonstratives are not,

5  in and of themselves, evidence.  You should, therefore, give

6  them only such weight as you think the underlying evidence

7  deserves.

8       Evidence may be direct or circumstantial.  Direct evidence

9  is direct proof of a fact, such as testimony by a witness about

10  what that witness personally saw or heard or did.

11       Circumstantial evidence is proof of one or more facts from

12  which you could find another fact.  You should consider both

13  kinds of evidence.  By way of example, if you wake up in the

14  morning and see that the sidewalk is wet, you may find from

15  that fact that it rained during the night.  However, other

16  evidence, such as a turned-on garden hose, may provide a

17  different explanation for the presence of water on the

18  sidewalk.  Therefore, before you decide that a fact has been

19  proved by circumstantial evidence, you must consider all the

20  evidence in the light of reason, experience, and common sense.

21       The law makes no distinction between the weight to be

22  given to either direct or circumstantial evidence.  It's for

23  you to decide how much weight to give to any evidence.

24       There are rules of evidence that control what can be

25  received into evidence.  When a lawyer asked a question or

offered an exhibit into evidence and a lawyer on the other side thought that it wasn't permitted by the rules of evidence, that lawyer may have objected. If I overruled the objection, the question was answered or the exhibit received. If I sustained the objection, the question was not answered and the exhibit was not received. Whenever I sustained an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I may have ordered that evidence be stricken from the record and that you disregard or ignore that evidence. That means when you're deciding the case, you must not consider the stricken evidence for any purpose.

In deciding the facts of the case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness, you may take into account the opportunity and ability of the witness to see or hear or know the things testified to; the witness's memory; the witness's manner while testifying; the witness's interest in the outcome of the case, if any; the witness's bias or prejudice, if any; whether other evidence contradicted the witness's testimony; the reasonableness of the witness's testimony in light of all the evidence; and any other factors that bear on believability.

1    Sometimes a witness may say something that is not

2  consistent with something else he or she said.  Sometimes

3  different witnesses will give different versions of what

4  happened.  People often forget things or make mistakes in what

5  they remember.  Also, two people may see the same event but

6  remember it differently.  You may consider these differences,

7  but do not decide that testimony is untrue just because it

8  differs from other testimony.

9    However, if you decide that a witness has deliberately

10  testified untruthfully about something important, you may

11  choose not to believe anything that witness said.  On the other

12  hand, if you think the witness testified untruthfully about

13  some things but told the truth about others, you may accept the

14  part that you think is true and ignore the rest.

15    The weight of the evidence as to a fact does not

16  necessarily depend on the number of witnesses who testify.

17  What's important is how believable the witnesses were and how

18  much weight you think their testimony deserves.

19    We all have feelings, assumptions, perceptions, fears, and

20  stereotypes about others.  Some biases we're aware of and

21  others we may not be fully aware of, which is why they're

22  called implicit or unconscious biases.  No matter how unbiased

23  we think we are, our brains are hardwired to make unconscious

24  decisions.  We look at others and filter what they say through

25  our own personal experience and background.  Because we all do

this, we often see life and evaluate evidence in a way that
tends to favor people who are like ourselves or who have had
life experiences like our own.  We can also have biases about
people like ourselves.  One common example is the automatic
association of male with career and female with family.  Bias
can affect our thoughts, how we remember what we see and hear,
whom we believe or disbelieve, and how we make important
decisions.

As jurors, you're being asked to make an important
decision in this case.  You must, one, take the time you need
to reflect carefully and thoughtfully about the evidence.

Two, think about why you're making the decision you're
making and examine it for bias.  Reconsider your first
impressions of the people and the evidence in this case.  If
the people involved in this case were from different
backgrounds, for example, richer or poorer, more or less
educated, older or younger, or of a different gender, gender
identity, race, religion, or sexual orientation, would you
still view them and the evidence the same way?

Three, listen to one another.  You must carefully evaluate
the evidence and resist, and help each other resist, any urge
to reach a verdict influenced by bias for or against any party
or witness.  Each of you have different backgrounds and will be
viewing this case in light of your own insights, assumptions
and biases.  Listening to different perspectives may help you

1   to better identify the possible effects these hidden biases may

2   have on decision-making.

3        And, four, resist jumping to conclusions based on personal

4   likes or dislikes, generalizations, gut feelings, prejudices,

5   sympathies, stereotypes, or unconscious biases.  The law

6   demands that you make a fair decision based solely on the

7   evidence, your individual evaluations of that evidence, your

8   reason and common sense, and these instructions.

9        A deposition is the sworn testimony of a witness taken

10  before trial.  The witness is placed under oath to tell the

11  truth, and lawyers for each party may ask questions.  The

12  question and answers are recorded.

13       You heard some witnesses testify by deposition.  Insofar

14  as possible, you should consider deposition testimony presented

15  to you in court in lieu of live testimony in the same way as if

16  the witness had been present to testify.

17       You have heard testimony from certain expert witnesses who

18  testified to opinions and the reasons for their opinions.  This

19  opinion testimony is allowed because of the education or

20  experience of these witnesses.

21       Such opinion testimony should be judged like any other

22  testimony.  You may accept it or reject it and give it as much

23  weight as you think it deserves, considering the witness's

24  education and experience, the reasons given for the opinion,

25  and all the other evidence in the case.

1    Contour's expert witnesses are Dr. Jing Hu and Dr. Keith

2  Ugone.

3    GoPro's expert witnesses are Dr. Kevin Almeroth and

4  Dr. Patrick Kennedy.

5    To remind you, the facts must have been proven by a

6  required amount of evidence known as the burden of proof.

7  There are two burdens of proof that you must apply in this

8  case.  One, preponderance of the evidence; and, two, clear and

9  convincing evidence.

10    Contour had the burden of proof of proving patent

11  infringement, damages, and willful infringement by a

12  preponderance of the evidence.  When a party has the burden of

13  proving any claim by a preponderance of the evidence, it means

14  you must be persuaded by the evidence that the claim is more

15  probably true than not true.  You should base your decision on

16  all of the evidence, regardless of which party presented it.

17    GoPro had the burden of proving invalidity by clear and

18  convincing evidence.  When a party has the burden of proving

19  any defense by clear and convincing evidence, it means that the

20  party must present evidence that leaves you with a firm belief

21  or conviction that it is highly probable that the factual

22  contentions of the defense are true.  This is a higher standard

23  of proof than proof by a preponderance of the evidence, but it

24  does not require proof beyond a reasonable doubt.

25    Before you decide whether GoPro has infringed the asserted

**JURY INSTRUCTIONS**

1   claims of the patents-in-suit or whether the claims are

2   invalid, you will need to understand the patent claims.  As I

3   mentioned at the beginning of the case, the patent claims are

4   numbered sentences at the end of the patent that describes the

5   boundaries of the patent's protection.  It's my job as judge to

6   explain to you the meaning of any language in the claims that

7   needs interpretation.

8        I have interpreted the meaning of some of the language in

9   the patent claims involved in this case.  You must accept these

10  interpretations as correct.  My interpretation of the language

11  should not be taken as an indication that I have a view

12  regarding the issues of infringement and invalidity.  The

13  decisions regarding infringement and invalidity are yours to

14  make.

15       I instruct you that the following claim terms have the

16  following definitions:

17       The preamble requiring a "portable, point-of-view digital

18  video camera" is limiting.

19       The term "real time" means "without perceived delay."

20       The term "a wireless connection protocol device configured

21  to send real-time image content by wireless transmission

22  directly to and receive control signals or data signals by

23  wireless transmission directly from a personal portable

24  computing device executing an application" means:  "At least

25  one wireless connection protocol device that can both (1) send

real-time image content by wireless transmission directly to

and (2) receive control signals or data signals by wireless

transmission directly from a personal portable computing device

executing an application."

The term "generate from the video image data a first image

data stream and a second image data stream, wherein the second

image data stream is a higher quality than the first data

stream" means "record in parallel from the video image data a

first image data stream and a second image data stream, wherein

the second image data stream is a higher quality than the first

image data stream."

The term "generate first video image content and second

video image content corresponding to the video image data

representing the scene, wherein the second video image content

is a higher quality than the first image content" -- "video

image content" means "record in parallel first video image

content and second video image content corresponding to the

video image data representing the scene, wherein the second

video image content is a higher quality than the first video

image content."

The term "prior to a recording of the scene" means "before

storing video image data representing the scene."

The term "mount" means "a component configured to be

mounted to at least one of the body, a garment, or a vehicle."

The term "mounting interface" means "a place for attaching

1    a mount."

2        The claims are limited to a point-of-view digital video

3    camera (or camera system) comprising, "among other things, 'a

4    camera processor.'"  The camera processor is configured to,

5    among other things, cause the wireless connection protocol

6    device to send the first image data stream directly to the

7    personal portable computing device for display on a display of

8    the personal portable computing device, wherein the personal

9    portable computing device generates the control signals for the

10   video camera.  The "wherein" clause "helps define the control

11   signals that the processor is configured to receive."

12       If I have not provided a specific definition for a given

13   term, you are to use the plain and ordinary meaning of the

14   term.

15       This case involves two types of patent claims:

16   independent claims and dependent claims.  An "independent

17   claim" sets forth all of the requirements that must be met in

18   order to be covered by that claim.  Thus, it's not necessary to

19   look at any other claim to determine what an independent claim

20   covers.

21       In this case, Claim 11 of the '954 patent is an

22   independent claim, while Claim 12 is a dependent claim.  In the

23   '694 patent, Claim 3 is an independent claim, while Claim 6 is

24   a dependent claim.

25       A dependent claim does not itself recite all of the

1  requirements of the claim but refers to another claim for some

2  of its requirements.  In this way, the claim "depends" on

3  another claim.  A dependent claim incorporates all of the

4  requirements of the claims to which it refers.  The dependent

5  claim then adds its own additional requirements.  To determine

6  what a dependent claim covers, it's necessary to look at both

7  the dependent claim and any other claims to which it refers.  A

8  product that meets all of the requirements of both the

9  dependent claim and the claims to which it refers is covered by

10  that dependent claim.

11      I will now instruct you on the rules you must follow in

12  deciding whether Contour has proven that GoPro has infringed

13  one or more asserted claims of the patents-in-suit.  To prove

14  infringement of any claim, Contour must persuade you that it's

15  more likely than not that GoPro has infringed that claim.

16      Previously, I determined that the Live Preview Group 1

17  products include each element of Claim 11 of the '954 patent.

18  You must accept my ruling and you will not be asked to make any

19  further determination on that issue for the Live Preview

20  Group 1 products with respect to Claim 11 of the '954 patent.

21  My determination applies only to the Live Preview Group 1

22  products.  You, the jury, must decide on your own whether the

23  other accused GoPro products include each element of Claim 11,

24  and you should not be influenced one way or another in your

25  decision by my determination with respect to the Live Preview

1    Group 1 products.

2        My determination that the Live Preview Group 1 products

3    include each element of Claim 11 of the '954 patent does not

4    mean that I have determined that Claim 11 of the '954 patent is

5    valid, that damages are appropriate, or that GoPro willfully

6    infringed Claim 11.

7        A patent's claims define what is covered by the patent.  A

8    product directly infringes a patent if it's covered by at least

9    one claim of the patent.

10        Deciding whether a claim has been directly infringed is a

11    two-step process.  The first step is to decide the meaning of

12    the patent claim.  I have already made this decision, and I've

13    instructed you as to the meaning of the asserted patent claims.

14    The second step is to decide whether GoPro has made, used,

15    sold, or offered for sale within the United States a product

16    covered by Claims 11 and 12 of the '954 patent, or Claim 6 of

17    the '694 patent.  If it has, it infringes.  You, the jury, must

18    make this decision.

19        With one exception, you must consider Claims 11 and 12 of

20    the '954 patent and Claim 6 of the '694 patent individually,

21    and decide whether GoPro's products infringe that claim.  The

22    one exception to considering claims individually concerns

23    dependent claims.  A dependent claim includes all of the

24    requirements of a particular independent claim, plus additional

25    requirements of its own.  As a result, if you find that an

1    independent claim is not infringed, you must also find that its

2    depended claims are not infringed.  On the other hand, if you

3    find that an independent claim has been infringed, you must

4    still separately decide whether the additional requirements of

5    its dependent claims have also been infringed.

6         You've heard evidence that the previous owners of the

7    patents-in-suit, known as Contour, LLC and Contour, Inc., made

8    and sold commercial camera products.  However, in deciding the

9    issue of infringement, you may not compare GoPro's accused

10   products to Contour, LLC's or Contour, Inc.'s commercial

11   products.  Rather, you must compare GoPro's accused products to

12   the claims of the '954 and '694 patents when making your

13   decision regarding infringement.

14        Whether or not GoPro knew its product infringed or even

15   know of the patent does not matter in determining direct

16   infringement.

17        In order to directly infringe a claim, GoPro must

18   "literally" infringe the claim, and I'll explain what that

19   means now.

20        To decide whether GoPro's accused product literally

21   infringes a claim of the patents-in-suit, you must compare that

22   product with the patent claim and determine whether every

23   requirement of the claim is included in that product.  If so,

24   GoPro's accused product literally infringes that claim.  If,

25   however, GoPro's accused product does not have every

1  requirement in the patent claim, GoPro's product does not

2  literally infringe that claim.  You must decide literal

3  infringement for each asserted claim separately.

4      If the patent claim uses the term "comprising," that

5  patent claim is to be understood as an open claim.  An open

6  claim is infringed as long as every requirement in the claim is

7  present in GoPro's accused product.  The fact that GoPro's

8  product also includes other parts will not avoid infringement

9  as long, as it has every requirement in the patent claim.

10      In this case, Contour argues that GoPro willfully

11  infringed Contour's patents-in-suit.

12      To prove willful infringement, Contour must persuade you

13  that GoPro infringed a valid and enforceable claim of the

14  patents-in-suit.  The requirements for proving such

15  infringement were discussed in my prior instructions.

16      In addition to proving infringement of a claim, Contour

17  must persuade you that it's more likely true than not that

18  GoPro intentionally ignored or recklessly disregarded that

19  claim.  You must base your decision on GoPro's knowledge and

20  actions at the time of infringement.  Evidence that GoPro had

21  knowledge of the patent at the time of infringement by itself

22  is not sufficient to show willfulness.  Rather, to show

23  willfulness, you must find that GoPro engaged in additional

24  conduct evidencing deliberate or reckless disregard of

25  Contour's patent rights.

1    In deciding whether GoPro willfully infringed, you should

2    consider all the facts surrounding the infringement, including,

3    but not limited to, one, whether GoPro intentionally copied

4    Contour's patented technology in developing the accused

5    product; two, whether GoPro knew, or should have known, that

6    its conduct involved an unreasonable risk of infringement;

7    three, whether GoPro had a reasonable belief that at the time

8    of infringement, that its products did not infringe the

9    asserted patent or that the patent was invalid; and, four,

10   whether or not GoPro made a good faith effort to avoid

11   infringing the patent, for example, whether GoPro attempted to

12   design around the patent.

13         I'll now instruct you on the rules that you must follow in

14   deciding whether GoPro has proven that Claims 11 and 12 of the

15   '954 patent and Claim 6 of the '694 patent are invalid.  Before

16   discussing the specific rules, I want to remind you about the

17   standard of proof that applies to this defense.  A patent is

18   presumed to be valid.  In other words, it is presumed to have

19   been properly granted by the PTO.  But that presumption of

20   validity can be overcome if clear and convincing evidence is

21   presented in court that proves the patent is invalid.  To prove

22   invalidity of any patent claim, GoPro must persuade you to a

23   firm belief or conviction that it is highly probable that the

24   claim is invalid.

25         During this case, GoPro has submitted prior art that it

1  contends was not considered by the United States Patent and

2  Trademark Office, the PTO.  GoPro contends that such prior art

3  invalidates the asserted claims of the patents-in-suit.  In

4  deciding the issue of invalidity, you may take into account

5  whether any of the prior art was not considered by the PTO when

6  it issued the patents-in-suit.  In doing so, you must decide

7  whether the prior art was materially new, or whether it was

8  merely cumulative or less relevant than the prior art already

9  considered by the PTO.  Prior art that is materially new may

10  carry more weight than the prior art that was considered and

11  may make GoPro's burden of showing that it is highly probable

12  that a patent claim is invalid easier to sustain.

13      The question of invalidity of a patent claim is determined

14  from the perspective of a person of ordinary skill in the art

15  in the field of the asserted invention as of September 13th,

16  2010.  In deciding the level of ordinary skill, you should

17  consider all the evidence introduced at trial, including the

18  levels of education and experience of persons working in the

19  field, the types of problems encountered in the field, and the

20  sophistication of the technology.

21      Contour contends that the level of ordinary skill in the

22  field was a person having at least a bachelor's degree in

23  computer science, electrical engineering, or a similar

24  discipline, and some experience creating, programming, or

25  working with digital video cameras, such as POV action sports

1    video cameras.

2        GoPro contends that the level of ordinary skill is a

3    person having education in computer science or electrical

4    engineering and experience in the field of digital video

5    cameras, image processing, and transmission of multimedia

6    content between devices, and knowledge of the scientific

7    literature concerning the same.  GoPro contends that the

8    education and experience levels may vary between persons of

9    ordinary skill, with some persons holding a basic bachelor's

10   degree with three years of relevant work experience, and others

11   holding a master's or Ph.D. but having one to two years of

12   experience.

13       A patent claim is invalid if the claimed invention is not

14   new.  For the claim to be invalid because it is not new, all of

15   its requirements must have existed in a single device that

16   predates the claimed invention.  In patent law, these previous

17   devices are called "prior art references."  If a patent claim

18   is not new, we say it is "anticipated" by a prior art

19   reference.

20       The description in the written reference does not have to

21   be in the same words as the claim, but all of the requirements

22   of the claim must be there, stated so that someone of ordinary

23   skill in the field of wireless technology and digital video

24   cameras, such as POV cameras, looking at that one reference

25   would be able to make and use the claimed invention.

1    In determining whether a single item of prior art

2  anticipates a patent claim, you may consider not only what is

3  expressly disclosed in that item of prior art but also what is

4  inherently present or disclosed in it or inherently results

5  from its use.  Prior art inherently anticipates a patent claim

6  if the missing requirement or feature would necessarily be

7  present in the prior art.

8    In this case, GoPro can show that a patent claim is not

9  new if it shows the claim was disclosed in the prior invention

10 of Nicholas Woodman at GoPro in the form of the HD HERO2 and

11 WiFi BacPac in June 2012.

12   To be disclosed in a prior invention, the prior invention

13 must have been conceived and reduced to practice in the

14 United States before the priority date of the claimed invention

15 or diligently reduced to practice thereafter without

16 abandonment, concealment, or suppression.  Diligence means

17 working continuously though not necessarily every day.

18   In this case, Contour and GoPro dispute who is the first

19 inventor.  Since it's in dispute, you must determine a date of

20 conception for the claimed invention and the alleged prior

21 invention.

22   The date of invention is either when the invention was

23 reduced to practice or when conceived, provided the inventors

24 were diligent in reducing the invention to practice.  Diligence

25 means working continuously though not necessarily every day.

1   Conception is the mental part of an inventive act, i.e., the

2   formation in the mind of the inventor of a definite and

3   permanent idea of the complete and operative invention as it's

4   thereafter to be applied in practice, even if the inventor did

5   not know at the time that the invention would work.  Conception

6   of an invention is complete when the idea is so clearly defined

7   in the inventor's mind that if the idea were communicated to a

8   person having ordinary skill in the field of the technology, he

9   or she would be able to reduce the invention to practice

10  without undue research or experimentation.  This requirement

11  does not mean that the inventor has to have a prototype built

12  or actually explained her or his invention to another person.

13  But, there must be some evidence beyond the inventor's own

14  testimony that confirms the date on which the inventor had the

15  complete idea.  Conception may be proven when the invention is

16  shown in its complete form by drawings, disclosure to another

17  person, or other forms of evidence presented at trial.  A

18  claimed invention is "reduced to practice" when it's been

19  constructed, used, or tested sufficiently to show that it will

20  work for its intended purpose or when the inventor files a

21  patent application that fully describes the invention.  If one

22  person conceived of the claimed invention first, but reduced to

23  practice second, that person is the first inventor only if that

24  person (a) began to reduce the claimed invention to practice

25  before the other party conceived of it, (b) continued to work

diligently to reduce it to practice, and (c) did not abandon, suppress, or conceal the invention.

GoPro contends that Claims 11 and 12 of the '954 patent and Claim 6 of the '694 patent are invalid because the invention defined in those claims was conceived by and reduced to practice by or at the direction of Nicholas Woodman at GoPro in the form of HD HERO2 and WiFi BacPac in June 2012.

If the prior invention was abandoned, suppressed, or concealed, it's not prior art and cannot anticipate or render obvious any claim of the asserted patents.  In other words, the prior invention cannot be found to invalidate the asserted patents if it was abandoned, suppressed, or concealed.  In deciding this, you may consider whether the prior inventor actively concealed the invention from the public, or the prior inventor unreasonably delayed in making the invention publicly known.  Generally, a prior invention was not abandoned, suppressed, or concealed if the invention was made public, sold, or offered for sale, or otherwise used for a commercial purpose.  A period of delay does not constitute abandonment, suppression, or concealment, provided the prior inventor was engaged in reasonable efforts to bring the prior invention to market during this period.

A patent claim is invalid if the claimed invention would have been obvious to a person of ordinary skill in the field at the time the claimed invention was made.  This means that even

if all of the requirements of the claim cannot be found in a single prior art reference that would anticipate the claim, a person of ordinary skill in the field of digital action cameras who knew all about this prior art would have come up with the claimed invention.

GoPro contends that the following prior art and combinations of prior art when considered in view of the state of the art render the inventions claimed in the patents-in-suit obvious:  one, conception and reduction to practice by or at the direction of Nicholas Woodman at GoPro in the form of HD HERO2 and WiFi BacPac; or the combination of Boland and Ambarella A5 or A5s camera processors.

The ultimate conclusion of whether a claim is obvious should be based upon your determination of several factual decisions.

First, you must decide the level of ordinary skill in the field that someone would have had at the time the claimed invention was made.  In deciding the level of ordinary skill, you should consider all the evidence introduced at trial, including the levels of education and experience of persons working in the field, the types of problems encountered in the field, and the sophistication of the technology.

Second, you must decide the scope and content of the prior art.  In order to be considered as prior art to Claims 11 and 12 of the '954 patent and Claim 6 of the '694 patent, these

references must be reasonably related to the claimed invention
of that patent.  A reference is reasonably related if it's in
the same field as the claimed invention or is from another
field to which a person of ordinary skill in the field would
look to solve a known problem.

Third, you must decide what difference, if any, existed
between the claimed invention and the prior art.

Finally, you should consider any of the following factors
that you've been shown by the evidence:

(1) commercial success of a product due to the merits of
the claimed invention;

(2) a long-felt need for the solution provided by the
claimed invention;

(3) unsuccessful attempts by others to find the solution
provided by the claimed invention;

(4) copying of the claimed invention by GoPro or others;

(5) unexpected and superior results from the claimed
invention;

(6) acceptance by others of the claimed invention as shown
by praise from others in the field or from the licensing of the
claimed invention;

(7) skepticism that the claimed invention would work as
intended; and

(8) other evidence tending to show non-obvious.

The presence of any of the Factors 1 through 8 may be

1  considered by you as an indication that the claimed invention

2  would not have been obvious at the time the claimed invention

3  was made.  Although you should consider any evidence of these

4  factors, the relevance and importance of any of them to your

5  decision on whether the claimed invention would have been

6  obvious or not is up to you.

7       However, there must be a sufficient nexus, that is, a

8  connection, between any factor you consider and the claimed

9  invention.

10      A patent claim composed of several elements is not proved

11 obvious merely by demonstrating that each of its elements was

12 independently known in the prior art.  In evaluating whether

13 such a claim would have been obvious, you may consider whether

14 GoPro has identified a reason that would have prompted a person

15 of ordinary skill in the field to combine the elements or

16 concepts from the prior art in the same way as in the claimed

17 invention.  There's no single way to define the line between

18 true inventiveness on the one hand, which is patentable, and

19 the application of common sense and ordinary skill to solve a

20 problem on the other hand, which is not patentable.

21      For example, market forces or other design incentives may

22 be what produced a change rather than true inventiveness.  You

23 may consider whether an inventor would look to the prior art to

24 help solve the particular problem at hand.  You may consider

25 whether the change was merely the predictable result of using

1  prior art elements according to their known functions, or

2  whether it was the result of true inventiveness.  You may also

3  consider whether there is some teaching or suggestion in the

4  prior art to make the modification or combination of elements

5  claimed in the patent.  Also, you may consider whether the

6  innovation applies a known technique that had been used to

7  improve a similar device or method in a similar way.  You may

8  also consider whether the claimed invention would have been

9  obvious to try, meaning that the claimed innovation was one of

10  a relatively small number of possible approaches to the problem

11  with a reasonable expectation of success by those skilled in

12  the art.  However, you must be careful not to determine

13  obviousness using the benefit of hindsight.  Many true

14  inventions might seem obvious after the fact.  You should put

15  yourself in the position of a person of ordinary skill in the

16  field at the time the claimed invention was made and you should

17  not consider what is known today or what is learned from the

18  teaching of the patent.

19      I will instruct you about the measure of damages.  By

20  instructing you on damages, I'm not suggesting which party

21  should win on any issue.  If you find GoPro infringed any valid

22  claim of the patents-in-suit, you must then determine the

23  amount of money damages to be awarded to Contour to compensate

24  it for the infringement.

25      The amount of those damages must be adequate to compensate

Contour for the infringement.  A damages award should put the patent holder in approximately the financial position it would have been in had the infringement not occurred, but in no event may the damages award be less than a reasonable royalty.  You should keep in mind that the damages you award are meant to compensate the patent holder and not to punish an infringer.

Contour has the burden to persuade you of the amount of its damages.  You should award only those damages that Contour more likely than not suffered.  While Contour is not required to prove its damages with mathematical precision, it must prove them with reasonable certainty.  Contour is not entitled to damages that are remote or speculative.

A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention.  This right is called a "license."  A reasonable royalty is the payment for the license that would have resulted from a hypothetical negotiation between the patent holder and the alleged infringer taking place at the time when the infringing activity first began.  In considering the nature of this negotiation, you must assume that both parties would have acted reasonably and would have entered into a license agreement.  You must also assume that both parties believed the patent was valid and infringed.  Your role is to determine what the result of that hypothetical negotiation would have been.  The test for damages is what royalty would have resulted from the

hypothetical negotiation and not simply what either party would

have preferred.

A royalty can be calculated in several different ways and

it's for you to determine which way is most appropriate based

on the evidence you've heard.  You should consider all the

facts known and available to the parties at the time the

infringement began.  Some of the factors you may consider in

making your determination are:

(1) The value that the claimed invention contributes to

the accused products;

(2) The value that factors other than the claimed

invention contribute to the accused products;

(3) Comparable license agreements, such as those covering

the use of the claimed invention or similar technology.

One way to calculate a royalty is to determine what's

called an "ongoing royalty."  To calculate an ongoing royalty,

you must first determine the "base," that is, the product on

which the alleged infringer is to pay.  You then need to

multiply the revenue the defendant obtained from that base by

the "rate" or percentage that you find would have resulted from

the hypothetical negotiation.  For example, if the patent

covers a nail, and the nail sells for $1, and the licensee sold

200 nails, the base revenue would be $200.  If the rate you

find would have resulted from the hypothetical negotiation is

1 percent, then the royalty would be $2, or the rate of 0.01

times the base revenue of $200.  By contrast, if you find the

rate to be 5 percent, the royalty would be $10, or the rate

of 0.05 times the base revenue of $200.  Those numbers are only

examples and are not intended to suggest the appropriate

royalty rate.

Instead of a percentage royalty, you may decide that the

appropriate royalty that would have resulted from a

hypothetical negotiation is a fixed number of dollars per unit

sold.  If you do, the royalty would be that fixed number of

dollars times the number of units sold.

In this case, evidence of licenses has been introduced.

The royalty rate in one or more of those licenses may be

considered if it helps to establish the value that's

attributable to the patented invention as distinct from the

value of other features of GoPro's accused products.

The ultimate combination of royalty base and royalty rate

must reflect the value attributable to the infringing features

of the product, and no more.  When the accused infringing

products have both patented and unpatented features, measuring

this value requires you to identify and award only the value of

the patented features.  The process of separating the value of

patented features from the value of all other features is

called apportionment.

In determining a reasonable royalty, you may consider the

following factors:

(1) The royalties received by the patent owner for the licensing of the patent-in-suit -- patents-in-suit.

(2) The rates paid by GoPro for the use of other patents comparable to the patents-in-suit.  The nature and scope of the license as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

(4) The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

I'll just note 3 is not included in this instruction.

(5) The commercial relationship between the licensor and GoPro, such as, whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter.

(6) The effect of selling the patented specialty in promoting sales of other products of GoPro; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such derivative or convoyed sales.

(7) The duration of the patents-in-suit and the term of the license.

(8) The established profitability of any products made under the patents-in-suit; their commercial success; and their

popularity.

(9) The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

(10) The nature of the patented invention; the character and commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

(11) The extent to which GoPro has made use of the invention; and any evidence probative of the value of that use.

(12) The portion of the profit or of the selling price that may be customary in the particular business or in the comparable businesses to allow for the use of the invention or analogous inventions.

(13) The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

(14) The opinion testimony of qualified experts.

(15) The amount that a licensor (such as the patent owner) and a licensee (such as GoPro) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee who desired, as a business proposition, to obtain a license to manufacture and sell a

particular article embodying the patented invention would have

been willing to pay as a royalty and yet be able to make a

reasonable profit and which amount would have been acceptable

by a prudent patentee who was willing to grant a license.

(16) The availability of non-infringing alternatives:

comparing the invention and the next-best available

alternative, regardless of whether the alternative was actually

produced and sold during the infringement.  The next-best

available alternative must be adequate and acceptable to

customers.

No one factor is dispositive and you can and should

consider the evidence that's been presented to you in this case

on each of these factors.  You may also consider any other

factors which in your mind would have increased or decreased

the royalty GoPro would have been willing to pay and that

Contour would have been willing to accept, acting as normally

prudent businesspeople.

The damages that Contour may be awarded by you commence on

January 5, 2015.

The amount you find as damages must be based on the value

attributable to the patented invention, as distinct from the

unpatented features of the accused product or other factors

such as marketing or advertising or either party's size or

market position.  A royalty compensating the patent holder for

damages must reflect the value attributable to the infringing

1    features of the product and no more.  The process of separating

2    the value of the allegedly infringing features from the value

3    of all other features is called apportionment.  When the

4    accused infringing products have both patented and unpatented

5    features, your award must be apportioned so that it's based

6    only on the value of the patented features, and no more.

7         Comparable license agreements are one factor that may

8    inform your decision as to the proper amount and form of the

9    reasonable royalty award, similar to the way in which the value

10   of a house is determined relative to comparable houses sold in

11   the same neighborhood.  Whether a license agreement is

12   comparable to the license under the hypothetical license

13   scenario depends on many factors, such as whether they involve

14   comparable technologies, comparable economic circumstances,

15   comparable structure, and comparable scope.  If there are

16   differences between a license agreement and the hypothetical

17   license agreement, you must take those into account when you

18   make your reasonable royalty determination.

19        So, ladies and gentlemen, that is the long list of

20   instructions, and you'll have a copy of all of those when you

21   go into deliberation.

22        There are a few more instructions which talk about how you

23   do your deliberation.  I'm going to give you those after the

24   lawyers have argued, but right now I just -- indulge me for

25   about five more minutes.

1          I want to show you what the verdict form is going to look

2     like, and then we'll take our break, so that you'll know what

3     questions you're going to need to answer and you can be

4     thinking about that as the lawyers provide their argument.

5          So here is the verdict form.  When answering the following

6     questions and filling out this verdict form, please follow the

7     directions followed throughout the form.  Your answer to each

8     question must be unanimous.

9          Some of the questions contain legal terms that are defined

10    and explained in detail in the jury instructions.  Please refer

11    to the jury instructions if you're unsure about the meaning or

12    usage of any legal term that appears in the questions below.

13         So when we go to the findings [as read]:

14              "We, the jury, unanimously agree to the answers

15         to the following questions and return them under the

16         instructions of the Court as our verdict in this

17         case."

18         So first will be the findings on infringement, and you'll

19    see -- and I do this with each of the questions you have to

20    answer.  I refer you to the specific jury instructions that

21    apply to the question for your reference.  All of the jury

22    instructions matter.  You should consider all of them, but the

23    specific ones about infringements are Jury Instructions 16

24    through 19, so you can look back there.

25         And so the questions you're to answer here are [as read]:

1          "Has Contour proven by a preponderance of the

2     evidence that GoPro literally infringed the following

3     claims with respect to the Live Preview Group 1

4     products?"

5          And those are defined by -- listed down in the first

6     footnote.  And you check "Yes" if you find infringement.  And

7     here you're doing just Claim 12 for the '954 patent and Claim 6

8     for the '694 patent because I already -- you have an

9     instruction regarding Claim 11, which is the one that I

10    determined for the Live Preview Group 1 products only.

11         The second question on this is [as read]:

12         "Has Contour proven by a preponderance of the

13    evidence that GoPro literally infringed the following

14    claims with respect to the Live Preview Group 2

15    products?"

16         And here you'll see Claim 11 is back in as well as

17    Claim 12 under the '954 and the '694, and you need to respond

18    to each of those.  And the Live Preview Group products are

19    footnoted for you.

20         The next page [as read]:

21         "Has Contour proven by a preponderance of the

22    evidence that GoPro literally infringed any of the

23    following claims with respect to the live streaming

24    products?"

25         Those are also footnoted at the bottom of the page and,

1    again, it's a "Yes" or "No."  This one only for Claim 6 of the

2    '694 patent.

3        The next set of questions concerns the findings on

4    invalidity.  The jury instructions here were 21 through 25.

5    And you need to answer these questions as well, regardless of

6    your findings on any other issues.

7        Number 4 [as read]:

8            "Has GoPro proven by clear and convincing

9            evidence that any of the following claims are invalid

10           as anticipated?"

11       And there the claims are listed and, again, "Yes" or "No"

12   for each of them.

13       The next question [as read]:

14           "Has GoPro proven by clear and convincing

15           evidence that any of the following claims are invalid

16           because the claimed subject matter would have been

17           obvious to a person of ordinary skill in the art at

18           the time of the claimed invention?"

19       And, again, the claims are listed and you answer "Yes" or

20   "No."

21       And then the next question [as read]:

22           "Answer Question 6 regarding willful

23           infringement only if you find one of the" -- "at

24           least one claim infringed and not invalid."

25       So you don't have to answer this unless you find that one

1  claim has been infringed and is not invalid; but if you have

2  made that finding, then you answer Question 6, which is [as

3  read]:

4         "Has Contour proven by a preponderance of the

5      evidence that the infringement you found in

6      Questions 1 through 3 was willful?"

7      And I refer you to the willfulness instruction for that

8  question.

9      The next question is -- or part of the jury verdict is

10  findings on damages.  And, again, you would only answer

11  these -- this question if you found at least one claim

12  infringed and not invalid.  And then that question is [as

13  read]:

14         "What sum of money, if any, has Contour proven

15      by a preponderance of the evidence would reasonably

16      compensate Contour for any infringement that you

17      found?"

18      And you're asked to answer that in dollars.

19      And that's the end of the verdict form.

20      You want to make sure that once you filled it out, that it

21  reflects your views; and then the presiding juror would sign it

22  and date it and notify Ms. Davis that you've reached a verdict,

23  and then hang on to the form when you're brought back into the

24  courtroom.

25      So that is -- that's the verdict form.

PROCEEDINGS

1    And we'll take a 15-minute break now, and then we'll begin

2    with the argument.  The way that the argument works is Contour

3    will make an opening argument, GoPro will follow, and then

4    Contour gets a brief reply, and then the case will go to you.

5    All right.  15 minutes.

6    (Proceedings were heard out of the presence of the jury.)

7    **THE COURT:**  All right.  So, Mr. Keville, you should

8    assume that you've got an hour to do what you need to do.

9    Okay?

10    **MR. KEVILLE:**  Thank you, Your Honor.

11    **THE COURT:**  You're welcome.

12    And I haven't actually looked at yours, Mr. Haynes, but

13    you can assume you've got an hour and a quarter.  How's that?

14    Okay.

15    (Recess taken at 10:25 a.m.)

16    (Proceedings resumed at 10:43 a.m.)

17    (Proceedings were heard out of the presence of the jury.)

18    **MR. HAYNES:**  Do you know the timing?  If he goes

19    45 minutes, do you anticipate going all way through to the end

20    before a break, or could there be a break in the middle of what

21    I'm doing?

22    **THE COURT:**  I'm not going to take a break in the

23    middle of what you're doing.

24    **MR. HAYNES:**  Okay.  Great.

25    **THE COURT:**  My idea is that Mr. Keville is going to go

1    somewhere in the 50-minute range, we'll take a ten-minute

2    break, and then we'll -- then we'll run to the end.

3            **MR. HAYNES:**  Okay.  Great.  Thank you, Your Honor.

4        (Proceedings were heard in the presence of the jury.)

5            **THE COURT:**  All right.  Please be seated, everybody.

6        Mr. Keville.

7            **MR. KEVILLE:**  Thank you, Your Honor.

8            **THE COURT:**  The floor is yours.

9                            **CLOSING ARGUMENT**

10           **MR. KEVILLE:**  Members of the jury, let me start as I

11   did when you came in, by thanking you.  Contour has waited a

12   long time for this case to be heard, and we're very

13   appreciative of the attention that you all gave.  It wasn't

14   lost on us that you were taking notes.

15       In many ways, this is a classic and unpleasant story of a

16   big company taking the innovation from a small company and

17   squashing the competition.

18       But Contour was first with the innovations.  You saw

19   Mr. Mander draw how he came up with this technology.  And

20   Contour has the patents, and that's why we're here, to address

21   many years of willful infringement by GoPro.

22       Now, the judge has instructed you on the law.  Remember I

23   told you in the beginning I would have two chances.  One to

24   preview the evidence.  This is where I try and take the

25   evidence that you actually heard and put it together, and how

1    it fits to the claims that you heard the instructions on and

2    the verdict form.  So what I'm going to do is walk you through

3    the actual evidence.

4        I told you in the beginning anyone can tell a story.

5    Right?  It's easy to come in and say:  There's many emails

6    outside of court.  There's 400 prototype boards that no one's

7    ever seen.

8        I'm going to tie you to the evidence that you actually

9    heard and what you saw in the case.  But first, let me set the

10   stage.

11       You heard from Mr. Harrison at the beginning.  He first

12   got his first Contour camera in 2011.  He talked about the

13   companies were always both small way back then, but GoPro was

14   always bigger.

15       You heard Mr. Woodman say that Contour was the first one

16   to come out with the HD camera in 2008-2009, and that's what

17   triggered this [as read]:

18           "I want to squash VholdR . . . ."

19       That's Exhibit 363 [as read]:

20           ". . . and if that means letting the cat out of

21       the bag a bit early...so be it."

22       And what was the cat out of the bag early?  He promised

23   features in the camera that they didn't have ready in order to

24   try and get ahead of Contour, get ahold of VholdR.

25       And then they launched the HD HERO, their HD camera, in

1  November 2009.

2        Remember this exhibit you saw from Mr. Harrison.  This was

3  the presentation he made after they acquired Contour.  Contour

4  was the first to launch an action camera with no wires; the

5  first to launch an HD action camera; the first to launch

6  GPS-enhanced video; the first to come out with switch-on

7  recording; and, of course, what we're here for, the first to

8  come out with mobile integration.

9        You heard, by video, from Mark Barros, the co-founder of

10  Contour.  He said [as read]:

11        "We always made better products.  We did HD

12        first.  We did GPS first.  We pushed the

13        envelope . . . ."

14        He said [as read]:

15        "Later they," GoPro, "took our product roadmap

16        and basically copied it . . . ."

17        And that's what he was saying [as read]:

18        ". . . one company is innovative and one company

19        isn't and they just pick up that innovation."

20        That's what Mr. Barros said and that's why we're here.

21        Now, Mr. Woodman said, when they came out with their HD

22  camera [as read]:

23        ". . . we poured an enormous amount of our

24        profits back into marketing . . . ."

25        And we can't fault them for being a better marketer.  We

1    can and do fault them for doing it with Contour's inventions.

2        This was the reaction when they came out and saw that

3    Contour had come out with the Live Viewfinder.

4        And that's why I told you in the beginning, people can

5    say, when they come into court, "Well, I knew this.  It was

6    obvious.  We did it first."  But then you look at what they

7    actually wrote at the time.

8        This is January 5th, 2011.  This is Exhibit 443.  And when

9    Contour comes out with the Live Viewfinder real-time streaming

10   to smartphones, Nick Woodman doesn't say, "Oh, we did this

11   already."  He doesn't say, "Oh, that's obvious.  Nothing about

12   it.  You can just use an Ambarella chip."

13       No.  He says [as read]:

14           "Do we have any of these units we can take

15       apart?  We should get Zahid and Ben each a unit to

16       disassemble and review."

17       And remember, later, Zahid is the guy who's the developer

18   of their BacPac, the WiFi BacPac they're now saying came with

19   their first wireless.

20       [As read]:

21           "It uses the A5 DSP, so we should have been

22       smarter . . . ."

23       Now they're saying all you needed was the Ambarella chip.

24   Back at the time, when Contour came out with the invention,

25   they said, "Oh, it uses that chip.  We should have been

1    smarter."  Right?  That's what they said.

2        And then he said [as read]:

3            ". . . can you assist in covertly getting us a

4        couple of ContourGPS units?"

5        To take them apart.  And we know they did do that.  This

6    is Exhibit 259.  You can see the secret shopper competitive

7    product.  They bought one ContourGPS, two Contour+s, and put

8    them in for product development.

9        And Mr. Woodman said he didn't get the ability to live

10   stream to a phone until October 12, 2012, a full year later.

11   Now suddenly they're talking about the WiFi BacPac, and we'll

12   get to why that is.  But now they're saying it was reduced to

13   practice in June 2012.  Mr. Woodman said he didn't get the

14   ability to stream live to a phone until October 2012.

15       Now, you heard from Jason Greene by video, and he said his

16   understanding of the market share was after the HERO3 -- so

17   that's the first GoPro camera that has the integrated WiFi and

18   streaming to a phone -- when that came out, there was a big

19   market shift [as read]:

20           ". . . a huge portion going to GoPro."

21       And remember Mr. Woodman's testimony.  In that time

22   period, they went from about 500 million in 2012 to 986 million

23   in 2013.  They doubled their sales after coming out with the

24   camera that had the Contour patented invention.

25       And then they said this in opening [as read]:

1          "Contour went out of business.  That's not

2     GoPro's fault.  That's just business."

3     And that's partly true that Contour went out of business,

4 it's not their fault, but it's partly not true.

5     Not getting enough investor money, that's on Contour.  But

6 when you copy someone else's invention, remember Jason Greene

7 talked about you take away the first-mover advantage.  They had

8 the rights to the technology when the patents came out, and

9 they could have excluded anybody.  GoPro didn't honor that,

10 didn't pay for it, didn't change the design.

11     And then you heard Mr. Harrison.  He said [as read]:

12          "They thought we were dead, but we came back to

13     life."

14     They thought they had squashed Contour.

15     [As read]:

16          ". . . but we came back to life, and we were a

17     passionate team and we were driving as hard as we

18     possibly could.  But it was like working with a

19     500-pound gorilla foot on your head, stopping us from

20     being able to work."

21     And what happened then?  Well, remember now, GoPro has the

22 patented technology in their cameras and is not abiding by the

23 patent.

24     And Mr. Harrison talked about how they had negotiations

25 with Jabil.  Remember he said they went on for months and

1  months, a lot of terms negotiated.  They finally got to a deal.

2  They invite him down to St. Petersburg.  He said [as read]:

3          "It's a day I'm not going to forget.  I got in

4      my car, I drove to St. Petersburg, and nobody was

5      there to greet me.  I started making calls . . . ."

6      Nobody ever called him back.

7      I said [as read]:

8          "Did you learn what happened?"

9      He said [as read]:

10          "I never heard anything more from them.  The

11      next thing I learned was that they had signed a deal

12      with GoPro."

13      And Mr. Woodman confirmed that.  Remember he'd been making

14  cameras now, in 2014, for about ten years.  Never used Jabil.

15  But as soon as Contour starts going out in the public and

16  saying, "We're back and we're going to start making cameras,"

17  for the first time in 2014, he used a company called Jabil.

18      And Mr. Harrison said he tried to go to Ambarella and get

19  their processors.

20      [As read]:

21          "I thought we'd be greeted with some acclaim

22      returning to them, but they were lukewarm because, by

23      that time, they felt their partnership with GoPro,

24      that had a significant chunk of their market."

25      And that's what Didier LeGall confirmed.  In 2014, GoPro

1   accounted for about 35 percent of Ambarella's total revenue, or

2   about 55 million.  They made a lot of money making chips for

3   GoPro.

4        And then I wanted to bring this up.  So Contour's fighting

5   and clawing to get back into the market.  GoPro has their

6   patented technology.  GoPro's not acknowledging that.  They're

7   about to get in with Jabil and start manufacturing again, and

8   all of a sudden Jabil stops talking with them and is making a

9   Contour [sic] camera.

10       But they brought in Mr. Liu and Dr. Almeroth, and their

11  main purpose was to tell you, from 2014 forward, GoPro says:

12  We can avoid these patents.  It's easy.  It would cost nothing,

13  and none of our camera users would care.  Right?

14       Now, ask yourself if that's believable.  The point is,

15  they're trying to tell you:  You shouldn't value this

16  invention.  This invention is not worth any money because we

17  could change so easily.  We're now in 2025, and they never

18  changed.  Right?  And that's what Dr. Almeroth had to admit.

19            [As read]:

20            "They never did make this change; correct?"

21       He said [as read]:

22            "That's correct because this is

23       hypothetical . . . ."

24            "Instead, they've spent millions of dollars

25       litigating against Contour; correct?"

1    He said [as read]:

2    "Yeah, they did."

3    They spent millions of dollars on attorneys, millions of

4    dollars on experts, made us spend millions of dollars --

5    right? -- rather than do what they said, "Oh, we could make

6    this tiny change so your patent's not valuable."

7    You are the judges of credibility.  Right?  You have to

8    determine whether that makes any sense, whether you believe

9    that.  If they could have made this change and avoided all

10   this, why wouldn't they?  Right?  But rather, squash Contour;

11   don't pay for using the invention.

12   Now, infringement, this was Mr. Lema came in and he said

13   [as read]:

14        "We haven't removed the feature because our

15        position is we are -- the patents are not valid so we

16        can't infringe on a non-valid patent."

17   They basically didn't even really contest infringement.

18   For the Group 1 claims, they didn't contest it at all.  He said

19   again [as read]:

20        ". . . our position is the patents are not

21        valid . . . ."

22   Really, they're only challenging validity.  For the most

23   part, they know they infringe.

24   And this is probably one of the most important ones.  So

25   Dr. Almeroth comes in and he says [as read]:

1           "The claimed technology was not new and was
2       obvious."
3       But what you see on the bottom, just months before telling
4   you that the Contour patents are obvious and they're not valid,
5   GoPro was in another court, arguing that its own patents were
6   valid; and in doing so, they told the truth.  They said [as
7   read]:
8           ". . . Contour's claims recite an improved POV
9       camera with a processor configured to record low- and
10      high-quality data streams in parallel, followed by
11      the low-quality data stream's wireless
12      transfer . . . ."
13      When it served their interest to try and protect their
14  patents in another court, they said:  Our patents are
15  improvements to cameras just like Contour's patents are
16  improvements to cameras.  But here, where they don't want you
17  to award damages and don't hold them accountable, here they
18  tell something different.  And that, again, goes to
19  credibility.  Are they saying something else in another court
20  and saying something different here?
21      Mr. Mander, you heard him.  He's the one who got up, he
22  drew the camera.  He talked about the prototype.  He talked
23  about all the hard work they had to do.
24      You heard about Ben Bodley from Mr. LeGall.  He had to go
25  over to Taiwan and sit there with them for weeks, trying to

1   work out how these components would talk to each other.

2        Mr. Mander said [as read]:

3            "I'm not a lawyer, but the motivation of patents

4        is that you can share knowledge of what you're doing.

5        So the nature of that is, if you're lucky to get a

6        patent, then it's possible for other people to

7        license that patent, you know, for you to give them

8        permission to use it."

9        And Mr. Harrison explained that's why he was here.  Right?

10  He's very passionate about this.  You saw that.  He tried very

11  hard to get this company up and running again with GoPro

12  standing in his way.  And he said [as read]:

13            ". . . what this is about is protecting

14        inventors.  The inventors create amazing technology.

15        We don't expect big companies to just be able to

16        steal that technology and benefit by making fortunes

17        out of it."

18       So these are the patents, you saw those.  And I want to

19  point out a couple of things.

20       Mr. Mander came here to testify, but one thing that you'll

21  notice, unlike the patent that they say Nick Woodman has that

22  they say is his conception, which we dispute very highly, is

23  here, Mr. Mander said:  I had a team working with me.  We came

24  up with the ideas.  We worked it all out.  Ben Bodley went over

25  and did the software.  Laura O'Donnell was talking to

1    Didier LeGall and others at Ambarella.

2    And here, you can see all the inventors are listed.  The

3    team is listed, all the people who did the work together.  When

4    you look at the GoPro patent, it's only Nick Woodman.

5    So they talk about -- they showed you these documents and

6    they say, "Oh, look at this product spec and look at these

7    other things."  None of those are written by Nick Woodman, but

8    there are no other inventors named on his patent.

9    And another thing that you'll see is different is this:

10   Contour disclosed a tremendous amount of information.  These

11   are just the Ambarella and Woodman patents that are

12   highlighted.  There are a number of other patents that Contour

13   disclosed to the Patent Office and said, "Look, we're giving

14   you all the information.  You decide if we have something

15   patentable," and they did.

16   These are all the Ambarella documents that were given.

17   All of those were given to the Patent Office and considered by

18   the Patent Office.

19   You heard from Mr. Mooney.  Why are we here?  Well, he

20   said [as read]:

21        "I don't like bullies.  When people work really

22        hard, like Mr. Mander, to go and create something new

23        and novel that people were amazed by -- they won

24        awards; they won a CES award -- and then to have a

25        larger, more well-funded competitor come and utilize

1          that and not give the credit to where it belongs, to

2          not pay the fair value for that and to drag us along

3          for a long time as though they're going to, I don't

4          think that's right."

5          And that's why we're here, because it's not right.  And

6     that's what your job is, to determine how do we address "That's

7     not right."

8          And this -- let me -- before we get into the claims, with

9     a couple of things, Mr. Woodman agreed.

10         [As read]:

11              ". . . no company should make immense profits

12         off patented innovations of others without

13         compensating them; correct?

14         "That's correct."

15         So this is what we're asking.  The floor is that

16    hypothetical negotiation that Dr. Ugone talked about:  $3.60

17    per camera, $64 million roughly.

18         And then the ceiling, which is based on the Element

19    license -- you heard about comparable license -- is the royalty

20    damages based on the comparable license:  $9.71 per camera,

21    resulting in reasonable royalty damages of 174 million.

22         Okay.  So as I took you in the beginning, I'm going to

23    walk through what you're here to decide and then talk about how

24    the evidence fits it.

25         Are Contour's patents infringed by GoPro?  Are Contour's

1  patents valid?  Was GoPro's infringement willful?  If valid and

2  infringed, what are Contour's damages?

3      So let's start with infringement.  The Court has explained

4  that the Court determined previously that the Live Preview

5  Group 1 products include each element of Claim 11 of the '954.

6  So you must accept that.

7      Now, burden of proof, he talked about that.  We have the

8  burden to prove infringement by a preponderance of the

9  evidence.  That means it's more likely than not GoPro has

10 infringed.  If you think of it as a scale, a preponderance

11 means the scale just has to slip ever so tightly [sic] our way.

12 Right?  So ever so slightly, then we win by a preponderance of

13 the evidence.  And we embrace that.

14     They have a different burden.  They have a clear and

15 convincing burden because the Patent Office says it evaluated

16 this and there's a presumption of validity.

17     Okay.  Dr. Almeroth was asked [as read]:

18         "Are you offering any non-infringement opinions

19     today regarding the '95 -- the old products?"

20     He said [as read]:

21         "No, I'm not offering any non-infringement

22     opinions for the Live Preview Group 1 products."

23     So Dr. Hu came up and testified and explained why all

24 these elements were met; and then Dr. Almeroth comes up and

25 says, "I'm not offering non-infringement opinions."

1    So on your verdict form for "Has Contour proven by a

2    preponderance of the evidence that GoPro literally infringed

3    the Live Preview Group 1 products," you should check "Yes,"

4    because Dr. Hu explained all the infringement and they admitted

5    they're not putting up any evidence to contest it.

6        Now, Mr. Woodman came up, and you saw -- I showed you

7    earlier that Mr. Lema said their position is the patents were

8    invalid.  And you heard Nick Woodman.  He didn't agree with

9    their own defense that he's the prior inventor.  But before

10   getting to talking to his lawyer, he didn't say the point the

11   patents were not new.  He said [as read]:

12       ". . . I'm here to talk about the fact that

13       we're being accused of copying, and I don't believe

14       that we are -- or that we did."

15   But copying is not a part of determining infringement.

16   Copying is irrelevant to infringement.  It's relevant to other

17   things.

18       But here you see [as read]:

19       "Literal Infringement - To decide whether

20       GoPro's accused product literally infringes a claim

21       of the patents-in-suit, you must compare that product

22       with the patent claim and determine whether every

23       requirement of the claim is included in the product.

24       If so, GoPro's accused product literally infringes

25       that claim."

1    So why is copying relevant?  Well, that comes in in

2  willful infringement.  That's in determining whether it's

3  willful infringement, whether they copied it.  It also goes to

4  non-obviousness.  But in determining infringement, it's not an

5  issue.

6    Okay.  So then we got into here the wireless connection

7  protocol devices.  This is the Live Preview Group 2 products.

8  And Dr. Almeroth tried to say:  Well, there's two protocol

9  devices.  Now, remember it was one chip?  It always had

10  capability to do WiFi and/or Bluetooth.  And now he suddenly

11  came in and said:  Well, no, no.  It's actually two devices.

12    They had never said that through years and years of this

13  case; but then later, when these new products come out, they

14  say:  Oh, we've made a change and now one device is actually

15  two devices.

16    That, again, goes to credibility.

17    Dr. Hu explained that that was the only issue that they

18  were contesting as to the Live Preview -- Live Preview Group 2

19  cameras, including HERO4K, was this wireless connection

20  protocol.  She explained that it's a chip.  It supports both

21  WiFi and Bluetooth.

22    And Dr. Almeroth said [as read]:

23        "So what you see is that there are two different

24    devices . . . ."

25    He claimed that one device is two devices.

1    But as the Court instructed, this is the meaning of the
2  term [as read]:
3         "At least one wireless connection protocol
4    device that can both send real-time image content by
5    wireless transmission directly to and, two, receive
6    control signals or data signals by wireless
7    transmission directly from . . . ."
8    Okay?  There's nothing in this claim that you read that
9  says -- well, first, he said it was two devices.  The Court has
10  instructed that means at least one wireless connection protocol
11  device.  So under his theory, this infringes.
12    There's nothing in this claim that talks about it has to
13  be Bluetooth or it has to be WiFi.
14    So for the Group 2 Live Preview products, you should find
15  that all claims are infringed because Dr. Almeroth's only
16  contention was that there's two devices and the claim has been
17  construed to mean at least one, which includes two.
18    Then we get to the live streaming.
19    [As read]:
20         "What's accused here is where you go from the
21    GoPro to a phone, but the phone is acting as a
22    hot spot."
23    Dr. Hu went through that expressly.  [As read]:
24         "So is the first video stream wirelessly sent
25    directly to the phone?

1              "Yes.  That's the connection we focus on."

2         It's directly to the phone.

3         And then here you see it.  Here's the only element they're

4    contesting.  And you see that the wireless connection protocol

5    goes directly to the phone, and then it goes to the cloud and

6    comes back.

7         And this was demonstrated.  She showed the evidence that

8    she had done to test it, to make sure that you were getting the

9    image, that it went to the -- data went to the phone and then

10   you were able to see the image.

11        So for live streaming products, you should check "Yes" for

12   Claim 6.  Remember, we have limited this to only Claim 6

13   because the claims of the '954 patent had other elements that

14   were not met by this, including certain real-time elements, and

15   so we're limiting this to Claim 6.

16        So that's where you should come out based on the evidence

17   on infringement.

18        Let's talk about validity.  Are Contour's patents valid?

19        Well, as I told you in the beginning, I thought they would

20   say [as read]:

21             "If we infringe, we did it first."

22        This is your instruction [as read]:

23             "A patent is presumed to be valid.  In other

24        words, it is presumed to have been properly granted

25        by the Patent Office.  To prove invalidity of any

1      patent claim, GoPro must leave you with a firm belief

2      or conviction that it is highly probable that the

3      claim is invalid."

4          That means the scale has to tip more than just a slight

5      amount on their side.  So I put some scales, and let's look at

6      what the evidence is.

7          Dr. Almeroth said he's been in this case for something

8      like five, six years.  He's repeatedly claimed Nick Woodman

9      invented what is claimed in the patents, and that's the only

10     prior art they're contending anticipates.

11         So he goes on their side of the scale, and the scale tips

12     a little bit their way.

13         But then we heard Nick Woodman come in.  And Nick Woodman

14     was asked [as read]:

15             "Are you not contending that you are the first

16         inventor of what is claimed in these patents?"

17     He said [as read]:

18             "No, I'm not the inventor.

19             "You're not claiming that you invented first

20         what is claimed in the patents in this case?

21             "I believe I had a concept for what is claimed

22         in the patents, but, no, I'm not claiming to be the

23         inventor of those concepts.

24             "So the Woodman invention, you agree, is not the

25         same as the Contour invention?"

1    He said [as read]:

2        "That's correct."

3    Now, fairly, we expected at that point that claim was

4    over, but Dr. Almeroth came up and said:  Ignore Mr. Woodman.

5    I know better.

6    So to find for them on this prior inventor, you have to

7    find that Nick Woodman was untruthful or that he's completely

8    unaware of what the invention is, and that Dr. Almeroth is the

9    only one who really knows.

10   If you find that Nick Woodman did not conceive of the

11   invention as claimed, with their burden of clear and convincing

12   evidence, or if you find that Mr. Woodman abandoned the

13   invention for a time or did not use diligence reducing it to

14   practice, then it's not prior art, and you're done with this

15   invalidity position.

16   But let's go forward with our scales.  So Mr. Woodman

17   claims, "I'm not the inventor."  So that goes on our side of

18   the scale.  Remember, they have the clear and convincing burden

19   to prove firm conviction in your mind.

20   All right.  This was said in opening about Mr. Woodman's

21   patent, where they say the conception is.  You can look at it,

22   and you can compare his 2008 patent to Contour's 2010 patent

23   and look at the ideas that are expressed in those two patents

24   and see if you can find much daylight.  So they said you're

25   going to look at these two patents and there's not going to be

1   any daylight between them.

2       Then we asked Mr. Woodman [as read]:

3           "So this patent, the '251, has nothing to do

4       with what the camera processor does or how it's

5       configured?"

6       And he said [as read]:

7           "From a technical perspective, no.  It covers

8       the concept of various things, including being able

9       to wirelessly transmit a live preview to another

10      device using wireless protocol, but how it

11      specifically does that is not covered in the patent."

12      So a lot of daylight.  He said that product goes to

13  attaching these BacPacs onto the camera.  That's what this

14  patent was about.  He just mentioned like:  Hey, maybe we could

15  have cool things like a BacPac with a screen, a BacPac that had

16  a remote control, a wireless that went to a remote control.

17      He didn't do any of what Dr. Mander talked about.  He

18  didn't do any of the hard work to put together the invention.

19  So he did not have conception of the invention.  And his

20  patent, he admits there's a ton of daylight between them.

21      So that goes on our side of the scale.

22      Now, prior invention.  Right?

23      [As read]:

24          ". . . there must be some evidence beyond the

25      inventor's own testimony that confirms the date on

1      which the inventor had the complete idea."

2      So it's not enough for prior invention to just testify, "I

3  had the idea."

4      And this was their statement in opening [as read]:

5          "So we admit it didn't talk about two

6      resolutions, but Mr. Woodman will tell you that's

7      always what he had in mind, because that's the only

8      way you could do it."

9      Right?  Now, there wasn't testimony, there wasn't

10  documents that showed that was the only way you can do it.  In

11  fact, we have Boland, who had a separate invention with the

12  same patent, who did it differently.  He has his own patent,

13  his own invention.  He did it differently.  It's not the only

14  way you can do it.

15      But they told you in opening -- they admit it -- it didn't

16  talk about two resolutions.  That means there's no

17  corroboration.

18      They brought it up this morning as well with Dr. Hu.  They

19  said, "Didn't Mr. Woodman testify that he had these ideas?"

20      And that's not enough; right?  There has to be some

21  corroboration.  You saw no corroboration.

22      What you did see was documents like this, Exhibits 372,

23  426, and 2383.  Paul Nipper Donovan saying [as read]:

24          "The key is the protocols and features and

25      porting to Ambarella camera side.  We do not know how

1        to do this as we have no Ambarella development

2        system."

3        That's August 2009.  Right?

4        And then you see the other ones [as read]:

5            "Nipper and I are confused on A2's ability to

6        save HD video to the SD card . . . ."

7        Remember they talked about the prototype and they said,

8    "Oh, we were able to get two frames a second of video, of

9    images coming out."  And here they're saying they're confused

10   on the A2's ability.  Well, that's because the A2 couldn't put

11   out two video streams.

12       So when they said they had it working, that makes no sense

13   because the chip, the A2 that they used didn't have the

14   capability to put out two video streams.  So they couldn't see

15   it working.

16       That's why you saw so many documents that talked about:

17   Can we get a preview picture, one image?  They were trying to

18   get one image, and they couldn't get that working.

19       You saw the RC remote unit feature set.  That's one they

20   keep pointing to.  And there Bullet 2, says [as read]:

21           "Picture Preview - This may or may not work

22       while the unit is recording.  TBD."

23       They did not have a firm conception of the invention.

24   They had some vague idea, and they couldn't put it together.

25       So all those documents go on our side of the scale.  And,

1    remember, the scale has to tip more than slightly their way.

2    All of the evidence goes the other way.

3        And this, this is not evidence -- right? -- saying:

4    Mr. Woodman, were there many emails that you were sending

5    during this development time period?

6        [As read]:

7            "Way too many.  Hundreds, hundreds."

8        As if you, the jury, should think, "Oh, there must be some

9    evidence out there that I haven't seen."  That's not evidence.

10   Right?  If there were such emails, it was on them to come in

11   and bring them and show them to you.

12       [As read]:

13           "So, again, how many documents exist that are

14       showing the work of all the different projects you

15       were doing in this window of time?

16           "Hundreds."

17       Well, if you're doing the work and you have the burden to

18   prove it by clear and convincing evidence, you bring the

19   documents.  It's not enough to just say, "Oh, there's lots of

20   things that the jury hasn't seen."

21       So that goes on our side of the scale as well, the failure

22   of documents and this idea that there's other documents out

23   there.

24       Dr. Hu expressed her opinion why the GoPro, there was no

25   prior invention.  They didn't have a firm conception of it,

1    they weren't able to reduce it to practice, and they did

2    abandon it.

3         So she goes on our side of the scale.

4         But there's more.  There's the credibility of witnesses.

5    Right?  And the witnesses -- the things that you consider are

6    the witness's interest in the outcome of the case.  Obviously,

7    Nick Woodman has a big interest in the outcome of the case.

8         Whether other evidence contradicted the witness's

9    testimony.  So you heard this in opening [as read]:

10             ". . . Mr. Woodman, the founder of GoPro,

11        started working with Ambarella, they actually built a

12        prototype that had the ability to transmit

13        wirelessly, and they were using a protocol called

14        RF."

15        And they said [as read]:

16             ". . . the prototype," this one, "was built and

17        tested in 2009, in November of 2009."

18        And you saw the video of Mr. Donovan, who said [as read]:

19             "Yes, these are the cameras, these are the

20        prototypes that I got working in 2008 or 2009."

21        So that goes to credibility.  Right?

22        Nick Woodman testified under oath that [as read]:

23             ". . . this is an accurate image of prototypes

24        that were built in -- not you built" -- someone else.

25        Right?  Remember, is he the inventor?  Someone else

1        is building it -- "that you observed back in 2009?

2            "Yes.

3            "Those two prototypes" -- talking about this

4        picture -- "were made in 2009?"

5        He testified under oath they were.

6        [As read]:

7            "You said these were the prototypes from

8        August 2009?

9            "Yes.

10           "And you observed them working in 2009?

11           "Correct."

12       And then we saw that this date, if you take back the foam,

13   was actually November 16th, 2010.

14       Now, remember Mr. Woodman said that they stopped the

15   RF project in September of 2009.  This is a board that wasn't

16   created until November of 2010, when they're not working on the

17   project anymore.  So ask yourself:  Why is that?  Why would

18   there be this board?  Mr. Woodman said [as read]:

19           "I have no explanation for that."

20       And then this is what GoPro said [as read]:

21           ". . . just to be clear, putting that board

22       aside, let's just pretend that never existed."

23       They came in and they told you under oath:  We made this

24   work in 2009.  These are the two devices that we did, we saw in

25   2009, and they worked.

1        And Dr. Almeroth said:  Well, I never got to test them.

2   They didn't work.  Same for us.

3        But they came in and they said that to you.  Right?  And

4   then when it was revealed they didn't even exist in that time,

5   they said, "Let's just pretend that never existed."

6        They can't meet their clear and convincing burden and far

7   beyond that by just saying, "Let's pretend what we testified

8   under oath didn't exist."

9        So that goes on our side of the scale.

10       Mr. Donovan said there would have been -- remember you

11  heard about try to create some doubt by saying, "Well, weren't

12  there 400 boards?  Didn't you order 400 boards after this

13  prototype?"

14       Mr. Donovan said there would be purchase orders or some

15  kind of agreement with Skylight relating to production of these

16  units.

17       And he was asked [as read]:

18           "Do you have any of these in your possession?"

19       He said [as read]:

20           "No.  My assumption is GoPro would have those."

21       You didn't see this.  I was surprised to hear 400 boards,

22  400 boards.  I'm like, where's the evidence of 400 boards?  You

23  never saw it.  Nobody brought in boards.  Nobody brought in a

24  receipt.  Mr. Donovan said there would be purchase orders;

25  there'd be other things.  None of those documents were shown to

 1    you or to me.

 2         Okay.  Prior invention.  This gets to the idea of whether

 3    it was abandoned, suppressed, or concealed.

 4         And here you see the email from Mr. Woodman.  Like he

 5    testified, in September 2009, he canceled GoPro's RF daughter

 6    card order.

 7         So they were going to order these, but when they couldn't

 8    make it work, they canceled the order.

 9         And here you see this email from September 2009 [as read]:

10              "We have decided to cancel the RF board inside

11         of the camera."

12         And Mr. Woodman was asked about that, and he said [as

13    read]:

14              "That means I'm canceling the RF feature of the

15         HD HERO."

16         So he canceled the wireless work that they were doing

17    then.

18         Now, suddenly you're hearing more about the WiFi BacPac

19    because of what came out in this case.

20         Originally, it was, like, "We produced -- we did it.  We

21    made a prototype.  It worked.  We reduced it to practice."  And

22    they said they did that in 2009.

23         And then it came out, that's not possible because the

24    board wasn't made then.  So it couldn't have been 2009.

25         So now they're shifting and they're saying, "Oh, well,

1    let's rely on the 2012 WiFi BacPac."  And that, again, goes to

2    credibility and to whether they can meet the clear and

3    convincing burden.

4        Mr. Woodman, in October, so seven -- a month after he

5    says, "We're canceling the project," he says [as read]:

6            "How close were we really to succeeding with

7        mass production before the project was pulled?"

8        He doesn't even know how close they are.  They claim he's

9    the inventor.  Right?

10        That goes on our side of the scale.

11        And then these, very important documents, November 2010,

12    September 2010.  These are the documents where they show the

13    wireless project was idle and the infrared remote project, the

14    IR remote, that's idle.

15        [As read]:

16            "Accomplished Tasks:  None.

17            "Actions:  Awaiting directions from

18        Zahid . . . ."

19        Remember, Zahid's the guy, in a couple of months, is going

20    to get the cameras covertly so he can tear them down.  Right?

21        This goes to show that they abandoned.

22        And remember, when I was asking Dr. Almeroth this morning,

23    he said, "Oh, no, no.  There's been other evidence in this case

24    that we were working on this in 2009."  And I said, "You

25    promise you'll tell us after this?"

1    And then they came up and they didn't have any documents

2    from 2010.  That's because they did abandon the project.  They

3    did abandon the project until Contour came out with the live

4    preview and remote feature in January, and they knew they

5    needed it, and they said, "Go get some covertly and tear them

6    down."

7         So those go on our side.

8         So [as read]:

9             "Has GoPro proven by clear and convincing

10           evidence that any of the following claims are invalid

11           because the subject matter would have been obvious to

12           a person of ordinary skill . . . ?"

13        The answer is no.  You check "No" to this claim on

14   anticipation.

15        Okay.  Obviousness.  I told you they'd say [as read]:

16           "Even if Contour was first, the patents are

17           invalid as obvious."

18        There's two things there.  The first one is the alleged

19   Woodman prior invention.  We've just gone through that.  There

20   is no alleged prior invention by Woodman.  He didn't conceive

21   it.  He didn't diligently reduce it to practice.  He abandoned

22   it until Contour came out with a feature.  Then they covertly

23   got the Contour cameras.

24        So the other one they focused on was Boland plus

25   Ambarella.  So we had competing experts here.  Dr. Hu said,

1  "The claims are not obvious in view of Boland and Ambarella."

2  And Dr. Almeroth said, "Based on my analysis, I went through it

3  and they are obvious."

4      So on the scales, that's essentially equal.  We're

5  starting out with competing experts.

6      What else do we have?  Well -- it got a little cut off.

7  This is about prior art and whether the prior art was in front

8  of the Patent Office.  Right?  That's part of your

9  instructions.

10     GoPro contends that the prior art was not in front of the

11  Patent Office, and they say:  Well, because we don't know that

12  exactly the same time they were considered.

13     Okay.  So let's talk about what Dr. Almeroth said.  He

14  agreed the Patent Office considered the Boland patent

15  application and determined Contour had valid claims.  He had to

16  agree to that.  That happened.

17     And he agreed that the Patent Office considered the Boland

18  patent application at a time when it already had all of the

19  Ambarella patents and product data that we went through

20  yesterday.  He agreed; it did.

21     So the Patent Office -- all of this Boland plus Ambarella,

22  the Patent Office had all the Ambarella information.  They

23  looked at it.  They said, "No.  Valid claims."  Then they had

24  the Boland information.  They looked at it, and they said,

25  "Valid claims."

1    So all of that information goes on our side of the scale.

2    And instead of them meeting their clear and convincing burden,

3    we're meeting a burden we don't have, to show that they have

4    not proven invalidity.

5         But there's more.  Didier LeGall, this is their

6    questioning of Mr. LeGall [as read]:

7              "Did Ambarella, prior to December 2009, have the

8         idea of transmitting the lower-resolution stream

9         wirelessly?"

10   He said [as read]:

11             "I'm not sure because the detail for the

12        wireless were not resolved."

13        He said he didn't even know if they had the idea in

14   December 2009.

15        [As read]:

16             "But were you working on wireless transmission

17        at that time period?"

18   He said [as read]:

19             "Again, I'm not sure."

20        So this idea that all you needed to do was get the

21   Ambarella chip and then you had the invention, you heard

22   Dr. Mander talk about all the work that went in.  You heard

23   Didier LeGall say:  I'm not even sure we had that idea in

24   December 2009.

25        They tried to point to that picture where it had the

1    iPod, and then he admitted the iPod at that time had no

2    wireless.  What you were doing was you would take the video off

3    your camera, you'd plug your camera into your phone, you'd

4    download the videos onto your computer, and then you'd download

5    from your computer onto your iPod.  That's what he was

6    talking about.  He wasn't talking about wireless.  He wasn't

7    even sure they were thinking about it back then.

8        And then this was Exhibit 8.  That was the email with

9    Laura O'Donnell and Richard Mander and where they said

10   [as read]:

11           "We did the demonstration of the Bluetooth to

12        Ambarella.  It was a big hit and won Didier over for

13        the Bluetooth for our product."

14       So if this invention was so obvious, why, when they went

15   out to Ambarella and said, "Look, we can communicate

16   wirelessly," why was it a big hit and it won him over?  Because

17   it wasn't obvious.  Because nobody had figured out how to do it

18   until the Contour inventors did it.

19       Didier LeGall goes on our side of the scale.

20       Then there's more on obviousness.  There's:  What do you

21   consider that will show the invention is not obvious?  And

22   these are some of the things:  unsuccessful attempts by

23   others, copying of the claimed invention by GoPro or others,

24   praise from others in the field or licensing, and skepticism.

25       Dr. Hu testified about a bunch of that.  No question Nick

1    Woodman and GoPro knew of the Ambarella A5 in January 2009, and

2    you heard that from Dr. Almeroth this morning too.

3        Despite knowing of that, they were focused on making a

4    camera with a picture preview.  Right?  And that goes back to

5    what's really at issue.  The A2 could only do two things:  It

6    could record video and it could output a picture.  Right?  This

7    was not about video.

8        Now, did GoPro develop a working POV camera that included

9    a processor configured to generate two streams in parallel?

10   No, they did not.

11       And did you see that GoPro said the Looxcie system is

12   closely related to the Boland patent?  That's the one that came

13   out just a few days after the Contour patent, so it's not prior

14   art.  But GoPro had said Looxcie was purchasing Ambarella

15   chipsets and design modules.  Remember they talked about their

16   motivation to combine, and they said Boland said you could use

17   any camera processor.  And they had documents that showed

18   Looxcie and Boland were looking at Ambarella processors.

19       In the real world, where Boland had the ability to use the

20   Ambarella processors, had the Ambarella processors purchased,

21   he came up with a different invention.  His camera processor is

22   configured to do things serially and not parallel because

23   that's the choices they made, and the Patent Office said that's

24   a different invention.

25       And then you heard Mr. LeGall.  They did these -- all

1  their presentations that they did under NDA, so all of those

2  things are not prior art because they're not public, and they

3  weren't public in the United States.  He admitted that.  But

4  they made these presentations in 2009 about how we could have

5  two video streams.

6      And Samsung didn't come out with a camera with wireless

7  until 2012, despite them going to them and saying this chip can

8  make two streams.  So it wasn't obvious to them.

9      And here is a big answer.  He said [as read]:

10         "The difficulty came from talking to a cell

11      phone."

12     That was part of the problem that our inventors solved.

13  And here, Mr. LeGall is admitting, yeah, for others it wasn't

14  so obvious.  That goes to non-obviousness.

15     Canon, the same thing.

16     So failure of others goes on our side of the scale for

17  non-obvious.  And remember, this is their burden.  They have to

18  make the scale go more than slightly their way.  All of the

19  evidence goes the other way, that these claims are valid and

20  not obvious.

21     What else?  Well, the awards.  You heard about the three

22  awards Contour got.  These are Exhibits 442, 443, 444.  Best

23  Mobile Lifestyle Accessory of CES 2011 and the Red Dot award.

24  You heard about how prestigious those were.

25     And then I had -- Dr. Almeroth read some of the actual

1  people's responses on the day that Contour introduced the

2  Connect View and the live streaming, and these were the -- not

3  Dr. Almeroth's testimony, but this is him reading the comments

4  of people on that very day that it came out [as read]:

5          "I have to say that it is a cool little feature

6      for sure.  The ability to line up is a nice touch."

7      The other one [as read]:

8          "Cool thinking.  Innovative way to let you see

9      what you're shooting."

10     And then this one [as read]:

11         "I guess this is Contour's take on GoPro's new

12     LCD screen."

13     Remember GoPro had the BacPac with the screen on the back

14  of the camera.

15     He said [as read]:

16         "The downside of the GoPro screen is that I

17     can't see the shot when it's on my helmet, which

18     makes this app really useful."

19     That was the problem that we were trying to solve that

20  they weren't able to solve until they got our cameras and tore

21  them apart.

22     He says [as read]:

23         "I just can't stand the look of Contour's

24     footage.  So, Contour and GoPro, if you're reading

25     this, do a collaboration."

1    This guy liked our innovation, and he said, "Hey, I like

2    GoPro's footage better.  Why don't you guys put it together?"

3         GoPro could have done that, could have came and said,

4    "Hey, Contour, let's do a deal.  Let's take a license."  They

5    didn't do that, and that's why we're here.

6         So praise from others, that goes on our side of the scale.

7         In view of all of that, it should be very clear GoPro has

8    not proven by clear and convincing evidence that any of the

9    claims are invalid and the claimed subject matter would have

10   been obvious.  For Question 6, you should check "No" on all

11   claims.

12        Was GoPro's infringement willful?  Let's cover the

13   evidence on that.  On this we have a couple of things that we

14   look at.  And this first one, whether GoPro intentionally

15   copied Contour's patented technology in developing the accused

16   product, well, here, of course, we have Nick Woodman's email

17   [as read]:

18             ". . . get Zahid and Ben each a unit to

19        disassemble . . . ."

20        Remember Zahid, the one they're waiting for when they're

21   not doing anything in 2010.  They're waiting for Zahid to do

22   something.

23        Here's Mr. Woodman, in the beginning of 2011, saying:  Get

24   Zahid one of these so he can tear it apart.  Let's do it

25   covertly.

1    Then that actually happens.  They bill it to product

2    development.

3         And this is Woodman [as read]:

4         "We knew their camera was going to be based on

5         A5.  We should have been smarter and tapped into the

6         fact.  We should have known that they'd be launching

7         a dual-stream live preview feature.  Guys, get a

8         couple of them, take them apart, and determine how

9         they're doing it."

10   So they told you, "Oh, it's just competition to know what

11   your competitor is doing."  Right?  It's one thing to know,

12   "Hey, they've got an HD camera; they're advertising it at

13   1080p.  We need to have one of those too."  It's different to

14   say, "Get it, take them apart, and determine how they're doing

15   it."  That's copying.

16        So the evidence of copying was from January 2011 until

17   they came out with the HD HERO2 and WiFi BacPac in 2012.

18        What else goes to willfulness?  Whether GoPro knew or

19   should have known that its conduct involved an unreasonable

20   risk of infringement.

21        Well, we know that the HERO4 came out around the same time

22   that the first patent issued.  Contour notified GoPro

23   afterwards.  There were some discussions and then a lawsuit.

24        GoPro introduced all these cameras without making the

25   change.  Now, remember that when you think about -- when you're

1    talking about damages:  Oh, it's such a small change.  No one

2    would care.  We could make it easy, so this isn't worth much.

3         Why didn't they do it for all these cameras?  They knew

4    about the patent.  The lawsuit was going on.  They dragged it

5    on.  Okay?

6         And then another issue on willfulness, whether GoPro had a

7    reasonable belief, at the time of infringement, that the

8    product did not infringe the asserted claims.

9         Well, we know here is where they were found to meet all

10   the elements of Claim 11, August 2020.  And they came out with

11   all these cameras after and still no changes.  These small

12   changes they claim they could make, none of them happened.

13        Whether or not GoPro made a good faith effort to avoid

14   infringing the product, that's what we just talked about.  They

15   say there's these easy design-arounds, but they never did them.

16        And then additional conduct evidencing deliberate or

17   reckless disregard of Contour's patent rights, that's this.

18   That's the Woodman lockup period.  They have their IPO in June.

19   He can't sell any stock until December 22nd of 2014.

20        And then Contour's '694 patent application publishes in

21   August, and it already has a Notice of Allowability.  So they

22   know that patent's coming out.  It's public knowledge.  And

23   right at that time is when GoPro's CFO reaches out to the bank

24   and says, "Hey, we'd like to sell some stock early."  Okay?

25        And so then you see Woodman sells 4 million shares.  He

1    gets about $300 million right at the time that the '954 and

2    '694 patents issue.  December 3rd, right before they're

3    supposed to have a talk, Woodman sells another 837,000 shares

4    and receives $60 million.  Okay?  And Woodman testified he

5    didn't sell shares for years after that, or only in small

6    amounts.

7         And this go to credibility [as read]:

8              "When you were deposed under oath in

9         January 2020, you testified you had no recollection

10        of ever selling 300 million worth of GoPro stock?"

11   He said [as read]:

12             "I don't remember when I sold what and how much

13        I made.  I was really fortunate, but that was a

14        whirlwind time, so I don't remember specifically when

15        I sold what."

16        Ask yourself, when you talk about credibility, to say you

17   sold -- you got $300 million and you don't remember if you ever

18   did that.  Right?  That goes to credibility.

19        Okay.  So if valid and infringed, what are Contour's

20   damages?  Well, one way you look at it is a license and whether

21   there are comparable license agreements.  And in this case, we

22   do have a comparable license agreement.  We have licensed

23   products covered by the patents listed in Exhibit A, and those

24   are the two patents that are at issue in this case, the exact

25   same patents.

1        And Element agreed to pay the greater of 5 percent of net

2    sales or $5 per licensed product sold.  Okay?  Now, I'm going

3    to tell you a couple of things about this Element license.

4        There was talk about, well, there's an Element license but

5    there's also a SkyBell license.  But you heard from the person

6    from Element that those are two separate deals.  We negotiated

7    two separate deals.  They've paid the up-front money under

8    this.  Over periods of time, they paid $1.5 million.

9        They kept saying, "Well, there's no Element product.

10   Element hasn't made a product yet."  Right?  So they're saying

11   Element entered this license and in four years they haven't

12   come out with a product.  They're a TV maker.  They've never

13   made an action camera.

14       On the other hand, they're saying, "Well, look, it took

15   Nick Woodman three years from the time he had the conception,

16   allegedly, to when he came out with a product, and that's no

17   big deal."  They asked Mr. Woodman, "Is that a long time?"  He

18   said, "No.  Actually, that's really fast."

19       Yet, on the other hand, when they're talking about the

20   Element license, they're trying to get you to ignore this

21   because in four years Element hasn't put out a product.  That's

22   the difference in how they talk out of both sides of their

23   mouth.

24       Now, here is what Dr. Ugone said.  If you did the math and

25   calculated what the percentage would be for 9.71 as compared to

1    the 5 percent for the Element license, if you convert it back,

2    it'd be about 4 percent, roughly.

3        So that top end of the scale is about a 4 percent license.

4    The Element license is a 5 percent.  So this is less.

5        And remember you heard from them yesterday, from

6    Dr. Kennedy about the MPV license.  Right?  And in there, they

7    agreed to a 2 1/2 percent royalty.  They agreed that that's

8    what was reasonable.

9        And remember Dr. Kennedy said, "Well, there's a lot of

10   words and there's math, and I really just want to focus on this

11   number of 295,000 for two months."  But they agreed to

12   a 2 1/2 percent royalty.

13       And the other thing that was in that license, unlike the

14   Element license, in their license it said:  We will not use

15   this -- we, GoPro, will not use this as evidence of a

16   reasonable royalty.  And then they ignored their own agreement

17   to come in here and try and tell you, "Oh, look at the MPV

18   license, not the Element license."  Right?  In the real world,

19   you had the Element license.  They want you to ignore that.

20   You shouldn't ignore that.

21       These are the numbers.  It's a lot.  It's in Exhibit 14.

22   This is agreed by the parties.  These are the units sold under

23   each of the different groups.  There's about 13 million Group 1

24   Live Preview products, there's about 1.2 million Live Preview

25   Group 2 products, and there's about 3.6 million live streaming

1    products.

2        And I notice some of you writing that down.  If you need

3    a minute, I'll...

4        Okay.  So how does that work out?  When you do the math on

5    that, you have -- at the 3.60, which is the floor, you have the

6    Live Preview Group 1 products total out to 46 million.  If you

7    use the high, the 9.71, that totals out to 126 million.

8        For the Live Preview Group 2 at 3.60, it totals out to

9    4.5 million.  And at the high of 9.71, the 4 percent, it totals

10    out to about 12.3 million.

11        For the live streaming products, at the low of 3.60 it

12    totals out to about 13 million, and at the high of $9.70 it

13    totals out to about 35 million.

14        Why should you be at the high?  Right?  Why should you be

15    at the high?  Well, because in the real world, others have

16    agreed to 5 percent, and this is about 4 percent.  And they

17    have said in their own documents that 2 1/2 percent is

18    reasonable -- right? -- even though they want to walk it back.

19        But it's because what is this case about?  This case is

20    about, from the beginning, Nick Woodman wanting to squash

21    VholdR.  Right?  So he squashed VholdR once, and he said that

22    "I thought they were dead."  Right?  "I thought they were

23    dead."

24        And then they tried to come back.  They had the patent.

25    They should have had exclusive right.  When they came out of

1    that receivership, they should have had the exclusive right to

2    say, "We're the only ones who can sell live streaming wireless

3    preview according to the claims of the invention."  And they

4    had to sue them, and then they dragged this on for ten years.

5    And that's how they kept squashing VholdR.

6        Contour was about to start making again with Jabil, and

7    they got in the way of that and they kept making it difficult,

8    and they dragged this litigation on, and that's why you should

9    be at the high.

10       So I will say, in conclusion, Mr. Woodman and GoPro --

11   Mr. Woodman came in and said, "Look, I don't even remember if I

12   got $300 million."  I don't know whether this will even send a

13   message to him.  But for Mander and O'Donnell and for the

14   inventors who really worked to make this technology, for the

15   guys like Ben Bodley, who went over to Taiwan for weeks to try

16   and figure out how can we make the Ambarella communicate with

17   other things, these are the inventors and you should award,

18   when you get to damages, $174,003,005, and that's what we would

19   ask you fill in on your finding on damages.

20       And with that, I'll speak to you again in rebuttal.

21          THE COURT:  All right.  Ladies and gentlemen, let's

22   take a ten-minute break, and then we'll come back for the

23   remaining parts of the argument.

24       (Proceedings were heard out of the presence of the jury.)

25          THE COURT:  You've got about seven minutes left.

1          MR. KEVILLE:  What?

2          THE COURT:  Seven, more or less.  Maybe less.

3          MR. KEVILLE:  Keep it short, is what you're telling

4    me.

5                    (Recess taken at 11:38 a.m.)

6                (Proceedings resumed at 11:50 a.m.)

7        (Proceedings were heard out of the presence of the jury.)

8          THE COURT:  Ready to go?

9          MR. HAYNES:  I am, Your Honor.

10         THE COURT:  Okay.

11       (Proceedings were heard in the presence of the jury.)

12         THE COURT:  All right.  Please be seated, everybody.

13    Mr. Haynes, when you're ready.

14         MR. HAYNES:  I'm ready.  Thank you, Your Honor.

15                     <u>**CLOSING ARGUMENT**</u>

16         MR. HAYNES:  Good afternoon.

17      I want to pick up and start exactly where Mr. Keville did.

18    I think it's fair to say both sides very much appreciate your

19    time and consideration during this case.

20      This case is very important to GoPro.  We respect the U.S.

21    patent system, and we believe in intellectual property.  What

22    we do not believe in is getting a patent on something you did

23    not invent and coming into court and telling somebody that you

24    should have to pay $174 million for using an invention that you

25    came up with first.

1    Now, there was lots of discussion in what you just heard

2    about credibility and evidence, and I'm going to walk through

3    the evidence, but let me start with two very critical points.

4    What they did not show you a single time during that

5    entire presentation was a copy of the Boland patent and what it

6    teaches or a copy of Mr. Woodman's patent and what it teaches.

7    They don't want you to look at those documents because if you

8    look at what they disclose, you will see that they disclosed

9    every concept in their patents years before they thought of

10   them, and they disclose them in either the same level or more

11   detail than they themselves disclosed them.

12   So you're going to have those exhibits.  I invite you to

13   go look at Boland.  I invite you to go look at Mr. Woodman's

14   patent, the '251 patent.  And you won't see Woodman on the face

15   of their patent.  There are lots of Woodman patents on there.

16   What's not on there is the Woodman '251 patent, which is the

17   only thing we've been talking about in this case.  So the fact

18   that they cited a bunch of Mr. Woodman's other patents, totally

19   irrelevant.

20   What else is irrelevant is that the '251 patent, the

21   claims of that patent claim his wireless BacPac idea.  That's

22   what he thought he invented because that's what he thought was

23   new, the BacPac idea.  But what he didn't think he invented,

24   because he thought everybody already knew it, was what they

25   claim in their patent.

 1          So when you hear testimony from Mr. Woodman about, "I

 2     didn't invent what's in their patent," of course he didn't.  It

 3     was already out in the prior art.  Boland was doing it.

 4     Mr. Woodman was build- -- Woodman was building it.  It was out

 5     there.

 6          So look at the documents.  Go back to 2008, a year and a

 7     half before then, and see what was actually described in those

 8     patents and the concepts that they claim to have invented.

 9     Those concepts were already out there.  They were out there in

10     Boland.  They were out there in Mr. Woodman's patent, and GoPro

11     built a product.

12          Let me also talk about credibility.  I agree credibility

13     matters.  And when you're looking at evidence in this case,

14     there's been some suggestion that you should focus on what

15     they've been describing as evidence.

16          And I agree, Mr. Woodman's emails about squashing VholdR

17     and his emails about buying their products so he could look at

18     competitive intelligence, you can consider that.  You should.

19     But you should consider the actual document itself, and the

20     reason you should is because you're only being told part of the

21     story from Contour.

22          So I want to show you their Slide 7 from their opening

23     presentation.

24          If we could get the monitor over there.

25          Okay.  This is the email you were shown in their opening

 1   statement, and they read a couple of sentences on here, and

 2   they represented that this is an example of Mr. Woodman's

 3   January 5th, 2011, email where he's talking about, "Can you

 4   assist in covertly getting the document?"

 5        What they didn't tell is they cropped out half the email.

 6   They don't want you to see the whole story about what

 7   Mr. Woodman said.

 8        So if I could have the email back -- the Elmo back.

 9        This is the actual email on the right, and on the left is

10   Mr. Woodman's testimony explaining exactly what he meant.  And

11   you heard him explain this email when he talked about it.

12        And the parts they cropped out are the most important

13   parts.  They cropped out [as read]:

14            "It uses the A5 DSP, so we should have been

15            smarter and tapped into the fact that they would be

16            thinking about dual stream with this unit."

17        But then he goes on and says [as read]:

18            "I think they're using Bluetooth.  We can

19            leapfrog them because what we're doing is better."

20        They don't want you to see that part of the email.

21   They're telling you part of the story.

22        You're probably familiar, if you want to do something that

23   you don't want people to know about, you create a lot of noise;

24   you create a distraction.  You put that distraction and you

25   create as much -- whatever you can do over there, and then you

1    run over there and you steal their car.

2        Ask yourself what's going on here.  A lot of noise about

3    squashing, a lot of noise about covertly buying products.  But

4    you saw evidence their employees were buying GoPro products.

5    You heard at the start of this, "Don't let a big company push

6    the little company down."

7        In 2009, when this email was sent, the monstrous GoPro,

8    ten people, about the same size as Contour.  Nobody was

9    squashing anybody back then.  They're competing in the market.

10        And what Mr. Woodman told you, and what the email itself

11    says, they wanted to squash them by leapfrogging them with a

12    better product.  There is nothing wrong about that.  That's

13    exactly what you want to have in a competitive marketplace.  So

14    keep that in mind.

15        Now, unlike what you saw there, I'm going to walk you

16    through the evidence.  And I'm going to show you what's in the

17    Boland patent.  I'm going to show you what's in Ambarella.  And

18    then I'm going to show you what Mr. Woodman himself did.  And

19    that is all evidence.

20        And those scales you kept seeing, what you didn't see on

21    our side of the scale, you didn't see the Boland patent; you

22    didn't see Mr. Woodman's patent, because if you look at those

23    patents, that scale is going to tip the other way.

24        Okay.  Now, let me back up.  Remember what we're here for.

25    Patents are about promoting the progress of science.  What is

 1    the new idea?  What have you contributed?  What new discovery

 2    have you advanced science for?

 3         And when you're looking at what is in Contour's patents,

 4    ask yourself, as you're sitting here right now, in your mind,

 5    do you have a clear idea of what it was they claimed to have

 6    added to the prior art?  What was new?  The answer is nothing.

 7    And that's a problem.  Patents protect new inventions.  What

 8    they should not protect is when the Patent Office did not have

 9    all the information and issued a patent that shouldn't have

10    come out.

11         We have the opportunity to come here and present that

12    evidence to you.  You get to decide what is new, if anything.

13    You get to decide:  Are those ideas already out there?

14         Now, they don't want you to do that, and that's why they

15    keep talking about what the Patent Office considered.  They

16    looked at -- there were Ambarella documents considered; there

17    were Woodman documents considered.  All that is saying, "Don't

18    do it yourself."  They don't want you to look at the evidence

19    yourself and make your own decision.  They want you to defer to

20    somebody that did not have access to the information that you

21    have.

22         You have that information, and I'm going to walk through

23    some of it now.  But you have the information.  You don't have

24    to defer to the Patent Office because they did not know what

25    you know.

1    You heard Dr. Hu on the stand this morning.  They did not

2    know that the demonstration they saw with unique image

3    processing features, they didn't know that that was Ambarella's

4    chip that did that.  They didn't tell the Patent Office the

5    most important fact about Ambarella.

6        And then you saw a whole bunch of citations to Woodman.

7    They didn't tell them about the Woodman '251 patent.  So keep

8    that in mind when we walk through this.

9        So there are three questions, and I'm going to start with

10   invalidity because I do think that that's the most important of

11   why we're here.

12       This patent and what they're trying to do, trying to get

13   $174 million for something they didn't invent, that's a

14   problem.  That's not what the patent system is for.

15       Two separate independent grounds, Boland plus Ambarella,

16   and Mr. Woodman's prior invention.  So I'm going to walk

17   through each one of these; but just remember, if you think that

18   Boland and Ambarella, that it would have been obvious based on

19   the combined teaching of those references, if you think the

20   patents are -- would be obvious in light of that, that's

21   enough.  You can check the invalid box for obviousness.

22       If you think separately that Mr. Woodman, his prior

23   conception and reduction to practice is enough, you can check

24   both anticipation and obvious, depending on whether you think

25   every single part of the invention is explicitly disclosed or

1  whether you just think a person of ordinary skill would have

2  known, based on what Mr. Woodman said, how to get to the rest

3  of their patent.

4      Now, remember, the starting point of all of this, both

5  sides agree, you have to look at the state of the art.  And

6  this is uncontested.  This was Dr. Almeroth's slide.  And the

7  red line here is December 2009.  That's Contour's earliest

8  priority date.  And everything Dr. Almeroth said about all this

9  stuff to the left, uncontested, unrebutted.  So you can accept

10  that as true.  That's the state of the art, and that's the

11  level playing field that they have to start from.  So they need

12  to be able to tell you what they added to that.

13      What do you think that was?  This is their slide.  This is

14  Dr. Hu's slide, Contour's invention.  And she said:  You know,

15  at a high level, we built a camera that had this basic

16  hardware, but we had this wireless capability that allowed us

17  to record a high-definition video while transmitting a

18  lower-definition video wirelessly for a live preview.

19      And that's what you heard from Dr. Mander.  That's what

20  you saw in the video from Ms. O'Donnell.  That's what they

21  thought they had invented.  That was the concept.  That was

22  their idea that Contour thought they had.  The problem is that

23  was already out there.

24      This is the slide that I walked through using Dr. Hu's

25  slide.  I walked through this with Dr. Mander, and he admitted

1    every single one of these pieces, in the art.  The lens is in

2    there, image processor in there, camera processor, storage

3    device, wireless device, and also wireless transmission of

4    video.  And he had to do that because every single one of those

5    pieces was known.

6         Now, you're going to get the jury instructions, and that

7    instruction is going to tell you, if all you had was each

8    individual piece but you didn't know how to put them together,

9    then that's not enough.

10        But here, you've got both Boland and Mr. Woodman telling

11   you exactly how to put them together to achieve the exact same

12   concept that you heard Dr. Mander and Ms. O'Donnell say was

13   their invention.

14        So let's start with Boland.  This is the Boland patent on

15   the left.  It is TX-2350.  And you're going to get a memory

16   stick so you can go and you can look at Boland and see exactly

17   what it discloses.

18        But at a high level -- well, let me talk to you first

19   about what this combination is.

20        So you got Boland, and what that is, is a wearable headset

21   that could record high-resolution video and wirelessly transmit

22   low-resolution video to a remote device for a live preview.

23   And I'm going to walk you through where it says that.

24        What it doesn't specifically say in exact words in Boland,

25   but what people with ordinary skill in the art knew, was that

1    the camera processor that you use in Boland, you can use a

2    processor that's capable of recording in parallel.  And that's

3    the Court's construction of this "generate" term.

4         So you had to keep that piece.  Boland doesn't explicitly

5    say that its processor needs to record in parallel.  But it

6    does say you can use any processor you want, including things

7    that were commercially available.

8         And we all know Ambarella was commercially available.

9    They were out there telling everybody in the marketplace what

10   their chip could do, and the part they were talking about was

11   recording in parallel a high-resolution stream and a

12   low-resolution mobile stream.

13        And they take issue with those documents because they say,

14   "Well, the iPod could not connect wirelessly."  Who cares?

15   The idea of the wireless transmission of that stream comes from

16   Boland.  Ambarella didn't need to tell anybody because Boland

17   was already suggesting that.  All Boland needed was the chip

18   that could give them the lower-resolution stream that was

19   recorded in parallel.

20        And that combination, you heard this morning from

21   Dr. Almeroth, Dr. Hu does not dispute that every single element

22   of every single claim is disclosed by that combination.  And

23   you did not hear a word from Dr. Hu explaining why you wouldn't

24   put those two things together.

25        All you heard was:  Well, Samsung didn't put it together

1    that way.  Sony might not have done it -- or, actually, I think

2    they said Samsung did it but it took too long.  It took a year

3    or two.

4         Well, we've all heard testimony now, and he -- Mr. Keville

5    actually mentioned this:  It takes a while to get a commercial

6    product to market.  That doesn't mean that their patent's

7    valid.  It doesn't mean they had a new idea.

8         All right.  So let's walk through it.  I'm not going to go

9    through this because Dr. Almeroth walked you through every

10   piece of element -- evidence; but these are his slides where he

11   walked you through Boland and he pointed you to specific

12   paragraphs in Boland that disclosed every element of the

13   claims.

14        And this is evidence.  Boland is evidence.  This is what

15   you need to evaluate to see for yourselves:  Did they invent

16   anything new?  And I would invite you to compare what Boland

17   teaches to what their patent teaches.  Their first patent, the

18   '954, is JTX-1.  So compare those two patents for yourself.

19        You don't have to take my word for it.  You don't have to

20   take Mr. Keville's word for it.  You're the judge of the

21   evidence.  Look at those documents and ask yourself:  Is there

22   anything new in what Contour says they invented?  And the

23   answer is, no, there's not.

24        So we saw this Figure 2A on the left here.  That is the

25   schematic of Boland's processor.  It's got a lens, it's got an

1    image sensor, and it's got a processor.  And Dr. Almeroth

2    showed you that Boland discloses a wireless connection protocol

3    device.  It specifically says right there that you can use

4    WiFi.  You see that at the top.

5         And it also said that you can use that wireless protocol

6    device to send video in real time as it is recorded.  You can

7    see that on the upper right.

8         Dr. Almeroth explained to you how Boland has the camera

9    processor and how that processor records high-quality image

10   data and it puts that in a storage medium.  He showed you

11   Figure 2A, where the processor receives those video image

12   signals from the sensor, and they go into that processor that

13   then uses them to create image streams.

14        He showed you Boland's teaching that the video that is

15   captured is sent wirelessly from that camera that's on the

16   headset to a remote device over a wireless connection protocol

17   like WiFi.  You can see that in the picture on that lower left

18   there.  There's a -- you've got a person.  That's the wireless

19   communication handset, that's the remote device, and you can

20   see there's a little picture of a guy there.  That's their

21   preview that they are watching of what the camera is recording.

22        So what you've got is Boland disclosing a wearable

23   point-of-view camera that has all of the same hardware

24   components that they recite in their patent and that can record

25   in high resolution and output at a lower resolution to a remote

 1    device.

 2         And, again, Dr. Hu doesn't challenge any of this.  You

 3    didn't hear anything about it.  And you didn't actually even

 4    see a single word out of this patent in Contour's opening

 5    statement.  They don't want you to look at this.  Ask yourself

 6    why.

 7         Now, we haven't talked a whole lot about the control

 8    signals that are coming back.  But remember the claims of these

 9    patents.  You not only have to be able to send video out, you

10    need to be able to receive control signals back.  Was that

11    something new?  Is that the thing that got them a patent here?

12         Look at what Boland says.  Boland says that you can

13    configure the headset video capture parameters using that

14    remote handset.  And Boland actually says you can use --

15    receive commands to control any function on the camera.

16         And you heard Dr. Hu testify.  She said, "Look, we're not

17    claiming to have invented some new camera setting."  And she

18    also said that, when you're doing this, when you control

19    remotely camera functions, that can include any function that's

20    on the camera.

21         And then nobody's really focused on this because it's such

22    an obvious limitation, but it's in Boland anyway.  You can

23    mount it on your head and you can do a live preview in real

24    time.  Boland explicitly discloses that in paragraph 61.

25         You can -- Dr. Almeroth explained that, you know, this

1    on/off command, where you can start doing your live preview and

2    then start recording with an on/off command, Boland explicitly

3    talks about that too.

4        So what is in Contour's patent that's not in Boland?

5    Well, everything that's highlighted in green here, there's no

6    dispute.  That's all in Boland.  The pieces that aren't

7    highlighted in green relate to that generate limitation where

8    it has to record in parallel.  And what we know from the

9    testimony in this case, that recording in parallel means that

10   you are recording two image streams, one high quality and one

11   low quality, at the same time.  That's what camera processors

12   do.

13       Contour didn't invent that aspect of a camera processor.

14   That's out there.  Ambarella did it.  And how do we know that?

15   A 2008 document from Ambarella, record in parallel.  It says it

16   right there at the top, "Dual-Stream HD and Mobile Recording."

17       This is what Ambarella is telling the whole world their

18   chip could do.  And you didn't hear anybody in this case saying

19   that Contour invented that.

20       When you take that disclosure of Ambarella that is out

21   there in the world being told to lots of different companies,

22   it's in a press release that it can do dual recording in

23   January of 2009, 11 months before their patent, you've got

24   everything that's in this -- in this invention.

25       What they say they invented, all of the elements that were

1    in green in this prior slide, plus dual recording, high

2    resolution and low resolution so you can send that low

3    resolution out, there's nothing new here.

4        Now, in terms of the motivation to combine, you saw this

5    testimony, I think, again this morning.  The motivation to

6    combine Boland and to use other processors such as Ambarella is

7    explicitly in Boland.  He says:  Look, my invention, the

8    concepts I'm describing here, you can implement those with any

9    processor you want to.  And a person of ordinary skill in the

10   art would know about the processors that are on the market that

11   have been described in press releases, such as Ambarella's A5

12   and A5s chipsets.

13       That's the disclosure that says:  Hey, go ahead and

14   combine these things up.  Use whatever processor you want to.

15       And what we know is that Ambarella was telling everybody,

16   "Our processor is great because we have a mobile resolution

17   stream that our processor is going to output."

18       So if you're Boland and you're trying to build that out or

19   somebody that's reading Boland, a person of ordinary skill who

20   wants to go try to build it, they're going to go out there and

21   say, "Okay.  What's a good processor that can give me two image

22   streams?"  And Ambarella is telling everybody, "That's what we

23   can do."

24       So is the claimed inventions that are claimed here, are

25   those obvious in light of this combination?  Yeah.  Every

1    single element's disclosed.  The motivation is disclosed.  And

2    you have no testimony from Dr. Hu saying otherwise.  Instead,

3    you've got a lot of distraction, a lot of, "The Patent Office

4    looked at this part.  The Patent Office looked at that part."

5    But you get to make this decision based on all the evidence

6    that's in front of you, and the Patent Office did not have

7    that.

8        And let me be real clear about one thing.  The prior art

9    ground is Boland in combination with Ambarella.  The

10   Patent Office did not consider that combination, period.

11   You're the first ones that are going to get to consider that;

12   and when you do, I believe the evidence will show that their

13   patent is not valid.  There's nothing new.

14       Now, in terms of this question of the generate

15   limitations, this is the testimony from Mr. Mander and from

16   Ms. O'Donnell, the two inventors in this case.  And I asked

17   Dr. Mander, I said [as read]:

18           "Contour's not claiming that they contributed in

19       any way, shape, or form to the ability to generate,

20       using an image processor, a high-resolution stream

21       and a low-resolution stream and output those streams;

22       correct?"

23       His answer was [as read]:

24       "I think they supported it, meaning we made use of it."

25       "QUESTION:  Right.  But what comes out of that chip, a

1    high-resolution stream and a low-resolution stream, and

2    the manner in which those streams are generated, Contour

3    did not invent that; correct?

4    **"ANSWER:** Correct."

5    Ms. O'Donnell, she couldn't even remember where that idea

6    came from, but we know it didn't come from her because you

7    heard Mr. LeGall testify that that was Contour's idea, and he

8    told Ms. O'Donnell about that before their alleged conception

9    date.

10    Now, Dr. Mander, I thought he was a very nice person.  He

11    seemed very smart.  The problem with Dr. Mander's testimony is

12    he did not know what he did not know.  He thought -- at that

13    point in time, when he was working on this in December of 2009,

14    he didn't think anybody had streamed video wirelessly from a

15    camera to a phone.  And, again, he thought that he was the

16    first one to come up with this concept; right?

17    As we've gone through a few of these emails.

18    You see [as read]:

19    "At this point in time, December 15th, 2009,

20    what was your idea and what had formed in your mind

21    as to what you intended to build for this viewfinder

22    project?"

23    His answer [as read]:

24    "I was committed to having it be a wireless way

25    they send video to the iPhone and, as well, to

1          provide some ability to change controls on the

2          camera, and I wanted to do it with Bluetooth."

3          Okay.  What's there?  Wireless transmission of video, just

4    that general idea.  But he didn't know that he wasn't the first

5    one.  That's okay.  But that means -- but you know otherwise,

6    which means the Patent Office shouldn't have given him that

7    patent, and you should invalidate it.

8          What else do we know?  I asked him, I said:  Dr. Mander,

9    do you know what GoPro was doing at the time?

10         And he was very careful to tell me:  No, I had no idea

11   what GoPro was doing with Ambarella at the time.

12         So he didn't know that GoPro was already doing this.

13   Again, he didn't invent anything new.  He just didn't know what

14   other people were doing.  He did not know what he didn't know.

15         Now, I mentioned this earlier.  This is from the

16   prosecution history where -- the back-and-forth between the

17   Patent Office and Contour.

18         And now we're in 2014.  Ms. O'Donnell, Dr. Mander, they're

19   gone.  Right?  The company's already basically folded.  They're

20   reviving it, and the new owners are trying to get a patent.  So

21   they're out there and they're telling the Patent Office -- they

22   take a demonstration, they show it to the Patent Office, and

23   they demonstrate that it has -- what it can do, live preview

24   while recording.

25         The Patent Office says [as read]:

1        "They showed me some unique image processing

2        features, including the ability to save the

3        high-resolution video."

4        All of those features came from Ambarella, not Contour.

5    And Contour's lawyers at the time, or whoever attended this

6    meeting, there's nothing in this summary that suggests that

7    they told the Patent Office, "I know you think that's unique,

8    but it actually came from somebody else.  So we're not going to

9    take credit for it."

10       Instead, what the lawyers did for Contour is they took

11   what Ambarella -- was in their chip and they wrote it into

12   their patent claims.  They added the generate limitations.  And

13   now they're claiming credit for what Ambarella did and saying,

14   "Well, we did it new because we combined the two."

15       Well, think about what they combined:  known elements

16   and a commercially available processor.  There is nothing

17   inventive about using a camera chip for its intended purpose.

18       We've already talked about this.  Who cares how many

19   Ambarella patents are cited on the face of the patent?  The

20   question is Boland in combination with Ambarella.  Nobody's

21   considered that.  You get to do that for the first time.  Don't

22   take the bait and defer to the Patent Office.  That's what they

23   want you to do, but it's your decision.

24       Why is it your decision?  Because the Patent Office did

25   not sit here for the last eight days and hear the evidence that

1    you heard.  You have way more information.  Consider that

2    information and make your own decision.  That is what the Judge

3    will instruct you to do, and that is what our whole patent

4    process is set up to allow, for a jury to decide, based on all

5    the information and all the facts, whether the patent is

6    invalid or not.

7        Okay.  So I have to speed up here a little bit because I'm

8    going to run out of time at the end.

9        But let me talk a little bit about Mr. Woodman's

10   conception.  Okay?  And I think you heard the instructions, and

11   there's a lot of instructions, and I understand listening to

12   all those at once can be a little bit jumbled.  So let's talk

13   about what we have to show to show that Mr. Woodman invalidated

14   their patent with his prior work.  Okay?  There's two pieces.

15       Conception:  Did he have a firm and definite idea of the

16   elements of their patent in his mind before they did?  So the

17   mental part, all that's required is that he had the mental

18   concepts and the ideas in his head before they did.  So that's

19   Part 1.

20       Now, Part 2 -- and before I leave that, they're quibbling

21   about conception a little bit, but they're talking about things

22   like, "Well, you didn't describe every possible camera

23   setting," things like that.  Those things, if you talk about

24   changing camera settings, you can change anything on the

25   camera.  Mr. Woodman told you that.  So they're not really

1    fighting about conception.  What you heard, most of their

2    discussion was about diligence and reduction to practice.

3        But I think the instructions that you're going to see, and

4    you already -- and these were already read to you, but

5    diligence means working continuously, though not necessarily

6    every day.  Okay?  So the only thing you have to ask yourself

7    is:  Mr. Woodman had these ideas in his mind.  Was he working

8    on them?  And then their argument is:  Well, he wasn't

9    diligent.  He abandoned the invention.

10       And we're going to look at a couple of the documents; and

11   when we do, I want you to ask yourself:  Am I being told the

12   whole story, or am I being given half the story again?

13       But before we get to that, look at the legal instruction

14   that you have to apply [as read]:

15           "Generally, a prior invention was not abandoned,

16       suppressed, or concealed if the invention was made

17       public, sold, or offered for sale or otherwise used

18       for a commercial purpose."

19       There is no dispute that the HERO HD 2 and the WiFi BacPac

20   was sold commercially.  The instruction right there tells you

21   everything you need to know.  It was not abandoned, suppressed,

22   or concealed because we launched a product.

23       And that -- you don't actually need a legal instruction to

24   figure that out.  Ask yourself:  Did they abandon the idea when

25   they sold it?

1    And they showed you some documents.  We looked at that one

2    in March, and I'm going to show you the timeline, but they're

3    like, "Ah, this is the first time that we got a specification

4    document in March of 2011 and this is so late."  Those things

5    don't materialize out of thin air.  It's a lot of work.

6        And back in this time, GoPro's tiny.  There's only so many

7    people to go around, and they were trying to build up their

8    engineering resources at this time to get bigger so they could

9    move faster, but there's only so much they could do.

10        And all this stuff about Mr. Donovan and how he wasn't

11    working on WiFi in 2010, he told you himself that wasn't his

12    area.  It was Mr. Woodman and it was Rudy Samuels, and they

13    were trying out everything that was out there to make sure that

14    they sold the best product.

15        And Mr. Woodman told you the reason he wanted to be

16    careful is because he thought he was going to launch wireless

17    in the first HD HERO.  He was a month from mass production, and

18    he had to make a really tough call to pull it out because it

19    wasn't up to snuff.  He didn't want to put an inferior product

20    out on the market, so he pulled it down.  Then he kept working

21    on it to make a great product, and that's what he launched.

22        And, yeah, it took a while.  But so what?  That's just

23    noise.  It doesn't matter that it took a while because it

24    wasn't abandoned and it wasn't suppressed and it wasn't

25    concealed.  He kept working on it.

1    Look at the rest of this instruction [as read]:

2        "A period of delay does not constitute

3    abandonment, suppression, or concealment, provided

4    the prior inventor was engaged in reasonable efforts

5    to bring the invention to market."

6    That's the test you have to apply.  Were Mr. Woodman's

7    efforts reasonable to get this product to market?  We know it

8    was reasonable because he actually brought it to market.

9    That's all that's required.  So if he had the ideas, really

10   this whole abandonment theory, it's not -- it doesn't comport

11   with the law.  It's noise.  It's a distraction:  Don't look

12   over here.  They don't have enough emails.

13       We only have so much time, and I'm sure you feel like you

14   got enough emails, but they're working on things.  We know

15   that.  And you heard the testimony.  You saw documents.  It

16   wasn't just Mr. Woodman's testimony.  You heard it from

17   Mr. Donovan, and you heard it -- you saw emails where

18   Mr. Woodman was interacting with both his suppliers and

19   everybody else.

20       He's working on it.  He's being -- he's putting reasonable

21   efforts in.  He's trying.  It just takes -- it took a while.

22   And that doesn't matter.  Delay does not matter as long as the

23   effort was reasonable.  And that's your call to make.  But the

24   evidence in this case shows that he was working on it and

25   others at GoPro.  But, remember, we're still small at this

1    time.  So the people that were around were trying their best,

2    and it took a little bit of time.

3        Okay.  So we walked through these questions.  I'm going to

4    speed up a little bit, but let me just show you the documents

5    that -- the evidence that you should consider.  And, again, you

6    didn't see this evidence before.  But starting with the Woodman

7    patent -- right? -- way back in July 2008 -- right? -- that's

8    where the conception, the idea starts here.  And let's see what

9    Mr. Woodman came up with.

10       We had a wireless handset on somebody's wrist that

11   allowed -- added -- the BacPac added wireless connectivity to a

12   camera.  That wireless module included, for example, a WiFi

13   transceiver or a Bluetooth transceiver.  There's your wireless

14   connection protocol device.

15       That wireless module could be used to allow the user to

16   wirelessly download stored images and/or video to the camera --

17   or from the camera to a personal computer or a smartphone.

18   Right?  What ideas has he got?

19       Mr. Woodman's invention allowed images and/or video to be

20   captured and wirelessly downloaded in real time for the camera,

21   and that would allow a user to preview what they were seeing as

22   well as allow the user to wirelessly control operation of the

23   camera.

24       Look at the concepts in their patents and ask yourself --

25   and I told you this in opening, and he actually put it up for

1    me, Mr. Keville, in his statement -- where's the daylight?

2    They didn't want you to look at this patent.

3        I don't know if you remember the testimony when they asked

4    Mr. Woodman about his patent.  They didn't show him this

5    paragraph.  They showed him the claims where it talks about the

6    mount and how it mounted.

7        And so, yeah, Mr. Woodman thought his invention was really

8    about that mount because the concepts that he's describing

9    here, he didn't think that he was the first to invent all that

10   stuff.  It was out there.  But he did describe it.  And you

11   don't have to actually think you're the first to be -- to have

12   conception.  The only question is:  Did he have those ideas in

13   mind?  And the ideas are right -- not only in his mind, they're

14   right there on the paper.

15       And this is the last portion of that.  And just in case

16   you want to look at this or anybody wants to write it down,

17   we're looking at Woodman patent '2351 [sic] at Column 7,

18   line 22 to 26 and 34 to 52.  That's real evidence, and that's

19   what you have to weigh.

20       Now, they're correct that you can't just rely on what

21   Mr. Woodman says.  You need corroborating evidence.  You need

22   something in addition.  His patent is corroboration.  But

23   Mr. Woodman was here and he told you, "I had these ideas in

24   mind."

25       So this quote that they keep putting up about, "What was

1    your invention?  You didn't -- you're not claiming you invented

2    what Contour did," two problems with those quotes.  One, it's

3    not the legal test.  The question is:  Did he have the ideas in

4    mind?  He testified, "Absolutely, I did."

5         The other test is:  Did he diligently reduce it to

6    practice?  Did he launch a commercial product?  Yes, he did.

7         This notion of whether he thought he was the true

8    inventor, well, unlike Contour, he didn't want to take credit

9    for Ambarella's invention.  This generate limitation, it's not

10   his.  But he knew about it.  He talked to Ambarella.  They told

11   him all about it, and so he knew they could record in parallel.

12   But he's not claiming credit for that, and that's why he's

13   saying he's not the inventor.

14        Contour, they got no problem.  They'll take credit for

15   that all day long.  They'll ask you for $174 million for it.

16   Ask yourself if that's right, if that's fair, and if that's

17   what the evidence shows you.

18        In terms of this -- the notion of whether Mr. Woodman

19   could do -- transmit at a lower quality the second image stream

20   for the wireless preview, I acknowledged in my opening --

21   I think he showed you this too -- the lower quality is not

22   explicitly stated in Mr. Woodman's patent.  But what he

23   testified to was:  Look, at this time, wireless, everybody knew

24   you couldn't transmit HD.  Of course, you had to send it lower

25   quality.

1    But you don't have to take Mr. Woodman at his word for

2    this.  You should, but you don't have to.  You can ask Dr. Hu.

3    She told you.

4    [As read]:

5        "You would agree that in this time the wireless

6        capabilities that were available were known to be

7        limited?"

8    And then at the bottom [as read]:

9        "So you would agree with me that a person of

10       skill in the art at the time would know that if I

11       wanted to send video to a portable device, I'm going

12       to need to send it at a lower quality than I might be

13       able to record it on their phone and I don't -- and I

14       don't want to send that wirelessly.  You agree with

15       that; right?"

16   She agrees with Mr. Woodman.  It's not a eureka moment to

17   say, "You know what?  If I'm going to wirelessly send video,

18   I'm not sending HD, back in 2009.  I've got to send lower

19   quality."

20   Mr. Woodman acknowledged it.  Dr. Hu acknowledged it.

21   That's not new.  That's not inventive.  And Contour can't claim

22   credit for that either.

23   So conception, I would submit, by this time, July 2008, he

24   had all those ideas in his mind.  But, remember, Contour

25   doesn't come along and start thinking of things until

 1   December 15th, 2009.  So there's a whole big gap in there.

 2        And the instruction says all Mr. Woodman needed was to

 3   have the ideas in his head before Contour.  So he's got the

 4   whole rest of the year to make sure he's got a firm conviction

 5   of the concepts.

 6        And we showed you documents of what those concepts were.

 7   We showed you that he was looking at outputting two different

 8   resolutions.  This was an email from -- I can't read it, but

 9   I think it was still 2008 or early 2009, where he's thinking

10   about multiple resolutions and outputting -- saving a

11   higher-quality stream and outputting a lower-quality stream.

12   He testified about this document.

13        He testified that he was aware of the A2 and the A5 system

14   on chips from Ambarella and their capabilities.  He told

15   Ambarella [as read]:

16            "We're excited we're going to work with you to

17        build-out our current and our new products."

18        And they're saying, well, the A2 couldn't do everything

19   that our patent requires.  So what?  The question is:  Did

20   Mr. Woodman have in his mind that he could wirelessly transmit

21   the lower-resolution signal while recording two signals in

22   parallel?  And Mr. Woodman said, "Yeah, I knew about

23   Ambarella."  How did he know?  Well, the presentations that you

24   saw.  And on the right there is the blurb from their press

25   release, launched in January of 2009 [as read]:

1          "Both HD and mobile video are recorded at the

2     same time."

3     That's from a press release.  Everybody in the industry

4     knew what this chip could do.

5     So did he have the knowledge of what that chip could do in

6     his mind?  Absolutely.  So conception by this time -- well, let

7     me give you one more.

8     Then you've got the HERO HD design document, and you saw

9     testimony about this.  This is an early design document where

10    he's putting out his ideas on paper after his patent about the

11    details of how you might build that out, and he says,

12    "You know, look, we need to have a high resolution to the SD

13    card at the same time as outputting 640 by 480 VGA to an RF

14    transceiver."  Two different resolutions, save one to the SD,

15    output the lower resolution.

16    We're still -- this is January 2009.  We're still

17    11 months before Contour even gets a twinkle in their eye about

18    this invention.

19    Remote control.  And Dr. Almeroth talked about this, this

20    morning.  On remote control, this is the same document, it

21    talks about remote control should include camera power on/off

22    combined with mode select.

23    And we talked about -- you know, Dr. Hu, you may recall I

24    asked her if she had ever used the Apple TV control that had

25    two buttons on it where you can control a whole bunch of

1    functions with just two buttons.  Well, we actually saw this

2    morning there were at least four buttons on that, and those

3    buttons were supposed to mirror the control you could do on the

4    back of the camera.

5         He had those ideas in January of 2009, full and concrete,

6    permanent conception of what he wanted to do almost a year

7    before Contour shows up.

8         Now, on this notion of remote controls and how much detail

9    you need, I asked Dr. Hu about this.  I said [as read]:

10             "When you see references to wanting to be able

11        to control the camera settings from a remote device,

12        that's suggesting to you that you want to be able to

13        control the settings that the camera allows you to

14        change; right?"

15        She said, "Yes."

16        It's common sense.

17        [As read]:

18        "QUESTION:  Okay.  Let me ask you this question just

19        generally.  When you talk about camera settings, you're

20        not going to suggest to the jury that a particular camera

21        setting is something that Contour invented; right?

22        "ANSWER:  That's correct."

23        Nothing new there either.

24        More testimony from Mr. Woodman on Day 4, and this is

25    where he gave his explanation of all these questions about

1    "What did you invent?"  So I tried to bring him back to the

2    actual question that matters:  What did you have in your mind

3    at the time?  And this is his testimony.  He said [as read]:

4              "I had those concepts in my mind."

5        And you don't have to take his word for this alone.  He

6    also described it in his patent, the patent they don't want you

7    to look at.

8        So, those documents.  By this time, we're still in January

9    of 2009, 11 months before Contour.  Mr. Woodman's got all the

10   ideas; they're in his head.  So there really isn't a fight

11   about conception.  And Dr. Hu doesn't really make a real

12   challenge about that.  So conception, did he have the ideas?

13   That's in his head.

14       The rest of this -- so conception, that's met.

15       The rest of this, did he reduce it to practice, well, we

16   know that's met too.  How do we know it?  Dr. Hu admitted it on

17   the stand.  She fought me a little bit on it.  She didn't

18   really want to admit it, but I got her eventually.  I said [as

19   read]:

20             "Look, you know we sold the WiFi BacPac with the

21         HERO HD2.  That's reduction to practice.  Right?"

22       She said [as read]:

23             "As recited in the claims, yes."

24       No question that there was a reduction to practice.

25       And then you get back to that legal standard of:  Did you

1  abandon, suppress, or conceal it?  Remember what that said,

2  reasonable efforts.  Were Mr. Woodman's efforts and GoPro's

3  efforts at his direction during this time reasonable?

4      I can assure you GoPro wanted to launch this product.

5  They wanted to launch it as fast as they could.  Mr. Woodman

6  was disappointed they couldn't launch it earlier in 2009, but

7  he wanted to make sure he was selling a good-quality product.

8      Contour took a different route.  Their first product,

9  I think the testimony is that it could go five to seven frames

10 per second for that preview.  Mr. Woodman was, I think,

11 struggling around two at the time.  He said, "I'm not launching

12 that in the market."  He pulled it back.

13     Contour, they launched it.  And what do you know about

14 when they launched it?  You know that that product could not

15 compete head-to-head with the HERO HD that did not have

16 wireless at all.

17     They're saying, "They took away our first-mover market

18 advantage."  That's untrue.  They had the first-mover market

19 advantage.  They competed against the HERO H2 with no wireless

20 capabilities and they lost, and it wasn't close.  And we'll

21 look at some of that data.  But they're trying to blame GoPro

22 because nobody wanted to buy their product.  That's not GoPro's

23 fault.  They had first-mover advantage.  It didn't help.  And I

24 don't know why.  I wasn't there.  But the sales tell you

25 everything you need to know.

**CLOSING ARGUMENT / HAYNES**

1              The other thing I want you to keep in mind, this patent

2     didn't issue until 2015.  GoPro was doing nothing wrong.

3     There's no issued patent in 2009, '10, '11, '12, '13, '14.

4     There's nothing to infringe.

5              And so all of this argument that somehow GoPro was doing

6     bad things because they did competitive intelligence, they

7     bought their product to see that "Hey, they did launch before

8     us.  Man, that really -- that's bad.  But you know what?  They

9     went with Bluetooth.  That product's not going to be very good.

10    We can leapfrog them."

11             And that's what we did.  That's what GoPro did.  They

12    leapfrogged them.

13             But they were beating them even without wireless with the

14    HD HERO camera.  That camera was hugely successful.  That's

15    what put GoPro on the map.  You heard that from Mr. Woodman.

16    What they came -- their product, it couldn't compete.

17             Reasonable efforts, no abandonment, no suppression, no

18    concealment.

19             I'm not going to walk through all these documents, but you

20    heard Mr. Woodman talk about the diligence along the way.  I'm

21    not going to walk you through all the documents because I don't

22    need to show you a document of what somebody was doing

23    every day.

24             You know from your own common sense that product

25    development takes time; and to launch a product in 2012 and to

1   have product specs in 2011 and to launch the HERO HD that would

2   marry to that WiFi BacPac, that takes continuous work.  And

3   that's what was going on, and you saw documents along the way.

4        And let me talk briefly about this prototype.  And they're

5   saying, "This is a credibility issue."  Well, it turns out when

6   you're trying to go back 15 years, things get a little

7   confusing.

8        Mr. Nipper -- sorry.  Mr. Donovan and Mr. Woodman both

9   testified they had a prototype that was working in the lab; and

10  they both, I think, thought that that's what was in the

11  picture.  Maybe they were wrong.

12       But remember, we're not saying that prototype was

13  reduction to practice.  All we're saying about that prototype

14  is that we were working on it.  And there were multiple boards

15  built.  I asked Dr. Hu this morning, "You saw pictures?"  And

16  she told you she saw pictures of other boards in 2009.

17       And this nefarious, "Well, this has a 2010 date on it,"

18  what they don't want you to think about is that board with the

19  2010 date on it is exactly the same board that's in the HERO HD

20  camera, no RF chip, because they pulled that off.  Those same

21  boards were still around.

22       So somebody got confused, took a picture, but there were

23  other boards.  But at the end of the day, that doesn't matter.

24  What those boards show, even if they're in 2010, is that

25  GoPro's still working on it.  They're trying to build it.

 1   That's diligence.  Those are reasonable efforts.

 2       So this date issue and trying to make it some sort of

 3   nefarious act, it's a sideshow; it's a distraction.  Don't look

 4   at the patents.  Don't look at Boland.  Don't look at Woodman.

 5   Don't look at diligence.  Instead, focus on gotcha moments to

 6   try to make somebody misremember something from 15 years ago.

 7   That's distraction.  It doesn't matter.

 8       What matters was:  Were there reasonable efforts?  And

 9   regardless of when those prototypes were dated, they

10   demonstrate effort.  So that actually helps prove our case.  It

11   doesn't help theirs.

12       2010, we heard a lot about 2010 and what's going on.  The

13   answer to that is we know what's going on because Mr. Woodman

14   told you, and Dr. Hu admitted it this morning on the stand,

15   that they were researching different wireless technologies.

16       And Dr. Hu, she disagreed with me about whether you could

17   use cellular to communicate from a camera to a cell phone.  I

18   don't know.  Maybe she's right about that.  But we were

19   definitely looking at WiFi.  We were looking at Bluetooth.  We

20   were looking at Zigbee.  We were looking at other RF

21   techniques.

22       Mr. Woodman had been burned in 2009, and he wanted to make

23   sure he had something that was reliable and that could transmit

24   good-quality preview images and video to a remote device.  So

25   he took his time and he got it right, and then he launched it

1    and it was successful.

2        That's what good companies should do, and that's what he

3    did:  reasonable efforts to launch a good, high-quality

4    product to market.

5        So just so you can fill it all out, so you can sort of see

6    the whole thing here, there was activity in 2010.  Nobody's

7    denying what was -- that people were working on that.  But look

8    at the reality of your common sense.  The HERO HD2 camera with

9    the A5s chip launched in October of 2011.  That doesn't come

10   about overnight.  That requires a ton of engineering and work,

11   and that's what's going on through this window.

12       The WiFi BacPac launched later in 2012.  Those things

13   don't just magically appear.  It takes a ton of engineering

14   effort, especially when you're trying to grow as a company and

15   sell products.

16       So we've seen the jury instruction, but Dr. Hu agrees with

17   it.  Right?  The question is -- you know, in consumer

18   electronics, it can take some time to build something out.  And

19   you heard Mr. Keville.  Mr. Helfer told you, you know, that can

20   be four years.  It's nothing.  You know, so couple of years,

21   what we're dealing with here, is not much at all.

22       And remember you have to start from their conception date,

23   so December -- prior to December of 2009 and go forward.  At

24   most, you're looking at less than three years there.  And look

25   at what GoPro did in that time.  It launched a brand-new camera

 1   with a brand-new chip, the A5s from Ambarella.  They launched a

 2   unique thing in the marketplace, this BacPac that could clip

 3   onto the back of that camera and you could swap out the WiFi

 4   capability with a battery.  You could put that WiFi capability

 5   on there and make your camera wireless and send live previews

 6   out from the camera.

 7        That was -- those were great ideas, and they put them out

 8   really quick.  And Mr. Woodman told you that was actually

 9   pretty fast.

10        And this is the testimony from Mr. Helfer where he said

11   the same thing.

12        Now, I don't want to spend too much time going back to

13   this abandonment theory because it doesn't really matter given

14   that a commercial product was launched and there was reasonable

15   efforts, but there's been a lot of telling a part of the story

16   in this case of:  Don't look over here.  Let me distract you

17   with stuff over here.

18        We heard a lot about this document and this RC unit that

19   could only do a picture preview.  I wanted to show you what

20   that looks like.  This is the commercial product that they

21   launched, and this actually launched around the time of the

22   WiFi BacPac.

23        This doesn't have an LCD screen on it.  They were thinking

24   about trying to do a really, really bad, tiny, little picture

25   on this tiny little remote, and so they were looking at that,

1    and that was going to be an image for this product.

2        But the WiFi BacPac, that was being built to be capable of

3    a lot more, and it was capable of a lot more.  It ended up

4    communicating with phones.

5        And remember they said, "Well, it couldn't communicate

6    with a phone until later in time."  But remember, the phone

7    doesn't matter.  All that matters is whether the camera is

8    capable of sending out those videos.  And the WiFi BacPac had

9    those capabilities in June of 2012.

10        Let me make sure I've got my date right before I get

11    corrected.

12                    (Pause in proceedings.)

13        MR. HAYNES:  Yeah, June 2012.

14        Okay.  So this notion that we -- there was abandonment

15    because they went with no monitor on this key fob, that's not

16    abandonment.  It's a different product.  It has nothing to do

17    with what matters in this case.  It's certainly not abandonment

18    of the WiFi BacPac.  It was launched on the same day.

19        So I've told you what the law is.  Dr. Hu agrees with

20    this.

21        Just so the jury's clear -- this is the question I asked

22    her [as read]:

23        "QUESTION:  Just so the jury's clear, if they conclude

24        that GoPro had the ideas firmly in their mind prior to

25        December 2009 and then they reduced those ideas to

1      practice in the WiFi BacPac plus the HERO HD camera, as

2      long as they diligently reduced to practice and did not

3      abandon, suppress, or conceal, Contour's patents are

4      invalid; correct?

5      **"ANSWER:** Yes."

6      The patents are invalid, both because of Boland and

7  Ambarella and because of Woodman's prior invention.  So when

8  you get to the verdict form, check "Yes" down the line.

9      Okay.  I got excited about invalidity and I took a little

10 bit long, so I'm going to go through non-infringement a little

11 quicker.  But there are three arguments on non-infringement,

12 and Dr. Almeroth told you about two of them.  The third one is

13 really about Dr. Hu and what she failed to show.

14     And they have the burden on infringement, so if they don't

15 show it, it's not infringed.  So let me walk through quickly.

16 And you're familiar with these ideas now, and I think the

17 concepts are familiar now, but let me walk through the first

18 one.

19     So the first argument applies to both live streaming and

20 Live Preview Group 2, and this is the concept about having the

21 wireless connection protocol device that is configured to send

22 video wire -- to both send video wirelessly and to receive

23 control signals wirelessly.  And these are the products that

24 this argument applies to.  These are the Group 2 live preview

25 as well as live streaming.

1        Here's the claim limitation -- language where it talks
2    about what that wireless protocol connection device is.  And
3    you heard the Court's construction a few minutes ago that says
4    that that claim limitation requires at least one wireless
5    connection protocol device that does both, one, transmit video
6    and, two, receive control signals.

7        And the issue on this one is pretty crystallized.  There's
8    no fight about what's in our products.  We have a system on
9    chip, and there are two transceivers on that chip:  a
10   Bluetooth one and a WiFi.  Those are two separate wireless
11   connection protocol devices:  one sends video, one receives
12   control signals.

13       You get to decide whether that's a single, at least one,
14   wireless protocol connection device, or is that two separate
15   wireless connection protocol devices.  If you think it's two
16   separate devices, there's no infringement.  That's your
17   decision that you get to make, but the facts, I think, are
18   pretty clear before you.

19       Dr. Almeroth talked about it.  He said his analogy is it's
20   kind of like two people walking in the house.  You're both in
21   the house; you're both sitting on the system on chip.  You're
22   still two different people, even if you share the refrigerator.

23       So when Dr. Hu showed you this diagram and said, "Ah, but
24   there's some shared components out here," it doesn't matter
25   whether their system on chip is sharing some components.  The

1    question is:  Is there a WiFi transceiver and a Bluetooth

2    transceiver and are you using one of those wireless protocol

3    devices to send and receive?

4         And Dr. Hu, you may remember this -- this is the very

5    beginning of last week, so it's been a while -- but I asked her

6    about this.  I said, "Dr. Hu, do you see in your report" -- she

7    herself said that each of the accused products includes a

8    wireless connection protocol device, and her -- at that time,

9    before she understood how they actually worked, she said that a

10   wireless connection protocol device is a WiFi and/or Bluetooth

11   transceiver.  So she pointed to the transceiver as the protocol

12   device back then.

13        Then she found out how our products work that have two

14   different transceivers, neither of which is used to both send

15   and receive, and she changed her tune.  Now it's the system on

16   chip.

17        And, look, she pointed to the system on chip before, but

18   she was focused on what was inside it.  Now she's saying it's

19   the whole thing.  Pretty soon she's going to draw the box

20   around the whole camera and say that's a wireless device, but

21   you get to make that decision.

22        Next argument, this is the one where Dr. Hu just didn't

23   show it to you.  And the evidence that you saw, there's no

24   evidence in this case from which you can conclude that, with

25   respect to the Live Preview Group 2 products, the phone preview

1    stream is actually stored on the camera before it gets sent

2    out.

3        So this is the limitation.  This goes back to the record

4    in parallel, where you have to record both the high-resolution

5    and the low-resolution stream in parallel, and what they accuse

6    in the Live 2 -- Group 2 products is streaming -- or, sorry,

7    not streaming -- is the phone preview stream.  So this phone

8    preview stream is what they've got to point to.

9        And the Court's construction about the generating

10   limitations is you have to record in parallel both the

11   high-resolution stream and the low-resolution stream, which is

12   the phone preview.

13       Dr. Hu accuses the stream on the bottom that we see

14   here -- and most of the components are grayed out because

15   really what we want to focus on is this 4 -- this thing labeled

16   4 mbps.  And if you look at that, what you see is -- we talked

17   to Dr. Hu.  We said, "Look, can you store -- if you only store

18   one image frame, are you storing the video stream?"  Her answer

19   was, "No.  If you just have one frame, generally speaking,

20   that's not a stream."

21       And then you have testimony from Dicky Liu, uncontested,

22   unrebutted, this is the fact of what's in the product.  He told

23   you that that buffer that she points to, that 4, that orange

24   box, the 4 megabits per second, it's actually 3 megabits per

25   second according to him; but regardless of what it is, it can

1    only store, at most, one frame at a time.

2        So you're not recording the stream on the phone, and

3    that's not an accident.  GoPro's doing that on purpose because

4    it needs to send that stuff out superfast.  It doesn't want to

5    store a whole bunch of frames and have them sit there.  It

6    wants to get the frames in one at a time.  As they come in,

7    they go out.  That's why it's a live preview with very, very

8    little delay.  It's intentional.

9        But that's not what the claims require.  They require

10   recording both streams.  And GoPro's products have changed now,

11   and they don't record that low-resolution stream anymore.

12   They've made it faster for live preview by getting it out one

13   frame at a time.

14       The third argument is that the live stream cannot be

15   displayed on the phone in the hot spot; and this argument,

16   there's not a lot of testimony on it.  Here's the claim

17   language.  And just to orient you, this live streaming via

18   hot spot, Dr. Almeroth characterized it a bizarre theory.  And

19   you can form your own opinions about that.

20       But what the claim language says is that I'm going to send

21   first video image content directly to the personal portable

22   computing device for display on a display of that device.  And

23   what they're accusing is this streaming concept where if I use

24   my phone as a hot spot, and only then -- we're not talking

25   about live streaming in general -- only then, then it goes to

1    the hot spot, up to the cloud, and then it can go anywhere

2    else.

3         Dr. Hu said:  Yes, but one of the places, in theory, it

4    could go is if the user of the phone that has the hot spot

5    wants to go look at their own stream out on the Internet, they

6    can then connect themselves up to that stream and watch it.

7         But that is not the camera sending that stream to the

8    phone.  The address of that stream that goes up is not the

9    phone's address; it's the address of where it's headed in the

10   cloud, the Internet site out there.

11        So the claim that -- the only claim at issue here requires

12   that it be for -- that you have to have a preview image

13   allowing the user of the camera to manually adjust an angle of

14   the camera with respect to the video camera.  So this stream in

15   this claim in the '694 patent has to be a preview stream.

16        Ask yourself:  What did the evidence show about whether

17   that live stream can be a preview stream?  Well, first of all,

18   Dr. Hu's evidence specifically says, "Preview not supported

19   during live streaming."  So we didn't make that up.  That's

20   actually what the phone shows you when you try to do this.  It

21   says, "No, no live preview."

22        Dr. Hu says, "No, but it still is a live preview."

23        That doesn't make any sense.  You heard Dr. Almeroth.

24   With respect to the live streaming, you're not using the stream

25   to frame your camera angle.  By the time you've started

1    streaming, you're sending it out to the world.  It's on an

2    Internet site.  You're not framing your angles at this point.

3        And even more importantly than that, you can't really use

4    it to frame your angles.  Mr. Lema explained that when you're

5    doing this live streaming, because it has to go out to the

6    Internet and get stored up there and come back down, it can be

7    like in four, five, six, seven, up to ten seconds of delay from

8    when you start the stream and when you could actually preview

9    it.  That's not a preview.  It's useless for a preview, and

10   certainly not what they had in mind for their invention.  They

11   did not have in mind that the live preview would be a broadcast

12   live stream that just happens to go through a user's hot spot.

13       This theory doesn't make a lot of sense, and it doesn't

14   match the claims, and it doesn't infringe.

15       Mr. Liu, he backed this up as well.  He showed this

16   diagram on the left, where it has to go up to the stream and

17   down.

18       One of the interesting things I heard Dr. Hu say about

19   this diagram is, once it goes up to that stream, if Amazon

20   transcodes it and creates a different stream, Dr. Hu said,

21   "That still infringes.  I don't care.  You can go look at that

22   stream.  Even though it's different, that would still meet the

23   claims."  You want to evaluate credibility?  Evaluate that

24   statement.

25       Finally, let me touch very briefly on willfulness.

1    Willful infringement, you will get the criteria.  And they

2    talked a lot about did GoPro know it was infringing.

3        GoPro is aware that the Court has found certain elements

4    are satisfied.  That's not the only factor you have to look at.

5    One of the factors you have to look at is:  Did GoPro have a

6    reasonable belief that the patents were invalid?

7        And you've seen the evidence now, and that's the same

8    evidence that GoPro got to evaluate when it was deciding

9    whether it needed to change its products.  Ask yourself -- even

10   if you disagree whether they're right or wrong, ask yourself:

11   Were they reasonable?  Given what you know, was it reasonable

12   for them to look at the validity of these patents and say, "No

13   way.  We were doing this in 2009, ten months -- July 2008,

14   ten months before."

15       So did they -- did they have a reasonable belief of

16   invalidity?  Of course, they did.  You're probably wondering

17   why Contour is suing them for something that they invented and

18   claiming credit for Ambarella's camera processor.  That's

19   reasonable.

20       All right.  Now that brings me to damages.  And I don't

21   have a ton of time left anyway, but let me just be perfectly

22   clear.  The patents are invalid.  No damages.  No liability.

23   Zero payment.  And that makes sense because GoPro should not

24   pay Contour for something they did not invent any amount of

25   money.

1    So if it's invalid, no damages.  You can tune out.  You

2   don't have to listen to what I'm about to say, the rest, but

3   this is my only chance to talk to you about damages.

4        So if you disagree with GoPro's opinions in this case --

5   and we respect your decision, by the way.  Right?  We value

6   this process.  We presented our evidence.  We want you to

7   consider it.  We value your decision either way.  So if you

8   disagree with us and you want to look at damages, go ahead.

9        But you have to ask yourself -- and look at the

10  instructions.  Right?  You saw -- you heard an instruction

11  about apportionment, and you heard a lot of testimony about

12  incremental value of the invention.  Right?  What you have to

13  value in this case is:  What did they add to the prior art over

14  what was already there?  What's new and what's the value of

15  that?

16       And when you do that, remember, this is the state of the

17  art.  You saw this slide from Dr. Almeroth.  Everything over

18  here is out there.  What you're trying to add is this little

19  sliver over here on the right.  They want you to believe that

20  that's worth $174 million.  And I think -- he didn't use the

21  words, but he seemed to be suggesting that you should send a

22  message to GoPro because Mr. Woodman wanted to squash VholdR

23  15 years ago.

24       Read the instructions from the -- that you're -- on

25  damages.  It's not punitive.  You're not here to punish

**CLOSING ARGUMENT / HAYNES**

1    somebody.

2         And, look, if GoPro was using their invention -- you heard

3    it from Mr. Woodman himself, if we were using their invention

4    and these claims were valid, we'd pay a reasonable amount.  But

5    we're not going to pay them for something that we came up with

6    first and something that they can't identify -- even really

7    identify or articulate what the invention was that wasn't

8    already in the prior art.  It's not fair.

9         So if you want to value the features, then you have to

10   look at:  Okay.  What are they saying?  What are the use cases

11   where these features are supposed to add value?

12        And what we know is that the total amount of video that is

13   captured by Quik is less than 6 percent.  So that's the app

14   where we're actually using the app to hit record.  And so the

15   only way you're going to have live preview while recording is

16   when you're through that app.  Total use case is 6 percent

17   overall.  So there's 94 percent out that there have no need for

18   this invention.

19        So when you're valuing the invention, ask yourself:

20   What's the value to GoPro when they're sitting down at this

21   hypothetical negotiation?

22        The other thing, on the live streaming, it's even less.

23   Right?  1.4 percent of active users do any type of live

24   streaming.  That includes live streaming through a WiFi

25   hot spot.  I'm sorry.  That includes live streaming through a

**CLOSING ARGUMENT / HAYNES**

1    hot spot as well as through routers, as well as any other way,

2    so total live streaming.

3        So the actual usage of this tiny sliver use case where

4    you're using your phone as a hot spot and trying to send it

5    that way, some tiny fraction of 1.4 percent.

6        So when they sit down at this table, what's the value of

7    those things to GoPro?  And in this hypothetical negotiation,

8    you have to sit down there and you have to be a reasonable

9    business actor.  What would a reasonable business actor do?

10        And there's some facts that you would have in your mind,

11    and those facts that are in Contour's mind are not necessarily

12    the same facts that are in GoPro's mind.

13        Contour would be thinking -- at this time in 2014, you can

14    see, these are the sales numbers from Dr. Kennedy.  At this

15    point in time, Contour, they were basically on their way out.

16    Right?  They were in receivership.  They weren't currently

17    making any products.  Their non-wireless products, to the

18    extent they were having sales, were dwarfing their wireless

19    product sales.  That product was not a success even in

20    comparison with their own non-wireless products in the market.

21    And they had no money.

22        And at this point in time, you heard testimony they were

23    trying to get people to make chips for them, but they'd already

24    gone bankrupt.  They were in receivership.

25        Ask yourself:  Would you want to buy -- give somebody a

1   line of credit when you -- when they'd already gone out of

2   business?

3        Now, they're trying to blame GoPro for that.  They're

4   saying, "Oh, it's GoPro's fault."  It wasn't GoPro's fault.

5   They tried to negotiate commercial sales terms, and they

6   couldn't do it.  And I don't know what was in the other party's

7   head, I really don't, but they don't either.  And they're

8   trying to get you to blame GoPro for it.  GoPro wasn't there.

9   GoPro was out doing their own thing, as they'd been doing all

10  along.

11       So this notion that you should punish GoPro because they

12  couldn't get a supplier to sell them chips after they'd gone,

13  essentially, bankrupt, that's not GoPro's fault.

14       Now, what would GoPro have in its mind?  Well, it would

15  know that it launched the HERO HD camera without wireless in

16  2009, and that was a phenomenal success.  Its sales were

17  skyrocketing.

18       So you can see that 2011, there is no GoPro wireless

19  product in 2011.  None.  So that sales battle in 2011, when

20  they're going head-to-head, that's Contour wireless and

21  non-wireless and GoPro with its HD HERO that does not have

22  wireless capability.  And GoPro dominated them.  And it wasn't

23  because they didn't have first-mover advantage.  They had

24  first-mover advantage.  Their product, nobody wanted it.

25  Again, not GoPro's fault.

1    GoPro would also know that it had acceptable alternatives.

2  And you have to consider, you're sitting at that table and what

3  they're telling you is GoPro would pay $174 million.  I can

4  assure you no reasonable business actor is going to sit at that

5  table and write a check for $174 million without exploring

6  every possible alternative.

7    So what alternatives were available?  Well, we saw this

8  testimony.  This is the instruction you're going to get -- or

9  that you already got [as read]:

10       "The availability of non-infringing alternatives

11       compares the invention, Contour's invention, to the

12       next-best alternative, regardless of whether the

13       alternative was actually produced and sold during the

14       infringement."

15    So there's no requirement that we actually launched the

16  alternative.  This is what we would have considered.

17    The next-best alternative has to be adequate and

18  acceptable to customers.  Adequate.  It doesn't have to even be

19  as good; just good enough.

20    So what were the alternatives that GoPro would have

21  considered?  Well, you heard this from both Mr. Lema and Dicky

22  Liu.  The claims aren't just about live preview while

23  recording.  They add this limitation that you have to have

24  remote control of specific camera features.  So if GoPro takes

25  those features out, no infringement.

1    So when GoPro is sitting at that table and they're trying

2    to decide what's a reasonable royalty to pay for this, they're

3    absolutely going to consider, "Well, could we just take the --

4    make it so the camera can't control these features?"  And if

5    the answer to that is it's either do that or pay $174 million

6    or even $50 million or even $10 million, what do you think

7    they're going to do?

8    The evidence you saw was that when they disabled these

9    settings on some of their products, they got 900-something

10   complaints.  .02 percent of users complained about it.  And

11   these aren't people saying, "I would not have bought your

12   camera had I know that it didn't do this."  These are people

13   saying, "Man, this stinks.  I wish I had that feature."

14   These are people that probably already had a camera and

15   were using the camera and, after they bought it, realized, "Oh,

16   man, I really wish I could do this feature."

17   But it didn't impact sales.  And there's no evidence in

18   this case that anyone would have said, "I'm not going to buy

19   your camera if you can't -- if I can't control these particular

20   three settings from my remote phone."

21   And I'm not saying you can't control them at all.  I'm

22   saying from your phone.  You can still go to the camera and

23   change them.  That doesn't infringe.  You can still do live

24   preview while recording.  It doesn't infringe.  You have to

25   have it all together, including the ability to remotely control

1    those settings.

2        So ask yourself:  What would GoPro do?  Would they pay

3    millions and millions of dollars, or would they just deal with

4    900 customers who wish those settings were back?

5        You saw 2 cents is what that change would cost per

6    product.  You saw 26 cents at most.

7        I'm running out of time, so I'm going to skip ahead a

8    little bit.

9        When you get the verdict form -- well, let me -- there's

10   two numbers, this 9.71 number, which is the Element license --

11   and, look, I was trying to listen to that testimony.  All I

12   know is that transaction was a mess; and unwinding that thing,

13   trying to figure out how they got to $9.71, what I do know is

14   not a person in the world has ever paid $9.71 to Contour for

15   selling any product.  It never happened.  Element didn't do it.

16   Nobody else has done it.

17       So that number is a complicated transaction.  You've got

18   money going in both directions.  You've got principals that are

19   principals of two different companies that are involved in it

20   that are both negotiating with Element.  I don't know what

21   happened, but what I do know is it's not a comparable license.

22           THE COURT:  Mr. Haynes, you'll want to wrap up.

23           MR. HAYNES:  Okay.  Thank you, Your Honor.

24       So, finally, on the form, this is the breakdown.  If you

25   agree with us that we don't infringe, with respect to the

1    Group 2 live streaming products, the total is 3.379 million.

2    If you don't agree with anything GoPro had to say, if you

3    think the patents are valid, you think that GoPro infringes

4    every single claim, a reasonable amount for this feature is at

5    most $4,659,213.  And that's -- that's a lot.  It's a whole lot

6    more than the 2 cents it would cost to take these three ProTune

7    features out of the cameras.

8    So thank you again for your time and consideration, and we

9    look forward to your verdict.

10    **THE COURT:**  Mr. Keville.

11    **REBUTTAL ARGUMENT**

12    **MR. KEVILLE:**  Counsel started by saying we were

13    running from the evidence, running from Boland and Woodman's

14    '251 patent and that they're not on our scales.

15    Allen, could you put up Slide 75, please.  Slide 75,

16    please.  Yeah.

17    This is running from the evidence.  They tried to downplay

18    this.  They came in.  They said, "No, no.  We made it.  We made

19    it in 2009."  And then they testified under oath and now he

20    said, "Oh, they got some dates wrong."  They were under oath.

21    They swore to tell the truth.

22    And this is what this case was about.  Did they have an

23    invention?  Did they make the invention?  And they came in and

24    said, "Yeah, those are the two.  Yeah, we made those and tested

25    them and they worked in July 2009."  And now he says, "Just

1   pretend that never existed."

2       That's running from the evidence.  We're not running from

3   the evidence.  We're not running from anything in this case.

4   We invite you to look at Boland.

5       And Boland disclosed two things.

6       Allen, can you put up Slides 94 -- well, not yet.

7       So Boland was looked at by the Patent Office.  Go read it.

8   You can see the same thing.  It was an always-on camera

9   attached to your ear.  Right?  And what it did was it kept

10  overwriting clips.  It would write 30-second, five-minute clips

11  that it would store for a certain amount of time, and then it

12  would overwrite them.

13      And what the preview in Boland was, was go back, take

14  something you stored previously, and preview that clip.  So you

15  weren't getting a real-time preview; you were getting a preview

16  of what you had stored on the camera.

17      Then it had a second embodiment where it said you could

18  not record anything and just see what it was seeing on your

19  phone without recording anything.

20      Boland, in the real world, had these same processors and

21  configured them a different way to do different functions and

22  got his own patent.

23      So when they say, "Boy, if only Boland had the Ambarella

24  chip," well, they told you Boland had the Ambarella chip.  And

25  Boland looked at this and said, "I've got an idea.  This is how

1    I'll make it."  And the Patent Office said, "Here's your

2    patent.  That's fine.  Contour, here's your patent."

3        Allen, could you put up Slides 95 -- 94?  Start there.

4        He said we never put Boland on the scales.  Well, there's

5    Boland right there.

6        Allen, can you show?

7        There's Boland.  Boland's on the scale, but it's on our

8    side because the Patent Office considered it.  And they want

9    you to ignore it and say, "Just ignore that the Patent Office

10   considered it."

11       Then he said, if you're Boland -- yeah, so we covered

12   Boland being configured a different way.

13       Now let's talk about the '251 patent.  He said that was

14   not on the scales.  You should look at that.  Well, you should

15   because that's not a patent to our invention.

16       Allen, go to Slide 56.

17       And he said you can look at it and find any daylight.  And

18   Mr. Woodman, the named inventor, the only person whose name is

19   on this, said, "From a technical perspective, it has nothing to

20   do with the camera processor.  How it specifically does that is

21   not covered in the patent."

22       Can I have the Elmo, please.  Allen, you know what?  Let's

23   do it this way so I don't have to -- can you put up that

24   patent, the '251?  And go to Claim 1, please.

25       Here's what Mr. Woodman had, a removable display screen

 1    detachedly coupled to the camera.  So you put a display screen

 2    on the back of the camera.  Then you had first portion of the

 3    camera housing, second portion, an inner hinge, an outer hinge,

 4    a first fastening structure, a second fastening structure.

 5         His idea was take the GoPro, the box, and have something

 6    that attaches to the back -- right? -- a removable device.

 7         Then go, Allen, to Claim 9.

 8         And now he says, "wherein the removable display screen" --

 9    okay, so you're taking a screen off the camera -- "comprises a

10    wireless module configured to allow a user of the camera to

11    wirelessly control operation with a remote controller."

12         So you had a screen.  You took it off.  It had WiFi.  You

13    could take that little button that they showed and you could

14    use that to turn the camera on and off.  That's a different

15    invention.  So we invite you to look at that.

16         And he said the Patent Office never looked at that, but

17    that's not true.  Mr. Mooney testified and he said [as read]:

18              "We have a continuation of the patents-in-suit

19         where this '251 patent is on the face of the

20         patents."

21         Contour's continuation applications, meaning the ones that

22    have the same spec and forward on, the Patent Office has

23    considered the '251 patent and said Contour's patents are good

24    over that.

25         He said that Woodman just has to have the idea; right?

1   But that's not what he needs to have.  He needs to have a

2   definite and firm conviction of what is claimed.

3       And he tried to say -- I think he said that's not really

4   disputed.  That's hotly disputed.  We don't think Woodman ever

5   came close to having a conception of the invention.

6       And then he doubled down.  He said the lower-quality

7   stream is not in his patent.  And that's what I showed you when

8   I talked.  There has to be corroboration.  It can't just be him

9   saying, "Mr. Woodman, did you have the idea of a lower-quality

10  stream?" and Mr. Woodman saying, "Oh, yes, I did."  That's

11  not -- corroboration is needed.  You must have documents.

12      The other thing on this -- right? -- diligence and

13  abandonment.

14      Now I do need the Elmo.

15      This is their slide that he showed you.  And if you look

16  right here, in 2010 it just says, "Continued development."  And

17  that's exactly what we talked about this morning with

18  Dr. Almeroth.  We said:  Here's the documents that they said,

19  "We're stopping the project.  We're stopping the project."

20  Here's the documents at the end of 2010 that said, "The project

21  is idle."

22      He said, "Well, I think I've seen documents."

23      I said, "I'm sure your counsel will show them."

24      Counsel came back up, showed no documents.  Their own

25  slide says no documents exist to show that they did anything in

1    2010.

2        When did it pick back up?  It picked back up in 2011, when

3    we came out with the product and they went out and bought it

4    and tore it apart.

5        On damages, he said damages should be somewhere between

6    3 and 4 million.  That's less than they've paid their experts,

7    I believe, in this case.  To say that that's what the damages

8    should be is almost insulting.

9        Now, I don't want to punish GoPro.  That's not what we're

10   talking about.  These are the damages that are the right

11   numbers based on the royalties.  Right?  So there's the

12   5 percent Element license.  Their license would be 4 percent.

13   They've testified, their own expert said, "Yes, we have a

14   license at 2 1/2 percent."

15       So they're already saying, "We enter -- we, GoPro, enter

16   licenses about halfway between where your two numbers are."

17       So I'm not trying to punish GoPro, but it needs to be

18   fair, and it needs to be the right amount to go back to GoPro.

19           **THE COURT:**  You'll want to wrap up too.

20           **MR. KEVILLE:**  Okay.  Just about done.

21       He said that Dr. Hu never addressed the generate

22   limitation for the Live Preview Group 2.  That's incorrect.

23   Here it is right there.  That's from the trial transcript

24   [as read]:

25           "QUESTION:  Now, how about the requirement that generate

1      means record two streams?  Are the two streams recorded?

2          "ANSWER:  Yes.  They're both recorded in the data

3      buffers."

4          So, yes, she did testify about that.

5          And with that, I will leave you with one last point.  In

6      this trial that we've now had for a week and a half --

7      right? -- every day Mr. Mooney has been here, sitting here.

8      Right?  Back in the corner -- he's not a witness because he

9      came to the company too late but -- is the president of Contour

10     now.  He's been sitting here every day.

11         Nick Woodman is alleged to be the true inventor.  He's

12     supposed to be the one who invented this.  It's his company.

13     Where has Nick Woodman been?  He came.  He testified.  He was

14     gone.  Right?

15         So award the appropriate damages to Contour, not to

16     punish, but to really address the business reality.  They tried

17     to squash GoPro; they did squash -- they tried to squash

18     Contour/VholdR; they --

19             THE COURT:  Let's wrap it up.  Okay?

20             MR. KEVILLE:  Okay.  Thank you.

21             THE COURT:  All right.  Ladies and gentlemen, you've

22     now heard the perspectives of the lawyers.

23         Let me remind you one more time, what they told you is not

24     evidence.  What they told you is their perspective of what they

25     hoped you have learned, but you will have learned what you have

**FINAL JURY INSTRUCTIONS**

1  learned.  And you're about to have the ability to talk about it

2  with each other and sort through the instructions and the

3  evidence that you've received in order to answer the questions.

4  **FINAL JURY INSTRUCTIONS**

5  **THE COURT:**  On the verdict form -- so let me just give

6  you your closing instructions on how to deliberate.

7  Before you begin your deliberations, elect one member of

8  the jury as your presiding juror.  The presiding juror will

9  preside over deliberations and serve as the spokesperson for

10  the jury in court.

11  You shall diligently strive to reach agreement with all of

12  the other jurors if you can do so.  Your verdict must be

13  unanimous.

14  Each of you must decide the case for yourself, but you

15  should do so only after you have considered all the evidence,

16  discussed it fully with the other jurors, and listened to their

17  views.

18  It's important that you attempt to reach a unanimous

19  verdict but, of course, only if each of you can do so after

20  having made your own conscientious decision.  Do not be

21  unwilling to change your opinion if the discussion persuades

22  you that you should.  But do not come to a decision simply

23  because other jurors think it's right, or change an honest

24  belief about the weight and effect of the evidence simply to

25  reach a verdict.

 1       You may have taken notes during the trial.  Whether or not

 2  you took notes, you should rely on your own memory of the

 3  evidence.  Notes are only to assist your memory.  You should

 4  not be overly influenced by your notes or those of other

 5  jurors.

 6       Because you must base your verdict only on the evidence

 7  received in the case and on these instructions, I remind you

 8  that you must not be exposed to any other information about the

 9  case or to the issues it involves.

10       Except for discussing the case with your fellow jurors

11  during your deliberation, do not communicate with anyone in any

12  way and do not let anyone else communicate with you in any way

13  about the merits of the case or anything to do with it.  This

14  includes discussing the case in person, in writing, by phone,

15  tablet, computer, or any other means, via email, text

16  messaging, or any Internet chat room, blog, website, or

17  application, including but not limited to Facebook, YouTube,

18  Twitter, Instagram, LinkedIn, Snapchat, TikTok, or any other

19  forms of social media.  This applies to communicating with your

20  family members, your employer, the media or press, and the

21  people involved in the trial.  If you're asked or approached in

22  any way about your jury service or anything about the case, you

23  must respond that you've been ordered not to discuss the matter

24  and to report the contact to the Court.

25       Do not read, watch, or listen to any news or media

1   accounts or commentary about the case or anything to do with

2   it.  Do not do any research, such as consulting dictionaries,

3   searching the Internet, or using other reference materials; and

4   do not make any investigation or in any other way try to learn

5   about the case on your own.  Do not visit or view any place

6   discussed in this case, and do not use Internet programs or

7   other devices to search for or view any place discussed during

8   the trial.  Also, don't do any research about the case, the

9   law, or the people involved, including the parties, the

10  witnesses, or the lawyers, until you've been excused as jurors.

11  If you happen to read or hear anything touching on this case in

12  the media, turn away and report it to me as soon as possible.

13      These rules protect each party's right to have this case

14  decided only on evidence that's been presented here in court.

15  Witnesses here in court take an oath to tell the truth, and the

16  accuracy of their testimony is tested through the trial

17  process.  If you do any research or investigation outside the

18  courtroom or gain any information through improper

19  communications, then your verdict may be influenced by

20  inaccurate, incomplete, or misleading information that has not

21  been tested by the trial process.  Each of the parties is

22  entitled to a fair trial by an impartial jury, and if you

23  decide the case based on information not presented in court,

24  you will have denied the parties a fair trial.  Remember,

25  you've taken an oath to follow the rules, and it's very

1    important that you follow the rules.

2        A juror who violates these restrictions jeopardizes the

3    fairness of the proceedings.  If any juror is exposed to any

4    outside information, please notify the Court immediately.

5        If it becomes necessary during your deliberations to

6    communicate with me, you may send a note through the clerk

7    signed by any one or more of you.  No member of the jury should

8    ever attempt to communicate with me except by a signed writing.

9    I will not communicate with any member of the jury on anything

10   concerning the case except in writing or here in open court.

11   If you send out a question, I will consult with the lawyers

12   before answering it, which may take some time.  You may

13   continue your deliberations while waiting for the answer to any

14   question.  Remember that you're not to tell anyone, including

15   the Court, how the jury stands, whether in terms of vote count

16   or otherwise, until after you've reached a unanimous verdict or

17   have been discharged.

18       A verdict form has been prepared for you.  I showed it to

19   you earlier.  After you've reached unanimous agreement on a

20   verdict, your presiding juror should complete the verdict form

21   according to your deliberations, sign and date it, and advise

22   the clerk that you're ready to return to the courtroom.

23       So, ladies and gentlemen, those, finally, are the end of

24   the instructions, and now it's your opportunity to start your

25   deliberations.  You get to set the timing for this.  I think

**PROCEEDINGS**

1    I've said that before.

2        Everybody in this courtroom encourages you to work as long

3    and hard as you can, but it's your call when to come in the

4    morning, when to go in the afternoon.

5        With that, you are free to begin your deliberations.

6      (At 1:23 p.m. the jury retired to commence deliberations.)

7        (Proceedings were heard out of the presence of the jury.)

8        **THE COURT:**  All right.  Please be seated, everyone.

9        So I want representatives of the parties who can speak for

10    them to be within 15 minutes of the courtroom.

11        And we obviously have no idea yet how long they're going

12    to be working today or what their schedule is.  When Ms. Davis

13    knows about it, you will know about it.

14        So with that, see you later.

15        (Proceedings adjourned at 1:24 p.m.; jury continues

16    deliberations.)

17                            ---o0o---

18

19

20

21

22

23

24

25

1

2                    **<u>CERTIFICATE OF REPORTER</u>**

3           I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:  Thursday, October 9, 2025

7

8

9

10                        *Ana Dub*

11    _____

12           Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

13        CSR No. 7445, Official United States Reporter

14

15

16

17

18

19

20

21

22

23

24

25